## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] | Case No. 22-_____ (___) |
| Debtor. | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL AND (B) GRANT ADEQUATE PROTECTION; (II) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) MODIFYING AUTOMATIC STAY; (IV) SETTING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

The above-captioned debtor and debtor in possession (the "Debtor") hereby files this motion (the "Motion") for (a) the entry of interim and final orders (respectively, the "Interim DIP Order"[2] and the "Final DIP Order" and, collectively the "DIP Orders), under sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia:* (i) authorizing the Debtor to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), (ii) granting adequate protection to the Prepetition Secured Parties (as defined herein), (iii) authorizing the Debtor to obtain secured postpetition financing, (iv) granting liens and providing superpriority claims with respect to such postpetition financing, (v) vacating and

---

[1]    The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is GenapSys, Inc. (3904).  The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City, CA 94063.

[2]    A proposed form of the Interim DIP Order is attached hereto as Exhibit A.

modifying the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay"), (vi) scheduling a final hearing, and (vii) granting related relief.   In support of this Motion, the Debtor submits the *Declaration of Britton Russell in Support of Debtor's Chapter 11 Petition and First Day Motions* (the "First Day Declaration")[3], which was filed with the Court concurrently herewith, and the declaration of Brandon Aebersold (the "Aebersold Declaration"), attached hereto as Exhibit B.  In further support of this Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT[4]

1.      Despite a difficult two years, in which ongoing litigation, including corporate governance disputes, has depleted the Debtor's resources and made out-of-court financing efforts impossible, the Debtor has the support of its prepetition lenders.  As described below, the lenders have agreed to fund (through both the use of Cash Collateral and a new-money DIP loan) a sale process.  Thus, the relief requested in the Motion is a key first step to maximizing value in the Debtor's chapter 11 case.

2.      Since 2021, the Debtor has made several attempts to raise financing to fund its operations and defend against the California Action.[5]   However, the California Action has prevented the Debtor from obtaining crucially needed financing.  In early 2022, legal matters grew worse for the Debtor.  Not only was the Debtor participating in costly discovery in the California Action, but in March and April 2022, Dr. Esfandyarpour filed two separate actions in the Court of Chancery for the State of Delaware (the "Chancery Court") seeking (a) advancement of his legal

---

[3]     Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

[4]     Capitalized terms used in the Preliminary Statement but not defined therein have the meanings given to them in the body of this Motion.

[5]     The "California Action" means that certain litigation styled *Foresite Capital Fund IV, L.P. v. GenapSys, Inc. and Esfandyarpour*, Case No. 20-cv-367305, wherein Foresite Capital Fund IV, L.P. ("Foresite") sued the Debtor and its founder and former CEO, Dr. Hesaam Esfandyarpour, for, among other things, rescission of the 2019 agreement pursuant to which Foresite purchased $50 million of the Debtor's Series C Preferred Equity Interests.

fees and expenses incurred in connection with the California Action,[6] and (b) a determination that the Debtor's board was improperly constituted.[7]   On May 18, 2022, the Chancery Court entered an order (the "Status Quo Order") in the Section 225 Action that limited the Debtor's ability to take any actions outside the ordinary course of business.   Thereafter, a final hearing on the Section 225 Action was held on July 6, 2022 (the "225 Trial").   At the conclusion of the 225 Trial, the Chancery Court vacated the Status Quo Order.

3.      Facing a liquidity shortfall and mounting legal costs, and in an effort to avoid further distress, the Debtor sought to engage Lazard Frères & Co. LLC ("Lazard") to explore all restructuring avenues.   On May 19, 2022, to effect Lazard's engagement, the Debtor and the other defendants in the Section 225 Action filed a motion to modify the Status Quo Order to permit the Debtor to retain Lazard.   On May 23, 2022, the Chancery Court granted the motion.

4.      While the Debtor continued to litigate the Status Quo Order, Lazard commenced a prepetition marketing process for new financing and/or a sale transaction.   Despite the obstacles provided by the litigations, Lazard identified two potential anchor investors: (i) Party B[8] and (ii) Farallon Capital Management, L.L.C. ("Farallon").[9]   While the Debtor engaged in negotiations with both parties, these negotiations temporarily stalled.

5.      In tandem with Lazard's efforts, and in order to provide Lazard with additional time to engage the market, the Debtor commenced negotiations with the Prepetition Agent regarding upcoming payments under the Prepetition Loan Agreement.   After a series of negotiations, on June

---

[6]    *Esfandyarpour v. GenapSys, Inc.*, C.A. No. 2022-0296-VCZ.

[7]    *Esfandyarpour v. Zollars, Myers, Eliasson, McKenzie, Cecil, & GenapSys, Inc.*, C.A. No. 2022-0324-MTZ (the "Section 225 Action").

[8]    Party B and the Debtor are party to a Non-Disclosure Agreement.

[9]    Funds and/or accounts managed or advised by Farallon own, directly or indirectly, approximately 71% of the Series D Preferred Equity Interests.

1, 2022, the Prepetition Agent agreed to forbear (the "Forbearance") from exercising its rights for 20 days, which it subsequently extended as Lazard's marketing process continued to develop.

6.     Given the Debtor's defaults under the Prepetition Loan Agreement, the Debtor no longer had access to restricted cash and was unable to obtain further credit.  Without access to those funds, the Debtor did not have enough funding to meet its upcoming payroll obligations.  Accordingly, on June 24, 2022, the Debtor made the difficult decision to furlough almost all of its employees to keep the company afloat until the 225 Trial and, on July 8, 2022, the Debtor was forced to lay off more than 70 employees.

7.     Despite Farallon's original term sheet not being actionable, Lazard continued to engage Farallon regarding a potential investment, including Farallon acting as a stalking horse purchaser in a sale process under section 363 of the Bankruptcy Code (the "Sale Process").  While negotiations with Farallon were ongoing, the Prepetition Agent agreed to provide the Debtor with access to the restricted cash during an in-court process and a post-petition debtor-in-possession loan of up to $4 million, with $1 million available on an interim basis, while Lazard continued to market the Debtor's assets.  In addition, Lazard and the Debtor continued to engage both Farallon and the Prepetition Agent regarding either of these parties potentially acting as a stalking horse purchaser in the Sale Process.  As of the Petition Date, these negotiations remain ongoing.

8.     The Debtor's assets are valuable, but the circumstances described above have left the Debtor with few options at this time.  For two years, the Debtor has been subjected to value destructive litigation and has endeavored to obtain additional financing or consummate an out-of-court transaction.  However, to date, no parties, other than the Prepetition Secured Parties, have provided a viable path forward.  Without Cash Collateral use and access to the DIP Facility, the Debtor will lack sufficient liquidity to fund its operations and the Sale Process.  As such, absent the relief requested in this Motion, the Debtor will have insufficient liquidity, the Debtor's

4

operations will be compromised, the Debtor will likely face liquidation in the short term, and value will be lost, all to the detriment of its creditors and all stakeholders.  The proposed use of Cash Collateral and DIP Facility, however, will enable the Debtor to preserve its going concern value through the Sale Process and identify and consummate a value maximizing transaction pursuant to section 363 of the Bankruptcy Code.  Accordingly, for the reasons set forth below, the Debtor respectfully requests that the Court grant the relief requested herein.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.    The statutory predicates for the relief requested herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 6004, and Local Rules 2002-1(b) and 4001-2.

## BACKGROUND

11.    On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in the Chapter 11 Case, and no request has been made for the appointment of a trustee or an examiner.

5

Additional information regarding the Debtor's business, its capital structure, and the circumstances leading to the filing of the Chapter 11 Case is set forth in the First Day Declaration.

## **RELIEF REQUESTED**

12.    By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013 and 9014, and Local Rules 2002-1(b) and 4001-2, the Debtor seeks entry of the DIP Orders:

(i) authorizing the Debtor to use Cash Collateral in accordance with the Interim DIP Order and the Budget (as defined below);

(ii) authorizing the Debtor to grant adequate protection to Oxford Finance LLC ("Oxford"), as Prepetition Collateral Agent (in such capacity, the "Prepetition Agent"), for itself and for the lenders party to that certain Loan and Security Agreement, dated as of December 20, 2019 (as amended, the "Prepetition Loan Agreement"), among the Prepetition Agent, the lenders party thereto from time to time (the "Prepetition Lenders," and collectively with the Prepetition Agent, the "Prepetition Secured Parties"), including Oxford in its capacity as a lender, and the Debtor, as borrower thereunder, including the Adequate Protection Liens and the Adequate Protection Superpriority Claims (each as defined below);

(iii) authorizing the Debtor to obtain secured postpetition financing pursuant to the terms and conditions of that certain *Secured Debtor-in-Possession Term Loan and Security Agreement* in substantially the form attached to the Interim DIP Order (without exhibits or schedules) as Exhibit B (as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with its terms, and including the exhibits and schedules thereto, the "DIP Credit Agreement"), by and among the Debtor, Oxford, as Administrative Agent and Collateral Agent (in such capacities, the "DIP Agent"), Oxford and any other entity that becomes a lender under the DIP Facility (as defined below) in accordance therewith (collectively, the "DIP Lenders", and together with the DIP Agent, the "DIP Secured Parties") in an aggregate principal amount not to exceed $4,000,000, consisting of a multiple-draw term loan facility (the "DIP Facility", and any draws on the DIP Facility, the "DIP Loans");

(iv) authorizing the Debtor to execute the DIP Credit Agreement and all other documents, agreements and instruments delivered pursuant thereto or executed or filed in furtherance or in connection therewith, all of which shall be in form and substance customary for transactions of this type, and acceptable to the DIP Agent and the Debtor (as the same may be amended, restated, supplemented or otherwise modified from time to time in

accordance with their respective terms, and, collectively with the DIP Credit Agreement, the "DIP Loan Documents");

(v) authorizing the Debtor to use the proceeds from the DIP Facility as permitted in the DIP Loan Documents and in accordance with the Interim DIP Order and the Budget;

(vi) granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, automatically perfected security interests in and liens on all assets that constitute the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents and the Interim DIP Order (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations"), which shall rank junior in priority in respect to the Prior Liens (as defined below) and senior in priority to all other liens other than payment of the Carve-Out (as defined below);

(vii) granting superpriority administrative expense claims against the Debtor's estate to the DIP Secured Parties with respect to the DIP Obligations in accordance with section 364(c)(1) of the Bankruptcy Code over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of: (i) the Prepetition Loan Obligations (as defined below), (ii) the Adequate Protection Superpriority Claims, and (iii) the Carve-Out;

(viii) vacating and modifying the Automatic Stay pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order and the DIP Loan Documents;

(ix) waiving any applicable stay with respect to the effectiveness and enforceability of the DIP Orders (including under Bankruptcy Rule 6004); and

(x) granting the Debtor such other and further relief as is just and proper.

## THE DEBTOR'S PREPETITION CAPITAL STRUCTURE

13.    As of the Petition Date, the Debtor has total outstanding liabilities and other obligations of no less than approximately $36 million, including outstanding funded indebtedness. A chart depicting the Debtor's capital structure and a discussion of the Debtor's capital structure is set forth below.

| CAPITAL STRUCTURE | |
|---|---|
| Prepetition Loan Agreement | $32.0 million |
| Unsecured Trade Debt | $4.0 million |
| **TOTAL DEBT** | **$36.0 million** |
| | |
| Series D Preferred Equity | $70.0 million |
| Series C Preferred Equity | $85.3 million |
| Series B Preferred Equity | $36.5 million |
| Series A Preferred Equity | $8.5 million |
| **TOTAL PREFERRED EQUITY** | **$200.3 million** |
| | |
| **TOTAL COMMON EQUITY** | **$16.3 million** |

*i.        Prepetition Loan Agreement*

14.    On December 20, 2019, the Debtor entered into the Prepetition Loan Agreement with Oxford, in its capacity as the Prepetition Agent, and the Prepetition Lenders party thereto from time to time.  Under the Prepetition Loan Agreement, the Prepetition Secured Parties extended a term loan in the amount of $30 million to the Debtor (the "Prepetition Secured Loan").  The Prepetition Secured Loan is secured by substantially all of the Debtor's assets, subject to specified excluded assets (including, intellectual property (but all Accounts (as defined in the Prepetition Loan Agreement) and all proceeds of intellectual property are collateral under the Prepetition Loan Agreement)).  The Prepetition Secured Loan accrues interest at an approximate average rate of 8.95% per annum and matures in December 2024.

15.    As of the Petition Date, the approximate principal and capitalized interest outstanding under the Prepetition Secured Loan is $30 million, which excludes final payment fees of $0.9 million and prepayment fees of 3%.

*ii.        General Unsecured Trade Debt*

16.    The Debtor estimates that it has approximately $4.0 million, in the aggregate, in outstanding unsecured liabilities. These unsecured liabilities arise in favor of trade claimants and other routine, ordinary course creditors.

8

*iii.*        *Equity Interests*

17.        The Debtor is privately owned with five classes of stock, including preferred and common stock.  The preferred stock is separated into four series:  Series A, B, C, and D (collectively, the "Preferred Equity Interests").  In order of liquidation preference, Series D is senior with respect to Series C, which is senior with respect to Series B, which is senior with respect to Series A.  Each series of Preferred Equity Interests accrues dividends at a different annual rate. The Preferred Equity Interests' liquidation preferences have priority over the Debtor's common stock.  As of the Petition Date, the liquidation preferences of the Preferred Equity Interests totaled $200.3 million, in the following Amounts: Series A, $8.5 million; Series B, $36.5 million; Series C, $85.3 million; and Series D, $70 million.

## CASH COLLATERAL AND DIP FACILITY

18.        As set forth in the First Day Declaration and the Aebersold Declaration and as discussed herein, the Debtor faces a unique situation that requires access to Cash Collateral encumbered by the Prepetition Secured Parties' liens as well as new money DIP financing from the Prepetition Secured Parties.  In the absence of either Cash Collateral use or the DIP Facility, the Debtor believes that it will not have sufficient liquidity to fund its operations, or its Sale Process and that value may be lost.  Through extensive negotiations, the Debtor has found a path forward with the support of the Prepetition Secured Parties.  After an extensive prepetition effort, and with the assistance of Lazard and the Debtor's other professionals, the Debtor believes that it has finally found a viable and value-maximizing path forward.  A discussion of the need for, proposed use of funds under, and a summary of the material terms for the use of Cash Collateral and the funds advanced under DIP Facility follow.

## THE DEBTOR'S NEED FOR IMMEDIATE ACCESS TO CASH COLLATERAL

19.     In light of the challenges facing the Debtor, prior to the Petition Date, the Debtor engaged with the marketplace to find new and/or additional sources of financing.  The Debtor engaged investment banks, including Lazard, to facilitate this process, but the Debtor was unable to attract additional financing due to the uncertainty caused by, among other things, the prepetition litigations facing the company.

20.     While Lazard was running its prepetition process, the Debtor and the Prepetition Agent agreed to the terms of the Forbearance whereby, among other things, the Prepetition Agent would forbear on exercising certain of its rights under the Prepetition Loan Agreement.

21.     With the additional time afforded by the Forbearance, Lazard was able to reengage with Farallon, and eventually Soleus, regarding a proposed DIP Facility. In tandem, the Debtor also reengaged with the Prepetition Agent regarding the consensual use of Cash Collateral, including access to its restricted cash. While this structure ultimately did not materialize, soon thereafter the Debtor received a revised proposal from Party B and a proposal from the Prepetition Agent, which included Cash Collateral use and the DIP Facility.  After evaluating both proposals, the Debtor determined that the Prepetition Agent's proposal was in its best interests and would best position the Debtor to maximize the value of its estate.

22.     Substantially all of the Debtor's total cash on hand as of the Petition Date is subject to the liens of the Prepetition Secured Parties and thus constitutes Cash Collateral.  The consensual use of Cash Collateral is part and parcel of the overall financing of this Chapter 11 Case that will allow the Debtor to maximize the value of its estate.

23.     Absent authority to access the Cash Collateral and DIP Facility, even for a limited period of time, the Debtor would be unable to fully fund operations necessary to run the Sale Process.  Such a result may impair the Debtor's ability to maximize the value of its estate, causing

immediate and irreparable harm to the Debtor, its creditors, and all stakeholders.  Accordingly, the use of Cash Collateral is critical to executing the Debtor's Sale Process and maximizing the value of the Debtor's estate.

## THE PROPOSED DIP FACILITY AND ALTERNATIVE POSTPETITION FINANCING

24.     The Debtor faced unique circumstances prior to the Petition Date. It was ensnared in litigation.  As such, for almost two years, with the assistance of skilled investment bankers, including Lazard, the Debtor sought to raise new and/or additional financing.  Lazard's prepetition efforts nearly materialized; however, the two potential investors identified by Lazard ultimately decided not to participate in a transaction with the Debtor.  Having thoroughly exhausted all financing options, including proposals from Party B and Farallon, the Debtor reengaged with the Prepetition Secured Parties who ultimately agreed to provide the Cash Collateral and the DIP Facility.

25.     With the assistance of its professionals and advisors, the Debtor carefully evaluated the proposed DIP Facility, including the chapter 11 milestones and liquidity provided thereunder. In connection with reviewing the proposed DIP Facility, the Debtor identified at least three key reasons supporting its entry into the DIP Facility.   First, the Debtor, with the assistance of Lazard, evaluated an array of potential financing sources and only one materialized.  As set forth more fully in the Aebersold Declaration, Lazard, on behalf of the Debtor, launched a marketing process in May 2022 to (i) raise capital out-of-court through debt or a new round of preferred equity financing, (ii) solicit bids for the Debtor or its assets or (iii) raise capital through a chapter 11 process that would include both debtor-in-possession and exit financing (collectively, the "Prepetition Marketing Process").  In connection with the Prepetition Marketing Process, Lazard contacted over 100 potential investors, including strategic investors, financial investors, venture investors, and existing stakeholders.  Of those more than 100 investors, only 19 executed

11

confidentiality agreements and only two parties provided the Debtor with a term sheet. When both of these proposals failed to materialize, the Debtor turned back to the Prepetition Secured Parties to provide the Cash Collateral and DIP Facility.

26.     Second, substantially all of the Debtor's assets are encumbered and, as evidenced by Lazard's prepetition process, investors were wary of advancing funds while the prepetition litigations remained pending. After considering the foregoing factors, and in light of the immediately tangible benefits provided by the DIP Facility—in tandem with access to Cash Collateral—the Debtor concluded that alternative sources of financing with competitive or otherwise more favorable terms were not readily available. Indeed, the Debtor and Lazard did not identify any other viable options in the Prepetition Marketing Process. Further, given that substantially all of the Debtor's assets are encumbered by the Prepetition Secured Parties' liens, it is highly unlikely that any other third-party financing is available that would not require a priming fight.

27.     Third, any viable proposals for third-party financing came undone before they were actionable. But the Debtor submits that, even if there were other third-party financing available (there is none), any other proposal would have involved additional execution risk, including material timing, due diligence and professional fee constraints. Simply put, the Debtor lacks both the time and funds necessary to engage in such a process. Accordingly, the Debtor believes that pursing the DIP Facility, coupled with use of Cash Collateral, is the best path forward.

### DIP FINANCING IS NECESSARY TO PRESERVE THE VALUE OF THE DEBTOR'S ESTATE

28.     The Debtor must immediately instill confidence in the marketplace and its employees and vendors, reassuring them that this Chapter 11 Case will not erode their relationships with the Debtor or the overall value of the Debtor's estate. The Debtor believes that it must provide

assurances to its stakeholders as to its ability to seamlessly transition into chapter 11, operate in a "business as usual" fashion, and preserve the Debtor's going concern value.

29.     The DIP Facility, packaged with access to Cash Collateral, covers the Debtor's imminent financing needs and will provide the working capital necessary to allow the Debtor to, among other things, continue operating its businesses and to fund the Sale Process.

30.     The initial success of the Chapter 11 Case depends on the comfort level of the Debtor's stakeholders and the marketplace.  Approval and implementation of the DIP Facility will ensure the continued functioning of the Debtor and a successful Chapter 11 Case.

## SUMMARY OF TERMS OF THE DIP FACILITY[10]

31.     The provisions of the DIP Credit Agreement and the DIP Order were extensively negotiated and are the most favorable terms that the Debtor was able to obtain.  Moreover, the Debtor has an urgent need for the DIP Facility.  Approval of the DIP Facility will ensure the Debtor is able to maintain its operations, diligently prosecute this Chapter 11 Case, and maximize the value of its estate for the benefit of all stakeholders.  Accordingly, the Debtor requests that the Court enter the Interim DIP Order approving the DIP Facility.

32.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2:

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
| --- | --- |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | GenapSys, Inc.<br><br>DIP Credit Agreement, Decretal Paragraph |
| **Guarantors** | None. |

---

[10]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim DIP Order, as applicable.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Bankruptcy Rule** 4001(c)(1)(B) | |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | Oxford Finance LLC <br><br> DIP Credit Agreement, §§ 1.1, 10.6 and Appendix A |
| **DIP Agent** Bankruptcy Rule 4001(c)(1)(B) | Oxford Finance LLC <br><br> DIP Credit Agreement, Decretal Paragraph |
| **DIP Facility** Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rules 4001-2(a)(ii) 4001-2(a)(i)(B) | Secured multiple-draw term loan facility <br><br> DIP Credit Agreement, Recitals |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(A) | $1,000,000 on an interim basis <br> $4,000,000.00 on a final basis <br><br> DIP Credit Agreement, Recitals and § 2.1 <br> Interim DIP Order, ¶ 8(a) |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) | A copy of the Budget is attached to the DIP Order as Exhibit A. |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(B) | Interest Rate: 14% per annum to be paid in kind at Closing <br> DIP Credit Agreement, § 2.5 <br><br> Default Interest Rate: 2.0% <br> DIP Credit Agreement, § 2.7 |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(i)(B) | Up Front Fee: 200 basis points to be paid in kind at Closing. <br><br> DIP Credit Agreement, § 2.8 |

14

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Maturity Date**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | "**Termination Date**" means the earliest date to occur of: (a) the date that is ninety (90) days after the Petition Date; (b) the closing of the Approved 363 Sale; (c) the date on which the Bankruptcy Court orders (x) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (y) the dismissal of the Chapter 11 Case; (d) the date the DIP Facility is accelerated upon the occurrence of an Event of Default or otherwise; and (e) the approval by the Bankruptcy Court of any Alternative Sale Transaction, except for any Alternative Sale Transaction that (i) provides for the Payment in Full of the Obligations and the Prepetition Loan Obligations upon the closing of such Alternative Sale Transaction; and (ii) otherwise complies in full with all terms of the Bidding Procedures Order.<br><br>DIP Credit Agreement, § 1.1 |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | To secure the DIP Obligations, the DIP Administrative Agent is hereby granted, for the benefit of the DIP Secured Parties (i) pursuant to section 364(c)(2), a perfected lien on the Postpetition Collateral that is not otherwise encumbered by a Prior Lien, provided that such lien shall be junior to the Adequate Protection Liens and prior payment of the Carve-Out; and (ii) pursuant to section 364(c)(3), a perfected lien on the Postpetition Collateral junior to (A) the Adequate Protection Liens and (B) the Prior Liens, in each case subject to the Carve-Out ((i) and (ii) collectively, the "<u>DIP Liens</u>").<br><br>DIP Order, ¶ 12(a)<br><br>"<u>Postpetition Collateral</u>" means "all of the right, title and interest of the Debtor in, to, and under all present and after-acquired property and assets of the Debtor of any nature whatsoever, whether real or personal, tangible or intangible, wherever located, including, without limitation, (A) all cash and Cash Collateral of the Debtor (whether maintained with the Prepetition Agent or any other financial institution) and any investment of such cash and Cash Collateral, goods, cash-in-advance deposits, contracts, causes of action, general intangibles, accounts receivable, and other rights to payment, whether arising before or after the Petition Date, chattel paper, documents, instruments, interests in leaseholds, real properties, plants, machinery, equipment, patents, copyrights, trademarks, trade names or other intellectual property, licenses, insurance proceeds, and commercial tort claims, and all proceeds, products, offspring, rents and profits thereof, including, rights under letters of credit, capital stock and other equity or ownership interests held by the Debtor, including equity interests in subsidiaries (if any) and all other investment property, and, subject to the entry of the Final Order, proceeds of the Debtor's causes of action under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>" and such proceeds of Avoidance Actions, the "<u>Avoidance Action Proceeds</u>"), and (B) the proceeds of all of the foregoing, whether now existing or hereafter acquired."<br><br>DIP Order, ¶ 4 |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Except as otherwise expressly set forth herein, the Budget may be amended or modified in writing from time to time only with the written consent of the Debtor and the DIP Administrative Agent in their sole discretion, and any modifications to, or extensions, amendments or updates of, the Budget shall be in form and substance acceptable to and approved in writing by the Debtor and the DIP Administrative Agent in their sole discretion. During the Subject Period, the Debtor shall deliver to the DIP Administrative Agent on or before the close of business on Tuesday of each week (and if such day is not a business day, then the next succeeding business day) the following: (a) comparison for the prior week of actual results of all items contained in the Budget to the amounts originally contained in the Budget and (b) cumulative comparison for the period from the Petition Date through the end of the prior week of the actual results of all items contained in the Budget to the amounts originally contained in the Budget, in each case along with such supporting information and additional reporting as the DIP Administrative Agent may request. The Debtor's aggregate expenditures shall not exceed 110% of the aggregate of the Budget expenditures, tested on a weekly basis over a rolling four-week period (for the avoidance of doubt, excluding |

| **SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY** | |
|---|---|
| | disbursements for Professional Fees (as defined below), which shall not be subject to a variance). The Debtor and its professionals, consultants, and other advisors shall be available weekly (subject to reasonable scheduling conflicts) for a telephonic conference call with the DIP Administrative Agent and/or its professionals to discuss the status of the Chapter 11 Case, the results of operations and other matters pertaining to the Debtor, including any sale or restructuring efforts; provided that, for the avoidance of any doubt, nothing contained in the Interim DIP Order shall require the Debtor to disclose any privileged information or communications. The DIP Administrative Agent shall have independent access to the Debtor's financial advisors to discuss matters relating to the Debtor, including any contemplated sale or restructuring of the Debtor.<br><br>DIP Order, ¶ 21. |
| **Use of DIP Financing Facility and Cash Collateral Bankruptcy Rule 4001(b)(1)(B)(ii)** | Subject to the terms of the Interim DIP Order, pursuant to section 363(c)(2) of the Bankruptcy Code, the Debtor is authorized to use Cash Collateral for the period (the "Subject Period") from the Petition Date through the date that is two (2) calendar days following the Default Notice Date, strictly pursuant to and in accordance with the Budget attached to the Interim DIP Order as **Exhibit A** (the "Budget"). Upon the expiration of the Subject Period, Debtor's authority to use Cash Collateral, and their obligations under paragraph 4 of the Interim DIP Order, shall cease.<br><br>DIP Order, ¶ 3<br>DIP Credit Agreement, § 2.3<br><br>The Debtor is hereby immediately authorized on an interim basis to incur DIP Obligations, subject to the terms of the Interim DIP Order, the Budget (subject to the Permitted Variances) and the DIP Loan Documents, in the aggregate principal amount of up to $1,000,000 (the "Interim Funding Amount") subject to any conditions and limitations on availability in the DIP Credit Agreement, plus all interest, fees and other charges payable in connection with such DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents. The Debtor is hereby authorized to borrow money pursuant to the DIP Credit Agreement, subject to any limitations on and conditions precedent to borrowing under the DIP Loan Documents, and to use the proceeds of such borrowings to fund the Sale Process, for working capital and general corporate purposes of the Debtor, for other uses permitted under the DIP Credit Agreement, bankruptcy-related costs and expenses, and any other amounts required or allowed to be paid in accordance with the Interim DIP Order, but only as and to the extent authorized by the Budget (subject to the Permitted Variances) and the DIP Loan Documents.<br><br>DIP Order, ¶ 8(a)<br>DIP Credit Agreement, § 2.3 |
| **Events of Default Bankruptcy Rule 4001(c)(1)(B)**<br><br>**Local Rule 4001-2(a)(i)(M)** | a.    an "Event of Default" as defined under the DIP Loan Documents shall have occurred and is continuing, unless waived pursuant to the DIP Loan Documents;<br><br>b.    the failure by the Debtor to perform, in any respect, any of the material terms, provisions, conditions, covenants, or obligations under the Interim DIP Order;<br><br>c.    if the Final Order, in form and substance acceptable to the DIP Administrative Agent and the Prepetition Agent in their sole discretion, has not been entered by the Court on or before the date that that is twenty-five (25) days after the Petition Date;<br><br>d.    if the Debtor fails to timely meet any of the following case milestones:<br><br>    (i)    if the Debtor has not filed a bidding procedures motion (the "Bidding Procedures Motion"), in form and substance acceptable to the DIP Administrative Agent, seeking approval of bidding procedures for the sale of substantially all of the Debtor's assets |

| | |
|---|---|
| **SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY** | |

pursuant to section 363 of the Bankruptcy Code (the "Sale"), on or before three (3) business days after the Petition Date;

　　　　(ii)　　　if an order approving the Bidding Procedures Motion, in form and substance acceptable to the DIP Administrative Agent (a "Bidding Procedures Order"), has not been entered on or before twenty-five (25) days after the Petition Date; and

　　　　(iii)　　　if an order approving the Sale, in form and substance acceptable to the Prepetition Agent, has not been entered on or before fifty four (54) days after the Petition Date

e.　　　the failure to comply with the Budget (subject to permitted Variances) in accordance with the Interim DIP Order or the DIP Credit Agreement for any weekly reporting period;

f.　　　the filing by the Debtor of any motion seeking, or the granting of any motion providing for, reversal or modification of the Interim DIP Order;

g.　　　the commencement of a Challenge (as defined below) by any party, including the Debtor or the Creditors' Committee; or

h.　　　the consent of the Debtor to the standing of any party, including the Creditors' Committee, to pursue any claim or cause of action against any of the Released Parties.

DIP Order, ¶ 18

Under the DIP Credit Agreement, an "Event of Default" means

(a)　　　Failure to Make Payments When Due. The failure by Borrower to pay (i) when and as required to be paid herein, any amount of principal of any Loan; or (ii) within three Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document;

(b)　　　Default Under Other Indebtedness. The (i) failure of Borrower or any Subsidiary to pay when due any principal of, interest on or any other amount, including any payment in settlement, in respect of any Indebtedness in an amount, individually or in the aggregate, that exceeds $100,000, in each case, beyond the grace period, if any, provided therefor or (ii) breach or default by Borrower or any Subsidiary with respect to any other term of any loan agreement, note, mortgage, pledge or indenture relating to any Indebtedness in an amount, individually or in the aggregate, that exceeds $100,000, in each case, beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee on behalf of such holder or holders), to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or other redemption) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be;

(c)　　　Breach of Certain Covenants. Other than with respect to Section 8.1(a), Borrower defaults in the observance or performance of any covenant contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of fifteen (15) calendar days, in each case, after the earlier of (x) written notice thereof to Borrower from the Administrative Agent or any Lender or (y) any such Person's knowledge thereof; provided, that no such grace period shall apply with respect to defaults in the performance of the following obligations and covenants: (i) Section 2.3 (Use of Proceeds); (ii) Section 5.8 (Compliance with Laws; Sanctions and Contractual Obligations); (iii) Sections 5.1(a), 5.1(c), 5.1(e), 5.1(f), and 5.1(k) (Financial Statements and Other Reports); (iv) Section 5.13 (Cash Management); (v) Section 5.15 (Debtor-in-Possession Obligations); (vi) Section 5.16 (Budget); (vii) Section 5.19 (Bankruptcy Milestones); and (viii) any negative covenant under Section 6;

17

| | SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY |
|---|---|

(d)  Breach of Representations, etc. Any representation, warranty, certification or other statement made or deemed made by Borrower in any Loan Document or in any statement or certificate at any time given by Borrower in writing pursuant hereto or thereto or in connection herewith or therewith shall be false or misleading in any material respect as of the date made or deemed made;

(e)  Judgments and Attachments. Any money judgment, writ or warrant of attachment or similar process arising after the Petition Date and involving, individually or in the aggregate at any time, an amount in excess of $250,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Borrower or any Subsidiary or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) calendar days (or in any event later than five calendar days prior to the date of any proposed sale thereunder);

(f)  Employee Benefit Plans. There shall occur one or more ERISA Events that individually or in the aggregate results in or reasonably could be expected to result in a Material Adverse Effect;

(g)  Collateral Documents and other Loan Documents. At any time after the execution and delivery thereof: (i) this Agreement or any other Collateral Document ceases to be in full force and effect, legal, valid and binding (other than by reason of a release of Collateral in accordance with the terms hereof or thereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority set forth in Section 2.19, in each case for any reason other than the failure of Collateral Agent or any DIP Secured Party to take any action within its control or (ii) (A) any Loan Document shall cease to be, or shall be asserted in writing by Borrower not to be, valid or enforceable or (B) Borrower shall contest or deny in writing any further liability of Borrower, including with respect to future advances by Lenders, under any Loan Document;

(h)  Chapter 11 Case.

(i)  the entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or any filing by Borrower of a motion or other pleading seeking entry of such an order or supports or fails to timely oppose such dismissal or conversion;

(ii)  a trustee, responsible officer or an examiner having enlarged powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) is appointed or elected in the Chapter 11 Case, Borrower applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders in their sole discretion;

(iii)  the entry of an order staying, reversing, vacating or otherwise amending or modifying the DIP Order, whether by appeal or otherwise, or the filing by Borrower of an application, motion or other pleading seeking entry of such an order, without the prior written consent of the Required Lenders and the Agent;

(iv)  the entry of an order staying, reversing, vacating or otherwise amending or modifying the Bidding Procedures Order, whether by appeal or otherwise, or the filing by Borrower of an application, motion or other pleading seeking entry of such an order, without the prior written consent of the Required Lenders and the Agent;

(v)  the entry of an order in the Chapter 11 Case granting relief from any stay or proceeding (including the automatic stay) so as to allow a third party to proceed with

18

**SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY**

foreclosure against any assets or to permit other actions that would have a Material Adverse Effect, in each case, without the prior written consent of the Required Lenders and the Agent;

(vi)    (a) the entry of an order in the Chapter 11 Case (1) charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Lenders, (2) avoiding or requiring disgorgement by any of the Lenders of any amounts received in respect of the Obligations under the DIP Facility or (3) resulting in the marshaling of any Collateral or (b) the commencement of other actions by Borrower that challenge the validity, extent or priority of any Liens on the Collateral or the rights and remedies of the Agents or the Lenders under the DIP Facility in the Chapter 11 Case;

(vii)    other than in respect of the Prepetition Indebtedness, the entry of an order in the Chapter 11 Case seeking authority to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facility) or to use any Cash proceeds of any of the Collateral, the proceeds of which additional financing or cash collateral use are insufficient to provide for Payment in Full of the Obligations immediately upon entry of an order approving such financing or cash collateral use;

(viii)    the entry of an order in the Chapter 11 Case terminating Borrower's exclusive period to file a Chapter 11 Plan, the filing of a pleading by Borrower requesting, consenting to or supporting such relief, or the failure of Borrower to timely object to any motion requesting such relief;

(ix)    the filing or support of any pleading by Borrower (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (vii) above;

(x)    the entry of an order by the Bankruptcy Court in favor of any creditors' committee appointed in the Chapter 11 Case, any ad hoc committee, or any other party in interest, (a) sustaining an objection to claims of the Agent or any of the Lenders or (b) avoiding any Liens held by the Agent or any of the Lenders; or

(xi)    the commencement of any Insolvency Proceeding by Borrower or any Subsidiary of Borrower other than the Chapter 11 Case;

(i)    <u>Prepetition Loan Documents</u>. Any lien or security interest purported to be created under the Prepetition Loan Documents shall cease to be, or shall be asserted by the Borrower not to be, a valid and perfected lien on or security interest in the Postpetition Collateral or Prepetition Collateral (as each is defined in the DIP Order);

(j)    <u>Super-priority Claims</u>. An order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out or as otherwise expressly permitted under the Loan Documents, (i) a priority of any Lien against Borrower that is equal to or senior to the priority of the Liens on the Collateral granted in favor of the Collateral Agent, for the benefit of the DIP Secured Parties, or (ii) any other super-priority administrative expense claim in the Chapter 11 Case pursuant to section 364(c)(1) of the Bankruptcy Code that is pari passu with or senior to the claims of the Agents and the Lenders under the DIP Facility, or the filing by Borrower of a motion or application seeking entry of such an order;

(k)    <u>Compliance with DIP Order</u>. Failure of Borrower to comply in all material respects with the terms and conditions of the DIP Order;

(l)    <u>Adverse Proceeding</u>. Any Borrower or any Affiliate of Borrower shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other Adverse Proceeding against any Agent or Lender regarding the DIP Facility;

(m)    <u>Certain Orders</u>. An order is entered approving the solicitation of votes on a Chapter 11 Plan in the Chapter 11 Case, or an order approving a sale under section 363 of the

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | Bankruptcy Code or any order relating to such sale (including, but not limited to an order approving sale procedures) shall be entered that does not provide for Payment in Full of the Obligations in Cash on the effective date of such sale or is otherwise not satisfactory to Administrative Agent and the Required Lenders, or any order shall be entered that dismisses the Chapter 11 Case and that does not provide for Payment in Full of the Obligations on the effective date of such dismissal or is not otherwise satisfactory to Administrative Agent and the Required Lenders, or Borrower or any Affiliate of Borrower shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order, in each case without the prior written consent of the Required Lenders and the Agent; or<br><br>(n)　　Termination, Default Under Material Contracts. If there occurs (1) any termination or cancellation of any Material Contract without the prior written consent of the Required Lenders; or (2) any default by Borrower or any Subsidiary (or any Affiliate thereof) under any Material Contract (other than covenants not to file for bankruptcy proceedings with respect to Borrower's filing of the Chapter 11 Case, or except with the prior written consent of the Required Lenders).<br><br>DIP Credit Agreement, § 8.1 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>Local Rule 4001-2(a)(i)(H) | The DIP Credit Agreement contains the following milestones:<br><br>(a)　　by no later than three (3) Business Days following the Petition Date, the Borrower shall have filed a motion, in form and substance satisfactory to the Required Lenders, seeking entry of the Bidding Procedures Order and the Sale Order;<br><br>(b)　　by no later than twenty-five (25) days following the Petition Date, Borrower shall have obtained entry of the (i) Bidding Procedure Order and (ii) Final DIP Order;<br><br>(c)　　by no later than fifty-four (54) days following the Petition Date, the Bankruptcy Court shall have conducted, to the extent necessary, the sale hearing (in accordance with the terms of the Bidding Procedures Order) and entered the Sale Order approving the Approved 363 Sale, in form and substance acceptable to the Required Lenders, the Borrower and the purchaser in the Approved 363 Sale; and<br><br>(d)　　by no later than sixty (60) days following the Petition Date, the Approved 363 Sale shall have closed.<br><br>Interim DIP Order ¶ 18(d)<br>DIP Credit Agreement, § 5.19 |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(F) | Subject to the terms and conditions contained in this paragraph, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the DIP Liens, and the DIP Superpriority Claims shall be subordinate to (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Court (the "Case Administration Fees") as and when they are due without reference to the Budget; (ii) in the event of a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, all reasonable and documented fees and expenses, in an aggregate amount not to exceed $25,000, incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) unpaid professional fees and expenses payable to any Professional Person[11] (collectively, the "Professional Fees"), in an aggregate amount (the "Pre-Default Limit") equal to the cumulative budgeted amounts on a line item basis (i.e. a Professional Person can use the cumulative amounts in the Budget, for the period commencing on the |

---

[11]　Professional Person means any attorney, financial advisor, accountant, appraiser, monitor ,auctioneer or other professional person and who is retained, with Court approval, by (a) the Debtor pursuant to any one or more of Sections 327, 328(a), and 363 of the Bankruptcy Code or (b) anyCreditors' Committee appointed in the Chapter 11 Case pursuant to Section 1103(a) of the Bankruptcy Code.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | Petition Date and ending on the Carve-Out Effective Date, for such Professional Person only, and cannot use any excess that may exist during that period for another Professional Person, provided that there will be only one line item for the Debtor's counsel and only one line item for all of the Professional Persons retained by the Creditors' Committee, if any) for such Professional Fees reflected in the Budget that are incurred or accrued prior to the date on which the Prepetition Agent provides written notice to the Debtor, Debtor's counsel, the U.S. Trustee and counsel to the Creditors' Committee (if any) of an Event of Default (such notice, the "Carve-Out Notice," and the date of a delivery of such notice, the "Carve-Out Effective Date") but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date) are ultimately allowed by the Court pursuant to section 330 of the Bankruptcy Code; (iv) unpaid Professional Fees of the Debtor and the Creditors' Committee's (if any) in each case incurred or accrued on or after the Carve-Out Effective Date in an aggregate amount not to exceed $100,000 for Debtor Professional Persons and $25,000 for Creditors' Committee Professional Persons (if any), to the extent allowed at any time, whether by interim order, procedural order or otherwise; and (v) all accrued but unpaid wages and other compensation payable to the Debtor's employees (including obligations on account of paid time off), whether arising before or after the Petition Date, up to a maximum amount of $500,000 (the "Employee Amounts") (clauses (i)—(v), collectively, the "Carve-Out," and clause (iv) alone, the "Capped Carve-Out"). Subject to the immediately preceding sentence, so long as the Carve-Out Effective Date has not occurred, the Debtor shall be permitted to (a) pay Case Administration Fees as and when they are incurred without reference to the Budget and (b) Professional Fees allowed and payable under Bankruptcy Code sections 330, 331, and 503 as provided in the Budget. Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Effective Date, including any payment of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis. Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to the Debtor unless agreed to in writing by the DIP Administrative Agent. Immediately upon delivery of a Carve-Out Notice, the Debtor shall transfer to the Professional Fees Account funds in an amount equal to the sum of the Capped Carve-Out and unpaid Professional Fees and Employee Amounts in accordance with clauses (iii) and (v) above.<br><br>DIP Order, ¶ 22(a) |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | The effectiveness of the DIP Credit Agreement and the occurrence of the Closing Date are subject to the satisfaction of conditions precedent customary for financings of this type and are set forth at Article III of the DIP Credit Agreement.<br><br>DIP Credit Agreement, §§ 3.1-3.2 |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(1)(B)(iv) | As adequate protection against any diminution in value of the Prepetition Agent's interest in the Prepetition Collateral, the Prepetition Agent is hereby granted (effective and perfected as of the Petition Date and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or other agreements) a valid and perfected security interest in, and lien on (the "Adequate Protection Liens"), all of the right, |

| **SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY** | |
|---|---|
| 4001(c)(1)(B)(ii) | title and interest of the Debtor in, to, and under all present and after-acquired property and assets of the Debtor of any nature whatsoever, whether real or personal, tangible or intangible, wherever located, including, without limitation, (A) all cash and Cash Collateral of the Debtor (whether maintained with the Prepetition Agent or any other financial institution) and any investment of such cash and Cash Collateral, goods, cash-in-advance deposits, contracts, causes of action, general intangibles, accounts receivable, and other rights to payment, whether arising before or after the Petition Date, chattel paper, documents, instruments, interests in leaseholds, real properties, plants, machinery, equipment, patents, copyrights, trademarks, trade names or other intellectual property, licenses, insurance proceeds, and commercial tort claims, and all proceeds, products, offspring, rents and profits thereof, including, rights under letters of credit, capital stock and other equity or ownership interests held by the Debtor, including equity interests in subsidiaries (if any) and all other investment property, and, subject to the entry of the Final Order, proceeds of the Debtor's causes of action under Chapter 5 of the Bankruptcy Code ("Avoidance Actions" and such proceeds of Avoidance Actions, the "Avoidance Action Proceeds"), and (B) the proceeds of all of the foregoing, whether now existing or hereafter acquired (collectively, the "Postpetition Collateral"). Subject to the Carve-Out (as defined below), the Adequate Protection Liens shall be (i) first priority perfected liens on all of the Postpetition Collateral that is not otherwise encumbered by validly perfected, non-avoidable security interests or liens as of the Petition Date (including the Prepetition Liens) (the "Prior Liens"), (ii) first priority perfected replacement liens on all of the Postpetition Collateral as to which the Prepetition Agent had a first priority lien as of the Petition Date, and (iii) junior perfected liens on all Postpetition Collateral that is subject to a Prior Lien.  The Adequate Protection Liens on the Postpetition Collateral shall be senior to the DIP Liens on such Postpetition Collateral.<br><br>DIP Order, ¶ 4<br><br>The Adequate Protection Liens shall be enforceable against the Debtor, its estate, and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Chapter 11 Case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, a "Successor Case"). Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, or upon the dismissal of the Chapter 11 Case or Successor Case. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.<br><br>DIP Order, ¶ 5<br><br>As further adequate protection against any diminution in value of the interests of the Prepetition Agent in the Prepetition Collateral, the Prepetition Agent is hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code allowed superpriority administrative expenses claims in the Chapter 11 Case or any Successor Case in the amount of the Adequate Protection Obligations (the "Adequate Protection Superpriority Claim"), which shall be payable from and have recourse to all Postpetition Collateral and all proceeds of Postpetition Collateral.<br><br>DIP Order, ¶ 6<br><br>The Adequate Protection Superpriority Claims shall be junior only to the Carve-Out. Except for the Carve-Out, the Adequate Protection Superpriority Claims shall have priority over all |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | administrative expense claims and unsecured claims against the Debtor or its estate, including the DIP Superpriority Claim, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 of the Bankruptcy Code.<br><br>DIP Order, ¶ 7. |
| **Stipulations to Prepetition Liens and Claims** <br>Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br>Local Rule 4001-2(a)(i)(Q) | Not applicable. |
| **Liens on Avoidance Actions** <br>Bankruptcy Rule 4001(c)(1)(B)(xi) <br><br>Local Rule 4001-2(a)(i)(U) | The DIP Liens shall attach to, among other things, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions.<br><br>DIP Order, ¶ 3(a) & 12(a) |
| **Limitations on the Use of Cash Collateral, including with respect to Investigations** <br><br>Local Rule 4001-2(a)(i)(L) | Notwithstanding the foregoing, no more than $25,000 in the aggregate of Cash Collateral may be used by the Creditors' Committee (if any) to investigate, prior to the expiration of the Complaint Filing Deadline but not to prosecute, the claims and liens of the Prepetition Secured Parties.<br><br>Interim DIP Order, ¶24(b) |

| **SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY** | |
|---|---|
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)<br><br>Local Rule 4001-2(a)(i)(Q) | The stipulations and admissions contained in <u>Section F</u> and its subparagraphs of the Interim DIP Order, shall be binding on all parties in interest, including, without limitation, the Creditors' Committee (if any), unless, and solely to the extent that, (a) the Creditors' Committee, or another party in interest other than the Debtor, has obtained standing and timely filed a complaint and commenced an adversary proceeding (subject to the limitations set forth in <u>paragraph 17(b)</u> of the Interim DIP Order) (or timely filed a motion, with an attached draft complaint, to obtain standing to file such complaint and commence such an adversary proceeding) (a "<u>Challenge</u>") challenging the amount, extent, validity, or enforceability of the Prepetition Loan Obligations, or the perfection or priority of the Prepetition Liens, or otherwise asserting any claims or causes of action on behalf of the Debtor's estate against the Prepetition Agent or the other Prepetition Secured Parties relating to the Prepetition Loan Obligations, in each case no later than seventy five (75) days after the entry of the Interim DIP Order (the "<u>Complaint Filing Deadline</u>"); and (b) this Court rules in favor of the plaintiff in any such timely and properly commenced Challenge. If no Challenge is timely and properly commenced by the Complaint Filing Deadline, or to the extent such adversary proceeding does not result in a final and non-appealable order of this Court that is inconsistent with the acknowledgments of the Debtor contained in <u>Section F</u> and its subparagraphs of the Interim DIP Order, then, without the requirement or need to file any proof of claim with respect thereto and without further notice, motion or application to, order of, or hearing before, this Court, the acknowledgments of the Debtor contained in <u>Section F</u> and its subparagraphs of the Interim DIP Order with respect to the Prepetition Agent, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Loan Obligations, and Prepetition Collateral shall be binding, conclusive and final on the Creditors' Committee and any other Person, entity or party-in-interest in the Chapter 11 Case and any Successor Case and (i) the claims, liens, and security interests of the Prepetition Agent and the Prepetition Secured Parties shall be deemed to be finally allowed for all purposes in this Chapter 11 Case and any subsequent chapter 7 case in the event the Chapter 11 Case is converted, and shall not be subject to challenge by any party in interest as to validity, priority or otherwise, and (ii) the Debtor and its estate shall be deemed to have forever released any and all claims or causes of action against (A) the DIP Administrative Agent, the DIP Secured Parties, the Prepetition Agent, and the Prepetition Secured Parties and (B) with respect to each person (as defined in the Bankruptcy Code) in the preceding clause (A), such person's affiliates (as defined in the Bankruptcy Code) and the respective directors, officers, employees, agents, investment managers, subagents, representatives, and advisors (including attorneys, accountants and experts) of such person and such person's affiliates (all persons in clauses (A) and (B), collectively, the "<u>Released Parties</u>") with respect to the Prepetition Loan Documents, the DIP Loan Documents, or any related transactions.    Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in <u>Section F</u> and its subparagraphs hereof, and the releases contained in this paragraph, shall nonetheless remain binding on all parties in interest and preclusive except to the extent that such stipulations are expressly challenged in such adversary proceeding.<br><br>DIP Order, ¶ 23 |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable), whether or not a an Event of Default has occurred, including without limitation: (i) to require all cash, checks or other collections or proceeds from DIP Collateral received by the Debtor to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Secured Parties under the DIP Loan Documents in accordance with any requirements of the |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | DIP Loan Documents; (ii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the Postpetition Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein; (iv) the right to give the Debtor any notice provided for in any of the DIP Loan Documents or the Interim DIP Order; and (v) the right to declare (1) the termination, reduction or restriction of any further commitment under the DIP Loan Documents to the extent any such commitment remain unfunded; (2) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Debtor; (3) the termination of the DIP Loan Documents as to any future liability or obligation of the DIP Administrative Agent or any DIP Lender, but without affecting any of the DIP Liens on the Postpetition Collateral or the Obligations of the Debtor; and/or (4) declare a termination, reduction, or restriction of the ability of the Debtor to use any Cash Collateral; *provided* that with respect to the enforcement of the Prepetition Liens, Adequate Protection Liens, or DIP Liens or the exercise of any other rights or remedies with respect thereto (including rights to set-off or to apply any amounts in any bank accounts subject to such liens), (i) the DIP Administrative Agent or Prepetition Agent, as applicable, shall file a written notice with the Court, which notice can be the same as the Carve-Out Notice (the "Default Notice") setting forth the Events of Default and, shall serve such Default Notice upon the Debtor, its counsel, counsel to the Creditors' Committee (if any), and the U.S. Trustee.  Effective for the period beginning on the date the Default Notice is filed (the "Default Notice Date") and ending two (2) calendar days thereafter (the "Enforcement Notice Period") (and during which time the DIP Administrative Agent and/or Prepetition Agent shall permit the Debtor to cure such Event of Default and use Cash Collateral in accordance with the Budget), the DIP Administrative Agent, for itself and on behalf of the DIP Lenders, and the Prepetition Agent, for itself and on behalf of the Prepetition Lenders, shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Debtor or any other interested party, to enforce the DIP Liens, Adequate Protection Liens, or Prepetition Liens, or exercise any other rights or remedies with respect to the DIP Obligations, Prepetition Loan Obligations, or Adequate Protection Obligations (including rights to set-off or to apply any amounts in any bank accounts). |
| | DIP Order, ¶ 19(a) |
| **Releases**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtor provides certain estate releases to the Prepetition Secured Parties, the DIP Secured Parties and each their related parties.<br><br>DIP Order, ¶ 23 |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtor shall indemnify and hold harmless the DIP Secured Parties.<br><br>DIP Credit Agreement §§ 9.5 & 10.3 |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(V) | Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case at any time shall be charged against the Prepetition Secured Parties or DIP Secured Parties or any of their respective claims, the Prepetition Collateral, or the Postpetition Collateral pursuant to section 506(c) of the Bankruptcy Code, or otherwise.<br><br>DIP Order, ¶ 28 |
| **Marshalling Waiver** | Subject to entry of the Final Order, neither the Prepetition Secured Parties nor the DIP Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(X) | be, and proceeds shall be received and applied in accordance with the Interim DIP Order notwithstanding any other agreement or provision to the contrary.<br><br>DIP Order, ¶ 29 |
| **Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(W) | Subject to entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Agent with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.<br><br>DIP Order, ¶ 30 |

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

33.     Local Rule 4001-2(a)(i) requires a debtor to recite whether the proposed form of order approving cash collateral use and postpetition financing contains certain provisions of the type enumerated therein, identify the location of such provisions in the proposed order, and, with respect to certain provisions, justify the inclusion of such provisions in the proposed order.  The Debtor respectfully submits that all applicable disclosures required under Local Rule 4001-2(a)(i) have been made in the disclosure table set forth above with respect to the DIP Facility.  In addition, the Debtor makes the following disclosures:

1)     **Local Rule 4001-2(a)(i)(S) – Remedies Notice Period (Interim DIP Order, ¶ 19(a))**.  The relief sought in the Interim DIP Order seeks a remedies notice period of two calendar days, instead of five calendar days. Given the Debtor's limited operations, and in light of the customary nature of the Events of Default under the Interim DIP Order and DIP Credit Agreement, the Debtor believes that, on balance, it is a necessary and appropriate condition to obtain financing under the facts of this Chapter 11 Case.  In addition, this limitation was a prerequisite to funding by the Prepetition Secured Parties.

2)     **Local Rule 4001-2(a)(i)(T) – Emergency Hearing Limitations (Interim DIP Order, ¶ 19(b))**.  The relief sought in the Interim DIP Order seeks to limit what parties other than the Debtor may raise at an emergency hearing. Given the Debtor's limited operations, and in light of the customary nature of the Events

26

of Default under the Interim DIP Order and DIP Credit Agreement, the Debtor believes that, on balance, it is a necessary and appropriate condition to obtain financing under the facts of this Chapter 11 Case. In addition, this limitation was a prerequisite to funding by the Prepetition Secured Parties.

## APPLICABLE AUTHORITY

I.   **The Debtor Should Be Authorized to Obtain Postpetition Financing through the DIP Loan Documents.**

A.   **Entry into the DIP Facility Is an Exercise of the Debtor's Sound Business Judgment.**

34.   The Court should authorize the Debtor, as an exercise of its sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. See, e.g., In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

35.   Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In

27

re Curlew Valley Assocs., 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

36.    Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while terms favored DIP lenders, "taken in context, and considering the relative circumstances of the parties," court found them to be reasonable); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility.  For example, in In re ION Media Networks. Inc., the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  **Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization**.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

37.     The Debtor's determination to move forward with the DIP Facility is an exercise of its sound business judgment following an exhaustive, arm's-length process and careful evaluation of potential alternatives.  Specifically, and in the face of insufficient cash on hand, the Debtor and its advisors determined that the Debtor would require postpetition financing to support its operational and chapter 11 activities, including the funding of the Sale Process.  The Debtor negotiated the DIP Credit Agreement and other DIP Loan Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtor believes that it has obtained the best (and only) financing available.  Accordingly, the Court should authorize the Debtor's entry into the DIP Loan Documents, as it is a reasonable exercise of the Debtor's business judgment.

**B.      The Debtor Should Be Authorized to Grant Liens and Superpriority Claims.**

38.     The Debtor proposes to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to sections 364(c) of the Bankruptcy Code.  Specifically, the Debtor proposes to provide to the DIP Lenders with (i) a perfected lien on the Postpetition Collateral that is not otherwise encumbered by a Prior Lien, provided that such lien shall be junior to the Adequate Protection Liens and prior payment of the Carve-Out; and (ii) pursuant to section 364(c)(3), a perfected lien on the Postpetition Collateral junior to (A) the Adequate Protection Liens and (B) the Prior Liens, in each case subject to the Carve-Out.  The DIP Facility does not contemplate any priming and is a pure junior DIP Facility.

39.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  See In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit

cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> i.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;
>
> ii.  the credit transaction is necessary to preserve the assets of the estate; and
>
> iii.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

See In re Ames Dep't Stores, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); see also In re St. Mary Hosp., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); Crouse Grp., 71 B.R. at 549.

40.    As described above and as set forth in the First Day Declaration and the Aebersold Declaration, the Debtor is in need of an immediate capital infusion; yet, substantially all of the Debtor's existing assets are encumbered under its existing capital structure, no third-party financing is available, and the prepetition litigations have made it difficult to identify new financing sources.   Indeed, neither the Debtor nor Lazard has been able to identify any financing transactions that would not require some form of security.  Without postpetition financing, the Debtor lacks sufficient funds to operate its business, fund the Sale Process, and cover the projected costs of this Chapter 11 Case.  Absent the DIP Facility, which will provide certainty that the Debtor will have sufficient liquidity to administer this Chapter 11 Case, the value of the Debtor's estate would be significantly impaired to the detriment of all stakeholders.   Given the Debtor's circumstances, the Debtor believes that the terms of the DIP Facility, as set forth in the DIP Orders and the other DIP Loan Documents, are fair, reasonable, and adequate.

41.    As described above, the Debtor is unable to obtain unsecured credit.  Therefore, approving a superpriority claim and granting the non-priming DIP liens in favor of the DIP Lenders

is reasonable and appropriate. For the reasons set forth above and herein, the Debtor submits that it has met the standard for obtaining postpetition financing.

### C.    No Comparable Alternative to the DIP Facility Is Reasonably Available.

42.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Snowshoe, 789 F.2d at 1088 (demonstrating that credit was unavailable absent senior lien by establishment of unsuccessful contact with other financial institutions in geographic area); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)).

43.    As noted above, the Debtor does not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtor's existing capital structure and the cloud on the Debtor's business caused by the prepetition litigations.  Despite these obstacles, the Debtor, with the assistance of Lazard, scoured the marketplace for all available financings. After extensive negotiations with the Prepetition Agent and the DIP Lenders, and against imposing odds, the Debtor obtained two postpetition financing proposals from third parties.  While these offers did not materialize, the Prepetition Secured Parties ultimately offered to provide the DIP

Facility.  After evaluating the terms of the DIP Facility and considering the Debtor's liquidity position, the Debtor has determined that the DIP Facility provides the best opportunity available to the Debtor under the circumstances to fund this Chapter 11 Case.  Therefore, the Debtor submits that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtor is satisfied.

## II.    The Debtor Should Be Authorized to Use Cash Collateral.

44.    A debtor's use of property of the estate, including cash collateral, is governed by section 363 of the Bankruptcy Code.  Pursuant to section 363(c)(2), a debtor may use cash collateral if "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363]." 11 U.S.C. § 363(c)(2).

45.    Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).   Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  See In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While the Bankruptcy Code does not expressly define "adequate protection", section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  See, e.g., In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994) (explaining that "determination of whether there is adequate protection is made on a case by case basis"); In re Satcon Tech. Corp., No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18,

1992) ("[W]hat interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

46.    The Debtor has satisfied the requirements of sections 363(c)(2) and (e) and should be authorized to use Cash Collateral.  Importantly, the Prepetition Secured Parties have each consented to the use of Cash Collateral, subject to the terms of the Interim DIP Order and the Budget.  Moreover, the DIP Facility is being offered by the Prepetition Secured Parties.

47.    In addition, under the terms of the Interim DIP Order, the Debtor has agreed to provide the Prepetition Secured Parties with limited and customary adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtor and the imposition of the automatic stay, including (i) subject only to the Carve-Out, Adequate Protection Liens upon the Postpetition Collateral, which liens shall have priority over all interests, including the DIP Liens, except such liens shall be junior to any validly perfected lien with priority over the Prepetition Agent's liens as of the Petition Date; (ii) Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Obligations, which will have priority over all administrative expense claims except the Carve-Out, and (iii) customary budget compliance and related reporting.

48.    Without access to Cash Collateral, the Debtor would be unable to operate and conduct its Sale Process.  In view of the fact that Cash Collateral is essential to ongoing operations and funding the Sale Process, in conjunction with the Prepetition Secured Parties' consent to the use of Cash Collateral, the Court should grant the Debtor the authority to use Cash Collateral under section 363(c)(2) of the Bankruptcy Code.  Further, the Debtor submits, and the Prepetition

Secured Parties agree, that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.

49.     Accordingly, as set forth in and subject to the terms of the Interim DIP Order, the Prepetition Secured Parties have been adequately protected and the Debtor should be allowed to use Cash Collateral subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and its estate.

**III.    The Debtor Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Loan Documents.**

50.     Under the DIP Loan Documents, the Debtor has agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders pursuant to the DIP Loan Documents. Specifically, the Debtor has agreed to pay interest, the DIP Agent's professionals' fees and the upfront fee, which will be paid in kind at closing of the DIP Facility.  The Debtor, in consultation with its advisors, believes that these fees are an integral component of the overall terms of the DIP Facility, were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing, are reasonable and customary for similar transactions, and are the best financing terms available. Accordingly, the Court should authorize the Debtor to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

**IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

51.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted,

to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

52.    As explained herein and in the First Day Declaration and the Aebersold Declaration, the DIP Loan Documents are the result of: (a) the Debtor's reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing and (b) extended arm's-length, good-faith negotiations between the Debtor and the DIP Agent and DIP Lenders.  The Debtor submits that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

53.    The DIP Orders provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified under certain circumstances, including to permit (a) the Debtor to (i) grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may request in its sole discretion to assure the perfection and priority of the DIP Liens and (ii) permit the Debtor to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims and permit the Debtor to perform such acts as the Prepetition Agent may request in its sole discretion to assure the perfection and priority of the liens granted herein, (b) the Debtor to incur all liabilities and obligations to the DIP Agent as contemplated under the DIP Loan Documents the Prepetition Agent under the Prepetition Loan Agreement as contemplated by

35

the DIP Orders, (c) the Debtor to pay all amounts referred to, required under, in accordance with, and subject to the DIP Orders and the DIP Loan Documents, and (d) the implementation of the terms of the and the DIP Orders.

54.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing and cash collateral arrangements and, in the Debtor's business judgment, are reasonable and fair under the circumstances of this Chapter 11 Case.

**VI.    Failure to Obtain Immediate Interim Access to Cash Collateral Would Cause Immediate and Irreparable Harm.**

55.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

56.     In addition, pursuant to Bankruptcy Rule 6003, the Court may grant relief within twenty-one (21) days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

57.     As described herein and in the First Day Declaration and the Aebersold Declaration, the Debtor will suffer immediate and irreparable harm without authorization for the relief

requested herein.  Accordingly, the Debtor requests that the Court hold and conduct a hearing to consider entry of the Interim DIP Order.  The Debtor requires authority to use Cash Collateral and to obtain funds under the DIP Facility prior to the Final Hearing and entry of the Final DIP Order to continue operating, pay its administrative expenses, implement the relief requested in the Debtor's other "first day" motions and fund the Sale Process.  This relief will enable the Debtor to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

## BANKRUPTCY RULES 4001(a), 6004(a) AND 6004(h)

58.     The urgency of the relief requested justifies immediate relief.  To ensure the relief requested is implemented immediately, the Debtor requests that the Court waive the notice requirements under Bankruptcy Rule 6004(a).  The Debtor also requests that, to the extent applicable to the relief requested in this Motion, the Court waive the stays imposed by Bankruptcy Rules 4001(a) and 6004(h).  As described above, the relief that the Debtor seeks in this Motion is necessary for the Debtor to operate its business without interruption and to preserve value for its estate.  Accordingly, the Debtor respectfully requests that the Court waive the fourteen-day stays imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## REQUEST FOR FINAL HEARING

59.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court (i) set a date for the Final Hearing that is on or about August 5, 2022 to consider entry of the Final DIP Order, and (ii) fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **RESERVATION OF RIGHTS**

60.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (e) otherwise affect the Debtor's rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the Motion.

## **NOTICE**

61.     Notice of this Motion has been or will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) counsel for the Prepetition Secured Parties and DIP Secured Parties; (v) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate; and (vi) all parties entitled to notice pursuant to Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## **NO PRIOR REQUEST**

62.     The Debtor has not previously sought the relief requested herein from the Court or any other court.

RLF1 27605177v.2

WHEREFORE, the Debtor requests that the Court (a) at the "first day" hearing, enter the Interim DIP Order, (b) at the "second day" hearing, the Final DIP Order, and (c) grant such other and further relief as is just and proper.

Dated:   July 12, 2022
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ David T. Queroli*
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
David T. Queroli (No. 6318)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
defranceschi@rlf.com
merchant@rlf.com
queroli@rlf.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (*pro hac vice* pending)
Paul V. Shalhoub (*pro hac vice* pending)
Betsy L. Feldman (No. 6410)
Jessica D. Graber (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
rstrickland@willkie.com
pshalhoub@willkie.com
bfeldman@willkie.com
jgraber@willkie.com

*Proposed Co-Counsel to the Debtor*
*and Debtor in Possession*

## EXHIBIT A

**Proposed Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] | Case No. 22-_____ (___) |
| Debtor. | **Re. Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL AND (B) GRANT ADEQUATE PROTECTION; (II) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) MODIFYING AUTOMATIC STAY; (IV) SETTING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the *Debtor's Motion For Entry Of Interim And Final Orders (I) Authorizing Debtor to (A) Use Cash Collateral and (B) Grant Adequate Protection; (II) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens and Superpriority Administrative Expense Claims; (III) Modifying Automatic Stay; (IV) Setting a Final Hearing; and (V) Granting Related Relief* (the "Motion")[2] of GenapSys, Inc. (the "Debtor") for entry of an interim order (this "Interim Order") and a final order (the "Final Order") pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia*:

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is GenapSys, Inc. (3904). The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City, CA 94063.

[2] Except as otherwise noted, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(i) authorizing the Debtor to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") in accordance with this Interim Order and the Budget (as defined below);

(ii) authorizing the Debtor to grant adequate protection to Oxford Finance LLC ("Oxford"), as Prepetition Collateral Agent (in such capacity, the "Prepetition Agent"), for itself and for the lenders party to that certain Loan and Security Agreement, dated as of December 20, 2019 (as amended, the "Prepetition Loan Agreement"), among the Prepetition Agent, the lenders party thereto from time to time (the "Prepetition Lenders", and collectively with the Prepetition Agent, the "Prepetition Secured Parties"), including Oxford in its capacity as a lender, and the Debtor, as borrower thereunder, including the Adequate Protection Liens and the Adequate Protection Superpriority Claims (each as defined below);

(iii) authorizing the Debtor to obtain secured postpetition financing pursuant to the terms and conditions of that certain Secured Debtor-in-Possession Term Loan and Security Agreement in substantially the form attached hereto (without exhibits or schedules) as Exhibit B (as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with its terms, and including the exhibits and schedules thereto, the "DIP Credit Agreement"), by and among the Debtor, Oxford, as Administrative Agent and Collateral Agent (in such capacities, the "DIP Administrative Agent"), Oxford and any other entity that becomes a lender under the DIP Facility (as defined below) in accordance therewith (collectively, the "DIP Lenders", and together with the DIP Administrative Agent, the "DIP Secured Parties") in an aggregate principal amount not to exceed $4,000,000, consisting of a multiple-draw term loan facility (the "DIP Facility", and any draws on the DIP Facility, the "DIP Loans");

2

(iv) authorizing the Debtor to execute the DIP Credit Agreement and all other documents, agreements and instruments delivered pursuant thereto or executed or filed in furtherance or in connection therewith, all of which shall be in form and substance customary for transactions of this type, and acceptable to the DIP Administrative Agent and the Debtor (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms, and, collectively with the DIP Credit Agreement, the "DIP Loan Documents");

(v) authorizing the Debtor to use the proceeds from the DIP Facility as permitted in the DIP Loan Documents and in accordance with this Interim Order and the Budget (as defined below);

(vi) granting to the DIP Administrative Agent, for itself and for the benefit of the DIP Lenders, automatically perfected security interests in and liens on all assets that constitute the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents and this Interim Order (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations"), which shall rank junior in priority in respect to the Prior Liens (as defined below) and senior in priority to all other liens other than payment of the Carve-Out (as defined below);

(vii) granting superpriority administrative expense claims against the Debtor's estate to the DIP Secured Parties with respect to the DIP Obligations in accordance with section 364(c)(1) of the Bankruptcy Code over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of: (i) the Prepetition Loan Obligations (as defined below), (ii) the Adequate Protection Superpriority Claims, and (iii) the Carve-Out;

*ACTIVE 64865456v4*

*RLF1 27606987v.1*

(viii) vacating and modifying the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents;

(ix) waiving any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(x) granting the Debtor such other and further relief as is just and proper.

The Court having reviewed the Motion and the *Declaration of Britton Russell in Support of Debtor's Chapter 11 Petition and First Day Motions* and the declaration of Brandon Aebersold in support of the Motion, each filed contemporaneously with the Motion, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on July [___], 2022 (the "Interim Hearing"); and the Court having determined that the relief requested in the Motion is in the best interests of the Debtor, the estate, its creditors, and other parties in interest; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      Petition Date.  On July 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Case").

B.      Debtor in Possession.  The Debtor is continuing in the management and operation of its business and properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case.

4

C.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012, over these proceedings and over the persons and property affected hereby. Venue for the Chapter 11 Case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtor has consented to the Court's entry of a final order regarding the Motion, and the Court may enter a final order consistent with Article III of the United States Constitution.

D.      <u>Statutory Committee</u>.  As of the date hereof, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors (a "<u>Creditors' Committee</u>") in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

E.      <u>Necessary Approvals</u>. Upon entry of this Interim Order by the Court, the Debtor will have obtaied all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents as provided herein.

F.      <u>Debtor's Stipulations</u>.  Subject to the limitations specified in <u>paragraph 23</u> of this Interim Order, the Debtor, on behalf of itself and its estate, admits, stipulates, and agrees that (collectively, the "<u>Debtor's Stipulations</u>"):

1.      <u>Loans</u>.  On December 20, 2019, the Debtor entered into the Prepetition Loan Agreement, as amended from time to time thereafter (together with all agreements, documents, and instruments executed in connection therewith or in furtherance thereof, including the "Loan Documents" as defined therein, the "<u>Prepetition Loan Documents</u>"),

5

with the Prepetition Secured Parties. The Prepetition Loan Agreement provides for term loans in the aggregate principal amount of $30 million (collectively, the "Prepetition Loans"). The Prepetition Loan Documents evidence and govern the "Obligations" (as defined in the Prepetition Loan Documents) of the Debtor for principal, accrued and unpaid interest, fees, costs, expenses and all other amounts arising under the Prepetition Loan Documents (the "Prepetition Loan Obligations"). All payments on account of Obligations received by the Prepetition Agent prior to the filing of this Chapter 11 Case were duly authorized by the Debtor and were properly applied by the Prepetition Agent to the Prepetition Loans and any outstanding Obligations thereunder.

2.    Collateral.  Pursuant to the Prepetition Loan Documents,[3] and as security for all Obligations owing thereunder, the Debtor pledged and granted the Prepetition Agent a first priority security interest in and continuing lien (the "Prepetition Liens") on all of Debtor's right, title, and interest in and to certain of its property (consistent with the terms of the Prepetition Loan Documents, the "Prepetition Collateral"), including but not limited to:  (i) all goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles (except as noted below), commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts and other Collateral Accounts, all certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and

---

[3]    Capitalized terms used in this Section F(2) but not otherwise defined herein shall have the meanings ascribed to them in the applicable Prepetition Loan Documents.

ACTIVE 64865456v4

RLF1 27606987v.1

financial assets, whether now owned or hereafter acquired, wherever located and (ii) all Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

3.    <u>Outstanding Obligations</u>.  As of the Petition Date, the Debtor is liable for payment of all outstanding Prepetition Loan Obligations, and the outstanding Prepetition Loan Obligations shall be an allowed secured claim in an amount not less than $31,946,422.91, plus all accruing interest, fees, expenses, and other amounts owed to the Prepetition Secured Parties under the Prepetition Loan Documents.

4.    <u>Validity and Perfection of Loans</u>.  As of the Petition Date, the Prepetition Agent's security interest in the Prepetition Collateral was valid, binding, enforceable, non-avoidable and properly perfected. The Prepetition Loans and all Obligations under the Prepetition Loan Documents constitute a legal, valid, binding, non-avoidable obligation of the Debtor. No portion of the Prepetition Loans or the Prepetition Loan Documents, including all Obligations thereunder, are subject to avoidance, re-characterization, disallowance, disgorgement, recovery, subordination, or offset under the Bankruptcy Code or applicable non-bankruptcy law.  Any payments made before the Petition Date on account of the Obligations under the Prepetition Loan Documents were (1) payments out of the Prepetition Collateral and/or (2) made in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to the Debtor's unsecured creditors.  The Debtor has no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against any

7

of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, managers, members, directors or employees with respect to the Prepetition Loan Agreement or any other Prepetition Loan Documents, whether arising at law or at equity, including, without limitation, any re-characterization, subordination, avoidance or disgorgement, or other debtor claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

5.    <u>Default by the Debtor</u>.  The Debtor acknowledges and stipulates that the Debtor is in default of its debts and Prepetition Loan Obligations under the Prepetition Loan Documents.

6.    <u>No Liability to Third Parties</u>.  The Debtor acknowledges, stipulates, and agrees that in making their decision to permit the use of Cash Collateral or in taking any other actions related to this Interim Order, the Prepetition Agent and each of the Prepetition Secured Parties (i) shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute), and (ii) shall not owe any fiduciary duty to the Debtor, its estate, or its creditors. The Debtor further acknowledges, stipulates, and agrees that no Prepetition Secured Party's relationship with the Debtor shall constitute or be deemed to constitute a joint venture or partnership with the Debtor.

G.    <u>Adequate Protection</u>.  The Prepetition Agent, on behalf of itself and the other Prepetition Secured Parties, is entitled to receive adequate protection in respect of the Debtor's use

8

of the Prepetition Collateral to the extent of the decline in the value thereof, resulting from the (a) use of the Cash Collateral, (b) use, sale, depreciation, or other diminution in value of the Prepetition Collateral, or (c) imposition of the automatic stay under section 362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "Adequate Protection Obligations"). Pursuant to sections 361, 363, and 507(b), as adequate protection for the Adequate Protection Obligations, the Debtor has agreed to provide the Prepetition Agent with: (i) the Adequate Protection Liens and (ii) the Adequate Protection Superpriority Claims. The Prepetition Agent objects to the use by the Debtor of the Cash Collateral, except on the terms and conditions set forth in this Interim Order.

H.    Necessity of Relief Requested.  The Debtor requires the use of Cash Collateral and the DIP Loans in order to finance its operations and fund its Sale Process, absent which immediate and irreparable harm will result to the Debtor, its estate and creditors, and the prospects for a successful conclusion of the Chapter 11 Case. Without the use of Cash Collateral and the DIP Loans, it would be impracticable for the Debtor to continue to operate its business, even for a limited period of time, and serious and irreparable harm to the Debtor, its estate, and its creditors would occur. The Debtor does not have sufficient available sources of working capital and financing to continue to operate its business without the use of Cash Collateral and the DIP Loans. The relief requested in the Motion is, therefore, necessary to the preservation and maintenance of the value of the Debtor's assets. The Prepetition Agent, the DIP Administrative Agent, and the Debtor have negotiated at arms' length and in good faith regarding the Debtor's use of Cash Collateral and the DIP Loans to fund the continued operations of the Debtor for the period through the Default Notice Date (as defined below), all subject to the terms and conditions set forth in this Interim Order and DIP Loan Documents, including the protection afforded an entity acting in

9

"good faith" under section 363(m) of the Bankruptcy Code. Based on the record presented to the Court at the Interim Hearing, the terms of the DIP Facility, the proposed adequate protection arrangements and the use of the Cash Collateral are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Entry of this Interim Order is in the best interests of the Debtor, its estate, and its creditors.

        I.     <u>No Credit Available on More Favorable Terms</u>.  Despite diligent efforts and a sufficient marketing process, the Debtor has been unable to obtain post-petition financing on terms more favorable than those offered by the DIP Lenders under the DIP Loan Documents.

        J.     <u>Good Faith.</u>

        (i)     The DIP Lenders have indicated a willingness to provide financing to the Debtor, but solely on the terms and conditions set forth in the DIP Documents, including, without limitation: (a) entry of this Interim Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents, including, without limitation, the Debtor's ability to enter into such documents and to incur all of the obligations thereunder, and to confer upon the DIP Lenders all rights, powers and remedies thereunder; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility and the Debtor's use of the DIP Loans are essential to the Debtor's estate, that the DIP Secured Parties are extending credit to the Debtor pursuant to the DIP Loan Documents and this Interim Order in good faith, and that the DIP Administrative Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code. Accordingly, after considering all of its practical alternatives, the Debtor has concluded, in an

10

exercise of its sound business judgment, that the DIP Loans to be provided by the DIP Lenders, pursuant to the terms of the DIP Documents, represent the best financing currently available to the Debtor.

(ii)      The terms of the DIP Loan Documents, including, without limitation, the interest rates and fees applicable, are more favorable to the Debtor than any available from alternative sources. Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-length among the Debtor, the DIP Lenders and the DIP Administrative Agent. Any DIP Loans and other financial accommodations made to the Debtor by the DIP Administrative Agent and the DIP Lenders pursuant to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the DIP Administrative Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Administrative Agent and the DIP Lenders shall be entitled to all protections afforded thereby.

K.      Fair Consideration and Reasonably Equivalent Value. The Debtor will receive fair and reasonable consideration in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Loan Documents and this Interim Order. The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

L.      Final Hearing. At the Final Hearing, notice of which will be provided in accordance with this Interim Order, the Bankruptcy Rules and the Local Rules, the Debtor will seek final approval of the relief requested in the Motion on a final basis pursuant to the Final Order.

M.      Notice. Notice of the Interim Hearing and emergency relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery,

to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) counsel for the DIP Secured Parties; (v) counsel for the Prepetition Secured Parties; (vi) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate; and (vii) all parties entitled to notice pursuant to Local Rule 9013-1(m). Notice of the Motion and the hearing thereon was provided pursuant to Bankruptcy Rules Bankruptcy Rules 2002, 4001(b), (c), and (d), 6004 and 9014.

N.      Consent by the Prepetition Secured Parties. The Prepetition Lenders have, or are deemed to have, instructed the Prepetition Agent to consent to the Debtor's use of Cash Collateral and entry into the DIP Loan Documents solely in accordance with and subject to the terms and conditions provided in this Interim Order.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      Motion Approved. The Motion is granted on an interim basis as set forth herein. The Debtor's use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order. The Debtor is authorized to enter into the DIP Loan Documents and the DIP Loans are authorized on an interim basis, subject to the terms and conditions set forth in this Interim Order.

2.      Objections Overruled. All objections, reservations of rights or other statements with respect to the Motion, to the extent not withdrawn or resolved, are hereby overruled on the merits.

## AUTHORIZATION FOR USE OF CASH COLLATERAL

3.      Authorization to Use Cash Collateral. Subject to the terms of this Interim Order, pursuant to section 363(c)(2) of the Bankruptcy Code, the Debtor is authorized to use Cash

12

Collateral for the period (the "Subject Period") from the Petition Date through the date that is two (2) calendar days following the Default Notice Date, strictly pursuant to and in accordance with the Budget attached hereto as Exhibit A (the "Budget"). Upon the expiration of the Subject Period, Debtor's authority to use Cash Collateral, and their obligations under paragraph 4 of this Interim Order, shall cease.

4.      Adequate Protection Liens.  As adequate protection against any diminution in value of the Prepetition Agent's interest in the Prepetition Collateral, the Prepetition Agent is hereby granted (effective and perfected as of the Petition Date and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or other agreements) a valid and perfected security interest in, and lien on (the "Adequate Protection Liens"), all of the right, title and interest of the Debtor in, to, and under all present and after-acquired property and assets of the Debtor of any nature whatsoever, whether real or personal, tangible or intangible, wherever located, including, without limitation, (A) all cash and Cash Collateral of the Debtor (whether maintained with the Prepetition Agent or any other financial institution) and any investment of such cash and Cash Collateral, goods, cash-in-advance deposits, contracts, causes of action, general intangibles, accounts receivable, and other rights to payment, whether arising before or after the Petition Date, chattel paper, documents, instruments, interests in leaseholds, real properties, plants, machinery, equipment, patents, copyrights, trademarks, trade names or other intellectual property, licenses, insurance proceeds, and commercial tort claims, and all proceeds, products, offspring, rents and profits thereof, including, rights under letters of credit, capital stock and other equity or ownership interests held by the Debtor, including equity interests in subsidiaries (if any) and all other investment property, and, subject to the entry of the Final Order, proceeds of the Debtor's causes of action under Chapter 5 of the Bankruptcy Code

13

("<u>Avoidance Actions</u>" and such proceeds of Avoidance Actions, the "<u>Avoidance Action</u> <u>Proceeds</u>"), and (B) the proceeds of all of the foregoing, whether now existing or hereafter acquired (collectively, the "<u>Postpetition Collateral</u>"). Subject to the Carve-Out (as defined below), the Adequate Protection Liens shall be (i) first priority perfected liens on all of the Postpetition Collateral that is not otherwise encumbered by validly perfected, non-avoidable security interests or liens as of the Petition Date (including the Prepetition Liens) (the "<u>Prior Liens</u>"), (ii) first priority perfected replacement liens on all of the Postpetition Collateral as to which the Prepetition Agent had a first priority lien as of the Petition Date, and (iii) junior perfected liens on all Postpetition Collateral that is subject to a Prior Lien.  The Adequate Protection Liens on the Postpetition Collateral shall be senior to the DIP Liens on such Postpetition Collateral.

5.     <u>Priority of Adequate Protection Liens</u>.  The Adequate Protection Liens shall be enforceable against the Debtor, its estate, and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Chapter 11 Case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, a "<u>Successor Case</u>"). Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, or upon the dismissal of the Chapter 11 Case or Successor Case. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

14

6.    <u>Adequate Protection Superpriority Claims</u>.  As further adequate protection against any diminution in value of the interests of the Prepetition Agent in the Prepetition Collateral, the Prepetition Agent is hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code allowed superpriority administrative expenses claims in the Chapter 11 Case or any Successor Case in the amount of the Adequate Protection Obligations (the "<u>Adequate Protection Superpriority Claim</u>"), which shall be payable from and have recourse to all Postpetition Collateral and all proceeds of Postpetition Collateral.

7.    <u>Priority of Adequate Protection Superiority Claims</u>.  The Adequate Protection Superpriority Claims shall be junior only to the Carve-Out. Except for the Carve-Out, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, including the DIP Superpriority Claim, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 of the Bankruptcy Code.

## AUTHORIZATION FOR DIP FINANCING

8.    <u>Authorization for DIP Financing Pursuant to Budget</u>.

a.    The Debtor is hereby immediately authorized on an interim basis to incur DIP Obligations, subject to the terms of this Interim Order, the Budget (subject to the Permitted Variances) and the DIP Loan Documents, in the aggregate principal amount of up to $1,000,000 (the "<u>Interim Funding Amount</u>") subject to any conditions and limitations on availability in the DIP Credit Agreement, plus all interest, fees and other charges payable in connection with such DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents. The Debtor

15

is hereby authorized to borrow money pursuant to the DIP Credit Agreement, subject to any limitations on and conditions precedent to borrowing under the DIP Loan Documents, and to use the proceeds of such borrowings to fund the Sale Process, for working capital and general corporate purposes of the Debtor, for other uses permitted under the DIP Credit Agreement, bankruptcy-related costs and expenses, and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the Budget (subject to the Permitted Variances) and the DIP Loan Documents.

b.    The Debtor is authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto. The Debtor is further authorized to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, deposit account control agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtor's Obligations under the DIP Loan Documents, each as may be provided for under the DIP Credit Agreement or as otherwise reasonably requested by the DIP Secured Parties.

c.    The Debtor is further authorized to (i) perform and incur all of its Obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order, including without limitation, the non-refundable payment or reimbursement of the reasonable and documented fees, costs and expenses referred to in the DIP Loan Documents, including the fees and expenses of the DIP Secured Parties, and costs and expenses payable under the DIP Loan Documents.

16

9.     <u>Authorization for Payment of DIP Financing Fees and Expenses</u>. All fees paid and payable and all costs and/or expenses reimbursed or reimbursable (including, costs and expenses referred to in the DIP Loan Documents and the DIP Administrative Agent's and DIP Lenders' (and each of their respective affiliates') attorneys' fees and expenses), under the DIP Loan Documents, by the Debtor to the DIP Secured Parties are hereby approved and shall not be subject to disgorgement by any party for any reason. Subject to the notice provision below, the Debtor is hereby authorized to pay all such fees, costs and expenses in accordance with the terms of the DIP Loan Documents and this Final Order, without any requirement that the Debtor, the DIP Administrative Agent, the DIP Lenders or any of their respective counsel file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses. Subject to the notice and professional fee review provisions set forth herein, the foregoing fees, costs, and expenses of the DIP Administrative Agent and the DIP Lenders authorized by this Final Order, whether incurred prior to or after the Petition Date, including, without limitation, all fees referred to in the DIP Loan Documents, shall be deemed fully earned, nonrefundable and irrevocable as of the date of this Final Order. None of the DIP Administrative Agent's or DIP Lenders' attorneys, financial advisors and accountants' fees and disbursements shall be subject to the prior approval of this Court or the guidelines of the Office of the United States Trustee for this region (the "<u>U.S. Trustee</u>"), and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Other than with respect to any fees, costs and expenses payable on the Closing Date or as otherwise provided by an order of the Court, any such fees, costs and expenses shall be evidenced by a summary invoice (redacted, as necessary, to protect any applicable privilege) and delivered to the Debtor, the U.S. Trustee, and the Creditors' Committee (if any). The Debtor, the U.S. Trustee and

17

the Creditors' Committee (if any) shall have ten (10) days from the date of such delivery (the "Professional Fee Review Period") within which to object in writing to such payment after the Petition Date. In the absence of any objection by the Debtor, the U.S. Trustee or the Creditors' Committee (if any) following the expiration of the Professional Fee Review Period, the Debtor shall pay such invoice promptly, and in any event within five (5) calendar days, without the need for further application to or order of the Court. In the event that, within such period, the Debtor, the U.S. Trustee or the Creditors' Committee (if any) raises an objection to a particular invoice (such disputed fees, the "Disputed Invoiced Fees"), the applicable counsel shall notify the Debtor and DIP Administrative Agent in writing of the objection and the Debtor shall pay the fees and expenses not subject to the objection within three (3) business days following the expiration of the Professional Fee Review Period, without the need for further application to or order of the Court. If after seven (7) calendar days after such objection such objection remains unresolved, the parties may submit such objection to the Court for resolution. The Debtor shall pay any Disputed Invoiced Fees promptly upon resolution of the objection, including to the extent resolved through approval by the Court, to the extent of such approval. In no event shall any invoice or other statement submitted by the DIP Administrative Agent or the DIP Lenders to the Debtor, the Creditors' Committee (if any), the U.S. Trustee or any other interested person (or any of their respective Professional Persons) with respect to fees or expenses incurred by any professional retained by the DIP Administrative Agent or the DIP Lenders operate to waive the attorney/client privilege, the work-product doctrine or any other evidentiary privilege or protection recognized under applicable law. For the avoidance of doubt, under the terms of the DIP Credit Agreement, the fees, costs, and expenses payable or reimbursable under the DIP Credit Agreement shall be paid in kind by adding the same to the DIP Obligations.

18

10.     <u>Amendments, Consents, Waivers, and Modifications</u>. The Debtor, with the express written consent of the DIP Administrative Agent in accordance with the DIP Credit Agreement, may enter into any non-material amendments, consents, waivers, or modifications to the DIP Loan Documents without the need for further notice and hearing or any order of this Court, it being further understood that further approval of this Court, upon notice and a hearing, shall be required for any such authorizations, amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that are material or that shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Budget required to be delivered under the DIP Loan Documents shall not be considered amendments or modifications to the Budget or the DIP Loan Documents; *provided further* that, the Debtor and the DIP Secured Parties shall have the right to seek approval from the Court of material amendments, waivers, consents or other modifications on an expedited basis.

11.     <u>Valid and Binding Obligations</u>.  All Obligations under the DIP Loan Documents shall constitute valid, binding, and nonavoidable Obligations of the Debtor, enforceable against it and its successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims,

19

defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity. Without limiting the generality of the foregoing, in no event shall the Debtor be authorized to offset or recoup any amounts owed, or allegedly owed, by any of the DIP Lenders to the Debtor or any of its affiliates against any of the DIP Obligations without the prior written consent of any DIP Lender that would be affected by any such offset or recoupment, and no such consent shall be implied by any action, inaction, or acquiescence by any DIP Lender.

12.    <u>DIP Liens</u>

a.    To secure the DIP Obligations, the DIP Administrative Agent is hereby granted, for the benefit of the DIP Secured Parties (i) pursuant to section 364(c)(2), a perfected lien on the Postpetition Collateral that is not otherwise encumbered by a Prior Lien, provided that such lien shall be junior to the Adequate Protection Liens and prior payment of the Carve-Out; and (ii) pursuant to section 364(c)(3), a perfected lien on the Postpetition Collateral junior to (A) the Adequate Protection Liens and (B) the Prior Liens, in each case subject to the Carve-Out ((i) and (ii) collectively, the "<u>DIP Liens</u>")

b.    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364 of the Bankruptcy Code or otherwise, other than (i) the Prior Liens, (ii) the Adequate Protection Liens, and (iii) prior payment of the Carve-Out.

13.    <u>DIP Lenders' Superpriority Claim.</u> The DIP Administrative Agent, for the benefit of the DIP Secured Parties, is hereby granted an allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") pursuant to section 364(c)(1) of the Bankruptcy Code in the Debtor's Chapter 11 Case and in any successor case under the Bankruptcy Code (including

20

any Successor Case) for all DIP Obligations, having priority over any and all other administrative

expenses of and unsecured claims against the Debtor, now existing or hereafter arising, of any kind

whatsoever, including, without limitation, all administrative expenses of the kinds specified in or

arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the

entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other

provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may

become secured by a judgment lien or other non-consensual lien, levy or attachment, which

allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and

postpetition property of the Debtor, including all cash and cash equivalents, and all proceeds

thereof including, subject to entry of the Final Order, without limitation, any Avoidance Actions

Proceeds. The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate

in priority of payment only to prior payment of the (i) Prepetition Loan Obligations and Prepetition

Adequate Protection Obligations and (ii) the Carve-Out.  Other than the Adequate Protection

Superpriority Claim, no other superpriority claims shall be granted or allowed in this Chapter 11

Case or in any Successor Case.

### <u>AUTOMATIC PERFECTION AND SURVIVAL</u>

14.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Interim Order shall

be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and

Adequate Protection Liens, without the necessity of filing or recording any mortgage, financing

statement or other instrument or document which may otherwise be required under the law or

regulation of any jurisdiction or the taking of any other action (including, for the avoidance of

doubt, entering into any deposit account control agreement) to validate or perfect (in accordance

with applicable non-bankruptcy law) the DIP Liens or Adequate Protection Liens, or to entitle the

21

DIP Administrative Agent or Prepetition Agent, respectively, to the priorities granted herein. Notwithstanding the foregoing, the Debtor is authorized and directed to execute and deliver promptly to the DIP Administrative Agent and Prepetition Agent, as applicable, all such financing statements, mortgages, notices and other documents as the DIP Administrative Agent or Prepetition Agent may reasonably request, and the DIP Administrative Agent and Prepetition Agent may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

15.    _Survival of Liens and Claims._ The DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Claims and other rights and remedies granted under this Interim Order to the DIP Administrative Agent, for the benefit of itself and the DIP Lenders, or the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, shall continue in this and any Successor Case and shall be valid and enforceable against any trustee appointed in the Debtor's Chapter 11 Case and/or upon the dismissal of the Debtor's Chapter 11 Case or any Successor Case and such liens, security interests, and claims shall maintain their priority as provided in this Interim Order until, as applicable, all DIP Obligations, Adequate Protection Obligations, and Prepetition Loan Obligations, have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Loan Documents.

**DISPOSITION OF COLLATERAL; ADDITIONAL FINANCING**

16.    _Disposition of Collateral._ The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Postpetition Collateral or the Prepetition Collateral other than in the ordinary course of business or in accordance with the Bidding Procedures Order (as defined below), without the prior written consent of the DIP Administrative Agent and Prepetition Agent.

22

17.    <u>Prohibition on Additional Liens</u>. The Debtor shall not enter into any commitment or agreement with respect to any financing (i) that is secured by a security interest or other lien on all or any portion of the Postpetition Collateral or the Prepetition Collateral which is equal or senior to any security interest or other lien of the DIP Administrative Agent or Prepetition Agent, or (ii) any portion of which purports to be, or would be, payable prior to payment in full of all DIP Obligations, Prepetition Loan Obligations, and Adequate Protection Obligations.

## EVENTS OF DEFAULT; REMEDIES

18.    <u>Events of Default</u>. The occurrence of any of the following events, unless waived in writing by the Prepetition Agent, shall constitute an event of default (an "<u>Event of Default</u>," and collectively, the "<u>Events of Default</u>"):

a.    an "Event of Default" as defined under the DIP Loan Documents shall have occurred and is continuing, unless waived pursuant to the DIP Loan Documents;

b.    the failure by the Debtor to perform, in any respect, any of the material terms, provisions, conditions, covenants, or obligations under this Interim Order;

c.    if the Final Order, in form and substance acceptable to the DIP Administrative Agent  and the Prepetition Agent in their sole discretion, has not been entered by the Court on or before the date that is twenty-five (25) days after the Petition Date;

d.    if the Debtor fails to timely meet any of the following case milestones:

(i)    if the Debtor has not filed a bidding procedures motion (the "<u>Bidding Procedures Motion</u>"), in form and substance acceptable to the DIP Administrative Agent, seeking approval of bidding procedures for the sale of substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code (the "<u>Sale</u>"), on or before three (3) business days after the Petition Date;

23

(ii)    if an order approving the Bidding Procedures Motion, in form and substance acceptable to the DIP Administrative Agent (a "<u>Bidding Procedures Order</u>"), has not been entered on or before the date that is twenty-five (25) days after the Petition Date; and

(iii)    if an order approving the Sale, in form and substance acceptable to the Prepetition Agent, has not been entered on or before the date that is fifty four (54) days after the Petition Date.

e.    the failure to comply with the Budget (subject to permitted Variances) in accordance with this Interim Order of the DIP Credit Agreement for any weekly reporting period;

f.    the filing by the Debtor of any motion seeking, or the granting of any motion providing for, reversal or modification of this Interim Order;

g.    the commencement of a Challenge (as defined below) by any party, including the Debtor or the Creditors' Committee; or

h.    the consent of the Debtor to the standing of any party, including the Creditors' Committee, to pursue any claim or cause of action against any of the Released Parties (as defined below).

19.    <u>Remedies and Stay Modification.</u>

a.    The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable),

24

whether or not a an Event of Default has occurred, including without limitation: (i) to require all cash, checks or other collections or proceeds from DIP Collateral received by the Debtor to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Secured Parties under the DIP Loan Documents in accordance with any requirements of the DIP Loan Documents; (ii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the Postpetition Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein; (iv) the right to give the Debtor any notice provided for in any of the DIP Loan Documents or this Interim Order; and (v) the right to declare (1) the termination, reduction or restriction of any further commitment under the DIP Loan Documents to the extent any such commitment remain unfunded; (2) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Debtor;  (3) the termination of the DIP Loan Documents as to any future liability or obligation of the DIP Administrative Agent or any DIP Lender, but without affecting any of the DIP Liens on the Postpetition Collateral or the Obligations of the Debtor; and/or (4) declare a termination, reduction, or restriction of the ability of the Debtor to use any Cash Collateral; *provided* that with respect to the enforcement of the Prepetition Liens, Adequate Protection Liens, or DIP Liens or the exercise of any other rights or remedies with respect to thereto (including rights to set-off or to apply any amounts in any bank accounts subject to such liens), (i) the DIP Administrative Agent or Prepetition Agent, as applicable, shall file a written notice with the Court, which notice can be the same as the Carve-Out Notice (the "Default Notice") setting forth the Events of Default and, shall serve such Default Notice upon the Debtor, its counsel,

25

counsel to the Creditors' Committee (if any), and the U.S. Trustee. Effective for the period beginning on the date the Default Notice is filed (the "Default Notice Date") and ending two (2) calendar days thereafter (the "Enforcement Notice Period") (and during which time the DIP Administrative Agent and/or Prepetition Agent shall permit the Debtor to cure such Event of Default and use Cash Collateral in accordance with the Budget), the DIP Administrative Agent, for itself and on behalf of the DIP Lenders, and the Prepetition Agent, for itself and on behalf of the Prepetition Lenders, shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Debtor or any other interested party, to enforce the DIP Liens, Adequate Protection Liens, or Prepetition Liens, or exercise any other rights or remedies with respect to the DIP Obligations, Prepetition Loan Obligations, or Adequate Protection Obligations (including rights to set-off or to apply any amounts in any bank accounts).

b.      During the Enforcement Notice Period, (i) the Debtor shall be prohibited from requesting any further draws under the DIP Facility, but shall be permitted to use Cash Collateral, and (ii) the only basis on which the Debtor or the Creditors' Committee, if any, shall be entitled to seek an emergency hearing within the Enforcement Notice Period with the Court shall be to contest whether an Event of Default has occurred and/or is continuing. The Enforcement Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents.

c.      The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtor, the Creditors' Committee (if any), any other party in interest and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Enforcement Notice Period.

26

d.      Upon the occurrence of the Default Notice Date, other than funding the Carve Out and the Professional Fees Account (as defined below) in accordance herewith, the DIP Administrative Agent, and the DIP Lenders in accordance with the DIP Credit Agreement, shall have no further obligation to provide financing under the DIP Loan Documents.

20.      This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested.

## **BUDGET MAINTENANCE; CARVE OUT**

21.      <u>Budget Maintenance</u>.  Except as otherwise expressly set forth herein, the Budget may be amended or modified in writing from time to time only with the written consent of the Debtor and the DIP Administrative Agent in their sole discretion, and any modifications to, or extensions, amendments or updates of, the Budget shall be in form and substance acceptable to and approved in writing by the Debtor and the DIP Administrative Agent in their sole discretion. During the Subject Period, the Debtor shall deliver to the DIP Administrative Agent on or before the close of business on Tuesday of each week (and if such day is not a business day, then the next succeeding business day) the following: (a) comparison for the prior week of actual results of all items contained in the Budget to the amounts originally contained in the Budget and (b) cumulative comparison for the period from the Petition Date through the end of the prior week of the actual results of all items contained in the Budget to the amounts originally contained in the Budget, in each case along with such supporting information and additional reporting as the DIP Administrative Agent may request. The Debtor's aggregate expenditures shall not exceed 110% of the aggregate of the Budget expenditures, tested on a weekly basis over a rolling four-week

27

period (for the avoidance of doubt, excluding disbursements for Professional Fees (as defined below), which shall not be subject to a variance). The Debtor and its professionals, consultants, and other advisors shall be available weekly (subject to reasonable scheduling conflicts) for a telephonic conference call with the DIP Administrative Agent and/or its professionals to discuss the status of the Chapter 11 Case, the results of operations and other matters pertaining to the Debtor, including any sale or restructuring efforts; _provided_ that, for the avoidance of any doubt, nothing contained in this Interim Order shall require the Debtor to disclose any privileged information or communications. The DIP Administrative Agent shall have independent access to the Debtor's financial advisors to discuss matters relating to the Debtor, including any contemplated sale or restructuring of the Debtor.

22.    Carve-Out.

a.    Subject to the terms and conditions contained in this paragraph, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the DIP Liens, and the DIP Superpriority Claims shall be subordinate to (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Court (the "Case Administration Fees") as and when they are due without reference to the Budget; (ii) in the event of a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, all reasonable and documented fees and expenses, in an aggregate amount not to exceed $25,000, incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) unpaid professional fees and expenses payable to any Professional Person[4] (collectively, the "Professional Fees"), in an aggregate amount (the "Pre-Default Limit")

---

[4]    Professional Person means any attorney, financial advisor, accountant, appraiser, monitor ,auctioneer or other professional person and who is retained, with Court approval, by (a) the Debtor pursuant to any one or more of Sections 327, 328(a), and 363 of the Bankruptcy Code or (b) anyCreditors' Committee appointed in the Chapter 11 Case pursuant to Section 1103(a) of the Bankruptcy Code.

28

equal to the cumulative budgeted amounts on a line item basis (i.e. a Professional Person can use the cumulative amounts in the Budget, for the period commencing on the Petition Date and ending on the Carve-Out Effective Date, for such Professional Person only, and cannot use any excess that may exist during that period for another Professional Person, provided that there will be only one line item for the Debtors' counsel and only one line item for all of the Professional Persons retained by the Creditors' Committee, if any) for such Professional Fees reflected in the Budget that are incurred or accrued prior to the date on which the Prepetition Agent provides written notice to the Debtor, Debtor's counsel, the U.S. Trustee and counsel to the Creditors' Committee (if any) of an Event of Default (such notice, the "Carve-Out Notice," and the date of a delivery of such notice, the "Carve-Out Effective Date") but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date) are ultimately allowed by the Court pursuant to section 330 of the Bankruptcy Code; (iv) unpaid Professional Fees of the Debtor and the Creditors' Committee's (if any), in each case incurred or accrued on or after the Carve-Out Effective Date in an aggregate amount not to exceed $100,000 for Debtor Professional Persons and $25,000 for Creditors' Committee Professional Persons (if any), to the extent allowed at any time, whether by interim order, procedural order or otherwise; and (v) all accrued but unpaid wages and other compensation payable to the Debtor's employees (including obligations on account of paid time off), whether arising before or after the Petition Date, up to a maximum amount of $500,000 (the "Employee Amounts") (clauses (i)—(v), collectively, the "Carve-Out," and clause (iv) alone, the "Capped Carve-Out"). Subject to the immediately preceding sentence, so long as the Carve-Out Effective Date has not occurred, the Debtor shall be permitted to (a) pay Case Administration Fees as and when they are incurred without reference to the Budget and (b) Professional Fees allowed and payable under Bankruptcy Code sections 330, 331, and 503 as

29

provided in the Budget. Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Effective Date, including any payment of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis. Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to the Debtor unless agreed to in writing by the DIP Administrative Agent. Immediately upon delivery of a Carve-Out Notice, the Debtor shall transfer to the Professional Fees Account funds in an amount equal to the sum of the Capped Carve-Out and unpaid Professional Fees and Employee Amounts in accordance with clauses (iii) and (v) above.

b.      Prior to the occurrence of a Carve-Out Effective Date, and with respect to each Professional Person, the Debtor shall, on a weekly basis, transfer cash proceeds from cash on hand in an amount equal to the total budgeted weekly fees of such Professional Person for the prior week set forth in the approved Budget, up to the Pre-Default Limit less the amount of cash already deposited in the Professional Fees Account for such Professional Person, in each case into a segregated account not subject to the control of the Prepetition Agent, the DIP Administrative Agent, any other Secured Party (the "Professional Fees Account"). With respect to each Professional Person, the Debtor shall cause funds held in the Professional Fees Account to be used to pay Professional Fees for such Professional Person solely as they become allowed and payable pursuant to any interim or final orders of the Court or otherwise; provided that when all accrued and unpaid fees, disbursements, costs and expenses, allowed at any time by this Court (the "Allowed Professional Fees") and incurred by such Professional Person prior to the Carve-Out Effective Date have been paid in cash in full (regardless of when such Professional Fees are

30

allowed by the Court), any funds remaining in the Professional Fees Account with respect to such Professional Person shall revert to the Debtor (and shall not longer be held in trust for the benefit of such Professional Person) for use in accordance with the Budget and this Interim Order; provided further that the Debtor's obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account. The Professional Fees Account, and all funds held in the Professional Fees Account for each Professional Person, shall be held in trust exclusively for the benefit of the applicable Professional Person, including with respect to obligations arising out of the Carve-Out.

c.      Payment of any obligations within the Carve-Out shall not and shall not be deemed to reduce the Prepetition Loans or the Adequate Protection Obligations and shall not be deemed to subordinate the Adequate Protection Liens or the Adequate Protection Superpriority Claims to any junior prepetition or postpetition lien, interest, or claim in favor of any other party (other than those that are included within the Carve-Out).

## RELEASE, CHALLENGE RIGHTS, AND LIMITATIONS

23.      <u>Release of Claims Against DIP Secured Parties and Prepetition Secured Parties</u>. The stipulations and admissions contained in <u>Section F</u> and its subparagraphs of this Interim Order, shall be binding on all parties in interest, including, without limitation, the Creditors' Committee (if any), unless, and solely to the extent that, (a) the Creditors' Committee, or another party in interest other than the Debtor, has obtained standing and timely filed a complaint and commenced an adversary proceeding (subject to the limitations set forth in <u>paragraph 17(b)</u> of this Interim Order) (or timely filed a motion, with an attached draft complaint, to obtain standing to file such complaint and commence such an adversary proceeding) (a "<u>Challenge</u>") challenging the amount, extent, validity, or enforceability of the Prepetition Loan Obligations, or the perfection or priority

31

of the Prepetition Liens, or otherwise asserting any claims or causes of action on behalf of the Debtor's estate against the Prepetition Agent or the other Prepetition Secured Parties relating to the Prepetition Loan Obligations, in each case no later than seventy five (75) days after the entry of this Interim Order (the "Complaint Filing Deadline"); and (b) this Court rules in favor of the plaintiff in any such timely and properly commenced Challenge. If no Challenge is timely and properly commenced by the Complaint Filing Deadline, or to the extent such adversary proceeding does not result in a final and non-appealable order of this Court that is inconsistent with the acknowledgments of the Debtor contained in Section F and its subparagraphs of this Interim Order, then, without the requirement or need to file any proof of claim with respect thereto and without further notice, motion or application to, order of, or hearing before, this Court, the acknowledgments of the Debtor contained in Section F and its subparagraphs of this Interim Order with respect to the Prepetition Agent, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Loan Obligations, and Prepetition Collateral shall be binding, conclusive and final on the Creditors' Committee and any other Person, entity or party-in-interest in the Chapter 11 Case and any Successor Case and (i) the claims, liens, and security interests of the Prepetition Agent and the Prepetition Secured Parties shall be deemed to be finally allowed for all purposes in this Chapter 11 Case and any subsequent chapter 7 case in the event the Chapter 11 Case is converted, and shall not be subject to challenge by any party in interest as to validity, priority or otherwise, and (ii) the Debtor and its estate shall be deemed to have forever released any and all claims or causes of action against (A) the DIP Administrative Agent, the DIP Secured Parties, the Prepetition Agent, and the Prepetition Secured Parties and (B) with respect to each person (as defined in the Bankruptcy Code) in the preceding clause (A), such person's affiliates (as defined in the Bankruptcy Code) and the respective directors, officers,

32

employees, agents, investment managers, subagents, representatives, and advisors (including attorneys, accountants and experts) of such person and such person's affiliates (all persons in clauses (A) and (B), collectively, the "Released Parties") with respect to the Prepetition Loan Documents, the DIP Loan Documents, or any related transactions.  Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in Section F and its subparagraphs hereof, and the releases contained in this paragraph, shall nonetheless remain binding on all parties in interest and preclusive except to the extent that such stipulations are expressly challenged in such adversary proceeding.

24.    Limitations on the Cash Collateral, DIP Loans, and the Carve-Out.

a.    From and after the date of entry of this Interim Order, the proceeds of the DIP Loans, Postpetition Collateral, the Prepetition Collateral and Cash Collateral shall not, directly or indirectly, be used to pay any expenses, payments, and/or disbursements of the Debtor or incurred by the Debtor except for those items which are then due, expressly permitted under the Budget or this Interim Order, and in such amounts as clearly identified in the Budget and/or this Interim Order (including compensation and reimbursement of expenses allowed by this Court to Court-approved Professional Persons to the extent that such fees and expenses are in accordance with the line items reflected in the Budget for such Professional Persons). For the avoidance of doubt, the Budget contains a line item relating to the fees and expenses to be incurred by Professional Persons on an accrual basis, provided that there will be only one line item for the Debtors' counsel and only one line item for all of the Professional Persons retained by the Creditors' Committee, if any. Pursuant to this Interim Order, the Debtor shall be permitted to pay such Professional Fees that accrue and are in the Budget prior to the Carve-Out Effective Date, when and if authorized by the Court, provided that such payments do not exceed the cumulative budgeted amounts for such

33

Professional Fees, prior to the Carve-Out Effective Date (without regard to whether a Professional Person has exceeded its budgeted amount on a line item basis for a particular week prior to the Carve-Out Effective Date) in the Budget or DIP Budget.

b.    Notwithstanding anything herein, the DIP Loans and Cash Collateral may only be used in accordance with the Budget and, in any event, the DIP Loans, Cash Collateral and the Carve-Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) against any of the Released Parties or seeking relief that would impair their rights and remedies under the Prepetition Loan Documents, DIP Loan Documents, or this Interim Order, including, without limitation, (A) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions for lender liability against any of the Released Parties, any actions under section 105 of the Bankruptcy Code against any of the Released Parties, any actions under chapter 5 of the Bankruptcy Code against and of the Released Parties, or any actions under applicable, non-bankruptcy law or otherwise against any of the Released Parties, (B) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the rights and obligations of the Prepetition Agent or DIP Administrative Agent or seeking affirmative relief against the Prepetition Agent or DIP Administrative Agent, or (C) for the payment of any services rendered by the professionals retained by the Debtor or any Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceedings, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief that would impair the ability of the Prepetition Agent to recover on the Prepetition Loan Obligations or the DIP Administrative Agent

34

to recover on the DIP Obligations, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prepetition Loan Obligations or DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the Prepetition Agent, the DIP Administrative Agent, the Postpetition Collateral, or the Prepetition Collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the Prepetition Agent or DIP Administrative Agent of any rights and/or remedies under this Interim Order, the Prepetition Loan Documents, the DIP Loan Documents or applicable law, or the enforcement of realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the Prepetition Agent or DIP Administrative Agent upon any of the Postpetition Collateral and the Prepetition Collateral; (b) to make any distribution under a plan of reorganization in the Chapter 11 Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without prior written consent of the DIP Administrative Agent, unless otherwise ordered by the Court; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor without the prior written consent of the DIP Administrative Agent, (e) to object, contest, or interfere with in any way the enforcement or realization upon any of the Postpetition Collateral or the Prepetition Collateral by the Prepetition Agent or DIP Administrative Agent once an Event of Default has occurred; (f) to sell or otherwise dispose of the Postpetition Collateral or the Prepetition Collateral other than in the ordinary course of business or in accordance with the Bidding Procedures Order without the prior consent of the DIP Administrative Agent; (g) to the extent such Cash Collateral represents insurance proceeds constituting Postpetition Collateral, without the prior consent of the DIP Administrative Agent; (h) to pay indebtedness outside the ordinary course of business without the prior written consent of the DIP Administrative Agent; (i) to incur any new indebtedness without the prior written consent of the DIP Administrative Agent;

35

(j) to object to or challenge in any way the claims, liens, or interests (including interests in the Postpetition Collateral and the Prepetition Collateral) held by or on behalf of the Prepetition Agent or DIP Administrative Agent; (k) to pay any costs or expenses that are not ordinary course operating expenses of the Debtor; or (l) to modify or seek to modify the rights of the Prepetition Agent or DIP Administrative Agent under this Interim Order. Notwithstanding the foregoing, no more than $25,000 in the aggregate of Cash Collateral may be used by the Creditors' Committee (if any) to investigate, prior to the expiration of the Complaint Filing Deadline but not to prosecute, the claims and liens of the Prepetition Secured Parties.

**MISCELLANEOUS**

25.    <u>Collections</u>.  Notwithstanding anything in this Interim Order to the contrary, any and all claims and liens of the Prepetition Agent and Prepetition Lenders arising with respect to or in connection with this Interim Order or the Prepetition Loan Documents (the "<u>Superior Senior Obligations</u>"), including, without limitation, the Prepetition Loan Obligations, Prepetition Liens, the Adequate Protection Liens, and Adequate Protection Superpriority Claims, must and shall be indefeasibly paid and satisfied in full in cash before any payment or distribution, whether pursuant to a chapter 11 plan, setoff or otherwise, may or can be made to or retained by the DIP Administrative Agent or any of the DIP Lenders (in their respective capacities as such) arising with respect to or in connection with this Interim Order and/or the DIP Loan Documents (collectively, the "<u>Subordinate Senior Obligations</u>").  Any payment or distribution, whether in cash, securities or other property, which would otherwise, but for the terms hereof, be payable or deliverable to the DIP Administrative Agent or any DIP Lender in respect of or in connection with any Subordinate Senior Obligations shall be paid or delivered directly to the Prepetition Agent (to be held and/or applied by Prepetition Agent in accordance with the terms of this Interim Order and

36

the Prepetition Loan Agreement) until all Superior Senior Obligations are indefeasibly paid and satisfied in full in cash.

26.      <u>DIP Lenders Not Responsible Persons; No Control.</u> In (a) making the decision to make the DIP Loans; (b) administering the DIP Loans; (c) extending other financial accommodations to the Debtor under the DIP Loan Documents; and (d) making the decision to collect the indebtedness and obligations of the Debtor, none of the DIP Secured Parties shall be considered to (i) owe any fiduciary obligation to the Debtor or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (ii) be exercising control over the Debtor or its operations, have authority to determine the manner in which any of the Debtor's operations are conducted, or acting in any way as a responsible person, a control person, insider or as an owner or operator of the Debtor or any of its affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, and/or the DIP Loan Documents, under any applicable law

27.      <u>No Third-Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third-party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

28.      <u>Section 506(c) Claims</u>. Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case at any time shall be charged against the Prepetition Secured Parties or DIP Secured Parties or any of their respective claims, the Prepetition Collateral, or the Postpetition Collateral pursuant to section 506(c) of the Bankruptcy Code, or otherwise.

*ACTIVE 64865456v4*

*RLF1 27606987v.1*

29.     <u>No Marshaling/Application of Proceeds</u>. Subject to entry of the Final Order, neither the Prepetition Secured Parties nor the DIP Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied in accordance with this Interim Order notwithstanding any other agreement or provision to the contrary.

30.     <u>Section 552(b)</u>. Subject to entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Agent with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

31.     <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the Prepetition Agent's or DIP Administrative Agent's right to seek any other or supplemental relief in respect of the Debtor, including the right to seek additional adequate protection; or (b) any of the rights of the Prepetition Agent or DIP Administrative Agent under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Chapter 11 Case or a Successor Case, conversion of the Chapter 11 Case to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans.

32.     <u>Section 507(b) Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the

38

Prepetition Agent hereunder is insufficient to compensate for any diminution in value of the Prepetition Agent's interests in the Prepetition Collateral during the Chapter 11 Case or any Successor Case. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgement by the Prepetition Agent, that the adequate protection granted herein does in fact adequately protect the Prepetition Agent to the extent of any diminution in value of its interest in the Prepetition Collateral (including Cash Collateral).

33.     No Waiver by Failure to Seek Relief.  The failure of the Prepetition Agent or DIP Administrative Agent to seek relief or otherwise exercise its rights and remedies under this Interim Order or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise of the Prepetition Agent.

34.     Proofs of Claim.  The Prepetition Agent will not be required to file a proof of claim in the Chapter 11 Case or a Successor Case for its claims to be allowed, and the Debtor's Stipulations shall be and are hereby deemed to constitute a timely filed proof of claim. Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in the Chapter 11 Case or a Successor Case shall not apply to the Prepetition Agent.

35.     Good Faith.  The Prepetition Agent and DIP Administrative Agent have each acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.

36.     Access to Debtor.   The Debtor shall permit representatives, agents and/or employees of the DIP Administrative Agent, including professionals retained by the DIP Administrative Agent's legal professionals, to have reasonable access to its premises and records

39

during normal business hours and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

37. <u>Prepetition Secured Parties and DIP Secured Parties Credit Bid Rights.</u> The (i) Prepetition Agent shall be entitled, on behalf of the other Prepetition Secured Parties, to credit bid up to the full amount of the outstanding Prepetition Loan Obligations, including, without limitation, any accrued interest and expenses, and (ii) the DIP Administrative Agent shall be entitled, on behalf of the other DIP Secured Parties, to credit bid up the full amount of the outstanding DIP Obligations, including, without limitation, any accrued interest and expenses, in any sale of any Prepetition Collateral or Postpetition Collateral, respectively, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding or otherwise.

38. <u>Binding Effect of Interim Order</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof. Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Administrative Agent, the Prepetition Agent, the U.S. Trustee, all other creditors of the Debtor, any committee appointed in the Chapter 11 Case, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Case, any Successor Case, or upon dismissal of the Chapter 11 Case or a Successor Case. In the event of any inconsistency between the provisions of this Interim Order and any other order (including any "First Day" pleadings and orders relating

40

thereto), the provisions of this Interim Order shall govern and control. Any payments to be made under any order (including any "First Day" order) shall only be made in accordance with this Interim Order and the Budget.

39.    <u>No Modification of Interim Order</u>.  The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of the DIP Administrative Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Administrative Agent. In the event any of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-availability of any advances, payments, or use of cash whether previously or hereunder, or lien, claim, or priority authorized or created hereby. Any liens or claims granted to the DIP Administrative Agent or Prepetition Agent hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

40.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of liquidation or reorganization in the Chapter 11 Case; (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Case or a Successor Case. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Administrative Agent and Prepetition Agent pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Case,

41

in any Successor Case, or following dismissal of the Chapter 11 Case or any Successor Case, and shall maintain their priority as provided by this Interim Order until the DIP Obligations and Prepetition Loan Obligations have been indefeasibly paid in full.

41.     <u>Final Hearing</u>.  A final hearing on the Motion is scheduled for [_____], 2022 at [___ __.m.] (prevailing Eastern Time) before the Honorable [_____], United States Bankruptcy Court for the District of Delaware. The Debtor shall provide notice of the Final Hearing, the Motion and Interim Order in accordance with the Local Rules to all parties having been given notice of the Hearing and to any other party entitled to notice pursuant to Local Rule 9013-(m) and Bankruptcy Rule 2002. Any objections or responses to the entry of the Final Order shall be filed no later than [_____], 2022 at 4:00 p.m. (prevailing Eastern Time), which objections shall be served upon: (i) the Debtor, 200 Cardinal Way, 3rd Floor, Redwood City, CA 94063, Attn:  Dana J. Moss (dana.moss@genapsys.com); (ii) counsel to the Debtor, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn:  Rachel C. Strickland, Esq., Paul V. Shalhoub, Esq. and Betsy L. Feldman, Esq., and (b) Richards, Layton, & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn:  Daniel J. DeFranceschi, Esq. (defranceschi@rlf.com), Michael J. Merchant, Esq. (merchant@rlf.com) and David T. Queroli, Esq. (queroli@rlf.com); (iii) counsel to the DIP Administrative Agent and Prepetition Agent, (a) Greenberg Traurig LLP, 1000 Louisiana Street, Suite 6700, Houston, Texas 77002, Attn: Shari L. Heyen (heyens@gtlaw.com) and Eric J. Howe (howee@gtlaw.com), and (b) Greenberg Traurig, LLP, 3333 Piedmont Road NE, Suite 2500, Atlanta, Georgia 30305, Attn: David B. Kurzweil (kurzweild@gtlaw.com) and Matthew A. Petrie (petriem@gtlaw.com); (iv) counsel to the Creditors' Committee, if any; and (v) the Office of the U.S. Trustee for the District of Delaware,

*ACTIVE 64865456v4*

*RLF1 27606987v.1*

J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, DE 19801, Attn: Jane

M. Leamy, Esq. (jane.m.leamy@usdoj.gov).

42.    <u>Retention of Jurisdiction</u>.  The Court has and will retain exclusive jurisdiction to

enforce this Interim Order according to its terms.

*ACTIVE 64865456v4*

*RLF1 27606987v.1*

## EXHIBIT A

**Budget**

**Genapsys Inc.**
**Weekly Cash Flow**
**As of 7/11/2022**
($ in 000s)

| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
| Week ending | 7/15 | 7/22 | 7/29 | 8/5 | 8/12 | 8/19 | 8/26 | 9/2 | 9/9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | |
| D&O reimbursements | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Receipts** | $-- | $-- | $-- | $-- | $-- | $-- | $-- | $-- | $-- | $-- |
| **Operating Disbursements** | | | | | | | | | | |
| Wages & benefits - Remaining Employees | $224 | $166 | $265 | $2 | $288 | $66 | $272 | $2 | $283 | $1,567 |
| Proposed Key Employee Retention Program | | -- | 237 | -- | -- | -- | 462 | -- | -- | 699 |
| Wages & benefits - RIF employees | 46 | 248 | 13 | 24 | -- | 62 | -- | -- | -- | 332 |
| OPEX | 205 | 18 | 18 | 334 | 62 | 14 | 13 | 332 | 34 | 1,029 |
| **Total Operating Disbursements** | $475 | $432 | $532 | $360 | $350 | $80 | $746 | $334 | $318 | $3,627 |
| **Operating Cash Flow** | ($475) | ($432) | ($532) | ($360) | ($350) | ($80) | ($746) | ($334) | ($318) | ($3,627) |
| **Non Operating Disbursements** | | | | | | | | | | |
| Professional and Chapter 11 Fees | | | | | | | | | | |
| Debtor's counsel | $200 | $200 | $200 | $200 | $200 | $225 | $225 | $225 | $200 | $1,875 |
| Debtor's investment bank | 130 | -- | -- | 130 | -- | -- | -- | 130 | -- | 390 |
| Claims agent | 10 | 5 | 10 | 10 | 10 | 10 | 10 | 10 | 5 | 80 |
| Creditors' committee professionals | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| UST quarterly fees | -- | -- | -- | -- | -- | -- | -- | -- | 250 | 250 |
| Debt Service | | | | | | | | | | |
| Debt interest payments | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Debt principal payments | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Net Cash Flow** | ($815) | ($637) | ($742) | ($700) | ($560) | ($315) | ($981) | ($699) | ($773) | ($6,222) |
| Cash balance | $75 | $1,409 | $1,772 | $1,030 | $330 | $2,767 | $2,453 | $1,472 | $773 | $75 |
| Release of cash collateral | 2,149 | -- | -- | -- | -- | -- | -- | -- | -- | 2,149 |
| DIP funding | -- | 1,000 | -- | -- | 2,998 | -- | -- | -- | -- | 3,998 |
| Net cash flow | (815) | (637) | (742) | (700) | (560) | (315) | (981) | (699) | (773) | (6,222) |
| **Ending Cash** | $1,409 | $1,772 | $1,030 | $330 | $2,767 | $2,453 | $1,472 | $773 | $-- | $-- |

**EXHIBIT B**

**DIP Credit Agreement**

**SECURED DEBTOR-IN-POSSESSION
TERM LOAN AND SECURITY AGREEMENT**

**DATED AS OF JULY __, 2022**

**AMONG**

**GENAPSYS, INC.,
A DEBTOR-IN-POSSESSION, AS BORROWER,**

**THE LENDERS PARTY HERETO,**

**AND**

**OXFORD FINANCE LLC**

**AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT**

---

---

TABLE OF CONTENTS

Section 1.        DEFINITIONS AND INTERPRETATION ................................................................... 1

1.1      Definitions ......................................................................................................................... 1

1.2      Accounting Terms, Financials Statements, Calculations, Etc ........................................ 22

1.3      Interpretation, Etc ........................................................................................................... 23

Section 2.        LOANS ............................................................................................................... 23

2.1      Loans ................................................................................................................................ 23

2.2      Pro Rata Share ................................................................................................................. 24

2.3      Use of Proceeds ............................................................................................................... 26

2.4      Evidence of Debt; Register; Lenders' Books and Records; Notes .................................. 26

2.5      Interest on Loans ............................................................................................................. 26

2.6      [Reserved] ........................................................................................................................ 27

2.7      Default Interest ................................................................................................................ 27

2.8      Certain Fees ..................................................................................................................... 27

2.9      Repayments ...................................................................................................................... 27

2.10    Voluntary Prepayments ................................................................................................... 27

2.11    Mandatory Prepayments .................................................................................................. 28

2.12    Reserved ........................................................................................................................... 28

2.13    Application of Prepayments ............................................................................................. 29

2.14    General Provisions Regarding Payments ......................................................................... 29

2.15    Ratable Sharing ................................................................................................................ 30

2.16    Increased Costs; Capital Adequacy ................................................................................. 31

2.17    Taxes; Withholding, Etc .................................................................................................. 32

2.18    Obligation to Mitigate ..................................................................................................... 34

2.19    Security and Priority ........................................................................................................ 35

2.20    No Discharge; Survival of Claims ................................................................................... 35

Section 3.        CONDITIONS PRECEDENT ................................................................................. 35

3.1      Conditions to Credit Extension on Closing Date ............................................................ 35

3.2      Conditions to Each Credit Extension ............................................................................... 37

Section 4.        REPRESENTATIONS AND WARRANTIES ........................................................... 38

4.1      Organization; Requisite Power and Authority; Qualification ......................................... 38

4.2      Power; Authorization; Enforceable Obligations ............................................................. 38

i

4.3    No Conflict; Governmental Consents, Etc ................................................................ 38

4.4    Adverse Proceedings, Etc ........................................................................................ 39

4.5    Payment of Taxes .................................................................................................... 39

4.6    Properties ................................................................................................................. 39

4.7    Environmental Matters ............................................................................................ 40

4.8    No Defaults .............................................................................................................. 40

4.9    Governmental Regulation ........................................................................................ 40

4.10   Federal Reserve Regulations; Exchange Act .......................................................... 41

4.11   Employee Matters .................................................................................................... 41

4.12   ERISA ...................................................................................................................... 41

4.13   Plan Assets; Prohibited Transactions ...................................................................... 42

4.14   Compliance with Statutes, Etc ................................................................................ 42

4.15   Disclosure ................................................................................................................ 42

4.16   Sanctions; Anticorruption Laws; AML Laws; Etc .................................................. 42

4.17   Use of Proceeds ....................................................................................................... 43

4.18   Security Interest ....................................................................................................... 43

4.19   U.S. Person .............................................................................................................. 43

4.20   DIP Order ................................................................................................................. 43

4.21   Appointment of Trustee or Examiner; Liquidation ................................................ 44

4.22   No Other Insolvency Proceeding ............................................................................. 44

4.23   DIP Superpriority Claims; DIP Liens ..................................................................... 44

4.24   Real Estate ............................................................................................................... 44

4.25   Material Contracts ................................................................................................... 44

4.26   Insurance .................................................................................................................. 44

Section 5.        AFFIRMATIVE COVENANTS ................................................................. 44

5.1    Financial Statements and Other Reports ................................................................. 44

5.2    Existence .................................................................................................................. 47

5.3    Payment of Taxes and Claims ................................................................................. 47

5.4    Maintenance of Properties ....................................................................................... 47

5.5    Insurance .................................................................................................................. 47

5.6    Books and Records; Inspections .............................................................................. 47

5.7    Lender Meetings ...................................................................................................... 48

5.8    Compliance with Laws; Sanctions and Contractual Obligations ............................ 48

5.9    Environmental .......................................................................................................... 48

ii

| 5.10 | Plan Assets ........................................................................................ | 49 |
|------|---|---|
| 5.11 | Further Assurances ........................................................................... | 49 |
| 5.12 | Non-Consolidation ........................................................................... | 50 |
| 5.13 | Cash Management .............................................................................. | 50 |
| 5.14 | Intellectual Property ........................................................................ | 50 |
| 5.15 | Debtor-in-Possession Obligations ................................................... | 50 |
| 5.16 | DIP Budget; Variance Covenant ...................................................... | 50 |
| 5.17 | Use of Proceeds ............................................................................... | 51 |
| 5.18 | Consultants ...................................................................................... | 51 |
| 5.19 | Bankruptcy Milestones ..................................................................... | 51 |
| 5.20 | Post-Closing Matters ....................................................................... | 51 |
| Section 6. | NEGATIVE COVENANTS ............................................................. | 51 |
| 6.1 | Indebtedness .................................................................................... | 51 |
| 6.2 | Liens ................................................................................................ | 53 |
| 6.3 | Restricted Payments ........................................................................ | 54 |
| 6.4 | Reserved .......................................................................................... | 54 |
| 6.5 | Investments ..................................................................................... | 54 |
| 6.6 | Material Contracts ........................................................................... | 55 |
| 6.7 | Fundamental Changes; Disposition of Assets .................................. | 55 |
| 6.8 | Other Bankruptcies ......................................................................... | 55 |
| 6.9 | Sales and Lease-Backs ..................................................................... | 55 |
| 6.10 | Transactions with Shareholders and Affiliates ................................ | 56 |
| 6.11 | Conduct of Business ........................................................................ | 56 |
| 6.12 | Payment and Prepayment of Indebtedness ....................................... | 56 |
| 6.13 | Fiscal Year; Accounting Policies ..................................................... | 56 |
| 6.14 | Deposit Accounts and Securities Accounts ..................................... | 56 |
| 6.15 | Amendments to Organizational Agreements ..................................... | 57 |
| 6.16 | Other Super-priority Claims ............................................................ | 57 |
| 6.17 | Equity Issuances ............................................................................. | 57 |
| 6.18 | ERISA ............................................................................................. | 57 |
| 6.19 | Intellectual Property ........................................................................ | 57 |
| 6.20 | Capital Expenditures ....................................................................... | 57 |
| 6.21 | Change of Control ........................................................................... | 57 |
| Section 7. | Collateral ........................................................................................ | 57 |

*ACTIVE 66101174v7*

RLF1 27606993v.1

| | | |
|---|---|---|
| 7.1 | Grant of Security Interest | 57 |
| 7.2 | Cash Collateral | 58 |
| 7.3 | Commercial Tort Claims | 58 |
| 7.4 | Certain After-Acquired Collateral | 58 |
| 7.5 | No Assumption of Liability | 58 |
| 7.6 | Lien Perfection; Further Assurances | 58 |
| Section 8. | EVENTS OF DEFAULT | 59 |
| 8.1 | Events of Default | 59 |
| 8.2 | Remedies | 62 |
| 8.3 | Other Remedies | 63 |
| Section 9. | AGENTS | 63 |
| 9.1 | Appointment of Agents | 63 |
| 9.2 | Powers and Duties; Rights as a Lender | 64 |
| 9.3 | General Immunity | 64 |
| 9.4 | Lenders' Representations, Warranties and Acknowledgment | 66 |
| 9.5 | Indemnity | 66 |
| 9.6 | Successor Administrative Agent and Collateral Agent | 66 |
| 9.7 | Collateral Documents | 68 |
| 9.8 | Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim; Credit Bidding | 69 |
| 9.9 | Erroneous Payments | 70 |
| Section 10. | MISCELLANEOUS | 72 |
| 10.1 | Notices | 72 |
| 10.2 | Expenses | 74 |
| 10.3 | Indemnity and Related Reimbursement | 74 |
| 10.4 | Set-Off | 76 |
| 10.5 | Amendments and Waivers | 76 |
| 10.6 | Successors and Assigns; Participations | 78 |
| 10.7 | [Reserved] | 81 |
| 10.8 | Liens on After-Acquired Property | 81 |
| 10.9 | Independence of Covenants | 81 |
| 10.10 | Survival of Representations, Warranties and Agreements | 81 |
| 10.11 | No Waiver; Remedies Cumulative | 82 |
| 10.12 | Marshaling; Payments Set Aside | 82 |

ACTIVE 66101174v7

RLF1 27606993v.1

10.13    Severability ................................................................................................................ 82

10.14    Obligations Several; Actions in Concert .................................................................... 82

10.15    Headings ...................................................................................................................... 82

10.16    APPLICABLE LAW .................................................................................................. 82

10.17    CONSENT TO JURISDICTION ............................................................................... 83

10.18    WAIVER OF JURY TRIAL ....................................................................................... 83

10.19    Confidentiality ............................................................................................................ 84

10.20    Usury Savings Clause .................................................................................................. 84

10.21    Effectiveness; Counterparts ........................................................................................ 85

10.22    Entire Agreement ........................................................................................................ 85

10.23    PATRIOT Act ............................................................................................................. 85

10.24    Electronic Execution of Assignments and Loan Documents ...................................... 85

10.25    No Fiduciary Duty ....................................................................................................... 86

10.26    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.......... 86

10.27    DIP Order .................................................................................................................... 86

v

**APPENDICES**:    A        Loan Commitments

B        Notice Addresses

**SCHEDULES**:    4.4      Adverse Proceedings

4.7      Environmental Matters

4.8      No Defaults

4.11    Employee Matters

4.12    ERISA

4.24    Real Estate Assets

4.25    Material Contracts

5.20    Post-Closing Matters

6.1      Indebtedness

6.2      Liens

6.5      Investments

6.10    Affiliate Transactions

**EXHIBITS**:    A        Funding Notice

B        Note

C        Assignment Agreement

D        Closing Date Certificate

E        Tax Forms

*ACTIVE 66101174v7*

*RLF1 27606993v.1*

# SECURED DEBTOR-IN-POSSESSION
# TERM LOAN AND SECURITY AGREEMENT

This **SECURED DEBTOR-IN-POSSESSION TERM LOAN AND SECURITY AGREEMENT** (as amended, supplemented, modified or restated from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of July __, 2022, is entered into by and among GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession, as borrower (the "**Borrower**"), each Lender (as defined below) from time to time party hereto, and OXFORD FINANCE LLC, a Delaware limited liability company ("**Oxford Finance**"), as administrative agent (in such capacity, "**Administrative Agent**") and collateral agent (in such capacity, "**Collateral Agent**") for the Lenders. Capitalized terms used but not otherwise defined in the recitals below shall have the meanings ascribed to them in Section 1.1.

## RECITALS:

**WHEREAS**, on the Petition Date, Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the District of Delaware (together with any other court having jurisdiction over the Chapter 11 Case or any proceeding therein from time to time, the "**Bankruptcy Court**");

**WHEREAS**, Borrower is continuing to operate its business and manage its property as debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, in connection with the filing of the Chapter 11 Case, Borrower has requested that the Lenders provide a term loan facility in an aggregate principal amount of $4,000,000.00, which will be made available to Borrower as new-money term loans from time to time upon entry of the DIP Order and the satisfaction of the other conditions precedent set forth herein;

**WHEREAS**, on the Petition Date, the Borrower filed a motion with the Bankruptcy Court to enter interim and final orders authorizing Borrower to, among other things, obtain secured post-petition financing, and grant liens and super-priority, post-petition claims, pursuant to Bankruptcy Code Sections 105, 362, 363 and 364, Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware;

**WHEREAS**, upon satisfaction of the conditions set forth in Section 3, the Lenders have agreed to extend such credit to Borrower upon the terms and conditions set forth herein, the proceeds of which will be used exclusively for the purposes set forth in Section 2.3 to the extent permitted hereunder; and

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS AND INTERPRETATION

**1.1    Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Account**" means any "account," as defined in Article 9 of the UCC.

"**Account Debtor**" means any "account debtor," as defined in Article 9 of the UCC.

"**Administrative Agent**" has the meaning set forth in the preamble.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative or judicial), governmental investigation or arbitration at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Borrower, threatened in writing against or affecting Borrower or any Subsidiary or any property of such entity.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, as applied to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, that Person specified. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether by exercising voting power, by contract or otherwise.

"**Agent**" means each of Administrative Agent, Collateral Agent and any other Person appointed as an agent or similar title or capacity under or otherwise in connection with the Loan Documents and "**Agents**" mean collectively all such Agents.

"**Aggregate Amounts Due**" has the meaning set forth in Section 2.15.

"**Agreement**" has the meaning set forth in the preamble.

"**Agent Affiliates**" has the meaning set forth in Section 10.1(b)(iii).

"**Alternative Sale Transaction**" means any sale, liquidation or transfer of any assets of the Borrower other than through an Approved 363 Sale.

"**AML Laws**" means any and all laws, rules and regulations of any jurisdiction applicable to Borrower or its Subsidiaries or Affiliates from time to time concerning or relating to terrorism financing, money laundering or any predicate crime to money laundering, including, without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"**Anticorruption Laws**" means all applicable anti-corruption and antibribery laws, rules and regulations of any jurisdiction from time to time, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"**Approved 363 Sale**" means a sale of all or substantially all of the Borrower's consolidated assets pursuant to Section 363 of the Bankruptcy Code, in accordance with the Bidding Procedures Order, on terms, and in form and substance, satisfactory to the Administrative Agent.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that Borrower provides to Administrative Agent pursuant to any Loan Document or the transactions contemplated therein, which is distributed to Agents or Lenders by means of electronic communications pursuant to Section 10.1(b).

"**Assignment Agreement**" means an Assignment Agreement in substantially the form of Exhibit C or any other form approved by Administrative Agent.

"**Assignment Effective Date**" has the meaning set forth in <u>Section 10.6(b)</u>.

"**Authorized Officer**" means with respect to (a) delivering any Funding Notice and similar notices, the chief executive officer, chief financial officer, treasurer, or chief operating officer of Borrower or any person or persons that are designated in writing by one or more Authorized Officers described above to Administrative Agent as being authorized by Borrower to deliver such notices and (b) any other matter in connection with this Agreement or any other Loan Document, the chief executive officer, the chief financial officer, the treasurer, an assistant treasurer, the controller, a secretary, an assistant secretary, the principal accounting officer, the president or other similar officer of Borrower.

"**Availability Period**" means the period from the Closing Date to but excluding the earliest to occur of (a) the Termination Date; (b) the date of termination of the commitment of each Lender to make Loans pursuant to <u>Section 8.2</u>; and (c) the date that is five (5) Business Days prior to the scheduled closing of the Approved 363 Sale.

"**Avoidance Actions**" has the meaning set forth in the DIP Order.

"**Avoidance Action Proceeds**" has the meaning set forth in the DIP Order.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" has the meaning specified in the recitals hereto.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving bidding procedures for an Approved 363 Sale, each in form and substance satisfactory for the Administrative Agent.

"**Board of Directors**" means, (a) with respect to any corporation or company, the board of directors of the corporation or company, or any committee thereof duly authorized to act on behalf of such board, (b) with respect to a partnership, the board of directors or equivalent governing body of the general partner of the partnership, (c) with respect to a limited liability company, the managing member or members or any controlling committee or board of managers (or equivalent governing body) of such company or the sole member or the managing member thereof, and (d) with respect to any other Person, the entity, individual, board or committee of such Person serving a similar function.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor Governmental Authority.

3

"**Business Day**" means any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or the State of Delaware, or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person, or (b) as lessee under a Synthetic Lease.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP as of December 31, 2018 shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purpose of this Agreement (whether or not such operating lease obligations were in effect on such date) notwithstanding any change in GAAP (including the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update) following such date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as a Capital Lease.

"**Capital Stock**" means any and all shares, stock, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership or profits interests in a Person that is another type of entity, including partnership interests, membership interests, voting trust certificates, certificates of interest and profits interests, participations or similar arrangements, and any and all warrants, rights or options to purchase, or other arrangements or rights to acquire, subscribe, convert to or otherwise receive or participate in the economic or other rights associated with any of the foregoing.

"**Carve-Out**" has the meaning set forth in the DIP Order.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means any of the following, to the extent having a maturity of not greater than 12 months from the date of acquisition thereof: (a) readily marketable direct obligations of the government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the government of the United States, (b) certificates of deposit of or time deposits with any commercial bank that is a member of the Federal Reserve System, issues (or the parent of which issues) commercial paper rated as described in clause (c) below, is organized under the laws of the United States or any State thereof and has combined capital and surplus of at least $500,000,000, (c) commercial paper in an aggregate amount of not more than $50,000,000 per issuer outstanding at any time, issued by any corporation organized under the laws of any State of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P, (d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (b) above and (e) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two nationally recognized credit rating agencies and (iii) have portfolio assets of at least $5,000,000,000.

"**Change in Law**" means the occurrence, after the date hereof, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee

4

on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means (a) any Person or group (within the meaning of Section 13(d) or 14(d) of the Securities Act of 1933, as amended, but excluding (i) any employee benefit plan of such person or its subsidiaries and (ii) any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) has become, directly or indirectly, the beneficial owner, by way of merger, consolidation or otherwise, of 35% or more of the outstanding voting Capital Stock of Borrower on a fully-diluted basis; or (b) the sale, lease or transfer of all or substantially all of the consolidated assets of Borrower to any Person or group; or (c) occupation at any time of a majority of the seats (other than vacant seats) on the board of directors of Borrower by Persons who were not (i) directors of Borrower on the Closing Date, nominated, appointed or approved for consideration by shareholders for election by the board of directors of Borrower, (ii) approved by the board of directors of Borrower as director candidates prior to their election, nor (iii) appointed by directors so nominated, appointed or approved; or (d) the occurrence of a "change of control" or similar event as defined under the Prepetition Loan Documents.

"**Chapter 11 Case**" has the meaning specified in the recitals hereto.

"**Chapter 11 Plan**" means a plan of reorganization or liquidation filed in the Chapter 11 Case under Section 1121 of the Bankruptcy Code.

"**Chattel Paper**" means any "chattel paper," as defined in Article 9 of the UCC.

"**Closing Date**" means the later of the date hereof and the first date on which all of the conditions set forth in <u>Section 3.1</u> and <u>Section 3.2</u> have been fulfilled or waived in writing by the Administrative Agent.

"**Closing Date Certificate**" means a certificate dated as of the Closing Date and substantially in the form of <u>Exhibit D</u>.

"**Collateral**" means all of the Property and interests in Property described in <u>Section 7.1</u> and all "Collateral" as defined in any other Collateral Document, and shall include all Property that is subject to any Lien in favor of Collateral Agent or any agent or sub-agent appointed by it for the benefit of the DIP Secured Parties pursuant to any Collateral Document.

"**Collateral Agent**" has the meaning set forth in the preamble hereto.

"**Collateral Asset Sale**" means a sale, lease or sub lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer, grant of an exclusive license (as licensor or sublicensor), or other disposition to, or any exchange of property with, any Person (other than to or with Borrower), in one transaction or a series of transactions, of all or any part of the Collateral. For purposes of clarification, "Collateral Asset Sale" shall include (x) the sale or other disposition for value of any contracts and (y) the early termination or modification of any contract resulting in the receipt by Borrower of a Cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts that would have been due through the date of termination or modification without giving effect thereto).

"**Collateral Documents**" means the DIP Order, this Agreement, any Deposit Account Control Agreement, any Securities Account Control Agreement and all other instruments, documents and

5

agreements now or at any time hereafter delivered by or on behalf of Borrower pursuant to this Agreement or any of the other Loan Documents in order to grant to, or perfect a security interest in the Collateral in favor of Collateral Agent, for the benefit of DIP Secured Parties, as security for the Obligations.

"**Commercial Tort Claims**" means any "commercial tort claim," as defined in Article 9 of the UCC.

"**Commitment**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Commitment as of the Closing Date is set forth on <u>Appendix A</u>, subject to any increase or reduction pursuant to the terms of this Agreement. The maximum aggregate amount of the Commitments is $4,000,000.00.

"**Contractual Obligation**" means, as applied to any Person, any provision of any security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Controlled Account**" means (a) any Deposit Account of Borrower that is subject to a Deposit Account Control Agreement, and (b) any Securities Account of Borrower that is subject to a Securities Account Control Agreement.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Extension**" means the making of a Loan.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S., any state or territory thereof, the District of Columbia or any other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means the occurrence of any event that, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" has the meaning set forth in <u>Section 2.7</u>.

"**Defaulting Lender**" means, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent or any other Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent or the Borrower that it will comply with its prospective

funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent or the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any debtor relief law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"**Deposit Account**" means any "deposit account," as defined in Article 9 of the UCC.

"**Deposit Account Control Agreement**" means, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to the Borrower and Collateral Agent that (a) is entered into among Collateral Agent, the financial institution or other Person at which such Deposit Account is maintained and Borrower, and (b) is effective for Collateral Agent to obtain "control" (within the meaning of Article 9 of the UCC) of such Deposit Account.

"**DIP Budget**" means (a) the initial twelve week cash flow forecast setting forth the projected cash receipts and cash disbursements for Borrower on a line-item basis as attached to the DIP Order (the "**Initial DIP Budget**"), and (b) the most recently approved at such time updated DIP Budget delivered in connection with Section 5.1(e), which shall, in each case, include detailed line item receipts and expenditures, together with appropriate supporting schedules and information and an explanation of any change from the DIP Budget then in effect (each, an "**Updated DIP Budget**").

"**DIP Budget Variance Report**" has the meaning set forth in Section 5.1(f).

"**DIP Facility**" means the credit facility established under the DIP Order and this Agreement in favor of Borrower in accordance with their terms and pursuant to which the Commitments are established.

"**DIP Liens**" has the meaning specified in the DIP Order.

"**DIP Loan Proceeds**" has the meaning set forth in Section 2.3(a).

"**DIP Order**" means, collectively, the Interim DIP Order and, upon entry thereof, the Final DIP Order.

"**DIP Secured Parties**" means, collectively, the Agents and each Lender.

"**DIP Superpriority Claim**" has the meaning specified in the DIP Order.

"**Director**" means any natural Person constituting the Board of Directors or an individual member thereof.

"**Disbursement Account**" has the meaning set forth in <u>Section 2.1(c)</u>.

"**Dispose**" means, with respect to any Person, any conveyance, sale, lease (as lessor), license (as licensor), exchange, assignment, transfer or other disposition by such Person of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of Cash, Cash Equivalents, Securities or any other property or assets. For purposes of clarification, "Dispose" shall include (a) the sale or other disposition for value of any contracts, (b) the early termination or modification of any contract by any Person resulting in the receipt by such Person of a Cash payment or other consideration in exchange for such event (other than payments for previously accrued and unpaid amounts due through the date of termination or modification), or (c) any sale of merchant accounts (or any rights thereto (including any rights to any residual payment stream with respect thereto)).

"**Disposition**" as a noun shall have the corresponding meaning.

"**Disqualified Capital Stock**" means any Capital Stock that, by its terms (or by the terms of any other instrument, agreement or Capital Stock into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Capital Stock that is not otherwise Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder or beneficial owner thereof (other than solely for Capital Stock that is not otherwise Disqualified Capital Stock), in whole or in part, (c) provides for the scheduled payments of dividends, distributions or other Restricted Payments in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other obligation, instrument, agreement, or Capital Stock that would meet any of the conditions in clauses (a), (b), or (c) of this definition, in each case prior to the date that is 180 calendar days after the Termination Date; <u>provided</u>, that if such Capital Stock is issued pursuant to a plan for the benefit of employees of Borrower or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because they may be required to be repurchased by Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"**Documents**" means any "document," as defined in Article 9 of the UCC.

"**Dollars**" and the sign "**$**" mean the lawful money of the U.S.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clause (a) or clause (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any other Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electronic Chattel Paper**" means any "electronic chattel paper," as defined in Article 9 of the UCC.

8

"**Eligible Assignee**" means (a) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof) that is controlled by, controls, or is under common control with a Lender; (b) a commercial bank organized under the laws of the United States, or any State thereof, respectively, and having total assets in excess of $500,000,000; (c) a savings and loan association or savings bank organized under the laws of the United States or any State thereof, and having total assets in excess of $500,000,000; (d) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow, or a political subdivision of any such country, and having total assets in excess of $500,000,000, so long as such bank is acting through a branch or agency located in the United States; (e) the central bank of any country that is a member of the OECD; or (f) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise investing in commercial loans in the ordinary course of its business and having total assets in excess of $500,000,000; *provided* that neither Borrower nor any Affiliate of Borrower shall, in any event, be an Eligible Assignee.

"**Environmental Claim**" means any notice, claim, proceeding, notice of proceeding, investigation, demand, information request, abatement order or other order or directive by any Person or Governmental Authority alleging or asserting liability with respect to Borrower or any Subsidiary, as the case may be, arising out of, based on, in connection with or resulting from (a) the actual or alleged presence, Use or Release of any Hazardous Substance, (b) any actual or alleged violation of or non-compliance with any Environmental Law, or (c) any actual or alleged injury or threat of injury to property, human health or safety, natural resources or the environment caused by Hazardous Substances.

"**Environmental Laws**" means any applicable federal, state and local laws, statutes, ordinances, orders, rules and regulations, as well as common law, any final and binding judicial or administrative orders, decrees or judgments thereunder and any permits, approvals, licenses, registrations, filings and authorizations, in each case as now or hereafter in effect, relating to (a) the pollution, protection or cleanup of the environment, (b) the impact of Hazardous Substances on property, human health or safety, (c) the Use or Release of Hazardous Substances, (d) occupational safety and health, industrial hygiene or the protection of human health or welfare as a result of exposure to Hazardous Substances, or (e) the liability for, or costs of, other actual or threatened harm to the environment.

"**Environmental Permits**" means all permits, licenses, variances and certificates required by applicable Environmental Laws for the use or ownership of the Real Estate Assets by Borrower and its Subsidiaries, as the case may be, or of Borrower's or such Subsidiary's operations conducted thereat.

"**Equipment**" means any "equipment," as defined in Article 9 of the UCC.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Internal Revenue Code, is treated as a single employer under Section 414(m) or (o) of the Internal Revenue Code.

"**ERISA Event**" means (a) any Reportable Event, (b) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Internal Revenue Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived, pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA or an application for a waiver of the minimum

9

funding standard with respect to any Pension Plan, (c) the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan, (d) the failure by Borrower or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan, (e) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title W of ERISA with respect to the termination of any Pension Plan, including, but not limited to, the imposition of any Lien in favor of the PBGC or any Pension Plan, (f) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Internal Revenue Code or Section 303 of ERISA), (g) the receipt by Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA, (h) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan (during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA)) or from any Multiemployer Plan, and (i) the receipt by Borrower or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan or a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA), or in endangered or critical status (within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA).

"**Estate**" means, for Borrower, the estate created in Borrower's Chapter 11 Case pursuant to Section 541(a) of the Bankruptcy Code.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" has the meaning set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Lender or Agent or required to be withheld or deducted from a payment to a Lender or Agent, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender or Agent, as applicable, being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, (c) Taxes attributable to such Lender's or Agent's failure to comply with Section 2.17(b), and (d) any Taxes imposed under FATCA.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations promulgated thereunder or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Internal Revenue Code and, in each case, any fiscal or regulatory legislation, rules, or official practices adopted pursuant to any such agreements.

"**Federal Funds Rate**" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"**Final DIP Order**" mean means an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent and the Borrower, approving the DIP Facility on a final basis.

"**Fiscal Year**" means the fiscal year of Borrower, ending on June 30 of each calendar year.

"**Fixtures**" means any "fixtures," as defined in Article 9 of the UCC.

"**Fund**" means any Person (other than a Natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"**Funding Account**" means, with respect to any Lender or Agent, the bank account that such Person designates as its "Funding Account" pursuant to a written notice delivered on or prior to the Closing Date by such Person (or such other account as such Person designates in writing from time to time).

"**Funding Notice**" means a notice substantially in the form of Exhibit A.

"**GAAP**" means generally accepted accounting principles in the United States of America, consistently applied and as in effect from time to time.

"**General Intangibles**" means any "general intangible," as defined in Article 9 of the UCC.

"**Goods**" means any "goods," as defined in Article 9 of the UCC.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether associated with a state of the U.S., the U.S., or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guarantee**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness of any other

11

Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be the lower of (x) an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made and (y) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Hazardous Substances**" means any and all substances (whether solid, liquid or gas) that are regulated or otherwise classified, defined or listed as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, toxic substances, toxic pollutants, contaminants, pollutants or words of similar meaning or regulatory effect under any applicable Environmental Laws, including petroleum and petroleum by-products, asbestos and asbestos-containing materials, toxic mold, polychlorinated biphenyls, lead and lead-based paint, radon, pesticides and radioactive materials, flammables and explosives and compounds containing them.

"**Hazardous Substances Activity**" means any activity, event or occurrence involving any Hazardous Substances, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Substances, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged or received under the laws applicable to any Lender that are in effect as of the Closing Date or, to the extent allowed by law, under such applicable laws that may be in effect after the Closing Date and allow a higher maximum nonusurious interest rate than applicable laws in effect as of the Closing Date.

"**Indebtedness**" as applied to any Person, means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) obligations under Capital Leases, (c) notes payable and drafts accepted representing extensions of credit, whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA and trade accounts payable in the ordinary course of business), (e) all indebtedness (excluding prepaid interest thereon) secured by any Lien on any property or asset owned or held by that Person, regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person (provided that if that Person has not assumed such obligations, then the amount of Indebtedness of that Person for purposes of this clause (e) shall be equal to the lesser of the amount of the obligations of the holder of such obligations and the fair market value of the assets of that Person that secure such obligations), (f) the face amount of any letter of credit or similar instrument issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, (g) Disqualified Capital Stock, with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price (for purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Agreement, and as if such price were based upon, or measured by, the fair market value of such Disqualified Capital Stock), (h) net obligations of such Person in respect of any exchange traded or over the counter

12

derivative transaction, in each case whether entered into for hedging or speculative purposes or otherwise and (i) all Guarantees of that Person in respect of any of the foregoing.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under this Agreement or any other Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" has the meaning set forth in Section 10.3(a).

"**Insolvency Proceeding**" means, with respect to Borrower, any (a) case, action or proceeding before any court or Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, (b) general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or (c) similar arrangement in respect of creditors generally or any substantial portion of applicable creditors, in any case, undertaken under U.S. Federal, state or foreign law.

"**Instruments**" means any "instrument," as defined in Article 9 of the UCC.

"**Insurance Policies**" has the meaning in Section 5.5.

"**Intellectual Property**" means all U.S. and non-U.S. intellectual and similar Property of a Person of every kind and description, including inventions and invention disclosures (whether or not patentable), designs, patents, copyrights, trademarks, service marks, trade names, logos, designs, domain names, mask works, trade secrets, confidential or proprietary information, know-how, software and databases and all embodiments or fixations thereof and related documentation, registrations and franchises, all books and records describing or used in connection with the foregoing and all of the following with respect to the foregoing: (i) all applications therefor; (ii) all renewals, extensions, divisions, continuations or similar related rights thereof; (iii) all income, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iv) the right to sue for past, present and future infringements and dilutions thereof; (v) the goodwill of the business symbolized thereby or connected therewith and (vi) all of each Person's rights corresponding thereto throughout the world.

"**Interest Payment Date**" means the first Business Day of each calendar month, commencing with August 1, 2022.

"**Interim DIP Order**" means an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent and the Borrower, approving the DIP Facility on an interim basis.

"**Interim Amount**" has the meaning in Section 2.1(c).

"**Internal Revenue Code**" means the Internal Revenue Code of 1986.

"**Inventory**" means any "inventory," as defined in Article 9 of the UCC.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by Borrower or any of its Subsidiaries of, or of a beneficial interest in, any of the Capital Stock of any other Person, including the establishment or other creation of a Subsidiary or any other interest in the Capital Stock of any Person, (b) any direct or indirect loan, Guarantee, advance (other than advances to employees, officers or directors for customary moving, entertainment and travel expenses, drawing accounts and similar expenditures in the

13

ordinary course of business) or capital contributions by Borrower to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales of inventory to that other Person in the ordinary course of business; and (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person which constitute all or substantially all of the assets of such Person or of a division, line of business or other business unit of such Person.

"**Investment Property**" means any "investment property," as defined in Article 9 of the UCC.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided that in no event shall any Wholly-Owned Subsidiary of any Person be considered to be a "Joint Venture" to which such Person is a party.

"**Legal Requirements**" means, collectively, all governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including Environmental Laws and zoning restrictions) affecting Borrower, the Property or any other Collateral or any portion thereof or the construction, ownership, use, alteration or operation thereof, or any portion thereof (whether now or hereafter enacted and in force) and all permits, licenses and authorizations and regulations relating thereto.

"**Lender**" means each Person listed on Appendix A and any Person that becomes a "Lender" hereunder pursuant to Section 10.6, in each case, for so long as such Person holds Loans or Commitments hereunder.

"**Letter-of-Credit Rights**" means any "letter-of-credit right," as defined in Article 9 of the UCC.

"**Lien**" means (a) any lien, mortgage, pledge, assignment, security interest, charge, license, sublicense or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any other preferential arrangement having the practical effect of any of the foregoing, and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means each loan outstanding hereunder made by a Lender to Borrower pursuant to Section 2.1(a).

"**Loan Commitment**" means the commitment of a Lender to fund Loans.

"**Loan Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, and all other documents, certificates, instruments or agreements executed and delivered by or on behalf of Borrower for the benefit of any Agent or any Lender in connection herewith.

"**Loan Exposure**" means, with respect to any Lender, as of any time of determination, the outstanding principal amount of the Loans of such Lender.

"**Margin Stock**" has the meaning given to such term in Regulation U.

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on (i) the business, assets, condition (financial or otherwise) or results of operations of the Borrower and its Subsidiaries, taken as a whole (excluding any event, change or condition that would reasonably be expected to result from the filing or commencement of the Chapter 11 Case), (ii) the ability of the Borrower to perform its obligations

14

under the Loan Documents, (iii) the rights and remedies of, or benefits available to, the Agent or the Lenders under the Loan Documents, including the legality, validity, binding effect or enforceability of the Loan Documents, or (iv) the Collateral (taken as a whole) or the Agent's liens on the Collateral.

"**Material Contract**" shall mean (a) the Prepetition Loan Documents, and (b) any contract or other written agreement to which the Borrower or any of its Subsidiaries is a party (other than the Loan Documents) to the extent that the breach, nonperformance, cancellation or failure to renew such contract or written agreement could reasonably be expected to have a Material Adverse Effect.

"**Moody's**" means Moody's Investors Service, Inc. or any successor to its rating agency business.

"**Multiemployer Plan**" means a Plan which is a multiemployer plan, as defined in Section 3(37) of ERISA, to which Borrower or any ERISA Affiliate had an obligation to contribute over the five preceding calendar years.

"**Natural Person**" means a natural Person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person.

"**Net Asset Sale Proceeds**" means, with respect to any Collateral Asset Sale, an amount equal to: (a) Cash payments actually received by or on behalf of Borrower from such Collateral Asset Sale (including any Cash actually received by way of deferred payment pursuant to, or by monetization of, a note, receivable or otherwise (including by way of a milestone payment, as applicable), but, in each case, only as and when received), minus (b) (i) the amount of all taxes paid (or reasonably estimated to be payable) by Borrower attributable to such Collateral Asset Sale, (ii) the amount of any reserves established in accordance with GAAP to fund contingent liabilities reasonably estimated to be payable by Borrower (as determined reasonably and in good faith by Borrower), (iii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any claim allowed by the Bankruptcy Court in the Chapter 11 Case relating to Indebtedness or any other obligation (other than the Loans) that is secured by a Lien on the assets in question, that is senior to the DIP Liens, and that is required to be repaid under the terms thereof as a result of such Collateral Asset Sale, (iv) any direct, bona fide, out-of-pocket transaction costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT, transfer and similar taxes arising therefrom) incurred in connection with any sale of such assets to the extent paid or payable to non-Affiliates, (v) any funded escrow established pursuant to the documents evidencing any such Collateral Asset Sale to secure any indemnification obligations or adjustments to the purchase price associated with any such Collateral Asset Sale (provided that, to the extent that any amounts are released from such escrow to the Borrower or a Subsidiary thereof, such amounts net of any related expenses shall constitute Net Asset Sale Proceeds) and (vi) in the case of any disposition by a non-wholly-owned Subsidiary, the pro rata portion of the Net Asset Sale Proceeds thereof (calculated without regard to this clause (vi)) attributable to minority interests and not available for distribution to or for the account of Borrower or a wholly-owned Subsidiary as a result thereof.

"**Net Equity Proceeds**" means an amount equal to any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, Borrower, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses, in each case solely to the extent such discounts, commissions, costs, fees and expenses are paid to non-Affiliates.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (a) any Cash payments or proceeds actually received by Borrower (i) under any casualty, business interruption or "key man"

15

insurance policies in respect of any covered loss thereunder, or (ii) as a result of the taking of any Collateral by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (b) (i) any actual and reasonable costs incurred by Borrower in connection with the adjustment or settlement of any claims of Borrower in respect thereof, (ii) the amount of all taxes paid (or reasonably estimated to be payable) by the Borrower attributable thereto; (iii) the amount of any reserves established in accordance with GAAP to fund contingent liabilities reasonably estimated to be payable, that are attributable thereto (as determined reasonably and in good faith by Borrower); and (iv) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any claim allowed by the Bankruptcy Court in the Chapter 11 Case relating to Indebtedness or any other obligation (other than the Loans) that is secured by a Lien on the assets that were the subject of such loss or taking, as applicable, to the extent senior to the DIP Liens and required to be repaid under the terms thereof as a result of such loss or taking.

"**Note**" means a promissory note in the form of <u>Exhibit B</u>.

"**Obligations**" means all obligations (whether now existing or hereafter arising, absolute or contingent, joint, several or independent) of every nature of Borrower from time to time owed to Agents (including any former Agent), the Lenders or any of them, in each case, under any Loan Document, whether for principal, interest, fees, expenses, indemnification or otherwise.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury and any successor Governmental Authority.

"**Organizational Documents**" means (a) with respect to any corporation or company, its certificate, articles supplementary, memorandum or articles of incorporation or organization and its by-laws, (b) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, (d) with respect to any limited liability company, its certificate or articles of organization or formation and its operating agreement, and (e) with respect to any other entity, its functionally equivalent charter and organizational documents. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Connection Taxes**" means, with respect to any Lender or Agent, Taxes imposed as a result of a present or former connection between such Person and the jurisdiction imposing such Tax (other than connections arising from such Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means any and all present or future stamp, court or documentary, intangible, recording, filing or other similar Taxes arising from any payment made hereunder or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.18</u>).

"**Oxford Finance**" has the meaning set forth in the preamble.

"**Paid in Full**" and "**Payment in Full**" mean, with respect to any or all of the Obligations, that each of the following events has occurred, as applicable: (a) the indefeasible payment or repayment in full in immediately available funds of (i) the principal amount of all outstanding Loans, (ii) all accrued and unpaid interest, fees, premiums or other charges owing in respect of any Loan or unfunded Commitment or otherwise under any Loan Document, and (iii) all accrued and unpaid costs and expenses payable by Borrower to any Agent or Lender pursuant to any Loan Document, whether or not demand has been made therefor, including any and all indemnification and reimbursement claims that have been asserted by any such Person prior to such time; (b) the indefeasible payment or repayment in full in immediately available funds of all other outstanding Obligations, other than unasserted contingent indemnification and contingent reimbursement obligations; and (c) the termination of all unfunded Commitments.

"**Participant Register**" has the meaning set forth in Section 10.6(h)(i).

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**Payment Intangibles**" means any "payment intangible," as defined in Article 9 of the UCC.

"**PBGC**" means the Pension Benefit Guaranty Corporation, referred to and defined in ERISA, or any successor thereto performing similar functions.

"**Pension Plan**" means any Plan, other than a Multiemployer Plan, which is subject to Title W of ERISA or Sections 412 and 430 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Priority Lien**" means a valid, perfected and non-avoidable Lien in existence on the Petition Date (or a valid Lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code).

"**Permitted Variances**" shall have the meaning set forth in Section 5.16(a).

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" means the date on which Borrower commenced its Chapter 11 Case.

"**Plan**" means any "employee benefit plan," as defined in Section 3(3) of ERISA, which is (currently or hereafter), or within the prior six years was, maintained or contributed to by Borrower or, with respect to any such plan that is subject to Section 302 of ERISA or Title W of ERISA or Section 412 of the Code, any of its ERISA Affiliates, or with respect to which Borrower or any of its ERISA Affiliates, has any liability.

"**Post-Petition**" means any date or time after the Petition Date.

"**Prepetition Indebtedness**" has the meaning set forth in Section 6.1(b).

"**Prepetition Agent**" means Oxford Finance LLC, in its capacity as collateral agent under any of the Prepetition Loan Documents.

17

"**Prepetition Loan Agreement**" means that certain Loan and Security Agreement dated as of December 20, 2019 by and among Borrower, the Prepetition Agent, certain parties thereto as lenders (in such capacity, the "**Prepetition Lenders**" and together with the Prepetition Agent, collectively, the "**Prepetition Secured Parties**"), and the other parties from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

"**Prepetition Loan Documents**" means the "Loan Documents" as defined in the Prepetition Loan Agreement.

"**Prepetition Loan Obligations**" means all "Obligations" as defined in the Prepetition Loan Agreement.

"**Principal Office**" means Administrative Agent's "Principal Office" as set forth on <u>Appendix B</u>, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrower, Administrative Agent and each Lender.

"**Pro Rata Share**" means with respect to all payments and computations relating to the Loans of any Lender, the percentage obtained by dividing (a) the Loan Exposure of that Lender, by (b) the aggregate Loan Exposure of all Lenders. For all other purposes with respect to each Lender, "**Pro Rata Share**" means the percentage obtained by dividing (A) an amount equal to the sum of the Loan Exposure and unfunded Commitments of that Lender, by (B) an amount equal to the sum of the aggregate Loan Exposure and unfunded Commitments of all Lenders.

"**Property**" means with respect to any Person, all real and personal property of such Person, including: (a) all cash, money, cash equivalents, Deposit Accounts, Securities Accounts, Accounts, other receivables, Chattel Paper, contract rights, Goods and Inventory (wherever located), Instruments, Documents, securities (whether or not marketable) and Investment Property (including all of the issued and outstanding Capital Stock of each of its Subsidiaries), equity interests, furniture, Fixtures, Equipment, franchise rights, Intellectual Property, General Intangibles of any kind, rights to the payment of money (including tax refunds and any other extraordinary payments), Supporting Obligations, guarantees, Letter-of-Credit Rights, Commercial Tort Claims, causes of action and all substitutions, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property, all leased real property, all rents and leases from any real property interests, and all other proceeds of real property; (c) any Avoidance Actions and Avoidance Action Proceeds; and (d) Borrower's rights under section 506(c) of the Bankruptcy Code and the proceeds thereof. For the avoidance of doubt, the Collateral shall include all the foregoing rights, property, claims and interests, without regard as to whether such rights, property, claims and interests came into Borrower's Estates, or otherwise arose, after the Petition Date.

"**Real Estate Asset**" means any real property (including all buildings, fixtures or other improvements located thereon) now or hereafter owned, leased, operated or used by Borrower or any Subsidiary.

"**Register**" has the meaning set forth in <u>Section 2.4(b)</u>.

"**Regulation T**" means Regulation T of the Board of Governors and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board of Governors and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board of Governors and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" means any Fund that is managed, advised or administered by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or affiliate of an entity that manages, administers or advises a Lender.

"**Related Matter**" means (a) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or any syndication of the DIP Facility, or the use or intended use of the proceeds thereof), any amendments, waivers or consents with respect to any provision of this Agreement or any of the other Loan Documents, or any enforcement of any of the Loan Documents (including any sale of, collection from or other realization upon any of the Collateral) or any other act or omission or event occurring in connection therewith, (b) any Loan or the use or proposed use of the DIP Loan Proceeds; (c) any Environmental Claim or any Hazardous Substances Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership or practice of Borrower, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing clauses (a)—(c), whether based on contract, tort or any other theory, whether brought by a third party or by Borrower and regardless of whether any Indemnitee is a party thereto.

"**Related Parties**" means, in respect of any Person, any of the officers, directors, employees, agents, attorneys, representatives, subsidiaries, Affiliates or shareholders of such Person.

"**Release**" means, with respect to any Hazardous Substance, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into or through the environment (including the abandonment or discarding of barrels, containers and other closed receptacles containing regulated amounts of any Hazardous Substance).

"**Remediation**" means any response, remedial removal or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to remedy or mitigate any Release of any Hazardous Substance; and any action to comply with any Environmental Laws or with the terms and conditions of any Environmental Permits.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the 30-day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043, with respect to a Pension Plan.

"**Required Lenders**" means, at any time, Lenders having or holding Loans and unfunded Commitments representing in the aggregate more than 50% of the sum of all Loan Exposure and unfunded Commitments at such time; provided, however, if Oxford Finance or any Affiliate of Oxford Finance is the Administrative Agent and/or a Lender at such time, then the Required Lenders must include Oxford Finance or such Affiliate of Oxford Finance , as applicable.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Restricted Payment**" means (a) any dividend, other distribution or liquidation preference, direct or indirect, on account of any shares of any class of Capital Stock of Borrower or any Subsidiary of Borrower now or hereafter outstanding, to the holders of that class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of Borrower (or any direct or indirect parent thereof) or any Subsidiary of Borrower

19

now or hereafter outstanding; and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of Borrower (or any direct or indirect parent thereof) or of any Subsidiary of Borrower now or hereafter outstanding.

"**S&P**" means Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc., and any successor thereto.

"**Sale Order**" means an order approving the Approved 363 Sale in form and substance reasonably acceptable to the Borrower, Required Lenders and the purchaser in the Approved 363 Sale.

"**Sanctioned Country**" means a country or territory with which dealings are broadly and comprehensively prohibited under any Sanctions (as of the Closing Date, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted, prohibited or sanctionable under any Sanctions, including (a) any Person listed in any Sanctions related list of designated Persons maintained by the United States (including OFAC, the U.S. Department of the Treasury or the U.S. Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (b) any Person located, operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled, directly or indirectly, by any Person described in clause (a) or (b) of this definition.

"**Sanctions**" means economic, financial or trade sanctions, laws, regulations or restrictive measures, or trade embargoes, imposed, administered or enforced by the United States Government (including without limitation, sanctions administered or enforced by the United States Department of Treasury's Office of Foreign Assets Control), the United Nations Security Council, the European Union, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, including any other governmental or regulatory authority, institution or agency which administers economic, financial or trade sanctions laws, regulations, trade embargoes or restrictive measures applicable to Borrower or any of its Subsidiaries, any Lender or the Agents.

"**Second Advance**" has the meaning in Section 2.1(c).

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, including any derivatives.

"**Securities Account**" means any "securities account" as defined in Article 8 of the UCC and any "commodity account" as defined in Article 9 of the UCC.

"**Securities Account Control Agreement**" means, with respect to a Securities Account, an agreement in form and substance reasonably satisfactory to Collateral Agent that (a) is entered into among Collateral Agent, the Securities Intermediary at which the applicable Securities Account is maintained and Borrower, and (b) is effective for Collateral Agent to obtain "control" (within the meaning of Articles 8 and 9 of the UCC) of such Securities Account.

"**Securities Act**" means the Securities Act of 1933.

"**Securities Intermediary**" means any "securities intermediary" or "commodity intermediary" as such terms are defined in the UCC.

"**Software**" means any "software," as defined in Article 9 of the UCC.

"**Subsidiary**" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the Capital Stock having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time owned or the management of which is controlled, directly, or indirectly through one or more intermediaries, by such Person.   Unless the context otherwise requires, each reference to a "Subsidiary" in this Agreement refers to a Subsidiary of Borrower.

"**Supporting Obligations**" means any "supporting obligation," as defined in Article 9 of the UCC.

"**Synthetic Lease**" means, as applied to any Person, (a) any lease (including leases that may be terminated by the lessee at any time) of any property by that Person as lessee (i) that is accounted for as an operating lease under GAAP and (ii) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, and (b) any (i) synthetic, off-balance sheet or tax retention lease, or (ii) agreement for the use or possession of property, in each case under this clause (b), creating obligations that do not appear on the balance sheet of such Person but that, upon the application of any Debtor Relief Laws to such Person, would be characterized as indebtedness of such Person (without regard to accounting treatment).

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (together with interest, penalties and other additions thereto) in the nature of a tax imposed, levied, collected, withheld or assessed by any Governmental Authority.

"**Termination Date**" means the earliest date to occur of: (a) the date that is ninety (90) days after the Petition Date; (b) the closing of the Approved 363 Sale; (c) the date on which the Bankruptcy Court orders (x) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (y) the dismissal of the Chapter 11 Case; (d) the date the DIP Facility is accelerated upon the occurrence of an Event of Default or otherwise; and (e) the approval by the Bankruptcy Court of any Alternative Sale Transaction, except for any Alternative Sale Transaction that (i) provides for the Payment in Full of the Obligations and the Prepetition Loan Obligations upon the closing of such Alternative Sale Transaction; and (ii) otherwise complies in full with all terms of the Bidding Procedures Order.

"**Testing Period**" means, with respect to each DIP Budget Variance Report required to be delivered on a Variance Report Date, the prior one-week period ending immediately prior to such Variance Report Date; provided that, the Testing Period for the initial DIP Budget Variance Report shall commence on the Petition Date.

"**U.S.**" means the United States of America.

"**UCC**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it governs the perfection or priority of any Lien on or otherwise with regard to any item or items of Collateral.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation

Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Updated DIP Budget**" has the meaning set forth in the definition of "DIP Budget".

"**Use**" means, with respect to any Hazardous Substance, generation, manufacture, processing, distribution, handling, possession, use, discharge, placement, treatment, disposal, transportation, disposition, removal, abatement, recycling or storage.

"**Variance Report Date**" has the meaning set forth in Section 5.1(f).

"**WARN**" has the meaning set forth in Section 4.11.

"**Wholly-Owned**" means, in reference to any Subsidiary of a specified Person, that 100% of the Capital Stock of such Subsidiary (other than (x) Directors' qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable law) is owned, directly or indirectly, by such Person and/or one or more of such specified Person's other Subsidiaries that also qualify as Wholly-Owned Subsidiaries under this definition.

"**Withholding Agent**" means Borrower and the Administrative Agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.2    Accounting Terms, Financials Statements, Calculations, Etc**.   Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; provided that (a) all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP as of December 31, 2018 shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purpose of this Agreement (whether or not such operating lease obligations were in effect on such date) notwithstanding any change in GAAP (including the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update) following such date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as a Capital Lease. When used herein, the term "financial statements" shall be construed to include all notes and schedules thereto. Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, they shall be construed to mean "Borrower and its Subsidiaries on a consolidated basis" unless the context clearly requires otherwise. Except as otherwise provided therein, this Section 1.2 shall apply equally to each other Loan Document as if fully set forth therein, *mutatis mutandis.*

22

**1.3    Interpretation, Etc**.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. Any requirement for a referenced agreement, instrument, certificate or other document to be "substantially" in the form of an Appendix, Schedule or Exhibit hereto means that such referenced document shall be in the form of such Appendix, Schedule or Exhibit with such modifications to such form as are approved by the Borrower and the Administrative Agent, and, in the case of any Collateral Document, Collateral Agent. The words "hereof," "hereunder," "hereby" and words of similar import used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The use herein of the words "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The use herein of the words "continuing," "continuance," "existing" or any words of similar import or derivatives of any such words in reference to any Event of Default means that such Event of Default has not been expressly waived. The word "will" shall be construed as having the same meaning and effect as the word "shall." The words "assets" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties of any relevant Person or Persons. The terms lease and license shall be construed to include sub-lease and sub-license. Whenever the context may require, any pronoun shall be construed to include the corresponding masculine, feminine and neuter forms. References to Persons include their respective permitted successors and assigns. Except as otherwise expressly provided herein, references to statutes, legislative acts, laws, regulations and rules shall be deemed to refer to such statutes, acts, laws, regulations and rules as in effect from time to time, including any amendments of the same and any successor statutes, acts, laws, regulations and rules, unless any such reference is expressly limited to refer to any statute, act, law, regulation or rule "as in effect on" a specified date. Except as otherwise expressly provided herein, any reference in or to this Agreement, any other Loan Document, or any other agreement, instrument or other document shall be construed to refer to the referenced agreement, instrument or document as assigned, amended, restated, supplemented or otherwise modified from time to time, in each case in accordance with the express terms of this Agreement and any other relevant Loan Document unless such reference is expressly limited to refer to such agreement, instrument or other document "as in effect on" a specified date. If any payment to be made or action to be taken by Borrower shall fall due or shall be required to be taken, as applicable, on a day that is not a Business Day, such payment shall be due or such action shall be taken, as applicable, on the next succeeding Business Day. Except as otherwise provided therein, this <u>Section 1.3</u> shall apply equally to each other Loan Document as if fully set forth therein, *mutatis mutandis.*

**SECTION 2.    LOANS**

**2.1    Loans**.

(a)    <u>Loan Commitments</u>. Subject to the terms and conditions of this Agreement, including the satisfaction of the applicable conditions precedent set forth in <u>Section 3</u>, the Lenders severally agree to make Loans available to Borrower in an amount not to exceed each Lender's Pro Rata Share of the applicable Commitment from time to time on any Business Day during the Availability Period. Any amount borrowed under this <u>Section 2.1(a)</u> and subsequently repaid or prepaid may not be re-borrowed. Subject to <u>Sections 2.9</u>, <u>2.10</u>, and <u>2.11</u>, all amounts owed hereunder with respect to the Loans shall be Paid in Full no later than the Termination Date. The Loan Commitment of each Lender shall be (A) permanently reduced on a dollar-for-dollar basis by the aggregate principal amount of any Loans made by such Lender in

23

accordance with this <u>Section 2.1(a)</u>, (B) terminated in full upon the Termination Date and (C) terminated in full to the extent done so pursuant to <u>Section 8.2</u>.

(b)    <u>Reserved</u>.

(c)    <u>Borrowing Mechanics for Loans</u>.

(i)    Loans may be requested by Borrower in up to two advances, the first of which shall be in the aggregate amount of $1,000,000.00 (the "**Interim Amount**") and the second of which shall be in an aggregate amount equal to the then-remaining unfunded Commitments. The second advance of the Loans (the "**Second Advance**") (which, for the avoidance of doubt shall not occur until after entry of the Final DIP Order) shall occur no earlier than five (5) Business Days following the first advance.

(ii)    Borrower shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 2:00 p.m. (New York City time) within the time periods set forth in <u>Section 3.2(a)(i)</u> (or such later date as the Administrative Agent and Lenders funding Loans on such Credit Date may agree). Promptly upon receipt by Administrative Agent of any Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(iii)    Upon confirmation by the Administrative Agent of the satisfaction or waiver of the conditions precedent specified herein, each Lender shall make the proceeds of its Loan available to Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of such Loan to be credited to the account of Borrower in accordance with <u>Section 2.1(d)</u>, provided that the Administrative Agent may assume such satisfaction or waiver unless otherwise advised by a Lender prior to making such proceeds available.

(d)    <u>Deposit of Loan Proceeds</u>. All DIP Loan Proceeds shall be deposited into a Controlled Account in the name of Borrower located at East West Bank, Account No. 8045012419 (the "**Disbursement Account**") on the applicable Credit Date. Amounts in the Disbursement Account shall only be withdrawn to fund amounts in accordance with the DIP Budget and in accordance with the use of proceeds restrictions set forth in <u>Section 2.3</u>.

**2.2    Pro Rata Share**.

(a)    <u>Pro Rata Share</u>. All Loans shall be made by the Lenders simultaneously and proportionately to their respective Pro Rata Share, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder. Each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans.

(b)    <u>Reserved</u>.

(c)    <u>Replacement of Defaulting Lenders</u>.  If any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.6</u>), all of its interests, rights (other than its

24

existing rights to payments pursuant to Section 2.16 or Section 2.17) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment, and the Borrower shall offer the other Lenders hereunder the opportunity to be such assignee before making such offer to another Eligible Assignee); provided that: (i) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.6; (ii) such Defaulting Lender shall have received, as applicable, payment of an amount equal to the outstanding principal of its Loans and, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts); and (iii) such assignment does not conflict with applicable law.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  Each party hereto agrees that (x) an assignment required pursuant to this Section 2.2(c) may be effected pursuant to an Assignment Agreement executed by the Borrower, the Administrative Agent, and the assignee, and (y) the Defaulting Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender; provided, further that any such documents shall be without recourse to or warranty by the parties thereto.

(d)    Defaulting Lender Adjustments.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    the outstanding Loans held by such Defaulting Lender shall not be included in determining whether Required Lenders or all Lenders have taken or may take any action hereunder; provided, however, (x) the Commitment of such Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender; and (y) any amendment, waiver or consent requiring the consent of each affected Lender pursuant to Section 10.5(b) that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender;

(ii)    each Lender agrees that at any time when such Lender is a Defaulting Lender, upon the request of Agent, such Defaulting Lender shall pay to the other Lenders on a pro rata basis, any payment of principal, interest, fees or other amounts received by such Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8.2 or otherwise) to be applied solely to pay the Loans of all Lenders that are not Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by Lenders pro rata in accordance with their Pro Rata Share. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.2(d)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto; and

(iii)    no Defaulting Lender shall be entitled to receive any fees under this Agreement for any period during which that Lender is a Defaulting Lender (and Borrower shall not be required to pay to such Defaulting Lender any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

25

**2.3**     **Use of Proceeds**.

(a)     Borrower shall use the proceeds from the Loans (the "**DIP Loan Proceeds**") only for purposes permitted by the DIP Order and in accordance with the DIP Budget.

(b)     Notwithstanding anything to the contrary in this Agreement, no DIP Loan Proceeds nor any proceeds of any Collateral nor any portion of the Carve-Out may be used in any manner that is prohibited under the Bankruptcy Code or the DIP Order or that is otherwise not approved in the DIP Order and the DIP Budget.

**2.4**     **Evidence of Debt; Register; Lenders' Books and Records; Notes**.

(a)     <u>Lenders' Evidence of Debt</u>. Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Borrower, absent manifest error; <u>provided</u>, that, the failure to make any such recordation, or any error in such recordation, shall not affect Borrower's Obligations in respect of any Loan; and <u>provided</u>, <u>further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordation in the Register shall govern.

(b)     <u>Register</u>. Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The Register shall be available for inspection by Borrower or any Lender (with respect to (i) any entry relating to such Lender's Loans, and (ii) the identity of the other Lenders (but not any information with respect to such other Lenders' Loans)) at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Loans in accordance with the provisions of <u>Section 10.6</u>, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; <u>provided</u>, that failure to make any such recordation, or any error in such recordation, shall not affect Borrower's Obligations in respect of any Loan. Borrower hereby designates Administrative Agent to serve as Borrower's non-fiduciary agent solely for purposes of maintaining the Register as provided in this <u>Section 2.4</u> and <u>Section 10.6</u>.

(c)     <u>Notes</u>. At the request of any Lender at any time, Borrower shall execute and deliver a Note or Notes to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to <u>Section 10.6</u>) to evidence such Lender's Loans.

**2.5**     **Interest on Loans**.

(a)     Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the applicable Credit Date at a rate equal to 14% per annum until Payment in Full.

(b)     Interest payable pursuant to <u>Section 2.5(a)</u> shall be computed on the basis of a 365/366-day year, for the actual number of days elapsed from (and including) the last occurring Interest Payment Date (or if no Interest Payment Date has yet occurred, the Closing Date) to, but excluding, the immediately succeeding Interest Payment Date. In computing interest on any Loan, the date of the making of such Loan and the last Interest Payment Date with respect to such Loan shall be included, and the date

26

of payment of such Loan shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(c)     Except as otherwise set forth herein, interest on each Loan shall accrue on a daily basis and shall be payable (i) in kind in arrears on each Interest Payment Date, and such interest shall be capitalized and added to the principal amount of such Loan on such date; (ii) in cash upon any prepayment of such Loan, whether voluntary or mandatory, in accordance with Section 2.13(a)(iii); and (iii) in cash at the maturity of the Loans. Any and all interest paid in kind in accordance with the preceding sentence shall constitute and increase the outstanding principal amount of the Loans for all purposes under this Agreement as of the applicable Interest Payment Date, and shall bear interest from and after such Interest Payment Date in accordance with the provisions of this Agreement applicable to the Loans.

**2.6     [Reserved]**.

**2.7     Default Interest**.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including Post-Petition interest in any proceeding under any Debtor Relief Laws) at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the Loans (the "**Default Rate**") and shall be payable in cash upon demand by Agent.

**2.8     Certain Fees**.

(a)     Borrower shall pay to each Lender (including Oxford Finance in its capacity as Lender) an up-front fee in an amount equal to 200 basis points on each Lender's Pro Rata Share of the Commitment, payable in full on the Closing Date.  Such fee shall be payable in kind on the Closing Date, and such fee shall be capitalized and added to the principal amount of such Loan on the Closing Date.  Any and all fees paid in kind in accordance with the preceding sentence shall constitute and increase the outstanding principal amount of the Loans for all purposes under this Agreement as of the Closing Date, and shall bear interest from and after the Closing Date in accordance with the provisions of this Agreement applicable to the Loans.

(b)     All fees payable pursuant to this Section 2.8 (i) constitute compensation for services rendered and do not constitute interest or a charge for the use of money; and (ii) shall in all respects be fully earned when paid and non-refundable and non-creditable thereafter, and shall not be subject to any rebate or reduction by way of setoff or counterclaim.

**2.9     Repayments**.  To the extent not previously repaid, Borrower shall repay to the Lenders on the Termination Date in cash the aggregate principal amount of all Loans and all other Obligations outstanding on such date, including all accrued and unpaid interest thereon and any outstanding fees. Any confirmation order entered in the Chapter 11 Case will not discharge or otherwise affect in any way any of the Obligations in accordance with the Loan Documents, other than after the Payment in Full of all Obligations.

**2.10     Voluntary Prepayments**.

(a)     At any time and from time to time Borrower shall have the right to prepay the Loans on any Business Day in whole (but not in part) without payment of a prepayment premium or penalty.

(b)    All such voluntary prepayments shall be made upon not less than two (2) Business Days' prior written notice (or such shorter period as is otherwise agreed to by Administrative Agent), given to Administrative Agent by 2:00 p.m. (New York City time) on the date required. Upon the giving of any such notice, the principal amount of all Loans outstanding hereunder shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.13(a) with respect to Loans. Notwithstanding the foregoing, any notice of prepayment delivered in connection with any refinancing or other related transaction (such as a change of control transaction) may be, if expressly so stated to be, contingent upon the consummation of such refinancing or other transaction and may be revoked by Borrower in the event such refinancing or other transaction is not consummated.

**2.11    Mandatory Prepayments**.

(a)    Asset Sales.  No later than the third Business Day following the date of receipt by Borrower of any Net Asset Sale Proceeds (it being understood that such Net Asset Sale Proceeds shall be deposited into a Controlled Account on the same Business Day as receipt thereof), Borrower shall prepay the Obligations as set forth in Section 2.13(a) in an aggregate amount equal to such Net Asset Sale Proceeds.

(b)    Insurance/Condemnation Proceeds.    No later than the third Business Day following the date of receipt by Borrower of any Net Insurance/Condemnation Proceeds (it being understood that such Net Insurance/Condemnation Proceeds shall be deposited into a Controlled Account on the same Business Day as receipt thereof), Borrower shall prepay the Obligations as set forth in Section 2.13(a) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.

(c)    Issuance of Equity Securities. No later than the third Business Day following the date of receipt by Borrower of any Net Equity Proceeds (it being understood that any such Net Equity Proceeds shall be deposited into a Controlled Account on the same Business Day as receipt thereof), excluding any such Net Equity Proceeds used for purposes approved in writing by the Required Lenders in their sole discretion, Borrower shall prepay the Obligations as set forth in Section 2.13(a) in an aggregate amount equal to 100% of such Net Equity Proceeds.

(d)    Incurrence of Debt. On the date of receipt by Borrower of any Cash proceeds (it being understood that any such Cash proceeds shall be deposited into a Controlled Account on the same Business Day as receipt thereof) from the incurrence of any Indebtedness by Borrower, excluding any Cash proceeds received with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1, Borrower shall prepay the Obligations as set forth in Section 2.13(a) in an aggregate amount equal to 100% of such Cash proceeds, net of underwriting discounts, accounting, investment banking or broker fees and sales commissions and other reasonable costs and expenses associated therewith, in each case, paid to non-Affiliates, including reasonable legal fees and expenses.

(e)    Prepayment Certificate. Concurrently with any prepayment of the Loans pursuant to Sections 2.11(a) through (d), Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds owing to Lenders under this Agreement. In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Borrower shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

**2.12    Reserved**.

**2.13    Application of Prepayments**.

(a)    <u>Prepayments</u>. Any prepayments of Loans pursuant to <u>Sections 2.10</u> or <u>2.11</u> shall be applied as follows:

(i)    *first*, to the Prepetition Agent for payment of the Prepetition Loan Obligations until payment in full of such Prepetition Loan Obligations;

(ii)    *second,* to the payment of that portion of the Obligations constituting fees, indemnities and all expenses specified in <u>Section 10.2</u>, in each case to the full extent thereof, payable in accordance with the Loan Documents to the Agent in its capacity as such and to the Lenders, in accordance with their respective Pro Rata Share in proportion to respective amounts described in this clause *first* payable to them;

(iii)    *third,* to the payment of that portion of the Obligations constituting any accrued and unpaid interest on the Loans payable at the Default Rate, if any, to the Lenders in accordance with their respective Pro Rata Share in proportion to respective amounts described in this clause *second* payable to them;

(iv)    *fourth,* to the payment of that portion of the Obligations constituting any accrued and unpaid interest (other than Default Rate interest payable pursuant to clause *second)* on the Loans to the Lenders in accordance with their respective Pro Rata Share in proportion to respective amounts described in this clause *third* payable to them;

(v)    *fifth,* to the payment of that portion of the Obligations constituting unpaid principal in respect of the Loans to the Lenders in accordance with their respective Pro Rata Share (in accordance with the respective outstanding principal amounts thereof); and

(vi)    *sixth,* to the payment of any other outstanding Obligations.

**2.14    General Provisions Regarding Payments**.

(a)    Except as otherwise provided herein, all payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in immediately available funds, without defense, recoupment, set-off or counterclaim, free of any restriction or condition, and delivered by Borrower directly to each Lender in accordance with their Pro Rata Shares (or by the Borrower to the Administrative Agent with respect to any amounts payable to the Agents) not later than 2:00 p.m. (New York City time) on the date due by wire transfer to the Funding Account of such Lender or Administrative Agent, as applicable. For purposes of computing interest and fees, funds received by Administrative Agent or any Lender after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(b)    All payments in respect of the principal amount of any Loan shall be accompanied by payment of all accrued interest on such principal amount being repaid or prepaid, as applicable, and all such payments shall be applied in accordance with <u>Sections 2.13(a)(i)</u> through <u>2.13(a)(vi)</u>.

(c)    Borrower shall provide written notice to Administrative Agent one (1) Business Day prior to making any payment hereunder and, following receipt of such notice, Administrative Agent (or its agent or sub-agent appointed by it) shall promptly deliver to Borrower a written notice setting forth how such payment should be allocated amongst the Lenders (and/or the Agents, as applicable) entitled to

payment thereto in accordance with the terms hereof, including with respect to such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest made hereunder, together with all other amounts due thereto, including all fees payable with respect thereto and all other fees and amounts owed to the Administrative Agent and/or the Lenders hereunder.

(d)     Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

(e)     Administrative Agent shall deem any payment by or on behalf of Borrower hereunder that is not made in same day funds prior to 2:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent or any Lender, as applicable, until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt written notice to Borrower and each applicable Lender if any payment is non-conforming upon obtaining knowledge thereof. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made at the Default Rate from the date such amount was due and payable until the date such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day).

(f)     If an Event of Default shall have occurred and not otherwise been waived, and the Obligations have become due and payable in full hereunder, whether by acceleration, maturity or otherwise, all payments or proceeds received by any Agent or Lender hereunder or under any other Collateral Document in respect of any of the Obligations, including all proceeds received by any Agent or any Lender in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows: *first,* to the Prepetition Agent for payment of the Prepetition Loan Obligations until payment in full of such Prepetition Loan Obligations; *second,* to the payment of all costs and expenses of each Agent in connection with such sale, collection or other realization, including reasonable compensation to each Agent and its agents and counsel, and all other expenses, liabilities and advances made or incurred by any Agent in connection therewith, and all amounts for which any Agent is entitled to indemnification hereunder or under any other Collateral Document (in its capacity as an Agent and not as a Lender), and to the payment of all costs and expenses paid or incurred by any Agent in connection with the exercise of any right or remedy hereunder or under any other Collateral Document, all in accordance with the terms hereof or thereof; *third,* to the extent of any excess of such proceeds, to the payment of all other Obligations for the ratable benefit of the Lenders; and *fourth,* to the extent of any excess of such proceeds, to the payment to or upon the order of the grantor of the Collateral or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

(g)     [Reserved].

(h)     Notwithstanding anything herein to the contrary, to the extent that Borrower is required under the terms of this Agreement to reimburse any Agent for any fees, costs or expenses (including attorneys', financial advisors' and other professionals' fees, costs and expenses), the Borrower shall, to the extent requested by the Administrative Agent, make such payment directly to the third-party that is owed such fee, cost or expense in lieu of making such payment to such Agent.

**2.15    Ratable Sharing**.  Lenders hereby agree among themselves that, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross

30

action or by the enforcement of any right under the Loan Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of fees and any other amounts then due and owing to such Lender hereunder or under the other Loan Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) that is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, consolidation, set-off or counterclaim with respect to any and all monies owing by Borrower with respect to that participation as fully as if that holder were a direct creditor of Borrower in the amount of such participation. The provisions of this Section 2.15 shall not be construed to apply to (a) any payment made by Borrower pursuant to and in accordance with the express terms of any Loan Document or (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it.

### 2.16    Increased Costs; Capital Adequacy.

(a)    Compensation for Increased Costs and Taxes. In the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any Change in Law: (i) subjects such Lender to any additional Taxes (other than (1) any Taxes imposed on or measured by net income of such Lender or that are franchise Taxes or branch profits Taxes, (2) Indemnified Taxes or (3) Taxes described in clauses (a) through (d) of the definition of Excluded Taxes) with respect to this Agreement or any of the other Loan Documents or any of its Obligations hereunder or thereunder or any payments to such Lender of principal, interest, fees or other amount payable hereunder; or (ii) imposes, modifies or deems applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender; and the result of any of the foregoing is to increase the cost to such Lender of making, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount); then, in any such case, Borrower shall pay to such Lender within 15 days after receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    Capital Adequacy and Liquidity Adjustment. In the event that any Lender shall have determined (which determination shall, absent manifest error be final and conclusive and binding upon all parties hereto) that (i) any Change in Law regarding capital adequacy or liquidity, or (ii) compliance by

31

any Lender (or its applicable lending office) or any company controlling such Lender with any Change in Law regarding capital adequacy or liquidity, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling company could have achieved but for such Change in Law (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy and liquidity), then within 15 days after receipt by Borrower from such Lender of the statement referred to in the next sentence, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company for such reduction. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this <u>Section 2.16(b)</u>, which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(c)    <u>Delay in Requests</u>. Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.16</u> shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that Borrower shall not be required to compensate a Lender pursuant to this <u>Section 2.16</u> for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 days period referred to above shall be extended to include the period of retroactive effect thereof).

**2.17    Taxes; Withholding, Etc**.

(a)    <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of Borrower hereunder and under the other Loan Documents shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the Lender or the Agent, as applicable, receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Evidence of Exemption From U.S.</u> Withholding Tax. Any Lender that is entitled to an exemption from or reduction of U.S. withholding Tax with respect to payments made under this Agreement or under the other Loan Documents shall deliver to Borrower and Administrative Agent prior to funding or otherwise acquiring an interest in any Loan, and at the time or times thereafter upon reasonable request of Borrower or Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding, including Internal Revenue Service Forms W-8 or W-9 and customary certificates (each, a "**U.S. Tax Compliance Certificate**") to establish an exemption under the "portfolio interest exemption" substantially in the form of Exhibit E-1, E-2, E-3, or E-4, as applicable. In addition, any Lender, if reasonably requested by Borrower or Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or Administrative Agent as will enable Borrower or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such

32

documentation (other than the applicable Internal Revenue Service Form W-8 or W-9 or U.S. Tax Compliance Certificate) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.17 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Administrative Agent in writing of its legal inability to do so.

(c)     FATCA. If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by Borrower or Administrative Agent as may be necessary for Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph (c), "FATCA" shall include any amendments made to FATCA after the date hereof.

(d)     Payment of Other Taxes by Borrower. Without limiting the provisions of Section 2.17(b), Borrower shall timely pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law. Borrower shall deliver to Administrative Agent official receipts or other evidence of such payment reasonably satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(e)     Indemnification by Borrower. Without duplication of any amounts paid pursuant to Section 2.17(a), Borrower shall indemnify Administrative Agent and any Lender, within 10 calendar days after demand therefor, for the full amount of any Indemnified Taxes (including any Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) paid or payable by Administrative Agent or Lender or any of their respective Affiliates, as applicable, or required to be withheld or deducted from a payment to Administrative Agent or Lender or any of their respective Affiliates, as applicable, (in each case, excluding penalties and interest attributable solely to the gross negligence or willful misconduct of the applicable recipient) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower (with a copy to Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of any Lender, shall be conclusive absent manifest error.

(f)     Indemnification by the Lenders. Each Lender shall severally indemnify Administrative Agent, within 10 calendar days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified Administrative Agent therefor and without limiting the obligation of Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(h)(i) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Administrative Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error. Each Lender

33

hereby authorizes Administrative Agent to set-off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Administrative Agent to such Lender from any other source against any amount due to Administrative Agent under this paragraph (f).

(g)    Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Evidence of Payments. As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this Section 2.17, Borrower shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(i)    Defined Terms. For purposes of this Section 2.17, the term "applicable law" includes FATCA.

(j)    Survival. Each party's obligations under this Section 2.17 shall survive the resignation or replacement of Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**2.18    Obligation to Mitigate**. Each Lender agrees that, if such Lender requests payment under Section 2.16 or 2.17, then such Lender will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to make, fund or maintain its Credit Extensions, through another office of such Lender if, as a result thereof, the additional amounts payable to such Lender pursuant to Section 2.16 or 2.17, as the case may be, in the future would be eliminated or reduced and if, as determined by such Lender in its sole discretion, the making, funding or maintaining of Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.18 unless Borrower agree to pay all reasonable and documented incremental expenses incurred by such Lender as a result of utilizing such other office as described above. A certificate as to the amount of any such incremental expenses payable by Borrower pursuant to this Section 2.18 (setting forth in reasonable detail the basis for requesting such

amount) submitted by such Lender to Borrower (with a copy to Administrative Agent) shall be conclusive absent manifest error.

**2.19     Security and Priority**.  The Payment in Full of all Obligations, will be secured as provided in the Collateral Documents. Each DIP Secured Party, by its acceptance thereof, consents and agrees to the terms of the Collateral Documents as the same may be in effect or may be amended from time to time in accordance with their respective terms. Borrower consents and agrees to be bound by the terms of the Collateral Documents, as the same may be in effect from time to time, and agrees to perform its obligations thereunder in accordance therewith. Borrower will take any and all actions required by the Collateral Documents to create and maintain, as security for the Obligations, a valid and enforceable perfected Lien in and on all the Collateral in favor of the Collateral Agent for the benefit of the DIP Secured Parties with the Lien priority required below.

(a)     Borrower acknowledges and agrees that, upon entry of the DIP Order and the delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the DIP Superpriority Claims and DIP Liens as defined in, the DIP Order.

(b)     The Administrative Agent (at the direction of the Lenders) shall be entitled to challenge the amount, validity and perfection of any Lien or security interest filed against Borrower that relates to the Collateral that purports to be senior to any Lien thereon, including, but not limited to, any Lien or security interest that, if found to be valid, enforceable, non-revocable and perfected, would constitute a Permitted Priority Lien.

**2.20     No Discharge; Survival of Claims**.  The Borrower agrees that (a) any Chapter 11 Plan or any related confirmation order entered in the Chapter 11 Case shall not discharge or otherwise affect in any way any of the Obligations under this Agreement and the related Loan Documents, other than after the payment in full in cash to the Lenders of all Obligations under the DIP Facility and the related Loan Documents on or before the effective date of a Chapter 11 Plan and termination of the Commitments and (b) to the extent its Obligations hereunder and under the other Loan Documents are not satisfied in full, (i) its Obligations arising hereunder shall not be discharged by the entry of such confirmation order (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lenders pursuant to the DIP Order and the Liens granted to the Lender pursuant to the DIP Orders shall not be affected in any manner by the entry of such confirmation order.

## SECTION 3.    CONDITIONS PRECEDENT

**3.1     Conditions to Credit Extension on Closing Date**.  The obligation of each Lender to make a Credit Extension on the Closing Date is subject to the satisfaction, or waiver in accordance with <u>Section 10.5</u>, of the following conditions, on or before the Closing Date:

(a)     <u>Loan Documents</u>. Administrative Agent and the Lenders shall have each received copies of each Loan Document, in each case executed and delivered by Borrower and each other Person party thereto and in form and substance satisfactory to the Administrative Agent and the Lenders.

(b)     <u>Organizational Documents; Incumbency</u>. Administrative Agent shall have received from Borrower: (i) copies of its Organizational Documents and, to the extent applicable, certified as of a recent date by the appropriate Governmental Authority of the state of its incorporation or organization, and certified by an Authorized Officer of Borrower to be true and correct as of the Closing Date; (ii) incumbency certificates of the Authorized Officers of Borrower who execute the Loan Documents

35

to which Borrower are a party; (iii) resolutions of the board of directors (or similar governing body) of Borrower approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by an Authorized Officer as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of Borrower's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect), each dated a recent date prior to the Closing Date.

(c)     <u>Reserved</u>.

(d)     <u>DIP Order</u>. The Bankruptcy Court shall have (i) entered the Interim DIP Order, which Interim DIP Order (1) shall be in full force and effect and in form and substance satisfactory to the sole but reasonable discretion of the Required Lenders, and (2) shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, without the prior written consent of the Required Lenders; and (ii) authorized, confirmed and approved all terms and provisions of the DIP Facility and DIP Loan Documents.

(e)     <u>First Day Pleadings and Orders</u>. The Administrative Agent and the Required Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Case, in each case, in form and substance reasonably satisfactory to the Administrative Agent, not later than a reasonable time in advance of the Petition Date for such Persons and their advisors to review and analyze the same; (B) all motions, orders (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent; and (C) all "first day" orders shall have been approved and entered by the Bankruptcy Court except as otherwise agreed by the Administrative Agent.

(f)     <u>Collateral</u>. Collateral Agent and the Lenders shall have received, in each case, in form and substance satisfactory to Collateral Agent and the Required Lenders, (i) executed copies of any Deposit Account Control Agreements reasonably requested by the Required Lenders and (ii) each Collateral Document required for perfection of the Liens on the Collateral reasonably requested by the Required Lenders.

(g)     <u>Perfected Liens</u>. Upon the entry of the Interim DIP Order, the Collateral Agent shall, for the benefit of the DIP Secured Parties, have valid, perfected and enforceable liens on, and security interests in, the Collateral, in each case having the priorities set forth in the DIP Order.

(h)     <u>Initial DIP Budget</u>. The Administrative Agent and the Lenders shall have received the Initial DIP Budget, which shall be in form and substance acceptable to the Required Lenders.

(i)     <u>Closing Date Certificate</u>. Administrative Agent and the Lenders shall have received a certificate executed by an Authorized Officer of Borrower dated the Closing Date, in the form attached hereto as <u>Exhibit D</u>, certifying that the conditions set forth in clauses (j) and (k) of this <u>Section 3.1</u> have been satisfied as of the date thereof.

(j)     <u>No Litigation</u>. Other than the Chapter 11 Case, there shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court (including the Bankruptcy Court) or before any arbitrator or Governmental Authority, which matter is not subject to the automatic stay in the Chapter 11 Case and that, in the

36

reasonable opinion of Administrative Agent, individually or in the aggregate, could be reasonably likely to result in a Material Adverse Effect.

(k)    Representations and Warranties. The representations and warranties of Borrower contained in the Loan Documents shall be true and correct in all material respects (or, in the case of any representation and warranty that is qualified as to "Material Adverse Effect" or otherwise as to "materiality", in all respects) as of the Closing Date (or as of such earlier date if the representation or warranty specifically relates to an earlier date).

**3.2    Conditions to Each Credit Extension**.

(a)    Conditions Precedent. The obligation of each Lender to make any Loan on any Credit Date, is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions precedent:

(i)    Funding Notice. At least (A) two (2) Business Days prior to the initial funding hereunder, and (B) three (3) Business Days prior to each other Credit Date (or, in each case, such later date as the Administrative Agent and the Lenders funding Loans on such Credit Date may agree), Administrative Agent shall have received a duly executed Funding Notice, in accordance with Section 2.1(c)(ii).

(ii)    Representations and Warranties. The representations and warranties made by Borrower herein and in the other Loan Documents shall be true and correct in all material respects on and as of such Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, representations and warranties that already are qualified or modified by materiality in the text thereof shall be true and correct in all respects.

(iii)    No Trustee Appointed. No trustee or examiner having enlarged powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed with respect to Borrower or its respective properties in the Chapter 11 Case, unless consented to by the Administrative Agent.

(iv)    No Default. As of such Credit Date, no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension.

(v)    Chapter 11 Case. The Chapter 11 Case shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code with respect to Borrower.

(vi)    DIP Order. With respect to the Second Advance, (1) the Final DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal and (2) Borrower shall be in compliance in all respects with the Final DIP Order.

(vii)    Updated DIP Budget. The Agent, on behalf of the Lenders, shall have received the most recent (1) Updated DIP Budget in accordance with Section 5.1(e); and (2) DIP Budget Variance Report in accordance with Section 5.1(f).

37

(viii)     <u>Termination Date</u>. The Termination Date shall not have occurred.

(ix)     <u>No Material Adverse Effect</u>. Since the Petition Date, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually or in the aggregate, has had or could reasonably be excepted to have a Material Adverse Effect.

(x)     <u>Bidding Procedures Order</u>.  With respect to the Second Advance, the Bankruptcy Court shall have entered the Bidding Procedures Order and (1) the Bidding Procedures Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal and (2) Borrower shall be in compliance in all respects with the Bidding Procedures Order.

(b)     Each request for a borrowing of a Loan by Borrower hereunder shall constitute a representation and warranty by Borrower as of the applicable Credit Date that the conditions contained in <u>Section 3.2(a)(ii)</u>, <u>(iv)</u> and <u>(ix)</u> have been satisfied.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to the Agents and the Lenders on the Closing Date and upon each Credit Date thereafter:

**4.1     Organization; Requisite Power and Authority; Qualification**.  Borrower: (a) is duly incorporated or organized, validly existing and in good standing under the laws of incorporation or organization, as the case may be; (b) subject to the entry of the DIP Order and the terms thereof, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby; and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except for failures to be so qualified or authorized which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, Borrower has no Subsidiaries.

**4.2     Power; Authorization; Enforceable Obligations**.  Subject to the entry of the DIP Order and the terms thereof, Borrower has the power and authority to execute, deliver and perform under the Loan Documents to which it is a party and to obtain extensions of credit hereunder. Subject to the entry of the DIP Order and the terms thereof, Borrower has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and to authorize the extensions or guarantees (as applicable) of credit on the terms and conditions set forth under the Loan Documents to which it is a party. Subject to the entry of the DIP Order and the terms thereof, each Loan Document to which Borrower is a party on the Closing Date has been duly executed and delivered on behalf of Borrower and constitutes a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting the rights of creditors generally, (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law), and (iii) requirements of reasonableness, good faith and fair dealing.

**4.3     No Conflict; Governmental Consents, Etc**.  Subject to  the entry of the DIP Order and the terms thereof, the execution, delivery and performance by Borrower of the Loan Documents to which it is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not: (a) violate any (i) provision of any law or any governmental rule or regulation applicable to Borrower,

38

(ii) provision of the Organizational Documents of Borrower, or (iii) order, judgment or decree of any court or other agency of government binding on Borrower, <u>except</u> with respect to any violation in clause (i) and (iii) to the extent that such violation could not reasonably be expected to have individually or in the aggregate a Material Adverse Effect; (b) conflict with, result in a breach of or constitute a default under (i) any Contractual Obligation of Borrower or any Subsidiary, <u>except</u> where the direct or indirect consequences of such breach or default, if any, would not reasonably be expected to result in a Material Adverse Effect; (c) require any approval of stockholders, members or partners of Borrower, except for such approvals which have been obtained on or before the Closing Date; or (d) require any registration with, consent or approval of, or notice, or other action, to, with or by any Governmental Authority, <u>except</u> for the entry of the DIP Order and filings and recordings with respect to the Chapter 11 Case or the Collateral to be made, or otherwise delivered, to the Administrative Agent for filing and/or recordation, on the Closing Date.

      **4.4**    **Adverse Proceedings, Etc**.  Other than (a) the Chapter 11 Case, (b) any matter set forth in <u>Schedule 4.4</u> or (c) as stayed upon commencement of the Chapter 11 Case, there are no Adverse Proceedings pending or, to the knowledge of Borrower, threatened in writing against Borrower, any Subsidiary or any of their respective properties or revenues that, in each case, could reasonably be expected to (i) render invalid or void the Loan Documents or the transactions contemplated thereby, or (ii) have a Material Adverse Effect.

      **4.5**    **Payment of Taxes**.  Borrower, and each Subsidiary of Borrower, has: (a) timely filed, or caused to be timely filed, all income and other material tax returns that are required to be filed (taking into account all proper extensions) by it and (b) timely paid, or caused to be paid, all income and other material Taxes required to be paid to any Governmental Authority, <u>except</u> (a) for any Taxes, fees or other charges the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which Borrower has provided reserves for on its books in conformity with GAAP, (b) to the extent that the failure to make the payment could not reasonably be expected to result in a Material Adverse Effect or (c) Taxes the payment of which is prohibited, stayed or excused by the Bankruptcy Code or Bankruptcy Court.

      **4.6**    **Properties**.

        (a)    <u>Title</u>. Borrower and its Subsidiaries have, in each applicable case, (i) good record and marketable title to (in the case of fee interests in real property) and (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), all material properties and assets owned by or leased to Borrower and/or such Subsidiary (as applicable), except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except as would not reasonably be expected to have a Material Adverse Effect.  All such material properties and assets are free and clear of Liens securing Indebtedness, other than Liens permitted by <u>Section 6.2</u>.

        (b)    <u>Intellectual Property</u>. (i) Borrower owns, or has a valid and enforceable right, whether express or implied, to use, all Intellectual Property material to the conduct of its businesses as currently conducted; (ii) no material Adverse Proceeding is pending or has been asserted (or, to the knowledge of Borrower, threatened in writing), nor does Borrower know of any valid basis for any such Adverse Proceeding, by any Person (1) challenging the right of Borrower to use any Intellectual Property owned by or licensed to Borrower, (2) challenging the validity of any Intellectual Property owned or purported to be owned by Borrower or (3) claiming infringement, misappropriation or any other violation by Borrower of any right in Intellectual Property of any Person, and (iii) to the knowledge of Borrower, the operation of the business of Borrower during the past five years has not infringed, misappropriated or

39

otherwise violated, and does not infringe, misappropriate or otherwise violate, any rights in Intellectual Property of any Person.

**4.7    Environmental Matters**.  Except for any matters set forth in Schedule 4.7 or that could not reasonably be expected to have a Material Adverse Effect:

(a)    all uses and operations on the Real Estate Assets, as applicable, by or on behalf of Borrower and each Subsidiary of Borrower, as applicable, comply and have complied in the preceding five (5) year period with all applicable Environmental Laws and Environmental Permits, including the possession of any Environmental Permits required to operate such Real Estate Assets, as applicable;

(b)    there are no outstanding or pending or, to the knowledge of Borrower, threatened Environmental Claims;

(c)    there have not been any Releases or presence of, or exposure to any Hazardous Substance (i) from, on, under or at any Real Estate Asset or (ii) to the knowledge of Borrower, migrating toward any Real Estate Asset, that are reasonably likely to form the basis of any Environmental Claim against Borrower or any Subsidiary of Borrower (or for which Borrower or any Subsidiary of Borrower are liable) or a requirement for Remediation by Borrower or any Subsidiary of Borrower pursuant to Environmental Law;

(d)    no Liens are presently recorded pursuant to any Environmental Law with respect to any Real Estate Asset and, to Borrower's knowledge, no Governmental Authority has taken, is taking, or has threatened to take any action to subject the Real Estate Assets of Borrower to Liens under any Environmental Laws;

(e)    there are no planned or anticipated material changes to the uses or operations of any Real Estate Asset by Borrower or any Subsidiary of Borrower or of which either Borrower is otherwise aware that are reasonably likely to give rise to material liabilities or additional obligations pursuant to Environmental Law; and

(f)    there have been no material environmental investigations, studies, audits, reviews or other analyses conducted by, or that are in the possession of, Borrower or any Subsidiary in relation to the Real Estate Assets that have not been made available to the Lenders.

**4.8    No Defaults**.  Except as set forth in Schedule 4.8, neither Borrower nor any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, nor, to Borrower's knowledge, is any counterparty to such Contractual Obligation in default, except for those defaults arising from or related to the filing of the Chapter 11 Case for which Borrower has received satisfactory forbearances or waivers, those defaults for which Borrower has received written waivers from the applicable counterparty and otherwise where such default or defaults, if any, would not reasonably be expected to result in a Material Adverse Effect. No Default or Event of Default (which has not been waived) has occurred and is continuing.

**4.9    Governmental Regulation**.  Borrower is not subject to regulation under the Investment Company Act of 1940. Borrower is not a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company," as such terms are defined in the Investment Company Act of 1940. Other than the DIP Order, neither Borrower nor any Subsidiary is subject to any decree, order, judgment or other constraint imposed by any Governmental Authority restricting its use or disposition of its assets, or its operations.

40

4.10    **Federal Reserve Regulations; Exchange Act**.

(a)    Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

(b)    No portion of the DIP Loan Proceeds has or will be used in any manner, whether directly or indirectly, that causes or could reasonably be expected to cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors.

4.11    **Employee Matters**.

Except for any matters set forth in Schedule 4.11 or that could not reasonably be expected to have a Material Adverse Effect,

(a)    Borrower and its Subsidiaries are not engaged in any unfair labor practice, and there is: (i) no unfair labor practice complaint pending against Borrower or any Subsidiary, or to the best knowledge of Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Borrower or any Subsidiary, or, to the best knowledge of Borrower, threatened against any of them and (ii) no strike or concerted work stoppage in existence or threatened involving Borrower or any Subsidiary.

(b)    (i) hours worked by and payments made to employees of Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable requirement of law dealing with such matters; (ii) all payments due from Borrower and its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of Borrower and its Subsidiaries and (iii) neither Borrower nor any Subsidiary is party to a collective bargaining agreement, no union representation question exists with respect to the employees of Borrower or any Subsidiary and, to the knowledge of Borrower, no union organization activity is taking place.

(c)    Neither Borrower nor any Subsidiary has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("**WARN**") or any similar federal or state law that remains unpaid or unsatisfied.

4.12    **ERISA**.

Except for any matters set forth in Schedule 4.12 or that could not reasonably be expected to have a Material Adverse Effect:

(a)    Borrower represents as follows: (i) Borrower and each of its respective ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Internal Revenue Code relating to Plans and the regulations and published interpretations thereunder, and have performed all their obligations under each Plan; (ii) each Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Plan is so qualified and, to the knowledge of Borrower, nothing has occurred subsequent to the issuance of such determination letter that would cause such Plan to lose its qualified status; (iii) no ERISA Event has occurred during the five-year period (or, if shorter, for the period during which the Plan in question has been in existence) prior to the date on which this representation is made or deemed made and, as the date on which this representation is made or deemed to be made, no ERISA Event is reasonably expected to occur; and (iv) except (A) to the extent required under Section 4980B of the

41

Internal Revenue Code or similar state laws or (B) benefits provided through the end of the month of termination or retirement, no Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Borrower or any of its ERISA Affiliates.

(b)    Neither Borrower nor any ERISA Affiliate sponsors, maintains or has any obligation to contribute to: (i) a Multiemployer Plan or (ii) a Pension Plan.

**4.13    Plan Assets; Prohibited Transactions**.  Neither Borrower nor any Subsidiary is an entity deemed to hold "plan assets" within the meaning of Section 3(42) of ERISA. The execution and delivery of this Agreement and any other Loan Document will not give rise to any transaction that is subject to the prohibitions of Section 406 of ERISA or Sections 4975(c)(1)(A)-(D) of the Internal Revenue Code that could subject Administrative Agent or any Lender, on account of any Loan or execution of the Loan Documents hereunder, to any tax or penalty on prohibited transactions imposed under Section 4975 of the Internal Revenue Code or Section 502(i) of ERISA.

**4.14    Compliance with Statutes, Etc**.  Borrower and each Subsidiary is in compliance with in all material respects with all applicable Legal Requirements, except in such instances in which (a) such Legal Requirement is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.15    Disclosure**.  No representation or warranty of Borrower contained in any Loan Document or in any other documents, certificates or written statement furnished to the Administrative Agent or any Lender by or on behalf of Borrower for use in connection with any Loan Document or the transactions contemplated hereby (excluding any projections, estimates, forecasts, budgets and other forward-looking information and information of a general economic or industry nature)  contains, as of the date furnished or made, any material misstatement of fact or omits to state a material fact necessary in order to make the statements contained herein or therein taken as a whole not materially misleading in light of the circumstances in which the same were made <u>provided</u> that, with respect to projections, estimates, forecasts, budgets and other forward looking information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation and delivery (it being understood that such projected information may vary from actual results and that such variances may be material). There are no facts known by Borrower (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with any Loan Document or the transactions contemplated hereby.

**4.16    Sanctions; Anticorruption Laws; AML Laws; Etc**.

(a)    Neither Borrower, nor any of its Subsidiaries, nor any of the directors, officers or senior management of Borrower or its Subsidiaries, nor, to the knowledge of Borrower, any affiliates, agents, employees or representatives acting for or on behalf of Borrower or its Subsidiaries is (i) a Sanctioned Person or (ii) organized, based or resident in a Sanctioned Country. Neither Borrower nor any Subsidiary shall directly or indirectly request an extension of credit under or use the proceeds of the offering of the DIP Facility, or lend, contribute or otherwise make available such proceeds (i) to or for the benefit of any joint venture partner or other person or entity, for the purpose of financing the activities or business of, other transactions with or investments in, any individual or entity that is a Sanctioned Person or that is located, organized or resident in a Sanctioned Country or (ii) in a manner that would cause a violation of,

42

or constitute sanctionable conduct under, applicable Sanctions, including any such a violation by any party to this agreement. Borrower will comply in all material respects with Sanctions.

(b)    None of Borrower, any of its Subsidiaries, any of their directors, officers or employees, nor, to the knowledge of Borrower, any affiliates, agents or representatives acting for or on behalf of Borrower or its Subsidiaries has violated or will violate the U.S. Foreign Corrupt Practices Act, as amended, the U.K. Bribery Act, any laws intended to implement the OECD Convention on Combating Bribery of Foreign Public Officials or has made or will make a material violation of any other Anticorruption Laws or the AML Laws.

(c)    Borrower has established and currently maintains and will maintain policies, procedures and controls that are reasonably designed (and otherwise comply with applicable law) to promote compliance by Borrower and its Subsidiaries with the Anticorruption Laws, Sanctions and the AML Laws.

4.17    **Use of Proceeds**.  The proceeds of the Loans extended under the DIP Facility shall be exclusively used as set forth under <u>Section 2.3</u>.

4.18    **Security Interest**.  Upon entry of the DIP Order, the DIP Order shall be effective to create in favor of the Collateral Agent, for the benefit of the DIP Secured Parties, a legal, valid, enforceable and properly perfected security interest in all right, title and interest of Borrower in the Collateral and proceeds thereof, as and to the extent contemplated by the DIP Order and the Collateral Documents.

4.19    **U.S. Person**.  For U.S. federal income tax purposes, as of the date hereof, Borrower is either (i) a "United States person" (as defined in Section 7701(a)(30) of the Internal Revenue Code) that is not a disregarded entity or (ii) is a disregarded entity and is owned, directly or indirectly through one or more disregarded entities, by a "United States person" (as defined in Section 7701(a)(30) of the Internal Revenue Code).

4.20    **DIP Order**.

(a)    The DIP Order is in full force and effect, and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the written consent of the Borrower and the Required Lenders.

(b)    Upon the occurrence of the Termination Date (whether by acceleration or otherwise), the Lenders shall, subject to <u>Section 8</u> and the applicable provisions of the DIP Order, be entitled to immediate payment of Borrower's Obligations, and to enforcement of the remedies provided for under the Loan Documents in accordance with the terms thereof and the DIP Order, as applicable, without further application to or order by the Bankruptcy Court.

(c)    If the DIP Order is the subject of a pending appeal in any respect, none of the DIP Order, any Credit Extension by the Lenders or the performance by Borrower of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal. Borrower, the Agents and the Lenders shall be entitled to rely in good faith upon the DIP Order, notwithstanding objection thereto or appeal therefrom by any interested party. Borrower, the Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with the Loan Documents notwithstanding any such objection or appeal, unless the DIP Order has been stayed by a court of competent jurisdiction.

*ACTIVE 66101174v7*

RLF1 27606993v.1

**4.21    Appointment of Trustee or Examiner; Liquidation**.  No order has been entered in Borrower's Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (c) to convert Borrower's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or to dismiss Borrower's Chapter 11 Case.

**4.22    No Other Insolvency Proceeding**.  Other than the Chapter 11 Case, Borrower is not engaged as a debtor party in any Insolvency Proceeding. No Subsidiary of Borrower is engaged as a debtor party in any Insolvency Proceeding nor contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property. Borrower has not received any written notice or threat of any Person contemplating the filing of any such petition against it or any of its Subsidiaries.

**4.23    DIP Superpriority Claims; DIP Liens**.  Upon the entry of the DIP Order, the DIP Order and the Loan Documents are sufficient to provide the DIP Superpriority Claims and DIP Liens on the Collateral described in, and with the priority provided in, Section 2.19.

**4.24    Real Estate**.  As of the Closing Date, Schedule 4.24 contains a true, accurate and complete list of all Real Estate Assets owned or leased by Borrower and its Subsidiaries and the nature of the interest therein; provided that nothing herein shall prejudice Borrower's right to reject or assume and assign its interest in any lease, sublease, or assignment of leases.

**4.25    Material Contracts**.  Schedule 4.25 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date. All Material Contracts are in full force and effect and no defaults exist thereunder other than defaults the consequence of which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.26    Insurance**.  Except as would not reasonably be expected to have a Material Adverse Effect, all of the Insurance Policies are in full force and effect and neither Borrower nor any of its Subsidiaries is in default, whether as to payment of premium or otherwise, under the terms of any such Insurance Policy nor, except as would not be materially adverse to Borrower and its Subsidiaries, taken as a whole, has Borrower or any of its Subsidiaries failed to give any notice or present any material claim under any such insurance in a due and timely fashion or received written notice of any intent of an insurer to either claim any default on the part of Borrower or any of its Subsidiaries or not to renew any policy of insurance on its expiry or to increase any deductible or cost.

## SECTION 5.    AFFIRMATIVE COVENANTS

Borrower covenants and agrees that until Payment in Full of all Obligations, it shall perform, and shall cause each of its Subsidiaries to perform, all applicable covenants in this Section 5.

**5.1    Financial Statements and Other Reports**.  Unless otherwise provided below, Borrower will deliver to Administrative Agent and Lenders:

(a)    Notice of Event of Default; Material Adverse Effect. Promptly and in any event within two (2) Business Days after any officer of Borrower obtains knowledge thereof, notice (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Borrower with respect thereto, (ii) that Borrower or any Subsidiary has received a notice of default under any Material Contract or (iii) of the occurrence of any event, circumstance or change that has had, or could reasonably

44

be expected to have, either individually or in the aggregate, a Material Adverse Effect, which notice shall be accompanied by a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change and the nature of such claimed Event of Default, Default, event, circumstance or condition, and what action Borrower have taken, is taking and proposes to take with respect thereto;

(b)     Notice of Insolvency Proceeding. Promptly and in any event within one (1) Business Day after any officer, director or senior management employee of Borrower obtains knowledge thereof, written notice of the commencement of any Insolvency Proceeding by Borrower or any Subsidiary, other than the Chapter 11 Case;

(c)     Notice of Litigation. Promptly and in any event within three (3) Business Days after any officer of Borrower obtaining knowledge of (i) the institution of, or non-frivolous written threat of, any Adverse Proceeding not previously disclosed in writing by Borrower to the Lenders or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii), (1) would reasonably be expected to result in liability of Borrower or any Subsidiary in excess of $500,000, which amount would not be covered by insurance, (2) in which material injunctive or similar relieve is sought or (3) seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby or is otherwise related to any Loan Document, written notice thereof together with such other information as may be reasonably available to Borrower to enable Lenders and their counsel to evaluate such matters;

(d)     ERISA and Employment Matters. (i) As soon as possible and in any event within five (5) Business Days after any officer, director or senior management employee of Borrower obtains knowledge of the occurrence of any ERISA Event, written notice specifying the nature thereof, what action Borrower has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, (ii) promptly and in any event within ten (10) calendar days after the same is available to Borrower, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed with the Internal Revenue Service with respect to each Pension Plan; and (iii) promptly and in any event within ten (10) calendar days after Borrower sends notice of a mass layoff (as defined in WARN) to employees, copies of each such notice sent by Borrower;

(e)     Updated DIP Budget. By the close of business on Friday of each one-week period commencing on the Petition Date, Borrower shall deliver to Administrative Agent and the Lenders an Updated DIP Budget for the current week and the immediately subsequent 12-week period, in substantially the same form as the Initial DIP Budget (or such other form acceptable to the Lenders).  Such Updated DIP Budget shall be in substance satisfactory to the Required Lenders; provided, however, if a line item in any Updated DIP Budget is not approved by the Required Lenders, such line item shall be deemed excluded and disregarded from such Updated DIP Budget.

(f)     Weekly Reporting. On the Tuesday of every calendar week, commencing on the first Tuesday following the Petition Date (each such Tuesday, a "**Variance Report Date**"), Borrower shall deliver to Administrative Agent and the Lenders a variance report for the applicable Testing Period certified by an Authorized Officer (each, a "**DIP Budget Variance Report**") setting forth any differences between the actual cash receipts and disbursements of Borrower and its Subsidiaries for such Testing Period, on a line-item basis, compared to the projected cash receipts and disbursements set forth for such period in the applicable DIP Budget, and including explanations for all material variances (such explanations shall include, the degree to which the variance is a permanent variance from the DIP Budget (if known), the

45

cause of the variance, how the source of such variance will be addressed in subsequent forecasts (if appropriate) and whether such variance is expected to impact the DIP Budget).

(g)    Notice of Change in Board of Directors. With reasonable promptness and in any event within three (3) calendar days after such change, written notice of any change in the composition Board of Directors of Borrower;

(h)    Insurance Report. If any material diminution in coverage has occurred or is expected to occur to the insurance maintained by Borrower as required by Section 5.5, then as soon as practicable, one or more certificates from Borrower's insurance broker(s), in each case in form and substance reasonably satisfactory to the Lenders, outlining all insurance coverage maintained pursuant to Section 5.5 as of the date of such report by Borrower and its Subsidiaries and all material insurance coverage planned to be maintained by Borrower and its Subsidiaries pursuant to Section 5.5;

(i)    Information Regarding Change in Collateral. Borrower will furnish to Collateral Agent and the Lenders prior written notice of any change (1) in Borrower's corporate name, (2) in Borrower's identity or corporate structure, (3) in Borrower's jurisdiction of organization or formation or (4) in Borrower's Federal Taxpayer Identification Number or state organizational identification number. Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents;

(j)    Defaults Under Contractual Obligations. Promptly and in any event within three Business Days after any officer of Borrower obtaining knowledge (i) of any (x) event of default by Borrower or any Subsidiary of Borrower occurring after the Petition Date with respect to any Indebtedness, (y) condition or event that constitutes an event of default under any Contractual Obligation occurring after the Petition Date that, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect or (z) condition or event that constitutes an event of default under any Material Contract or (ii) that written notice has been given to Borrower asserting that any such condition or event has occurred, notice from an Authorized Officer of Borrower specifying the nature and period of existence of such condition or event and the nature of such claimed event of default, and what action Borrower has taken, is taking and proposes to take with respect thereto;

(k)    Compliance with Laws. Promptly and in any event within five (5) calendar days after any officer of Borrower obtaining knowledge of a violation of any applicable law, rule, regulation or order of any Governmental Authority (including all Environmental Laws) that could reasonably be expected to have a Material Adverse Effect, notice from an Authorized Officer of Borrower specifying the nature of such violation and what action Borrower or the applicable Subsidiary has taken, is taking and proposes to take with respect thereto;

(l)    Bankruptcy Matters.

(i)    As soon as practicable in advance of, and (1) in any event no less than five (5) Business Days in advance, prior written notice of any assumption or rejection of any Material Contracts pursuant to Section 365 of the Bankruptcy Code and (2) in any event no less than three (3) Business Days in advance of filing (or such shorter review period as is necessary in the event of exigent circumstances as determined by the Borrower in its reasonable discretion), copies of all of Borrower's proposed material pleadings (including, without limitation, motions, objections and

46

replies) and orders in the Chapter 11 Case  (which pleadings and proposed orders must be reasonably satisfactory to the Agent and Lenders); and

        (ii)      promptly after filing or distribution thereof, copies of all other pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court, or distributed by or on behalf of Borrower to any creditors' committee or other statutory committee appointed in the Chapter 11 Case or any other ad hoc committee;

        (m)    <u>Other Information</u>. (i) Concurrently with any delivery of financial statements and related information by Borrower or any Subsidiary to any creditor (including with respect of the Prepetition Indebtedness) that is not otherwise required to be delivered hereunder, copies of such financial statements and related information and (ii) promptly after any request, such other information and data with respect to Borrower or any Subsidiary as from time to time may be reasonably requested by Administrative Agent or any Lender.

        **5.2**    **Existence**.  Subject to the Chapter 11 Case and except as otherwise permitted under <u>Section 6.7</u>, Borrower will, and will cause each Subsidiary to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits necessary to carry out its business and for continuation of its trade or business.

        **5.3**    **Payment of Taxes and Claims**.  Borrower will, and will cause each Subsidiary to, pay, discharge or otherwise satisfy all income and other material Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all material claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; <u>provided</u>, that payment of such Tax or claim is not prohibited, stayed or excused by the Bankruptcy Code or Bankruptcy Court; except, that no such Tax or claim need be paid if (a) it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor or (b) the failure to make the payment could not reasonably be expected to result in a Material Adverse Effect.

        **5.4**    **Maintenance of Properties**.  Borrower will, and will cause each Subsidiary to, maintain or cause to be maintained in good repair, working order and condition, if applicable, ordinary wear and tear excepted, all material properties necessary in the business of Borrower.

        **5.5**    **Insurance**.  Borrower shall, and shall cause each of its Subsidiaries to, maintain insurance underwritten by insurers of recognized financial responsibility, of the types and in the amounts that Borrower reasonably believes is adequate and customary for its business which are commercially available at customary rates (the "**Insurance Policies**"), including insurance covering all Real Estate Assets and personal Property owned or leased by Borrower and Borrower's Subsidiaries against theft, damage, destruction, flood and other natural catastrophes as applicable, acts of vandalism, liability insurance and such other risks that may be required by Legal Requirements or Contractual Obligations, with such deductibles as are customary for companies in the same or similar business.

        **5.6**    **Books and Records; Inspections**.  Borrower will keep, and will cause its Subsidiaries to keep, proper books of record and accounts in conformity with GAAP. Borrower will permit any authorized representatives designated by any Agent or any Lender to visit and inspect any of the properties of Borrower to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and

their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested (but in no event more than once each fiscal year unless an Event of Default has occurred and is continuing). Unless an Event of Default has occurred and is continuing, Borrower shall have the right to have a representative present at any and all inspections. Nothing in this Section 5.6 shall be construed to cause Borrower or any of its Subsidiaries to divulge any materials covered by an attorney-client privilege that has not been waived or otherwise subject to confidentiality or disclosure restrictions that would prohibit or restrict such disclosure.

5.7    **Lender Meetings**. Borrower will and will cause the Chief Financial Officer and other relevant members of management, upon the reasonable request of the Administrative Agent (at the direction of the Required Lenders), to participate in a meeting with the Administrative Agent and the Lenders to be held at such location as may be agreed to by Borrower and the Administrative Agent or via conference call, at such time as may be agreed to by Borrower and the Administrative Agent (but not to exceed more than one such meeting per week during the term of this Agreement), to discuss the transactions contemplated under the Loan Documents, the DIP Budget Variance Report, the Chapter 11 Case, the financial and operational performance of Borrower and its Subsidiaries and such other related matters as may be reasonably requested with reasonable advance notice by the Administrative Agent.

5.8    **Compliance with Laws; Sanctions and Contractual Obligations**. Borrower shall, and shall cause each Subsidiary to, comply in all material respects with (a) the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws) (it being understood, in the case of any laws, rules, regulations and orders specifically referred to in any other provision of this Agreement, Borrower shall also be required to represent and/or comply with, as applicable, the express terms of such provision) and (b) the provisions of all Contractual Obligations, in each case, except as stayed by the Chapter 11 Case or where the failure to do so would not reasonably be expected to have a Material Adverse Effect. With respect to Sanctions, Anticorruption Laws and AML Laws, Borrower shall comply with the covenants set forth in Section 4.16. In addition, neither Borrower, any of its Subsidiaries, nor any director or officer of Borrower or its Subsidiaries shall be a Sanctioned Person or organized, based or resident in a Sanctioned Country.

5.9    **Environmental**.

(a)    Environmental Disclosure. Borrower will deliver to Administrative Agent and Lenders:

(i)    as soon as practicable following receipt thereof, copies of all material environmental written notices, audits, investigations, studies, reviews, analyses and reports of any kind or character, whether prepared by personnel of Borrower or by independent consultants, Governmental Authorities or any other Persons, with respect to any Environmental Claims, Hazardous Substances Activity, Remediation, or actual or alleged violations or noncompliance with of Environmental Laws at or affecting any Real Estate Asset, any of which would reasonably be expected to result in a Material Adverse Effect;

(ii)    promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws, (2) any Remediation required to be undertaken by Borrower or any other Person in response to (x) any Hazardous Substances Activities the existence of which has a reasonable likelihood to result in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, (y) any Environmental Claims that, individually or in the

48

aggregate, have a reasonable likelihood of resulting in a Material Adverse Effect, and (z) Borrower's actual knowledge of any occurrence or condition on any real property adjoining or in the vicinity of any Real Estate Asset that would reasonably be expected to cause such Real Estate Asset or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any applicable Environmental Laws;

(iii)    as soon as practicable following the sending or receipt thereof by Borrower, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable likelihood of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any Governmental Authority and (3) any written request for information from any Governmental Authority that evidences that such Governmental Authority is investigating whether Borrower may be potentially responsible for any Hazardous Substances Activity;

(iv)    prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Borrower that would reasonably be expected to (x) expose Borrower or any Subsidiary to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (y) affect the ability of Borrower or any Subsidiary to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for its respective operations; and (2) any proposed action to be taken by Borrower or any Subsidiary materially to modify current operations in a manner that would reasonably be expected to subject Borrower or any Subsidiary to any additional material obligations or requirements under any Environmental Laws; and

(v)    with reasonable promptness, such other material documents and information as from time to time reasonably may be requested by Administrative Agent or any Lender in relation to any matters disclosed pursuant to this Section 5.9(a).

(b)    Hazardous Substances Activities, Etc. Borrower shall, and shall cause each Subsidiary promptly to, take such commercially reasonable actions required under applicable Environmental Laws to (i) cure any violation of, or non-compliance with, applicable Environmental Laws by it that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against Borrower or any Subsidiary and discharge any obligations it may have to any Person thereunder, in each case where failure to respond or to discharge any obligations could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.10    **Plan Assets**. Borrower shall not take any action, or omit to take any action, which would cause the assets of Borrower to become "plan assets" within the meaning of Section 3(42) of ERISA at any time.

5.11    **Further Assurances**. In furtherance and not in limitation of the Borrower's obligations set out in Section Section 7, at any time or from time to time upon the reasonable request of Administrative Agent, Borrower will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent, Collateral Agent or any Lender may reasonably request in order to perfect, establish control (within the meaning of Article 9 of the UCC), ensure the priorities, rights and remedies or renew the rights of Collateral Agent for the benefit of DIP Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other Property hereafter acquired by Borrower that may be deemed to be part of the Collateral). In furtherance and not in limitation of the foregoing, Borrower shall take such actions as any

49

Agent or any Lender may reasonably request from time to time to ensure that the Obligations are secured by the Collateral.  Borrower shall provide advance written notice to Administrative Agent before forming or acquiring any Subsidiaries, and any Subsidiaries of the Borrower from time to time in existence shall promptly be required to join this Agreement as guarantors and pledge all or substantially all of their assets as collateral for the Obligations.

5.12    **Non-Consolidation**.  Borrower shall: (a) maintain entity records and books of account separate from those of any other entity that is an Affiliate of such entity; (b) not commingle its funds or assets with those of any other entity that is an Affiliate of such entity; and (c) provide that its Board of Directors will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

5.13    **Cash Management**.  Borrower shall: (a) maintain cash management systems in accordance with the DIP Order, other orders entered by the Bankruptcy Court, and the Collateral Documents, and (b) agrees to promptly execute and deliver to Administrative Agent and Collateral Agent a Deposit Account Control Agreement or Securities Account Control Agreement, as applicable, with respect the Controlled Account.

5.14    **Intellectual Property**.  With respect to any Contractual Obligation under which Borrower or any Subsidiary receives a license or other rights (including by means of a covenant not to sue, release or non-assertion agreement) with respect to any Intellectual Property, Borrower shall, and shall cause each Subsidiary to, as applicable, (a) renew or to not terminate, cancel, surrender or release its rights under any such Contractual Obligation, or amend any such Contractual Obligation or related arrangements to limit the scope of the right of Borrower or any Subsidiary to use the Intellectual Property subject to such Contractual Obligation, either with respect to product, territory, term or otherwise, or to not increase the amounts to be paid by Borrower or any Subsidiary thereunder or in connection therewith, without the prior written consent of Collateral Agent (in consultation with the Required Lenders); and (b) give Collateral Agent and the Lenders prompt written notice of any material breach of any obligation, or any default, by the third party that is the licensor or by Borrower or any Subsidiary that is the licensee or any other party under such Contractual Obligation, and deliver to Collateral Agent (promptly upon the receipt thereof by Borrower or any Subsidiary in the case of a notice to such person and concurrently with the sending thereof in the case of a notice from person) a copy of each notice of default and any other notice received or delivered by Borrower or any Subsidiary in connection with any such Contractual Obligation.

5.15    **Debtor-in-Possession Obligations**.  Borrower shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules and any order of the Bankruptcy Court (including, for the avoidance of doubt, the DIP Order), as each such order is amended and in effect from time to time in accordance with the Loan Documents.

5.16    **DIP Budget; Variance Covenant**.

(a)    For each Testing Period, Borrower shall not permit (i) the actual cash receipts to be less than 92.5% of the budgeted cash receipts, in each case, calculated for such Testing Period on a line-by-line basis (as opposed to on a cumulative basis); and (ii) the actual cash disbursements to exceed 110.0% of the budgeted cash disbursements (other than professional fees of the Borrower and of any creditors' committee appointed in the Chapter 11 Case, which shall not exceed 100% of the budgeted amounts for such professional fees), in each case, calculated for such Testing Period on a cumulative weekly basis over a rolling four (4) week period (for any Testing Period, the permitted variance between actual cash receipts and budgeted cash receipts, and actual cash disbursements and budgeted cash disbursements, collectively, "**Permitted Variances**"); provided, that, for any Testing Period, (x) if actual cash receipts for any line item

50

exceed budgeted cash receipts for such line item, the amount of such excess can be included as an additional Permitted Variance with respect to such line item in a subsequent Testing Period; and (y) if budgeted cash disbursements exceed actual cash disbursements, calculated on a cumulative weekly basis over a rolling four (4) week period, the amount of such excess can be included as an additional Permitted Variance with respect to such line item in a subsequent Testing Period.

(b)    Borrower shall, and shall cause its Subsidiaries to, comply with the terms of the DIP Budget, subject to any Permitted Variances.

**5.17    Use of Proceeds**.  The proceeds of each Loan shall be used by Borrower during the Chapter 11 Case exclusively as provided in Section 2.3, in each case, in accordance with the DIP Budget.

**5.18    Consultants**.  Borrower shall provide the Agents and Lenders with reasonable access to any consultant, turnaround management firm, broker or financial advisory firm retained by Borrower in the Chapter 11 Case.

**5.19    Bankruptcy Milestones**.  Borrower shall comply with the following milestones:

(a)    by no later than three (3) Business Days following the Petition Date, the Borrower shall have filed a motion, in form and substance satisfactory to the Required Lenders, seeking entry of the Bidding Procedures Order and the Sale Order;

(b)    by no later than twenty-five (25) days following the Petition Date, Borrower shall have obtained entry of the (i) Bidding Procedure Order and (ii) Final DIP Order;

(c)    by no later than fifty-four (54) days following the Petition Date, the Bankruptcy Court shall have conducted, to the extent necessary, the sale hearing (in accordance with the terms of the Bidding Procedures Order) and entered the Sale Order approving the Approved 363 Sale, in form and substance acceptable to the Required Lenders, the Borrower and the purchaser in the Approved 363 Sale; and

(d)    by no later than sixty (60) days following the Petition Date, the Approved 363 Sale shall have closed.

**5.20    Post-Closing Matters**.  Borrower shall execute and deliver the documents and complete the tasks set forth on Schedule 5.20, in each case within the time limits specified therein. Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, the parties hereto acknowledge and agree that, at all times prior to the applicable time limits specified on such Schedule 5.20, all conditions precedent and representations contained in this Agreement and the other Loan Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described on Schedule 5.20 within the time periods required thereon, rather than as elsewhere provided in the Loan Documents).

## SECTION 6.    NEGATIVE COVENANTS

Borrower covenants and agrees that until Payment in Full of all Obligations, Borrower shall perform, and shall cause its Subsidiaries to perform, all covenants in this Section 6.

**6.1    Indebtedness**.  Borrower shall not, and shall cause its Subsidiaries to not, directly or indirectly, create, incur, assume or guaranty or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

51

(a) the Obligations;

(b) Indebtedness of Borrower existing on the Closing Date described in <u>Schedule 6.1</u> (the "**Prepetition Indebtedness**"), but not any extensions, renewals or replacements of such Indebtedness except with the express written approval of the Required Lenders;

(c) Indebtedness of the Borrower incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including obligations under any Capital Lease and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (d) of this <u>Section 6.1</u>; <u>provided</u> that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this clause (c) together with any Refinance Indebtedness in respect thereof permitted by clause (d) below, shall not exceed $1,000,000 at any time outstanding;

(d) Indebtedness which represents extensions, renewals or refinancings (such Indebtedness being so extended, renewed, refinanced or replaced being referred to herein as the "**Refinance Indebtedness**") of any of the Indebtedness described in clause (c) of this <u>Section 6.1</u> (such Indebtedness being referred to herein as the "**Original Indebtedness**"); <u>provided</u> that (i) the aggregate principal amount of the Original Indebtedness does not increase from that amount outstanding at the time of any such extension, renewal or refinancing, (ii) any Liens securing such Refinance Indebtedness are not extended to any property of Borrower not secured by the Liens securing the Original Indebtedness at the time of such extension, renewal or refinancing, (iii) such Refinance Indebtedness does not result in a shortening of the average weighted maturity of such Original Indebtedness, (iv) the terms of such Refinance Indebtedness are not materially less favorable to the obligor thereunder than the terms of such Original Indebtedness and (v) if such Original Indebtedness was subordinated in right of payment to the Obligations, then the terms and conditions of such Refinance Indebtedness must include subordination terms and conditions that are at least as favorable to the Lenders as those that were applicable to such Original Indebtedness;

(e) trade payables not represented by a note, customarily paid by Borrower within ninety (90) days of incurrence and in fact not more than ninety (90) days outstanding, that are incurred in the ordinary course of Borrower's business, in amounts reasonable and customary for such business;

(f) Indebtedness of Borrower with respect to performance bonds, surety bonds, appeal bonds, customs bonds, worker's compensation claims and similar obligations in an aggregate principal amount outstanding at any time not to exceed $250,000, in each case, incurred in the ordinary course of business;

(g) Indebtedness in respect of treasury, depository, credit card, debit card and cash management services or automated clearinghouse transfer of funds, overdraft or any similar services, in each case incurred in the ordinary course of business, not to exceed $250,000 at any time outstanding;

(h) the incurrence by Borrower or its Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five (5) Business Days;

(i) Indebtedness owed to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents; and

(j)    unsecured Indebtedness of the Borrower in an aggregate principal amount not exceeding $50,000.

**6.2**    **Liens**. Borrower shall not, and shall cause its Subsidiaries to not, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any Property, any Capital Stock in Borrower or any Subsidiary of Borrower or any other asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Borrower or any Subsidiary of Borrower, whether now owned or hereafter acquired, leased (as lessee), or licensed (as licensee), or any income, profits, or royalties therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such Property, asset, income, profits or royalties under the UCC of any State or under any similar recording or notice statute or under any applicable intellectual property laws, rules or procedures, except:

(a)    Liens in favor of Collateral Agent for the benefit of DIP Secured Parties granted pursuant to any Loan Document;

(b)    Liens on fixed or capital assets acquired, constructed or improved by Borrower; provided that (i) such Liens secure Indebtedness permitted by clause (d) of Section 6.1, (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 80% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Liens shall not apply to any other property or assets of Borrower or any Subsidiary;

(c)    Liens existing on the Closing Date described in Schedule 6.2; provided, that (i) the property covered thereby is not changed, (ii) the principal amount secured or benefited thereby incurred prior to the Petition Date is not increased, and (iii) the direct or any contingent obligor with respect thereto is not changed;

(d)    Liens for Taxes (i) not yet due or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP or (ii) the payment of which is prohibited, stayed or excused by the Bankruptcy Code or Bankruptcy Court;

(e)    statutory Liens of landlords, of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code), in each case incurred in the ordinary course of business, provided, that such Liens are not in imminent danger of foreclosure and would not otherwise reasonably be expected to have a Material Adverse Effect;

(f)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, or Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP or imposed by ERISA;

(g)    easements, rights-of-way, restrictions, encroachments, covenants, additions, restrictions, encroachments and other similar matters, in each case that do not and will not interfere in any material respect with the ordinary conduct of the business of Borrower and its Subsidiaries taken as a whole;

(h)    customary rights of set-off, banker's liens and other similar Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the ordinary maintenance and administration of Deposit Accounts or Securities Accounts, provided, that such Liens are not in imminent danger of foreclosure and would not otherwise reasonably be expected to have a Material Adverse Effect;

(i)    Liens securing judgments to the extent and so long as such judgments do not individually or in the aggregate constitute an Event of Default under Section 8.1(e), so long as such Liens (i) are adequately bonded and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made or (ii) are stayed by the Bankruptcy Court;

(j)    (i) licenses, sublicenses, leases or subleases granted by Borrower to other Persons not materially interfering with the conduct of the business of Borrower and (ii) any interest or title of a lessor, sublessor or licensor under any lease or license agreement permitted by this Agreement to which Borrower is a party;

(k)    Liens on pledges or deposits in the ordinary course securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit and bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Borrower or any of its Subsidiaries, to the extent permitted under this Agreement; and

(l)    Liens in favor of the Prepetition Agent securing Indebtedness permitted by Section 6.1(i).

6.3    **Restricted Payments**.  Borrower shall not, and Borrower shall cause its Subsidiaries to not, through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Payment, except each Subsidiary may make Restricted Payments to Borrower.

6.4    **Reserved**.

6.5    **Investments**.  Borrower shall not, and shall cause its Subsidiaries to not, directly or indirectly, make or own any Investment in any Person, including any Joint Venture, except:

(a)    Investments in Cash and Cash Equivalents;

(b)    Investments owned as of the Petition Date by (i) Borrower in any other Borrower, (ii) Borrower in any Subsidiary of Borrower or (iii) any Subsidiary of Borrower in another Subsidiary of Borrower;

(c)    Investments (i) constituting deposits, prepayments and other credits to suppliers, and/or (ii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, made in the ordinary course of business and consistent with the past practices of Borrower and, in the case of clause (ii), to the extent necessary to maintain the ordinary course of supplies; provided that any Investment made under this subsection (c) shall be in accordance with the DIP Budget;

(d)    Investments held by Borrower as of the Petition Date and set forth on Schedule 6.5; and

(e)      Investments received in compromise or resolution of obligations of trade creditors or customers that were incurred in the ordinary course of business of Borrower or any of its Subsidiaries.

Notwithstanding anything in this <u>Section 6.5</u> to the contrary, in no event shall Borrower make any Investment that results in or facilitates in any manner any Restricted Payment not otherwise permitted under the terms of <u>Section 6.3</u> or that is otherwise in any manner inconsistent with the DIP Budget.

**6.6     Material Contracts**.  Borrower shall not, and shall cause its Subsidiaries to not, amend, modify, terminate or waive any material rights or obligations under, any Material Contract, without the prior written consent of the Required Lenders.

**6.7     Fundamental Changes; Disposition of Assets**.  Borrower shall not, and shall cause its Subsidiaries to not, enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever (including, without limitation, the granting of any interest in the direct or indirect equity of Borrower or any Subsidiary), whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased (as lessee) or licensed (as licensee), or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures, in each case in the ordinary course of business) the business, a substantial portion of the property or assets of, or any portion of the Capital Stock or other evidence of beneficial ownership of, any Person, any division or line of business or any other business unit of any Person, except:

(a)      disposals of surplus, obsolete or worn out property in the ordinary course of business;

(b)      Investments made in accordance with <u>Section 6.5</u> and Restricted Payments made in accordance with <u>Section 6.3</u>;

(c)      Liens may be granted to the extent permitted by <u>Section 6.2</u>;

(d)      any involuntary loss, damage or destruction of property and the disposition of the assets so damaged or destroyed shall be permitted, provided that such loss, damage or destruction is not caused by the gross negligence or permissive waste of Borrower, any Subsidiary or any Affiliate thereof;

(e)      any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property shall be permitted; and

(f)      the Approved 363 Sale.

**6.8     Other Bankruptcies**.  Other than the Chapter 11 Case, Borrower shall not, and shall cause its Subsidiaries to not, file any petition for bankruptcy, insolvency, dissolution or liquidation pursuant to the Bankruptcy Code or any similar federal or state law (or the filing of any involuntary petition if Borrower or any of its Affiliates colluded with, solicited, caused to be solicited or joined other creditors in such filing). Other than as consented to by the Administrative Agent (in its sole discretion), the Borrower shall not file any debtor in possession financing pleadings or any documents pertaining to a debtor in possession financing.

**6.9     Sales and Lease-Backs**.  Following the Petition Date, Borrower shall not, and shall cause its Subsidiaries to not, directly or indirectly, become or remain liable as lessee or as a guarantor or other

55

surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, that Borrower or Subsidiary (a) has sold or transferred or is to sell or to transfer to any other Person, or (b) intends to use for substantially the same purpose as any other property that has been or is to be sold or transferred by Borrower or any Subsidiary to any Person in connection with such lease.

**6.10    Transactions with Shareholders and Affiliates**.  Borrower shall not, and shall cause its Subsidiaries to not, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of Capital Stock of Borrower or any of its Subsidiaries (or any Affiliate of such holder) or with any Affiliate of Borrower; provided, however, that Borrower and its Subsidiaries may enter into or permit to exist any such transaction if either (a) the Required Lenders have consented thereto in writing prior to the consummation thereof or (b) the terms of such transaction are not less favorable to Borrower or such Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, further, that the foregoing restrictions shall not apply to the following:

(a)    transactions between or among Borrower and its Subsidiaries not involving any other Affiliate;

(b)    Restricted Payments permitted under Section 6.3 and Investments permitted under Section 6.5(b);

(c)    transactions existing on the Closing Date described in Schedule 6.10;

(d)    customary fees, indemnities and reimbursements paid to directors of Borrower and its Subsidiaries in accordance with the DIP Budget; and

(e)    Borrower entering into, and making payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of Borrower and its Subsidiaries in the ordinary course of business and in accordance with the DIP Budget.

**6.11    Conduct of Business**.  From and after the Closing Date, except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court, Borrower shall not, and shall cause its Subsidiaries to not, engage in (a) any business other than the businesses engaged in by Borrower or Subsidiary on the Petition Date or any business reasonably related or incidental thereto or representing a reasonable expansion thereof or (b) any business or activities that conflict with the requirements of Section 4.16.

**6.12    Payment and Prepayment of Indebtedness**.  From and after the Closing Date, Borrower shall not make any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Prepetition Indebtedness, except as provided hereunder.

**6.13    Fiscal Year; Accounting Policies**.  Borrower shall not, and shall cause its Subsidiaries to not, change its Fiscal Year end from December 31 or make any change in its accounting policies that is not required under GAAP.

**6.14    Deposit Accounts and Securities Accounts**.  Borrower shall not deposit funds in any Deposit Account other than a Controlled Account or deposit, acquire, or otherwise carry any security entitlement or commodity contract in a Securities Account other than a Controlled Account.

56

**6.15    Amendments to Organizational Agreements**.  Borrower shall not, and shall cause its Subsidiaries to not, amend or permit any amendments to Borrower's or such Subsidiary's Organizational Documents, in each case, without the prior written consent of the Required Lenders.

**6.16    Other Super-priority Claims**.  Borrower shall not incur, create, assume, suffer to exist or permit any other super-priority claim which is *pari passu* with or senior to the claims of the Agents and the Lenders against Borrower hereunder, except for the Carve-Out and any super-priority claims granted to the Prepetition Agent pursuant to the interim and final cash collateral orders entered by the Bankruptcy Court.

**6.17    Equity Issuances**.  Borrower shall not, and shall cause its Subsidiaries to not issue any Disqualified Capital Stock.

**6.18    ERISA**.  Neither Borrower nor any of its ERISA Affiliates shall, nor shall it permit any of its Subsidiaries to take any action or omit to take any action which would cause the transaction contemplated hereby to constitute a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Internal Revenue Code, or substantially similar provisions under federal, state or local laws, rules or regulations or in any transaction that would cause any obligation or action taken or to be taken hereunder (or the exercise by any Agent or Lender of any of its rights under the Loan Documents) to be a non-exempt prohibited transaction under such provisions.

**6.19    Intellectual Property**.  Borrower shall not do any act or omit to do any act that may result in the lapse, abandonment, cancellation, dedication to the public, forfeiture or other impairment of, any of its Intellectual Property.

**6.20    Capital Expenditures**.  Except as permitted by this Section 6.20, Borrower shall not make any capital expenditures (including expenditures for maintenance, repair or improvement of any Real Estate Asset or other existing properties and assets). Borrower shall cause its Subsidiaries to not make any capital expenditures (including expenditures for maintenance, repair or improvement of any existing properties and assets) other than capital expenditures in accordance with the DIP Budget or as otherwise approved by the Required Lenders in their sole discretion.

**6.21    Change of Control**.  No Change of Control shall occur.

**SECTION 7.    COLLATERAL**

**7.1    Grant of Security Interest**.  To secure the prompt payment and performance of all of the Obligations, the Borrower hereby grants to Collateral Agent, for the benefit of the DIP Secured Parties, a continuing security interest in and Lien upon all real and personal property of the Borrower, including, without limitation, all Postpetition Collateral (as defined in the DIP Order), and all of the following Property and interests in Property of the Borrower, whether now owned or existing or hereafter created, acquired or arising and wheresoever located:  (i) all Accounts; (ii) all Supporting Obligations; (iii) all Goods, including all Inventory and Equipment (including Fixtures); (iv) all Instruments; (v) all Chattel Paper (including all Electronic Chattel Paper); (vi) all Documents; (vii) all General Intangibles (including Payment Intangibles and Software); (viii) all Deposit Accounts; (ix) all Investment Property; (x) all Letter-of-Credit Rights; (xi) all monies now or at any time or times hereafter in the possession or under the control of an Agent or a Lender or a bailee or Affiliate of an Agent or a Lender, including any Cash Collateral (as defined in the DIP Order); (xii) all Intellectual Property in which the Borrower has an interest; (xiii) all Commercial Tort Claims; (xiv) all Real Estate Asset; (xv) upon entry of the Final DIP Order, all Avoidance Actions and Avoidance Action Proceeds; (xvi) all accessions to, substitutions for and all replacements, products and cash and non-cash proceeds of (i) through (xv) above, including proceeds of and unearned premiums with

57

respect to insurance policies insuring any of the Collateral and claims against any Person for loss of, damage to or destruction of any of the Collateral; and (xvii) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs, and other computer materials and records) of the Borrower pertaining to any of (i) through (xvi) above.

       **7.2    Cash Collateral**.  In addition to the items of Property referred to in <u>Section 7.1</u> above, the Obligations shall also be secured by all of the other items of Property from time to time described in any of the Collateral Documents as security for any of the Obligations

       **7.3    Commercial Tort Claims**.  The Borrower shall promptly notify the Collateral Agent in writing upon the Borrower obtaining a Commercial Tort Claim in an amount exceeding $50,000 after the Closing Date against any Person, but regardless of the dollar amount of such Commercial Tort Claim, at Collateral Agent's request, Borrowers shall promptly enter into an amendment to this Agreement (or any of the other Loan Documents) and do such other acts or things deemed appropriate by the Collateral Agent to confer upon the Collateral Agent a first priority perfected security interest in each such Commercial Tort Claim.

       **7.4    Certain After-Acquired Collateral**.  The Borrower shall promptly notify the Collateral Agent in writing upon the Borrower obtaining any Collateral after the Closing Date consisting of Deposit Accounts, Securities Accounts, Investment Property, Letter-of-Credit Rights or Electronic Chattel Paper and, upon the Collateral Agent's request, shall promptly execute such documents and do such other acts or things deemed appropriate by the Collateral Agent to confer upon the Collateral Agent control with respect to such Collateral; promptly notify the Collateral Agent in writing upon the Borrower obtaining any Collateral after the Closing Date consisting of Documents or Instruments in an amount exceeding $50,000 but regardless of the dollar amount, upon the Collateral Agent's request, the Borrower shall promptly execute such documents and do such other acts or things deemed appropriate by the Collateral Agent to deliver to it possession of such Documents as are negotiable and Instruments, and, with respect to non-negotiable Documents, to have such non-negotiable Documents issued in the name of the Collateral Agent.

       **7.5    No Assumption of Liability**.  The security interests granted pursuant to this Agreement and the other Loan Documents are granted as security only and shall not subject any Agent or any Lender to, or in any way alter or modify, any obligation or liability of the Borrower with respect to or arising out of the Collateral.

       **7.6    Lien Perfection; Further Assurances**.  The Liens granted to the Collateral Agent pursuant to the provisions of this Agreement and the other Loan Documents shall be in addition to all Liens conferred upon Agent pursuant to the terms of the DIP Order.  The Interim Order, and, if and when it becomes effective, the Final Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Collateral Agent's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, deed of trust, preferred mortgages (formerly known as preferred ship mortgages) or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Collateral Agent in and to the Collateral or to entitle the Collateral Agent to the priorities granted herein; provided, however, that the Borrower shall, promptly following the request of the Collateral Agent, execute such instruments, assignments, mortgages, deeds of trust, ship mortgages, or documents as are necessary to perfect the Collateral Agent's liens upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of the Collateral Agent's Liens upon the Collateral.  The Borrower hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as "all assets" of the Borrower or words of similar effect, regardless of whether any particular asset comprised

58

in the Collateral falls within the scope of Article 9 of the UCC of the State of New York or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC of the State of the Borrower's location for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to such Borrower, and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  The Borrower agrees to furnish any such information to the Collateral Agent promptly upon request.  The Borrower also ratifies its authorization for the Collateral Agent to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.  No such filing or recordation shall be necessary or required in order to create or perfect any such Lien.  The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof.  At the Collateral Agent's request, each Borrower shall also promptly execute or cause to be executed and shall deliver to the Collateral Agent any and all documents, instruments and agreements deemed necessary by the Collateral Agent to give effect to or carry out the terms or intent of the Loan Documents.

## SECTION 8.    EVENTS OF DEFAULT

**8.1    Events of Default**.  The occurrence of any one or more of the following events shall be, and shall constitute the commencement of, an "**Event of Default**" hereunder (and any Event of Default that has occurred shall continue unless and until waived by the Administrative Agent and the Required Lenders in writing in their sole discretion):

(a)    Failure to Make Payments When Due. The failure by Borrower to pay (i) when and as required to be paid herein, any amount of principal of any Loan; or (ii) within three Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document;

(b)    Default Under Other Indebtedness. The (i) failure of Borrower or any Subsidiary to pay when due any principal of, interest on or any other amount, including any payment in settlement, in respect of any Indebtedness in an amount, individually or in the aggregate, that exceeds $100,000, in each case, beyond the grace period, if any, provided therefor or (ii) breach or default by Borrower or any Subsidiary with respect to any other term of any loan agreement, note, mortgage, pledge or indenture relating to any Indebtedness in an amount, individually or in the aggregate, that exceeds $100,000, in each case, beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee on behalf of such holder or holders), to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or other redemption) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be;

(c)    Breach of Certain Covenants. Other than with respect to Section 8.1(a), Borrower defaults in the observance or performance of any covenant contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of fifteen (15) calendar days, in each case, after the earlier of (x) written notice thereof to Borrower from the Administrative Agent or any Lender or (y) any such Person's knowledge thereof; provided, that no such grace period shall apply with respect to defaults in the performance of the following obligations and covenants: (i) Section 2.3 *(Use of Proceeds)*; (ii) Section 5.8 *(Compliance with Laws; Sanctions and Contractual Obligations)*; (iii) Sections 5.1(a), 5.1(c), 5.1(e), 5.1(f), and 5.1(k) *(Financial Statements and Other Reports)*; (iv) Section 5.13 *(Cash Management)*; (v) Section 5.15 *(Debtor-in-Possession Obligations)*; (vi) Section 5.16 *(DIP Budget)*; (vii) Section 5.19 *(Bankruptcy Milestones)*; and (viii) any negative covenant under Section 6;

59

(d)    Breach of Representations, etc. Any representation, warranty, certification or other statement made or deemed made by Borrower in any Loan Document or in any statement or certificate at any time given by Borrower in writing pursuant hereto or thereto or in connection herewith or therewith shall be false or misleading in any material respect as of the date made or deemed made;

(e)    Judgments and Attachments. Any money judgment, writ or warrant of attachment or similar process arising after the Petition Date and involving, individually or in the aggregate at any time, an amount in excess of $250,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Borrower or any Subsidiary or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) calendar days (or in any event later than five calendar days prior to the date of any proposed sale thereunder);

(f)    Employee Benefit Plans. There shall occur one or more ERISA Events that individually or in the aggregate results in or reasonably could be expected to result in a Material Adverse Effect;

(g)    Collateral Documents and other Loan Documents. At any time after the execution and delivery thereof: (i) this Agreement or any other Collateral Document ceases to be in full force and effect, legal, valid and binding (other than by reason of a release of Collateral in accordance with the terms hereof or thereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority set forth in Section 2.19, in each case for any reason other than the failure of Collateral Agent or any DIP Secured Party to take any action within its control or (ii) (A) any Loan Document shall cease to be, or shall be asserted in writing by Borrower not to be, valid or enforceable or (B) Borrower shall contest or deny in writing any further liability of Borrower, including with respect to future advances by Lenders, under any Loan Document;

(h)    Chapter 11 Case.

(i)    the entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or any filing by Borrower of a motion or other pleading seeking entry of such an order or supports or fails to timely oppose such dismissal or conversion;

(ii)    a trustee, responsible officer or an examiner having enlarged powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) is appointed or elected in the Chapter 11 Case, Borrower applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders in their sole discretion;

(iii)    the entry of an order staying, reversing, vacating or otherwise amending or modifying the DIP Order, whether by appeal or otherwise, or the filing by Borrower of an application, motion or other pleading seeking entry of such an order, without the prior written consent of the Required Lenders and the Agent;

(iv)    the entry of an order staying, reversing, vacating or otherwise amending or modifying the Bidding Procedures Order, whether by appeal or otherwise, or the filing by

Borrower of an application, motion or other pleading seeking entry of such an order, without the prior written consent of the Required Lenders and the Agent;

(v)     the entry of an order in the Chapter 11 Case granting relief from any stay or proceeding (including the automatic stay) so as to allow a third party to proceed with foreclosure against any assets or to permit other actions that would have a Material Adverse Effect, in each case, without the prior written consent of the Required Lenders and the Agent;

(vi)    (a) the entry of an order in the Chapter 11 Case (1) charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Lenders, (2) avoiding or requiring disgorgement by any of the Lenders of any amounts received in respect of the Obligations under the DIP Facility or (3) resulting in the marshaling of any Collateral or (b) the commencement of other actions by Borrower that challenge the validity, extent or priority of any Liens on the Collateral or the rights and remedies of the Agents or the Lenders under the DIP Facility in the Chapter 11 Case;

(vii)   other than in respect of the Prepetition Indebtedness, the entry of an order in the Chapter 11 Case seeking authority to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facility) or to use any Cash proceeds of any of the Collateral, the proceeds of which additional financing or cash collateral use are insufficient to provide for Payment in Full of the Obligations immediately upon entry of an order approving such financing or cash collateral use;

(viii)  the entry of an order in the Chapter 11 Case terminating Borrower's exclusive period to file a Chapter 11 Plan, the filing of a pleading by Borrower requesting, consenting to or supporting such relief, or the failure of Borrower to timely object to any motion requesting such relief;

(ix)    the filing or support of any pleading by Borrower (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (vii) above;

(x)     the entry of an order by the Bankruptcy Court in favor of any creditors' committee appointed in the Chapter 11 Case, any ad hoc committee, or any other party in interest, (a) sustaining an objection to claims of the Agent or any of the Lenders or (b) avoiding any Liens held by the Agent or any of the Lenders; or

(xi)    the commencement of any Insolvency Proceeding by Borrower or any Subsidiary of Borrower other than the Chapter 11 Case;

(i)     _Prepetition Loan Documents_. Any lien or security interest purported to be created under the Prepetition Loan Documents shall cease to be, or shall be asserted by the Borrower not to be, a valid and perfected lien on or security interest in the Postpetition Collateral or Prepetition Collateral (as each is defined in the DIP Order);

(j)     _Super-priority Claims_. An order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out or as otherwise expressly permitted under the Loan Documents, (i) a priority of any Lien against Borrower that is equal to or senior to the priority of the Liens on the Collateral granted in favor of the Collateral Agent, for the benefit of the DIP Secured Parties, or (ii) any other super-priority administrative expense claim in the Chapter 11 Case pursuant to section 364(c)(1)

61

of the Bankruptcy Code that is *pari passu* with or senior to the claims of the Agents and the Lenders under the DIP Facility, or the filing by Borrower of a motion or application seeking entry of such an order;

(k)     <u>Compliance with DIP Order</u>. Failure of Borrower to comply in all material respects with the terms and conditions of the DIP Order;

(l)     <u>Adverse Proceeding</u>. Any Borrower or any Affiliate of Borrower shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other Adverse Proceeding against any Agent or Lender regarding the DIP Facility;

(m)     <u>Certain Orders</u>. An order is entered approving the solicitation of votes on a Chapter 11 Plan in the Chapter 11 Case, or an order approving a sale under section 363 of the Bankruptcy Code or any order relating to such sale (including, but not limited to an order approving sale procedures) shall be entered that does not provide for Payment in Full of the Obligations in Cash on the effective date of such sale or is otherwise not satisfactory to Administrative Agent and the Required Lenders, or any order shall be entered that dismisses the Chapter 11 Case and that does not provide for Payment in Full of the Obligations on the effective date of such dismissal or is not otherwise satisfactory to Administrative Agent and the Required Lenders, or Borrower or any Affiliate of Borrower shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order, in each case without the prior written consent of the Required Lenders and the Agent; or

(n)     <u>Termination, Default Under Material Contracts</u>. If there occurs (1) any termination or cancellation of any Material Contract without the prior written consent of the Required Lenders; or (2) any default by Borrower or any Subsidiary (or any Affiliate thereof) under any Material Contract (other than covenants not to file for bankruptcy proceedings with respect to Borrower's filing of the Chapter 11 Case, or except with the prior written consent of the Required Lenders).

**8.2     Remedies**.   Upon the occurrence of an Event of Default, and subject to the terms of the DIP Order, Borrower's right to access and to use the DIP Loan Proceeds for any purpose shall automatically terminate, and the Administrative Agent, on behalf of and at the direction of the Required Lenders, shall exercise all rights and remedies provided for under this Agreement and any other Loan Document and may declare (a) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remain unfunded, (b) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by Borrower, and (c) the termination of the Loan Documents as to any future liability or obligation of the Administrative Agent, the Collateral Agent or any Lender, but without affecting any of the Liens on the Collateral or the Obligations of Borrower; <u>provided</u> that, with respect to the enforcement of the Liens on the Collateral or exercise of any other rights or remedies with respect to the Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the Collateral), the Collateral Agent shall provide at least five (5) Business Days' prior written notice thereof to Borrower and file such notice on the docket in the Chapter 11 Case; <u>provided</u>, <u>further</u>, that no notice shall be required for any exercise of rights or remedies (x) to block or limit withdrawals from any bank accounts that are part of the Collateral (including by sending any control activation notices to depositary banks pursuant to any Deposit Account Control Agreement or Securities Account Control Agreement) and (y) in the event the Obligations under the DIP Facility have not been Paid in Full on the Termination Date. Borrower hereby grants to the Collateral Agent, effective upon an Event of Default, an irrevocable, non-exclusive, worldwide, fully assignable and sublicenseable, license, under all applicable Intellectual Property rights, to commercialize and exploit any Intellectual Property that is part of the Collateral, for the purpose of enabling the Collateral Agent to exercise all rights and remedies provided for it herein and in the other Loan Documents.

*ACTIVE 66101174v7*

RLF1 27606993v.1

**8.3    Other Remedies**.  Subject to the terms of the DIP Order, including, without limitation, any required notices to the Borrower upon and after the occurrence of an Event of Default and for so long as such Event of Default shall exist, the Collateral Agent may in its discretion (and, upon receipt of written direction of the Required Lenders, shall) exercise from time to time the following rights and remedies:

(a)    All of the rights and remedies of a secured party under the UCC or under other applicable law, and all other legal and equitable rights to which the Collateral Agent may be entitled under any of the Loan Documents, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in this Agreement or any of the other Loan Documents, and none of which shall be exclusive.

(b)    The right to collect all amounts at any time payable to the Borrower from any Account Debtor or other Person at any time indebted to such Borrower.

(c)    The right to take immediate possession of any of the Collateral, and to (i) require the Borrower to assemble the Collateral, at the Borrower's expense, and make it available to the Collateral Agent at a place designated by the Collateral Agent which is reasonably convenient to both parties, and (ii) enter any premises where any of the Collateral shall be located and to keep and store the Collateral on said premises until sold (and if said premises be owned or leased by the Borrower, then the Borrower agrees not to charge the Collateral Agent for storage of any Collateral thereon).

(d)    The right to sell or otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as may be required by applicable law, in lots or in bulk, for cash or on credit, all as the Collateral Agent, in its sole discretion, may deem advisable.  The Borrower agrees that any requirement of notice to the Borrower of any proposed public or private sale or other disposition of the Collateral by Agent shall be deemed reasonable notice thereof if given at least 10 days prior thereto, and such sale may be at such locations as the Collateral Agent may designate in said notice.  The Collateral Agent shall have the right to conduct such sales on the Borrower's premises, without charge therefor, and such sales may be adjourned from time to time in accordance with applicable law.  The Collateral Agent shall have the right to sell, lease or otherwise dispose of the Collateral, or any part thereof, for cash, credit or any combination thereof, and the Collateral Agent may purchase all or any part of the Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Obligations.

(e)    The right to obtain the appointment of a receiver, without notice of any kind whatsoever, to take possession of the Collateral and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver.

## SECTION 9.    AGENTS

**9.1    Appointment of Agents**.  Oxford Finance is hereby appointed Administrative Agent and Collateral Agent hereunder and under each other Loan Document, and each Lender hereby irrevocably authorizes Oxford Finance, in such capacity, to act as Administrative Agent and Collateral Agent in accordance with the terms hereof and the other Loan Documents. Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Loan Documents, as applicable. The provisions of this Section 9 are solely for the benefit of the Agents and Lenders and Borrower shall not have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Borrower or

63

any of its Subsidiaries. Each Agent, without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to Administrative Agent or Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

9.2    **Powers and Duties; Rights as a Lender**.

(a)    Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. In the event that any obligations are permitted to be incurred and subordinated in right of payment to the Obligations hereunder and/or are permitted to be secured by Liens on all or a portion of the Collateral, each Lender authorizes Administrative Agent and Collateral Agent, as applicable, to enter into intercreditor agreements, subordination agreements and amendments to the Collateral Documents to reflect such arrangements on terms that are acceptable to Administrative Agent and Collateral Agent, in their respective sole discretion, as applicable. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

(b)    The Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not such Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity.  Such Person and its branches and Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

9.3    **General Immunity**.

(a)    <u>No Responsibility for Certain Matters</u>. No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of Borrower to any Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby or for the financial condition or business affairs of Borrower or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or as to the value or sufficiency of any Collateral or as to the satisfaction of any condition set forth in <u>Section 3</u> or elsewhere herein (other than confirm

64

receipt of items expressly required to be delivered to such Agent) or to inspect the properties, books or records of Borrower or any of its Subsidiaries or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)        Exculpatory Provisions. No Agent nor any of its officers, partners, Directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent (i) under or in connection with any of the Loan Documents, or (ii) with the consent or at the request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), in each case except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. No Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose or be liable for the failure to disclose, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Required Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Required Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability, is contrary to any Loan Document or applicable law or may be in violation of the automatic stay under any Debtor Relief Law. Without prejudice to the generality of the foregoing, (1) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Borrower), accountants, experts and other professional advisors selected by it; and (2) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of Required Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

(c)        Delegation of Duties. Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.5 shall apply to any the Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.5 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Borrower and the Lenders, (ii) such rights, benefits and privileges (including

65

exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent and (iii) such sub-agent shall only have obligations to Administrative Agent and not to Borrower, any Lender or any other Person and neither Borrower, any Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent. Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

(d)     Notice of Default or Event of Default. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default is given to such Agent by Borrower or a Lender. In the event that Administrative Agent shall receive such a notice, Administrative Agent will endeavor to give notice thereof to the Lenders; provided that failure to give such notice shall not result in any liability on the part of Administrative Agent.

### 9.4     Lenders' Representations, Warranties and Acknowledgment.

(a)     Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Borrower in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Borrower. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)     Each Lender, by delivering its signature page to this Agreement or an Assignment Agreement shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Required Lenders or Lenders as of such date.

### 9.5     Indemnity.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under Section 10.2 or 10.3(a) to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.

### 9.6     Successor Administrative Agent and Collateral Agent.

(a)     Administrative Agent may resign at any time by giving thirty (30) calendar days' prior written notice thereof to Lenders and Borrower. Administrative Agent shall have the right to appoint a financial institution to act as successor Administrative Agent hereunder in such notice, subject to the reasonable satisfaction of Borrower and the Required Lenders, and Administrative Agent's resignation shall become effective on the earliest of (i) thirty (30) calendar days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor Administrative Agent by Borrower and the Required Lenders or (iii) such other date, if any, agreed to by

the Required Lenders. Upon any such notice of resignation, if a successor Administrative Agent has not already been appointed by the resigning Administrative Agent, then the Required Lenders shall have the right, upon five Business Days' notice to Borrower, to appoint a successor Administrative Agent and Collateral Agent. If neither the Required Lenders nor Administrative Agent have appointed a successor Administrative Agent, then the Required Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the resigning Administrative Agent automatically upon the effectiveness of such resignation; provided that, until a successor Administrative Agent is so appointed by the Required Lenders or Administrative Agent, any collateral security held by Administrative Agent in its role as Collateral Agent on behalf of the Lenders under any of the Loan Documents shall continue to be held by the resigning Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning Administrative Agent, and the resigning Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall be made by or to the successor Administrative Agent. Except as provided above, any resignation of Oxford Finance or its successor as Administrative Agent pursuant to this Section 9.6 shall also constitute the resignation of Oxford Finance or its successor as Collateral Agent. After any resigning Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder. Any successor Administrative Agent appointed pursuant to this Section 9.6 shall, automatically upon its acceptance of such appointment, become the successor Collateral Agent for all purposes hereunder.

(b)    In addition to the foregoing, Collateral Agent may resign at any time by giving prior written notice thereof to Lenders. Collateral Agent shall have the right to appoint a financial institution as Collateral Agent hereunder, subject to the reasonable satisfaction of Borrower and the Required Lenders and Collateral Agent's resignation shall become effective on the earliest of (i) 30 calendar days after delivery of the notice of resignation, (ii) the acceptance of such successor Collateral Agent by Borrower and the Required Lenders or (iii) such other date, if any, agreed to by the Required Lenders. Upon any such notice of resignation or any such removal, if a successor Collateral Agent has not already been appointed by the resigning Administrative Agent, then Required Lenders shall have the right, upon five Business Days' notice to Administrative Agent, to appoint a successor Collateral Agent. Until a successor Collateral Agent is so appointed by Required Lenders or Administrative Agent, any collateral security held by Collateral Agent for the benefit of the Lenders under any of the Loan Documents shall continue to be held by the resigning Collateral Agent as nominee until such time as a successor Collateral Agent is appointed. Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Collateral Agent under this Agreement and the other Collateral Documents, and the resigning or removed Collateral Agent under this Agreement shall promptly (1) transfer to such successor Collateral Agent all sums, Securities and other items of Collateral held hereunder or under the other Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Collateral Agent under this Agreement and the other Collateral Documents and (2) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Collateral Agent of the security interests created under the Collateral Documents, whereupon such resigning or removed Collateral Agent shall be discharged from its duties and obligations under this Agreement and the other Collateral Documents. After any resigning or removed Collateral Agent's resignation or removal hereunder as Collateral Agent, the provisions of this Agreement and the other Collateral Documents shall

67

inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement or the other Collateral Documents while it was Collateral Agent hereunder.

(c)    Notwithstanding anything herein to the contrary, Administrative Agent and Collateral Agent may assign their rights and duties as Administrative Agent and Collateral Agent hereunder to an Affiliate of Oxford Finance without the prior written consent of, or prior written notice to, Borrower or the Lenders; provided that Borrower and the Lenders may deem and treat such assigning Administrative Agent and Collateral Agent as Administrative Agent and Collateral Agent for all purposes hereof, unless and until such assigning Administrative Agent or Collateral Agent, as the case may be, provides written notice to Borrower and the Lenders of such assignment. Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as Administrative Agent and Collateral Agent hereunder and under the other Loan Documents.

(d)    Notwithstanding anything contained herein to the contrary, in the event Oxford Finance resigns or is replaced as Administrative Agent or Collateral Agent, each of the provisions contained herein for the benefit and protection of any Agent, including but not limited to, indemnification, exculpation, releases and waivers shall continue and remain in full force and effect in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent or retiring Collateral Agent was acting as Administrative Agent or Collateral Agent, respectively.

**9.7    Collateral Documents**.

(a)    <u>Agents under Collateral Documents</u>. Each Lender hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of DIP Secured Parties, to be the agent for and representative of the DIP Secured Parties with respect to the Collateral and the Collateral Documents. Subject to <u>Section 10.5</u>, without further written consent or authorization from any DIP Secured Party, Administrative Agent or Collateral Agent, as applicable may execute any documents or instruments necessary to, in connection with a sale or Disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other Disposition of assets or to which Required Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.5</u>) have otherwise consented. Upon request by Administrative Agent at any time, the Lenders will confirm in writing Administrative Agent's authority to release its interest in particular types or items of Collateral.

(b)    <u>Right to Realize on Collateral</u>. Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrower, Administrative Agent, Collateral Agent and each DIP Secured Party hereby agree that (i) no DIP Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies hereunder and under any of the other Loan Documents may be exercised solely by Administrative Agent or Collateral Agent, as applicable, for the benefit of the DIP Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent for the benefit of DIP Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including pursuant to Section 363(k), Section 1129(b)(2)(a)(ii), or otherwise of the Bankruptcy Code), Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale or disposition and Collateral Agent, as agent for and representative of DIP Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale or other disposition.

(c)　　Release of Collateral, Termination of Loan Documents. Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations have been Paid in Full, upon request of Borrower, Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral.

(d)　　No Duty. Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of Collateral Agent's Lien thereon, or any certificate prepared by Borrower in connection therewith, nor shall Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(e)　　Agency for Perfection. Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets that, in accordance with Article 9 of the UCC, can be perfected only by possession or control (or where the security interest of a DIP Secured Party with possession or control has priority over the security interest of another DIP Secured Party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the other DIP Secured Parties, except as otherwise expressly provided in this Agreement. Should Administrative Agent or any Lender obtain possession or control of any such Collateral, Administrative Agent or such Lender shall notify Collateral Agent thereof, and, promptly upon Collateral Agent's request therefor shall deliver such Collateral to Collateral Agent or in accordance with Collateral Agent's instructions. Borrower by its execution and delivery of this Agreement hereby consents to the foregoing.

**9.8     Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim; Credit Bidding**. In case of the pendency of any proceeding under any Debtor Relief Laws relative to Borrower, including the Chapter 11 Case, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)　　to file a verified statement pursuant to rule 2019 of the Bankruptcy Rules that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)　　to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its respective agents and counsel and all other amounts due to the Lenders and Administrative Agent under Sections 2.8, 10.2 and 10.3 allowed in such judicial proceeding); and

(c)　　to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 2.8, 10.2 and 10.3.

69

Nothing contained in this <u>Section 9.8</u> shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The DIP Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar laws in any other jurisdictions to which Borrower is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the DIP Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form and/or appoint one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Capital Stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any DIP Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any DIP Secured Party or any acquisition vehicle to take any further action.

**9.9    Erroneous Payments**.

(a)    If the Administrative Agent (x) notifies a Lender or any Person who has received funds on behalf of a Lender (any such Lender or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and (y) demands in writing the return of such Erroneous Payment (or a portion

70

thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 9.9 and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding clause (a), each Lender or any Person who has received funds on behalf of a Lender (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)    it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 9.9(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 9.9(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 9.9(a) or on whether or not an Erroneous Payment has been made.

(c)    Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)    The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered

71

from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender, to the rights and interests of such Lender, as the case may be) under the Loan Documents with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower; provided that this Section 9.9 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from, or on behalf of (including through the exercise of remedies under any Loan Document), the Borrower for the purpose of a payment on the Obligations.

(e)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

Each party's obligations, agreements and waivers under this Section 9.9 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the applicable Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## SECTION 10.  MISCELLANEOUS

### 10.1    Notices.

(a)     Notices Generally. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to Borrower, Collateral Agent or Administrative Agent shall be sent to such Person's mailing address as set forth on Appendix B or in the other relevant Loan Document, and in the case of any Lender, the mailing address as indicated on Appendix B or otherwise indicated to Administrative Agent and Borrower in writing. Each notice hereunder shall be in writing and may be personally served or sent by email or U.S. mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon sending of email, or three Business Days after depositing it in the U.S. mail with postage prepaid and properly addressed; provided, no notice to any Agent in its capacity as such shall be effective until received by such Agent; provided, further, any such notice or other communication shall, at the request of Administrative Agent, be provided to any sub-agent appointed pursuant to Section 9.3(b) as designated by Administrative Agent from time to time.

(b)     Electronic Communications.

(i)     Notices and other communications to any Agent, Lenders, and Borrower hereunder may be delivered or furnished by other electronic communication (including e-mail and Internet or intranet websites, including Debt Domain, Intralinks, SyndTrak or another relevant website or other information platform (the "**Platform**")) pursuant to procedures approved by Administrative Agent in its sole discretion; provided that, notwithstanding the foregoing, in no event will notices by electronic communication be effective to any Agent or any Lender pursuant

72

to Section 2 if any such Person has notified Administrative Agent that it is incapable of receiving notices under such Section 2 by electronic communication. Any Agent may, in its sole discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. In the case of any notices by electronic communication permitted in accordance with this Agreement, unless Administrative Agent otherwise prescribes, (1) any notices and other communications permitted to be sent to an e-mail address shall be delivered during normal business hours and deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment, but excluding any automatic reply to such e-mail), except that, if such notice or other communication is not sent prior to noon, local time at the location of the recipient, then such notice or communication shall be deemed not to have been received until the opening of business on the next Business Day for the recipient, at the earliest, and (2) notices or communications permitted to be posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (1) of notification that such notice or communication is available and clearly identifying an accessible website address therefor.

(ii)      Borrower understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii)      The Platform and any Approved Electronic Communications are provided "as is" and "as available." None of the Agents or any of their Related Parties (the "**Agent Affiliates**") warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications or the Platform and each expressly disclaims liability for errors or omissions in the Platform and the Approved Electronic Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by the Agent Affiliates in connection with the Platform or the Approved Electronic Communications. In no event shall the Agent Affiliates have any liability to Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of Borrower's or Administrative Agent's transmission of communications through the Platform. Each party hereto agrees that no Agent has any responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Approved Electronic Communication or otherwise required for the Platform.

(iv)      Borrower, each Lender and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

(v)      All uses of the Platform shall be governed by and subject to, in addition to this Section 10.1, separate terms and conditions posted or referenced in such Platform and related agreements executed by the Lenders and their Affiliates in connection with the use of such Platform.

73

(c)    Change of Address, Etc. Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

**10.2    Expenses**. Borrower agrees to promptly pay or reimburse the Agents and the Lenders and each of their respective Affiliates for their respective reasonable and documented out-of-pocket costs and expenses (including reasonable and documented attorneys', financial advisors' and other professionals' fees and expenses) incurred in connection with (a) the preparation, negotiation and execution of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and in connection with any transaction contemplated hereby or thereby, (b) creating, perfecting, recording, maintaining, and preserving Liens under the Loan Documents, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees and title insurance premiums; (c) the on-going administration of the Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto); (d) the custody or preservation of any of the Collateral (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel); (e) the Chapter 11 Case including preparation therefor, (f) the enforcement or preservation of any rights under the Loan Documents, (g) after the occurrence of a Default or an Event of Default, enforcing or preparing for enforcement of any Obligations of or in collecting or preparing to collect any payments due from Borrower hereunder or under the other Loan Documents by reason of such Default or Event of Default (including in connection with any actual or prospective sale of, collection from, or other realization upon any of the Collateral) and (h) in connection with any structuring, planning, preparation, negotiation, or execution of any standstill, forbearance or work-out arrangements involving Borrower or any actual or prospective refinancing, recapitalization or restructuring of Borrower, whether or not pursuant to or in contemplation of any insolvency or bankruptcy cases or proceedings.

**10.3    Indemnity and Related Reimbursement**.

(a)    Borrower shall indemnify Agents (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any Person (including Borrower) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, or, in the case of Agents (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Substances on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnitee is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by Borrower against an Indemnitee for breach in bad faith of such Indemnitee's material obligations hereunder or under any other Loan Document, if Borrower  has obtained a final and nonappealable judgment in its favor on such claim as

74

determined by a court of competent jurisdiction or (z) or result from a claim not involving an act or omission of the Borrower or any of its Subsidiaries and that is brought by an Indemnitee against another Indemnitee (other than against an Agent in its capacity as such). This clause (a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim. All amounts due under this clause (a) shall be payable not later than five days after demand therefor and to the extent not paid in full by the Borrower in cash, for the avoidance of doubt, such amounts shall be included in, and constitute, outstanding Obligations hereunder.

(b)     To the fullest extent permitted by applicable law, Borrower shall not assert, and Borrower hereby waives, any claim against any Indemnitee on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, or as a result of any Related Matter. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnitee results from such Indemnitee's willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(c)     Borrower also agrees that no Indemnitee will have any liability to Borrower or any Person asserting claims on behalf of or in right of Borrower or any other Person in connection with or as a result of this Agreement or any Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof, or any act or omission or event occurring in connection therewith, in each case, except in the case of Borrower to the extent that any losses, claims, damages, liabilities or expenses incurred by Borrower or its affiliates, shareholders, partners or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the bad faith, gross negligence or willful misconduct of such Lender, or Agent in performing its funding obligations under this Agreement; provided, however, that in no event will any such Lender or Agent have any liability for any indirect, consequential, special or punitive damages in connection with or as a result of such Lender's or Agent's, or their respective Affiliates', Directors', employees', attorneys', agents' or sub-agents' activities related to or arising from any Related Matter.

(d)     Borrower, for itself and on behalf of its Subsidiaries, successors and assigns (collectively, "**Releasors**" and, individually, a "**Releasor**"), hereby RELEASES, ACQUITS AND FOREVER DISCHARGES each of the Lenders, Agents and any of their respective officers, directors, employees, agents, attorneys, representatives, Subsidiaries, Affiliates or shareholders (the "Releasees") from any and all liabilities, claims, demands, actions or causes of action of every kind or nature (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any Releasor now has, ever had or hereafter may have against the Releasees based on acts, transactions or circumstances that have occurred or been consummated on or before the date of the Closing Date and that arise out of or relate to (i) the DIP Facility or any other extension of credit by the Lenders to Borrower and their Affiliates; (ii) any Loan Document or Collateral; (iii) any transaction, act or omission contemplated by or described in or concluded under any Loan Document; or (iv) any aspect of the dealings or relationships between or among the Releasors, on the one hand, and the Releasees on the other hand, under or in connection with any Loan Document or any transaction, act or omission contemplated by or described in or concluded under any Loan Document (collectively, the "Claims"). The provisions of this paragraph shall survive the termination of the DIP Facility and any other Loan Document and Payment in Full of any Obligations thereunder. Borrower, for itself and on behalf of their successors, assigns and other legal representatives, hereby unconditionally and

75

irrevocably agrees that such Releasor shall not sue any Releasee on the basis of any Claim released, remised and discharged pursuant to the foregoing provisions of this paragraph, and if any Releasor violates the foregoing covenant, such Releasor, for itself and its successors and assigns, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and cost incurred by any Releasee as a result of such violation.

**10.4    Set-Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, each Lender, and its respective Affiliates is hereby authorized by Borrower at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to Borrower or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set-off and to appropriate and to apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) and any other obligations or Indebtedness at any time held or owing by such Lender to or for the credit or the account of Borrower against and on account of the Obligations of Borrower to such Lender hereunder, and under the other Loan Documents, including all claims of any nature or description arising out of or connected hereto or with any other Loan Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to <u>Section 2</u> and although such Obligations and liabilities, or any of them, may be contingent or unmatured. The rights of each Lender, and its respective Affiliates under this <u>Section 10.4</u> are in addition to other rights and remedies (including other rights of set-off) that such Lender or its Affiliates may otherwise have.

**10.5    Amendments and Waivers**.

(a)    <u>Required Lenders' Consent</u>. Subject to the additional requirements of <u>Sections 10.5(b)</u> and <u>10.5(c)</u> or as otherwise provided in this Agreement, no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by Borrower therefrom, shall in any event be effective unless in writing signed by the Required Lenders and Borrower and acknowledged by Administrative Agent; *provided* that Administrative Agent may, with the consent of Borrower (and without any requirement for consent from any other Person), amend, modify, or supplement this Agreement or any other Loan Document to cure any obvious typographical error, incorrect cross-reference, defect in form, inconsistency, omission or ambiguity (in each case, as concluded by Administrative Agent in its sole discretion), so long as the Lenders and Borrower have received at least five (5) Business Days' prior written notice thereof and Administrative Agent has not received, within five (5) Business Days after delivery of such notice, a written notice from Required Lenders and Borrower stating that the Required Lenders and Borrower object to such amendment.

(b)    <u>Affected Lenders' Consent</u>. Without the written consent of each Lender that would be directly and adversely affected thereby, no amendment, modification, termination, or consent shall be effective with respect to any Loan Document if the effect thereof would:

(i)    increase or extend the expiration date of any Commitment hereunder without the written consent of such Lender;

(ii)    reduce the principal amount of, or premium, if any, of any Loan or reduce the interest rate thereon (other than a waiver of Default Rate);

*ACTIVE 66101174v7*

RLF1 27606993v.1

(iii)    postpone or extend the maturity of the DIP Facility or any Loan, or any date for the payment of interest, premium or fees payable under the Loan Documents, or reduce the amount of, waive or excuse any such payment (other than a waiver of Default Rate);

(iv)    alter any provision relating to the pro rata sharing of payments or set-offs required thereby; or

(v)    except as expressly permitted under the Loan Documents (including in the context of a credit bid), release all or substantially all of the Collateral from the Liens created under the Collateral Documents, or alter the priorities of the obligations secured thereby as set forth in <u>Section 2.19</u>.

(c)    <u>Other Consents</u>. No amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by Borrower therefrom, shall:

(i)    amend the definition of "Required Lenders" without the consent of each directly and adversely affected Lender; <u>provided,</u> with the consent of Administrative Agent and the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Loan Commitments and the Loans are included on the Closing Date; or

(ii)    amend, modify, terminate or waive any provision of <u>Section 9</u> as the same directly applies to any Agent, or any other provision hereof as the same directly applies to the rights or obligations of any Agent, in each case in any manner adverse to such Agent without the consent of such Agent.

(d)    <u>Execution of Amendments, Etc</u>. Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this <u>Section 10.5</u> shall be binding upon each Lender at the time outstanding, each future Lender, Borrower, and each future Borrower.

(e)    <u>Compensation for Amendments</u>. Notwithstanding anything to the contrary in any Loan Document, Borrower may not directly or indirectly pay or otherwise transfer any consideration, whether by way of interest, fee, or otherwise, to or for the benefit of any current or prospective Lender or any of its Affiliates (other than any customary fees paid to Administrative Agent or any of its Affiliates as consideration for arranging, structuring, or providing other services in connection therewith) for or as an inducement to any action or inaction by such Lender or any of its Affiliates, including any consent, waiver, approval, disapproval, or withholding of any of the foregoing in connection with any required or requested approval, amendment, waiver, consent, or other modification of or under any Loan Document or any provision thereof unless such consideration is first offered to all then existing Lenders in accordance with their respective Pro Rata Share and is paid to any such Lenders that act in accordance with such offer.

(f)    <u>Cashless Settlement</u>. Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue, or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification, or similar transaction permitted by the terms of this Agreement pursuant to a cashless settlement mechanism approved by Borrower, Administrative Agent and such Lender.

77

10.6    **Successors and Assigns; Participations**.

(a)    Generally. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders. Borrower's rights and obligations hereunder and Borrower's interests therein may not be assigned or delegated by Borrower without the prior written consent of all Lenders. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents, and Lenders, and any other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Register. Borrower, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding unfunded Commitments and Loans (including principal and stated interest) listed therein for all purposes hereof, and no assignment or transfer of any such unfunded Commitment or Loan (including any Note) shall be effective, in each case, unless and until recorded in the Register following Administrative Agent's acceptance of a fully executed Assignment Agreement, together with the forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 10.6(e). Each assignment shall be recorded in the Register promptly following acceptance by Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to Borrower and a copy of such Assignment Agreement shall be maintained, as applicable. The date of such recordation of a transfer shall be referred to herein as the "**Assignment Effective Date**." Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent is listed in the Register as a Lender, shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding unfunded Commitments or Loans. It is intended that the Register be maintained such that the Loans are in "registered form" for the purposes of the Internal Revenue Code.

(c)    Right to Assign. Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its unfunded Commitment or Loans owing to it or other Obligations (provided, however, that pro rata assignment shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments) with the prior written consent of Borrower (such consent not to be unreasonably withheld or delayed) and the Administrative Agent; provided that, the prior written consent of Borrower shall not be required for any assignment (i) if such assignment is to an Eligible Assignee; or (ii) if an Event of Default has occurred and is continuing; provided, further, that the Borrower shall be deemed to have consented to any assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof. Each assignment pursuant to this Section 10.6(c) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount (x) as may be agreed to by Borrower and Administrative Agent, (y) as shall constitute the aggregate amount of the Loans or unfunded Commitments of the assigning Lender or (z) as is assigned by an assigning Lender to an Affiliate or Related Fund of such Lender).

(d)    Mechanics. Assignments and assumptions of Loans and unfunded Commitments by Lenders shall be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to U.S. federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.17(b),

78

together with payment to Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable in connection with an assignment to an assignee that is already a Lender or is an Affiliate or Related Fund of a Lender or a Person under common management with a Lender).

(e)     Notice of Assignment. Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to Borrower and shall maintain a copy of such Assignment Agreement.

(f)     Representations and Warranties of Assignee. Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the unfunded Commitments and/or Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable unfunded Commitments or Loans, as the case may be; (iii) it will make or invest in, as the case may be, its unfunded Commitments or Loans for its own account in the ordinary course and without a view to distribution of such unfunded Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such unfunded Commitments or Loans or any interests therein shall at all times remain within its exclusive control); (iv) it will not provide any information obtained by it in its capacity as a Lender to Borrower or any of its Affiliates; and (v) neither such Lender nor any of its Affiliates owns or controls any trade obligations or Indebtedness of Borrower or any Capital Stock of Borrower.

(g)     Effect of Assignment. Subject to the terms and conditions of this Section 10.6, as of the Assignment Effective Date: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and unfunded Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights that survive the termination hereof under Section 10.10) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided, anything contained in any of the Loan Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the involvement of such assigning Lender as a Lender hereunder prior to the Assignment Effective Date); (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any unfunded Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new or unfunded Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(h)     Participations.

(i)     Each Lender shall have the right at any time to sell one or more participations to any Person (other than to Borrower, any of its Subsidiaries or any of its Affiliates or any Natural Person) in all or any part of its unfunded Commitments, Loans or in any other

79

Obligation; provided that such Lender shall remain a "Lender" for all purposes hereunder, the participant shall not constitute a "Lender" hereunder, and Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder. Each Lender that sells a participation pursuant to this Section 10.6(h) shall, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of Borrower, maintain a register on which it records the name and address of each participant and the principal amounts of (and stated interest on) each participant's participation interest with respect to the Loan (each, a "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any unfunded Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such unfunded Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Unless otherwise required by the Internal Revenue Service, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to the Loan for all purposes under this Agreement, notwithstanding any notice to the contrary. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     Unless otherwise agreed to by Administrative Agent, the holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (1) extend the final scheduled maturity of any Loan or Note or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (2) consent to the assignment or transfer by Borrower of any of its rights and obligations under this Agreement, or (3) release all or substantially all of the Collateral under the Collateral Documents (except as expressly provided in the Loan Documents) supporting the Loans hereunder in which such participant is participating. In the case of any such participation, except as otherwise set forth below in this Section 10.6(h)(ii), the participant shall not have any rights under this Agreement or any of the other Loan Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by Borrower hereunder shall be determined as if such Lender had not sold such participation.

(iii)     Borrower agrees that each participant shall be entitled to the benefits of Sections 2.16 and 2.17 (subject to the requirements and limitations therein) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; provided, (x) a participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such participant acquired the participation,

80

and (y) a participant that is not a "United States person" (as defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes shall not be entitled to the benefits of Section 2.17 unless Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of Borrower, to comply with Section 2.17 as though it were a Lender; provided, further, that, except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to Borrower or any other Person in connection with the sale of any participation. To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though such participant were a Lender; provided that such participant agrees to be subject to Section 2.15 as though it were a Lender.

(iv)     Certain Other Assignments and Participations. In addition to any other assignment or participation permitted pursuant to this Section 10.6, any Lender may assign, pledge and/or grant a security interest in, all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender, including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; provided, that no Lender, as between Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided further, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered substituted as a "Lender" hereto or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**10.7    [Reserved]**.

**10.8    Liens on After-Acquired Property**.  Effective as of the Closing Date, and subject to the DIP Order, the Agent and the Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their Collateral, and no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the Collateral under Section 552(b) of the Bankruptcy Code (subject to any provisions of the DIP Order with respect to costs or expenses incurred after entry of such DIP Order). Furthermore, Borrower and its estate shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the DIP Liens, on any Property acquired by Borrower or its estate or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Administrative Agent, Collateral Agent or the Lenders upon the Collateral.

**10.9    Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not preclude the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.10    Survival of Representations, Warranties and Agreements**.   All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of Borrower set forth in Sections 2.16, 2.17, 10.2, 10.3, 10.4, and 10.12, and the agreements of Lenders set forth in Sections 2.15, 9.3(b) and 9.5 shall survive the Payment in Full of the Obligations.

81

**10.11    No Waiver; Remedies Cumulative**.  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Loan Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.12    Marshaling; Payments Set Aside**.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of Borrower or any other Person or against or in payment of any or all of the Obligations. To the extent that Borrower makes a payment or payments to Administrative Agent, or Lenders (or to Administrative Agent, for the benefit of Lenders), or any Agent or Lender enforces any security interests or exercises any right of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or set-off had not occurred.

**10.13    Severability**.  In case any provision in or under this Agreement or any Loan Document shall be held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement and the other Loan Documents, shall not in any way be affected or impaired thereby (it being understood that the invalidity, illegality or unenforceability of a provision in a particular jurisdiction shall not in and of itself affect the validity, legality or enforceability of such provision in any other jurisdiction). The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid, legal and enforceable provisions the economic effect of which comes as close as reasonably possible to that of the invalid, illegal or unenforceable provisions.

**10.14    Obligations Several; Actions in Concert**.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Loan Commitment of any other Lender hereunder. Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. Anything in this Agreement or any other Loan Document to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or any Note or otherwise with respect to the Obligations without first obtaining the prior written consent of Administrative Agent or Required Lenders (as applicable), it being the intent of Lenders that any such action to protect or enforce rights under this Agreement or any other Loan Document with respect to the Obligations shall be taken in concert and at the direction or with the consent of Administrative Agent or Required Lenders (as applicable).

**10.15    Headings**.  Section headings herein are included for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.16    APPLICABLE LAW**.  **EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER**

82

THAN WITH RESPECT TO THE MORTGAGE, WHICH SHALL HAVE THE GOVERNING LAW AS PROVIDED FOR THEREIN) AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.17  CONSENT  TO  JURISDICTION.    BORROWER  IRREVOCABLY  AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AGAINST ANY AGENT, ANY LENDER OR ANY RELATED PARTY OF ANY OF THE FOREGOING, IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN A FORUM OTHER THAN THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF,  AND  EACH  OF  THE  PARTIES  HERETO  IRREVOCABLY  AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

10.18  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED HEREUPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY  OR  IN  WRITING  (OTHER  THAN  BY  A  MUTUAL  WRITTEN  WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.18 AND EXECUTED BY EACH OF THE

83

**PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

10.19    **Confidentiality**.  Each Agent and each Lender shall hold all non-public information regarding Borrower and its businesses identified as such by Borrower and obtained by such Agent or such Lender pursuant to the requirements hereof in accordance with such Agent's or such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by Borrower that, in any event, Administrative Agent may disclose any such information to the Lenders and other Agents, and any Agent or Lender may make (a) disclosures of such information to Affiliates of such Lender or such Agent and to their respective officers, Directors, partners, members, employees, legal counsel, independent auditors and other advisors, experts, or agents on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.19), to the extent such Lender in its sole discretion determines that any such party needs and should have access to such information, (b) disclosures of such information reasonably required by any potential or prospective assignee, transferee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to Borrower and its obligations (provided that such assignees, transferees, participants, counterparties and advisors are advised of and agree to be bound by either the provisions of this Section 10.19 or other substantially similar confidentiality restrictions), (c) disclosure on a confidential basis to any rating agency when required by it, (d) disclosure on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (e) disclosures in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) disclosures made pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform Borrower promptly thereof to the extent not prohibited by law), (g) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates and (h) disclosures with the consent of the Borrower. Notwithstanding anything to the contrary set forth herein, each party (and each of their respective employees, representatives or other agents) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions and other tax analyses) that are provided to any such party relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure shall remain subject to the confidentiality provisions hereof (and the foregoing sentence shall not apply) to the extent reasonably necessary to enable the parties hereto, their respective Affiliates, and all of their respective Directors and employees to comply with applicable securities laws. For this purpose, "tax structure" means any facts relevant to the federal income tax treatment of the transactions contemplated by this Agreement but does not include information relating to the identity of any of the parties hereto or any of their respective Affiliates.

10.20    **Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the

84

Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest that would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if, when the Obligations hereunder are Paid in Full, the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest that would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest that would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration that constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrower. In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**10.21    Effectiveness; Counterparts**.  This Agreement shall become effective upon the execution and delivery of a counterpart hereof by each of the parties hereto and receipt by Borrower and Administrative Agent of written notification of such execution and authorization of delivery thereof. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.22    Entire Agreement**.  This Agreement, together with the other Loan Documents (including any such other Loan Document entered into prior to the date hereof), reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, made prior to the date hereof.

**10.23    PATRIOT Act**.  Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender, or Administrative Agent, as applicable, to identify Borrower in accordance with the PATRIOT Act.

**10.24    Electronic Execution of Assignments and Loan Documents**.  The words "execution," "signed," "signature," and words of like import in any Assignment Agreement or any other Loan Document shall in each case be deemed to include electronic signatures, signatures exchanged by electronic transmission, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided, that Administrative Agent or Collateral Agent may request, and upon any such request Borrower shall be obligated to provide, manually executed "wet ink" signatures to any Loan Document.

*ACTIVE 66101174v7*

*RLF1 27606993v.1*

**10.25    No Fiduciary Duty**.  Each Agent, Lender, and their Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of Borrower, its equity holders and/or their affiliates. Borrower agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and Borrower, its equity holders or its affiliates, on the other. Borrower acknowledge and agree that (a) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and Borrower, on the other and (b) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of Borrower, its equity holders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise Borrower, its equity holders or its Affiliates on other matters) or any other obligation to Borrower, except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of Borrower, its management, stockholders, creditors or any other Person. Borrower acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Borrower agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Borrower, in connection with such transaction or the process leading thereto.

**10.26    Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

**10.27    DIP Order**.  To the extent there is any inconsistency between the terms of this Agreement and the DIP Order, the terms of the DIP Order shall govern.

[Remainder of page intentionally left blank]

86

**LENDER:**

**OXFORD FINANCE LLC**, a Delaware limited
liability company

By: _____
Name:
Title:

**BORROWER:**

**GENAPSYS, INC.**, a Delaware corporation

By:_____
Name: Britton Russell
Title: Chief Financial Officer, Treasurer

**ADMINISTRATIVE AGENT AND COLLATERAL AGENT:**

**OXFORD FINANCE LLC**, a Delaware limited liability company

By:_____

Name:

Title:

**Term Loan Commitments**

| Lender | Commitment | Pro Rata Share |
|---|---|---|
| Oxford Finance LLC | $4,000,000.00 | 100% |
| **Total** | **$4,000,000.00** | **100%** |

**APPENDIX B**

**Notice Addresses**

**if to Borrower:**

Genapsys, Inc.
200 Cardinal Way
Third Floor
Redwood City, CA 94063
Attn: General Counsel
Email: legal@genapsys.com

with a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn: Rachel C. Strickland, Paul V. Shalhoub, Betsy L. Feldman
Email: rstrickland@willkie.com; pshalhoub@willkie.com;
bfeldman@willkie.com

**if to Lenders:**

OXFORD FINANCE LLC
133 North Fairfax Street
Alexandria, Virginia 22314
Attention: Legal Department
Fax: (703) 519-5225
Email: LegalDepartment@oxfordfinance.com

with a copy (which shall not constitute notice) to:

Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Attn: David Kurzweil / John Dyer
Email: kurzweild@gtlaw.com / dyerj@gtlaw.com

**if to Agent:**

OXFORD FINANCE LLC
133 North Fairfax Street
Alexandria, Virginia 22314
Attention: Legal Department
Fax: (703) 519-5225
Email: LegalDepartment@oxfordfinance.com

DAL:1125566.574v7

RLF1 27606993v.1

with a copy (which shall not constitute notice) to:

Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Attn: David Kurzweil / John Dyer
Email: kurzweild@gtlaw.com / dyerj@gtlaw.com

**SCHEDULE 4.4**

**ADVERSE PROCEEDINGS**

**[To be provided]**

**SCHEDULE 4.7**

## ENVIRONMENTAL MATTERS

**[To be provided]**

**SCHEDULE 4.8**

**NO DEFAULTS**

**[To be provided]**

**SCHEDULE 4.11**

**EMPLOYEE MATTERS**

**[To be provided]**

**SCHEDULE 4.12**

**ERISA**

**[To be provided]**

**SCHEDULE 4.24**

**REAL ESTATE ASSETS**

**[To be provided]**

**SCHEDULE 4.25**

**MATERIAL CONTRACTS**

**[To be provided]**

**SCHEDULE 5.20**

**POST-CLOSING MATTERS**

**[To be provided]**

**SCHEDULE 6.1**

**INDEBTEDNESS**

**[To be provided]**

**SCHEDULE 6.2**

**LIENS**

**[To be provided]**

**SCHEDULE 6.5**

**INVESTMENTS**

**[To be provided]**

**SCHEDULE 6.10**

**AFFILIATE TRANSACTIONS**

**[To be provided]**

**EXHIBIT A**

**FORM OF FUNDING NOTICE**

To:     OXFORD FINANCE LLC, as Administrative Agent

Date:   [•], 2022

Ladies and Gentlemen:

Reference is made to the Secured Debtor-in-Possession Term Loan Agreement, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**;" the terms defined therein being used herein as therein defined), among GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession (the "**Borrower**"), the Lenders from time to time party thereto and OXFORD FINANCE LLC, as Administrative Agent and Collateral Agent.

The undersigned hereby requests pursuant to Section 2.1(c) of the Agreement a Loan in the amount of $_____; to be disbursed on [●], 2022 (the "**Borrowing Date**"). The undersigned requests that the proceeds of the Loan be disbursed to the Disbursement Account on the Borrowing Date (which is a Business Day no earlier than [two] / [three][1] Business Days following the date hereof).

The undersigned hereby certifies that the following statements are true on the date hereof and will be true on the Borrowing Date:

(A)     the conditions set forth in Section 3 of the Agreement have been satisfied or will be satisfied as of the Borrowing Date;

(B)     the representations and warranties contained in Section 4 of the Agreement are correct, before and after giving effect to the borrowing of the Loan and to the application of the proceeds thereof, as though made on and as of each such date;

(C)     no Default or Event of Default has occurred and is continuing, or would result from the Loan or from the application of the proceeds thereof;

(D)     no Material Adverse Effect or any event, fact or circumstance that could reasonably be expected to have a Material Adverse Effect, has occurred or exists; and

(F)     this Funding Notice has been executed and delivered by an Authorized Officer of the Borrower.

---

[1] The first variation is to be used for the first Loan and the second variation is to be used for the second Loan.

*ACTIVE 66101174v7*

Very truly yours,

GENAPSYS, INC.

By:    _____
Name: _____
Title:

**EXHIBIT B**

**FORM OF NOTE**

**SECURED PROMISSORY NOTE**

$_____                                          Dated: [•], 2022

   FOR VALUE RECEIVED, the undersigned, GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession ("**Borrower**") HEREBY PROMISES TO PAY to OXFORD FINANCE LLC (together with its permitted assigns, "**Lender**") the principal amount of [_____] MILLION DOLLARS ($_____) or such lesser amount as shall equal the outstanding principal balance of the Loan made to Borrower by Lender, plus interest on the aggregate unpaid principal amount of such Loan, at the rates and in accordance with the terms of the Secured Debtor-in-Possession Term Loan Agreement, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**"), among Borrower, the Lenders from time to time party thereto and OXFORD FINANCE LLC, as Administrative Agent and Collateral Agent. If not sooner paid, the entire principal amount and all accrued and unpaid interest hereunder shall be due and payable on the Termination Date as set forth in the Agreement. Any capitalized term not otherwise defined herein shall have the meaning attributed to such term in the Loan Agreement.

   Principal, interest and all other amounts due with respect to the Loan, are payable in lawful money of the United States of America to Lender as set forth in the Agreement and this Secured Promissory Note (this "**Note**"). The principal amount of this Note and the interest rate applicable thereto, and all payments made with respect thereto, shall be recorded by Lender and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Note.

   The Agreement, among other things, (a) provides for the making of a secured Loan by Lender to Borrower, and (b) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events.

   This Note may not be prepaid except as set forth in Section 2.10 and Section 2.11 of the Agreement.

   This Note and the obligation of Borrower to repay the unpaid principal amount of the Loan, interest on the Loan and all other amounts due Lender under the Agreement is secured under the Agreement and by the other Collateral Documents.

   Presentment for payment, demand, notice of protest and all other demands and notices of any kind in connection with the execution, delivery, performance and enforcement of this Note are hereby waived.

   Borrower shall pay all reasonable fees and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by Lender in the enforcement or attempt to enforce any of Borrower's obligations hereunder not performed when due.

   This Note shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of New York.

The ownership of an interest in this Note shall be registered on a record of ownership maintained by Lender or its agent. Notwithstanding anything else in this Note to the contrary, the right to the principal of, and stated interest on, this Note may be transferred only if the transfer is registered on such record of ownership and the transferee is identified as the owner of an interest in the obligation. Borrower shall be entitled to treat the registered holder of this Note (as recorded on such record of ownership) as the owner in fact thereof for all purposes and shall not be bound to recognize any equitable or other claim to or interest in this Note on the part of any other person or entity.

*[Balance of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed by one of its officers thereunto duly authorized on the date hereof.

**BORROWER:**
GENAPSYS, INC.


By _____
   Name:
   Title:

**LOAN INTEREST RATE AND PAYMENTS OF PRINCIPAL**

| Date | Principal Amount | Interest Rate | Termination Date | Notation By |
|------|------------------|---------------|------------------|-------------|

EXHIBIT C

## ASSIGNMENT AGREEMENT

This Assignment Agreement (this "<u>Assignment Agreement</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][2] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][3] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][4] hereunder are several and not joint.][5] Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement identified below (as amended, the "<u>Agreement</u>"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment Agreement as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Agreement and any other documents or instruments delivered pursuant thereto in the amount[s] and equal to the percentage interest[s] identified below of all the outstanding rights and obligations under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "<u>Assigned Interest</u>"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment Agreement, without representation or warranty by [the][any] Assignor.

1.    <u>Assignor[s]</u>:    _____

    _____

    [Assignor [is] [is not] a Defaulting Lender]

---

[2]    For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[3]    For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[4]    Select as appropriate.

[5]    Include bracketed language if there are either multiple Assignors or multiple Assignees.

ACTIVE 66101174v7

2.      Assignee[s]:      _____

                          _____

        [for each Assignee, indicate [Affiliate][Related Fund] of [*identify Lender*]]

3.      Borrower:  Genapsys, Inc.

4.      Administrative Agent:  Oxford Finance LLC, as the administrative agent under the Agreement

5.      Agreement:   Secured Debtor-in-Possession, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time), among the Borrower, the Lenders from time to time party thereto, the Administrative Agent and Oxford Finance LLC, as Collateral Agent

6.      Assigned Interest[s]:

| Assignor[s][6] | Assignee[s][7] | Aggregate Amount of Commitment for all Lenders[8] | Amount of Commitment Assigned | Percentage Assigned of Commitment[9] |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  | $_____ | $_____ | _____% |
|  |  | $_____ | $_____ | _____% |
|  |  | $_____ | $_____ | _____% |

[7.     Trade Date:  _____ ][10]

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[6] List each Assignor, as appropriate.

[7] List each Assignee and, if available, its market entity identifier, as appropriate.

[8] Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[9] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[10] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

*ACTIVE 66101174v7*

RLF1 27606993v.1

The terms set forth in this Assignment Agreement are hereby agreed to:

<u>ASSIGNOR[S]</u>[11]
[NAME OF ASSIGNOR]


By: _____
Name:
Title:


[NAME OF ASSIGNOR]


By: _____
Name:
Title:

<u>ASSIGNEE[S]</u>[12]
[NAME OF ASSIGNEE]


By: _____
Name:
Title:


[NAME OF ASSIGNEE]


By: _____
Name:
Title:

[Consented to and][13] Accepted:

OXFORD FINANCE LLC, as
  Administrative Agent


By: _____
Name:
Title:

---

[11] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).

[12] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).

[13] To be added only if the consent of the Administrative Agent is required by the terms of the Agreement.
*ACTIVE 66101174v7*

[Consented to:][14]

GENAPSYS, INC.

By: _____
Name:
Title:

_____

[14] To be added only if the consent of the Borrower is required by the terms of the Agreement.
*ACTIVE 66101174v7*

*RLF1 27606993v.1*

ANNEX 1
TO ASSIGNMENT AGREEMENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AGREEMENT

1.    Representations and Warranties.

1.1.    Assignor[s].  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any Collateral, (iii) the financial condition of the Borrower, any of its Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.

(1)    [The][Each] Assignee represents and warrants that:

(i)    it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Agreement;

(ii)    it meets all the requirements to be an assignee under Section 10.06(c) and (f) of the Agreement (subject to such consents, if any, as may be required under Section 10.06(c) of the Agreement);

(iii)    from and after the Effective Date, it shall be bound by the provisions of the Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder;

(iv)    it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type;

(v)    it has received a copy of the Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.1 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment Agreement and to purchase [the][such] Assigned Interest; and

(vi)    it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment Agreement and to purchase [the][such] Assigned Interest; and

(2)　　**[The][Each]** Assignee agrees that:

　　　　(i)　　it will, independently and without reliance upon the Administrative Agent, **[the][any]** Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; and

　　　　(ii)　　it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.;

2.　　<u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of **[the][each]** Assigned Interest (including payments of principal, interest, fees and other amounts) to **[the][the relevant]** Assignor for amounts which have accrued to but excluding the Effective Date and to **[the][the relevant]** Assignee for amounts which have accrued from and after the Effective Date.  Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to **[the][the relevant]** Assignee.

3.　　<u>General Provisions</u>.  This Assignment Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment Agreement may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment Agreement.  This Assignment Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

**EXHIBIT D**

**CLOSING DATE CERTIFICATE**

To:     OXFORD FINANCE LLC, as Administrative Agent

Date:   [•], 2022

Ladies and Gentlemen:

      Reference is made to the Secured Debtor-in-Possession Term Loan Agreement, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**;" the terms defined therein being used herein as therein defined), among GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession (the "**Borrower**"), the Lenders from time to time party thereto and OXFORD FINANCE LLC, as Administrative Agent and Collateral Agent.

      We have read the provisions of the Agreement that are relevant to the furnishing of this Closing Date Certificate. We have made such examination or investigation as was, in our opinion, necessary to enable us to express an informed opinion as to whether the conditions precedent referenced below have been complied with.

      The Borrower hereby certifies that the conditions set forth in clauses (j) and (k) of <u>Section 3.1</u> of the Agreement have been satisfied as of the date thereof.

Very truly yours,

GENAPSYS, INC.

By:     _____
Name:  _____
Title:

**EXHIBIT E**

**TAX FORMS**

EXHIBIT E-1
<u>FORM OF U.S. TAX COMPLIANCE CERTIFICATE</u>

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Secured Debtor-in-Possession Term Loan Agreement, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**;" the terms defined therein being used herein as therein defined), among GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession (the "**Borrower**"), the Lenders from time to time party thereto and OXFORD FINANCE LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 2.17(b) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E (or W-8BEN, as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____
Name:
Title:
Date:

EXHIBIT E-2
FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Secured Debtor-in-Possession Term Loan Agreement, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**;" the terms defined therein being used herein as therein defined), among GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession (the "**Borrower**"), the Lenders from time to time party thereto and OXFORD FINANCE LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 2.17(b) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E (or W-8BEN, as applicable).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: _____
Name:
Title:
Date:

E-2-1

EXHIBIT E-3
FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Secured Debtor-in-Possession Term Loan Agreement, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**;" the terms defined therein being used herein as therein defined), among GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession (the "**Borrower**"), the Lenders from time to time party thereto and OXFORD FINANCE LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 2.17(b) of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E (or W-8BEN, as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E (or W-8BEN, as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: _____
Name:
Title:
Date:

E-3-1

EXHIBIT E-4
FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Secured Debtor-in-Possession Term Loan Agreement, dated as of July [•], 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**;" the terms defined therein being used herein as therein defined), among GENAPSYS, INC., a Delaware corporation and a Chapter 11 debtor-in-possession (the "**Borrower**"), the Lenders from time to time party thereto and OXFORD FINANCE LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 2.17(b) of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E (or W-8BEN, as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E (or W-8BEN, as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____
Name:
Title:
Date:

# **EXHIBIT B**

**Aebersold Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] | Case No. 22-_____ (___) |
| Debtor. | |

**DECLARATION OF BRANDON AEBERSOLD IN SUPPORT OF
DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL AND (B) GRANT
ADEQUATE PROTECTION; (II) AUTHORIZING DEBTOR TO (A) OBTAIN
POSTPETITION FINANCING AND (B) GRANT LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (III) MODIFYING AUTOMATIC STAY; (IV)
SETTING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

I, Brandon Aebersold, make this declaration under 28 U.S.C. § 1746:

1.      I am a Managing Director at Lazard Frères & Co.  LLC. ("Lazard"), the
proposed investment banker to GenapSys, Inc. as debtor and debtor in possession (the "Debtor"
or the "Company") in the above-captioned chapter 11 case (the "Chapter 11 Case").  I submit this
declaration (the "Declaration") in support of the *Debtor's Motion for Entry of Interim and Final
Orders (I) Authorizing Debtor to (A) Use Cash Collateral and (B) Grant Adequate Protection; (II)
Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens And Superpriority
Administrative Expense Claims; (III) Modifying Automatic Stay; (IV) Setting A Final Hearing;
and (V) Granting Related Relief* (the "Cash Collateral and DIP Motion"),[2] which the Debtor filed
contemporaneously herewith.

---

[1]     The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is
GenapSys, Inc. (3904).  The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City,
CA 94063.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Cash Collateral and
DIP Motion.

2.      I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtor.  I am not being specifically compensated for this testimony.  Lazard, as a professional proposed to be retained by the Debtor, will receive payments in its capacity as financial advisor to the Debtor.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based on my personal knowledge of the Debtor's operations and finances gleaned during the course of my engagement with the Debtor, my discussions with the Debtor's senior management, other members of the Lazard team, and the Debtor's other advisors, and my review of relevant documents and/or my opinion based upon my experience. I am authorized to submit this Declaration and, if called to testify, I could and would testify competently to the facts and opinions set forth herein.

### Background and Qualifications

4.      I am a Managing Director with Lazard, a financial advisory and investment banking firm.  Prior to joining Lazard, I practiced law at the firm of Simpson Thacher & Bartlett LLP, where I focused on mergers and acquisitions and leveraged finance transactions.  I joined Lazard in 2007 following graduation from The University of Chicago Booth School of Business. Throughout my years of investment banking and restructuring experience, I have advised corporate clients, governments, and creditor groups in a broad range of restructuring, reorganization, and capital raising transactions, in traditional and distressed situations, across a diverse variety of industries.  In addition, I have substantial experience marketing, structuring, and evaluating debtor-in-possession financings, secured debt facilities, and exit financings.

5.      Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years.  Lazard operates in 41 cities across 26 countries, including principal offices at 30 Rockefeller Plaza, New York, New York 10020.  Lazard has

dedicated professionals who provide restructuring services to its clients.  The current managing directors, directors, vice presidents, associates, and analysts of Lazard have extensive experience providing investment banking and financial advisory services to financially troubled companies and creditors thereof in complex financial restructurings out-of-court and in chapter 11 proceedings.  Lazard and its professionals have been involved as advisors to debtors, creditors, equity constituencies, and government agencies in numerous reorganization cases.  Since 1990, Lazard's professionals have been involved in over 300 restructurings, representing well over $1 trillion in debtor liabilities.

6.      I am also generally familiar with the cash flow forecasts prepared by the Debtor's management. I understand that these forecasts take into account disbursements anticipated by the Debtor's management during the projected period and consider a number of factors, including, but not limited to, the effect anticipated by Debtor's management of the chapter 11 filing on the organization, fees and interest expenses associated with postpetition financing, professional fees, payroll costs, vendor relationships, and other required operational and product development payments.

### Lazard's Retention

7.      Prior to July 11, 2022 (the "Petition Date"), the Debtor engaged Lazard to act as the Debtor's investment banker in connection with the Debtor's review of strategic alternatives to address its capital structure. Under my supervision, the Lazard team has worked closely with the Debtor's management and other professionals retained by the Debtor and has become knowledgeable and familiar with the Debtor's capital structure, liquidity needs, and business operations.

8.      Since Lazard's engagement in May 2022, Lazard has worked with the Debtor's management, financial team, and other professionals retained by the Debtor with respect

3

to the Debtor's evaluation of strategic alternatives, including, among other things, (i) analyzing the Debtor's liquidity and projected cash flows, (ii) understanding the Debtor's technologies and product development timeline, (iii) reviewing and analyzing the Debtor's capital structure and financing needs, (iv) providing strategic advice to the Debtor's Finance and Risk Committee of the Board of Directors and management, (v) participating in discussions and negotiations with certain of the Debtor's stakeholders, (vi) conducting a marketing effort to either raise capital or sell the Debtor or the Debtor's technology, (vii) soliciting, negotiating, and analyzing debtor-in-possession and exit financing, and (viii) assisting the Debtor in connection with preparations for the commencement of this Chapter 11 Case.

9.      Lazard worked closely with the Debtor's management and other advisors to evaluate the Debtor's capital needs and potential out-of-court and in-court financing alternatives, including debtor-in-possession financing ("DIP Financing").  The results of these efforts culminated in the release of the restricted cash and the DIP Financing provided under the DIP Facility (as defined below) described in detail in the Cash Collateral and DIP Motion.

### Debtor's Prepetition Efforts and Prepetition Marketing Process

10.      As explained in the *Declaration of Britton Russell in Support of the Chapter 11 Petition and First Day Motions* (the "First Day Declaration"), the Debtor is out of liquidity and has faced a number of challenges in raising capital outside this Chapter 11 Case.  As more fully set forth in the First Day Declaration, the Debtor is the subject of several ongoing litigations that, when combined with the challenging environment for venture capital investing, have impacted its ability to attract additional capital and contributed to its significant liquidity constraints.

11.      The Debtor commenced a capital-raising process to avoid a liquidation and protect the jobs of the Debtor's employees.  To implement this strategy, the Debtor and Lazard designed a process to (i) raise capital out-of-court through debt or a new round of preferred equity

4

financing, (ii) solicit bids for the Debtor or its assets, or (iii) raise capital through a chapter 11 process that could include both debtor-in-possession and/or exit financing (collectively, the "Prepetition Marketing Process"). Lazard launched the Prepetition Marketing Process in May 2022. Lazard, on behalf of the Debtor, contacted over 100 potential investors, including strategic investors, financial investors, venture investors, and existing stakeholders.

12.     In connection with the Prepetition Marketing Process, the Debtor and its advisors prepared, among other things, marketing materials and an electronic data room to provide potential investors and bidders with information upon which to make a proposal. During the Prepetition Marketing Process, of the over 100 potential investors contacted, 19 interested parties executed confidentiality agreements and were granted access to the electronic data room, which contained significant diligence and other confidential information about the Debtor's business, assets, and technologies. Interested parties were also offered the opportunity to meet with the Debtor's management. Lazard informed each of these parties that the Prepetition Marketing Process was expeditious by necessity in order to address the Debtor's liquidity forecast.

13.     Throughout the Prepetition Marketing Process, it was challenging to find potential investors willing to provide financing or to bid on the Debtor or its assets. The feedback from the parties that were contacted varied; however, three primary themes emerged. First, a number of potential investors initially expressed interest in the promising technology, but were uncomfortable with the expedited timing and perceived process risk. Second, potential investors were aware of the existing litigation overhang from ongoing lawsuits and did not want to engage. Third, a number of potential investors were unwilling to lend to a pre-revenue company and preferred to invest in companies that were closer to a market launch.

5

14.     Notwithstanding these challenges, the Debtor did receive two term sheets. The first term sheet was from Farallon Capital Management, LLC ("Farallon"), a holder of Series D Preferred Equity Interests of the Debtor (the "Original Farallon Term Sheet").[3]  The Original Farallon Term Sheet contemplated investment to be effectuated through a plan of reorganization through Chapter 11.  The second term sheet was from an investor group ("Party B") that initially reached out to the Debtor's management and proposed an out-of-court equity financing.  The Debtor's management and professionals scheduled several calls with Party B and Party B was given access to the Debtor's virtual data room to perform business diligence.  Due to complexities in discussions with Party B that included requirements of exclusivity and the cessation of preparation of a bankruptcy filing, the Party B term sheet was not feasible.

15.     The Debtor worked to effectuate a transaction based on the Original Farallon Term Sheet in the event it could not raise capital on an out-of-court basis.  Unfortunately, as the Company continued to negotiate with Farallon and other existing investors, it became clear that the transaction contemplated by the Original Farallon Term Sheet was not actionable for a number of reasons, including that necessary capital was not available.

16.     Concurrently with the Prepetition Marketing Process, in an effort to help with the Debtor's liquidity, the Debtor commenced negotiations with the Prepetition Agent regarding upcoming payments under the Prepetition Credit Agreement.  After a series of negotiations, on June 1, 2022, the Prepetition Agent agreed to forbear (the "Forbearance") from exercising its rights for 20 days, which it subsequently extended.

---

[3]     Funds and/or accounts managed or advised by Farallon own, directly or indirectly, approximately 71% of the Series D Preferred Equity Interests.  Additionally, a Series D Director designated by Zone III Healthcare Holdings, LLC (a Farallon managed vehicle) is a member of GenapSys' board of directors.

17.     Despite the Original Farallon Term Sheet not being actionable, Lazard continued to engage Farallon regarding a potential investment, including Farallon acting as a stalking horse purchaser in a sale process under section 363 of the Bankruptcy Code (the "Sale Process").  While negotiations with Farallon were ongoing, the Prepetition Agent agreed to provide the Debtor with access to the restricted cash during an in-court process (the "Cash Collateral") and a post-petition debtor-in-possession loan of up to $4 million, with $1 million available on an interim basis (the "DIP Facility" and the lenders thereunder, the "DIP Lenders"), while Lazard continued to market the Debtor's assets.  In addition, Lazard and GenapSys continued to engage both Farallon and the Prepetition Agent regarding either of these parties potentially acting as a stalking horse purchaser in the Sale Process.  As of the Petition Date, these negotiations remain ongoing.

## Debtor's Need for Cash Collateral and Postpetition Financing

18.     The Debtor's financing strategy includes two sources.  First, the consensual use of Cash Collateral is needed to gain access to the restricted cash and partially fund the Debtor's operations.  The DIP Facility will provide the necessary capital to finance the remainder of the Chapter 11 Case.  Both the Cash Collateral and the DIP Facility are necessary to fund the Debtor's remaining operations and the administrative costs of the Chapter 11 Case and the Sale Process.

19.     The Debtor is entering chapter 11 as a pre-revenue technology company with a cash balance of only approximately $75,000 as of the Petition Date.  Absent immediate authority to use Cash Collateral or the DIP Facility, even for a limited period of time, the Debtor would be unable to fund any operations and potentially impair the Debtor's ability to maximize value.

20.     The Debtor believes that the Cash Collateral and DIP Facility provide necessary liquidity to conduct the Sale Process.  Throughout the Prepetition Marketing Process,

7

the Debtor has not been able to find a lender willing to fund DIP financing on a basis junior to the Prepetition Secured Parties or on any other terms more favorable than the proposed DIP Facility.

21.     Based on the Debtor's current cash balance and cash flow forecast, my discussions with the Debtor's management, my experience in restructuring, and my familiarity with the Debtor, cash collateral alone will not be sufficient to fund the Debtor through the Chapter 11 Case and the Debtor will require access to borrowings under the DIP Facility to fund the costs of administering this Chapter 11 Case, employee wages and near-term working capital needs during the Sale Process.  The Debtor, with the assistance of its advisors, evaluated its cash flow and liquidity needs in a chapter 11 scenario to determine how much DIP Financing the Debtor would reasonably need to operate its business and pay the expenses of a chapter 11 process while effectuating a sale transaction.  The proposed DIP Financing and cash collateral forecast reflects the Debtor's assumptions as to the Debtor's liquidity needed to operate and fund the administrative costs of the Sale Process.

### DIP Financing and Use of Cash Collateral Have Been Negotiated at Arm's-Length and in Good Faith

22.     Since the early stages of the Prepetition Marketing Process, the Debtor and its advisors have engaged in extensive negotiations with the Prepetition Secured Parties and their respective advisors.  The parties exchanged multiple drafts of term sheets and debtor-in-possession documents with respect to the proposed facility.  The DIP Facility contains certain milestones that the Debtor must meet throughout this Chapter 11 Case.  The milestones were required by the DIP Lenders as a condition to providing the DIP Facility.

23.     Based on my experience and knowledge of the market, I believe that the fees and expenses in the proposed DIP Facility are necessary under the circumstances, and, on the whole and under the current circumstances, the financial terms of the DIP Facility are reasonable.

Furthermore, based upon my observations and involvement in the negotiation of the DIP financing in this matter, I believe that the negotiations with potential lenders were conducted at arm's-length and in good faith.  Moreover, as part of negotiations among the parties and in an effort to further extend the Debtor's runway, the DIP Lenders agreed that all fees, costs and expenses payable or reimbursable under the DIP Credit Agreement will be paid in kind by adding the same to the DIP Obligations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  July 12, 2022
New York, New York

_/s/ Brandon Aebersold_____

Name:  Brandon Aebersold
Title:  Managing Director