**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] | Case No. 22-_____ (___) |
| Debtor. | |

**DECLARATION OF BRITTON RUSSELL IN SUPPORT OF DEBTOR'S
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Britton Russell, hereby declare, under penalty of perjury, as follows:

1.      I am the Chief Financial Officer and Treasurer (the "CFO") of GenapSys, Inc. (the "Debtor" or "GenapSys"), a Delaware corporation and the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case").

2.      I have held my current position with the Debtor since March 5, 2021.  Prior to that, I served as Senior Vice President of Finance at Invitae.  I hold a Master of Business Administration degree in Business Administration and Management, a Bachelor of Science Degree in Finance, and a Bachelor of Arts Degree in Business with a concentration in sustainability.

3.      As a result of my tenure with the Debtor, I am familiar with the day-to-day operations and business and financial affairs of the Debtor.  All facts set forth in this declaration (the "Declaration") are based on my personal knowledge, my communications with other members of the Debtor's senior management and the Debtor's advisors, my review of relevant documents, or my opinion, based on my overall professional experience, in light of my personal knowledge of

---

[1]    The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is GenapSys, Inc. (3904).  The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City, CA 94063.

the Debtor's operations, business affairs, and financial condition.  If called as a witness, I could and would competently testify to the matters set forth herein based on the foregoing.

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), thus commencing the Chapter 11 Case.  The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Concurrently with this Declaration, the Debtor has filed various applications and motions seeking immediate or expedited relief (collectively, the "First Day Motions") to minimize the adverse effects of the Debtor's filing for chapter 11 protection, and to enhance the Debtor's ability to maximize value for the benefit of its estate and creditors through the contemplated sale of substantially all of its assets pursuant to an auction and sale process.  As further discussed below, I am familiar with the contents of each of the First Day Motions, and I believe the Debtor would suffer immediate and irreparable harm absent the ability to continue its business operations through the relief sought in the First Day Motions.

6.      Part I of this Declaration provides background with respect to the Debtor's business and capital structure, and the events leading to the commencement of this Chapter 11 Case.  Part II sets forth the relevant facts in support of the First Day Motions.

**INTRODUCTION**

7.      As set forth more fully below, GenapSys is a life sciences company with a mission to build an affordable, scalable genomic sequencing ecosystem for research and diagnostic purposes.  Prior to the Petition Date, from late 2021 to early 2022, GenapSys undertook several strategic initiatives aimed at raising additional capital to position the company for continued growth.  Unfortunately, despite its proven technology and interest from investors, the Debtor's

2

business was not able to withstand the liquidity, operational, and reputational impacts of prepetition litigation. As a result of the market downturn, the litigation filed against the Company in 2020, the value-destructive actions taken recently by the Debtor's founder and former CEO, Dr. Hesaam Esfandyarpour, in two lawsuits filed against the Debtor, the Debtor's prepetition marketing efforts were severely hampered. GenapSys was forced to furlough nearly its entire workforce to preserve enough liquidity so that it could manage through to the Trial (as defined below) on July 6, 2022, and then ultimately laid off most of its workforce after the Trial to stretch its liquidity to reach the Petition Date. Having explored all strategic alternatives in consultation with its legal and financial advisors, the Debtor determined that the best path to preserve and maximize the value of the Company's assets was to commence the Chapter 11 Case as quickly as possible after the Trial, and implement a marketing process and sale of its assets.

## I. GENERAL BACKGROUND

A.    <u>Overview of the Debtor</u>

8.    The Debtor, founded in 2010 by Dr. Esfandyarpour,[2] is a privately held Delaware corporation headquartered in Redwood City, California. The Debtor's business involves a novel method for DNA sequencing. Instead of optical-based technologies more traditionally used in the industry, the GenapSys semiconductor-based technology centers around measuring minute changes in electrical signal upon the incorporation of a DNA base, which allows for a simpler, more scalable, and lower cost solution to the challenges of DNA sequencing. <u>See</u> <u>Figure A</u> <u>infra</u>. Prior to resigning as of February 16, 2021, Dr. Esfandyarpour was GenapSys's chief executive officer. Dr. Esfandyarpour continues to serve on the Debtor's board of directors (the "<u>Board</u>").

