**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] | Case No. 22-10261 (BLS) |
| Debtor. | <u>Objection Deadline</u>: July 28, 2022 at 4:00 p.m. (ET)<br><u>Hearing Date</u>: August 4, 2022 at 10:00 a.m. (ET) |

**MOTION OF THE DEBTOR FOR ENTRY OF ORDERS
(I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) AUTHORIZING
THE DEBTOR TO DESIGNATE A STALKING HORSE BIDDER AND TO PROVIDE
BIDDING PROTECTIONS, (C) SCHEDULING AN AUCTION AND APPROVING THE
FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, (E) SCHEDULING A SALE HEARING AND
APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (F)
GRANTING RELATED RELIEF; AND (II)(A) APPROVING THE SALE OF THE
DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES
<u>AND (C) GRANTING RELATED RELIEF</u>**

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") hereby files this

motion (the "<u>Motion</u>") for the entry of (a) an order, substantially in the form attached hereto as

<u>Exhibit A</u> (the "<u>Bidding Procedures Order</u>"), (i) approving bidding procedures, substantially in the

form attached to the Bidding Procedures Order as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>"), to be used

in connection with the sale (the "<u>Sale Transaction</u>") of substantially all of the Debtor's assets (the

"<u>Assets</u>"), (ii) authorizing the Debtor to designate a Stalking Horse Bidder and provide Bid

Protections in accordance with the Stalking Horse Designation Procedures, (iii) scheduling (A) an

auction of the Assets (the "<u>Auction</u>"), if any, and scheduling the hearing to approve a sale of the

---

[1]    The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is
GenapSys, Inc. (3904).  The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City,
CA 94063.

Assets (the "Sale Hearing"), (iv) approving the form and manner of notice of the proposed Bidding

Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding

Procedures Order as Exhibit 2 (the "Sale Notice"), (v) authorizing procedures governing the

assumption and assignment of certain executory contracts and unexpired leases (the "Contracts")

in connection with any Sale Transaction (the "Assumption and Assignment Procedures"),

(vi) approving the form and manner of notice to each relevant non-debtor counterparty to a

Contract (each, a "Counterparty") of (A) the Debtor's calculation of the amount necessary to cure

any defaults under an applicable Contract (the "Cure Costs") and (B) certain other information

regarding the potential assumption and assignment of Contracts in connection with the Sale

Transaction, substantially in the form attached to the Bidding Procedures Order as Exhibit 3

(the "Assumption and Assignment Notice"), and (vii) granting related relief; and (b) an order

(the "Sale Order"),[2] (i) authorizing the sale of the Assets free and clear of all liens, claims, interests,

and encumbrances, except certain assumed liabilities and permitted encumbrances as determined

by the Debtor and the Successful Bidder (as defined below), with liens to attach to the proceeds of

the Sale Transaction, (ii) authorizing the assumption and assignment of certain Contracts in

connection with the Sale Transaction, and (iii) granting related relief.  In support of this Motion,

the Debtor relies upon and incorporates by reference the *Declaration of Britton Russell in Support

of Debtor's Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [Docket No.

11].[3]  In further support of this Motion, the Debtor respectfully represents as follows:

---

[2]    A copy of the Sale Order will be filed in advance of the Sale Hearing.

[3]    Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

RLF1 27624743v.1

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       The statutory and legal predicates for the relief sought herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 6004-1 and 9006-1.

## BACKGROUND

### I.       General

3.       On July 11, 2022 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in the Chapter 11 Case and no request has been made for the appointment of a trustee or an examiner. Additional information regarding the Debtor's business, its capital structure, and the circumstances leading to the filing of the Chapter 11 Case is set forth in the First Day Declaration.

## II.    Prepetition Marketing Process and Sale Process

4.      As set forth in the First Day Declaration, prior to the Petition Date, the Debtor undertook several strategic initiatives aimed at raising additional capital to position the company for continued growth.  Unfortunately, despite the promise of its technology and the success of early conversations with investors, the Debtor's business was not able to withstand the liquidity, operational, and reputational impacts of certain prepetition litigation.  Tightening liquidity prompted the Debtor to conduct a comprehensive review of all strategic options, including, among other things, a sale of substantially all of its assets (the "Sale Process").  In May 2022, the Debtor engaged Lazard Frères & Co. LLC ("Lazard") as its investment banker.

5.      Immediately upon its retention, Lazard spearheaded a marketing process for an investor who would be willing to provide a much-needed capital infusion under the unfortunate circumstances being faced by the Debtor.  Lazard solicited interest from over 100 potential financial and strategic investors for financing and investment proposals that would enable the Debtor to execute on its business plan and potentially simplify its capital structure.  Nineteen of the parties signed non-disclosure agreements and became involved in the process.  By June 13, 2022, Lazard had received only two non-binding indications of interest (one of which was from one or more affiliates of Farallon Capital Management, L.L.C. (together with its affiliates, "Farallon")), each contemplating different transaction structures and terms.  However, by late June 2022, Farallon and the Debtor's prepetition secured creditor, Oxford Finance LLC ("Oxford"), were unable to reach an agreement, and, accordingly, Farallon's initial non-binding indication of interest was no longer actionable.  Additionally, the other potential investor ("Party B") had stopped meaningfully engaging.

6.      With Lazard's assistance, the Debtor re-engaged Farallon regarding a potential purchase of the Debtor's assets and potential DIP financing to support the Sale Process. Unfortunately, given the timing and liquidity constraints facing the Debtor, the Debtor, the Prepetition Agent and Farallon were unable to finalize a deal structure before the Petition Date, although the Prepetition Argent and Farallon remained, and are still engaged in, discussions regarding the Sale Process, including with respect to acting as a Stalking Horse Bidder.

## THE NEED FOR A TIMELY PROCESS

7.      Shortly after the Petition Date, the Debtor obtained Court approval of its use of Cash Collateral and the DIP Facility.  However, even with access to the Cash Collateral and the funding under the DIP Facility, the Debtor's current financial condition will not allow for administration of this Chapter 11 Case and the Sale Process for an extended period of time.

8.      In connection with providing the DIP Facility, the DIP Lender has required a timeline under the DIP Credit Agreement governing the Debtor's Cash Collateral use and availability under the DIP Facility.  Specifically, the Debtor and the DIP Lenders have agreed to, among others, the following proposed key dates and deadlines, including milestones established under the DIP Agreement (the "Milestones"):

(a)      The filing of a motion seeking approval of sale and bidding procedures within three (3) business days of the Petition Date.

(b)      The entry of an order approving the sale and bidding procedures within twenty-five (25) days of the Petition Date.

