## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] | Case No. 22-10621 (BLS) |
| Debtor. | **Re: Docket No. 73** |

**DEBTOR'S OBJECTION TO MOTION OF DR. HESAAM ESFANDYARPOUR, PH.D. AND DR. KOSAR PARIZI, PH.D. TO (I) DISMISS THE CHAPTER 11 CASE OR (II) IN THE ALTERNATIVE, APPOINT A CHAPTER 11 TRUSTEE**

The above-captioned debtor and debtor in possession (the "Debtor") hereby objects (the "Objection") to the *Motion of Dr. Hesaam Esfandyarpour, Ph.D. and Dr. Kosar Parizi, Ph.D. to (I) Dismiss the Chapter 11 Case or (II) in the Alternative, Appoint a Chapter 11 Trustee* [Docket No. 73] (the "Motion" or "Mot.").

### PRELIMINARY STATEMENT[2]

1.     Far from a case that should be dismissed, this case is the posterchild for when Chapter 11 is necessary, useful, and appropriate.  When the case was commenced, the Debtor was in default to its secured lender.  As the First Day declarations disclosed, the timing of the filing was driven by the fact that payroll could only be funded on July 13, 2022 with the lender's consent, and the lender would only allow access to additional restricted cash to fund payroll with the protections of DIP financing.  Thus, to put itself in a position to pay employees rather than laying them off, and to maximize value for the benefit of all of its stakeholders, the Debtor commenced this Chapter 11 Case prepared to run a prompt Section 363 sale process.  The

---

[1]     The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is GenapSys, Inc. (3904).  The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City, CA 94063.

[2]     Capitalized terms not defined in this Preliminary Statement have the meaning set forth in the Statement of Facts.

Debtor's Board is composed of a majority of directors not affiliated with any bidder; five of the seven directors have no ties to any potential bidder. Indeed, and ironically, one of the two directors who does appear to have such ties to a potential bidder is one of the two movants, Dr. Hesaam Esfandyarpour (the "Founder").[3] The Debtor also has a Special Committee of independent directors. In this Chapter 11 Case, the Debtor is pursuing a sale process with no pre-ordained stalking horse, so it cannot be credibly argued that any party is being favored.

2. Unfortunately, any sale is unlikely to leave anything for common stockholders. Thus, the Founder, who owns a substantial portion of the common stock (the "Common Stock," and the holders thereof, the "Common Stockholders"), is attempting to block a sale with some ill-conceived notion that doing so can somehow save his equity investment. All of the Board members other than the Founder understand that a director's gambling the creditors' recoveries for a Hail Mary for a recovery on the director's own stock is a breach of fiduciary duty. It is unfortunate that the Founder lacks this understanding.

3. The Founder's Motion is meritless because the bankruptcy filing was validly authorized by the Company's board of directors. In the Chancery Court Ruling, the Chancery Court determined that there were three directors: (1) Robert Zollars, an independent director; (2) Harish Soundararajan, a Series D director; and (3) the Founder, as a common director. That ruling was premised on, *inter alia*, a holding that the Founder had previously contracted away his right to vote any shares (directly or indirectly) for the appointment, election or removal of any directors, and such contract was valid, enforceable and could not be nullified. Indeed, the Chancery Court found that the very point of the contract was that the investors and the

---

[3] There are two Movants: Dr. Esfandyarpour and his wife, Dr. Kosar Parizi (collectively, "Movants"). Movants misleadingly refer to themselves as "the Founders" despite the fact that only Dr. Esfandyarpour in fact founded the Company and all of the Debtor's corporate records refer to him, and only him, as the Founder. This Objection uses the correct terminology, such that "the Founder" refers solely to Dr. Esfandyarpour and "Movants" refers to both Dr. Esfandyarpour and Dr. Parizi (who is his wife).

2

Company's directors at the time of contracting had determined it was necessary to "sideline" the Founder as a result of his mismanagement of the Company, including subjecting himself and the Company to allegations of serious fraud by one of the Company's preferred stockholders.  As part of the Founder's contractual agreement, he agreed to provide a proxy to vote his shares to the Company's independent directors, including current director Robert Zollars. And the Founder agreed in a voting agreement that his successor as CEO, Jason Myers, would be one of the common directors of the Company.

4.      Yet on July 9 and 10, the very weekend following the Chancery Court Ruling which rejected the Founder's attempt to wrest control of the Company, the Founder renewed his attempted coup and purported to designate two additional directors as common directors—the very same two directors that the Chancery Court had just the day before held could not be added to the Board by the Founder.  He later sought to add a Series B director (again, another director the Chancery Court had rejected) based on a written consent from a shareholder that can only be described as dubious, both because it purported to cast votes that shareholder (Jem Management) does not control and because it was fraught with irregularities (such as name misspellings) casting serious doubt over its validity.  The Founder then purported to name himself as Interim CEO and to fire the Company's management.  Just as in the Chancery Court Action, these acts were premised on attempted breaches of contract, including an attempt to nullify a proxy that the Chancery Court determined was part of a valid and enforceable contract.

5.      The Company was therefore required to act swiftly to protect its ability to seek Chapter 11 protection in the interests of *all* of its stakeholders.  As discussed further below, the bankruptcy filing was validly authorized:

- Soundararajan (the Series D director) and Zollars (as an Independent Director) were both confirmed as valid board members by the Chancery Court;

3

- The Company's common stockholders, including through use of the proxy held by Zollars in the Side Letter Agreement (defined below), voted 57% of the common shares of the Debtor by written consent to remove the Founder's designees and appoint two common directors, Myers (as the CEO of the Company) and Fredrik Eliasson, and reappointed the Founder as a common director not sitting in the CEO Director seat, because he has not been the CEO of the Debtor for more than a year;

- Zollars, as the Company's Independent Director, appointed Loretta Cecil as another Independent Director of the Board to fill a seat left vacant by Fred Nazem pursuant to the Vacancy Provision (defined below) set forth in Section 3.2.1 of the Debtor's Charter; and

- The Company's Series C stockholders voted 71% of the Series C shares by written consent to elect a director, Hamid Moghadam, to the Board pursuant to the Debtor's Voting Agreement (defined below) entered into in connection with its most recent Series D financing round.

6.     In sum, after the Chancery Court Ruling, and the above actions were taken, the Board had seven members, with the Founder holding one seat.  After the Founder's breaches of contract were corrected, the properly constituted Board met on July 11 to authorize the filing of this Chapter 11 Case, and validly authorized the bankruptcy filing.  Each of the directors who were appointed after the Chancery Court Ruling had been on the Board for over a year and were intimately familiar with the serious issues facing the Company as well as the harm that the Founder was inflicting on the enterprise.  The timing of the meeting was driven by the exigencies of the situation.  Had the Board waited another day as the Founder now cavalierly suggests it should have, the Company would have been unable to fund its payroll without consent from its lender.

7.     While the Founder complains about notice, he appeared at the July 11 meeting and had an opportunity to be heard if he so wished; his arguments to the contrary are false and disingenuous.  Thus, under Delaware law, notice was waived.  And in any event, to eliminate any doubt, the Board met again on July 12 and ratified the prior day's Resolutions (as defined

4

below) and ratified the CFO's authority to sign the Petition.  Because notice of that meeting was obviously sufficient, Movants argue that ratification was impossible because the July 11 Board Meeting was void, but Movants are dead wrong on the law of ratification.  In short, the filing was validly authorized.

8.     The Founder cannot prevail using the same playbook he just ran in the Delaware Chancery Court.  There, to thwart the Debtor from negotiating financing or an investment which would dilute him, he sought to appoint by shareholder written consent a new slate of directors to replace board members *that he helped choose, voted to appoint, and then sat with for months without complaint*.  The current Motion is more of the same.  The Founder's own efforts over the weekend of July 9-10 to elect an alternative slate of directors (the same slate the Chancery Court held he could not elect) were invalid and brazenly breached a Voting Agreement and Proxy.  And rather than actually addressing the Debtor's problems – a severe and immediate liquidity crisis and a lack of an investor willing to provide cash immediately without a bankruptcy – the Movants try to undercut the Debtor's ability to effectuate a sale by arguing that the Debtor lacked authority to file the Chapter 11 Case.

9.     The Founder's arguments are especially absurd because, contrary to his arguments before this Court, the Founder has treated the bankruptcy filing as validly authorized in other judicial proceedings.  In an action captioned *Foresite Capital Fund IV, L.P. v. GenapSys, Inc. and Hesaam Esfandyarpour, Ph.D.*, Case No. 20CV367305 (the "California Action"), one of the Company's Series C preferred stockholders, Foresite Capital Fund IV, L.P. ("Foresite") has brought a claim against the Founder and the Company, alleging that the Founder has engaged in serious fraud, including through data manipulation and financial fraud.  That action is ongoing and, on August 1, 2022—one week after the Founder filed the motion to

5

dismiss in this Court, he filed a motion in the California Action arguing that the bankruptcy stay should be extended to him to protect him from the litigation with Foresite.   By expressly seeking the benefits of the automatic stay, he has admitted that this Chapter 11 Case is valid and authorized.  He even cites a purported need to protect this Court's jurisdiction.[4]  It is remarkable that he did not disclose his affirmative use of the Chapter 11 filing either to this Court or the Superior Court in California.  Judge Kulkarni in the California Action has already observed that it was troubling that the Founder had not informed him of the Motion to Dismiss the bankruptcy and has advanced the date of the hearing on the Founder's motion to stay the California Action as a consequence of the bankruptcy from October 6, 2022 to September 8, 2022.  ***The Founder cannot be permitted to treat the bankruptcy as a valid act in some jurisdictions and not others***. That fact alone should result in denial of the Motion to Dismiss.

10.     The Motion's other arguments are equally specious.  Not only is this case not a "bad faith" filing, but it was the only way the Board could preserve value.  It is the Movants who are acting in bad faith by trying to thwart a sale process for their own selfish reasons and without any plan for preserving value, while at the same time seeking to capitalize on the automatic stay. This, not any action of the Board, is in bad faith.  Nor should a trustee be appointed.  The only Board member who has been accused of fraud is the Founder (as described below), and there is no credible argument that any Board member who approved the filing did so in breach of his or her fiduciary duties or is doing anything other than exactly what they should be doing: acting in good faith to enable a sale of the Debtor to the highest bidder, including the one preferred by the Founder.

---

[4]     *See* Ex. 1 (Stay Motion) at 5 ("a ruling that the automatic stay does not apply to all of the causes of action in this litigation would likely invade the bankruptcy court's jurisdiction over the debtor and the debtor's assets.").

11.     Accordingly, the Court should deny the Motion with prejudice and help pave the path towards a value maximizing sale.

## STATEMENT OF FACTS

**A.     The Debtor's Board of Directors.**[5]

12.     Because the Movants make numerous baseless allegations regarding the motivations and interests of members of the Board of Directors (the "Board") of the Debtor, the Debtor provides here a background on the individuals who are overseeing the Debtor's business and affairs and are seeking to maximize value for its stakeholders.  With the possible exceptions of the Founder and Dr. Harish Soundararajan, who is an Investment Director at Farallon Capital Management (an investor in the Series D Preferred Stock and a party that may be interested in participating in the sale process), none of the directors stands to gain personally from the bankruptcy process and none is affiliated with any purchaser or participant in the sale process. Moreover, to further ensure the integrity, efficiency and effectiveness of the sale process, the Board established a special committee consisting solely of disinterested directors with substantial experience to oversee the sale process and to address other matters (the "Special Committee"), which does not include Mr. Soundararajan.[6]  Importantly, Mr. Soundararajan voted in favor of the Chapter 11 filing and abstained only from the resolution relating to the sale process.

13.     Mr. Robert Zollars (the "Chairman" or "Zollars") is the Chairman of the Board. Zollars has led eleven healthcare companies, ranging in size from $100 million to over $5 billion in revenue, as president or CEO.  He is an experienced board member, and serves on the boards of Change Healthcare, Recuro Health, Five9, Kate Farms, and Parata Systems.  He joined the

---

[5]     *See* Ex. 2 at 4–5 (Defs' Pretrial Brief, Chancery Court 225 Action (MTZ)); Ex. 3 (https://www.prologis.com/who-we-are/leadership/hamid-r-moghadam); Ex. 4 (https://www.faralloncapital.com/our-people/harish-chandra-soundararajan).

[6]     The members of the Special Committee are Robert Zollars, Fredrik Eliasson, and Ms. Loretta Cecil.

7

Board in October 2020, and he served on the Company's Compensation Committee, of which he was the Chairperson, and its Nominating and Governance Committee and Finance and Risk Committee.   He is a member of the Special Committee.

14.    Dr. Jason Myers (the "CEO" or "Myers") is a biochemist with a Ph.D. from Stanford and the CEO of the Debtor.  He has over twenty years of experience in genomics and product development.   Prior to his current role, Myers was cofounder and CEO of ArcherDX, which was acquired by Invitae.   Before that, he led development for Ion Torrent™, where his leadership contributed to its acquisition by Life Technologies and ultimately by Thermo Fisher. Myers joined the Company as CEO in February 2021.

15.    Mr. Fredrik Eliasson has over twenty-five years of executive and senior leadership experience.   He is currently EVP and CFO at Change Healthcare, a healthcare technology company that offers software, analytics, and network solutions services.   Eliasson began to serve on the Board in March 2021.   He chaired the Company's Audit Committee and served on the Finance and Risk Committee.   He is also a member of the Special Committee.

16.    Ms. Loretta Cecil has over thirty years of executive and leadership experience in the healthcare and technology industries.   She is currently EVP and General Counsel for Change Healthcare.   She previously served as SVP and General Counsel for McKesson, one of the largest healthcare companies in the world.   Cecil joined the Board in May 2021.   She served on the Company's Nominating and Corporate Governance Committee and the Finance and Risk Committee, and she is a member of the Special Committee.   Cecil, together with Eliasson, and Myers, were unseated as directors in the Chancery Court Ruling (defined below) before being reelected (as described below).

8

17.     Mr. Hamid Moghadam is the founder, Chairman, and CEO of Prologis, Inc., the largest logistics real estate company in the world.  Moghadam is a trustee emeritus of Stanford University and currently serves on the boards of Stanford Management Company (former Chair), Stanford Health Care and the Stanford Graduate School of Business.  Previously, he served as a trustee and as a member on the board's executive committee for the Urban Land Institute, Chairman of NAREIT and REITPAC, and as a member of several other philanthropic, community, and corporate boards.  Moghadam received the 2013 Ernst & Young National Entrepreneur of the Year Overall Award and is a recipient of the Ellis Island Medal of Honor. He has been named CEO of the Year and received multiple lifetime achievement awards from leading publications and industry organizations, including Harvard Business Review, which in their latest rankings, voted him as the #17 Best Performing CEO in the world.  Mr. Moghadam received an MBA from the Stanford Graduate School of Business and a Bachelor and Master of Science in engineering from Massachusetts Institute of Technology.  Moghadam has served on the Company's Board from approximately December 2017 to June 2020, again from approximately October 2020 to September 2021, and he rejoined the Board in July 2022 as the Series C director.

