## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] | Case No. 22-10621 (BLS) |
| Debtor. | **Obj. Deadline: TBD**<br>**Hearing Date: TBD** |

**EMERGENCY MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I)
AUTHORIZING AND APPROVING ENTRY INTO STALKING HORSE
AGREEMENT AND RELATED BID PROTECTIONS IN CONNECTION
WITH THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") hereby files

this emergency motion (the "Motion") for the entry of an order, substantially in the form

attached hereto as Exhibit A  (the "Proposed Stalking Horse Order"), pursuant to sections 105(a),

363, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002,

6004, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

Rules 2002-1, 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of

the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing

and approving (i) the Debtor's designation of a stalking horse bidder, (ii) the Debtor's entry into

a stalking horse agreement with such stalking horse bidder, (iii) the Debtor's payment of certain

bid protections in connection therewith, and (iv) granting related relief.  In support of this

Motion, the Debtor relies upon the *Declaration of Lisa Lansio in Support of the Emergency*

*Motion of the Debtor for Entry of an Order (I) Authorizing and Approving Entry into Stalking*

*Horse Agreement and Related Bid Protections in Connection with the Sale of All or Substantially*

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is GenapSys, Inc. (3904).  The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City, CA 94063.

*All of the Debtor's Assets, and (ii) Granting Related Relief* (the "<u>Lansio Declaration</u>"), filed contemporaneously herewith.    In further support of this Motion, the Debtor respectfully represents as follows:

<u>**JURISDICTION AND VENUE**</u>

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.    Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory and legal predicates for the relief sought herein are sections 105(a), 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007, and Local Rules 2002-1, 6004-1, and 9006-1.

<u>**BACKGROUND**</u>

*A. General Background*

3.    On July 11, 2022 (the "<u>Petition Date</u>"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Case</u>").    The Debtor is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    No official committees have been appointed in the Chapter 11 Case.    Additional information regarding the Debtor's business, its capital structure, and the circumstances leading to the filing of the Chapter 11 Case is set forth in the *Declaration of Britton Russell in Support of Debtor's Chapter 11 Petition and First Day Motions*

2

[Docket No. 11] (the "First Day Declaration"),[2] filed on July 12, 2022 and incorporated herein by reference.

**B.  Background Related to the Sale Process**

4.      As discussed in the Bidding Procedures Motion (as defined below), prior to the Petition Date, with the assistance of Lazard Frères & Co. LLC ("Lazard"), the Debtor engaged in a prepetition marketing process and solicited interest from over 100 potential financial and strategic investors.  During the prepetition marketing process, the Debtor received two non-binding indications of interest, including one from one or more affiliates of Farallon Capital Management, L.L.C. ("Farallon").[3]  Unfortunately, given timing and liquidity constraints, the Debtor was unable to finalize an agreement for the purchase of the Debtor's assets prior to the Petition Date.  As discussed more below, following the Petition Date, Farallon has remained engaged in the sale process.

5.      On July 14, 2022, the Debtor filed the *Motion of the Debtor for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Authorizing the Debtor to Designate a Stalking Horse Bidder and to Provide Bidding Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 54] (the "Bidding Procedures

---

[2]     Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

[3]     Funds and/or accounts managed or advised by Farallon own, directly or indirectly, approximately 71% of the Series D Preferred Equity Interests. Additionally, a Series D Director designated by Zone III Healthcare Holdings, LLC (a Farallon managed vehicle) is a member of GenapSys' board of directors.

Motion") seeking, among other things, approval of certain bidding procedures (the "<u>Bidding Procedures</u>").[4]  The facts and legal arguments set forth in the Bidding Procedures Motion are incorporated herein by reference.

6.      Following the Petition Date, the Debtor continued to negotiate with certain affiliates of Farallon regarding a potential stalking horse transaction.  These negotiations resulted in the Debtor receiving a stalking horse bid for substantially all of the Debtor's assets from Sequencing Health, Inc. (the "<u>Stalking Horse Bidder</u>"), a purchaser entity anticipated to be affiliated with entities, funds and/or accounts managed or advised, directly or indirectly, by, or under common control with, three investors holding Series D preferred equity interests in the Debtor: Farallon, Soleus Private Equity Fund, II, L.P. ("<u>Soleus</u>"), and PBM GEN Holdings, LLC ("<u>PBM</u>").[5]  To that end, on August 11, 2022, the special committee of independent directors (the "<u>Special Committee</u>")[6] approved, subject to finalizing certain terms, the Debtor's entry into that certain *Asset Purchase Agreement*, dated as of August 12, 2022, by and among the Stalking Horse Bidder, as purchaser, and the Debtor, as seller (the "<u>Stalking Horse Agreement</u>", and the sale transactions contemplated thereby, the "<u>Sale Transaction</u>").

