# **EXHIBIT 1**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GENAPSYS, INC.,[1] <br>                   Debtor. | Case No. 22-10621 (BLS) <br> **Re: Docket No. 73, 118, 119** |

**FOUNDERS' REPLY IN SUPPORT OF MOTION OF DR. HESAAM
ESFANDYARPOUR, PH.D. AND DR. KOSAR PARIZI, PH.D. TO (I) DISMISS THE
CHAPTER 11 CASE OR (II) IN THE ALTERNATIVE,
<u>APPOINT A CHAPTER 11 TRUSTEE</u>**

Hesaam Esfandyarpour, Ph.D. and Kosar Parizi, Ph.D. (collectively, the "<u>Founders</u>") by and through their undersigned counsel hereby submit this reply (the "<u>Reply</u>") in support of their *Motion of Dr. Hesaam Esfanyarpour, Ph.D. and Dr. Kosar Parizi, Ph.D. to (I) Dismiss the Chapter 11 Case or (II) In the Alternative, Appoint a Chapter 11 Trustee* [Docket No. 73] (the "<u>Motion</u>")[2] and in reply to the objections filed by GenapSys, Inc. (the "<u>Debtor</u>") [Docket No. 118] (the "<u>Debtor Objection</u>") and its secured lender, Oxford Finance, LLC [Docket No. 119] (the "<u>Lender Objection</u>, and together with the Debtor Objection, the "<u>Objections</u>"). In further support of the Motion, the Founders respectfully state as follows:

## PRELIMINARY STATEMENT

1. After over 120 pages of briefing by the Founders and the Debtor, the only rational takeaway is that the Debtor's governance is a confusing mess, director seats are allegedly controlled by any number of agreements drafted at different times, interpreted in different ways

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is GenapSys, Inc. (3904). The Debtor's headquarters are located at 200 Cardinal Way, 3rd Floor, Redwood City, CA 94063.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion.

at different junctures, some of which are purported to remain in effect with others are claimed to have been overridden, all depending upon who you listen to and at what moment in time.

2. Vice-Chancellor Zurn's ruling on July 8 defined a new paradigm for the Debtor. Whatever did or did not happen in 2021 or in the spring of 2022 with respect to governance is now irrelevant. Solely before the Court is the question of whether there was a valid board meeting on July 11, 2022, three (3) days after Vice-Chancellor Zurn ruled that only three (3) directors (Dr. Esfandyarpour, Zollars and Soundararajan) were validly appointed.

3. The Court does not need to and should not enter into the Debtor's labyrinth of confusing and contradictory purported appointments, voting agreements and exercises of proxies. There are three (3) clear reasons why the July 11 Meeting was void. And because the July 11 Meeting was void, not voidable, and not capable of ratification, there was no authority to commence this Chapter 11 Case.

4. **First**, the Debtor admits that notice to Dr. Esfandyarpour of the July 11 Meeting violated the Bylaws. He actively protested the meeting going forward on deficient notice and never waived that objection.

5. **Second**, the Debtor does not deny the July 11 Meeting was held without notice to the Series B Director. A majority of Series B Stockholders, including Jem Management Limited, Stanford StartX Fund LLC, IPV Capital and Amidi LLC, designated and voted for Akhlaghpour to be the Series B Director. The Jem Voting Agreement is a red herring. Only Jem and Dr. Esfandyarpour are party to it and they both wanted Jem's votes to count for Akhlaghpour and the agreement, executed prior to the Side Letter Agreement, specifically states that the Proxyholder (Dr. Esfandyarpour) may not transfer his rights under the Jem Voting Agreement.

6. **Third**, the Debtor does not deny that validly appointed Common Directors Maney and Rategh received no notice of the July 11 Meeting. The Debtor's purported removal of Rategh and Maney and appointment of Myers and Eliasson failed. Even if Zollars had a proxy to vote for Dr. Esfandyarpour, the Debtor's own communications on July 12, 2022 (which it does not address on this issue in the Debtor's Objection) acknowledge that Zollars' proxy rights did not extend to the Trusts. Thus, the Debtor lacked the necessary majority to unseat Rategh and Maney or install Myers and Eliasson.