---

[2]    Dr. Esfandyarpour is a Silicon Valley-based electrical engineer. After finishing his Ph.D. and post-doctorate work at Stanford University, Dr. Esfandyarpour and his team developed several novel technologies for DNA sequencing and protein detection at the Stanford Genome Technology Center. These technologies would eventually form the basis for the GenapSys system.



**Figure A**.  GenapSys's Core Technology

9.      The Debtor is developing an electronic-based sequencing solution to enable scalability and reduce the cost of ownership in both centralized and decentralized settings.  The Debtor's planned solutions include a benchtop sequencer as well as a sequencing module that can be integrated with automated liquid handlers, each option designed to scale throughput by utilizing a range of semiconductor sensor densities.  GenapSys is developing an end-to-end ecosystem that would enable customers to own and analyze their data to allow for lab customization.  See Figure B infra.  The Debtor also maintains an intellectual property portfolio that includes dozens of different patents associated with its technology.



**Figure B**.  GenapSys's Sequencing Ecosystem

B.    **The Debtor's Prepetition Capital Structure**

10.    The Debtor is still developing and commercializing its products, which is a capital-intensive proposition.  Prior to the Petition Date, GenapSys raised approximately $230.3 million from secured debt and preferred equity to develop its DNA sequencing technology and detection system, as further described in this section.

### 1.    Secured Claims

11.    On December 20, 2019, GenapSys entered into that certain Loan and Security Agreement with Oxford Finance LLC, in its capacity as collateral agent (in such capacity, the "Prepetition Agent"), and the lenders party thereto from time to time (the "Prepetition Lenders," and together with the Prepetition Agent, the "Prepetition Secured Parties") (as amended, supplemented, or otherwise modified prior to the Petition Date, including all exhibits thereto, the "Prepetition Credit Agreement").  Under the Prepetition Credit Agreement, the Prepetition Secured Parties extended a term loan of $30 million (the "Secured Loan") to GenapSys.  The Secured Loan is secured by substantially all of the Debtor's assets, except as specifically excluded.  The Secured Loan accrues non-default interest at an approximate average rate of 8.95% per annum and matures in December 2024.

12.    As of the Petition Date, the approximate principal and capitalized interest outstanding under the Secured Loan is $30 million, which excludes final payment fees of $0.9 million and prepayment fees of 0.5%.

### 2.    Unsecured Claims

13.    The Debtor's unsecured creditors are believed to hold claims totaling approximately $4 million in the aggregate.  Those creditors include trade claimants, and other routine, ordinary course creditors.

### 3.      Equity Interests

14.      GenapSys is privately owned with five classes of stock.  The preferred stock is separated into four series:  Series A, B, C, and D (collectively, the "<u>Preferred Equity Interests</u>"). In order of liquidation preference, Series D is senior with respect to Series C, which is senior with respect to Series B, which is senior with respect to Series A.  Each series of Preferred Equity Interests accrues dividends at a different annual rate.  The Preferred Equity Interests' liquidation preferences have priority over GenapSys's common stock.  As of the Petition Date, the liquidation preferences of the Preferred Equity Interests totaled $200.3 million.

15.      The table below sets out the amounts outstanding and the liquidation preference for each series of Preferred Equity Interests:

| <u>Series of Preferred Equity Interest</u> | <u>Amount Outstanding</u> | <u>Liquidation Preference</u> |
|---|---|---|
| Series D | $70 million | The greater of: (a) Original Issue Price of $7.8400 per share plus all declared and unpaid dividends, and (b) such amount per share as would have been payable had all shares of preferred stock been converted into common stock immediately prior to the liquidation event |
| Series C | $85.3 million | Original Issue Price of $18.8852 per share plus all declared and unpaid dividends, where cash dividends accrue at a rate of 4% of the Original Issue Price per annum on each outstanding share of Series C Preferred Equity Interests |
| Series B | $36.5 million | Original Issue Price of $5.9548 per share plus all declared and unpaid dividends, where cash dividends accrue at a rate of 8% of the Original Issue Price per annum on each |

| | | outstanding share of Series B Preferred Equity Interests |
|---|---|---|
| Series A | $8.5 million | Original Issue Price of $1.00 per share plus all declared and unpaid dividends, where cash dividends accrue at a rate of 8% of the Original Issue Price per annum on each outstanding share of Series A Preferred Equity Interests |

16.     Prior to the Petition Date, in an action commenced on June 15, 2020 in the Superior Court of the State of California in the County of Santa Clara, captioned *Foresite Capital Fund IV, L.P. v. GenapSys, Inc. and Esfandyarpour*, Case No. 20-cv-367305 (the "California Action"), Foresite Capital Fund IV, L.P. ("Foresite") alleged GenapSys and Dr. Esfandyarpour, among other things, fraudulently induced Foresite to purchase $50 million of GenapSys's Series C Preferred Equity Interests in June 2019.  This action is pending as of the Petition Date.