(c)      The entry of an order approving the DIP Facility on a final basis within twenty-five (25) days of the Petition Date.

(d)      The entry of an order approving a sale within fifty-four (54) days of the Petition Date.

(e)      The closing of a sale within sixty (60) days of the Petition Date.

5

9.      Given the time constraints imposed by the Milestones and the Debtor's operational and financial situation, the Debtor, in consultation with its advisors, believes that pursuing the sale of the Debtor's Assets in the manner described herein, with the opportunity to designate a Stalking Horse Bidder, is the course of action most likely to maximize value and encourage robust bidder participation.

10.     The Debtor and its advisors have negotiated a timeline that balances the need to provide adequate notice to parties in interest, and to sufficiently market the Assets in the context of a postpetition Sale Process, with the need to quickly and efficiently consummate a sale transaction.  The Bidding Procedures and the Debtor's proposed timeline for the Sale Process are a product of good-faith, arm's-length negotiations and reflect the best option for maximizing the value of the Assets under the circumstances of this Chapter 11 Case.  As detailed above, the Debtor's business has been thoroughly marketed to a wide range of potential strategic and financial investors and buyers.  A substantial amount of information regarding the Debtor's businesses has been made available to these prospective purchasers during the prepetition phase of the Sale Process.  In addition, as set forth in the Bidding Procedures, bidders will have access to additional, updated information about the Debtor's business that will aid parties in developing thoughtful and competitive bids.  As such, the Debtor believes that prospective bidders already know the Assets well and will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

11.     Finally, the Debtor believes that the Bidding Procedures will provide a uniform process by which interested bidders can participate in a competitive auction for the Debtor's Assets.  The Debtor believes that the Bidding Procedures will market test for the Debtor's Assets and will lead to a value-maximizing transaction.

12.     Accordingly, the Debtor has determined that pursuing the sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interests of the Debtor's estate, will provide interested parties with sufficient opportunity to participate, and will maximize the value of its estate for the benefit of their stakeholders.

## IV.    The Bidding Procedures

### A.    Overview

#### 1.    Stalking Horse Designation Procedures

13.     As part of its Bidding Procedures, the Debtor seeks authority, subject to the terms of the Bidding Procedures Order, to designate one or more stalking horse bid(s) (the "Stalking Horse Bids"), pursuant to the procedures set forth in the Bidding Procedures (the "Stalking Horse Designation Procedures") for any or all of the Debtor's Assets and to enter into one or more purchase agreements (the "Stalking Horse Agreements") with one or more potential bidders (the "Stalking Horse Bidders"), upon consultation with the (i) legal and financial advisors for Prepetition Secured Parties and the DIP Administrative Agent, and (ii) any official committee appointed in this Chapter 11 Case, through its legal and financial advisors (together, the "Consultation Parties"), and upon the written consent of the Prepetition Agent and the DIP Administrative Agent.

14.     As has become customary in attempting to market and sell assets like Debtor's Assets in a value-maximizing manner, the Debtor believes it is important to have the ability to enter into a Stalking Horse Agreement with a potential buyer.  Also, consistent with the market for this kind of process, the Debtor foresees that it may be necessary to afford a Stalking Horse Bidder certain protections (the "Bid Protections").

15.     Pursuant to the Bidding Procedures, upon the designation of a Stalking Horse Bidder, the Debtor may seek to award a Stalking Horse Bidder with Bid Protections under certain

circumstances. In the event that the Debtor, with the written consent of the Prepetition Agent and the DIP Administrative Agent and in consultation with the Consultation Parties, selects one or more parties to serve as a Stalking Horse Bidder, then the Debtor seeks authority to provide such Stalking Horse Bidder(s) with Bid Protections not exceeding 3% of an applicable Qualified Bid, provided that the Debtor obtains the consent of the Consultation Parties and the U.S. Trustee with respect to such Bid Protections, by submitting an order to the Court under certification of counsel that approves such Bid Protections (the "Stalking Horse Order").

16.    In the event that the Consultation Parties and the U.S. Trustee do not each consent to the proposed Bid Protections and entry of the Stalking Horse Order, the Debtor shall be authorized to file a notice seeking an expedited hearing on not less than seven (7) calendar days' notice (the "Stalking Horse Hearing") seeking approval of the Stalking Horse Order.  All parties in interest shall have the right at the Stalking Horse Hearing to object to the Debtor's entry into a Stalking Horse Agreement on any grounds, including to object to the Bid Protections and the form of Stalking Horse Order.  To the extent that the Debtor, with the consent of the Prepetition Agent and the DIP Administrative Agent, seeks to award Bid Protections in excess of 3% of an applicable Qualified Bid, whether or not the other Consultation Parties consent to such Bid Protections, the Debtor must seek Court approval of the Bid Protections and may do so on an expedited basis.

17.    The Debtor intends to provide copies of any Stalking Horse Agreements, if applicable, and, in its discretion, may provide form purchase agreements if no Stalking Horse Agreement has been entered into with respect to the Debtor's Assets, to all parties who designate their interest in submitting a bid.

## 2.    Bidding Procedures Summary

18.    The Debtor (in consultation with its advisors) designed the Bidding Procedures to promote a competitive and expedient Sale Process.  If approved, the Bidding Procedures will allow

the Debtor to solicit and identify bids from potential buyers that constitute the highest or otherwise

best offer for the Assets on a schedule consistent with the Milestones and the Debtor's chapter 11

strategy

19.     As the Bidding Procedures are attached to the Bidding Procedures Order, they are

not herein restated in their entirety.  Pursuant to Local Rule 6004, certain of the key terms of the

Bidding Procedures are highlighted in the chart below:[4]

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER | |
| --- | --- |
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | **Qualified Bid and Qualified Bidder Requirements are set forth in Sections IV, V and VI of the Bidding Procedures.** <br><br> **A.  Due Diligence –** Execute confidentiality agreement with the Debtor. <br><br> **B.  Bid Deadline –** Submit Qualified Bid by **August [23], 2022, at 4:00 p.m. (ET)**. <br><br> **C.  Qualified Bid Requirements** <br><br>  1. <u>Identification of Bidder</u>.  A Qualified Bid must fully disclose the legal identity of the bidder and any related parties participating in the bidding and Auction process. <br><br>  2. <u>Purchase Price</u>.  A Qualified Bid must (a) identify the Assets to be purchased, including any then-known Contracts that are proposed to be assumed and assigned to the bidder and any liabilities to be assumed and (b) set forth the purchase price of the bid. <br><br>  3. <u>Form of Consideration</u>. <br>   • *Credit Bidding*. (i) The Prepetition Agent shall be entitled, on behalf of the other Prepetition Secured Parties, to credit bid up to the full amount of the outstanding Prepetition Loan Obligations (as defined in the DIP Order), including, without limitation, any accrued interest and expenses, as set forth in the DIP Order, and (ii) the DIP Administrative Agent shall be entitled, on behalf of the other DIP Secured Parties, to credit bid up to the full amount of the outstanding DIP Obligations, including, without limitation, any accrued interest and expenses, as set forth under the DIP Order.  Any credit bid by the Prepetition Agent or the DIP Administrative Agent shall be deemed to be a Qualified Bid, and the DIP Administrative Agent and the Prepetition Agent shall be deemed Qualified Bidders in connection with such credit bid.  No other party may credit bid. <br><br>   • *All-Cash Offer*. Unless a bid includes a permitted Credit Bid, the bid must |