18.     Dr. Harish Soundararajan is an Investment Director at Farallon Capital Management.  Previously, Soundararajan was an Engagement Manager at McKinsey and Company.  Prior to McKinsey, Soundararajan completed his post-doctoral fellowship at Wyss Institute for Biologically Inspired Engineering at Harvard Medical School.  He obtained his Ph.D. in Biological Science from University of Cambridge (Trinity College), UK, and his B.Eng. (First Class with Distinction) in Electronics and Communication Engineering from Anna University, India.  Soundararajan joined the Board as a Series D director in February 2021.

9

19.    The Founder founded the Company in 2010 and served as the CEO until February 2021 and the Chairman of the Board until November 2021.  He is a holder of a minority of the Company's outstanding Common Stock.  As shown below, the Founder has been sued for fraud by investor Foresite in California; has been accused of fraudulent inducement by another of the Debtor's investors in a deposition in the Chancery Court Action; and appears to have generated a false written consent in the events leading up to the disputes at the heart of the issues presented by the Motion.

**B.    The Founder's Voting Agreement.**

20.    On March 29, 2022, in a transparent effort to derail a potential financing to which he objected for self-interested reasons, the Founder commenced an action (the "<u>Chancery Court Action</u>") in the Court of Chancery of the State of Delaware (the "<u>Chancery Court</u>") under Section 225 of the Delaware General Corporation Law (the "<u>DGCL</u>") against the Debtor and certain individuals serving as directors.  In the Chancery Court Action, the Founder sought to elect his own slate of directors, to remove the majority of the Company's directors, and contested the validity of the election of a majority of directors under Delaware law, even though he undisputedly personally appointed them, previously executed agreements and consents acknowledging the proper composition of the Board, and treated them as directors at all points until he sought to remove them through the Chancery Court Action.  On July 8, 2022, the Chancery Court issued its post-trial rulings (the "<u>Chancery Court Ruling</u>") in the Chancery Court Action.[7]

---

[7]    References to the Chancery Court Ruling ("Tr. Ruling") herein refer to <u>Ex. L</u> to the Motion.

21.    The Chancery Court Ruling included several findings related to a voting agreement between the Founder and the Debtor dated November 28, 2020 (the "Side Letter Agreement") that restricts the Founder's ability to appoint directors to the Board.[8]

22.    The Chancery Court described the troubles arising from the CEO's management of the Company that led the independent directors serving at the time to procure contractual protection in the form of the Side Letter Agreement, which was necessary to diminish the Founder's influence and control over the Debtor in an effort to induce investment (Tr. Ruling 7:3–18):

> 2020 was a difficult year for GenapSys.  Chief among the [C]ompany's troubles was litigation in California, which I'll call the "Foresite litigation."  In June 2020, Foresite Capital, one of the [C]ompany's Series C investors, filed an action in California state court in which Foresite is presently alleging [the Founder] fraudulently induced its investment through data manipulation designed to cast the [C]ompany's technology in a more favorable light.  See JX 809.  The Foresite litigation indisputably cast a cloud over GenapSys and more troubles followed.  The [C]ompany lost the support of Oxford, its lender.  JX 45 and JX 48.  In October 2020, its auditor resigned.  JX 42.  And around this time, its D&O insurance provider also dropped the [C]ompany.[9]

23.    The Chancery Court thus observed that in 2020, "GenapSys, in financial and legal turmoil, needed cash, and its directors other than plaintiff [i.e., the Founder] found it necessary **to sideline its founder** to placate investors and to facilitate the cash infusion" (Tr. Ruling 14:16–20) (emphasis added).  Investors "wanted to be assuaged that [the Founder] could not appoint his own slate of directors." (Tr. Ruling 47:1–2).  As a result, the Debtor and the Founder executed

---

[8]    The Side Letter Agreement is Ex. A to the Motion, but it is an unexecuted version, so the Debtor attached the fully executed Side Letter Agreement as Ex. 5.

[9]    *See* Ex. 6 (Foresite Amended Complaint, JX 809); Ex. 7 (Email to Moghadam, et al. from Zollars re Search Companies, JX 45) and Ex. 8 (Email from Founder to Zollars; Nazem; Moghadam re Fwd: Notice of Events of Default, JX 48); Ex. 9 (Email from Nazem to Founder cc Zollars; Moghadam re Fwd: Rescinding Engagement Letter with attachments, JX 42).

11

the Side Letter Agreement.   The Chancery Court found that the Side Letter Agreement was

intended to:

> minimize[e] [the Founder's] influence on the [C]ompany.  He may not
> communicate with potential investors without the express approval or
> participation of an independent director.  He resigned as an employee and
> CEO.   He assigned his proxy, and he waived, relinquished, and
> quitclaimed any interest in all of the [C]ompany's IP, including any IP that
> he developed.

(Tr. Ruling 46:10–18).  The Company and the Founder used the Side Letter Agreement to induce

investment in its Series D financing round, including from Farallon Capital.

24.     Section 4(a) of the Side Letter Agreement (the "Voting Restriction") "prohibits

[the Founder] from using his voting power to appoint, elect, or remove board members" (Tr.

Ruling 10:9–15).  It reads:

> Except with respect to the Board Right,[10] Esfandyarpour shall not exercise
> any voting or consent right, including any super-majority or similar voting
> or consent right, [with] respect to any shares of capital stock of the
> Company (the "Shares"), whether such shares are held directly or
> indirectly (including pursuant to a trust) or by a third party, with respect to
> the appointment, election or removal of any member of the Board (or any
> committee thereof) (collectively, the "Matters").

25.     The Chancery Court held that "under California and Delaware law, Section 4(a)'s

Voting Restriction is an enforceable promise that can be breached, but not revoked" (Tr. Ruling

43:2–4) and further that the Voting Restriction "obviates [the Founder's] director appointment

and removal rights" (Tr. Ruling 47:10–18).

26.     Section 4(b) of the Side Letter Agreement (the "Proxy") appoints a majority of

the Company's independent directors (as defined therein) or a sole remaining independent

---

[10]    "Board Right" was defined the Side Letter Agreement as: "[the Founder] shall have the right to remain on the
Board for so long as [the Founder] holds at least 5% of the Company's outstanding capital stock."

director as the Founder's proxyholder, empowered to vote his shares.  By its plain language, it creates an "irrevocable proxy" (Tr. Ruling 11:1–12:10).  It reads:

> To secure Esfandyarpour's obligation to vote or provide a consent with respect to the Shares in accordance with this Agreement, Esfandyarpour hereby appoints Proxyholder with full power of substitution and re-substitution, as Esfandyarpour's sole, exclusive, true and lawful attorney in fact and irrevocable proxy, for and in Esfandyarpour's name, place and stead, to vote or provide a consent with respect to the Shares and the Rights (as defined below) as Esfandyarpour's proxy, at any annual, special or other meeting of the stockholders of the Company called to vote on any of the Matters, and with respect to any written consent of stockholders (including any subset of stockholders). The proxy and power granted by Esfandyarpour pursuant to this Section 4(b) are coupled with an interest and are given to secure the performance of Esfandyarpour's duties under this Agreement…  For purposes of this Agreement, the 'Proxyholder' means the Board acting solely through the [] majority of the Independent Directors, or if there is only one Independent Director in office, the prior written consent of such sole Independent Director (in either case, the "Independent Director Majority").

27.    At trial in the Chancery Court, the Founder argued that he had revoked the Voting Restriction and Proxy in Section 4 *in toto*.  The Chancery Court held that the Founder "offered no evidence" in support of the argument that he could do so.  The Chancery Court also noted that the Founder "evaded giving any substantive answers when asked whether the side letter agreement contained a voting agreement in addition to a proxy" (Tr. Ruling 39:12–40:1).[11]

28.    The Founder also argued that Section 4 was an improper entrenchment device designed to perpetuate the independent directors in office.  The Chancery Court concluded the Founder "has fallen well short" of proving this argument, holding that "a preponderance of the credible evidence -- indeed, nearly all the evidence -- shows [the independent directors] understood the side letter agreement was necessary to attract investment" (Tr. Ruling 48:7–9, 49:21–50:3).

---

[11]    Ex. 10 (Trial Transcript at 141, 142, 144, and 145).

13

29.     In contrast to the Founder's evasive testimony, the Chancery Court found that "Zollars credibly testified" that the directors "were just as happy to resign if [the Founder] did not agree to reduce his influence" (Tr. Ruling 50:4–14) and two of them did resign.[12]

30.     In sum, "[the Founder] offered no evidence of an entrenchment motive at all. There is no evidence in the record that supports the conclusion that the side letter agreement was designed to entrench the other directors.  Plaintiff has utterly failed to establish the side letter agreement was motivated solely or primarily by the board's desire to entrench themselves" (Tr. Ruling 50:15–22).

31.     Accordingly, the Chancery Court concluded that the Founder's written consents (Mot. Exs. G–I), in which he attempted to vote shares he held directly and indirectly, and shares held by third parties, were invalid because he lacked the power to vote those shares due to the Proxy (Tr. Ruling 51:9–11, 51:21–23).  Embedded in the Chancery Court's ruling that the Founder lacked the *power* to vote those shares is the clear conclusion that the provisions of Section 4 are valid.

32.     As described further below, the Chancery Court additionally determined that certain of the Company's directors—Jason Myers, Fredrik Eliasson, Diana McKenzie, and Loretta Cecil—had not met the technical requirements to be validly appointed under the Debtor's Amended and Restated Certificate of Incorporation (the "<u>Charter</u>").

**C.     Background on the Manner of the Election of the Debtor's Directors, Board Composition and Voting Agreements.**

33.     As permitted by the DGCL (which only provides default rules which may be freely modified), Section 18 of the Debtor's Bylaws addresses the filling of vacancies when a class is entitled to elect a director.  It provides:

---

[12]     Ex. 10 (Trial Transcript at 223–26).

> Unless otherwise provided in the Certificate of Incorporation, . . . whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the Certificate of Incorporation, vacancies and newly created directorships of such class or classes or series shall, unless the Board of Directors determines by resolution that any such vacancies or newly created directorships shall be filled by stockholders, be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

34.     In connection with the Debtor's Series D financing in or around February 2021, the Charter provided for a total of nine directorships elected or appointed as follows: one director elected by the holders of the Series B Preferred Stock, voting as a separate class; one director elected by the holders of the Series C Preferred Stock, voting as a separate class; two directors elected by the holders of the Series D Preferred Stock, voting as a separate class; three directors (one of which is required to be the acting CEO) elected by the holders of Common Stock, voting as a separate class; and two directors elected by the holders of Common Stock and Preferred Stock, voting as a single class on an as-converted basis (Tr. Ruling 19:2–5, 26:16–20, 27:2–16).[13]

35.     In approving the Series D financing, the Board adopted resolutions filling five of these seats, leaving four seats vacant. The corresponding stockholder consent for the Series D financing approved the same five designated directors and vacancies.[14]

36.     Section 3.2.1 of the Charter contains provisions that address how vacancies are filled.  One provision (the "Vacancy Provision") provides that designated directorships that have never been filled by stockholders (i.e., the four initial vacancies) shall remain vacant until stockholders fill the vacancy (Tr. Ruling 19:19–20:2).[15]  It reads:

---

[13]     Ex. 11 at 5 (2/5/2021 Written Consent and Board Resolution).

[14]     Ex. 11 at 3.

[15]     The Charter is Ex. B to the Motion.

If the holders of shares of Preferred Stock or Common Stock, as the case may be, fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this Section 3.2.1, then any directorship not so filled shall remain vacant until such time as the holders of the Preferred Stock or Common Stock, as the case may be, elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by stockholders of the Corporation other than by the stockholders of the Corporation that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class.

37.    Another sub-provision of Section 3.2.1 (the "Director Designation Provision") provides that if stockholders of any classes or series have previously filled a designated Board seat and thereafter that seat becomes vacant, then that vacancy shall be filled by stockholders of such classes or series **or** by any remaining director elected by the stockholders of such classes or series (Tr. Ruling 16:20–17:5).  The Director Designation Provision provides:

Except as otherwise provided in this Section 3.2.1 [i.e., the Vacancy Provision], a vacancy in any directorship filled by the holders of any class or classes or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or classes or series or by any remaining director or directors elected by the holders of such class or classes or series pursuant to this Section 3.2.1.

38.    The Company's Amended and Restated Voting Agreement (the "Voting Agreement") provides that the stockholders party thereto agreed to vote for or consent to the election of designees of one or more specified parties, including two "Independent Directors," which would initially be Zollars and Nazem (Tr. Ruling 18:19–24).[16]  As described further below, the Voting Agreement further provides that the stockholders party thereto would vote for or consent to the election of the Company's CEO as one of the Company's three common directors, and included contractual obligations for removing the Founder as the CEO Director and replacing him when the Founder ceased to be the CEO.  The parties to the Voting Agreement

---

[16]    The Voting Agreement is Ex. D to the Motion.

16

-- which included the Founder -- collectively held a sufficient number of votes of the Debtor's stock to cause the election of the Debtor's nine authorized directorships.

39.     The Founder's voting rights are further governed by the Side Letter Agreement. As described above, the Side Letter Agreement's purpose was to divest the Founder of the power to appoint his own slate of designees.  The Chancery Court stated: "[t]he text of the voting restriction is plain.  [The Founder] 'shall not exercise any voting or consent right . . . with respect to the appointment, election or removal of any member of the Board'" (Tr. Ruling 46:3–7, 47:1–4).

40.     In connection with the Series D financing in February 2021, the Board set the number of directorships at nine and allocated the right to appoint directors among stockholder classes (Tr. Ruling 26:8–11).  At that time, five directors were elected by the stockholders and four seats were left vacant (Tr. Ruling 19:2–13).  Those seats were designated as follows:

| The Debtor's February 2021 Board | |
|---|---|
| Series B | Initially Vacant |
| Series C | Moghadam |
| Series D-1 | Soundararajan |
| Series D-2 | Initially Vacant |
| Independent-1 | Zollars |
| Independent-2 | Nazem |
| CEO Common-1 | The Founder |
| Common-2 | Initially Vacant |
| Common-3 | Initially Vacant |

41.     Between February and May 2021, the Board, including the Founder, believed it had appointed four additional directors to the Board by unanimous written consents drafted by the Debtor's outside counsel at Paul Hastings LLP—all while the Founder served as Chairman of the Board and before the Debtor had hired a General Counsel.  "[The Founder] served alongside the 2021 appointees in the boardroom, never questioning the validity of their appointment or their ability to take corporate action as directors" (Tr. Ruling 22:14–17).

17

42.    In March 2022, the Debtor received a term sheet for equity financing from Farallon and a settlement term sheet from Foresite.  Concerned that the financing and settlement would dilute himself, Parizi (the Founder's wife) and their affiliated trusts, the Founder filed the Chancery Court Action to stop the Debtor's financing and settlement efforts.[17]  Rather than objecting to the substantive terms of the proposal, the Founder pursued an indirect path to block the financing by attempting to install his own slate of directors, removing the directors he had previously voted to appoint, and challenging the validity of the directors to act on behalf of the Company.

43.    After trial, as discussed above, the Chancery Court concluded that Section 4(a) of the Side Letter Agreement was enforceable and that the Founder's written consents to appoint his own slate of directors breached that provision and were therefore a nullity.  The Chancery Court further held, however, that the Board's unanimous written consents electing the prior 2021 appointees were invalid because the vacant seats were purportedly filled by the entire Board (including the Founder) instead of by the elected directors of the same class or series or the stockholders, as required by the Vacancy Provision (Tr. Ruling 30:16–31:11).  Notably, the Chancery Court acknowledged that "everyone involved," including the Founder, believed that their appointments were appropriate and that they had "participated in multiple board meetings, voted on numerous issues, and devoted significant time and energy to the business and affairs of GenapSys."  (Tr. Ruling 34:5–35:22).  The Chancery Court specifically determined that the Founder treated them as "directors until filing this action."  (*See id.* & 29:8–33:15).