7.      Pursuant to the Stalking Horse Agreement, the Stalking Horse Purchaser has submitted a "stalking horse bid" (the "<u>Stalking Horse Bid</u>") for substantially all of the

---

[4]      Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Motion.

[5]      During the marketing process, Soleus and PBM informed Lazard that they would not be in the position to submit a bid on their own for the Debtor's assets.

[6]      To ensure the integrity, efficiency and effectiveness of the sale process, the Debtor's board of directors (the "<u>Board</u>") established the Special Committee consisting solely of disinterested directors with substantial experience to oversee the sale process and to address other matters.  Dr. Harish Soundararajan, who is an Investment Director at Farallon and is Farallon's designated Board member, is not a member of the Special Committee and has no role with respect to any decisions involving the sale process or consideration of any bids.

Debtor's Assets (collectively, the "Purchased Assets", as defined in section 2.1 of the Stalking Horse Agreement), for an aggregate purchase price of up to $10,000,000 in cash consideration[7] and the assumption of certain prepetition indebtedness to Oxford Finance LLC (collectively, the "Purchase Price"). The Debtor estimates the aggregate Purchase Price, based on the Cash Purchase Price and the Assumed Oxford Indebtedness, to be approximately $42 million.

8.    At the time of filing the Bidding Procedures Motion, the Debtor had not yet designated a stalking horse bidder. As a result, the Bidding Procedures Motion[8] provides for approval of certain procedures (the "Stalking Horse Designation Procedures") authorizing the Debtor to designate one or more stalking horse bidders, enter into one or more stalking horse purchase agreements, and provide bid protections to any stalking horse bidders. The Stalking Horse Designation Procedures provide that the Debtor may seek, on shortened notice, approval of bid protections to any stalking horse bidder. As the Court is aware, the Bidding Procedures Motion was originally scheduled to be heard (on full notice) at the August 4, 2022 hearing. The hearing on the Bidding Procedures Motion, however, was adjourned to August 15, 2022 due to the Court's desire to first consider the pending motion to dismiss [Docket No. 73] (the "Motion to Dismiss") filed by the Debtor's founder. The Debtor believes that the Motion to Dismiss is wholly without merit and will be overruled at the August 15, 2022 hearing, thereby allowing the Court to proceed with consideration of the Bidding Procedures Motion. That said, the Debtor submits that an expedited stalking horse order is necessary given the compressed timeline that

---

[7]    Pursuant to the Stalking Horse Agreement, "Cash Purchase Price" means the dollar amount that is equal to the sum of (i) the total DIP Obligations; (ii) the Cure Amounts; (iii) the Buyer Closing Payments; (iv) the Transferred Employee PTO; (v) the WARN Obligations (if any); and (vi) two million dollars ($2,000,000); *provided* that the Cash Purchase Price shall in no event exceed ten million dollars ($10,000,000) after accounting for each component of the Cash Purchase Price, including any such component that may be paid shortly following Closing.

[8]    On August 3, 2022, the Debtor filed a notice [Docket No. 105] of revised order approving the Bidding Procedures incorporating certain comments received from various parties to the Bidding Procedures Motion.

includes a Bid Deadline as early as August 23, 2022. Accordingly, the Debtor has filed this Motion on an emergency basis seeking approval of the stalking horse relief at the Court's earliest convenience. For the estate to fully realize the benefits of having a Stalking Horse Bidder, it is imperative that the Stalking Horse Bid be in place sufficiently in advance of the Bid Deadline to serve as a floor upon which competing bids will be based. Indeed, the Debtor believes that approval of entry into the Stalking Horse Agreement and the related Bid Protections (as defined below) as soon as possible will ensure competitive bidding for the Debtor's assets and a value-maximizing sale process.

## RELIEF REQUESTED

9.       Pursuant to sections 105(a), 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007, and Local Rules 2002-1, 6004-1, and 9006-1, the Debtor hereby seeks entry the Proposed Stalking Horse Order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtor to (i) enter into the Stalking Horse Agreement, substantially in the form attached hereto as Exhibit B, subject to higher or better offers for the Purchased Assets submitted in accordance with the proposed Bidding Procedures; and (ii) provide the Stalking Horse Bidder with certain bidding protections pursuant to the terms of the Stalking Horse Agreement; and (b) granting related relief.