7. If the Court makes a simple, clear and legally-sound finding on any or all of the three (3) reasons above, the July 11 Meeting was void, this bankruptcy case was not instituted with the requisite corporate authority and must be dismissed. And critically, following dismissal, the Debtor will have available a Love Heath, Inc. transaction that will inject needed liquidity into the business and resolve the governance disputes that have endlessly plagued the Debtor.[3]

## REPLY

**A. Actions Taken at the July 11 Meeting Were Void.**

**a. Dr. Esfandyarpour's Notice Objection**

8. The Debtor does not dispute, because it cannot, that it failed to provide the necessary and proper notice required by its Bylaws for the July 11 Meeting. The result is clear. The July 11 Meeting was void. Because the Debtor cannot dispute this fatal fact, it spends most of its effort on this point arguing that the actions taken at the July 11 Meeting were subsequently ratified at the July 12 Meeting. There are two problems with this

---

[3] As for the Lender Objection, it half-heartedly defends the Debtor's sale process while ignoring the viable alternative in Love Health, Inc. and concentrates mostly on protecting its downside risk in a dismissal scenario. For their part, the Founders are not contesting the liens, claims, protections, and other rights and remedies granted the Prepetition Agent and Postpetition DIP Agent pursuant to the Interim DIP Order remain valid and enforceable. Rather, the Founders look forward to resolving the defaults under the Debtor's existing financing with the appropriate parties in connection with the Love offer post-dismissal.

3

approach. First, the July 11 Meeting was not voidable and acts taken pursuant to that meeting cannot be ratified. Second, the July 12 Meeting suffers from the same notice defects. The July 11 Meeting and the authorization to file for bankruptcy are unquestionably void and shall remain ever so.

9. As conceded by the Debtor, on Sunday July 10, 2022, Debtor's General Counsel sent an email notice to Dr. Esfandyarpour of the July 11 Meeting. But section 21(d) of the Bylaws requires that notice of a board meeting be provided "during normal business hours, at least twenty-four (24) hours before the date and time of the meeting." Sunday, unequivocally, is not normal business hours for the Debtor.

10. Recognizing the notice defect, Dr. Esfandyarpour, on July 11th at 10:11 a.m., in advance of the July 11 Meeting, sent an email to the Debtor's General Counsel and other directors, stating his objection that the July 11th Meeting was without proper notice, and could not proceed as a lawful board meeting. *See* Motion, Ex. U. Nevertheless, the Debtor went forward with the July 11 Meeting notwithstanding the deficient notice.

11. Rather than address the clear and admittedly deficient notice, the Debtor argues that it need not comply with the Bylaws because of the "liquidity crisis" it was facing. Debtor Objection, at ¶73. Financial woes, however, do not excuse proper corporate governance, and, importantly, the Bylaws do not provide an exception to the notice requirement for any reason, much less the Debtor's financial condition.

12. Likewise, the Debtor's argument that Dr. Esfandyarpour waived any objection to receiving the required notice by asking for a board meeting to be held over the weekend is a contrivance.[4] The Bylaws are clear that notice needs to be given during business hours. Dr.

---

[4] The Debtor's Objection is unclear as to whether it is asking the Court to estop Dr. Esfandyarpour from arguing that the actions at the July 11 Meeting were invalid due to lack of notice because he once asked for a weekend meeting.

4

Esfandyarpour could not waive the notice requirements under the Bylaws by simply by asking for a meeting, nor could he force the other members of the Debtor's board to attend an improperly noticed meeting.[5] Nor would any supposed waiver apply to a separately noticed meeting. Moreover, the proposed Saturday July 9 meeting did not take place.