**C.    Events Leading to the Chapter 11 Case**

**1.    Prepetition Liquidity Crunch; Unsuccessful Capital Raising Efforts; Section 225 Action**

17.     In late 2019, Dr. Esfandyarpour conducted a limited launch of a first-generation DNA benchtop sequencer, selling a few dozen instruments and billing customers less than $1 million.  In February 2021, the Board asked Dr. Esfandyarpour to step down as CEO and appointed Dr. Jason Myers as CEO.  By mid-2021, the Company halted sales and offered refunds to existing customers.  While the underlying semiconductor technology had been externally proven, there were numerous performance issues with the benchtop sequencer due to inherent design flaws.  The Company quickly realized that it needed to redesign its DNA sequencing solution to better meet customer requirements, and engaged investment banking firms for assistance in addressing its liquidity needs.  The Company sought to raise new equity, primarily to meet its commitments to launch its products and fund associated working capital needs.  For example, in late 2021,

7

GenapSys signed a letter of intent with a SPAC, which ultimately fell apart. By early 2022, efforts to complete the equity raise were unsuccessful. GenapSys began considering other options to address its liquidity needs.

18.    Also, by early 2022, GenapSys faced mounting litigation costs associated with the California Action, as well as in connection with certain corporate governance disputes. For one, discovery costs in the California Action were beginning to strain GenapSys's finances. For another, Dr. Esfandyarpour commenced two actions in the Court of Chancery for the State of Delaware (the "Chancery Court") that further strained GenapSys's liquidity. In the first, commenced on March 29, 2022 and captioned *Esfandyarpour v. GenapSys, Inc.*, C.A. No. 2022-0296-VCZ (the "Advancement Action"), Dr. Esfandyarpour sought advancement of his legal fees and expenses incurred in connection with the California Action. In the second, commenced on April 12, 2022 in the Chancery Court and captioned *Esfandyarpour v. Zollars, Myers, Eliasson, McKenzie, Cecil, & GenapSys, Inc.*, C.A. No. 2022-0324-MTZ (the "Section 225 Action"), Dr. Esfandyarpour sought a determination that the GenapSys board was improperly constituted, as well as entry of an order maintaining the status quo pending a trial on the Section 225 Action. The earliest trial date available in the Section 225 Action that Dr. Esfandyarpour would agree to was July 6, 2022—a trial date much too late while the Debtor's available cash was dwindling.

19.    At this time, in the face of diminishing liquidity, GenapSys approached various potential investors and lenders in an effort to raise additional capital by entering into new, or modifying its existing, preferred equity agreements. However, potential investors were unwilling to move forward with financing, primarily due to the California Action and Section 225 Action (including the ability to obtain necessary shareholder approvals in light of Dr. Esfandyarpour's equity holdings and his disputes with GenapSys).

8

20.     In addition, on May 18, 2022, the Chancery Court entered an order (the "Status Quo Order") that limited GenapSys's ability to take any actions outside the ordinary course of business.[3]  The parties filed several motions seeking to modify the Status Quo Order, but none were successful in expediting the requested relief sought or the Trial date.

21.     First, on May 19, 2022, given its diminishing liquidity and the need to consider different restructuring options, GenapSys and the other defendants in the Section 225 Action filed a motion to modify the Status Quo Order to permit GenapSys to retain an investment banker, Lazard Frères & Co. LLC ("Lazard") to explore all restructuring avenues.  On May 23, 2022, the Chancery Court granted the motion (the "First SQO Relief Order").  Subsequently, GenapSys retained Lazard, and Lazard commenced a marketing process for potential investors (the "Prepetition Marketing Process").