---

[4]    This summary is qualified in its entirety by the provisions of the Bidding Procedures.  To the extent that there is any inconsistency between the terms of the Bidding Procedures and this summary, the terms of the Bidding Procedures shall control.  Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the Bidding Procedures, as applicable.

include a statement confirming that the bid is based on an all-cash offer (provided that with the prior written consent of the Debtor, following the Debtor's consultation with the Consultation Parties, a bid may include forms of consideration other than cash; provided further that, absent prior written consent of the Prepetition Agent and the DIP Administrative Agent (as applicable), the portion of a bid to be used to satisfy in full the Prepetition Loan Obligations and the DIP Obligations must be in cash).

4. Minimum Bid for Assets. Each bid must either (a) (i) be a bid for all of the Debtor's Assets and (ii) must be paid in full in cash and exceed the sum of (I) $2 million; (II) cure costs of all assumed Contracts; (III) any transfer taxes resulting from the Sale; (IV) unless the DIP Administrative Agent has agreed otherwise, the amount of the DIP Obligations; (V) unless the Prepetition Agent has agreed otherwise, the Prepetition Loan Obligations; (VI) the Bid Protections, if any; and (VII) if a Stalking Horse Bidder has been designated, the $250,000 Minimum Overbid (subparts (I)-(VII) collectively, the "Minimum Amount"); or (b) propose an alternative transaction that, in the Debtor's reasonable business judgment, provides higher or better terms than the such bid, provided that such alternative transaction must, at a minimum, provide for the immediate cash repayment in full of (I) unless the DIP Administrative Agent has agreed otherwise, the DIP Obligations; (II) unless the Prepetition Agent has agreed otherwise, the Prepetition Loan Obligations; and (III) the Bid Protections.

The Debtor, following consultation with the Consultation Parties, may consider a bid for a portion of the Assets (each such bid, a "Partial Bid") if the Debtor receives one or more other Partial Bids for the remaining Assets, such that, when taken together, the Partial Bids collectively constitute a higher or otherwise better bid than any Stalking Horse Bid, provided that the Partial Bids collectively must be equal to or exceed the Minimum Amount.

If the value of a bid relative to any Stalking Horse Bid includes additional non-cash components (such as fewer contingencies than are in such Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtor in better evaluating the competing bid.

5. Proposed Asset Purchase Agreement. A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (each, a "Proposed Asset Purchase Agreement"). A Proposed Asset Purchase Agreement shall (a) be duly authorized and executed; (b) be based on, and marked against, the form asset purchase agreement to be provided by the Debtor to Prospective Bidders to reflect the proposed sale transaction and to show any other proposed modifications to the form purchase agreement; (c) specify the proposed purchase price for the Assets in U.S. dollars; (d) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that, by its nature, must be prepared by the Debtor); and (e) identify any Contracts that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtor in connection with the proposed sale transaction. A Qualified Bid must also include a marked copy of any Stalking Horse Agreement showing the differences between such Stalking Horse Agreement and the Prospective Bidder's Proposed Asset Purchase Agreement.

6. Proposed Sale Order. A Qualified Bid must include a proposed sale order (each, a "Proposed Sale Order") and be marked against the proposed Sale Order to be provided by the Debtor to Prospective Bidders.

7. Financial Information.  A Qualified Bid must include (a) a statement that the Prospective Bidder is financially capable of consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; (b) sufficient evidence, as reasonably determined by the Debtor, to determine that the Prospective Bidder has, or will obtain, the financial wherewithal to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; and (c) Adequate Assurance Information (as defined below) with respect to any Contracts included or that may be included in the Prospective Bidder's bid, including the identity of any known proposed assignee of the applicable Contracts (if different from the Prospective Bidder), including contact information for such proposed assignee.

8. Good Faith Deposit.  Each Qualified Bid (other than a credit bid by the DIP Administrative Agent or the Prepetition Agent) must be accompanied by a good faith deposit (each, a "Good Faith Deposit") in the form of cash (or other form acceptable to the Debtor in its sole discretion) in an amount equal to 10% of the proposed purchase price for the Assets

9. Adequate Assurance.  A Qualified Bid must include evidence of the Prospective Bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid.  The Debtor may require (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased premises included in the bid (collectively, the "Adequate Assurance Information").  Adequate Assurance Information must be in a form that will permit its immediate dissemination to Counterparties;

10. Representations and Warranties.  A Qualified Bid must include a statement that (a) the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its bid; and (b) the Prospective Bidder has relied solely upon its own due diligence in making its bid.

11. Authorization.  A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution and delivery of a bid, participation in the Auction and closing the proposed Sale Transaction.

12. Other Requirements.  A Qualified Bid must also satisfy, among others (as set forth in Section VI.A.12 of the Bidding Procedures), the following requirements:
   - state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined below) for the applicable Assets (each such bid, a "Backup Bid");
   - state that the bid represents a binding, good-faith and bona fide offer to purchase the applicable Assets and is irrevocable (a) until the selection of the Successful Bid; or, (b) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date (as defined below);
   - state and acknowledge that the Prospective Bidder shall not be entitled to any bidding protection or payment in connection with the submission of a bid for the Assets or otherwise participating in the Sale Process;
   - state that the Prospective Bidder is committed to closing the Sale Transaction