---

[17]    Ex. 12 at 19(E) (5/3/22 Aff. of HE).

44.     Thus, the Chancery Court concluded that as of **July 8, 2022**, there were three validly designated directors—the Founder, Soundararajan, and Zollars—and six vacancies.  The following table indicates who can fill each vacancy:

| The Debtor's July 8, 2022 Board | | Who Can Fill Vacancy? |
| --- | --- | --- |
| Series B | Initially Vacant | Stockholders |
| Series C | Initially Filled; Vacant by Resignation | Stockholders |
| Series D-1 | Soundararajan | N/A |
| Series D-2 | Initially Vacant | Mutually designated by Farallon and Founder and acceptable to the Board |
| Independent-1 | Zollars | N/A |
| Independent-2 | Initially Filled; Vacant by Resignation | Zollars or Stockholders |
| CEO Common-1 | The Founder | N/A |
| Common-2 | Initially Vacant | Stockholders |
| Common-3 | Initially Vacant | Stockholders |

45.     As detailed below, after the Chancery Court Ruling, four of the vacancies were filled.  As a result, as of **July 11, 2022, and prepetition**, the Debtor's Board consisted of seven directors and two vacancies:

| The Debtor's Current Board | |
| --- | --- |
| Series B | Vacant |
| Series C | Moghadam |
| Series D-1 | Soundararajan |
| Series D-2 | Vacant |
| Independent-1 | Zollars |
| Independent-2 | Cecil |
| CEO Common-1 | Myers |
| Common-2 | Eliasson |
| Common-3 | The Founder |

**D.      July 8-9 – The Founder Attempts to Seize Control in Breach of Contract, and New Common Directors Are Appointed.**

46.     As shown above, when the Board created 9 directorships in February 2021, the Founder initially held the Common seat reserved for the CEO (the "<u>CEO Director</u>").  But the

parties to the February 2021 Voting Agreement had agreed that if the Founder ever ceased to serve as the Debtor's CEO, they would vote their respective shares to remove the Founder from the CEO Director seat, elect the new CEO as the CEO Director, and elect the Founder (if he still was a stockholder) as a Common Director.  Section 1.2(e) of the Voting Agreement reads:

> As one (1) of the Common Directors, the Company's acting Chief Executive Officer (the "**CEO Director**"), who shall initially be Hesaam Esfandyarpour, Ph.D (the "**Founder**"); provided that if for any reason the CEO Director shall cease to serve as the Chief Executive Officer of the Company, each of the Stockholders shall promptly vote their respective Shares (i) to remove the former Chief Executive Officer of the Company from the Board as the CEO Director (if such person has not resigned as the CEO Director); provided that, if the Founder ceases to serve as the Chief Executive Officer of the Company but continues to hold any shares of the Company's outstanding capital stock, he shall, at his sole election, be appointed to the Board as a Common Director pursuant to Section 1.2(f), or designate another individual to be appointed to the Board as a Common Director pursuant to Section 1.2(f) and shall remain as the Chairperson of the Board until the earlier of (A) November 28, 2021 and (B) the date he resigns from the Board; and (ii) to elect the new Chief Executive Officer of the Company as the new CEO Director.

47.     The Founder ceased to be the Debtor's CEO in mid-February 2021, and Myers began to serve as the Debtor's CEO (Tr. Ruling 20:10).  Myers continues to be the CEO today.

48.     The Voting Agreement also specifies how the other two Common seats are filled. Section 1.2(f) of the Voting Agreement provides:

> As the other two (2) Common Directors, two persons to be designated by the Key Holders holding a majority of the outstanding shares of Common Stock (excluding Common Stock issued or issuable upon conversion of the Preferred Stock) then held by all Key Holders, which director seats shall initially be vacant; provided that, if the Founder resigns or is removed as the CEO Director in accordance with Section 1.2(e) but continues to hold any shares of the Company's outstanding capital stock, then promptly following the Founder's written request each of the Stockholders shall vote their respective Shares to appoint the Founder, or another individual designated by the Founder, to the Board as a Common Director pursuant to this Section 1.2(f).

20

49.     The Founder and Parizi are parties to the Voting Agreement and Key Holders (as defined therein), as are their affiliated trusts,[18] yet they have refused to comply with the Voting Agreement.[19]

50.     Notwithstanding the fact that the Founder and Parizi were obligated to vote their shares to elect Myers as the CEO Director, on July 8, 2022,[20] in an attempted end run around the Chancery Court Ruling, the Founder purported to designate Rategh and Maney (the "Founder's Common Designees") to the two Common vacancies under the Director Vacancy Provision (Mot. ¶ 34).  These are the same two individuals that the Founder had unsuccessfully tried to appoint to the Board but were rejected by the Chancery Court because the Founder's actions violated the Side Letter Agreement.  As is shown in the argument section below, the Founder's second bite at the apple—this time by invoking the Director Vacancy Provision—is equally invalid because he does not have that power, and his attempt to do so is in breach of the Voting Agreement in any event.  *See infra* § II (B)(I).  This is merely an open attempt to seize control of the Board and to fire Myers as the CEO, thus rendering his contractual obligation to vote Myers as the CEO Director a nullity.  This is directly contrary to everyone's expectations—the investors, the Company's directors, and its incumbent management—all of whom had been promised that the Founder would be "sidelined" as a condition to any investment.  (Tr. Ruling 14:16-20).

51.     It was therefore appropriate and necessary for the Company to take measures to preserve the contracted-for expectations of the Company's investors, and to protect the interests of all of the Company's stakeholders.  In particular, the Company desperately needed relief that

---

[18]    Mot. Ex. D at Preamble, Schedule B, and 6.17.

[19]    Mot. Ex. Q.

[20]    The Written Consent purports to have been executed on July 8 but was delivered to the Debtor's General Counsel on July 9.

only bankruptcy courts can afford—which the Company had previewed might be necessary during the Chancery Court Action.   Thus, pursuant to Section 3.2.1 of the Charter and as required by the Voting Agreement, on July 9, 2022, by written consent (the "<u>Common Director Written Consent</u>"), the stockholders listed in the chart below, constituting a requisite majority, removed the Founder as the CEO Director, elected Myers as the CEO Director, elected Eliasson as the second Common Director, and elected the Founder as the third Common Director.[21]

| Stockholder | Date | Percent of Common |
|---|---|---|
| Hesaam Esfandyarpour by proxy | 7/9/2022 | 31% |
| The Cyrus the Great Trust by proxy | 7/9/2022 | 10% |
| The Venus the Great Trust by proxy | 7/9/2022 | 10% |
| The Moghadam 2012 Dynasty Trust, Dated December 18, 2012 | 7/9/2022 | 6% |
| | | Total     57% |

52.     Movants contend, without any explanation, that the Proxy did not extend to the Founder's Cyrus the Great Trust and Parizi's Venus the Great Trust (Mot. ¶¶ 37, 78).   The Founder's assertion ignores the plain language of the Side Letter Agreement.

53.     Pursuant to the Side Letter agreement, Zollars (defined therein as the "<u>Proxyholder</u>") had an irrevocable proxy to vote any shares held *directly or indirectly* by the Founder with respect to the appointment, election, or removal of any Board members (defined therein as the "<u>Matters</u>"), and to provide "any written consent of stockholders."[22]   The Proxy applies to any shares of capital stock (defined therein as the "<u>Shares</u>"), "whether such shares are held directly or indirectly (**including pursuant to a <u>trust</u>) or by a third party.**"  *Id.* (emphasis supplied).   Thus, where the Founder has any rights to vote Shares, or provide consents, he

---

[21]     Ex. 13 (7/9/22 Common Director Written Consent).

[22]     *See* Ex. 5 (Side Letter Agreement) at 2.

appointed Zollars as his irrevocable proxy to vote or provide consents with respect to the Matters.

54.     The Founder has the right to vote Shares held by the Cyrus the Great and Venus the Great Trusts.  Indeed, he has signed written consents on behalf of the Venus the Great Trust no less than **nine** times and on behalf of the Cyrus the Great Trust at least **seven** times.[23]

55.     Accordingly, Zollars, as Proxyholder, validly provided the Common Director Written Consent as proxy for the Founder and his controlled trusts, including the Cyrus the Great Trust and Venus the Great Trust.

**E.     July 10 – The Independent Director Appointee.**

56.     Pursuant to the Director Designation Provision, on July 10, 2022, Zollars, as the sole remaining "Independent Director" pursuant to the Chancery Court's ruling, having been elected by the holders of Common Stock and Preferred Stock, voting as a single class, appointed Cecil to fill the vacant second Independent Director seat (i.e., the other seat elected by the holders of the Common Stock and Preferred Stock, voting as a single class).[24]

57.     In any event, as the chart below shows, stockholders representing a majority in voting power of the outstanding Common Stock and Preferred Stock, voting as a single class, voted in favor of the designation of Cecil as an Independent Director.[25]

| Stockholder | Date | Percent of Common and Preferred |
|---|---|---|
| Hesaam Esfandyarpour by proxy | 7/12/2022 | 14.51% |
| Zone III Healthcare Holdings, LLC | 7/12/2022 | 10.65% |
| Foresite Capital Fund IV LP | 7/18/2022 | 5.40% |
| The Cyrus the Great Trust by proxy | 7/12/2022 | 4.90% |
| The Venus the Great Trust by proxy | 7/12/2022 | 4.90% |

---

[23]    Ex. 14 (Cyrus and Venus Trust Written Consents).

[24]    Ex. 15 (7/10 Director Consent to fill Independent Director Vacancy).

[25]    Ex. 16 (7/18 Written Consent to appoint Independent Director).

23

| Stockholder | Date | Percent of Common and Preferred |
|---|---|---|
| The Moghadam 2012 Dynasty Trust, Dated December 18, 2012 | 7/12/2022 | 4.00% |
| Soleus Private Equity Fund II, LP | 7/13/2022 | 2.60% |
| Farallon Overflow Fund, L.P. | 7/12/2022 | 1.18% |
| PBM GEN Holdings, LLC | 7/16/2022 | 0.71% |
| Manning Family Foundation | 7/16/2022 | 0.47% |
| Dattels/Johnson 1992 Family Trust | 7/12/2022 | 0.24% |
| David & Barbara Roux Trust | 7/13/2022 | 0.24% |
| Fredrik and Danielle Eliasson Joint Revocable Living Trust U/A 1/31/2018 | 7/13/2022 | 0.12% |
| Jason and Harmony Myers | 7/13/2022 | 0.12% |
| The Myers Family 2020 Irrevocable Trust | 7/13/2022 | 0.12% |
| ZoCo LLLP | 7/12/2022 | 0.12% |
| | Total | 50.28% |

## F.    July 11 – The Series C Director Appointee.

58.    Pursuant to the Vacancy Provision, on the morning of July 11, 2022, the holders of 71% of the outstanding Series C Preferred Stock, voting as a separate class, executed and delivered a written consent electing Moghadam as the Series C Director (the "Written Consent Electing Series C Director").[26]

| Stockholder | Date | Percent of Series C |
|---|---|---|
| Foresite Capital Fund IV LP | 7/10/2022 | 58% |
| The Moghadam 2012 Dynasty Trust, Dated December 18, 2012 | 7/11/2022 | 13% |
| | Total | 71% |

59.    A majority of the members of the Board approved the election of Moghadam as the Series C Director at the Board meeting later that day.[27]

60.    The Founder contends that this vote was inadequate because (1) a 2/3rds vote of the Company's Series C stockholders is required for the appointment of a Series C Director

---

[26]    Ex. 17 (7/11/22 Written Consent Electing Series C Director of Stockholders); Ex. 18 (228e Notice).

[27]    Ex. 19 (7/11/22 Board Minutes); Ex. 20 (7/12/22 Board Minutes).

because of a June 17, 2017 Letter Agreement between Foresite and the Debtor (Mot. ¶¶ 41, 82 &

Mot. Ex. AC); and (2) Moghadam, Trustee of The Moghadam 2012 Dynasty Trust, dated

December 18, 2012 (the "Moghadam Trust"), did not have authority to vote shares held by his

own trust because the Founder alleges that pursuant to a Holder Voting Agreement (the "Putative

Moghadam Voting Agreement"), Moghadam granted the Founder a proxy to vote shares held by

the Moghadam Trust (Mot. ¶ 39 and Ex. R).  Neither contention is meritorious.

61.     First, the June 17, 2017 Letter Agreement was superseded by a later agreement of

the Company.  Under Section 1.2(c) of the Voting Agreement (which was executed in 2021), a

director seat is reserved for the Series C Director, who is to be "designated by the holders of *a*

*majority* of the outstanding shares of the Series C Preferred Stock (voting together as a separate

class)."  (Mot. Ex D § 1.2(c) (emphasis added)).  Under Section 6.11 of the Voting Agreement,

the Company agreed that the Voting Agreement set forth the "full and entire understanding

between the parties with respect to the subject matter hereof, and any other written or oral

agreement relating to the subject matter hereof existing between the parties is expressly

canceled."  (*Id.* § 6.11).[28]  Section 1.2(c) of the Voting Agreement—which provides that "a

majority" vote is sufficient to elect the Series C director—accordingly superseded the provision

for a two-thirds vote to elect the Series C director under the prior June 17, 2017 Letter

Agreement.

62.     Second, even if the Founder's assumption regarding the voting threshold to

appoint a Series C director is true (which it is not), that would not impact the vote because

Zollars—not the Founder—would have the right to vote the shares subject to the Putative

---

[28]     Even if the June 17, 2017 Letter Agreement survived the Voting Agreement—which it did not, because there cannot be two different voting thresholds to elect the Series C director—Foresite and the Company were the only parties to the June 17, 2017 Letter Agreement, and they can waive the supermajority voting threshold necessary to elect a Series C director.  (*See* Mot. Ex. AC).

25

Moghadam Voting Agreement by virtue of the proxy.  Zollars, of course, voted the shares to elect Moghadam.

63.    Third, Moghadam disputes the enforceability of the Putative Moghadam Voting Agreement.  Moghadam contends that he first learned of the existence of the purported proxy in March 2022—four and a half years after the Founder alleges it was executed—and realized it was fraudulent.[29]  Moghadam patiently and repeatedly, at his deposition in the Chancery Court Action, explained the series of events that led to the Putative Moghadam Voting Agreement.[30] On December 20, 2017, the Founder sent Moghadam and his counsel at Morrison & Foerster three documents to review: (1) a Series C Conversion Agreement (clean); (2) redline of that document; and (3) the Trinitas Series C Stock Purchase Agreement.[31]  The Putative Moghadam Voting Agreement was not attached.[32]  Concerned that there could be side agreements that the Founder had not disclosed, Moghadam directly asked the Founder to confirm that "[t]here are no other inducements or other arrangements in connection with the Trinitas preferred stock purchase."  The Founder responded unequivocally, "Yes, confirmed."[33]  But that was not true. The Founder had entered into a Holder Voting Agreement with Trinitas (the "Trinitas Voting Agreement"), which granted the Founder the right to vote Trinitas' shares by proxy.[34]

64.    On December 22, 2017, the Founder asked Moghadam to "DocuSign GenapSys Series C Closing Documents."  Moghadam asked the Founder to "please confirm that these are the documents that [Moghadam's counsel] reviewed a few days ago" because his counsel was

---

[29]    *See* Ex. 21 (Moghadam's Chancery Court Action transcript) at 49-50, 65 (hereinafter, "Moghadam Tr.").