## The Stalking Horse Agreement

10.      As set forth in the Bidding Procedures Motion, the consummation of the Sale Transaction that will maximize the value of the Debtor's estate and creditor recoveries is the cornerstone of the Debtor's chapter 11 strategy. The Stalking Horse Agreement is the product of the Debtor's and its advisor's extensive marketing efforts, which began prior to the Petition Date and have been ongoing during the course of the Chapter 11 Case. The Stalking Horse Bid represents the highest and best offer received for the Purchased Assets, guarantees a sale of the

6

Purchased Assets at an attractive price, and allows the Debtor to continue the sale process in accordance with the proposed Bidding Procedures. That process and the proposed Bidding Procedures will provide an opportunity to market all of the Purchased Assets through a competitive auction process that will allow the Debtor to identify any higher or better offers that might exist. Because the Stalking Horse Bid not only locks in a purchase price that represents significant value for the Purchased Assets, but also allows the Debtor to test the market and see if it can secure an even better deal, the proposed transaction with the Stalking Horse Bidder, entry into the Stalking Horse Agreement, and approval of the Bid Protections serve the best interests of the Debtor's estate and its stakeholders.

11.    By this Motion, the Debtor seeks authority to provide the Stalking Horse Bidder with standard bid protections in accordance with the terms of the Stalking Horse Agreement and the proposed Bidding Procedures. Specifically, the Stalking Horse Agreement provides for the payment of (a) an expense reimbursement, in an amount not to exceed $750,000, on account of reasonable and out-of-pocket costs and expenses that may be incurred by Stalking Horse Bidder in connection with the Stalking Horse Agreement (the "Expense Reimbursement"), and (b) a "break-up" fee in an amount equal to $1,290,000 (the "Break-Up Fee" and, together with the Expense Reimbursement, the "Bid Protections"), in the event the Debtor consummates an Alternative Transaction (as defined in the Stalking Horse Agreement). The Break-Up Fee equates to roughly three percent (3%) of the Purchase Price, with the Bid Protections in the aggregate amounting to approximately 4.9% of the Purchase Price.

12.    The proposed Bidding Procedures also provide for certain other Bidding Protections to the Stalking Horse Bidder. For example, if the Stalking Horse Bid is selected as the Baseline Bid (or a Leading Bid) for the Purchased Assets at the Auction, a topping bid must

7

include a minimum purchase price in an amount equal to the sum of (a) $2 million; (b) the cure

costs of all assumed Contracts, (c) any transfer taxes resulting from the Sale, (d) unless the DIP

Administrative Agent has agreed otherwise, the amount of the DIP Obligations; (e) unless the

Prepetition Agent has agreed otherwise, the Prepetition Loan Obligations; (f) the Bid

Protections; and (g) the applicable Minimum Overbid amount (such topping bid, a "Stalking

Horse Overbid"). See Bidding Procedures, Section VI.A.4. Additionally, the Debtor only will

consider a Partial Bid for a portion of the Purchased Assets if (x) the Debtor receives another

Partial Bid for the remaining Purchased Assets such that, when taken together, the Partial Bids

constitute a higher or better bid than the Stalking Horse Bid, and exceed the Stalking Horse

Overbid amount. See Bidding Procedures, Section VI.A.4.

      13.    In accordance with Local Rule 6004-1(b)(iv), the below chart summarizes

certain significant terms of the Stalking Horse Agreement:[9]

| MATERIAL TERMS OF THE STALKING HORSE AGREEMENT | |
|---|---|
| **Purchase Price** | The Purchase Price is equal to the sum of the Cash Purchase Price plus the Assumed Oxford Indebtedness. Stalking Horse Agreement § 2.6. |
| | The "Cash Purchase Price" means the dollar amount that is equal to the sum of (i) the total DIP Obligations; (ii) the Cure Amounts; (iii) the Buyer Closing Payments; (iv) the Transferred Employee PTO; (v) the WARN Obligations (if any); and (vi) two million dollars ($2,000,000); provided that the Cash Purchase Price shall in no event exceed ten million dollars ($10,000,000) after accounting for each component of the Cash Purchase Price, including any such component that may be paid shortly following Closing. |
| | The Debtor estimates that the aggregate Purchase Price, based on the Cash Purchase Price and the Assumed Oxford Indebtedness, to be approximately $42,000,000. |