13. Likewise, Dr. Esfandyarpour did not waive his right to notice or his objection to inadequate notice by appearing at the start of the July 11 Meeting. He appeared for the sole purpose of voicing his objection. Seconds in, he realized that he was muted, chat was disabled and his raise hand feature was not working, so he immediately left. The fact that the Debtor previously conducted a handful of board meetings via Zoom and used the "raise hand" feature is of no moment. The Debtor willfully would not let Dr. Esfandyarpour speak at a board meeting where speaking was the medium of communication. Nor does it mean that those prior meetings themselves complied with Delaware law or the Bylaws.[6]

14. Even if the "raise hand" feature was working, as the Debtor alleges and the Founders vigorously dispute, the Debtor does not allege that the Chairman informed the meeting participants that they should use the "raise hand" feature at the July 11 Meeting to make a comment or ask a question because that did not happen. Nor does the Debtor explain why the chat feature was disabled to prevent questions from being raised. A Zoom "raised hand" would not have unmuted Dr. Esfandyarpour nor activated his chat functionality.

---

Two wrongs do not make a right. Further, estoppel is an equitable defense that cannot apply to a void action. For example, in *Rainbow Mountain, Inc. v. Begeman,* 2017 WL 1097143, (Del. Ch. Mar. 23, 2017), the Chancery Court found that the removal of a director in violation of a bylaw was void and of no effect, even though the director challenging that removal had participated in the removal.

[5] For what it is worth, Dr. Esfandyarpour's request for a Saturday meeting was sent on the prior Friday, in compliance with the Bylaws.

[6] Indeed, Debtor points to no instance in the prior meetings where notice was invalid such that a board member needed to lodge an objection at the beginning of the meeting. Therefore, reference to prior meetings is irrelevant.

15.     The undisputed facts are that Dr. Esfandyarpour was prevented from lodging an objection at the beginning of the July 11 Meeting.  Even if the Debtor's suggested approach was appropriate and accepted by the board members in regular meeting settings, the Debtor was aware of Dr. Esfandyarpour's objection in advance of the meeting and should have anticipated his objection from the outset.  Dr. Esfandyarpour, directly and through counsel, immediately followed up after the July 11 Meeting to confirm his objection once again in writing.  There is no reasonable basis for the Debtor to believe, let alone argue, that he waived his right to notice or that the actions taken at the July 11 Meeting were valid.

### b. The Exclusion of the Series B Director at the July 11 Meeting

16.     Even if Dr. Esfandyarpour somehow waived his right to proper notice under the Bylaws—and he did not—the July 11 Meeting was also void because the Debtor failed to provide any notice to the newly appointed Series B Director, Hossein Akhlaghpour (the "Series B Director").  Dr. Esfandyarpour provided Debtor's General Counsel with notice of this appointment on Monday, July 11, 2022 at 2:07 p.m. (PT), before the July 11 Meeting was scheduled to begin.  *See* Motion, Ex. S.  It was done by a shareholders' written consent executed by a majority of the Series B shareholders, including Jem Management Limited ("Jem"), Stanford StartX Fund LLC, IPV Capital and Amidi LLC which designated and cast their votes for Akhlaghpour.  Rather than halt the July 11 Meeting, the Debtor chose to ignore the valid appointment and hold a board meeting where a director was deliberately excluded.

17.     The Debtor's Objection argues that the appointment of the Series B Director is invalid because it was signed by Jem, who had previously given Dr. Esfandyarpour a proxy over its Series B shares pursuant to that certain Holder Voting Agreement originally between Apoletto Limited and Dr. Esfandyarpour, dated as of November 5, 2013 (the "Jem Voting Agreement").