22.     Next, on May 24, 2022, Dr. Esfandyarpour moved to modify the Status Quo Order to allow him to participate in Lazard's financing process even though the Board had constituted a Finance and Risk Committee and delegated authority to it to oversee and direct financing efforts. On June 10, 2020, the Chancery Court denied Dr. Esfandyarpour's motion (the "Second SQO Relief Order").

---

[3]     More specifically, the Status Quo Order prevented the Debtor from:  (a) taking any action that could result in any changes to the members or size of the Board, (b) amending, modifying, or repealing any of the provisions of the company's bylaws or certificate of incorporation, (c) consenting to any merger, tender offer, restructuring, recapitalization, or reorganization of the company, (d) agreeing to any transaction that would result in a change of control of the company, (e) entering into or agreeing to any transaction, the consummation of which would require the approval of or a vote by the company's stockholders, (f) authorizing or issuing securities of the company, or changing the terms of any of the company's securities (including without limitation any common stock, preferred stock, options, warrants, or purchase rights), or purchasing any of the company's securities; (g) in connection with any potential merger, sale, or other strategic transaction involving the company: (1) entering into any retention, engagement, or similar agreement with any financial advisor or investment banker, (2) agreeing or committing to any exclusivity provision, or (3) agreeing to pay any break-up, termination, or similar fees, or reimbursement or payment of expenses, (h) entering into or agreeing to any transaction to acquire another entity through any form of acquisition structure, including, but not limited to, any equity purchase or asset purchase agreement, or (i) entering into any legal binding commitment with respect to, or agreeing to do, any of the foregoing.

23.     Finally, by June 13, 2022, only one potentially viable investor had emerged as of that time, as discussed in further detail below.  With a mere ten days left of projected liquidity, GenapSys and the other defendants in the Section 225 Action filed another motion to modify the Status Quo Order, this time seeking authority to pursue the potential investment, which, by its terms, necessitated the filing of a chapter 11 case.  On June 17, 2022, the Chancery Court denied the motion (the "Third SQO Relief Order").  Shortly thereafter, the Company filed a motion to move the trial date up a week.  The Chancery Court denied the motion.  As a result, GenapSys had to take actions to limit costs so it could survive until the Chancery Court held the Trial.

24.     Between May 18, 2022, when the Status Quo Order was entered, and July 6, 2022, when the Chancery Court held a trial on the issues underlying the Section 225 Action (the "Trial"), GenapSys withered under the Status Quo Order.  Nearly all of the company's employees were furloughed on June 24, 2022 as a cost-saving measure, and, on July 8, 2022, more than 70 employees were laid off or further furloughed.  Additionally, despite the extensive Prepetition Marketing Process, which continued through May and June of 2022, all of the Debtor's prospects for viable sources of investment failed to manifest and were deterred by the cloud cast by the Section 225 Action.  Finally, given the Debtor's defaults under the Prepetition Credit Agreement, the Debtor no longer had access to restricted cash and was unable to obtain further credit.  In short, GenapSys faced a dire situation.

25.     At the Trial, after issuing rulings concerning governance issues, the Chancery Court vacated the Status Quo Order.  As promptly as possible after the Chancery Court's ruling, the Debtor commenced this Chapter 11 Case.

### 2.    Prepetition Marketing Process

26.    The pre-Trial litigation in the Section 225 Action proved to be a major distraction for the Board and management from the company's real issue—finding an investor who would be willing to provide a much-needed capital infusion under the unfortunate circumstances being faced by GenapSys.    To facilitate the Prepetition Marketing Process, the Debtor and its advisors prepared, among other things, marketing materials and an electronic data room to provide potential investors and bidders with information upon which to make a proposal.    During the Prepetition Marketing Process, of the over 100 potential investors contacted, 19 interested parties executed confidentiality agreements (each, an "NDA") and were granted access to the electronic data room, which contained significant diligence and other confidential information about the Debtor's business, assets, and technologies.    Interested parties were also offered the opportunity to meet with the Debtor's management.    Lazard informed each of these parties that the Prepetition Marketing Process was expeditious by necessity in order to address the Debtor's liquidity.    Lazard assisted the Debtor in preparing, among other things, marketing materials, and an electronic data room to provide potential investors with information upon which to make a proposal.