| | |
|---|---|
| | contemplated in its bid as soon as practicable (and in no case later than September 9, 2022);<br>• expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Process;<br>• not contain any financing contingencies of any kind;<br>• state whether the Prospective Bidder intends to offer future employment to any of the Debtor's employees;<br>• certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtor and<br>• include a covenant to comply with the terms of the Bidding Procedures and the Bidding Procedures Order. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | This Motion seeks, and the proposed Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).  *See* Bidding Procedures Order ¶ 36 |
| **Provisions Providing Bid Protections to Stalking Horse or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | Pursuant to Section II of the Bidding Procedures, Bid Protections, if any, are subject to the Stalking Horse Designation Procedures set forth therein. Specifically, with the written consent of the Prepetition Agent and the DIP Administrative Agent and subject to the provisions set forth in the Bidding Procedures, the Bidding Procedures Order, and in consultation with the Consultation Parties, the Debtor may enter into one or more Stalking Horse Agreements, in each case, subject to higher or otherwise better offers at the Auction, with any Stalking Horse Bidder that submits a Qualified Bid (as defined below) acceptable to the Debtor, in consultation with the Consultation Parties, to establish a minimum Qualified Bid at the Auction.  Absent agreement of the Debtor, consent of the Prepetition Agent and the DIP Administrative Agent, and further order of the Bankruptcy Court, (i) any Stalking Horse Agreement shall limit the amount of break-up fees, if any, to no greater than 3% of the Qualified Bid and (ii) the reimbursement of expenses, if any, shall be limited to documented, actual and necessary expenses incurred by any Stalking Horse Bidder up to $750,000.00.  For the avoidance doubt, no Stalking Horse Bidder shall be entitled to any Bid Protections absent entry of a Stalking Horse Order (as defined below) or further order of the Court.<br><br>In the event that the Debtor, with the written consent of the Prepetition Agent and the DIP Administrative Agent and in consultation with the other Consultation Parties, selects one or more parties to serve as Stalking Horse Bidder(s) and to provide such Stalking Horse Bidder(s) with Bid Protections, upon such selection, the Debtor shall be authorized, provided that it obtains the consent of the Consultation Parties and the U.S. Trustee, to submit an order to the Court under certification of counsel that approves such Bid Protections.  In the event that the Consultation Parties and the U.S. Trustee do not each consent to the proposed Bid Protections and entry of the Stalking Horse Order, the Debtor shall be authorized to file a notice seeking an expedited hearing on not less than five (5) calendar days' notice.  All parties in interest shall have the right at the Stalking Horse Hearing to object to the Debtor's entry into a Stalking Horse Agreement on any grounds, including to object to the Bid Protections and the form of Stalking Horse Order.  In the event that the Debtor, with the consent of the Prepetition Agent and the DIP Administrative Agent and in consultation with the Consultation Parties, determines that the Bid Protections must exceed the amounts set forth herein, the Debtor shall request that the Court hold a hearing on the approval of any such greater Bid Protections on an expedited basis. |

| | |
|---|---|
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | Section IX of the Bidding Procedures sets forth the Debtor's reservation of rights to, in its reasonable business judgment and after Consultation with the Consultation Parties, in a manner consistent with its fiduciary duties and applicable law, modify these Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein; adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders, as applicable; or otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Assets, in each case, to the extent not materially inconsistent with these Bidding Procedures or the Bidding Procedures Order. For the avoidance of doubt, the Debtor may not modify any terms or conditions of the Bidding Procedures that require the consent of the Prepetition Agent or the DIP Administrative Agent without such parties' prior written consent. |
| **Closing with Alternative Back-up Bidders** Local Rule 6004-1(c)(i)(E) | Section VII.C.2 of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids. |
| | Immediately prior to the conclusion of the Auction, the Debtor will (a) determine which Qualified Bid is the Backup Bid for the Auction Package and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the material terms of the Backup Bid. |
| | Except as otherwise provided in any Stalking Horse Agreement, a Backup Bid will remain binding on the Backup Bidder until the earlier of (a) the first business day after the closing of a Sale Transaction with the Successful Bidder for the applicable Auction Package and (b) 30 days after the Sale Hearing (such date, the "<u>Backup Bid Expiration Date</u>"). If the Sale Transaction with the applicable Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder will be deemed the new Successful Bidder for the applicable Auction Package and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; <u>provided</u>, <u>that</u>, the Debtor may, in its reasonable business judgment, elect not to pursue the Sale Transaction contemplated by the Backup Bid. |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | Section VII of the Bidding Procedures sets forth the procedures governing the Auction. |
| | If the Debtor receives more than one Qualified Bid for the Assets, the Debtor will conduct an Auction for the Assets. If any Stalking Horse Bid is the only Qualified Bid received in respect of the Assets, the Debtor will not conduct an Auction for the Assets and will seek approval of such Stalking Horse Bid at the Sale Hearing. In the event the Debtor determines not to hold an Auction for some or all of the Assets, the Debtor will file and serve a notice stating that the Auction for such Assets has been canceled and providing all other relevant information to the Sale Notice Parties as required by the Bidding Procedures. |
| | The Auction, if required, will be conducted on **August [25], 2022, at [__]:00 [_].m. (ET), at either (i) at the office of Richards, Layton & Finger, P.A., located at One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, or (ii) virtually** or at such other date, time or location as designated by the Debtor, after consulting with the Consultation Parties. If the Debtor conducts the Auction virtually, the Debtor will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail. The Debtor will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders and the Consultation Parties, and will cause publication of such change to occur on the Kroll Website. |
| | A.  <u>Participation</u>. Each participant in the Auction must (i) be a Qualified Bidder, (ii) appear at the Auction or through a duly authorized representative and (iii) confirm on the record that (A) the participant has not engaged in any collusion with respect to any bid or the Sale Process and (B) any and all Qualified Bids submitted by the participant constitute good faith, binding and <u>bona fide</u> offers to purchase the applicable Assets. |

B. <u>Proceedings</u>. The Auction proceedings will (i) be transcribed and/or video recorded and (ii) include open bidding in the presence of all Qualified Bidders, subject to reasonable limitations imposed by a virtual auction platform to be evaluated and determined by the Debtor.

C. <u>Baseline Bids</u>. Prior to the commencement of the Auction, the Debtor will determine, in its reasonable business judgment, the highest and/or best Qualified Bid submitted (such Qualified Bid, a "<u>Baseline Bid</u>"). Bidding at the Auction shall commence at the amount of the applicable Baseline Bid.

D. <u>Minimum Overbids</u>. At each round of bidding, Qualified Bidders may submit successive bids higher than the Leading Bid (as defined below) from the prior round, which initially will be based on and increase from the applicable Baseline Bid. The Debtor will announce 24 hours before the Auction the minimum required increments for successive Qualified Bids (in any event an amount not less than $250,000 (the "<u>Minimum Overbid</u>")). During the Auction, the Debtor may, in its reasonable discretion, announce increases or reductions to Minimum Overbids at any time.

E. <u>Leading Bids</u>. After the first round of bidding and between each subsequent round of bidding, the Debtor will announce the bid that it believes to be the highest or otherwise best offer for the Assets (each such bid, a "<u>Leading Bid</u>") and describe the material terms thereof.