[30]    *Id.* at 48-70.

[31]    Trinitas Capital G, L.P. ("Trinitas") is a Limited Partnership registered in the Cayman Islands and an unrelated, separate holder of Series C Preferred Stock.

[32]    Ex. 22 (HE00051935–51979).

[33]    Ex. 23 (GNPS-DE-00039649; HE00051927).

[34]    Ex. 24 (Trinitas Holder Voting Agreement).

"out of town and I can't get these reviewed again."   The Founder misrepresented that the DocuSign package included "**exactly the same** Stock Purchase Agreement" that Moghadam's counsel reviewed "as well as the ancillary agreements . . . exactly as Trinitas Capital signed." The Founder explained that the Trinitas signature pages did not require Moghadam's signature but were "included to be a *comprehensive* package."[35]

65.    Moghadam trusted the Founder's representations and executed the DocuSign. Unbeknownst to Moghadam, the Founder had slipped in the Putative Moghadam Voting Agreement, which the Founder created from the Trinitas Voting Agreement.[36]

66.    The Founder altered the party name in the Trinitas Voting Agreement from "TRINITAS CAPITAL G, L.P., a Limited Partnership registered in Cayman Island" to "THE MOGHADAM 2012 DYNASTY TRUST, DATED DECEMBER 18, 2012, a Limited Partnership registered in Cayman Island."[37]   The Moghadam Trust is <u>not</u> a Cayman Islands limited partnership, as his counsel surely would have noted if he were ever provided the document.

---

**HOLDER VOTING AGREEMENT**

This HOLDER VOTING AGREEMENT (this "*Agreement*") is entered into as of December 27, 2017, by and between TRINITAS CAPITAL G, L.P., a Limited Partnership registered in Cayman Island ("*Stockholder*"), and Hesaam Esfandyarpour (the "*Holder*").

---

**HOLDER VOTING AGREEMENT**

This HOLDER VOTING AGREEMENT (this "*Agreement*") is entered into as of December 27, 2017, by and between **THE MOGHADAM 2012 DYNASTY TRUST, DATED DECEMBER 18, 2012,** a Limited Partnership registered in Cayman Island ("*Stockholder*"), and Hesaam Esfandyarpour (the "*Holder*").

---

[35]   Ex. 25 (emphasis added) (HE00052316).

[36]   Ex. 26 (GNPS-DE-00001802).

[37]   Compare Ex. 27 (GNPS-DE-00001807) and Ex. 26 (GNPS-DE-00001802).

27

67.    In summary, Moghadam testified during his deposition for the Chancery Court Action:

> It was inserted in the package of documents that my…attorney had reviewed and approved, and it was sent to me without my attorney being aware of it and not having reviewed or approved it on a subsequent date when she was out of town and actually on Christmas vacation. It was on Christmas day…. [T]he first instant that this document appeared…was December 26 -- 22nd of 2017, and she… was on …vacation for Christmas, and a corrected version of this apparently was resent by [the Founder] for my signature and after, by the way, assurances that these are the documents reviewed and approved by my counsel, which was false.[38]

68.    On March 21, 2022, when it first became an issue, Moghadam notified the Founder that the Putative Moghadam Voting Agreement was void because the Founder fraudulently induced Moghadam to sign the agreement based on false and misleading statements that the Founder knowingly made to Moghadam, with the intent to deceive Moghadam, understanding that Moghadam was relying on the Founder's statements that the documents were the same.[39]    Moghadam, who had in fact relied upon the Founder's deliberately false and misleading statements, reiterated the fraudulent nature of the Putative Moghadam Voting Agreement in April 2022 when he revoked his proxy.[40]

**G.    Background to the July 11 Board Meeting.**

69.    Prior to the Chancery Court's ruling, the Debtor had considered potential equity investments and strategic alternatives, including restructuring and reorganization with the assistance of Lazard.  But the Company was effectively paralyzed while the Founder's litigation in the Chancery Court was pending, as the Debtor was subject to a "status quo order" preventing actions outside the ordinary course until the Chancery Court ruled on the composition of the

---

[38]    Moghadam Tr. at 54-55.

[39]    Ex. 28 (Putative Moghadam Voting Agreement Revocation - First Notice).

[40]    Ex. 29 (Putative Moghadam Voting Agreement Revocation - Second Notice); Ex. 30 (4/14/22 Email from Moghadam re fraudulent proxy).

Board.  In early June 2022, the Debtor sought emergency relief in the Chancery Court to permit the Debtor to file a bankruptcy petition and, separately, to expedite the trial date.  Both motions were denied.  With little cash and no access to capital, the Debtor was forced to furlough and lay off much of its workforce to extend liquidity until the trial in early July.  In spite of the Debtor's obvious and severe capital needs, the Founder continued to exert his litigation-based leverage over the Debtor—all to advance his personal agenda of avoiding dilution in the misplaced hope that he would find a party willing to assist him in crushing other investors.

70.    The Chancery Court understood the Company's dire financial situation and issued its ruling within three days of trial.  Ahead of its afternoon bench ruling, the Chancery Court issued a written order in the morning "[i]n the interest of accommodating the parties' business needs."[41]

**H.    Notice of the July 11 Board Meeting.**

71.    The Debtor's business needs dictated the timing for a special meeting of the Board as promptly as possible after the Chancery Court Ruling and termination of the status quo order.  Section 21(b) and (d) of the Bylaws provide that special meetings of the Board may be held whenever called by the Chairman of the Board, the President or any two of the directors.[42] Notice of the time and place of special meetings shall be given orally or in writing, including by any electronic means during normal business hours at least 24-hours before the date and time of the meeting.  Notice is waived by any director's attendance at a meeting, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  *Id.*

---

[41]    Ex. 31 at E (Chancery Court Order and Judgment).

[42]    Ex. 32 at Section 21 (Bylaws).

29

72.     The Founder knew the urgency with which the Debtor needed to act.  To that end, **the Founder requested that a special meeting of the Board be held on Saturday, July 9,** or promptly thereafter.[43]  The Chairman responded on Saturday and suggested a meeting on Monday.[44]

73.     Time was of the essence.  Oxford, the Debtor's secured lender, had expressed that it was only willing to release additional restricted cash to the Debtor if it would receive the protections of a Debtor-in-Possession financing order.  The Debtor urgently needed Oxford's consent so that it could fund payroll on July 13, so the Chairman called for a special meeting to occur Monday, July 11 at 5:30 p.m. Eastern (the "July 11 Board Meeting").  The Secretary provided 24-hours' notice of the meeting.[45]  The Founder read the notice within approximately one hour of receiving it.[46]  In light of the Debtor's liquidity crisis, notice was delivered during the weekend for good reason.  Moreover, the Founder already had requested a weekend Board meeting, so he clearly did not object to conducting business – the actual meeting itself – on the weekend.  His change of tune on Monday is simply another effort, contrary to his own fiduciary duties, to advance his own parochial interests.

I.     **The July 11 Board Meeting.**

74.     The Board began conducting meetings via Zoom on March 24, 2022.[47]  Beginning that meeting and at each meeting thereafter, to maintain order and control background noise, the Company utilized the features within Zoom to mute all attendees except for the speaker.  At each meeting, the Chairman announced that if anyone wanted to make a comment or ask a question,

---

[43]   Ex. 33 (7/8/22 Email from Founder re Saturday Board meeting).

[44]   Ex. 34 (7/9/22 Email from Zollars re Monday Board Meeting).

[45]   Ex. 35 (Notice of 7/11 Board Meeting).

[46]   Ex. 36 (Read Receipt of Notice of 7/11 Board Meeting).

[47]   Ex. 37 (3/24/22 Board Minutes).

30

she or he should use the "raise hand" notification feature within Zoom and the Chairman would call on people in order of when hands were raised so that everyone had an opportunity to be heard.[48]  A total of four meetings were conducted in this manner.

75.    The Founder claims he had no way to register his objection at the start of the July 11 Board Meeting (Mot. ¶ 3).  That is false.  The Founder understood the process and utilized it on numerous occasions at numerous meetings.  Whenever he used the raise hand notification feature, which he did extensively, the Chairman recognized him, and the Founder was heard by all parties.  The minutes of several Board meetings and the Founder's comments to draft minutes show how often he utilized the notification feature in Zoom to be heard.

76.    For example, at the March 24, 2022 Board meeting, the Founder used the notification feature within Zoom and voiced his opinion numerous times.  Attendees remained muted, unless speaking.[49]  Again, at the May 10, 2022 Board meeting, the Founder participated in the meeting and came off of mute to object to the approval of prior minutes.[50]  The Founder provided a markup to the draft minutes, showing the numerous times he used the notification feature within Zoom to make comments and voice objections.  The Founder even objected to the process used to maintain order at Board meetings, demonstrating he clearly knew how to use the notification feature to be recognized.[51]

77.    Having done it many times at prior Board meetings, the Founder knew exactly how to raise his hand and voice his objection to notice of the meeting at the July 11 Board Meeting; he simply did not do it.  The Founder attended the beginning of the meeting, he did not

---

[48]    *See* Ex. 19 (7/11/22 Board Minutes).

[49]    *See* Ex. 37 (3/24/2022 Board Minutes).

[50]    *See* Ex. 38 (5/10/2022 Board Minutes).

[51]    *See* Ex. 39 (Founder markup to 5/10/2022 Board Minutes).

31

activate his camera, and he did not use the notification feature to make a comment or ask a question.  During the first order of business, he left the meeting, and the Board, which had a quorum, proceeded with its business, which included approving the resolutions (the "<u>Resolutions</u>") to commence the Chapter 11 case (the "<u>Chapter 11 Case</u>)".  Contrary to his suggestion, the Founder was in no way precluded from speaking at the July 11 Board Meeting; he elected not to raise his hand to speak.[52]

**J.      The July 12 Board Meeting.**

78.      Despite the Founder's request for a Saturday Board meeting, despite reading the meeting notice on Sunday, and despite his fiduciary duties under the dire circumstances facing the Company, he sent correspondence on Monday indicating that he believed the July 11 Board Meeting had not been properly noticed because the notice was issued on a Sunday.  To eliminate any doubt as to the proper authorization for the bankruptcy filing, the Chairman called for a special meeting on Tuesday, July 12 (the "<u>July 12 Board Meeting</u>"), and the Secretary provided 24-hours' notice of the meeting to the Board.[53]

79.      Six of the seven Board members attended the July 12 Board Meeting, constituting a quorum.  The Founder was absent.  The Board approved and ratified the Resolutions and ratified the actions of the CFO to file the petition.[54]

**K.      The Founder's Purported Designees.**

80.      Despite the Chancery Court's ruling that the Founder is prohibited from appointing directors by the Side Letter, the Founder claims to have attempted again to appoint

---

[52]    *See* Ex. 19 (7/11/22 Board Minutes).

[53]    Ex. 40 (Notice of 7/12 Board Meeting).

[54]    Ex. 20 (7/12/22 Board Minutes).

the same Board members that were rejected by the Chancery Court: Hamid Rategh, David Maney, Hossein Akhlaghpour, and Terence Tan (the "Founder's Designees").

81.    The common directors he purports to have designated are discussed *supra* ¶ 50. In addition to these two, the Founder also asserts that Series B stockholders elected a director, Hossein Akhlaghpour (the "Founder's Series B Designee"), but the Founder had insufficient votes to fill the Series B vacancy (Mot. ¶ 42).

82.    The Founder entered into a Holder Voting Agreement with Jem Management Limited ("Jem") pursuant to which Jem granted the Founder an irrevocable proxy to vote Jem's shares with respect to the appointment of Board members (the "Jem Voting Agreement").[55]    In April 2022, the Founder relied upon the Jem Voting Agreement and tried to appoint the Founder's Series B Designee by voting Jem's shares by proxy (Mot. Ex. H).  The Chancery Court ruled that the action was invalid because the Side Letter Agreement prohibits the Founder from voting to appoint Board members (Tr. Ruling 51:9–11, 51:21–23).  As the chart below shows, without Jem's vote, the Founder falls well short of the required threshold to elect the Founder's Series B Designee, since only the following shares (at most) validly voted:

| Stockholder | Percent of Series B | |
|---|---|---|
| Amidi, LLC | | 1% |
| IPV Capital II HK Limited | | 12% |
| Stanford StartX Fund LLC | | 10% |
| | Total | 23% |

83.    In an attempt to make another end run around the Chancery Court Ruling, the Founder contends that Jem voted its own shares to elect the Founder's Series B Designee, but that is not permitted by the unambiguous language of the Jem Voting Agreement.  Jem gave its

---

[55]    Ex. 41 (Jem Holder Voting Agreement).

irrevocable proxy to the Founder, which in turn gave his irrevocable proxy to Zollars. Control over voting Jem's shares belongs exclusively to Zollars pursuant to the Side Letter.

84.    In any event, to put it charitably, this Court should be skeptical that Jem in fact voted rather than the Founder sloppily having attempted to vote for Jem. The Debtor's Section 327(e) counsel noted the irregularities in a letter to the Founder's counsel:

> The written consent purporting to elect Mr. Akhlaghpour is highly irregular, including because the signature on behalf of Jem Management Limited appears to be of dubious provenance—it appears to misspell the signatory's name, does not state the signatory's title, misspells the entity's name, and **the signature appears to have been copied and pasted onto the page and remains freely moveable in the PDF of the written consent**. In that regard, to ascertain whether Mr. Akhlaghpour was validly elected and whether his election is barred by the Side Letter Agreement dated November 28, 2020, we request immediate written proof that your client has terminated or amended the Holder Voting Agreement by and between Apoletto Limited and your client, dated November 5, 2013, to which Jem Management Limited joined. Your client previously purported to vote Jem Management Limited shares to elect Series B directors (which the Court of Chancery determined was invalid and in breach of contract), and **your client swore under oath that Jem Management Limited lacks authority to vote its shares for the election of directors because the Holder Voting Agreement provided your client with an irrevocable proxy**. We therefore need additional information to determine whether Mr. Akhlaghpour was validly elected. *See* Ex. 42 (7/12/22 Letter from Willkie to Founder's counsel).

85.    Counsel to the Debtor followed up with the Founder's counsel again on July 14.[56] Founder's counsel did not address these irregularities in his reply.

86.    Finally, the Founder contends that the Founder's Designees, by majority vote, appointed Terence Tan to an Independent seat (the "Founder's Independent Designee").[57] The Founder's Designees could not appoint the Founder's Independent Designee, as set forth in the Argument Section. *See infra* § II (B)(6).

---

[56]    Ex. 43 (7/14/22 Letter from Willkie to Founder's Counsel).

[57]    Ex. 44 (Draft Minutes from Meeting of Founder's Designees).

87.     In sum, none of the Founder's Designees are valid Board members.  There were seven valid Board members prepetition, and six directors (all but the Founder) voted to commence the Chapter 11 Case at the July 11 Board Meeting, which action the Board approved and ratified at the July 12 Board Meeting.