---

[9]    This summary is qualified in its entirety by the provisions of the Stalking Horse Agreement. To the extent that there is any inconsistency between the terms of the Stalking Horse Agreement and this summary, the terms of the Stalking Horse Agreement shall control. To the extent a particular type of provision identified in Local Rule 6004-1(b)(iv) is not herein summarized, the Stalking Horse Agreement does not contain a provision of such type or such provision is otherwise inapplicable to the relief requested herein. Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the Stalking Horse Agreement, as applicable.

| Purchased Assets | Subject to the terms and conditions set forth in the Stalking Horse Agreement, at the Closing and in exchange for the Purchase Price, the Debtor agrees to sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to accept, purchase, acquire, assume and take delivery of, all right, title and interest in and to all rights, properties and assets of the Debtor, real, personal or mixed, tangible or intangible, of every kind and description, except for the Excluded Assets (collectively, the "Purchased Assets") free and clear of all Encumbrances (other than Permitted Encumbrances). See id. at § 2.1(a)-(n). |
|---|---|
| Excluded Assets | Any assets that are not Purchased Assets are excluded from the Sale Transaction. See id. at § 2.2(a)-(o). |
| Termination | Notwithstanding anything herein to the contrary, the Stalking Horse Agreement may be terminated at any time prior to the Closing: |
| | 11.1.1 — by written mutual consent of the Debtor and Buyer; |
| | 11.1.2 — by either Buyer or the Debtor, if the Closing has not occurred on or prior to 5:00 p.m. (E.T.) on September 16, 2022 (the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in the Stalking Horse Agreement by the Debtor or Buyer, then the breaching Party may not terminate the Stalking Horse Agreement pursuant to Section 11.1.2; |
| | 11.1.3 — by either Buyer or the Debtor, upon written notice to the other Party, if the other Party is in material breach or default of any provision of the Stalking Horse Agreement, which breach is not cured within ten (10) Business Days after written notice thereof is received by the breaching Party, provided, however, that the terminating party is not in material breach or default of the Stalking Horse Agreement; |
| | 11.1.4  — by either Buyer or the Debtor if (i) the sale is disapproved by the Bankruptcy Court, (ii) any court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any final and non-appealable applicable Law which is in effect and has the effect of making the Sale illegal or otherwise restraining or prohibiting consummation of the Sale and which is not satisfied, resolved or preempted by the Sale Order, or (iii) to the extent not previously terminated pursuant to another subsection of Section 11.1, if the Debtor accepts or agrees to any Alternative Transaction (unless Buyer is a Back-Up Bidder as contemplated by the Sale Procedures Order, then in such case, upon the Closing of the Alternative Transaction); |
| | 11.1.5 — by either Buyer or Debtor, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided, amended or modified (or required to be amended or modified) in form and substance no longer satisfactory to Buyer, by an Order of a court of competent jurisdiction; |
| | 11.1.6 — by either Buyer or Debtor, if the Bankruptcy Case is dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason prior to Closing; |
| | 11.1.7 — by either Buyer or Debtor, upon the conclusion of the Auction, if Buyer is not selected as the Successful Bidder or Back-Up Bidder; |
| | 11.1.8  — by either Buyer or Debtor if the Bankruptcy Court has not |

approved the consummation of the Sale on or before September 14, 2022, or if the Sale Order has not been entered before such date (or is vacated or stayed as of such date);

11.1.9 — by Buyer if the Sale Procedures Order is entered by the Bankruptcy Court after the date of the Stalking Horse Agreement and such Order is not in the form attached to the Sale Motion filed on July 14, 2022 or such other form and substance reasonably acceptable to Buyer;

11.1.10 — by Buyer immediately upon the Bankruptcy's Court's failure to enter the Stalking Horse Order in accordance with the Sale Procedures Order designating Buyer as the Stalking Horse Bidder, approving the Break-Up Fee and Expense Reimbursement, and permitting the release of the Deposit in accordance with the terms of the Stalking Horse Agreement;

11.1.11 — by Buyer if the Sale Order is not in form and substance reasonably satisfactory to Buyer;

11.1.12 — by Buyer (i) if Oxford Finance does not deliver its duly executed signature page to the Oxford Loan Modification Agreement, (ii) if, despite Buyer's commercially reasonable efforts, Buyer and Oxford Finance have not agreed to a form of Oxford Loan Modification Agreement by August 22, 2022, or (iii) in the event that Oxford Finance requires any material modifications (as determined by Buyer in its reasonable discretion) to the Oxford Loan Modification Agreement from the form agreed to by August 22, 2022;

11.1.13 — by Buyer if the Cash Purchase Price exceeds ten million dollars ($10,000,000);