Debtor's Objection, at ¶83.[7]  Thus, because Dr. Esfandyarpour did not sign the Series B shareholder consent as proxyholder for Jem, it was not executed by a majority of the Series B shareholders and the appointment of the Series B Director could not be valid, according to the Debtor.  Dr. Esfandyarpour's remedy for this purported breach of the Jem Voting Agreement is specific performance.  *See* Jem Voting Agreement, at § 2.2.  Because Dr. Esfandyarpour would also have voted for the Series B Director if exercising his proxy rights under the Jem Voting Agreement, this is a "no harm, no foul" situation, where the outcome would be the same under either scenario.  Moreover, the Debtor is not a party to the Jem Voting Agreement nor is it a third party beneficiary.  It simply has no standing to raise any issue with respect to that contract.

18.	The Debtor recognizes that the only two parties to the Jem Voting Agreement are completely aligned on the election of Akhlaghpour.  To avoid the inescapable conclusion that they deliberately excluded the validly elected Series B Director, the Debtor goes on to suggest that Zollars, not Dr. Esfandyarpour, is entitled to exercise Dr. Esfandyarpour's proxyholder rights under the Jem Voting Agreement.  The Debtor's logic is that any rights Dr. Esfandyarpour had under the Jem Voting Agreement were transferred to the Debtor and Zollarus pursuant to the subsequent Side Letter Agreement.

19.	The plain language of the Jem Voting Agreement directly contradicts the Debtor's argument.  The Jem Voting Agreement unambiguously states that proxyholder voting rights "may not be assigned by [Dr. Esfandyarpour] without the consent of [Jem]."  Jem Voting Agreement, at § 5.6.  The only possible resolution of the manufactured dispute regarding the appointment of the Series B Director is that the Series B Director was properly appointed.

---

[7] To the extent the Debtor is asserting or implying, without saying, that Dr. Esfandyarpour forged Jem's signature on the shareholder consent, Dr. Esfandyarpour strongly refutes that allegation as nothing more than an effort to taint his character and credibility with this Court.  The Court should afford **zero** weight to these baseless and unfounded allegations.

### B. Actions Taken at the July 12 Meeting Were Also Void.

20. Effectively admitting that the July 11 Meeting was not properly noticed, the Debtor's primary argument shifts to the **post-petition** board meeting on July 12, 2022 (the "July 12 Meeting"). The Debtor's new argument is that the void actions authorized at the July 11 Meeting, including the filing of the Petition, were ratified by the same board members at the July 12 Meeting, thus allegedly curing the notice defects with the July 11 Meeting. Of course, the Debtor once again ignores the legitimate appointment of the Series B Director, who received no notice of the July 12 Meeting either. The lack of notice to the Series B Director renders the July 12 Meeting void for the same reason that the July 11 Meeting was void, and the Court need go no further.

21. Even if the July 12 Meeting was not void due to the lack of notice to the Series B Director, that meeting was ineffective to ratify the void actions arising from the July 11 Meeting. The Debtor argues that even had the July 11 Meeting been invalid for failure to provide proper notice, the bankruptcy filing would still be authorized because the board ratified the actions the board took at that meeting during the July 12 Meeting. Debtor's Objection at ¶56. The Debtor makes this argument by implying that *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *15 (Del. Ch. Oct. 11, 2013), *judgment entered*, (Del. Ch. 2013), *and aff'd*, 82 A.3d 730 (Del. 2013), *and aff'd,* 106 A.3d 1035 (Del. 2014), which held that an action in violation of bylaws are void, was merely a one-off decision that this Court can ignore. The Debtor's argument goes against the great weight of Delaware authority. In particular, the Debtor ignores other cases post-*Klaassen* that have agreed with its holding. In *Rainbow Mountain, Inc. v. Begeman*, 2017 WL 1097143, at *9 (Del. Ch. Mar. 23, 2017), then-Vice Chancellor Montgomery-Reeves specifically considered and adopted Vice Chancellor Laster's holding in *Klaassen*:

> The Court also observed that "traditionally, when a board took action in contravention of a mandatory bylaw, the board action was treated as void." The Court recognized that "the case law in this area has not always been consistent, and some cases apply equitable defenses even if a bylaw was violated." But the rule in Klaassen "is the best I can do to harmonize the decisions into a workable rule. It necessarily represents one trial judge's effort and may not accurately reflect Delaware law." I agree and follow that logic here.