27.    The Prepetition Marketing Process yielded two potential anchor investors: (i) Party B[4] and (ii) Farallon Capital Management, L.L.C. ("Farallon").[5]    While the Debtor engaged in negotiations with both parties, these negotiations temporarily stalled.

28.    One of the potential anchor investors, one or more funds affiliated with Farallon, had been willing to be a lead investor in the earlier equity raise that was scuttled by the California

---

[4]    Party B and the Debtor are party to a Non-Disclosure Agreement.

[5]    Funds and/or accounts managed or advised by Farallon own, directly or indirectly, approximately 71% of the Series D Preferred Equity Interests.    Additionally, a Series D Director designated by Zone III Healthcare Holdings, LLC (a Farallon managed vehicle) is a member of GenapSys' board of directors.

11

Action and Section 225 Action.  Now, Farallon was interested in loaning and/or investing money as part of a chapter 11 bankruptcy filing.  Farallon's proposal also contemplated an additional investment by other investors.  Unfortunately, this proposal —which was never signed by the company or Farallon (the "Original Farallon Term Sheet")—came undone.  As the Company continued to negotiate with Farallon and other existing investors, it became clear that the transaction contemplated by the Original Farallon Term Sheet was not actionable for a number of reasons.  Among other things, Dr. Esfandyarpour jeopardized the Original Farallon Term Sheet by sending multiple emails and a presentation addressed to some but not all of the company stockholders (but, notably, not to the company's board of directors or to the company's internal or external counsel) that contained a litany of falsehoods and grievances.  At the bottom of the email, Dr. Esfandyarpour forwarded an initial email to the Company from Party B, exhorting stockholders to demand that GenapSys enter into a transaction with Party B.

29.    While the Prepetition Marketing Process was ongoing, Party B had approached senior management and indicated that it was willing to provide a new Series E Preferred Stock investment.  Although the liquidity under the proposed investment would have come too late to rescue the Debtor and the terms of the offer were unacceptably too constrictive, management nevertheless engaged in discussions with Party B.  Party B refused to sign the Company's form NDA; GenapSys ultimately agreed to Party B's form of NDA.  In its proposal, Party B insisted that GenapSys agree to negotiate exclusively with Party B and cease preparation of any type of restructuring or bankruptcy filing.  Given the dire circumstances facing GenapSys, this was not feasible.  Towards the end of June 2022, GenapSys proposed a limited form of exclusivity if Party B covered payroll and other agreed expenses during the period of exclusivity, but Party B rejected that proposal.  GenapSys made a further proposal to Party B at the end of June that Party B also

rejected, although Party B indicated they would make a final proposal, which Party B did not do until the weekend before the Petition Date (as described below).

30.    Because the Debtor was out of liquidity and there was no interested investor or buyer for the Debtor, the Debtor's prospects for continuing as a going concern company became very bleak.

### 3.    Forbearance Agreement; Negotiations with Prepetition Secured Parties

31.    While GenapSys was litigating the Status Quo Order and commencing the Prepetition Marketing Process, it was also subject to upcoming principal amortization payments under the Prepetition Credit Agreement commencing on June 1, 2022, which were adding significant strain to GenapSys's liquidity timeline.  Non-payment would trip certain default provisions in the Prepetition Credit Agreement.  The Debtor requested that the Prepetition Agent forbear from exercising remedies for 30 days if the Debtor did not make the required payments of principal and interest.

32.    After negotiations, on June 1, 2022, the Prepetition Agent consented to a 20-day forbearance (the "Forbearance Agreement").  The Prepetition Agent agreed to forbear from debiting the Debtor's bank account for its June 1st principal payment (but required payment of its June interest payment) and from exercising its rights and remedies with respect to certain specified defaults under the Prepetition Credit Agreement until the earliest of (a) June 21, 2022, (b) such other date as may be agreed in writing between the Debtor and the Prepetition Agent, and (c) the date of any subsequent default under the Prepetition Credit Agreement or breach of the Forbearance Agreement.  The Forbearance Agreement also required that the Debtor provide the Prepetition Agent with detailed plan and debtor-in-possession term sheets or documents no later

than June 10, 2022.  The Prepetition Agent agreed to extend the deadline for those deliverables as the Prepetition Marketing Process continued to develop.