F. <u>Successful Bids</u>. Immediately prior to the conclusion of the Auction, the Debtor will (i) determine in consultation with the Consultation Parties which Qualified Bid constitutes the highest or otherwise best bid for the Assets (such bid, a "<u>Successful Bid</u>") and (ii) notify all Qualified Bidders at the Auction of the identity of the bidder that submitted the Successful Bid for the Assets (each such bidder, a "<u>Successful Bidder</u>") and the material terms of the Successful Bid.

## B.    Key Dates and Deadlines

20.        The Debtor proposes the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures, to the extent such potential extension is not inconsistent with the DIP Orders and any Stalking Horse Agreements. [5]

| **[Three] business days after the entry of the Bidding Procedures Order** | Deadline for Debtor to file and serve Sale Notice |
| --- | --- |

---

[5]    The Debtor reserves the right to change the proposed sale-related deadlines at any time prior to the Bidding Procedures Hearing; *provided, however*, that any modified dates shall not provide parties with any lesser notice or time than the dates set forth in the entered Bidding Procedures Order.

14

| **[Three] business days after the entry of the Bidding Procedures Order** | Deadline for Debtor to file and serve Assumption and Assignment Notice |
|---|---|
| **August [23], 2022, at 4:00 p.m. (ET)** | Bid Deadline |
| **August [23], 2022, at 4:00 p.m. (ET)** | Sale Objection Deadline and Cure Objection Deadline |
| **August [25], 2022, at [__] [_].m. (ET), at [_____]** | Auction |
| **One day after the conclusion of the Auction** | Deadline for Debtor to file and serve Notice of Auction Results |
| **August [30], 2022 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |
| **September [1], 2022 at 12:00 p.m. (ET)** | Debtor's Deadline Reply to Supplemental Objections |
| **September [2], 2022, subject to the availability of the Court** | Sale Hearing |
| **September [9], 2022** | Deadline to consummate approved sale transaction |

## C.    Sale Noticing and Objection Procedures

21.    The below chart sets forth the noticing and objection procedures and requirements established by the Bidding Procedures (collectively, the "Sale Noticing and Objection Procedures"):

| SALE NOTICING AND OBJECTION PROCEDURES | |
|---|---|
| **Sale Notice** | [Three] business days after the entry of the Bidding Procedures Order, the Debtor will file with the Court, serve on the Sale Notice Parties and cause to be published on the Kroll Website, the Sale Notice, which will set forth (A) a description of the Assets available for sale in accordance with the Bidding Procedures; (B) the date, time and location of the Auction and Sale Hearing; (C) the Sale Objection Deadline and Supplemental Sale Objection Deadline (each as defined below) and the procedures for filing such objections and, if applicable, (D) a summary of the material terms of any Stalking Horse Agreement, including the terms and conditions of any Bid Protections to be provided thereunder, as of the date of the Sale Notice. |
| **Sale Objections** | Objections to the sale of the Assets, including (i) any objection to a sale of Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order must (A) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (B) be filed with the Court by no later than August [23], 2022, at 4:00 p.m. (ET) (the "Sale Objection Deadline"); and (C) served on the Objection Notice Parties. |
| **Publication Notice** | Within three business days after the entry of the Bidding Procedures Order, the Debtor will cause the information contained in the Sale Notice to be published once in the national edition of the *USA Today* (the "Publication Notice"). |
| **Qualified Bid Selections** | The Debtor will evaluate timely bids and will (i) after consultation with the Consultation Parties make a determination regarding which bids qualify as Qualified Bids and which Qualified Bid has been selected as the Baseline Bid and (ii) notify bidders whether they qualify as Qualified Bidders as soon as commercially reasonable following the Bid Deadline. |
| **Auction Results** | One day after the conclusion of the Auction, the Debtor will file with the Court, serve on the Sale Notice Parties and cause to be published on the Kroll Website, a notice of the results of the Auction (the "Notice of Auction Results"), which will (A) identify the Successful Bidder and the Backup Bidder; (B) either include a copy of each Successful Bid and the Backup Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby, or provide instructions for accessing each Successful Bid and the Backup Bid free of charge from the Kroll Website; and (C) set forth the Supplemental Sale Objection Deadline and the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction. |
| **Supplemental Sale Objections** | Following service of the Notice of Auction Results, Sale Notice Parties will have an opportunity to object to the conduct of the Auction and/or the particular terms of any proposed Sale Transaction in the Successful Bid (each such objection, a "Supplemental Sale Objection"). Any Supplemental Objection must (i) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) be filed with the Court by no later than August [30], 2022 (the "Supplemental Sale Objection Deadline"); and (iii) served on the Objection Notice Parties. |

16

22.     The Debtor submits that the Sale Noticing and Objection Procedures, coupled with the Assumption and Assignment Procedures set forth below, constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the Sale Process, including the Objection Deadlines (as defined below), the Bid Deadline and the time and location of the Auction and Sale Hearing.  Accordingly, the Debtor requests that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

## C.     Assumption and Assignment Procedures

23.     In connection with the Sale Transaction, the Debtor likely will seek to assume and assign to the Successful Bidder one or more Contracts.   The Assumption and Assignment Procedures are designed to, among other things, govern the Debtor's provision of Adequate Assurance Information and notice of Cure Costs to applicable Counterparties.  The below chart sets forth the Assumption and Assignment Procedures:

| ASSUMPTION AND ASSIGNMENT PROCEDURES | |
|---|---|
| **Assumption and Assignment Notice** | [Three] business days after the entry of the Bidding Procedures Order, the Debtor will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale Transaction an Assumption and Assignment Notice, which will (i) identify the applicable Contracts; (ii) list the Debtor's good-faith calculation of Cure Costs with respect to each Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). |
| **Cure Objections** | Cure Objection Deadline.  Any Counterparty to a Contract that wishes to object to the Debtor's proposed Cure Costs (each such objection, a "Cure Objection") shall file with the Court and serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than **August [23], 2022, at 4:00 p.m. (ET)** (the "Cure Objection Deadline"). |
| | Resolution of Cure Objections.  The Debtor, any Stalking Horse Bidder or Successful Bidder, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to |

17

consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph. If a Cure Objection is resolved in a manner that is not in the best interests of the Debtor and its estate, whether or not such resolution occurs prior to or after the closing of the applicable Sale Transaction, the Debtor, any Stalking Horse Bidder or, as applicable, the Successful Bidder may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the applicable Sale Transaction (subject to the terms of the applicable Sale Transaction). All other objections to the proposed assumption and assignment of the Debtor's right, title and interest in, to and under a Contract will be heard at the Sale Hearing.