**L.      The Need for a Bankruptcy Filing and the Sale Process.**

88.     The Founders' Motion ignores the Debtor's liquidity crisis, pretends that the Debtor could have entered into an out of court equity investment with Love Health, Inc. ("LH"), and chose the bankruptcy alternative for some unspecified entrenchment motivation. These contentions ignore the facts.

89.     The Declaration of Britton Russell in Support of Debtor's Chapter 11 Petition and First Day Motions (the "First Day Affidavit") lays out in detail the Debtor's liquidity crisis, its pre-petition marketing efforts (and how they were stymied by the Founder and the litigation that the Founder initiated) and the discussions with LH, which are referred to in the First Day Affidavit as Party B.  Rather than repeat those facts here, the First Day Affidavit is incorporated herein by reference.

90.     By way of summary only, it is crucial to note that the Debtor was fast running out of cash during the lead up to the Chancery Court trial but was unable to enter into any transaction because of the ongoing litigation.  The Company even requested permission of the Chancery Court to file for bankruptcy before trial to help implement a potential restructuring opportunity, which was denied, or to move up the trial date, which was also denied because the Founder objected.  Oxford, the Debtor's secured lender, did not agree to any further forbearance or further access to restricted cash.  Thus, to stay within its available cash limitations, nearly all of the Company's employees were furloughed on June 24, 2022, as a cost-saving measure, and, on July

35

8, 2022, more than 70 employees were laid off or further furloughed.  Even with these measures, the Debtor had enough cash only to get it to July 12.

91.     There is not a shred of evidence that LH was prepared to make a capital infusion by July 12.  The parties had not reached agreement on material terms of an investment; they had not even exchanged draft agreements.  While the Debtor welcomes LH's participation in a sale process through the Chapter 11 Case, by the time LH responded to the Debtor on the weekend before the chapter 11 filing, the Debtor certainly did not have the time to negotiate an equity financing transaction with LH that could be executed and closed within 48 hours.  The Debtor did not have enough unrestricted cash to meet its payroll—due on July 13—and had no actionable proposal in hand to raise the cash absent the filing of a bankruptcy case.

92.     The bankruptcy filing was thus necessary.  To be clear, no part of the decision to file a bankruptcy case was to spite the Founder, as the Motion suggests.  Indeed, there was nothing to be gained from any such action.  Only one of the six non-Founder Board members has any affiliation at all with any known possible bidder – the Class D director – and there has been no allegation (nor could there in good faith be such an allegation) that the other five Board members are beholden to him.  A sale to one party or a different party does not in any way benefit those five directors or those for whom they work.

## ARGUMENT

## I.   THE BANKRUPTCY FILING WAS PROPERLY AUTHORIZED

### A. THE MOVANTS MISPERCEIVE THE CONCEPT OF CORPORATE AUTHORIZATION

93.     The Founder argues that the bankruptcy petition (the "Petition") filing is void due to an alleged foot-fault with respect to the manner in which notice was provided of the meeting of the Board at which the filing was authorized.  This argument is without merit.  As a Delaware

corporation, there simply is no question (as demonstrated below) that the Debtor had the corporate power to file the Petition.  The relevant question is not *power* but *authority*.  Here, the Petition was executed by an officer, the CFO, in advance of the filing.  As explained herein, given that the issue is authority rather than power, even if there were a defect in the Board's initial authorization of the CFO to act—and there was not—the filing could be and was validly ratified and endorsed by the Board.

94.    A corporation, which "lacks a body and mind," "only can act through human agents." *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 60 (Del. Ch. 2015).  Because a corporation is distinct from its human agents, Delaware law resolves questions over whether and when a given individual or body acting on a corporation's behalf has done so in a manner that has legal effect and is binding on the corporation.  That inquiry has three layers.

95.    *First*, the act in question must not be *ultra vires*—that is, beyond the power of the corporation to conduct.[58]  Clearly, the Debtor's filing of the Petition was not *ultra vires*.  The Charter contains a provision, consistent with Section 102(a)(3) of the DGCL, empowering it "to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law,"[59] which expressly includes the power to take part in judicial proceedings.[60]  Bankruptcy is a judicial proceeding, so there was clear corporate power to file the Petition.

---

[58]    *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 439 (Del. Ch. 2020) ("Properly understood, the concept of corporate power refers to whether the entity has been granted the ability to engage in a given act.").  The *Farley* court distinguished the concept of "corporate power" from the related concept of authorization, which "refers to whether the proper intra-corporate actors or combination of actors, such as the corporation's officers, directors, or stockholders, have taken the steps necessary to cause the corporation to take the given act." *Id.*

[59]    Charter Article THIRD.

[60]    8 *Del. C.* § 122(2) ("Every corporation created under this chapter shall have power to . . . [s]ue and be sued in all courts and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding, in its corporate name . . . .").

96.    *Second*, the act in question must comply with the DGCL and the certificate of incorporation and bylaws adopted in accordance with the DGCL,[61] the terms of which are read into the certificate of incorporation of every Delaware corporation.[62]  This aspect of the inquiry has two subparts—a "who" and a "what."  First is *who* (if anyone) is required by the DGCL and governing documents to approve the act.  Although numerous DGCL and governance document provisions expressly require board (and sometimes stockholder) approval for given acts, neither the DGCL nor the Debtor's governing documents required any specific approvals to file the bankruptcy Petition, rendering the "who" part of the inquiry moot.  Second is *what* steps (often termed "corporate formalities") a given corporate decisionmaker must follow under the DGCL and governing documents before her actions have the dignity of official acts.  These requirements, which are typically found in the bylaws,[63] include procedural requirements such as quorum, notice, applicable voting standards, and the like.  This second facet is the focus of the Motion, which argues (in short) that actions the Board authorized were void because such authorizations were granted at meetings that did not comply with certain technical requirements set forth in the Bylaws.

97.    *Third*, the agent performing the challenged act must have authority to bind the corporation by application of general principles of agency law, whether through the doctrines of express authority or ratification.[64]  As its name implies, express authority can derive from an

---

[61]    *Id.* §121(a) (certificate of incorporation); §109(b) (bylaws); §121(b) ("Every corporation shall be governed by the provisions and be subject to the restrictions and liabilities contained in this chapter.").

[62]    *Id.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation . . . .").

[63]    As the Chancery Court Ruling recognized, however, these requirements can also be found in contracts governing the relations between and among the corporation, its directors, and its stockholders, such as voting agreements. Tr. Ruling 53:23–54:3 ("Plaintiff's written consents purporting to appoint substitute directors were invalid under the voting restriction in the side letter agreement . . . .").

[64]    *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010) (applying "hallmark principles of agency law to traditional corporate

38

express grant of authority in the certificate of incorporation, bylaws, or a board resolution.[65]

Thus, in the context of corporate action, these agency law principles interact with corporate law

principles. For example, a board can grant, before the fact or afterward by ratification, an agent

express authority (whose effect is governed by agency law) by adopting resolutions (whose

validity is governed by corporate law).

98.     Here, the Debtor's agent—its Chief Financial Officer, Mr. Britton Russell (the

"CFO")—executed the Petition and caused Debtor's bankruptcy counsel to file the Petition. The

Motion, while incorrectly framed, essentially raises the issue of whether that agent had

authority—beforehand or retroactively by way of ratification—to execute and direct the filing of

the Petition by virtue of the interacting principles of corporate and agency law summarized

above. The Court must answer "yes" and deny the Motion because, as the below discussion

establishes: (i) the Board gave the CFO express authority to act by adopting resolutions to that

effect at a duly convened meeting on July 11;[66] (ii) even if one assumes that the authorization

granted at the July 11 Board Meeting was voidable, the Board ratified *its own* acts of July 11 at a

duly convened meeting on July 12; and (iii) even if one assumes the July 11 Board Meeting was

---

fiduciaries, such as officers and directors"); *Hannigan v. Italo Petroleum Corp. Am.*, 47 A.2d 169, 171–72 (Del. 1945) (holding that a corporate officer's execution of a note on the corporation's behalf, which was challenged as beyond the scope of his authority, could be ratified); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 14.02 (2021) ("In line with general principles of agency law, even acts originally unauthorized can become binding through board ratification, acceptance of benefits, or other estoppel."); 2A Fletcher Cyc. Corp. § 752 ("If the officers or the agents of a corporation assume to act for the corporation without any authority at all, or if they exceed their authority or act irregularly, and the act is one that could have been authorized in the first instance by the shareholders, board of directors or subordinate officers, as the case may be, it may be expressly or impliedly ratified by them, and thus be rendered just as binding, except as to intervening rights of third persons, as if it had been authorized when done, or done regularly. The ratification of an unauthorized act of an agent is equivalent to original authorization and confirms that which was originally unauthorized.").

[65]    8 *Del. C.* § 142(a); *id.* § 102(b)(1).

[66]    *See* Docket No. 1 at p. 24 ("Resolved, that the filing of a voluntary petition on behalf of the Company be, and the same hereby is, authorized, and adopted, in all respects and that the Company's Chief Executive Officer and Chief Financial Officer, be and they hereby are, authorized and empowered on behalf of the Company, to execute, acknowledge, deliver and verify the Petition and to cause the same to be filed with the Bankruptcy Court.").

void (or, indeed, even if it had never happened at all), the Board ratified the act *of the CFO* at the same July 12 Board Meeting. *See infra* § C.

## B. THE BOARD THAT VOTED IN FAVOR OF FILING THE BANKRUPTCY PETITION IS THE DEBTOR'S DULY AUTHORIZED BOARD

99.    The Board authorized the Petition's filing at the July 11 Board Meeting, the Petition was filed later that day, and the Board ratified and endorsed the filing at the July 12 Board Meeting.  Given that the validly appointed directors, acting by a supermajority vote at duly called and convened meetings, approved and, as a matter of caution, also subsequently endorsed the filing of the Petition and related matters, the filing of the Petition was affected with appropriate corporate authorization.  The Movant's contentions to the contrary are meritless.

100.    The Movants' main argument asserts that four of the seven individuals serving on the Board during each special meeting had not been validly elected or appointed to the Board and were therefore not validly serving as directors.  The Movants are wrong.  As demonstrated below, the Founder's purported attempt to reconstitute the Board violated the DGCL and the Debtor's governing instruments.  Even if the Founder had managed to validly appoint one or more directors, the Founder's Designees were removed by the subsequent valid actions of stockholders that resulted in the constitution of the seven-person Board that authorized the Petition.  The Founder's putative board of directors, which consists of persons who are not even acting under color of authority, is not validly constituted and has no power to oversee or direct the management of the business and affairs of the Debtor.  In contrast, the seven-member Board which voted to approve the Chapter 11 filing was properly constituted and is vested with the full power to oversee and direct the management of the business and affairs of the Debtor.

**1.    The Founder's attempt to fill two Common vacancies on July 8 was invalid.**

101.    After the Chancery Court Ruling, there were three directors in office: the Founder, Mr. Zollars, and Mr. Soundararajan.    On July 8, the Founder attempted to fill two Common vacancies with Messrs. Rategh and Maney by executing and delivering a written consent in his capacity as a Common Director, since the Chancery Court Ruling conclusively rejected his attempt to place those same two individuals on the Board through written shareholder consents.    Unfortunately for the Founder, his attempt to make the same appointments as a director fares no better.

102.    First, the Founder's written consent as a director violated the Charter, which provides in the Vacancy Provision quoted above in ¶ 36 that designated directorships that have never been filled by stockholders "shall remain vacant" until stockholders fill the vacancy (Tr. Ruling 19:19–20:2). The two Common seats that the Founder purported to fill had been created in February 2021, were initially vacant, and had never been filled by stockholders. Indeed, before the Chancery Court, this is exactly what the *Founder* argued to establish that the Common vacancies had not properly been filled by the 2021 appointments.    Ex. 45 (Pl.'s Pretrial Brief, Chancery Court 225 Action (MTZ)) at 13-14 (arguing that "for vacancies resulting from a failure to elect," the "Certificate reserved that authority in the stockholders of the relevant class or series.").    Therefore, the Vacancy Provision in the Charter required those seats to remain vacant until filled by holders of Common Stock in the first instance.    Because the Founder purported to fill them in his capacity as director, the July 8 written consent was defective for violating the Charter and therefore void.    *See, e.g., STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130 (Del. 1991) (holding that a purported corporate act that violated the charter was void).

103.    Second, the Founder's written consent violated the Voting Agreement, which provides that one of the three common directors—the CEO Director—must be the Company's acting Chief Executive Officer.  The Movants contractually agreed in Section 1.3 of the Voting Agreement that the Common seats must "remain vacant until otherwise filled" by stockholder vote.  By seeking to appoint two additional common directors, the Founder breached the Voting Agreement, which reserves one of the three Common director seats for the Company's Chief Executive Officer, which at all relevant times has been Jason Myers.

104.    Third, and in any event, on July 9, the holders of a majority in voting power of the outstanding Common Stock, acting by written consent in lieu of a meeting, effectively reversed any and all actions the Founder purported to take on July 8.  Through the Common Director Written Consent, the holders (i) removed the Founder as CEO Director; (ii) appointed Mr. Myers as CEO Director as required by the Voting Agreement; (iii) filled one Common Director vacancy with Mr. Eliasson; and (iv) filled the second Common Director vacancy with the Founder, as also required by the Voting Agreement.  Thus, even if the Founder's July 8 consent were valid— which it was not—his actions were later undone through the removal of his putative directors and the appointment by stockholders of valid directors.[67]  As discussed below, the Common Director Written Consent removing the Founder's putative Common Directors and appointing the legitimate Common Directors was valid.

### 2.    The Common Director Written Consent filling the three Common director seats was valid.

105.    Holders of Common Stock were empowered by the DGCL and the Charter to remove Common Directors appointed by the Founder and fill all Common Director vacancies.

---

[67]    While the Debtor's Bylaws purport to require 66 2/3% of votes to remove a director without case, Delaware law is clear that such a bylaw provision is void.  *See Frechter v. Zier*, 2017 WL 34512, at *4 ("Section 141(k) unambiguously confers on a <u>majority</u> the power to remove directors, and [a] contrary provision … is unlawful.") (emphasis supplied).

The DGCL provides that each director shall hold office *until his removal* or resignation.  8 *Del. C.* § 141(b).  It further provides that whenever the holders of any class of capital stock are entitled to elect directors, the holders of a majority in voting power of the outstanding stock of the class shall have the right to remove such directors with or without cause. *Id.* § 141(k).  The Charter imposes the same regime.  *See* Charter Art. FOURTH, Section (B)(3.2.1) (providing that any director elected by a given class or series of stock with special designation rights "may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of capital stock entitled to elect such director or directors").  Because the holders of Common Stock, as a class, were empowered under the Charter to elect the three Common Directors, they also were empowered under Section 3.2.1 of the Charter and Section 141(k) of the DGCL to remove Common Directors.  They did so by removing the Founder's Designees in the Common Director Written Consent.

106.    The Common Stockholders were further empowered to fill Common Director vacancies.  The DGCL provides that vacancies may be filled as "provided in the certificate of incorporation or bylaws."  8 *Del. C.* § 223(a).  The Charter, in turn, provides that vacancies:

> shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or classes or series or by any remaining director or directors elected by the holders of such class or classes or series pursuant to this Section 3.2.