11.1.14 — by Buyer if the Bankruptcy Court determines that any Desired Contract listed on Schedule 11.1.14 to the Stalking Horse Agreement cannot be assigned to Buyer by operation of law and Buyer has not entered into an alternative arrangement with the applicable non-Debtor party for the subject matter of any Desired Contract listed on Schedule 11.1.14;

11.1.15 — by Buyer if the condition set forth in Section 10.9 of the Stalking Horse Agreement is not satisfied;

11.1.16 — by Buyer if the Transition Services Agreement has not been agreed to on terms reasonably acceptable to Buyer;

11.1.17 — by the Debtor at any time before the Bid Deadline (established by the Bidding Procedures) to the extent permitted by Section 6.8 of the Stalking Horse Agreement;

11.1.18 — by the Debtor if there is an Alternative Transaction and Debtor has determined in good faith after consultation with Debtor's outside legal counsel and financial advisors that failure to consummate the Alternative Transaction would reasonably be expected to violate the Bankruptcy Code

See id. at § 11.1.1-18.

| | |
|---|---|
| **Bid Protections** | The Break-Up Fee, Expense Reimbursement and the Deposit, shall be the sole and exclusive remedy of the Parties for a breach of the Stalking Horse Agreement. If the Closing does not occur in accordance with the Stalking Horse Agreement due exclusively to Buyer's default or breach of the Stalking Horse Agreement in accordance with Section 11.1.3 or Buyer terminates the Stalking Horse Agreement pursuant to Section 11.1.16, then Buyer shall not be entitled to the Break-Up Fee or Expense Reimbursement, and Debtor shall be permitted to retain the Deposit, in accordance with the |

| | Escrow Agreement. If the Closing does not occur for any other reason, Buyer shall receive (a) the release of the Deposit to Buyer in accordance with the Stalking Horse Agreement, the Escrow Agreement, and Sale Order, and (b) upon consummation of an Alternative Transaction: (i) the Break-Up Fee and (ii) the Expense Reimbursement. In the event of an Alternative Transaction, the Break-Up Fee and Expense Reimbursement shall be directly and immediately paid to Buyer at the closing of the Alternative Transaction from the proceeds of the Alternative Transaction. In the event that there is no Alternative Transaction, Buyer shall not be entitled to the Break-Up Fee or Expense Reimbursement. See id. at § 11.2.1 |
|---|---|
| **Sale to Insider** Del. Bankr. L.R. 6004-1(b)(iv)(A) | The Stalking Horse Bidder is a purchase entity anticipated to be affiliated with entities, funds and/or accounts managed or advised, directly or indirectly, by, or by under common control with three investors holding Series D preferred equity interests in the Debtor: Farallon, Soleus, and PBM. As discussed further below, the Debtor believes that Farallon is not an insider of the Debtor. |
| **Agreements with Management** Del. Bankr. L.R. 6004-1(b)(iv)(B) | The Stalking Horse Bidder has not entered into any agreements with management or key employees. |
| **Releases** Del. Bankr. L.R. 6004-1(b)(iv)(C) | The Stalking Horse Agreement does not contain any releases. |
| **Closing and Other Deadlines** Del. Bankr. L.R. 6004-1(b)(iv)(E) | The Stalking Horse Agreement may be terminated by either Buyer or the Debtor if the Closing has not occurred on or prior to 5:00 p.m. (E.T.) on September 16, 2022 (the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by Debtor or Buyer, then the breaching Party may not terminate this Agreement pursuant to Section 11.1.2 of the Stalking Horse Agreement. See id. at 11.1.2. |
| **Good Faith Deposits** Del. Bankr. L.R. 6004-1(b)(iv)(F) | No later than August 22, 2022, Buyer shall deposit into an interest bearing escrow account with Citibank, N.A. as escrow agent (the "Escrow Agent") an amount equal to $1,500,000.00 (such amount, the "Deposit") by wire transfer of immediately available funds pursuant to the terms of an escrow agreement to be agreed prior to August 22, 2022 (the "Escrow Agreement"). The Deposit will be credited against the Purchase Price at Closing, and will otherwise be disbursed as provided in the Stalking Horse Agreement, the Bidding Procedures, the Escrow Agreement and the Sale Order. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of Debtor or Buyer. See id. at § 2.7. |
| | If the Closing does not occur in accordance with the Stalking Horse Agreement due exclusively to Buyer's default or breach of the Stalking Horse Agreement in accordance with Section 11.1.3 then Buyer shall not be entitled to the Break-Up Fee or Expense Reimbursement, and the Debtor shall be permitted to retain the Deposit, in accordance with the Escrow Agreement. See id. at § 11.2. |
| **Interim Arrangements with Purchaser** | The Parties shall use their respective commercially reasonable efforts to work together in good faith to negotiate, agree to the terms of, and execute, a transition services agreement (the "Transition Services Agreement") in a |