*Rainbow Mountain, Inc. v. Begeman*, 2017 WL 1097143, at *9 (Del. Ch. Mar. 23, 2017).

22. Vice Chancellor Montgomery-Reeves confirmed this view in another ruling one year later: "under Delaware law, a corporate action is void where it violates a statute or a governing instrument such as the certificate of incorporation or the bylaws." *Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Holdings, Inc.*, 2018 WL 658734, at *5 (Del. Ch. Feb. 1, 2018). Chancellor Bouchard also endorsed that view: "[U]nder Delaware law, a corporate action is void where it violates a statute or a governing instrument such as the certificate of incorporation or the bylaws." *Almond for Almond Family 2001 Tr. v. Glenhill Advisors LLC*, 2018 WL 3954733, at *18 (Del. Ch. Aug. 17, 2018), *aff'd sub nom. Almond as Tr. for Almond Family 2001 Tr. v. Glenhill Advisors, LLC*, 224 A.3d 200 (Del. 2019).

23. By far the better reading of Delaware law is that actions taken in violation of a bylaw are void. The Debtor's argument relies on cherry-picking two cases that pre-date *Klaassen* and the numerous other cases holding that actions taken in violation of bylaws are void. The Debtor also ignores that *Klaassen* reached its conclusion by carefully considering the treatment of actions in violation of corporate documents versus those only in violation of equitable principles. That analysis showed that the predominating view throughout history was that actions in violation of corporate documents were void. *See Klaassen* at 15-19.[8] The Court

---

[8] The *Klaassen* opinion explained *Nevins'* (one of the two cases on which Debtor stakes its position) divergence from other cases that held that actions in violation of corporate documents were void by noting that the court in

should reject the Debtor's position and instead follow the dominant view that actions in violation of bylaws are void.

24. Because the actions the board took at the July 11 Meeting are void, the Debtor cannot invoke ratification to attempt to salvage them. Delaware law is clear that void acts are not subject to equitable defenses, including ratification. *See Boris v. Schaheen*, 2013 WL 6331287, at *15 (Del. Ch. Dec. 2, 2013) ("Only voidable acts are susceptible to these equitable defenses."). In *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1998 WL 71836, at *8 (Del. Ch. Feb. 4, 1998), *as revised* (Mar. 5, 1998), the Chancery Court held that a board could not ratify a board resolution it passed at a special meeting for which it did not give a director notice because that action was void, even though the director in question was present at the second meeting where the ratification vote occurred and the board could have taken that action had it complied with the bylaws and other corporate documents. The Chancery Court summarized its holding as follows: "[t]o determine if the board's ratification vote was effective, the Chancery Court must decide two questions: (1) were the defendants' actions void or only voidable; and (2) what was the legal consequence of the board's ratification of those actions if they were (a) void or (b) voidable? Delaware law recognizes that a board may ratify its prior acts, but in this case the defendants' acts were void and therefore not curable by ratification." *Id.* The same result must follow here, and the actions at the July 11 Meeting are invalid and the board could not ratify them.

25. The Debtor makes one more attempt to save its invalid bankruptcy filing, arguing that, even if the actions at the July 11 Meeting were void, the board ratified the CFO's filing of the Petition. Debtor's Objection at ¶57. The Debtor argues that agency law permitted the board

---

*Nevins* appeared to view the plaintiff as raising an equitable challenge, submitting himself to equitable defenses. *Klaassen* at *18.

as principal to ratify the actions of the CFO as an agent. Incredibly, the Debtor seems to be asking this Court to ignore what actually happened and imagine a world in which the CFO was a rogue actor who, without any corporate authority, directed the Debtor's counsel to commence filing a bankruptcy case and then have this Court countenance this bankruptcy filing based on that fiction.