33.     Given the Debtor's defaults under the Prepetition Credit Agreement, the Debtor no longer had access to certain restricted cash (the "Restricted Cash").  Without access to those funds, the Debtor did not have enough funding to meet its upcoming payroll obligations.  Accordingly, on June 24, 2022, the Debtor made the difficult decision to furlough almost all of its employees to keep the company afloat until the Trial and, on July 8, 2022, the Debtor was forced to lay off or further furlough more than 70 employees.

**D.      DIP Facility; Sale Process**

34.     Shortly after the Chancery Court ruled in the Section 225 Action, Party B proposed a revised term sheet that removed an interim funding mechanism from the earlier term sheet, and also contemplated an out-of-court process.  GenapSys requested additional information as to whether Party B was still willing to provide funding to avert an acute liquidity crisis while the parties negotiated the proposal.  On the day before the Petition Date, Party B responded and inquired about the amount of funding needed, and also indicated that it would like a call with the Prepetition Agent to discuss (among other things) how to avoid a bankruptcy or restructuring.

35.     Concurrently with reviewing Party B's new proposal, the Debtor received a proposal from the Prepetition Agent.  The Prepetition Agent agreed to provide the Debtor with access to the Restricted Cash (which totaled $3 million) in connection with an in-court process (the "Cash Collateral") and a post-petition debtor-in-possession loan of up to $4 million, with $1 million available on an interim basis (the "DIP Facility" and the lender thereunder, the "DIP Lender"), while Lazard continued to market the Debtor's assets for sale under section 363 of the Bankruptcy Code (the "Sale Process").  In addition, Lazard and GenapSys engaged with Farallon and the Prepetition Agent regarding either of these parties potentially acting as a stalking horse

14

purchaser in the Sale Process.  As of the Petition Date, these negotiations remain ongoing.  The Prepetition Agent nevertheless remained willing to allow use of Cash Collateral and to provide funding under the DIP Facility to fund the Sale Process.

36.     After considering its limited options, the Debtor determined that Oxford's funding proposal ultimately proved more feasible and had a greater potential to maximize value for all its stakeholders.

37.     It is my belief that the Company exercised its business judgment in the selection and negotiation of the DIP Facility.  As part of the Prepetition Marketing Process, the Debtor, with Lazard's assistance, sought to determine if any lenders would be willing to provide financing to the company, in either an in-court or an out-of-court scenario.  The Debtor and its advisors determined that none of the potential lenders contacted was able to offer financing that was on better terms than the DIP Facility negotiated with the DIP Lender, particularly in light of the fact that substantially all the Debtor's assets are encumbered by liens granted to the Prepetition Secured Parties.  In addition, the current market for venture capital is extremely tight.  Having received only one actionable DIP financing proposal (the proposal from the DIP Lender), the Debtor, with guidance from its advisors, actively negotiated the terms of the DIP Facility proposal.  The DIP Facility provides the Debtor with access to liquidity on reasonable economic terms, including no premiums, minimal fees, and interest payable in kind. These concessions from the DIP Lender are designed to provide the Debtor as much liquidity as possible under the circumstances to avoid a chapter 7 filing and bridge the Debtor to an orderly Sale Process.

38.     In my business judgment, access to the DIP Facility and the Cash Collateral will provide the Debtor with the liquidity necessary to administer the Chapter 11 Case and conduct the contemplated Sale Process.  While the Prepetition Agent is willing to allow use of Cash Collateral

and the DIP Lender is willing to provide the DIP Facility, the DIP Facility contemplates the following milestones to ensure that the Chapter 11 Case and the Sale Process (particularly in light of the Prepetition Marketing Process) proceed expeditiously:

a.  The filing of a motion seeking approval of sale and bidding procedures within three (3) business days of the Petition Date.

b.  The entry of an order approving the sale and bidding procedures within twenty-five (25) days of the Petition Date.

c.  The entry of an order approving the DIP Facility on a final basis within twenty-five (25) days of the Petition Date.

d.  The entry of an order approving a sale within fifty-four (54) days of the Petition Date.

e.  The closing of a sale within sixty (60) days of the Petition Date.

39.    In my opinion, without access to the Cash Collateral and the DIP Facility, the Debtor will not be able to successfully prosecute the Chapter 11 Case.