<u>Adjournment</u>.  If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing, or, at the Debtor's option, be adjourned to a subsequent hearing (each such Cure Objection, an "<u>Adjourned Cure Objection</u>").  An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction.  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Cure Objection shall, as applicable, be deemed assumed and assigned to the applicable Successful Bidder as of the closing date of the applicable Sale Transaction.

<u>Failure to Timely Object</u>.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract.  The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs.

RLF1 27624743v.1

| | |
|---|---|
| **Adequate Assurance Objections** | <u>Adequate Assurance Objection Deadline</u>.  Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance (each such objection, an "<u>Adequate Assurance Objection</u>"), shall file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by **August [30], 2022** (the "<u>Adequate Assurance Objection Deadline</u>" and, together with the Cure Objection Deadline, the Sale Objection Deadline and the Supplemental Sale Objection Deadline, the "<u>Objection Deadlines</u>"). <br><br><u>Resolution of Adequate Assurance Objections</u>.   The Debtor and the objecting Counterparty shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.   If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the applicable Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing. <br><br><u>Failure to Timely Object</u>.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance.  The applicable Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document. |
| **Notice of Assumed Contracts** | As soon as reasonably practicable after the closing of the Sale Transaction, the Debtor will file with the Court, serve on the applicable Counterparties and cause to be published on the Kroll Website, a notice containing the list of Contracts that the Debtor assumed and assigned pursuant to the asset purchase agreement with the Successful Bidder. |
| **Reservation of Rights** | The inclusion of a Contract or Cure Costs with respect to any Contract on any Assumption and Assignment Notice or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtor, the Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned.  The Debtor reserves all of its rights, claims and causes of action with respect to each Contract listed on the aforementioned notices. |

## **<u>RELIEF REQUESTED</u>**

24.     The Debtor hereby seeks entry of the following:

(a)     the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the following relief:

(i)     approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u>, to be used in connection with one or more Sale Transactions of substantially all of the Debtor's Assets;

(ii)    authorizing the Debtor to designate a Stalking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures;

(iii)    scheduling (A) the Auction of the Assets no later than August [25], 2022 and (B) the Sale Hearing to consider approval of the proposed Sale Transaction(s) no later than September [2], 2022, subject to the availability of the Court;

(iv)    approving the Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2;

(v)    approving the Assumption and Assignment Procedures;

(vi)    approving the Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3; and

(vii)    granting related relief; and

(b)    a Sale Order, granting the following relief:

(i)    authorizing the sale of the Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtor and the Successful Bidder (as defined below), with liens to attach to the proceeds of the applicable Sale Transaction;

(ii)    authorizing the assumption and assignment of certain Contracts in connection with an applicable Sale Transaction; and

(iii)    granting related relief.

## BASIS FOR RELIEF

### V.    The Bidding Procedures Are Fair, Appropriate and in the Best Interests of the Debtor and Its Stakeholders

25.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of a debtor's property:  maximizing the value of sale proceeds received by the estate.  See Burtch v. Ganz (In re Mushroom Co.), 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (debtor has "fiduciary duty to maximize the value of the bankruptcy

estate"); In re Food Barn Stores, Inc., 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing Metro. Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.), 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.")).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

26.    The Bidding Procedures provide for an orderly and uniform process through which interested parties may submit offers to purchase the Assets.  Importantly, the Debtor believes the Milestones that set the timeline for the Debtor's sale process are reasonable and will in no way hinder the Debtor's ability to sufficiently market the Assets, especially given the process Lazard conducted prior to the filing of this Chapter 11 Case.  Stated simply, the Debtor, with the assistance of its advisors, has structured the Bidding Procedures to attract competitive and active bidding from parties with the financial capability to close on a Sale Transaction quickly and efficiently.

27.    Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures.  See, e.g., In re Lucky Brand Dungarees, LLC, No. 20-11768 (CSS) [Docket No. 251] (Bankr. D. Del July 30, 2020) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 8 days after entry of bidding procedures

order and sale hearing 40 days after the petition date); In re Templar Energy LLC, No. 20-11441

(BLS) [Docket No. 101] (Bankr. D. Del. June 23, 2020) (approving bidding procedures with bid

deadline 13 days after entry of bidding procedures order and sale hearing 43 days after the petition

date); In re Sustainable Restaurant Holdings, Inc., No. 20-11087 (JTD) [Docket No. 99] (Bankr.

D. Del. June 19, 2020) (approving bidding procedures with bid deadline 19 days after entry of

bidding procedures order and sale hearing 64 days after the petition date); In re Alpha

Entertainment LLC, No. 20-10940 (LSS) [Docket No. 181] (Bankr. D. Del. May 28, 2020)

(approving bidding procedures with bid deadline 33 days after entry of bidding procedures order

and sale hearing 116 days after the petition date); In re Bumble Bee Parent, Inc., No. 19-12502

(LSS) [Docket No. 171] (Bankr. D. Del. Dec. 19, 2019) (approving bidding procedures, with

designated stalking horse bid protections, including bid deadline 31 days after entry of bidding

procedures order and sale hearing 71 days after the petition date); In re FTD Companies, Inc., No.

19-11240 (LSS) [Docket No. 201] (Bankr. D. Del. June 25, 2019) (approving bidding procedures

with bid deadline 20 days after entry of bidding procedures order and sale hearing 58 days after

the petition date); In re Charlotte Russe Holding, Inc., No. 19-10210 (LSS) [Docket No. 199]

(Bankr. D. Del. Feb. 21, 2019) (approving bidding procedures with bid deadline 10 days after entry

of order and auction scheduled for 29 days after entry of order); In re Central Grocers, Inc., No.

17-10993 (LSS) [Docket No. 338] (Bankr. D. Del. June 2, 2017) (approving bidding procedures

with auction scheduled for 27 days after entry of order and authorizing debtors to designate

additional stalking horse bidders without prior hearing under uncontested circumstances); In re

Golfsmith Int'l Holdings, Inc., No. 16-12033 (LSS) [Docket No. 196] (Bankr. D. Del. Oct. 6,

2016) (approving bidding procedures with a bid deadline 11 days after entry of order and auction scheduled for 13 days after entry of order).[6]

**A. The Bid Protections Have Sound Business Purposes and Should Be Approved**

28.     As noted above, the Bidding Procedures, through the application of the Stalking Horse Designation Procedures, provide for Bid Protections, if they prove necessary for the entry into any Stalking Horse Agreement, including break-up fees and an expense reimbursement in an amount no greater than 3% of an applicable Qualified Bid.  The Debtor believes that the Bid Protections may be necessary for any Stalking Horse Bidder to enter into a Stalking Horse Agreement.  In addition, the Debtor believes that the presence of a Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for the Assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtor's estate, its creditors and all other parties in interest.