Charter Art. FOURTH, Section (B)(3.2.1).  The Common Stockholders availed themselves of this right on July 9 by filling the vacancies with the director slate listed in the Common Director Written Consent.  Thus, even if one assumes the Founder validly filled the vacancies on July 8, the Common Stockholders removed those directors the next day and filled the resulting vacancies with new directors.

43

107.    The Movants do not argue that the Common Director Written Consent violated any corporate formalities.  Rather, they claim that it was ineffective because it did not include a sufficient number of votes of Common Stock to take the action.  They are wrong.

108.    *First*, the Founder argues that Mr. Zollars lacked authority to execute the consent on the Founder's behalf because the Founder had purportedly revoked the Proxy.  As an initial matter, when the Founder made the same argument in the Chancery Court, the Vice Chancellor rejected his argument, observing that he had utterly failed to carry his burden at trial that he could revoke any part of the Voting Agreement, including the Proxy.  *See* Tr. Ruling 39:17-22 ("[A]s [Founder] tells it, he was able to, and did revoke Section 4 *in toto*, including the voting restriction.  I note this argument was made entirely in briefing and that plaintiff offered no evidence on this point at trial.").[68]  The Chancery Court expressly found that the Founder sought to eliminate the Proxy from the Side Letter Agreement, but ultimately agreed to give the Proxy to Zollars and the other independent directors after extensive bargaining.  As the Chancery Court held, the Founder "persistently resisted both the voting restriction and the proxy," and specifically sought to "eliminate[] the [P]roxy" during negotiations over the Side Letter Agreement.  (Tr. Ruling 12:11–13:18).   The Chancery Court determined that the Company's independent directors "insisted on both the [P]roxy and the full voting restriction," and the Founder "capitulated" to those provisions in order to induce the Series D financing round.  (*Id.*).  The Founder then used the Side Letter Agreement, including the Proxy, to induce $70 million of investment from the Company's prospective Series D investors, who were concerned that the Founder could "influence his friends to join the board and outnumber" the Company's three independent directors.  (*See id.* 13:19–14:24).

---

[68]    The Debtor has sought discovery in this Chapter 11 Case from the Founder to produce any evidence of revocation.

44

109.    The Founder cannot retrade his contract now.  The Proxy is irrevocable, and there is no basis to allow the Founder to violate the plain terms of the Side Letter Agreement.  The Founder claims the Proxy is revocable under California law, which the Debtor disputes.  But since the issue concerns who may vote for directors of a Delaware corporation, regardless of whether Delaware law or California law applies, the Proxy is irrevocable.  Section 212(e) of the DGCL provides that "[a] duly executed proxy shall be irrevocable if it states that it is irrevocable and if . . . it is coupled with an interest sufficient in law to support an irrevocable power."  8 *Del. C.* § 212(e).  The Proxy satisfies both elements.  First, it states that it is irrevocable.  Side Letter Agreement § 4(b) ("Esfandyarpour hereby appoints Proxyholder . . . as Esfandyarpour's sole, exclusive, true and lawful attorney in fact and *irrevocable proxy* . . ..") (emphasis added).  It is also coupled with an interest sufficient in law to support an irrevocable power—namely, Mr. Zollars' position as a director of the Debtor. *See Haft v. Haft*, 671 A.2d 413, 423 (Del. Ch. 1995) (Allen, C.) (holding that a CEO's interest in the corporation was an interest sufficient to support an irrevocable proxy).  Movants do not assert otherwise as a matter of Delaware law.

110.    The Proxy is also irrevocable under California law.  Under Section 705(e) of the California Corporations Code, a proxy is irrevocable if (1) "given to secure the performance of a duty" or (2) given to a person designated in a voting agreement.  Cal. Corp. Code § 705(e).

111.    Either prerequisite would be sufficient to render the proxy irrevocable, and both are met.

112.    The first prerequisite is met here because the Proxy was expressly "given to secure performance of Esfandyarpour's duties under" the Side Letter Agreement, which imposes on the Founder several performance obligations. Side Letter Agreement § 4(b); *see Hunt v. Rousmanier's Administrators*, 21 U.S. 174, 201–02 (1823) (holding that where a "letter of

attorney forms part of a contract, and is a security for money, or for the performance of any act which is deemed valuable," it is irrevocable).

113.    In the Side Letter Agreement, the Founder has multiple performance obligations, and the Company's directors and its investors rely and relied on these ongoing obligations.  As examples, the Founder agreed to restrictions on communications with prospective investors, (Side Letter Agreement § 1); that he would not exercise voting or consent rights regarding the "appointment, election or removal of any member of the Board," (*id.* § 4(a)); and that any transfer of his shares would be subject to certain restrictions.  (*Id.* § 4(c)).

114.    In addition, the Founder received consideration for his agreement to the Proxy. He (i) was given a Consulting Agreement through which he received $414,000 per year, (ii) was provided a contractual right to a seat on the board so long as he held "at least 5% of the Company's capital stock," (*id.* § 2), and (iii) induced the Company's Series D financing round in the amount of $70 million by entering into the Side Letter Agreement (*see supra* ¶ 108).

115.    The second prerequisite is also met here because Section 4 of the Side Letter Agreement is a voting agreement that designates the Debtor's independent directors, including Zollars, as the holder of the proxy to secure the voting agreement.  Side Letter Agreement § 4(a). Both Delaware and California law recognize that an irrevocable proxy may be given to secure a voting agreement.  *See* R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations & Business Organizations Statutory Deskbook: 2021 Edition § 7.11[B] (citing *Abercrombie v. Davies*, 123 A.2d 893, 905-07 (Del. Ch. 1956)).

116.    Movants argue that the Proxy expired after eleven months, but the California statute provides that the Proxy remains irrevocable under the Side Letter Agreement.  Because the Proxy was "given to secure the performance of a duty," it remains irrevocable "until the

46

happening of events which, by its terms, discharge the obligations secured by it." Cal. Corp. Code 705(e). The Founder's obligations remain ongoing, and the Side Letter Agreement's termination clause provides that it only terminates upon (1) written agreement of the parties; (2) when each of the three independent directors cease to serve on the Company's Board; and (3) an initial public offering of the Company's common stock.[69] None of those events has occurred. Likewise, Section 705(e)(5) provides that a proxy given to secure a voting agreement is irrevocable until the voting agreement has terminated (*see* Cal. Corp. Code §§ 705(e)(5) & 706)). The voting agreement in the Side Letter Agreement has not been terminated—on the contrary, the Chancery Court confirmed just last month that the Side Letter Agreement remains in full force and effect when it invalidated the Founder's written consents based on it. Under either prerequisite, the Proxy remains valid and irrevocable today.

117. In any event, if somehow the Founder revoked his Proxy, that means he is in breach of the Side Letter Agreement. The Chancery Court found that the Side Letter Agreement is binding against the Founder (Tr. Ruling 50:15–22). It is inconceivable that this Chapter 11 Case could be dismissed because the Founder thwarted corporate action by breaching a contract, all to benefit himself.

118. *Second*, the Movants contend, without explanation, that the Proxy did not extend to the Cyrus the Great Trust and Venus the Great Trust (Mot. ¶¶ 37, 78) and that the consent of Zollars, executing the Common Director Written Consent as proxy for such trusts under the Side Letter Agreement, was ineffective. The Founder's contention ignores the plain language of the Side Letter Agreement. *See supra* ¶¶ 52-53. Pursuant to the Side Letter Agreement, Mr. Zollars had an irrevocable proxy to vote any shares held *directly or indirectly* by the Founder and to

---

[69] Notably, the Side Letter Agreement was amended in April 2021 to terminate upon a SPAC transaction. Tr. Ruling 15:1–11. As the Chancery Court found, the Founder "agitated about his voting rights during the[] negotiations" over the amendment, but "the amendment did not touch Section 4," including the Proxy. *Id.*

47

provide "any written consent of stockholders."[70]  The Proxy even specifies that it applies to any shares "(including pursuant to a trust)."[71]  Where the Founder would have had any rights to vote Shares, or provide consents, he appointed Mr. Zollars as his irrevocable proxy to vote or provide consents with respect to the Matters.  And he did not have such rights; the Founder has signed written consents to vote the shares held by the Venus the Great Trust no less than nine times and to vote the shares held by the Cyrus the Great Trust at least seven times.[72]  *See supra* ¶ 54.  It defies logic that the Movants can argue (without citation) that Mr. Zollars lacked authority to vote these shares.

119.    *Third*, the Movants' calculations regarding the vote are wrong.  The Movants contend that Moghadam did not have authority to vote the shares held by the Moghadam Trust because the Putative Moghadam Voting Agreement allegedly granted the Founder a proxy to vote shares held by the Moghadam Trust (Mot. ¶ 39 and Ex. R).  Even assuming *arguendo* that this was true (it is not), 51% of the Common Stock still would have voted in favor of the Common Director Written Consent, so the vote still would carry.  *See supra* ¶ 51 (chart showing voting on Common Director Written Consent).  Similarly, even if the Founder really obtained a proxy to vote such shares, then Mr. Zollars would have had the power to vote the Moghadam shares—like all other shares owned, controlled or voted by the Founder—by virtue of the Proxy.  *See supra* ¶ 118.  Either way, these shares voted for the Common Director Written Consent.  Moreover, as shown above, the Putative Moghadam Voting Agreement was procured by fraud.  *See supra* ¶¶ 63-68; Moghadam Tr. at 48–70.  Thus, the agreement, and any putative proxy contained therein, is a legal nullity and must be disregarded.

---

[70]    *See* Ex. 5 (Side Letter Agreement) at 2.

[71]    *Id.*  (emphasis added).

[72]    Ex. 14 (Cyrus and Venus Trust Written Consents).

120.    Thus, both Moghadam's shares and the trusts' shares validly voted as part of the Common Director Written Consent as part of the 57% of the Common Stockholders who approved it.  *See supra* ¶ 51.

### 3. Mr. Zollars' July 10 written consent filling the Independent Director seat was valid.

121.    On July 10, Mr. Zollars executed and delivered a written consent in his capacity as the Debtor's lone Independent Director in which he filled the sole vacant Independent Director seat with Ms. Cecil.  That seat, unlike the formerly vacant Common Director seats, had been filled in the past by Mr. Nazem, who subsequently resigned.  Accordingly, Mr. Zollars was empowered to fill the vacancy by the Director Designation Provision of the Charter, which provides in relevant part that "a vacancy in any directorship filled by the holders of any class or classes or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or classes or series *or by any remaining director or directors elected by the holders of such class or classes or series*."   Charter Art. FOURTH, Section (B)(3.2.1).  Because the Charter entitles "[t]he holders of record of the shares of Common Stock and Preferred Stock (voting together as a single class, on an as-converted to Common Stock basis)" to elect both Independent Directors, Mr. Zollars was authorized to fill the vacancy in his capacity as sole director who had been elected by the holders of a majority in voting power of the Common Stock and Preferred Stock, voting as a single class.  *Id.*

122.    The Movants' convoluted attack on Mr. Zollars' consent appointing Ms. Cecil has no justification in the Charter or the DGCL and is plainly incorrect.  *See* Mot. ¶ 80.  The argument, to the extent it can be understood, is apparently based on the premise that, because the "Independent Directors" are elected by the holders of Common Stock and Preferred Stock, voting as a single class, the provisions of the Charter specifying that directors elected by the

49

holders of a "class, classes or series" of stock may fill a vacancy in any other directorship elected by the holders of the same class, classes or series of stock do not apply.

123.    This argument disregards the plain language of the Charter and misapprehends the manner in which vacancies are filled.  The Charter's plain terms empower a director "elected by the holders of [a] class or classes" to fill vacancies of that same "class or classes."  In Mr. Zollars' case, those "classes" are the Common Stock and the Preferred Stock, which are entitled, as a single class, to elect two directors (one of whom was Mr. Zollars).  Moreover, to the extent the Founder suggests that the Bylaws would dictate a different outcome, he is mistaken.  Section 18 of the Bylaws provides in relevant part that:

> whenever the holders of any class or classes of stock . . . are entitled to elect one or more directors by the provisions of the Certificate of Incorporation, vacancies . . . of such class or classes . . . shall . . . be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected . . . .

This is the *same* vacancy-filling mechanism.  Accordingly, Mr. Zollars validly appointed Ms. Cecil to the Board.  In any event, as shown above, stockholders representing a majority in voting power of the outstanding Common Stock and Preferred Stock, voting as a single class, voted in favor of the designation of Cecil as an Independent Director.  *See supra* ¶ 57.

### 4.  The Written Consent electing Series C Director was valid.

124.    On the morning of July 11, before the July 11 Board Meeting, holders of approximately 71% of the outstanding shares of Series C Preferred Stock executed and delivered the Written Consent Electing Series C Director filling the Series C Director vacancy with Mr. Moghadam, who had previously held the Series C Director seat pursuant to the Voting Agreement.  *See supra* ¶ 58 (chart of stockholders voting in favor of Series C Director).

125.    The Movants challenge this appointment, like the Common Director Written Consent, on grounds that the consent allegedly was not executed by a high enough percentage of

50

Series C Preferred Stock.  And like with the Common Director Written Consent, the argument rests on Mr. Moghadam allegedly not being entitled to execute the consent of the Moghadam Trust's shares because of the existence of the Putative Moghadam Voting Agreement.  But as set forth above, the Movants are wrong.

126.    Only a majority of the Company's Series C shares must be voted to elect a Series C director, as stated in the Voting Agreement, which superseded the Company's June 17, 2017 Letter Agreement, and this threshold was reached even without the Moghadam trust shares.  *See supra* ¶ 61 and n. 28.  Further, as described above, the Putative Moghadam Voting Agreement was procured through fraud, *see supra* ¶¶ 63-68, and even if that agreement is valid, that would simply mean that Zollars, not the Founder, would vote these shares.  Accordingly, requisite shares voted in favor of the Series C election and Mr. Moghadam was elected to the Board.

### 5. The Series B stockholders' July 11 written consent filling the Series B Director seat was ineffective.

127.    The Founder's attempt to concoct appointments to the Board shortly before and after the July 11 and July 12 Board Meetings all fail.  His purported action of the Series B stockholders on July 11, which attempted to fill the vacant Series B Director seat with Mr. Akhlaghpour, was ineffective because it was not executed by 50% of Series B Preferred Stockholders.  *See supra* ¶ 82 (chart of those voting).  The Founder's argument to the contrary is based on improperly counting Jem's shares.

128.    But as described above, the Court of Chancery already found that due to the Side Letter Agreement, the Founder cannot vote Jem's shares under the Jem Voting Agreement[73]; only Zollars can.  *See Supra* ¶ 83.  The Founder's attempt to end run the Chancery Court Ruling—having Jem vote itself—fails both because it is not permitted by the unambiguous

---

[73]    Ex. 41 (Jem Holder Voting Agreement).

language of the Jem Voting Agreement and because Jem's vote is, to put it mildly, suspicious. As set forth above, Jem's written consent purporting to elect Mr. Akhlaghpour appears to misspell the signatory's name, misspells the entity's name, and the signature appears to have been copied and pasted onto the page and remains freely moveable in the PDF of the written consent, among other problems.  *See supra* ¶ 84.