| | |
|---|---|
| Del. Bankr. L.R. 6004-1(b)(iv)(G) | form reasonably acceptable to each of Buyer and the Debtor pursuant to which the Debtor shall provide Buyer and Buyer shall provide the Debtor, as applicable, with certain services for a 60 day transitional period following the Closing Date (the "Transition Period").  The Transition Services Agreement shall provide that the transition services are provided solely at Buyer's costs and expense, by the Transferred Employees, with oversight provided by any one or more executive level Employee of the Debtor that remains with the Debtor after the Closing or any professional advisors engaged by the Debtor to provide such oversight.  In furtherance of the forgoing, for all transition services, Buyer agrees to pay the Debtor for all out-of-pocket costs incurred by the Debtor and attributable to the provision of such services to Buyer plus an agreed amount provided for in the terms and provisions of the Transition Services Agreement.  See id. at § 7.7. |
| **Record Retention**<br>Del. Bankr. L.R. 6004-1(b)(iv)(J) | Pursuant to Section 7.6 of the Stalking Horse Agreement, the Debtor shall retain a copy of all Books and Records solely to facilitate the Debtor's administration of the Bankruptcy Case and wind down of the Business related to the Excluded Assets; *provided, however,* that the Debtor shall not disclose any confidential, proprietary or non-public Books and Records to any Third Party without the prior written consent of Buyer or further order of the Bankruptcy Court. See id. at § 7.6. |
| **Avoidance Actions**<br><br>Del. Bankr. L.R. 6004-1(b)(iv)(K) | Pursuant to section 2.1(k) of the Stalking Horse Agreement, the Debtor seeks to sell all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, related to the Purchased Assets or the Business including, but not limited to, all claims arising under section 547 of the Bankruptcy Code related to payments for goods or services delivered or provided to Seller (the "Avoidance Actions"), which Buyer shall waive in connection with the consummation of this Agreement.  See id. at § 2.1(k). |
| **Requested Findings as to Successor Liability**<br>Del. Bankr. L.R. 6004-1(b)(iv)(L) | Notwithstanding any provision in the Stalking Horse Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of the Debtor or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "Excluded Liabilities"), and Seller shall be solely and exclusively liable for all such Liabilities.  See id. at § 2.4(a)-(k). |
| **Sales Free and Clear**<br>Del. Bankr. L.R. 6004-1(b)(iv)(M) | Subject to the terms and conditions set forth in the Stalking Horse Agreement, at the Closing and in exchange for the Purchase Price,  the Debtor agrees to sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to accept, purchase, acquire, assume and take delivery of the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances). See id. at § 2.1(a).<br><br>The Debtor expects the proposed Sale Order will include customary findings concerning the absence of successor liability for the Buyer. |
| **Relief from Stay**<br>Del. Bankr. L.R. 6004-1(b)(iv)(O) | The Debtor is seeking a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h) pursuant to the Stalking Horse Order.<br><br>The Debtor will also be seeking such a waiver in respect of the proposed Sale Order. |

**Argument**[10]

**A.  The Proposed Bid Protections Are Necessary, Reasonable, and Appropriate**

14.    Providing a stalking horse bidder with certain bid protections in connection with a sale of significant assets under section 363 of the Bankruptcy Code has become standard practice in chapter 11 cases.  In the Third Circuit, "break-up" fees and expense reimbursements are considered administrative expenses and must be necessary to preserve the value of a debtor's estate.  See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999).  In O'Brien, the Third Circuit provided two examples of a potential benefit accruing from the payment of a break-up fee.  See id. at 537.  First, a benefit to the estate may arise if, "assurance of a breakup fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id.  Second, bidding protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.  Termination and similar fees are effective mechanisms for protecting bidders in connection with an asset sale and can be "important tools to encourage bidding and to maximize the value of the debtor's assets."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); see

---

[10]    The legal arguments set forth in the Bidding Procedures Motion in paragraphs 38 through 43 (with respect to (i) the Debtor's sound business justification for the sale of its Assets, (ii) the sufficiency of the Sale Noticing and Objection Procedures and (iii) reasonableness and fairness of the price the Debtor will yield for its Assets),  in paragraphs 48 through 49 (with respect to the Debtor's justifications for  a sale of its Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code), and in paragraphs 50 through 56 (with respect to the assumption and assignment of Contracts) are incorporated herein by reference.  See Bidding Procedures Motion ¶¶ 38-43, 48-56.