26. First, the minutes of the July 12 Meeting at which the Debtor claims the board ratified the bankruptcy filing do not show that the board ratified the CFO's action of filing the petition. Instead, they indicate that the board only ratified the resolutions: "[u]pon a motion duly made and seconded, the board then ratified the resolutions attached as Exhibit A which had properly been adopted on the previous day." Debtor's Objection, Ex. 20. Those resolutions were void and incapable of ratification. Thus, the Debtor cannot show that there was a ratification of the CFO's actions.

27. Second, the Debtor also relies on inapposite authority concerning the power of boards to ratify actions officers took without authorization. For example, in *Klig v. Deloitte LLP*, 36 A.3d 785 (Del. Ch. 2011), the Chancery Court held that a board validly ratified the decision by management to put someone on leave of absence where that authority arguably rested with the board in the first instance.

28. Here, however, the CFO was not mistakenly acting beyond his authority or without authority. He was acting pursuant to a void board action in violation of the Bylaws. The resolutions from the July 11 Meeting specifically called for the "Authorized Officers" (which included the CFO) to "execute, acknowledge, deliver, and verify the Petition and to cause the same to be filed with the Bankruptcy Court." The Debtor concedes this, stating that "the CFO

executed and instructed counsel to file the Petition pursuant to express authority he was granted in the Resolutions adopted at the July 11 Board Meeting." Debtor's Objection, at ¶147.

29. An officer of a corporation does not have the ability to act in violation of the company's bylaws. The Debtor has not cited a single case in which a court has held that a board validly ratified an officer's actions taken pursuant to authorization in violation of governing corporate documents. Nor can it, as reaching that conclusion would vitiate the rule that void acts are not ratifiable. The Debtor cannot save the filing of the bankruptcy by artificially trying to divorce it from its unlawful authorization.

30. Notably absent from the Debtor's efforts or arguments is any mention to the relevant provisions of the DGCL that allow for ratification of corporate acts in section 204 of the DGCL.[9] To be clear, the July 11 Meeting was *ultra vires* and the DGCL cannot be used to ratify *ultra vires* acts. But since the Debtor seems to believe that ratification is available, one must

---

[9] Section 204 of the DGCL provides a statutory path for a board of directors to ratify defective corporate acts. In relevant part it provides:

> (b)(1) In order to ratify 1 or more defective corporate acts pursuant to this section (other than the ratification of an election of the initial board of directors pursuant to paragraph (b)(2) of this section), the board of directors of the corporation shall adopt resolutions stating:
>
> (A) The defective corporate act or acts to be ratified;
>
> (B) The date of each defective corporate act or acts;
>
> (C) If such defective corporate act or acts involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued;
>
> (D) The nature of the failure of authorization in respect of each defective corporate act to be ratified; and
>
> (E) That the board of directors approves the ratification of the defective corporate act or acts.

8 Del C. § 204(b)(1).

question why the Debtor did not avail itself of the DGCL. Rather than adopt resolutions that follow the requirements of section 204(b), the board attempted a hasty and improper attempt at common law ratification. That effort failed, and the Petition must be dismissed for lack of authorization.

### C. The July 9 Written Consents Are Invalid and Unenforceable.

31. On July 9, 2022, Zollars, purporting to act as proxy for stockholder voting interests of Dr. Esfandyarpour, the Cyrus the Great Trust, the Venus the Great Trust, and Hamid Moghadam as trustee to the Moghadam 2012 Dynasty Trust, purported to (a) remove Dr. Esfandyarpour as CEO (Common) Director and appoint him as Founder (Common) Director, (b) remove Rategh and Maney as Common Directors, (c) appoint Myers as the CEO Common Director, and (d) appoint Eliasson as the remaining common director. All of these actions were invalid for a number of reasons.

32. First, Dr. Esfandyarpour had revoked his proxy as of April 12, 2022, and Zollars could not serve as Proxyholder for his shares. *See* Motion, Ex. AA.