## II.  FACTS IN SUPPORT OF FIRST DAY MOTIONS

40.    In my capacity as CFO, I believe that the relief requested in the First Day Motions is necessary and essential to ensuring that the Debtor's immediate needs are met, and that the Debtor (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11 Case.  My opinion as to the necessity of the First Day Motions is based upon my firsthand experience as CFO and my review of various materials and information provided to me by the Debtor's senior management and the Debtor's advisors, as well as discussions had in connection therewith.  In considering the necessary first-day relief, the Debtor's senior management, the Debtor's advisors, and I were cognizant of the limitations imposed on a debtor-in-possession and, in light of these limitations, narrowed the relief requested at the outset of the Chapter 11 Case to those matters that require urgent relief to preserve value during the pendency of this chapter 11 proceeding.

16

A.      **Section 156(c) Application**

41.      Concurrently herewith, the Debtor filed an application to retain Kroll as this Court's claims and noticing agent for the Chapter 11 Case.  I believe that the retention of Kroll is critical because of the large number of creditors identified in these cases.

42.      I understand that Kroll is a data-processing firm with extensive experience in noticing, claims processing, and other administrative tasks in chapter 11 cases.  The Debtor solicited bids from three prominent bankruptcy claims and noticing agents prior to selecting Kroll and believes Kroll's rates are reasonable given the quality of Kroll's services and prior bankruptcy experience.  Given the need for the services described above and Kroll's expertise in providing such services, I believe that retaining Kroll will expedite service of notices, streamline the claims administration process, and permit the Debtor to focus on its restructuring efforts.

43.      The Debtor also intends to file a separate application to retain Kroll as administrative agent to provide, among other things, certain solicitation-related services.

B.      **Cash Management Motion**

44.      In the ordinary course of its business prior to the Petition Date, the Debtor maintained a centralized cash management system (the "Cash Management System") to collect, transfer, and disburse funds efficiently and to record transactions accurately.   The Cash Management System comprises ten (10) bank accounts at EastWest Bank ("EastWest") and Silicon Valley Bank ("SVB," and together with EastWest and any other bank at which the Debtor may hold accounts, the "Banks").[6]

45.      The Debtor is requesting authorization to maintain its existing Cash Management System.  I believe that the Debtor's existing cash management and intercompany accounting

---

[6]     A list of the Bank Accounts is attached to the Cash Management Motion as Exhibit C.

procedures are essential to the orderly operation of the Debtor's business.  Any material interruption in the Debtor's existing Cash Management System could cause confusion, disrupt payroll, introduce inefficiency into the Debtor's operations when efficiency is most essential, and strain the Debtor's relationships with critical third parties, each of which could diminish the prospects for a successful restructuring.

46.    In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment, and reporting requirements.  The Debtor believes that the accounts in their current cash management system either meet those requirements or, to the extent that certain accounts do not, that such requirements should be modified as set forth in the motion given the security of the Debtor's deposits and the expedited nature of this Chapter 11 Case.

47.    In light of the Debtor's need to maintain its Bank Accounts and cash management functions, I believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtor's estate and its creditors.

**C.    <u>Employee Wages Motion</u>**

48.    Concurrently herewith, the Debtor has filed a motion (the "<u>Wage Motion</u>") seeking authority to, among other things, satisfy certain of its prepetition obligations to its employees, pay prepetition payroll-related taxes and withholdings associated with the Debtor's employee wage claims and employee benefit obligations, and other similar tax obligations, continue any employee benefit programs in place as of the Petition Date (including satisfying any prepetition obligations associated with such programs), and reimburse employees for prepetition travel and other business expenses that were incurred on behalf of the Debtor (collectively, the "<u>Employee Obligations</u>").

49.    In order to achieve a successful restructuring, it is essential that the Debtor's employees work with the same or greater degree of commitment and diligence as they did prior to the Petition Date. The requested authority to continue to pay its prepetition employee obligations

18

and to maintain its current employee benefits programs is critical to ensure that the Debtor can retain personnel knowledgeable about the Debtor's business, the Debtor's employees continue to provide quality services to the Debtor at a time when they are needed most, and the Debtor remains competitive with comparable employers. The Debtor's employees are especially critical at this moment given the need to continue critical product development efforts.