29.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537.  Second, "if the availability of a break-up fee [was] to induce a bidder to research the value of the debtor and convert [the] value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is

---

[6]     The unreported orders cited herein are voluminous and not attached to this Motion.  Copies of these orders will be made available upon request to the proposed counsel for the Debtor.

sold will reflect its true worth." Id.; see also In re Reliant Energy Channelview LP, 594 F.3d 200, 206–08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

30.    In O'Brien, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.    the presence of self-dealing or manipulation in negotiating the break-up fee;

b.    whether the fee hampers, rather than encourages, bidding;

c.    the reasonableness of the break-up fee relative to the purchase price;

d.    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.    the correlation of the fee to a maximum value of the debtor's estate;

g.    the support of the principal secured creditors and creditors' committees of the break-up fee;

h.    the benefits of the safeguards to the debtor's estate; and

i.    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

31.    While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtor's estate because they may enable the Debtor to secure

an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than any Stalking Horse Agreement—a clear benefit to the Debtor's estate. Further, a Stalking Horse Bidder may not agree to act as a "stalking horse" without the Bid Protections, given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction. Without the Bid Protections, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose any downside protection that would be afforded by the existence of a Stalking Horse Bidder. The bid of a Stalking Horse Bidder would send a message to all potential bidders that the Assets are at least worth as much as any Stalking Horse Bid. Therefore, without the benefit of the bid of a Stalking Horse Bidder (*i.e.*, a bid providing the floor), the bids received at auction for the Assets could be substantially lower than any bid offered by a Stalking Horse Bidder.

32.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. at 659. The Debtor does not believe that the Bid Protections will stifle bidding. To the contrary, the Debtor believes that such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders". *Id.* at 662.

33.     Here, the bid of a Stalking Horse Bidder would serve all three functions. *First*, a Stalking Horse Bidder might not enter into a Stalking Horse Agreement without the Bid Protections. *Second*, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of any Stalking Horse Bidder. *Third*, the bid of the Stalking Horse Bidder could attract additional bidders because,

among other things, additional bidders would be able to save considerable time and expense because they could use many of the documents that a Stalking Horse Bidder may negotiate, including, among other things, any Stalking Horse Agreement and the schedules thereto, in making their bid.  In sum, if all or any portion of the Assets are sold to a Successful Bidder other than a Stalking Horse Bidder, the Sale Transaction likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

34.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.  'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible'".  *Id*. (citation omitted).

35.     Here, the Bidding Procedures provide for a break-up fee in an amount no greater than 3% of an applicable Qualified Bid absent further order of the Court.  This amount is consistent with the range of bid protections typically paid in sale transactions that have been recently approved by this Court.  See, e.g., In re Pancakes & Pies, LLC, Case No. 19-11743 (KG) (Bankr. D. Del. Aug. 23, 2019) [Docket No. 141] (authorizing potential stalking horse agreements to include expense reimbursements and break-up fees not exceeding 3% of the qualified bid); In re GUE Liquidation, Inc. Case No. 19-11240 (LSS) [Docket No. 201] (same); In re Hospital Acquisition LLC, No. 19-10998 (BLS) (Bankr. D. Del. June 27, 2019) [Docket No. 298] (authorizing potential stalking horse agreements to include break-up fees not exceeding 3% of the qualified bid and expense reimbursements not exceeding $250,000); In re The Weinstein Co. Holdings LLC, No. 18-10601 (MFW) (Bankr. D. Del. Apr. 6, 2018) [Docket No. 190] (approving break-up fee and expense reimbursement equal to 5% of the purchase price).

26

**B.    Approval of a Sale of the Assets Is Warranted Under Section 363 of the Bankruptcy Code**

36.    Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . .  use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely authorize a sale if it is based upon the debtor's sound business judgment.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

37.    Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  See In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting Lionel factors) (citing Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.), 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)). As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm.

of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.), 147 B.R. 650,

656 (S.D.N.Y. 1990) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

1.   **The Debtor Has Demonstrated a Sound Business Justification for the Sale of the Assets**

38.   A sound business justification exists where the sale of a debtor's assets is necessary

to preserve the value of the debtor's estate for the benefit of creditors and interest holders.  See,

e.g., Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of

Penn., Inc.), 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. at 179

(approving the sale of the debtor as a going concern upon a showing of "a valid business

purpose . . . ."); In re Lionel Corp., 722 F.2d at 1071 (adopting a rule "requiring that a judge

determining a § 363(b) application expressly find from the evidence presented before him . . . a

good business reason to grant" the sale).

39.   As set forth above in the First Day Declaration, a strong business justification exists

for a sale of the Debtor's Assets as described herein.  An orderly but expeditious sale of the Assets

is critical to maximizing recoveries for the Debtor's economic stakeholders.  Moreover, a timely

closing of a sale of the Assets is required under the DIP Facility, without which, the Debtor would

not be able to fund the Sale Process or continue its operations during the pendency of this Chapter

11 Case.

2.   **The Sale Noticing and Objection Procedures Are Appropriate and Comply with Bankruptcy Rules 2002 and 6004**

40.   Bankruptcy Rules 2002 and 6004 require the Debtor to notify creditors of the

proposed sale, provide a description of the Assets and disclose the time and place of the Auction,

the terms and conditions of any proposed Sale Transaction and the Objection Deadlines.  See Fed.

R. Bankr. P. 2002(a), 2002(c) and 6004(a).  The Sale Noticing and Objection Procedures set forth

above are reasonably calculated to provide all of the Debtor's known creditors and other parties in

28

interest with adequate and timely notice of all of the key dates, deadlines and other material information related to the Sale Process.  Further, publishing the Publication Notice in the *USA Today* is designed to capture any creditors and parties in interest not currently known to the Debtor. Accordingly, the Debtor requests that the Court approve the Sale Noticing and Objection Procedures as set forth herein, including the Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, and find that no other or further notice of the Bidding Procedures, the Auction (excluding the Auction results) or the Sale Hearing is necessary or required.

### 3.      The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Assets

41.      As set forth above, the Debtor believes that any Sale Transaction governed by the Bidding Procedures will yield a fair and reasonable price for the Assets.  The Bidding Procedures were designed to facilitate a competitive bidding process.

42.      The Debtor also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire Sale Process.  The Bidding Procedures provide an appropriate framework for the Debtor to review, analyze and compare bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of its bids for the benefit of all parties in interest.

43.      A Sale Transaction governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or best value for the Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties in interest in this Chapter 11 Case.