129.    It lacks credibility to argue that Jem would have made errors like this.  It is even more dubious given that Debtor's counsel called the Founder out on this in writing twice, and the Founder did not answer.  *See supra* ¶¶ 84-85.  The Debtor now has propounded discovery requests seeking documents on this issue.

130.    Accordingly, Mr. Akhlaghpour is not a member of the Board.

**6.  The July 14 action of the Founder's supposed board in filling a non-existent Independent Director vacancy was invalid.**

131.    The Founder continued to try to place new Board members post-petition. To be clear, even if he did so, by definition this could not affect whether the CFO was authorized to execute the Petition because the filing occurred first, and indeed the Founder's purported actions even post-date the Board's July 12 ratification of the CFO's actions.  But for completeness, we address here why the Founder's post-petition actions were invalid.

132.    The Founder argues that his supposed board convened on July 14 and, by majority vote, filled an allegedly Independent Director vacancy with Mr. Tan.  This action was invalid for several reasons.  First, there was no vacant Independent seat to fill.  There are only two Independent seats.  As detailed above, Mr. Zollars filled one and Ms. Cecil filled the other. Second, for reasons discussed above, the Founder's Designees were not duly elected and therefore all actions they attempted to take are invalid.  *See supra* § II(B)(I).  Third, even if there were a vacant Independent Director seat and the Founder's "Board" was the actual Board, that

Board lacked authority to fill the vacant seat. Rather, under the Director Designation Provision and Section 18 of the Bylaws, only Mr. Zollars, as sole Independent Director, could fill the vacancy. *See supra* § II(B)(3). Fourth, Tan is not eligible to be an Independent Director pursuant to the Voting Agreement because he and his affiliates own shares of the Company's common stock and preferred stock[74]. Notably, the Founder himself conceded in his trial testimony that Tan cannot qualify as an Independent Director. Tr. 129:15-130:5 ("[I]f Mr. Terence Tan and Ms. Sara Nazari wouldn't qualify for the same reason, then so be it.").

## C. THE BOARD DULY AUTHORIZED THE FILING OF THE BANKRUPTCY PETITION

133.    The Board duly authorized the CFO to file the Petition twice: once by majority vote at the July 11 Board Meeting (before the Petition was filed), and a second time by majority vote ratifying and authorizing the prior filing at the July 12 Board Meeting. The Movants argue the July 11 Board Meeting was void for lack of proper notice, which is incredible since the Founder is taking the polar opposite position in the Foresite litigation to argue that he is entitled to the benefits of the automatic stay. Regardless, the Movants do not challenge any formality requisite to actions taken at the July 12 Board Meeting and instead only argue that the July 12 Board Meeting has no legal effect because void acts cannot be ratified. Both arguments fail.

### 1.    The actions taken at the July 11 Board Meeting were valid.

134.    The July 11 Board Meeting was duly convened because it complied with all corporate formalities set forth in the DGCL, Charter, and Bylaws. The Movants challenge the July 11 Board Meeting only for lack of quorum and proper notice. Their quorum argument rests on the theory that the wrong Board members were present and that quorum necessitated the

---

[74]    The Founder argued in the Chancery Court Action that Zollars was ineligible to serve as an Independent Director because he owned stock. The Chancery Court rejected this argument because Zollars was expressly named as an Independent Director under the Voting Agreement. Tr. 52:2-53:9. The same is not true for Tan.

presence of half of their slate of directors.  That argument is debunked above.  *See supra* § II(B)(1), (6).  This solely leaves the issue of notice.

135.    The Debtor certainly understands that it provided 24 hours' notice of the July 11 Board Meeting on a Sunday because the Debtor's liquidity crisis did not permit it to wait until Monday, July 11, to give notice, which would have necessitated the meeting being held on Tuesday, July 12, by which time the Debtor would have been out of cash.  It is the height of irony that the Founder, who asked for the meeting itself to be held on the immediately prior Saturday, now complains that the notice could not be provided on a Sunday because Sunday is not a business day.  Having previously called for a meeting himself and having taken the position that the Debtor should conduct business on a Saturday, he should be estopped from arguing that merely receiving a notice on Sunday was invalid.  His about face on how soon this meeting should have been conducted is simply another misguided attempt to leverage the Debtor's financial difficulties at the expense of the Debtor's stakeholders to which he owes fiduciary duties.  In any event, as shown below, the issue of whether the notice was sent is irrelevant.

136.    Under Delaware law, notice is not always required to convene special board meetings.  Instead, Section 229 of the DGCL provides by statutory default that "[a]ttendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting *for the express purpose of objecting at the beginning of the meeting*, to the transaction of any business because the meeting is not lawfully called or convened."  8 *Del. C.* § 229 (emphasis added).  The Bylaws similarly provide that "[n]otice of any meeting . . . will be waived by any director by attendance thereat, except when the director attends the meeting *for the express purpose of objecting*, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened." Bylaws § 21(d) (emphasis

added).  Thus, silent attendance of each duly authorized director at a meeting obviates the need for prior notice.  Further, only objections lodged during and at the meeting directly with the convened board are sufficient to neutralize attendance's waiver effect.  *See id.* (requiring the objection to be both "express" and voiced "at the beginning of the meeting").

137.    Each duly authorized director—the Founder included—waived notice of the July 11 Board Meeting pursuant to the DGCL and Bylaws by attending and failing to "expressly" object "at the beginning of the meeting."  Thus, the special meeting was duly convened.

138.    The Founder concedes that he attended the July 11 Board Meeting but argues that he falls within the objection exception because (i) he purportedly emailed objections to notice and (ii) he alleges he was unable to speak during the meeting.  The Founder's emailed objections are ineffective because the DGCL and the Bylaws required him to voice an "express" objection "at the beginning of the meeting, not specifically by e-mail."  And the Founder's insistence that he was unable to object because he was muted is simply untrue, and he knows it.  As set forth above, the July 11 Board Meeting was the 4th Board meeting where the Board, to maintain order, muted everyone and informed all attendees how to use the raise hand feature.  *See supra* ¶¶ 74-75.  The Founder utilized the procedure regularly.  *See supra* ¶¶ 76-77.

139.    Having done it many times at prior Board meetings, the Founder knew exactly how to raise his hand and voice his objection to notice of the meeting at the July 11 Board Meeting; he simply failed to avail himself of the opportunity.  The Founder attended the beginning of the meeting, he did not activate his camera, and he did not use the notification feature to make a comment or ask a question.  During the first order of business, he left the

meeting, and the Board, which had quorum, proceeded with its business, which included approving the Resolutions.[75]

140.    Accordingly, by attending and failing to object, the Founder (and all other directors in attendance) waived notice for the July 11 Board Meeting.   As a result, the actions the Board took at that meeting were valid.

### 2.  Even if the actions taken at the July 11 Board Meeting were ineffective, the filing was effectively ratified at the July 12 Board Meeting.

141.    The Board approved and ratified the filing of the Petition at the July 12 Board Meeting.  The Movants do not take issue with any of the formalities exercised in convening the July 12 Board Meeting (such as notice) and instead argue that the July 12 Board Meeting had no legal effect because the actions taken at the July 11 Board Meeting were void and therefore incapable of subsequent ratification.  This argument fails for two reasons.

142.    *First*, contrary to the Movants' argument, Delaware corporate law precedent, while not uniform, weighs in favor of a finding that notice of a special meeting given in technical violation of the bylaws only renders the board action voidable, not void.  The Founder relies upon a single opinion of the Court of Chancery— *Klaassen v. Allegro Dev. Corp*., 2013 WL 5739680 (Del. Ch. Oct. 11, 2013)—to argue that actions like the one here are void, but fails to point out that the *Klaassen* court recognized that the rule it espoused "necessarily represent[ed] one trial judge's effort and *may not accurately reflect Delaware law*."  *Id.* at *19 n.10 (emphasis added).  The Founder also fails to point out that on appeal, the Delaware Supreme Court expressly declined to adopt any such rule, noting that the Chancery Court's "broad pronouncement" of the void-voidable distinction was "not necessary to decide this case." *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046–47 & n.75 (Del. 2014).

---

[75]    *See* Ex. 19 (7/11/22 Board Minutes).

143.     The Supreme Court's decision not to adopt the Chancery Court's "broad pronouncement" in the trial court opinion in *Klaassen* left undisturbed several sound opinions of Delaware courts recognizing that technical violations of bylaws may render challenged acts voidable, but will not render them void.  In *Nevins v. Bryan*, for example, the Court of Chancery held that failure to give proper notice of a board meeting in violation of the bylaws rendered actions taken at the meeting voidable.  885 A.2d 233, 246 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005). Likewise, in *Lofland v. DiSabatino*, the Court of Chancery held that defective notice of an annual stockholder meeting in violation of the corporation's bylaws rendered a vote taken at the meeting voidable.  1991 WL 138505 (Del. Ch. July 25, 1991).  Thus, because giving notice on a Sunday at most made the actions at the July 11 Board Meeting voidable, the Board was entitled during the July 12 Board Meeting to ratify any act taken at the July 11 Board Meeting.

144.     *Second*, even if the Board's July 11 authorization of the bankruptcy filing was void, the act of a duly appointed officer executing the Petition and directing counsel to file it is one that the Board was well within its rights to endorse and ratify—which is precisely what it did at the July 12 Board Meeting.  Thus, the validity of the Board's action at the July 12 Board Meeting does not hinge on the validity of any action taken at the July 11 Board Meeting.  Put differently, even if the July 11 Board Meeting had *never* occurred, the CFO could have executed the Petition in his capacity as an executive officer of the Debtor without prior board approval and the Board could have subsequently ratified that act by operation of general principles of agency law that govern every Delaware corporation's capacity to interact with the outside world.  In *Klig v. Deloitte LLP*, 36 A.3d 785 (Del. Ch. 2011), the Court expressly noted that a board may ratify and endorse—and confirm the validity of—actions taken by officers.  The Court stated:

57

"A board of directors [ ] may ratify acts taken by officers ... that might not have had actual authority to take such actions." Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 11.05[a], at 11–32 (2010). Chancellor Allen explained the effect of a principal's ratification of the agent's conduct as follows:

> One way of conceptualizing that effect is that it provides, after the fact, the grant of authority that may have been wanting at the time of the agent's act. Another might be to view the ratification as consent or as an estoppel by the principal to deny a lack of authority. See Restatement (Second) of Agency § 103 (1958). In either event the effect of informed ratification is to validate or affirm the act of the agent as the act of the principal. *Id*. § 82.

*Lewis v. Vogelstein*, 699 A.2d 327, 334–35 (Del. Ch. 1997).

145.    As in *Klig*, the Board, having full knowledge of the filing of the Petition and the matters relating to the decision to file it, including the extreme liquidity crisis, ratified and endorsed the actions of the officers that provided the Debtor the much-needed protection it secured through the Petition.

146.    As stated above, Delaware corporations can only act through their agents, including their officers.  General principles of agency law govern a corporate officer's capacity to bind a corporation.  *Cf., e.g., Kates*, 8 A.3d at 601 (applying "hallmark principles of agency law to traditional corporate fiduciaries, such as officers and directors").  Accordingly, an officer can bind the corporation.  Indeed, even a corporate officer who exceeds the bounds of his express authority can nonetheless bind the corporation if the board ratifies his act after the fact. *Hannigan*, 47 A.2d at 171–72 (citing and applying the following principle in concluding that a CEO's actions beyond his express authority could be ratified: "[i]f a corporate officer . . . performs an act or enters into a contract or other transaction without being authorized so to do, but which could have been authorized in the first instance by the Board of Directors . . . not

58

being prohibited by Charter or by statute nor contrary to public policy, such contract or transaction may nevertheless become binding on the company if ratified expressly or by implication"); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 14.02 (2021) ("In line with general principles of agency law, even acts originally unauthorized can become binding through board ratification, acceptance of benefits, or other estoppel."); 2A Fletcher Cyc. Corp. § 752 ("If the officers or the agents of a corporation assume to act for the corporation without any authority at all, or if they exceed their authority or act irregularly, and the act is one that could have been authorized in the first instance by the shareholders, board of directors or subordinate officers, as the case may be, it may be expressly or impliedly ratified by them, and thus be rendered just as binding, except as to intervening rights of third persons, as if it had been authorized when done, or done regularly.").

147.    Here, the CFO executed and instructed counsel to file the Petition pursuant to express authority he was granted in the Resolutions adopted at the July 11 Board Meeting.  But even if the July 11 Board Meeting was void (or, indeed, never took place), the CFO simply exercised the bounds of his authority as an officer of the Debtor (including under the Bylaws, which empowered him to "perform . . . duties commonly incident to his office").  Bylaws § 28(f).  Thus, his actions were capable of ratification, which occurred one day later.  *Hannigan*, 47 A.2d at 171–72.

148.    For all of these reasons, the filing of the Petition was duly authorized by the Debtor.

## II.    THE CHAPTER 11 CASE WAS FILED IN GOOD FAITH

149.    The Movants also seek dismissal of the Chapter 11 Case on the basis that it was filed in bad faith.  This argument is specious and the reality is exactly the opposite of the

Movants' position: the Chapter 11 Case not only was filed in good faith, but was the only way to preserve value for all of the Debtor's stakeholders in the face of the Debtor's liquidity crisis and financial distress, which prohibited the Debtor from continuing its normal business operations. Indeed, without protections afforded to DIP financing, the Debtor's secured lender would not have permitted funding of payroll on July 13 (two days after the Petition was filed).   As described above, the Debtor had already laid off employees to try to cut costs, negotiated with its lenders in an attempt to access capital, which the lenders rejected absent the filing of a bankruptcy case, and shopped the company, but did not identify any deal that could close immediately.  Accordingly, the Debtor decided that the Chapter 11 Case would best serve the Debtor's goal of preserving the business as a going concern and maximizing the value of the Debtor's estate for the benefit of all parties in interest.

150.    The case law is clear that bad faith should "not [be] lightly infer[red]" and that dismissal based on lack of good faith is generally only appropriate in "egregious cases." *In re Perlin*, 497 F.3d 364, 373 (3d Cir. 2007); *In re EHT US1, Inc.*, 630 B.R. 410, 429 (Bankr. D. Del. 2021) (same); *In re Gen. Growth Props.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) ("a bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution") (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989)).

151.    In determining whether a bankruptcy case has been filed in good faith, the court must examine the "totality of the facts and circumstances" and determine where a petition falls along the spectrum ranging from the "clearly acceptable to the patently abusive."   *In re JER/Jameson Mezz II Borrower, LLC*, 461 B.R. 293, 298 (Bank. D. Del. 2011) (Walrath, J.) (citing *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 162 (3d Cir. 1999)).

152.    The Third Circuit focuses on two key inquiries when assessing whether a petition was filed in good faith: (i) whether the petition serves "a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate," and (ii) whether the petition was "filed merely to obtain a tactical litigation advantage."  *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (citations omitted).  The Third Circuit has also recognized that "(a) preserving a going concern and (b) maximizing property available to satisfy creditors [are] valid bankruptcy purposes."  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004).

153.    The non-exhaustive list of factors that this Court has applied in determining whether a case was filed in good faith is as follows:

> (a) single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure; (e) two-party dispute that can be resolved in pending state court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous bankruptcy petitions; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k) debtor formed immediately prepetition; (l) the debtor filed solely to create automatic stay; and (m) the subjective intent of the debtor.

*See, e.g., JER/Jameson*, 461 B.R. at 298-99 (Walrath, J.) (citing *Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002)).