13

also <u>O'Brien</u> at 537 (finding a benefit to the estate where assurance of a break-up fee promotes more competitive bidding).  Put differently, these bid protections enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity to generate even greater value through an auction process.  <u>See</u> <u>In re 995 Fifth Ave. Assocs., L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>O'Brien</u> at 537 (finding a benefit to the debtor's estate where a break-up fee "induc[ed] a bid that otherwise would not have been made and without which [] bidding would have been limited").

15.     The Bid Protections were a material inducement for the Stalking Horse Bidder to enter into the Stalking Horse Agreement.  The Bid Protections promote more competitive bidding for the Purchased Assets because it ensures that the Stalking Horse Bidder will hold open its offer as a minimum bid on which other bidders and the Debtor may rely. Executing the Stalking Horse Agreement has put the Debtor in a more advantageous position to solicit additional competitive bids for the Purchased Assets that may be materially higher or of otherwise better value to the Debtor's estate.  The Stalking Horse Bid also increases the likelihood that the price at which the Purchased Assets are sold will reflect their fair market value.  In short, the Stalking Horse Bid will serve as a catalyst for other Qualified Bids.

16.     In addition, the Debtor carefully negotiated the terms of the Bid Protections to ensure that they would be commensurate with the value conferred on the Debtor's estate by the Stalking Horse Bid.  As mentioned above, the Stalking Horse Bidder, Sequencing Health, Inc., is an acquisition entity anticipated to be affiliated with funds managed or advised,

14

directly or indirectly, by three investors holding Series D preferred interests in the Debtor: Farallon, Soleus, and PBM. Dr. Harish Soundararajan, an Investment Director at Farallon, is a member of the Debtor's Board (though is not a member of the Special Committee). No representatives of Soleus or PBM hold a seat on the Debtor's Board. Notwithstanding Dr. Soundararajan serving on the Debtor's Board, the Debtor submits that Farallon is not an insider. See Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC et al (In re Radnor Holdings Corp.), 353 B.R. 820 (Bankr. D. Del. 2006) (finding shareholder of a debtor, who was also a lender, was not an insider solely because it designated a board member on a debtor's board). Moreover, none of the affiliated parties are "a person in control" of the Debtor. Accordingly, the Debtor submits that consideration of the Bid Protections should not be subject to the heightened scrutiny that is sometimes applied to consideration of insider transactions. Cf. In re Lucky Brand Dungarees, LLC, Case No. 20-11768 (CSS) (Bankr. D. Del. Jul. 30, 2020) [Docket No. 251] (entering bidding procedures order approving bid protections for a stalking horse bidder connected with insiders of the debtors, over the objection of the United States trustee); In re Activecare, Inc., Case No. 18-11659 (LSS) (Bankr. D. Del. Aug. 17, 2018) [Docket No. 119] (entering bidding procedures order approving bid protections for stalking horse bidder alleged to be an insider); In re Katy Industr., Inc., Case No. 17-11101 (KJC) (Bankr. D. Del. Jun. 19, 2017) [Docket No. 163] (same); In re ExGen Texas Power, LLC, Case No. 17-12377 (BLS) (Bankr. D. Del. Nov. 30, 2017) [Docket No. 99] (entering bidding procedures order approving bid protections for insider stalking horse bidder); In re BPS US Holdings Inc., Case No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) [Docket No. 233] (entering bidding procedures order approving bid protections for stalking horse bidder that was considered an insider under Canadian law).

15

17.     Assuming arguendo that Farallon is an "insider" of the Debtor, which it is not, there are sound reasons to approve the proposed Bid Protections in this instance.  First, the Stalking Horse Agreement, including the Bid Protections, were approved by the Special Committee consisting entirely of independent directors.  Neither Farallon nor Dr. Soundararajan has any involvement in the Debtor's sale process, evaluation of any bid, or negotiation of any agreement for the purchase of the Debtor's assets.  Second, Farallon is an investment firm that manages capital on behalf of institutions and individuals – it is not an "operator" of a going forward business.  While Farallon obviously has familiarity with the Debtor's business in its capacity as the holder of Series D equity interests, it had no experience with the Debtor's business at an operational level.  Accordingly, the amount of due diligence that was required in arriving at the Stalking Horse Agreement was tremendous.  Unlike a typical strategic buyer, the Stalking Horse Bidder was required to conduct extensive diligence with respect to the assets, liabilities, and operating expenses of the Debtor.  The Stalking Horse Bidder incurred significant time and expense in diligence and negotiating the Stalking Horse Agreement.  As a result, the Debtor has determined, in its reasonable business judgment, and upon the advice and counsel of its advisors, that the Bid Protections would compensate the Stalking Horse Bidder for the risk it has assumed and the substantial value it has conferred upon the Debtor's estate in the event the Debtor elects to pursue an Alternative Transaction.