33. Second, even if Dr. Esfandyarpour's proxy was not revoked, the Proxy did not authorize the Debtor or any of its directors to vote the shares held by the Venus the Great Trust or the Cyrus the Great Trust. The Debtor conceded this point when the Debtor's General Counsel, on July 12, after the Petition Date, emailed the Founders requesting they cause the Trusts to execute the July 9 Written Consents. *See* Motion, Ex. Q. If Zollars' purported actions on behalf of the Trusts were valid on July 9, the Debtor would not need signatures on behalf of the Trusts after that date. This concession is fatal to the Debtor's position, as without the shares of both Trusts, the July 9 Written Consents were not approved by a majority of the Common Shareholders, and thus were not valid.

34. Third, even if the Proxy did authorize the Debtor to vote shares that Dr. Esfandyarpour owns or controls on behalf of others, Dr. Esfandyarpour was no longer a Trustee for either of the Trusts as of no later than July 1, 2022 and had no power or ability to vote any shares held by either of the Trusts. *See* Exhibits A-D. With no control over the shares of either of the Trusts, Dr. Esfandyarpour could not vote the shares of the Trusts, and neither could Zollars. Without the votes of the shares held by the Trusts (roughly 20% of the Debtor's common stock), the July 9 Written Consents do not reflect the votes of at least a majority of the Debtor's common stock, which is insufficient support to appoint Myers and Eliasson to the two common director seats.[10]

35. Because the July 9 Written Consents were ineffective to authorize any of the actions set forth therein, the appointment of Myers and Eliasson as common directors never happened. As set forth in the Motion, whether those two (2) seats were vacant or were filled by Rategh and Maney following their appointment by Dr. Esfandyarpour, the three common director seats were unanimously opposed to the bankruptcy filing. *See* Motion, at ¶¶73-74; Charter, at § 3.2. Those three votes combined with a fourth vote from the Series B Director left the Debtor with four (4) votes against bankruptcy, making it impossible for the Debtor's remaining board members—even if properly appointed—to obtain the majority vote required to authorize the bankruptcy filing.

36. For efficiency, the Founders rely upon the arguments and grounds set forth in the Motion, including but not limited to those regarding the invalidity of Mr. Moghadam and Ms. Cecil as directors, and the Founders reserve all rights.

---

[10] Without the votes of the Trusts, the Debtor's math in paragraph 57 of the Debtor's Objection is also wrong, meaning the Debtor did not have the support of "a majority in voting power of the outstanding Common Stock and Preferred Stock, voting as a single class" when attempting to appoint Ms. Cecil as the second independent director.

# CONCLUSION

WHEREFORE, the Founders respectfully requests that the Court enter an order overruling the Objections, granting the Motion, dismissing the Chapter 11 Case, or, in the alternative, appointing a chapter 11 trustee, and granting such further relief as is equitable and just.

| | |
|---|---|
| Dated: August 11, 2022<br>Wilmington, Delaware | Respectfully submitted,<br><br>*/s/ Christopher M. Samis*<br>Jeremy W. Ryan (No. 4057)<br>Christopher M. Samis (No. 4909)<br>R. Stephen McNeill (No. 5210)<br>Elizabeth R. Schlecker (No. 6913)<br>**POTTER ANDERSON & CORROON LLP**<br>1313 N. Market Street, 6th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 984-6000<br>Facsimile: (302) 658-1192<br>Email: jryan@potteranderson.com<br>       csamis@potteranderson.com<br>       rmcneill@potteranderson.com<br>       eschlecker@potteranderson.com<br><br>*Counsel to the Founders* |

**EXHIBIT A**

**FILED UNDER SEAL**

**EXHIBIT B**

# FILED UNDER SEAL

**EXHIBIT C**

# FILED UNDER SEAL

**EXHIBIT D**

# FILED UNDER SEAL