50.    As of the Petition Date, the Debtor estimates, based on a thorough review of its books and records, that the total amount of prepetition Employee Obligations owed is approximately $1,805,500, of which $1,449,500 comes due in the first twenty one (21) days of this Chapter 11 Case. The proposed interim and final orders, if entered, will grant the Debtor the authority to pay the Employee Obligations in accordance with the Debtor's prepetition practices, provided, however, that no single Employee shall be entitled to receive more than $15,150 on account of prepetition Employee Obligations, except to the extent required under applicable state law.

51.    If this motion were not granted, I believe that it would result in significant deterioration in morale among Employees, which undoubtedly would have a devastating impact on the Debtor. The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtor's estate and the importance of the Employees to the restructuring efforts. I believe authorizing the Debtor to pay Employee Obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor, its estate, its creditors, and other parties in interest, and will enable the Debtor to continue to operate its business without disruption, in an economic and efficient manner.

52.    I believe that the authority to pay the Employee Obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate.

D.      **Tax Motion**

53.     In the ordinary course of business, the Debtor incurs or collects and remits certain taxes, including sales, use, property, franchise, and various other similar taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies (the "Taxing Authorities").

54.     Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business could have a wide-ranging and adverse effect on the Debtor's operations as a whole, as described further in the Taxes Motion.  I believe that payment of the Taxes and Fees in an amount not to exceed $20,000 is in the best interest of the Debtor and its estate, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtor's estate.

E.      **Utilities Motion**

55.     In connection with the operation of its business and the management of its research facilities and laboratories, the Debtor obtains utility services (collectively, the "Utility Services") from various utility companies (collectively, the "Utility Companies").  Pursuant to certain of the Debtor's lease agreements, certain Utility Services are billed directly to the Debtor's landlords and passed through to the Debtor as part of the Debtor's lease payments.  The Debtor does not seek relief as to such leases.  Among other things, the Debtor requests that the Court:  (i) prohibit the Utility Companies from altering, refusing, or discontinuing the Utility Services on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) determine that the Debtor has provided each of the Utility Companies with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based on the Debtor's establishment of a segregated account in the amount of $12,000, which equals 50% of the Debtor's estimated monthly cost of the Utility Services subsequent to the Petition Date; and

(iii) establish procedures for determining additional adequate assurance of future payment, if any, and authorizing the Debtor to provide additional adequate assurance of future payment to the Utility Companies.

56.    Uninterrupted Utility Services are essential to the Debtor's business operations and the overall success of the Chapter 11 Case.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted.  Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Case.  I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor and its estate, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtor's estate.

**F.    Cash Collateral and DIP Motion**

57.    The Debtor is seeking an order through the above-referenced motion (the "Cash Collateral and DIP Motion") authorizing, among other things, the incurrence of post-petition indebtedness through the DIP Facility, granting of security interests and superpriority administrative expenses, and use of cash collateral.  I have reviewed the Cash Collateral and DIP Motion, and the factual statements therein are true and correct to the best of my knowledge.  Attached to the Debtor's proposed Interim DIP Order as Exhibit A is an initial thirteen-week cash flow budget (the "Budget"), which set forth the Debtor's anticipated expenditures and all necessary and required expenses that the Debtor expects to incur.  I supervised the preparation of the Budget.

58.    The DIP Facility gives the Debtor appropriate flexibility during the Chapter 11 Case.  The Debtor needs access to the Cash Collateral, as well as the cash available under the DIP Facility to fund ongoing operating expenses and the necessary administrative expenses of bankruptcy.  The Debtor considered whether it could operate using only the Cash Collateral and determined that it could only do so for a very limited period of time.  The company's ability to

remain a viable operating entity depends on obtaining the interim and final relief requested in the Cash Collateral and DIP Motion.

59.     The DIP Lender has indicated that the DIP Facility and related documents set forth the only terms under which it would agree to provide the Debtor's financing.  The Debtor negotiated the terms of the DIP Facility at arm's-length and in good faith, with all relevant parties represented by counsel.  I believe that the negotiated terms are reasonable under the circumstances.

*     *     *

60.     I have reviewed each of the First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Motions: (i) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its business operations; and (ii) is in the best interests of the Debtor and its stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 12th day of July, 2022.

GenapSys, Inc.,
Debtor and Debtor in Possession

By: */s/ Britton Russell*
    Britton Russell
    Chief Financial Officer

RLF1 27607433v.1