### 4.      The Bidding Procedures Ensure that the Sale Process Is Conducted in Good Faith and that the Ultimate Purchaser of the Applicable Assets

**Is Entitled to the Protections Afforded by Section 363(m) of the
Bankruptcy Code**

44.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's

assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale . . . were stayed pending
> appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies the "policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely."  Cumberland Farms Dairy, Inc. v. Abbotts Dairies of Penn., Inc.

(In re Abbotts Dairies of Penn., Inc.), 788 F.2d 143, 147 (3d Cir. 1986));  see also Reloeb Co. v.

LTV Corp. (In re Chateaugay Corp.), No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9

(S.D.N.Y. May 10, 1993); Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994)

("Section 363(m)  . . . provides that good faith transfers of property will not be affected by the

reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the

pendency of the appeal.").

45.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held

that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders

or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Abbotts Dairies,

788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978))

(other citations omitted); see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re

Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997).

46.     The Debtor submits that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  As set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  In addition, Lazard is an independent investment bank retained by the Debtor for the purpose of exploring strategic alternatives, marketing the Debtor's business and soliciting bids since May 2022.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Assets.  Any purchase agreement with a Successful Bidder executed by the Debtor will be negotiated at arm's-length and in good faith.  Accordingly, the Debtor seeks a finding that any Successful Bidder (including any Stalking Horse Bidder(s)) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

47.     Based on the foregoing, the Debtor submits that they have demonstrated that the proposed Sale Transaction is a sound exercise of the Debtor's business judgment and should be approved as a good faith transaction.

### C.  A Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code

48.     In the interest of attracting the best offers, the Court should authorize the Debtor to sell the Assets free and clear of any liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

RLF1 27624743v.1

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5); see also In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); In re Zeigler, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (same); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

49.     The Debtor anticipates that any Sale Transaction it elects to pursue will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the applicable Assets.  As an initial matter, the Prepetition Secured Parties, who are secured by liens on substantially all of the Assets (except for intellectual property of the Debtor, but including proceeds of such intellectual property), already have consented to the terms of the Bidding Procedures, and subject to the Bidding Procedures, will be an active participant in the sale process.  And any competing bid must be sufficient to pay off in full the Prepetition Secured Parties, unless they agree otherwise.  Additionally, any parties with junior liens on the Assets can be compelled to accept a money satisfaction of their interests, but also would be adequately protected by such liens attaching to the proceeds of the applicable Sale Transaction in the order of their respective priority.  Accordingly, the Debtor requests that the Court authorize the sale of the

Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

**D.  The Debtor's Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code**

50.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease.  See, e.g., In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . . .");  In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice).  In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

51.     Any proposed Sale Transaction will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment.  Assumption of any Contracts is an exercise of the Debtor's sound business judgment because the transfer of Contracts in connection with a Sale Transaction is an essential element in the Debtor's ability to maximize the value of the Assets—and, particularly so when a Contract is integral to the ownership or operation of the Assets to be acquired.  Further, the ability to assume and assign Contracts will

increase the likelihood that the Debtor will be able to sell the Assets as a going concern, thereby avoiding needless value-destruction through a liquidation.

52.     The consummation of any Sale Transaction involving the assignment of a Contract will be contingent upon the Debtor's compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults under the Contracts to be assumed be cured or that the Debtor provide adequate assurance that such defaults will be promptly cured.  See 11 U.S.C. § 365(b)(1).  The Debtor's assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of an applicable Sale Transaction.  As set forth above, subject to the Court's approval, the Debtor will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Debtor's good-faith calculation of the Cure Costs for each Contract that could be assumed in connection with a Sale Transaction.  Counterparties will have an opportunity to raise any Cure Objections in advance of the Sale Hearing.

53.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract."  11 U.S.C. § 365(f)(2).  While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case."  See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); see also In re Alipat, Inc., 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to

be defined by commercial rather than legal standards . . . [and] factual considerations").  While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance."  In re Carlisle Homes, Inc., 103 B.R. at 538 (citations omitted); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

54.    Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

55.    The Bidding Procedures expressly specify that for a bid to qualify as a "Qualified Bid," a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable obligations under any Contracts that may be included in the bid.  The Debtor will furnish all available Adequate Assurance Information to the relevant Counterparties as soon as reasonably possible following its receipt of such information.  Finally, any Counterparty that is dissatisfied with the content or quality of any relevant Adequate Assurance Information will have an opportunity to request additional information from the Debtor and, if necessary, lodge an Adequate Assurance Objection in advance of the Sale Hearing.  In light of the foregoing, the Debtor's assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

56.    Finally, in order to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Assets, the Debtor further requests that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[7]

## VI.    Requests for Immediate Relief & Waiver of Stay

57.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtor seeks a waiver of any stay of the effectiveness of the Bidding Procedures Order, any Sale Order and any other order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale Transaction.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

58.    As set forth above in the First Day Declaration, the relief requested herein is necessary and appropriate to maximize the value of the Debtor's Assets for the benefit of the Debtor's economic stakeholders.  Given the Debtor's precarious financial condition, its obligation to comply with the Milestones under the DIP Facility and the time-intensive nature of conducting

---

[7]    Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

a postpetition Sale Process from beginning to end, the relief requested herein should be granted and effective as soon as practicable. Any delay in the Sale Process could jeopardize the Debtor's chapter 11 strategy. Accordingly, the Debtor submits that ample cause exists to justify waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## NOTICE

59.     Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the United States Securities and Exchange Commission; (v) counsel for the Prepetition Secured Parties; (vi) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate; (vii) all persons and entities known by the Debtor to have asserted any lien on or encumbrance with respect to the Assets (for whom identifying information and addresses are available to the Debtor); and (viii) any other party entitled to notice pursuant to Bankruptcy Rule 2002 or order of the Court. The Debtor respectfully submits that no further notice of this Motion need be provided.

*[Remainder of Page Intentionally Left Blank]*

RLF1 27624743v.1

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>; (ii) and, after the Sale Hearing, the Sale Order, respectively, granting the relief requested in the Motion and (iii) grant such other and further relief to the Debtor as the Court may deem proper.

Dated:   July 14, 2022
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ J. Zachary Noble*

Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
David T. Queroli (No. 6318)
J. Zachary Noble (No. 6689)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
defranceschi@rlf.com
merchant@rlf.com
queroli@rlf.com
noble@rlf.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (*pro hac vice* pending)
Paul V. Shalhoub (*pro hac vice* pending)
Betsy L. Feldman (No. 6410)
Jessica D. Graber (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
rstrickland@willkie.com
pshalhoub@willkie.com
bfeldman@willkie.com
jgraber@willkie.com

*Proposed Co-Counsel to the Debtor and Debtor in Possession*