154.    As shown below, the filing of this case meets every criterion of a good faith filing as articulated in *15375 Mem'l Corp.* and *Integrated Telecom Express*.  Indeed, this might be the first time that someone has argued that a bankruptcy filing made to access DIP financing and run a section 363 sale process for the benefit of hundreds of creditors, with no litigation pending against the Movants, somehow is a bad faith filing.  The Movants may list the *Primestone* factors, but they meet almost none of them, as demonstrated below.

### A. THE DEBTOR IS IN FINANCIAL DISTRESS AND COMMENCED THE CHAPTER 11 CASE FOR VALID BANKRUPTCY PURPOSES

155.    After considering the limited restructuring options available to the Debtor, the Debtor commenced the Chapter 11 Case due to the financial distress created by, among other things, an unsuccessful product launch resulting in refunds, unsuccessful capital raising efforts, and mounting litigation costs, all largely caused by the Founder.  *See* First Day Affidavit ¶¶ 17, 18, 19.  As a result of the increased costs that the Debtor experienced leading up to the Chapter 11 Case, and without access to additional liquidity, a chapter 11 filing was necessary and appropriate to preserve the business as a going concern and to maximize the value of the Debtor's estate for the benefit of its creditors.  These are both recognized, valid bankruptcy purposes under *15375 Mem'l Corp.* and *Integrated Telecom Express*.

156.    As discussed above, during the course of the Chancery Court Action, the Debtor hired an investment banker to market the Debtor's assets, but there was a cloud cast over the marketing process due to the pendency of the Chancery Court Action.  *Id.* ¶ 89.  In other words, no one would make a firm offer because they did not know who the seller was.  All the while, the Debtor's operating business was hemorrhaging cash and litigation costs continued to add up, further pushing the Debtor into a liquidity crisis.  By the time of the Chancery Court Ruling, only days of operating cash remained.  *Id.* ¶ 90.

157.    While the Debtor evaluated alternatives to a bankruptcy filing, such as a forbearance with the Debtor's secured lender (which was only approved for a limited time) and potential out-of-court restructuring transactions with interested parties, the Debtor's only real option was bankruptcy given the lenders' position, the lack of an executable out-of-court transaction and the Debtor's cash position.

158.    The Movants argue, without evidence or merit, that LH stood ready and able to transact with the Debtor out-of-court and would have provided a capital infusion in an amount between $30 million and $100 million.  But LH's prepetition interest in the Debtor, while welcome, was not actionable in the timeframe needed given the Debtor's cash position.  LH did not even submit an actionable term sheet, much less a draft agreement.  The engagement between the Debtor and LH was in its infancy; LH initially demanded exclusivity prepetition at a time when the Company was undergoing a process to explore all strategic alternatives with Lazard's assistance and, on numerous occasions, LH delayed or failed to respond to the Debtor for weeks.  With the Debtor's cash position in crisis, it could not gamble that a prepetition deal with LH would suddenly emerge to stave off bankruptcy.  The Debtor welcomes any bid LH may make post-petition in the sale process.

## B.    THE DEBTOR DID NOT COMMENCE THE CHAPTER 11 CASE MERELY TO OBTAIN A TACTICAL LITIGATION ADVANTAGE

159.    The Founder's argument that the Debtor commenced this case merely for a litigation advantage (Mot. ¶¶ 94-98) is wrong for numerous reasons.  *First*, the Founder simply ignores the fact that the Debtor was quickly running out of cash, with no access to additional liquidity, and a lender refusing to provide access to restricted cash absent an immediate chapter 11 filing.  Thus, even if there were some "litigation advantage" (which there was not), it does not change the Debtor's immediate need for bankruptcy.

160.    *Second*, the Debtor filed for bankruptcy *after* the Chancery Court Ruling, which was a final judgment.  All of the caselaw concerning bad faith filings being litigation tactics concern a filing either to forestall existing litigation or stay a ruling.  *See, e.g., SGL Carbon Corp.*, 200 F.3d 154 at 164.  The Founder cites no opinion that dismissed a chapter 11 filing as a litigation tactic where the petition was filed post-judgment and the Debtor complied with the

63

judgment.  Moreover, "litigation tactic" cases involve suits for money damages or property – not the makeup of a debtor's board.  Stated differently, litigation over the makeup of the Board certainly may affect corporate decisionmaking but does not impact the Debtor's value or prospects.

### C.  THE CHAPTER 11 CASE IS NOT A TWO-PARTY DISPUTE

161.    The Chapter 11 Case is not a two-party dispute; the Debtor seeks to preserve the business as a going concern and to maximize value for the benefit of all creditors.  The Movants even admit that the Debtor has "less than 1,000 creditors."[76]  Caselaw dismissing chapter 11 petitions because they are a two-party dispute have done so when there are fewer than 10 or 15 creditors – not hundreds.  *See, e.g., Primestone*, 272 B.R. at 558 (case dismissed because debtor filed the case to forestall "virtually its only creditor").

162.    Moreover, the Movants' argument that this is a two-party dispute is extremely ironic given that the Founder filed a motion to stay litigation against him (the "<u>Stay Motion</u>")[77] brought by one of the Debtor's stockholders, Foresite, in the California Action.  In the Stay Motion, the Founder argues that the automatic stay of section 362(a) of the Bankruptcy Code should apply to his defense of litigation brought by Foresite, a third party.  The Founder cannot credibly argue both that this is a two-party dispute between the Board and him and that a third party's claim against him should be stayed because of its relationship to the Chapter 11 Case.  Additionally, among the Founder's arguments in the Stay Motion is a purported concern about this Court's jurisdiction.  *See* Stay Motion at 5:4-6 ("[a]ccordingly, a ruling that the automatic stay does not apply to all of the causes of action in this litigation would likely invade the bankruptcy court's jurisdiction over the debtor and the debtor's assets.").  It is hard to understand

---

[76]    Mot. ¶ 92.

[77]    *See* Ex. 1 (Stay Motion).

64

how the Founder can simultaneously seek to "protect" this Court's jurisdiction and move to dismiss the Chapter 11 Case, which would deprive it of jurisdiction.

### D.  THE OTHER *PRIMESTONE* FACTORS ALSO WEIGH IN FAVOR OF THE DEBTOR

163.    In addition to the analysis above, the *Primestone* factors heavily favor not dismissing the Chapter 11 Case:

i.  **Single Asset Case**: Not applicable.  The Debtor's assets consist of intellectual property, lab equipment, executory contract rights, real property interests, and others.

ii.  **Few Unsecured Creditors**: Not applicable.  The Debtor has many unsecured creditors, and the Founder admits that the Debtor has "less than 1,000 creditors." (Mot. ¶ 92).  Hundreds of creditors cannot be said to be "few."

iii.  **No Ongoing Business or Employees**: Not applicable.  The Debtor has more than 40 employees, including scientists and engineers, who are continuing to make progress on research and development.

iv.  **Petition Filed on Eve of Foreclosure**: Not applicable.  The Debtor negotiated a Pre-Petition forbearance with its secured lender and did not file the case to avoid imminent foreclosure.

v.  **No Cash or Income**: While it is true that the Debtor did not have significant cash or access to liquidity absent a chapter 11 filing, it did seek and obtain approval to use its secured lender's cash collateral and to obtain post-petition financing on an interim basis to successfully prosecute the Chapter 11 Case. Without question, that is a valid chapter 11 purpose.

vi.  **Previous Bankruptcy Petition**: Not applicable. This is the Debtor's first bankruptcy.

vii.  **Prepetition Conduct was Improper**: Not applicable. As discussed herein, the Debtor filed the Chapter 11 Case pursuant to the Board's authorization to maximize value in the face of a liquidity crisis.  Moreover, the Chancery Court Ruling did not in any way find that any member of the Board *other than the Founder* acted improperly.

65

    viii.   **No Possibility of Reorganization**: Not applicable.  The Debtor believes that the Court-approved sale process will allow the Debtor to maximize the value of its assets and enable the Debtor to pay creditors through a chapter 11 plan.

    ix.   **Debtor formed Immediately Prepetition**: Not applicable.  The Debtor was formed in 2010.

    x.   **Debtor filed Solely to Create Automatic Stay**: Not applicable.  The Debtor filed the Chapter 11 Case in the face of a liquidity crisis to maximize the value of its assets for the benefit of all parties in interest.  However, the Founder is attempting to use the automatic stay to his advantage in the California Action.  *See supra* ¶ 162.

    xi.   **Subjective Intent of the Debtor**: The Debtor's intent is to maximize value through a Court-approved sale process, which could only be obtained through bankruptcy.

    xii.   **The Debtor's Post-Petition Misconduct**: The Debtor has not engaged in any post-petition misconduct and seeks to use the bankruptcy process and the Court's guidance in successfully prosecuting the Chapter 11 Case.

    xiii.   **Lack of Financial Distress**: It is clear that the Debtor experienced financial distress and such distress led to the filing of the Chapter 11 Case.  *See supra* ¶ 155.

164.    In summary, *every* applicable factor of the *Primestone* test cuts in the Debtor's favor.  This case is anything but a bad faith filing and should not be dismissed.

## III.   NO TRUSTEE SHOULD BE APPOINTED

165.    As a last-ditch effort, the Movants seek in the alternative the appointment of a chapter 11 trustee, thereby candidly revealing that their true purposes are to wrest control from the Board and to cause delay—which has been the Founder's misguided strategy all along.  This effort fails as well.  As alternative relief, the Movants only are requesting it if the Court has found that the Chapter 11 Case (a) was validly authorized, and (b) should not be dismissed

66

because it was not filed in bad faith.  Once the Court reaches those decisions, there will simply be no basis to appoint a trustee.

166.    The Third Circuit has recognized that "appointment of a trustee should be the exception, rather than the rule," and parties seeking such an extraordinary remedy must demonstrate, by clear and convincing evidence, that cause exists to overcome the "strong presumption against appointing an outside trustee."  *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989); *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998); *accord Official Comm. of Asbestos Pers. Injury Claimants & Official Comm. of Asbestos Prop. Damage Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) (appointment of a trustee is warranted only as "a last resort").  The Movants' request to appoint a chapter 11 trustee does not come close to satisfying the legal standard, is unsupported by any evidence, and must be denied.

## A. THE MOVANTS HAVE FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT CAUSE EXISTS TO APPOINT A CHAPTER 11 TRUSTEE UNDER SECTION 1104(A)(1) OF THE BANKRUPTCY CODE

167.    Section 1104(a)(1) of the Bankruptcy Code authorizes a court to order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement."    11 U.S.C. § 1104(a)(1).    The Movants have offered no evidence to demonstrate fraud, dishonesty, incompetence, or gross mismanagement, which is their burden. *See In re Excel Mar. Carriers Ltd.*, 2013 WL 5155040, at *4 (Bankr. S.D.N.Y. Sept. 13, 2013).

168.    The Movants seem to argue that the Founder's issues and acrimony with the Debtor and the Board are enough to warrant appointment of a chapter 11 trustee.  This theory fails for multiple reasons.  First, hostility between the Founder and the Debtor – even if well-founded (it is not) – does not standing alone "demonstrate fraud, dishonesty, incompetence, or

67

gross mismanagement." Second, the Movants do not even attempt to allege (nor could they) that the Board has committed fraud or acted dishonestly. The only real concern voiced by the Movants relates to the Debtor allegedly ignoring LH's overtures. This fails to justify the appointment of a chapter 11 trustee for two independent reasons. First, even if true, it does not implicate section 1104(a)(1)'s standard. Second, and crucially, LH was not ignored by the Debtor and, in fact, the Debtor engaged LH prepetition and welcomes LH's involvement as a bidder in the sale process now.

169. Moreover, as discussed above, the Board is qualified, honest and comprised of a majority of disinterested directors. The Board consists of seven members, five with no ties or allegiance to any bidder or interested party in the sale process. Of the two members with ties to potential bidders, one is the Founder. In addition, the Debtor has a Special Committee of disinterested directors to consider, among other things, a transaction with any bidder with ties to a board member.

170. The Founder, on the other hand, has been accused of fraud in civil suits by multiple parties in two different courts, and is attempting to gamble with creditor recoveries in this case for personal benefit. Accordingly, the Founder should not be heard to argue that the Board is dishonest in any manner.

**B. THE MOVANTS HAVE FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT APPOINTMENT OF A CHAPTER 11 TRUSTEE IS WARRANTED UNDER THE BEST INTERESTS STANDARD UNDER SECTION 1104(A)(2) OF THE BANKRUPTCY CODE**

171. Section 1104(a)(2) of the Bankruptcy Code authorizes a court to order the appointment of a trustee "if such appointment is in the interests of creditors, any equity security

68

holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2).[78]

172.    The Movants simply ignore the Debtor's liquidity crisis and generally assert that LH was the white knight that could have prevented the Debtor from filing bankruptcy. *See* Mot. ¶¶ 107-109. This is obviously false since the Debtor had not even received an actionable term sheet from LH providing liquidity before it would run out of cash. The Debtor has demonstrated through its advancing of a neutral sale process that it is well-positioned to run a sale process that will market test the Debtor's assets and provide the means to pay creditors.

173.    Moreover, at this stage of the case, the appointment of a trustee would come at great cost to the Debtor's estate, given the time necessary for a chapter 11 trustee to get up to speed and the costs associated with such efforts. Specifically, the monetary costs associated with selection of a chapter 11 trustee, and the chapter 11 trustee's subsequent hiring of professionals, all of whom would spend time getting up to speed, are not contained in the DIP budget and would cause a default. Further, the extra time needed to get up to speed in the case would also constitute a default.

174.    In short, the Movants present no credible facts to support a finding that a chapter 11 trustee is necessary in this case. Rather, the record before the Court demonstrates, at best, a general discontent by the Founder, a condition that is not unusual for any chapter 11 case. That is not a basis to appoint a trustee. *Cf. In re G-I Holdings, Inc.*, 385 F.3d 313, 313 (3d Cir. 2004);

---

[78]    Additionally, courts have considered the following four factors in determining whether a chapter 11 trustee should be appointed pursuant to section 1104(a)(2) of the Bankruptcy Code: (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 659 (Bankr. S.D.N.Y. 2006) (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)); *Schuster v. Dragone (In re Dragone)*, 266 B.R. 268, 273 (D. Conn. 2001); *In re Colorado-Ute Elec. Ass'n*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990). The Movants do not even attempt to make an argument under these factors, and none would succeed.

69

*In re Sundale, Ltd.*, 400 B.R. 890, 909 (Bankr. S.D. Fla. 2009) (denying motion to appoint trustee and stating that "[n]either loss of confidence, however reasonable, or acrimony, however bitter, necessarily results in appointment of trustee"). Accordingly, the alternative relief sought by the Movants under section 1104(a) of the Bankruptcy Code should be denied.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court deny the Motion and grant any such other and further relief as may be just and proper.

Dated:     August 8, 2022
            Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Russell C. Silberglied*
Daniel J. DeFranceschi (No. 2732)
Russell C. Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
David T. Queroli (No. 6318)
Matthew P. Milana (No. 6681)
J. Zachary Noble (No. 6689)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
defranceschi@rlf.com
silberglied@rlf.com
merchant@rlf.com
queroli@rlf.com
milana@rlf.com
noble@rlf.com


*Proposed Counsel to the*
*Debtor and Debtor in Possession*