18.     As noted above, the Bidding Procedures provide for additional Bid Protections for the Stalking Horse Bidder, including by establishing Minimum Overbid requirements and certain Qualified Bid requirements specifically for Purchased Assets.  Bidding incentives such as these have become commonplace in connection with sales of significant assets under section 363 of the Bankruptcy Code.  Courts regularly approve these types of incentives

16

under the "business judgment standard," pursuant to which courts grant deference to the actions of a debtor's board of directors when such actions were taken in good faith and in the exercise of reasonable judgment.  See Integrated Res., Inc., 147 B.R. at 656 (citing Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

19.    The Debtor's decision to offer the Stalking Horse Bidder Bid Protections is an exercise of the Debtor's sound business judgment.  The Bid Protections, both individually and collectively, were material inducements for the Stalking Horse Bidder's entry into the Stalking Horse Agreement.  As such, the Bid Protections are necessary for the Debtor to ensure a sale of the Purchased Assets to a contractually-committed buyer at a price the Debtor believes is fair, and to maintain the ability to pursue enhanced value for the Purchased Assets through the Debtor's Auction process.

**B.  The Stalking Horse Bidder Sale Would Be Consummated in Good Faith**

20.    Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely."  Cumberland Farms Dairy, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Dairies of Penn., Inc.), 788 F.2d 143, 147 (3d Cir. 1986)); see also Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.), No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993); Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994)

17

("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

21.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Abbotts Dairies, 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)) (other citations omitted); see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997).

22.     The Debtor and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith, and through extensive arms'-length negotiations.  To that end, the Debtor and the Stalking Horse Bidder have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and in the Debtor's sale process generally.  To the best of the Debtor's knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be set aside under section 363(n) or any other applicable provision of the Bankruptcy Code.  As such, in the event the Stalking Horse Bidder is named the Successful Bidder for the Purchased Assets, the Debtor requests a finding that the Stalking Horse Bidder is a good-faith purchaser and is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code.

### Requests for Immediate Relief & Waiver of Stay

23.     Pursuant to Bankruptcy Rule 6004(h), the Debtor seeks a waiver of any stay of the effectiveness of the Proposed Stalking Horse Order.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral

is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth above and in the Bidding Procedures Motion, the relief requested herein is necessary and appropriate to maximize the value of the Debtor's Assets for the benefit of the Debtor's economic stakeholders.  Given the Debtor's precarious financial condition, its obligation to comply with the Milestones under the DIP Facility and the time-intensive nature of conducting a postpetition Sale Process from beginning to end, the relief requested herein should be granted and effective as soon as practicable.  Any delay in obtaining the relief requested herein could inhibit the Debtor's ability to maximize the value of the Purchased Assets.  Accordingly, the Debtor submits that ample cause exists to justify waiving the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that such stay applies to the relief requested herein.

## **NOTICE**

24.    Notice of this Motion has been or will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the United States Securities and Exchange Commission; (v) counsel for the Prepetition Secured Parties; (vi) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate; (vii) all persons and entities known by the Debtor to have asserted any lien on or encumbrance with respect to the Assets (for whom identifying information and addresses are available to the Debtor); and (viii) any other party entitled to notice pursuant to Bankruptcy Rule 2002 or order of the Court. The Debtor respectfully submits that no further notice of this Motion need be provided.

## **NO PRIOR REQUEST**

25.    No previous request for the relief requested herein has been made to this or any other court.

19

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter the Proposed Stalking Horse Order, substantially in the form attached here as <u>Exhibit A</u>, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:    August 12, 2022
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Michael J. Merchant*
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
David T. Queroli (No. 6318)
J. Zachary Noble (No. 6689)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
defranceschi@rlf.com
merchant@rlf.com
queroli@rlf.com
noble@rlf.com

*Proposed Counsel to the*
*Debtor and Debtor in Possession*

RLF1 27802529v.4