## **Exhibit A**

**Asset Purchase Agreement**

*Execution Version*

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**GENAPSYS, INC.**
**a Delaware corporation,**

**as Seller,**

**and**

**SEQUENCING HEALTH, INC.,**
**a Delaware corporation,**

**as Buyer**

**Dated as of August 23, 2022**

*Execution Version*

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | DEFINITIONS; CERTAIN INTERPRETIVE MATTERS. | 2 |
| | 1.1 Definitions | 2 |
| | 1.2 Interpretive Matters | 13 |
| II. | PURCHASE AND SALE. | 13 |
| | 2.1 Purchased Assets | 13 |
| | 2.2 Excluded Assets | 15 |
| | 2.3 Assumed Liabilities | 16 |
| | 2.4 Excluded Liabilities | 17 |
| | 2.5 Procedures for Assumption and Assignment of Assumed Contracts | 18 |
| | 2.6 Purchase Price | 19 |
| | 2.7 Deposit | 19 |
| III. | CLOSING. | 20 |
| | 3.1 Closing Date | 20 |
| | 3.2 Payments on the Closing Date | 20 |
| | 3.3 Closing Date Prorations | 20 |
| | 3.4 Tax Returns | 20 |
| | 3.5 Allocation of Purchase Price | 21 |
| IV. | REPRESENTATIONS AND WARRANTIES OF SELLER. | 21 |
| | 4.1 Existence; Power | 21 |
| | 4.2 Authorization; Enforceability | 21 |
| | 4.3 Governmental Authorization; No Conflict | 22 |
| | 4.4 Permits | 22 |
| | 4.5 Intellectual Property | 22 |
| | 4.6 Real Property and Purchased Tangible Property | 24 |
| | 4.7 Plans and Material Documents | 24 |
| | 4.8 Employees and Contractors | 25 |
| | 4.9 Finders' Fees | 25 |
| | 4.10 Title to and Condition of Assets | 25 |
| | 4.11 Taxes | 25 |
| | 4.12 Compliance with Laws | 26 |
| | 4.13 Material Contracts | 27 |
| | 4.14 Financial Statements | 28 |
| | 4.15 Proceedings | 28 |
| | 4.16 Subsidiaries | 28 |
| | 4.17 No Other Representations and Warranties | 28 |
| V. | REPRESENTATIONS AND WARRANTIES OF BUYER. | 28 |
| | 5.1 Existence; Power | 28 |
| | 5.2 Authorization; Enforceability | 28 |
| | 5.3 Governmental Authorization; No Conflict | 29 |
| | 5.4 Adequate Funds | 29 |
| | 5.5 Finders' Fees | 29 |

*Execution Version*

VI.   BANKRUPTCY MATTERS.......................................................................................... 29

    6.1   Bankruptcy Court Approval........................................................................... 29
    6.2   Stalking Horse Status.................................................................................... 30
    6.3   Sale Order ...................................................................................................... 30
    6.4   Bidding Procedures........................................................................................ 30
    6.5   Assumption Motions...................................................................................... 30
    6.6   Conflicts ........................................................................................................ 30
    6.7   Bankruptcy Milestones ................................................................................. 30
    6.8   Alternative Transaction and Compliance with Fiduciary Duties..................... 30

VII.  ADDITIONAL AGREEMENTS. ................................................................................. 31

    7.1   Employee Matters ......................................................................................... 31
    7.2   Use of Name ................................................................................................. 33
    7.3   Collection of Accounts Receivable................................................................ 33
    7.4   Conduct of Business ..................................................................................... 33
    7.5   Efforts; Cooperation. .................................................................................... 34
    7.6   Access to Information; Reporting .................................................................. 34
    7.7   Transition Services ........................................................................................ 34
    7.8   Oxford Loan Modification ............................................................................ 35
    7.9   Further Assurances......................................................................................... 35

VIII. CLOSING DELIVERABLES. .................................................................................... 35

    8.1   Closing Deliverables of Seller ...................................................................... 35
    8.2   Closing Deliverables of Buyer ...................................................................... 36
    8.3   Additional Closing Deliverable of Buyer ...................................................... 36

IX.   CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE.................. 36

    9.1   Accuracy of Representations ......................................................................... 36
    9.2   Buyer's Performance ..................................................................................... 36
    9.3   Buyer's Deliveries ........................................................................................ 36
    9.4   Government Orders........................................................................................ 37
    9.5   No Injunction ................................................................................................ 37
    9.6   Entry of Sale Order ....................................................................................... 37
    9.7   Minimum Liquidity ....................................................................................... 37

X.    CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE.................. 37

    10.1  Accuracy of Representations ......................................................................... 37
    10.2  Seller's Performance..................................................................................... 37
    10.3  Seller's Deliveries ........................................................................................ 37
    10.4  Oxford Loan Modification Agreement .......................................................... 37
    10.5  Government Orders........................................................................................ 37
    10.6  No Injunction ................................................................................................ 38
    10.7  Entry of Sale Order ....................................................................................... 38
    10.8  No Material Adverse Effect ........................................................................... 38
    10.9  Specified Employees...................................................................................... 38
    10.10 Transition Services Agreement...................................................................... 38

XI.   TERMINATION. ................................................................................................. 38
    11.1   Termination Events ................................................................................... 38
    11.2   Effect of Termination ............................................................................... 40

XII.   MISCELLANEOUS. ......................................................................................... 40
    12.1   Survival .................................................................................................... 40
    12.2   Notices ..................................................................................................... 41
    12.3   Amendments and Waivers ....................................................................... 42
    12.4   No Presumption Against Drafting Party ................................................... 42
    12.5   Expenses .................................................................................................. 43
    12.6   Successors and Assigns ........................................................................... 43
    12.7   Entire Agreement ..................................................................................... 43
    12.8   Severability .............................................................................................. 43
    12.9   No Third-Party Beneficiaries ................................................................... 44
    12.10  Governing Law ........................................................................................ 44
    12.11  Consent to Jurisdiction ............................................................................ 44
    12.12  WAIVER OF JURY ................................................................................. 44
    12.13  Counterparts ............................................................................................ 44
    12.14  Time of the Essence ................................................................................. 44

## LIST OF EXHIBITS

Exhibit A        Form of Escrow Agreement
Exhibit B        Form of Oxford Loan Modification Agreement

## LIST OF SCHEDULES

Schedule 2.1(c)      Purchased Tangible Property
Schedule 2.1(n)      Specific Purchased Assets
Schedule 2.2(o)      Specific Excluded Assets
Schedule 2.5(a)      Desired Contracts
Schedule 4.4         Permits
Schedule 4.5.1       Registered and Material Intellectual Property
Schedule 4.5.2       Licensed Intellectual Property
Schedule 4.5.3       Licenses of Seller Intellectual Property
Schedule 4.5.6       Open Source Software
Schedule 4.5.7       Governmental Funding
Schedule 4.6         Real Property and Purchased Tangible Property
Schedule 4.7         Plans and Material Documents
Schedule 4.8         Employees and Contractors
Schedule 4.10       Title to and Condition of Assets
Schedule 4.11       Taxes
Schedule 4.12       Compliance with Laws
Schedule 4.13       Material Contracts
Schedule 4.14       Financial Statements
Schedule 4.15       Proceedings
Schedule 11.1.14    Desired Contracts Required to be Assignable

*Execution Version*

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "***Agreement***") is dated as of August 23, 2022 by and among GenapSys, Inc., a Delaware corporation ("***Seller***"), and Sequencing Health, Inc., a Delaware corporation (the "***Buyer***"). Seller and Buyer are each referred to individually as a "***Party***," and collectively as the "***Parties***."

## RECITALS

A.      Seller is in the business of developing, manufacturing, operating, marketing, distributing and selling devices and Software for detecting, sequencing, and otherwise processing nucleic acids, proteins and metabolites for genetic testing and analyzing, interpreting and otherwise evaluating data with respect thereto and providing products, Software and services related to the foregoing (the "***Business***"), including developing, manufacturing, operating, marketing, distributing and selling highly accurate and scalable semiconductor-based electronic sequencing devices with within compact platforms;

B.      Seller has developed or otherwise owns or holds rights in the Purchased Technology (as defined herein), including Patents, Copyrights and Trade Secrets relating to devices and Software for detecting and sequencing nucleic acids, proteins and metabolites for genetic testing;

C.      On July 11, 2022, Seller filed a voluntary bankruptcy petition, initiating Case No. 22-10621 (BLS) (the "***Bankruptcy Case***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") pursuant to Chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

D.      On July 14, 2022, Seller filed a motion [D.I. 54] in the Bankruptcy Court (the "***Sale Motion***") seeking entry of an order (the "***Sale Procedures Order***") authorizing Seller, among other things, to conduct a sale process for the Business and the Purchased Assets (as defined herein) (the "***Sale***"), and approving procedures with respect thereto (the "***Bidding Procedures***").

E.      In accordance with the Sales Procedures Order, Seller will seek the Bankruptcy Court's entry of an order, designating the Buyer as the Stalking Horse Bidder (such order, the "***Stalking Horse Order***").

F.      For the Bankruptcy Court to enter the Stalking Horse Order, Seller and Buyer desire to amend and restate that certain Asset Purchase Agreement, dated August 12, 2022 (the "**Original Purchase Agreement**"), between Seller and Buyer to this Agreement, which removes the provisions providing for the Break-Up Fee (as defined in the Original Purchase Agreement) and changes the dates set forth in Section 2.7 from August 22, 2022 to August 25, 2022 and the dates set forth in Section 7.8 and Section 11.1.12 from August 22, 2022 to August 24, 2022.

G.      Subject to and in accordance with the Sale Procedures Order (including the receipt of a higher or otherwise better bid), once entered, Seller intends to sell the Purchased Assets (as defined herein) on the terms and conditions contained in this Agreement, including obtaining an order from the Bankruptcy Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 2002, 6003, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedures

(the "***Bankruptcy Rules***") authorizing the transactions contemplated hereunder, in form and substance satisfactory to Buyer (the "***Sale Order***").

NOW THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the Parties hereby covenant and agree as follows:

## I.    DEFINITIONS; CERTAIN INTERPRETIVE MATTERS.

1.1    <u>Definitions</u>. For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"***Accounting Principles***" means GAAP as in effect as of the date hereof, and only to the extent consistent with GAAP, the accounting methodologies, principles, policies, definitions, methods, practices, techniques and procedures used by Seller in preparing the Financial Statements.

"***Accounts Receivable***" means any and all accounts, notes, trade and other receivables owed to Seller, together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts that are payable, or that may become payable, to Seller with respect to products sold or services performed on or prior to the Closing Date.

"***Accrued PTO Liability***" means all accrued but unused paid time off for periods prior to the Closing Date for all Employees.

"***Acquisition Agreement***" means any merger agreement, acquisition agreement, purchase agreement, asset purchase agreement, purchase and sale agreement, securities purchase agreement or similar agreement or document providing for, an Alternative Transaction.

"***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocation***" has the meaning set forth in <u>Section 3.5</u>.

"***Alternative Transaction***" means (i) an equity investment made directly or indirectly into Seller by a Third Party (and not Buyer), (ii) a merger, consolidation, share exchange, business combination, recapitalization, reorganization or other similar transaction involving Seller and a Third Party (and not Buyer), or (iii) a sale of substantially all of the Purchased Assets to a Third Party (and not Buyer), whether pursuant to the Auction or otherwise, including whether consummated inside or outside of the Bankruptcy Case; <u>provided</u>, <u>however</u>, that regardless of whether any such Alternative Transaction

*Execution Version*

occurs inside or outside of the Bankruptcy Case, any Alternative Transaction must (a) comply with the Sale Procedures Order, including by providing for cash payment in full of the Expense Reimbursement upon closing, or (b) provide for cash payment in full of the Expense Reimbursement upon closing (or consummation).

"***Ancillary Agreements***" means the Master Assignment, the IP Assignments and any other agreement executed in connection with Closing.

"***Applicable Law***" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"***Assumed Contracts***" means the Contracts that shall be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, the Sale Order (or other order of the Bankruptcy Court), and Section 2.5.

"***Assumed Liabilities***" has the meaning set forth in Section 2.3.

"***Assumed Oxford Indebtedness***" means that portion of the Oxford Indebtedness assumed under the Oxford Loan Modification Agreement.

"***Assumed Plan Liabilities***" has the meaning set forth in Section 2.3(c).

"***Assumed Plans***" has the meaning set forth in Section 7.1.3.

"***Auction***" has the meaning set forth in the Bidding Procedures.

"***Avoidance Actions***" has the meaning set forth in Section 2.1(k).

"***Bankruptcy Case***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Bankruptcy Rules***" has the meaning set forth in the Recitals.

"***Bidding Procedures***" has the meaning set forth in the Recitals.

"***Books and Records***" has the meaning set forth in Section 2.1(f).

"***Business***" has the meaning set forth in the Recitals.

"***Business Day***" means any day other than a Saturday or Sunday or a holiday in the State of Delaware.

*Execution Version*

"***Business Products***" means each product and service developed, manufactured, operated for the benefit of others, marketed, distributed, sold or otherwise made available by Seller and each product and service currently under development to be manufactured or operated for the benefit of others and/or marketed, distributed, sold or otherwise made available by Seller, including devices and Software for the detection, sequencing, and otherwise processing of nucleic acids, proteins and metabolites for genomic testing and analysis, interpretation and otherwise evaluation of data with respect thereto and products, Software and services related to the foregoing.

"***Buyer***" has the meaning set forth in the introductory paragraph.

"***Buyer Closing Payments***" means all financial obligations of Buyer in connection with Closing, as set forth in Section 3.2.2.

"***Cash and Cash Equivalents***" means all cash and cash equivalents (including (i) any cash that is collateralizing any letters of credit issued pursuant to any credit agreement or facility, (ii) marketable securities, (iii) short-term investments, (iv) security deposits, earnest deposits, bid, performance, lease, utility or other deposits, or any other forms of deposit or security by Seller in connection with the Business and (v) checks, ACH transactions or other wire transfers or drafts deposited or available for deposit, and net of issued but uncleared checks or drafts written or issued by Seller).

"***Cash Purchase Price***" means the dollar amount that is equal to the sum of: (i) the total DIP Obligations; (ii) the Cure Amounts; (iii) the Buyer Closing Payments; (iv) the Transferred Employee PTO; (v) the WARN Obligations (if any); and (vi) two million dollars ($2,000,000); *provided* that the Cash Purchase Price shall in no event exceed ten million dollars ($10,000,000) after accounting for each component of the Cash Purchase Price, including any such component that may be paid shortly following Closing.

"***Claim***" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in Section 3.1.

"***Closing Date***" has the meaning set forth in Section 3.1.

"***COBRA***" shall mean Part 6 of Subtitle I of ERISA, Section 4980B of the Code and any similar state or local law.

"***Code***" means the United States Internal Revenue Code of 1986 (as amended) and the regulations promulgated thereunder.

"***Contract***" means any agreement, contract, purchase order, lease, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, in each case as amended, supplemented, modified, restated, or extended from time to time, and including all exhibits, schedules, addenda, and other attachments thereto.

"***Copyright***" means any copyright, any copyrightable work, any work of authorship (including Software), any mask work or other right in any semiconductor chip product, any moral rights related to any of the foregoing, any registration or recording of any of the foregoing, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other domestic or foreign jurisdiction, and all extensions or renewals of any of the foregoing.

"***Cure Amounts***" has the meaning set forth in <u>Section 2.5(a)</u>.

"***Desired Contracts***" has the meaning set forth in <u>Section 2.5(a)</u>.

"***DIP Credit Agreement***" means that certain Secured Debtor-in-Possession Term Loan and Security Agreement dated as of July 18, 2022 among GenapSys, Inc. as debtor-in-possession and borrower, the lenders party thereto, and Oxford Finance LLC as administrative agent and collateral agent, in an aggregate principal amount not to exceed $4,000,000, consisting of a multi-draw term loan facility, as approved by the Bankruptcy Court pursuant to the DIP Order.

"***DIP Obligations***" all obligations of the Debtor owing and outstanding under the DIP Credit Agreement, as approved by the DIP Order, including, but not limited to, principal, interest, fees, and expenses.

"***DIP Order***" means the orders entered by the Bankruptcy Court approving, on an interim and final basis, the Debtor's entry into the DIP Credit Agreement and the transactions contemplated thereunder.

"***Encumbrances***" means any mortgage, deed of trust, hypothecation, assignment, preemptive purchase right, charge, Judicial Lien, Claim, community property interest, right-of way, easement, covenant, condition, equitable interest, Lien, option, pledge, security interest, instrument, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"***Environmental Law***" means any Law relating to pollution, the protection of human health and safety (with respect to exposure to Hazardous Materials), the environment, or natural resources or the release, manufacture, processing, treatment, storage, disposal or handling of, or exposure to, Hazardous Materials.

"***Environmental Liabilities and Obligations***" means all Liabilities arising from any impairment, impact or damage to the environmental, health or safety, or any failure to comply with any Environmental Law.

"***Equitable Principles***" has the meaning set forth in <u>Section 4.2</u>.

"***Escrow Agent***" has the meaning set forth in <u>Section 2.7</u>.

"***Escrow Agreement***" has the meaning set forth in <u>Section 2.7</u>.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means all employers (whether or not incorporated) that would be treated together with Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***Excluded Contract***" means all Contracts of Seller other than the Assumed Contracts.

"***Expense Reimbursement***" means cash in an amount of up to $750,000 on account of reasonable and out-of-pocket costs and expenses that may be incurred by the Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any previous versions thereof.

"***Final Order***" means an order of any court or tribunal, which has not been stayed, appealed, amended, reversed, modified, or vacated, and the time for which any appeal has expired.

"***GAAP***" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"***Governmental Authority***" means any court or tribunal in any jurisdiction (domestic or foreign) or any federal, tribal, state, parish, county, municipal or other governmental or quasi-governmental, administrative or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality, in each case, of competent jurisdiction.

"***Hazardous Materials***" means any waste, chemical substance or product or other substance (i) that is listed, defined, designated or classified as or otherwise determined to be, hazardous, radioactive, infectious, toxic or a pollutant or contaminant under or pursuant to any environmental Law or (ii) the generation, handling, recycling, use, treatment, storage, transportation, release, disposal or exposure of or to which is subject to regulation under any environmental Law, including any admixture or solution thereof and specifically including petroleum and all derivatives thereof and synthetic substitutes therefore, chlorides, naturally occurring radioactive material or "N.O.R.M." and asbestos or asbestos-containing materials.

"***Indebtedness***" of any Person means, without duplication, (a) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed, and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (c) all obligations of such Person for the reimbursement of any obligor on any letter

of credits, banker's acceptance or similar credit transactions, and (d) all obligations of the type referred in clauses (a) through (c) of any Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations.

"***Intellectual Property***" means any Copyright, Patent, Trademark, Trade Secret, Software, right in data and databases, any other similar or equivalent type of proprietary right or intellectual property right anywhere in the world and all rights to sue, obtain damages or other remedies, including for past, present, and future infringement or misappropriation, and other administrative rights arising from or relating to any of the foregoing.

"***Inventory***" means all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories.

"***IP Assignments***" means (i) a patent assignment for each jurisdiction in which any Patent included within the Purchased Intellectual Property is issued (or an application for which is pending), in a form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned), which form shall be suitable for recording in such jurisdiction, (ii) a copyright assignment for each jurisdiction in which any Copyright included within the Purchased Intellectual Property is registered (or an application for which is pending), in a form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned), which form shall be suitable for recording in such jurisdiction, (iii) a trademark assignment for each jurisdiction in which any Trademark included within the Purchased Intellectual Property is registered (or an application for which is pending), in a form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned), which form shall be suitable for recording in such jurisdiction, and (iv) such other assignment or assignments for Intellectual Property in the form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned).

"***Judicial Lien***" has the meaning set forth in Section 101(36) of the Bankruptcy Code.

"***Knowledge of Seller***" and similar wording (e.g., "***Seller has no Knowledge***" or "***Seller's Knowledge***") means the actual knowledge of Britton Russell and Dana Moss after making reasonable inquiry with respect to the particular matter in question; *provided* that, with respect to any representation or warranty regarding Intellectual Property, reasonable inquiry does not include obtaining any opinion of counsel regarding non-infringement, freedom to operate, validity, enforceability or similar matters.

"***Law***" means any applicable federal, state, county, city, municipal, foreign, or other governmental statute, law, rule, regulation, ordinance, order, code, or requirement (including pursuant to any settlement agreement or consent decree) and any permit or license granted under any of the foregoing, or any requirement under the common law.

7

"***Liability***" means any and all Claims, debts, Indebtedness, Encumbrances, losses, damages, adverse claims, liabilities, fines, surcharges, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"***Lien***" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

"***Master Assignment***" means the Master Assignment, Bill of Sale, and Conveyance in the form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned).

"***Material Adverse Effect***" means any circumstance, condition, occurrence, event that, individually or in the aggregate (i) would be reasonably expected to prevent or materially delay beyond the Outside Date or materially impair Seller's ability to consummate the transactions contemplated by this Agreement, or (ii) would be reasonably expected to have, a material adverse effect on the Purchased Assets or the Business taken as a whole; provided, however, that in no event shall any circumstance, condition, occurrence, event or change arising out of any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (a) changes in the economy, market, financial or capital markets or regulatory or political conditions in general but that do not have a disproportionate effect on Seller relative to other participants in the industry in which Seller conduct the Business; (b) terrorism, war, military actions or the outbreak of hostilities (including, for the avoidance of doubt, as a result of, arising out of, or otherwise in connection with, the instability and hostilities with respect to the Russia and Ukraine conflict) or natural disasters, or any escalation or worsening of such terrorism, war, military actions, hostilities or natural disasters; (c) changes that affect generally the industry in which Seller operates but that do not have a disproportionate effect on Seller relative to other participants in the industry in which Seller conducts the Business; (d) any state of facts, circumstance, condition, event, change, development, occurrence, result or effect, or any escalation or worsening of such  facts, circumstances, conditions, events, changes, developments, occurrences, results or effects threatened or existing as of the date hereof, to the extent directly or indirectly resulting from any epidemic, pandemic or disease outbreak (including, without limitation, COVID-19); (e) changes in any Applicable Law or GAAP or other applicable accounting requirements or principles; (f) any matters disclosed on the Schedules hereto or (g) the commencement of the Bankruptcy Case.

"***Most Recent Financial Statements***" has the meaning set forth in <u>Section 4.14</u>.

"***Offeree***" has the meaning set forth in <u>Section 7.1.1</u>.

"**Order**" means any award, writ, injunction, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority.

"**Outside Date**" has the meaning set forth in <u>Section 11.1.2</u>.

"**Oxford Finance**" means Oxford Finance LLC, a Delaware limited liability company, and any successor thereto under the Oxford Loan Documents.

"**Oxford Indebtedness**" means all Indebtedness arising under or relating to the Oxford Loan Documents.

"**Oxford Lenders**" means the lenders party to the Oxford Loan Documents from time to time (including any lenders thereto as a result of assignment, substitution or joinder).

"**Oxford Loan Documents**" means (i) that certain Loan and Security Agreement dated as of December 19, 2019 by and among Seller, as borrower, Oxford Finance, as collateral agent, and the Oxford Lenders party thereto from time to time, as the same as the same may from time to time be amended, modified, supplemented or restated (including, without limitation, that certain First Amendment to Loan and Security Agreement dated as of June 23, 2020, that certain Second Amendment to Loan and Security Agreement dated as of October 21, 2021, that certain Third Amendment to Loan and Security Agreement dated as of January 31, 2022 that certain Fourth Amendment to Loan and Security Agreement dated as of April 8, 2022; (ii) any promissory note or promissory notes executed and delivered by Seller to Oxford Finance or the Oxford Lenders evidencing Indebtedness for money borrowed under said Loan and Security Agreement, and (iii) any related loan documents executed and delivered by Seller, on one hand, and Oxford Finance and/or the Oxford Lenders, on the other hand, in connection with the foregoing; but specifically excluding (a) any warrant or other document granting any right to any shares, equity or other securities of the Seller; (b) the DIP Credit Agreement; (c) the DIP Order; and (d) any other document executed by Seller in connection with the DIP Credit Agreement or the DIP Order .

"**Oxford Loan Modification Agreement**" is the agreement in the substantially final form attached hereto as <u>Exhibit B</u>, between Oxford Finance and the Buyer governing the terms by which the Buyer shall assume the Oxford Indebtedness.

"**Party**" or "**Parties**" has the meaning set forth in the introductory paragraph.

"**Patents**" means any letters patent, applications for letters patent, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisional, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, the European Patent Office, the World Intellectual Property Organization, or in any similar office or agency of the United States, any State thereof, or any other domestic or foreign jurisdiction.

"***Permits***" has the meaning set forth in <u>Section 2.1(e)</u>.

"***Permitted Encumbrances***" means: (i) statutory Liens for current property taxes not yet due and payable, including liens for ad valorem Taxes and statutory liens not yet due and payable, (ii) Encumbrances that constitute Assumed Liabilities (including Encumbrances under the Assumed Contracts); (iii) with respect solely to any tangible property, any landlords', carriers', warehousemens', mechanics', suppliers', materialmens', repairmens' liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue and any other Encumbrances that will be irrevocably released in full (of record, as appropriate) on or prior to the Closing; (iv) real property leased under each Real Property Leases, liens, mortgages, deeds of trust or other liens or Encumbrances which affect or encumber only the landlord's fee interests (but excluding leasehold mortgages or other liens created by Seller), and/or (v) Encumbrances arising by, through or under Buyer's financing for the transactions contemplated hereby, including the Encumbrances arising under the Oxford Loan Modification Agreement.

"***Person***" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"***Petition Date***" means July 11, 2022.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"***Prepayments***" means (i) prepaid expenses held as current assets on Seller's Books and Records, and (ii) cash in advance paid to Seller's suppliers which are reflected as payments towards future accounts payable on the Books and Records.

"***Proceeding***" means any Claim, action, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before any Governmental Authority or arbitrator.

"***Purchase Price***" has the meaning set forth in <u>Section 2.6.1</u>.

"***Purchased Assets***" has the meaning set forth in <u>Section 2.1</u>.

"***Purchased Intellectual Property***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Purchased Marks***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Purchased Technology***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Purchased Tangible Property***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Representatives***" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"***Sale***" has the meaning set forth in the Recitals.

"***Sale Order***" has the meaning set forth in the Recitals.

"***Sale Procedures Order***" has the meaning set forth in the Recitals.

"***Seller***" has the meaning set forth in the introductory paragraph.

"***Seller Employees***" has the meaning set forth in Section 4.7.

"***Seller's Employee Plans***" has the meaning set forth in Section 4.7.

"***Seller Permitted Assigns***" means any Person, including a liquidating trust, appointed (a) pursuant to a plan of reorganization or liquidation to administer and implement such plan of reorganization or liquidation, as applicable, or (b) to facilitate the administration and closure of the Bankruptcy Case whether under Chapter 11 or Chapter 7 of the Bankruptcy Code.

"***Software***" means all computer software (in object code or Source Code format), including executable code, software development tools, application programming interfaces (APIs), graphical user interfaces (GUIs), assemblers and compilers, all software libraries, and all data, data files, databases, and database schema, firmware, and related documentation and materials.

"***Source Code***" means computer software in a form which a program's design, logic, structuring and processing methods may be read by a trained human being and utilized to build the object code of such software, including compiler command files, build scripts, scripts relating to the operation and maintenance of such application, API, GUI and object libraries.

"***Specified Employees***" means those certain executive level employees Buyer designates as such in accordance with Section 7.1.1.

"***Stalking Horse***" has the meaning set forth in Section 6.2.

"***Standard Commercial Software Licenses***" means Contracts pursuant to which Seller licenses for non-customized Software generally available to the public on reasonable terms, which have been licensed to Seller for less than $50,000 per year and which are not incorporated into any of the Business Products.

"***Successful Bidder***" has the meaning set forth in the Bidding Procedures.

"***Tax***" or "***Taxes***" (and with correlative meaning, "***Taxable***", "***Taxation***" "***Taxing***") means all federal, state, local or foreign taxes, including all net income, gross

receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real property, personal property, unclaimed property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto and recapture or reimbursement obligations with respect to any tax abatement or other tax benefit (including with respect to the Colorado leased real property or Colorado payroll), whether disputed or not, and including any amounts paid to any governmental entity and deemed by agreement with that entity to constitute taxes and any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"***Tax Returns***" means any return, declaration, report, estimate, information return and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"***Third Party***" means any Person other than Seller, Buyer or any of their respective Affiliates.

"***Trade Secrets***" shall mean all categories of trade secrets as defined in the Uniform Trade Secrets Act including inventions (whether patentable or not), chip designs, integrated circuits, innovations, schematics, manufacturing and production processes, procedures and techniques, algorithms, concepts, ideas, methods (whether or not patentable), processes, practices, know-how, formulae, designs, research and development information, business information, business methods supplier and customer lists and related information, and all other similar confidential and proprietary information and rights.

"***Trademarks***" means any trademark, trade name, corporate name, business name, fictitious name, domain name, trade style, trade dress, service mark, logo, emblem, sign or insignia, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other domestic or foreign jurisdiction, and all extensions or renewals of any of the foregoing.

"***Transfer Taxes***" has the meaning set forth in Section 3.2.2.

"***Transferred Employee***" has the meaning set forth in Section 7.1.1.

"***Transferred Employee PTO***" a dollar amount sufficient to satisfy in full the accrued but unused paid time off of the Transferred Employees as of the Closing Date.

"***WARN***" shall mean the Worker Adjustment and Retraining Notification Act and all similar state and local plant closing or mass layoff laws.

"***WARN Obligations***" has the meaning set forth in Section 7.1.6.

"***WARN Obligations Cap***" has the meaning set forth in Section 7.1.6.

1.2     <u>Interpretive Matters</u>.  Unless the context requires otherwise, (i) all references to Sections, Articles, Exhibits, or Schedules are to Sections, Articles, Exhibits, or Schedules of or to this Agreement, with each Schedule being made a part of this Agreement for all purposes, (ii) each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it in accordance with GAAP, (iii) words in the singular include the plural and vice versa, (iv) all references to $ or dollar amounts are to lawful currency of the United States, (v) unless otherwise specified, the term "day" or "days" refers to calendar days, (vi) the pronoun "his" refers to the masculine, feminine, and neuter, (vii) the words "herein," "hereby," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular Section, Article, or other subdivision, and (viii) the term "including" means "including without limitation."

## II.     PURCHASE AND SALE.

2.1     <u>Purchased Assets</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing and in exchange for the Purchase Price, Seller agrees to sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to accept, purchase, acquire, assume and take delivery of, all right, title and interest in and to all rights, properties and assets of Seller, real, personal or mixed, tangible or intangible, of every kind and description, except for the Excluded Assets (collectively, the "***Purchased Assets***") free and clear of all Encumbrances (other than Permitted Encumbrances), including without limitation the following:

(a)     all Intellectual Property, and rights thereunder, all income, royalties and payments receivable in respect thereof, all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Intellectual Property and any and all corresponding rights that have been, now or hereafter may be secured throughout the world with respect to any Intellectual Property (collectively, the "***Purchased Intellectual Property***"), including (i) all Patents, including the Patents listed on <u>Schedule 4.5.1</u>, all Software and Copyrights, including the Software and registered Copyrights listed on <u>Schedule 4.5.1</u>, and all Trade Secrets, including all Trade Secrets relating to the foregoing or otherwise used in the Business (collectively, the "***Purchased Technology***") and (ii) the name "GenapSys" and any other Trademark, all registrations or applications for registration therefor (whether domestic or foreign) and all goodwill associated therewith (collectively, the "***Purchased Marks***") including the registered Trademarks listed on <u>Schedule 4.5.1</u>;

(b)     all Assumed Contracts (subject to <u>Section 2.5</u>);

(c)     all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "***Purchased Tangible Property***"), including, the Purchased Tangible Property set forth on <u>Schedule 2.1(c)</u>;

(d)     all Inventory, all Prepayments (excluding any Prepayments with respect to Excluded Contracts) and all Accounts Receivable (excluding Accounts Receivable arising under Excluded Contracts);

(e)      all permits, licenses, registrations, consents, approvals, certificates, variances or other authorizations relating to the Purchased Assets or the Business (the "***Permits***"), to the extent transferrable;

(f)      all books and records of Seller, including without limitation books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), copies of Tax Returns (other than income Tax Returns), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property (the "***Books and Records***"); provided, however, that, notwithstanding the foregoing, "Books and Records" shall not include the originals of Seller's minute books, stock books and Tax Returns and Seller shall retain a copy of the Books and Records for the purposes set forth at Section 7.6;

(g)      the amount of and all rights to any proceeds received by Seller, including all insurance recoveries and recoveries from other Third Parties, in respect of, in connection with, or arising from (i) the loss, destruction or condemnation of any Purchased Assets or relating to the Purchased Assets or any Transferred Employee, in each case, whether occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(h)      all phone and telecopy numbers, websites, domain names and email addresses of Seller associated with the Purchased Assets or the Business;

(i)      all goodwill and other intangible assets associated with the Purchased Assets and the Business, including all customer relationships, and all information and documents related thereto;

(j)      all rights and assets related to the Assumed Plans, if any;

(k)      all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, related to the Purchased Assets or the Business including, but not limited to, all claims arising under section 547 of the Bankruptcy Code related to payments for goods or services delivered or provided to Seller (the "***Avoidance Actions***"), which Buyer shall waive in connection with the consummation of this Agreement;

(l)      all rights and obligations under or arising out of all insurance policies (including returns and refunds of any premiums paid, or amounts due back to the Seller, with respect to cancelled insurance policies) relating to the Purchased Assets or any of the Assumed Liabilities, and all benefits of any nature of any Seller with respect thereto (including any claims of Seller arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder), except as set forth in Section 2.2(h);

(m)      all rights against any Person (including customers, suppliers, vendors, lessors, lessees, licensees, licensors of Seller) arising under any Assumed Contract, other

Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise; provided that the foregoing expressly excludes any and all claims against Foresite Capital Management IV, L.P., Hesaam Esfandyarpour, and any affiliates thereof; and

        (n)        any assets identified on <u>Schedule 2.1(n)</u>.

    2.2    <u>Excluded Assets</u>.  The following assets of Seller (collectively, the "***Excluded Assets***") shall be retained by Seller, and are not being sold or assigned to Buyer hereunder:

        (a)        Seller's rights under this Agreement and the Ancillary Agreements;

        (b)        any amounts (including the Purchase Price) paid or payable to Seller pursuant to this Agreement or the Ancillary Agreements;

        (c)        all Cash and Cash Equivalents;

        (d)        all (i) taxpayer and other identification numbers, corporate seals, corporate organizational records, all minute books, stock transfer books and other documents relating to the organization, maintenance, and existence of Seller as a corporation or a limited liability company, as applicable (ii) original Tax, accounting and financial records which pertain exclusively to the Excluded Assets, and (iii) such other files, books and records which pertain exclusively to the Excluded Assets or to the formation, existence or capitalization of Seller or of any other Person;

        (e)        all Contracts that are not Assumed Contracts;

        (f)        all set-off rights to claims filed or asserted in the Chapter 11 Case (except to the extent arising in connection with an Assumed Contract which is subject to cure);

        (g)        any rights, claims (including warranty claims or indemnities) or causes of action of Seller, solely to the extent relating to any Excluded Asset or Excluded Liability, including any and all claims against Foresite Capital Management IV, L.P., Hesaam Esfandyarpour, and any affiliates thereof;

        (h)        all rights of the Seller under any director and officer insurance policy and any director and officer insurance tail policies (including returns and refunds of any premiums paid, or amounts due back to the Seller, with respect to cancelled director and officer insurance policies), and all benefits of any nature of any Seller with respect thereto (including any claims of Seller arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder);

(i)    all rights and obligations under or arising out of all other insurance policies (including returns and refunds of any premiums paid, or amounts due back to the Seller, with respect to cancelled insurance policies) relating to the Excluded Assets or any of the Excluded Liabilities, and all benefits of any nature of any Seller with respect thereto (including any claims of Seller arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder);

(j)    any records which Seller is legally required to retain in its possession and any records related to Excluded Assets including the seals, charter documents, minute books, stock books and books of account or other records having to do with the formation or organization of the Seller;

(k)    personnel records for Seller Employees who are not Transferred Employees and, to the extent the transfer of such records (whether directly or by means of the sale of Seller) to Buyer or its affiliates is prohibited by applicable Law, for Transferred Employees, and all organizational documents and minute books of Seller;

(l)    all Seller's Employee Plans that are not Assumed Plans;

(m)    Seller's attorney-client and work-product privileges;

(n)    all Tax refunds, Tax credits and other Tax benefits which are related to Seller's operation of the Business prior to the Closing; and

(o)    such other assets of Seller listed on <u>Schedule 2.2(o)</u>, if any.

2.3    <u>Assumed Liabilities</u>.    Subject to the terms and conditions set forth in this Agreement, at the Closing, without limitation of the representations, warranties, covenants and other obligations of Seller contained in this Agreement and the other Transaction Documents, Buyer hereby assumes and agrees to pay, perform, fulfill and discharge when due, from and after the Closing Date, only the following liabilities (collectively, the "***Assumed Liabilities***"):

(a)    all liabilities and obligations of Seller, if any, relating to the Purchased Assets that arise from and after the Closing and solely to the extent that such liabilities and obligations arise in connection with Buyer's ownership, use or operation of the Purchased Assets from and after the Closing;

(b)    all of Seller's liabilities under the Assumed Contracts to the extent required to be performed from and after the Closing, and all Cure Amounts associated with such Assumed Contracts;

(c)    the Assumed Oxford Indebtedness; and

(d)    all liabilities arising from and after the Closing under the Assumed Plans, if any (the "***Assumed Plan Liabilities***"); <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the Assumed Plan Liabilities shall not include any liabilities or obligations arising with respect to or in connection with the Assumed Plans to the extent such liabilities or obligations arose prior to

the Closing Date or with respect to a Seller Employee who does not become a Transferred Employee.

Notwithstanding the foregoing and for avoidance of doubt, Assumed Liabilities shall not include any Liability that constitutes an Excluded Liability or any Liability relating to or arising out of any violation of any Applicable Law prior to the Closing by, or any Claim against, Seller or any breach, default or violation by Seller prior to the Closing of or under any Assumed Contracts, other than the Cure Amounts.  From and after Closing, Seller shall have no liability or obligation with respect to any of the Assumed Liabilities.

2.4    <u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "***Excluded Liabilities***"), and Seller shall be solely and exclusively liable for all such Liabilities, including, without limitation, the following Liabilities (which shall constitute Excluded Liabilities):

(a)    all Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation, performance of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of any and all counsel, accountants, consultants, advisers, investment bankers, brokers, finders or others;

(b)    except for Assumed Liabilities, all Liabilities arising out of relating to otherwise in respect of the Purchased Assets or the Business arising prior to the Closing;

(c)    all Liabilities of Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(d)    except solely for the Assumed Oxford Indebtedness, all Liabilities of Seller for Indebtedness;

(e)    all (i) Liabilities of Seller for any Taxes, (ii) Taxes arising from or in connection with any Excluded Assets, and (iii) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities, in each case, for any Pre-Closing Tax Period;

(f)    all Liabilities of Seller in respect of Contracts to which Seller is party or is otherwise bound, in each case, that are not Assigned Contracts;

(g)    except solely for the Assumed Plan Liabilities, if any, all Liabilities with respect to employment or other provision of services, compensation, severance, benefits or payment of nature owed to any current or former employee, officer, director, member, partner or independent contractor of Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual) that (i) arises out of or relates to the employment, service provider or other relationship between Seller or any ERISA Affiliate and any such individual, including, but not limited to, the termination of such relationship, (ii) arises out of or relates to Seller's Employee Plan, or (iii) arises out of or relates to events or conditions occurring before the Closing Date;

(h) all Liabilities of Seller to any of its equity holders with respect to dividends, distributions, redemption of interests, option payments or otherwise;

(i) to the maximum extent permitted under Applicable Law, all Environmental Liabilities and Obligations;

(j) all Liabilities arising out of, in respect of or in connection with failure by Seller or any of its Affiliates to comply with any Applicable Law or Order; and

(k) all Liabilities in respect of any pending or threatened Proceeding arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Proceeding relates to such operation on or prior to the Closing Date (including, without limitation, any and disputes with current or former employees of Seller prior to the Closing Date, including, for the avoidance of doubt, any pending or threatened Proceeding by (i) Hesaam Esfandyarpour, (ii) Dr. Hamid Rategh, (iii) Kozar Parizi, and/or (iv) Robert Navarino).

2.5 <u>Procedures for Assumption and Assignment of Assumed Contracts</u>.

(a) <u>Schedule 2.5(a)</u> sets forth a complete list as of the date hereof of all Contracts that Buyer intends to assume at the Closing (the "***Desired Contracts***"). Upon Closing, subject to the terms and conditions hereof, Seller will assign the Desired Contracts to Buyer, and Buyer will assume all Assumed Liabilities thereunder, and at such time as is required by the Bankruptcy Court in the Sale Order, unless otherwise agreed between Buyer and the applicable counterparty to an Assumed Contract, Seller shall, at Closing, pay cash to the Third Party (or parties) to the applicable Assumed Contract in order to cure the monetary defaults and satisfy any pecuniary obligations of Seller (or obtain waivers with respect thereto) or, if applicable, such other lesser amount as may be mutually agreed by Buyer and the applicable counter-party to such Assumed Contract (the "***Cure Amounts***").

(b) At any time prior to entry of the Sale Order, Buyer will have the right to provide written notice to Seller of Buyer's election to designate a Desired Contract as an Excluded Contract, and, upon such designation in writing, such Desired Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute a Purchased Asset).

(c) At any time prior to the entry of the Sale Order, Buyer will have the right to provide written notice to Seller of Buyer's election to designate a Contract as a Desired Contract, and upon such designation in writing, and subject to the requirements of <u>clause (d)</u> below, such Contract will constitute a Purchased Asset and Assumed Contract and will be conveyed to Buyer under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) such Contract is added to the Assumed Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such Contract, and (B) the assumption and assignment of such Contract has been or is approved by the Bankruptcy Court (including through the Sale Order).

(d) With respect to each Desired Contract, Buyer will deliver by the Bid Deadline ( established by the Bidding Procedures) information Buyer believes to be sufficient to

demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Desired Contract as required under Section 365 of the Bankruptcy Code, which information Seller will be permitted to disseminate to any Third Party that is a party to any Desired Contract.  In the event Buyer cannot demonstrate adequate assurance of future performance with respect to a Desired Contract, such Desired Contract shall become an Excluded Contract, <u>provided</u>, <u>however</u>, that any dispute over Buyer's satisfaction of the foregoing requirement, to the extent not consensually resolved, will be determined by the Bankruptcy Court.

(e)    If Buyer exercises its rights in <u>clause (b)</u> or <u>clause (c)</u> above to designate a Contract as an Excluded Contract or a Desired Contract (as the case may be), then the Parties acknowledge and agree that there will be no increase or reduction in the Cash Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing.

(f)    Absent the prior written consent of Buyer, at no time prior to the Closing (or the earlier undisputed termination of this Agreement, if applicable) shall Seller assume, reject (or move to assume or reject), amend, modify, restate, or rescind any Desired Contract. Seller acknowledges and agrees that, at any time following Buyer's designation as the Successful Bidder, Buyer may contact and negotiate with non-Debtor parties to Desired Contracts, and as soon as reasonably practicable after the execution of this Agreement, Seller shall provide contact information and copies of any applicable Contracts, in order to facilitate such discussions; <u>provided</u>, <u>however</u>, that Seller shall reasonably cooperate with Buyer, including prior to the Auction, with respect to communications with such non-Debtor parties to Desired Contracts.  If any Desired Contract listed on <u>Schedule 11.1.14</u> hereto cannot be assigned to Buyer by operation of law, Buyer shall, prior to the Closing Date, use commercially reasonable efforts to enter into an alternative arrangement with the applicable non-Debtor party for the subject matter of such Desired Contract listed on <u>Schedule 11.1.14</u>.

2.6    <u>Purchase Price</u>.

2.6.1    The purchase price for the Purchased Assets under this Agreement is an amount (the "***Purchase Price***") equal to the sum of:

(a)    the Cash Purchase Price; *plus*

(b)    the Assumed Oxford Indebtedness.

The Purchase Price will be delivered by Buyer as set forth in <u>Section 3.2</u>.

2.7    <u>Deposit</u>.  Subject to completion of the Escrow Agent's KYC requirements, no later than August 25, 2022, Buyer shall deposit into an interest bearing escrow account with Citibank, N.A. as escrow agent (the "***Escrow Agent***") an amount equal to $1,500,000.00 (such amount, the "***Deposit***") by wire transfer of immediately available funds pursuant to the terms of an escrow agreement to be agreed prior to August 25, 2022, and to be attached as <u>Exhibit A</u> hereto on or prior to August 25, 2022 (the "***Escrow Agreement***").  The Deposit will be credited against the Purchase Price at Closing, and will otherwise be disbursed as provided in this Agreement, the Bidding Procedures, the Escrow Agreement and the Sale Order.  The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of Seller or Buyer.

Buyer shall cause Seller to be reimbursed for one-half of the Acceptance Fee (as provided for in the Escrow Agreement) within five (5) Business Days of Buyer's receipt of an invoice requesting reimbursement of such amount.

## III.    CLOSING.

3.1    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in Article IX, and Article X (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "***Closing***") will take place remotely via the exchange of electronic documents and signatures by electronic mail (or wet signatures, to the extent required) on the date that is two (2) Business Days after the satisfaction or waiver of the conditions set forth in Article VIII, Article IX and Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place, date or time is agreed to in writing by Seller and Buyer.  The date and time at which the Closing actually occurs is hereinafter referred to as the "***Closing Date***."

3.2    <u>Payments on the Closing Date</u>.  At the Closing, in addition to such other actions as may be provided for herein, Buyer shall pay to Seller, by wire transfer of immediately available funds, an amount equal to the Cash Purchase Price, except that (i) the portion of the Cash Purchase Price related to the payment of the DIP Obligations shall be paid directly to Oxford Finance at the Closing, by wire transfer of immediately available funds and (ii) the Buyer Closing Payments shall be paid in accordance with <u>Section 3.2.2</u>.

3.2.1    At the Closing, Buyer shall assume the Assumed Liabilities, and with regard to Assumed Contracts, and, as Cure Amounts are part of the Cash Purchase Price, Seller shall pay to the applicable counter-party to such Assumed Contract any Cure Amounts, at such time as may be designated by the Bankruptcy Court in the Sale Order or otherwise agreed between Buyer and such applicable counter-party to such Assumed Contract.

3.2.2    At the Closing, or as soon as reasonably practicable thereafter, Buyer shall pay all recording costs or fees to record the IP Assignment.  As soon as reasonably practicable after the Closing, (i) Buyer shall pay (a) all sales, conveyance and similar Taxes and fees (for the avoidance of doubt, excluding either Party's income Taxes) ("***Transfer Taxes***"); and (b) and all recording costs or fees to record any documents to transfer title to the Purchased Assets; and (ii) Seller shall pay all recording costs or fees to record any documents to release of record or cure Encumbrances other Permitted Encumbrances.

3.3    <u>Closing Date Prorations</u>.  Except as otherwise set forth in this Agreement, all utility charges, rents or other payments under the Purchased Assets and all real property, personal property and similar Taxes with respect to the Purchased Assets shall be prorated as of the Closing Date, except as otherwise expressly provided to the contrary in this Agreement.  All prorations shall be final.

3.4    <u>Tax Returns</u>.  Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes unless Seller is required to file such Tax Returns under Applicable Law.  In such event Seller will file such Tax Returns, but Buyer

will prepare such Tax Returns that relate to Transfer Taxes at its owns expense and pay Seller for all costs associated with filing such Tax Returns.

3.5     Allocation of Purchase Price.  The Purchase Price shall be allocated among the Purchased Assets based on an allocation schedule prepared by Buyer, which allocation schedule shall (i) be prepared (x) in accordance with Section 1060 of the Code (and any similar provision of state, local or foreign law, as appropriate) and (y) in consultation with Seller, and (ii) be provided to Seller within 90 days after the Closing (the "***Allocation***").  Each Party will report, act and file Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Allocation.  No Party will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by Applicable Law.

## IV.     REPRESENTATIONS AND WARRANTIES OF SELLER.

Except as set forth in the correspondingly numbered section of the Schedules, on the date hereof and as of the Closing Date (or as of such specific date as may be specified in the applicable representation and warranty or covenant), Seller hereby represents and warrants to Buyer as follows:

4.1     Existence; Power.  Seller is a corporation duly organized and validly existing under the laws of the State of Delaware.  Subject to the limitations imposed on Seller as a result of the Bankruptcy Case, Seller has the requisite corporate power and authority and all governmental licenses, authorizations, permits, consents, and approvals required to carry on the Business as conducted.

4.2     Authorization; Enforceability.

4.2.1     Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller's execution, delivery, and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, are within Seller's capacity, power and authority and have been duly authorized by all necessary corporate or limited liability company action.

4.2.2     Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller has the requisite capacity, power and authority, and have taken all action necessary to execute and deliver this Agreement and each Ancillary Agreement and to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.  This Agreement and each Ancillary Agreement has been duly executed and delivered by Seller, as applicable.  Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, this Agreement and each Ancillary Agreement constitutes a legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its and their respective terms, subject to applicable bankruptcy, insolvency or other similar laws relating to or affecting the enforcement of creditors' rights generally and general equitable principles (regardless of whether such enforceability is considered in a proceeding at Law or in equity) (collectively, "***Equitable Principles***").

4.3     <u>Governmental Authorization; No Conflict</u>.

4.3.1     Except for (a) entry of the Sale Order and/or the Sale Procedures Order, and (b) notices, filings and consents required in connection with the Bankruptcy Case, no Seller is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by Seller of this Agreement and the other Ancillary Agreements to which it is or will be a party or the consummation or performance by Seller of any of the transactions contemplated hereby and thereby.

4.3.2     When the consents and other actions described in the preceding <u>Section 4.3.1</u>, including entry of the Sale Order, have been obtained and taken, the execution and delivery by Seller of this Agreement and the other Ancillary Agreements to which Seller is or will be a party and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Seller under (a) the certificate of incorporation, operating agreement, bylaws or other governing documents of Seller, or (b) any Applicable Law.

4.4     <u>Permits</u>.  All Permits held by Seller are listed on <u>Schedule 4.4</u>.  Seller has all material Permits which are needed or required by applicable law to operate its business related to or affecting the Business or any ancillary services related thereto as currently conducted.  Without limiting the foregoing, Seller has obtained all export licenses and other approvals, timely filed all required filings and has assigned the appropriate export classifications to all products, in each case as required for its exports of products, software and technologies from the United States and any other applicable jurisdiction.  Seller is in compliance in all material respects with the terms of all applicable Permits, there are no pending or threatened claims against Seller with respect to such Permits, and there are no pending investigations related to Business with respect to any Permits nor any facts, conditions, or circumstances that would reasonably be expected to give rise to any material future claims or investigations.

4.5     <u>Intellectual Property</u>.

4.5.1     <u>Registered and Material Intellectual Property</u>. <u>Schedule 4.5.1</u> sets forth an accurate and complete list of all Patents, registrations for Trademarks and registrations Copyrights included within the Purchased Intellectual Property and all applications or other similar filings with respect to the foregoing (the "***Registered Intellectual Property***"), including, as applicable, for each item, (i) the record owner of such item, (ii) the jurisdiction in which such item has been issued or registered or is pending, (iii) the issuance, registration or application number, and (iv) the application date and (if applicable) the registration date of such item.  <u>Schedule 4.5.1</u> also sets forth an accurate and complete list of (i) all unregistered Trademarks material to the conduct of the Business, and (ii) all proprietary Software owned by Seller and material to the conduct of the Business.  To Seller's Knowledge, all issuance, renewal, maintenance and other payments that are or have become due with respect to the Registered Intellectual Property have been paid by or on behalf of the Seller by the relevant due date or within an available grace period or extension period after such relevant due date as permitted by law.  Except as set forth on <u>Schedule 4.5.1</u>, there are no pending or, to the Knowledge of the Seller, threatened interferences, re-examinations or other

post-grant proceedings, office actions, oppositions, cancellation proceedings, or any equivalent Proceedings involving any Registered Intellectual Property.  Since January 1, 2021, except as set out in Schedule 4.5.1 and except for the lapse of provisional patent applications or Patent Cooperation Treaty applications which have been replaced by pending patent applications, no patents or patent applications owned or licensed by Seller under an exclusive license have expired, lapsed or been abandoned or deemed withdrawn according to the applicable patent offices.

4.5.2    Licensed Intellectual Property.  Schedule 4.5.2 sets forth a list of all Contracts with respect to any Intellectual Property licensed by Seller (the "***Inbound IP Licenses***"), other than Standard Commercial Software.

4.5.3    Licenses of Seller Intellectual Property.  Schedule 4.5.3 sets forth any and all Contracts pursuant to which Seller has granted to any Person any option, license, shared ownership interests or any other interest of any kind relating to the Purchased Intellectual Property, including any licenses granted by Seller to any Person to use the Purchased Intellectual Property (the "***Outbound IP Licenses***").

4.5.4    Title to Intellectual Property.  Seller owns all right, title and interest to the Purchased Intellectual Property and the Inbound IP Licenses, in each case without any conflict with the rights of others, including former employees or consultants, or academic or medical institutions with which any of them or any of the current directors, officers or employees of Seller may be affiliated now or may have been affiliated in the past.  Seller can and will convey the Purchased Intellectual Property and all Inbound IP Licenses which are Assumed Contracts free and clear of all Encumbrances pursuant to the Sale Order.

4.5.5    Noninfringement of Intellectual Property.  To the Knowledge of Seller, (i) no Person is engaging in any activity that infringes, misappropriates or violates any Intellectual Property owned by or exclusively licensed to Seller, (ii) the operation of the Business (including its products and services) does not infringe, misappropriate or violate any Intellectual Property of any other Person or constitute unfair competition or unfair or deceptive trade practices under any Applicable Law, and (iii) no Claim has been asserted or threatened that the use of any Intellectual Property of Seller or the operation of the Business infringes, misappropriates or violates the Intellectual Property of any third party.

4.5.6    Open Source Software.  Except as set forth in Schedule 4.5.6, Seller has not embedded, used or distributed any open source, copyleft or community source code (including but not limited to any libraries or code, software, technologies or other materials that are licensed or distributed under any General Public License, Lesser General Public License or similar license arrangement or other distribution model described by the Open Source Initiative at www.opensource.org, collectively "***Open Source Software***") in connection with any of the Business Products (whether currently available or in development) in any manner that would materially restrict the ability of Seller (or any successor to the Business or subsequent owner of any Business Products) to protect its proprietary interests in any of the Business Products or in any manner that requires, or purports to require (i) any Purchased Intellectual Property (other than the Open Source Software itself) be disclosed or distributed in Source Code form or be licensed for the purpose of making derivative works; (ii) any restriction on the consideration to be charged for the distribution of any Purchased Intellectual Property; (iii) the creation of any obligation with

respect to Purchased Intellectual Property, or the grant to any third party of any rights or immunities under Purchased Intellectual Property; or (iv) any other limitation, restriction or condition on the right of the owner of Purchased Intellectual Property with respect to the use or distribution of any Purchased Intellectual Property.

4.5.7    Governmental Funding. Except as set forth in Schedule 4.5.7, no government funding, facilities of a university, college, other educational institution or research center was used in the development of any Purchased Intellectual Property. To the Knowledge of Seller, no Person who was involved in, or who contributed to, the creation or development of any Purchased Intellectual Property, has performed services for the government, university, college, or other educational institution or research center in a manner that would affect Seller's rights in the Purchased Intellectual Property. With respect to any Intellectual Property exclusively licensed under any Inbound License that has been created pursuant to, and/or is subject to, any funding agreement with any government or Governmental Authority (or any other Person), or is subject to the requirements of the Bayh-Dole Act or any similar provision of any applicable law, the licensor of such Licensed Intellectual Property exclusively licensed under any Inbound License, to the Knowledge of Seller, has complied with the provisions of such funding agreement and/or laws.

4.5.8    Protection of Trade Secrets. Seller has taken all necessary and appropriate steps to protect and preserve the confidentiality of all Trade Secrets included in the Purchased Intellectual Property. To the Knowledge of Seller, all use, disclosure or appropriation of Trade Secrets included in the Purchased Intellectual Property by or to any Person has been pursuant to the terms of a written agreement between Seller and such Person. All use, disclosure or appropriation of Trade Secrets not owned by Seller has been pursuant to the terms of a written agreement between Seller and the owner of such Trade Secrets, or is otherwise lawful.

4.6    Real Property and Purchased Tangible Property.  Seller does not own any real property.  Schedule 4.6 lists all real property leased by Seller and sets forth the lease agreement (including all amendments and modifications thereto) for each (collectively, the "***Real Property Leases***"), including the identification of the lessee and lessor thereunder.  Seller has a valid leasehold interest in the real property leased under each Real Property Leases free and clear of any Encumbrances, other than Permitted Encumbrance.  The Purchased Tangible Property constitutes all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property used in connection with the Business.

4.7    Plans and Material Documents.  Schedule 4.7 sets forth a list of all material benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program in effect and covering one or more employees of Seller ("***Seller Employee***") or the beneficiaries or dependents of Seller Employees, and is maintained, sponsored, contributed to, or required to be contributed to by Seller, or under which Seller has any material liability for premiums or benefits (each, a "***Seller's Employee Plan***").  To the Knowledge of Seller, Seller's Employee Plan has been maintained, funded and administered in accordance with the terms of Seller's Employee Plan and complies in form and in operation in all material respects with the applicable requirements of ERISA and the Code, except where the failure to comply would not have a material adverse effect on the Business.

4.8     <u>Employees and Contractors</u>.  Seller has provided Buyer with a true, complete and correct list of all Seller Employees, specifying their position, annual salary or rate of pay, exempt/non-exempt status, employment status (whether active or on leave of absence), date of hire, work location, and bonus and commission terms.  Except as set forth on <u>Schedule 4.8</u>, Seller has no Knowledge of any complaints before or claims by a Governmental Authority or in arbitration regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like, and Seller has no Knowledge of any such complaints or claims being threatened. Seller (i) is not party to or bound by any collective bargaining or similar agreement with any labor organization, and (ii) has no employees that are represented by any labor organization.  To the Knowledge of Seller, there are no union organizing activities among any Seller Employees.  No labor strike, lockout, or material work stoppage is pending or, to the Knowledge of Seller, threatened.  Except as set forth on <u>Schedule 4.8</u>, there are no unresolved internal complaints of harassment, discrimination, or retaliation by any Seller Employees.  Seller has, since January 1, 2021, complied in all material respects with all applicable labor and employments Laws with respect to the Seller Employees, including, but not limited to, ensuring that employees classified as exempt from overtime compensation are properly classified as such and ensuring that all employees have been paid for all hours worked in accordance with the requirements of all applicable Laws.  To the extent that Seller utilizes independent contractors in conjunction with its business, such independent contractors are properly classified as independent contractors in accordance with applicable Laws.

4.9     <u>Finders' Fees</u>.  Except for any Person(s) whom Seller shall be solely responsible for any fees or commissions owing, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or any of the Ancillary Agreements.

4.10    <u>Title to and Condition of Assets</u>.  Seller has title to, or a valid leasehold interest in, all of the Purchased Assets (including, without limitation, the transfer free and clear of all Encumbrances, except as set forth on <u>Schedule 4.10)</u>.  Upon consummation of the transactions contemplated hereby and by the Ancillary Agreements, Buyer will acquire title to all of the Purchased Assets, free and clear of all Encumbrances (except for the Permitted Encumbrances). The Purchased Assets include, without limitation, all material tangible and intangible assets necessary for the conduct of the Business as it is currently conducted.

4.11    <u>Taxes</u>.    Except as set forth on <u>Schedule 4.11</u>, Seller (i) has not received any outstanding notice of audit, and is not undergoing any audit, of Tax Returns relating to the Business and (ii) has never received any written notice of deficiency or assessment from any taxing authority with respect to liability for Taxes relating to the Business which has not been fully paid or finally settled. Seller has complied in all material respects with all Applicable Laws, rules and regulations relating to the payment and withholding of Taxes and has withheld all amounts required by Applicable Law to be withheld from the wages or salaries of employees and independent contractors of the Business and is not liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such laws, rules and regulations.

4.12     Compliance with Laws.

4.12.1     Seller is, and, and to the Knowledge of Seller, for the last six (6) years has been, in compliance with all Applicable Laws, except where such failure to comply has been cured without any continuing Liability on the part of Seller or would not have a Material Adverse Effect. Except as set forth on Schedule 4.12, Seller has not received any notice from any Governmental Authority regarding any actual or alleged material violation of, any of failure to comply in any material respect with, any Applicable Laws, except where such actual or alleged violation has been cured without any continuing Liability on the part of Seller or would not have a Material Adverse Effect.

4.12.2     In connection with its collection, storage, use and/or disclosure of any information that constitutes "personal information," "personal data" or "personally identifiable information" as defined in applicable laws (collectively "***Personal Information***") by or on behalf of Seller, Seller is and, to the Knowledge of Seller, has been in compliance in all material respects with (a) all Applicable Laws (including, without limitation, laws relating to privacy, data security, telephone and text message communications, and marketing by email or other channels) in all relevant jurisdictions, (b) Seller's privacy policies and public written statements regarding Seller's privacy or data security practices, and (c) the requirements of any contract codes of conduct or industry standards, by which Seller is bound. Seller maintains and has maintained reasonable physical, technical, and administrative security measures and policies designed to protect all Personal Information owned, stored, used, maintained or controlled by or on behalf of Seller from and against unlawful, accidental or unauthorized access, destruction, loss, use, modification and/or disclosure. To the extent Seller maintains or transmits protected health information, as defined under 45 C.F.R. § 160.103, Seller is in compliance with the applicable requirements of the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, including all rules and regulations promulgated thereunder. Seller is and, to the Knowledge of Seller, in compliance in all material respects with all Applicable Laws relating to data loss, theft and breach of security notification obligations. To the Knowledge of Seller, there has been no occurrence of (i) unlawful, accidental or unauthorized destruction, loss, use, modification or disclosure of or access to Personal Information owned, stored, used, maintained or controlled by or on behalf of Seller such that privacy requirements require or required Seller to notify Governmental Authorities, affected individuals or other Persons of such occurrence or (ii) unauthorized access to or disclosure of Seller's Trade Secrets that could reasonably be expected to result in a Material Adverse Effect.

4.12.3     Seller does not engage in (a) the design, fabrication, development, testing, production or manufacture of one (1) or more "critical technologies" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "***DPA***"); (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800); or (c) the maintenance or collection, directly or indirectly, of "sensitive personal data" of U.S. citizens within the meaning of the *DPA*. Seller has no current intention of engaging in such activities in the future.

4.13    <u>Material Contracts</u>.

4.13.1    <u>Schedule 4.13</u> sets forth all of the following Contracts to which Seller is a party or by which it is bound as of the date of this Agreement, other than Seller Benefit Plans (together with the Real Property Leases, the Inbound IP Licenses and the Outbound IP Licenses, collectively, the "***Material Contracts***"):

(a)    any Contracts for capital expenditures or the acquisition of fixed assets or for the purchase, maintenance or acquisition of materials, supplies, merchandise, equipment, parts or other property or services involving the expenditure by Seller in any instance or under which Seller purchases materials, supplies, merchandise, equipment, parts or other property or services not generally available from alternate sources;

(b)    any non-exclusive distributor, dealer, supply, sales or similar Contracts under which Seller has paid or is obligated during any calendar year and any exclusive distributor, dealer, supply, sales or similar Contracts to which Seller is a party under which Seller may make purchases;

(c)    any non-exclusive distributor, dealer, supply, sales or similar Contracts under which Seller sells Business Products  and any exclusive distributor, dealer or similar Contracts under which Seller sells Business Products;

(d)    any Contract under which Seller will receive future payments prior to the expiration of such Contract;

(e)    any Contract under which Seller is a lessee of or holds or operates any personal property, owned by any other Person;

(f)    any partnership, limited liability company and joint venture Contracts entered into by Seller;

(g)    any Contract for support or maintenance of Intellectual Property and any Contract providing for the escrow of any Source Code; and

(h)    any Contract (including employment and consulting contracts) with any current director, officer or employee of Seller.

4.13.2    Seller has delivered to Buyer true, accurate and complete copies of all Material Contracts (including all amendments thereto).  Each Material Contract is in full force and effect, and is a valid and binding agreement of Seller and, to the Knowledge of Seller, each of the other parties thereto, enforceable by or against Seller, and, to the Knowledge of Seller, each of such other parties thereto in accordance with its terms, subject to Equitable Principles.  No condition exists or event within the last six months has occurred that (whether with or without notice or lapse of time or both) would constitute a default by (i) Seller under any Material Contract or (ii) to the Knowledge of Seller, any other party to any Material Contract except, in each case, for defaults that would not have a Material Adverse Effect.  None of the Material Contracts are between Seller, on one hand, and any of its officers, directors, consultants or shareholders or any Affiliate thereof, on the other hand.

4.14    <u>Financial Statements</u>.  <u>Schedule 4.14</u> sets forth the unaudited consolidated financial statements of Seller as of March 31, 2022 (the "***Balance Sheet Date***"), consisting of the consolidated balance sheet of Seller as of the Balance Sheet Date, and the related statements of income, retained earnings, stockholders' equity and cash flow for the year to date period then ended (the "***Most Recent Financial Statements***").  The Most Recent Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and except that the Most Recent Financial Statements may not contain all footnotes required by GAAP.  The Most Recent Financial Statements are based on the books and records of the Business, and fairly present in all material respects the financial condition and operating results of Seller as of the dates, and for the periods, indicated therein, subject in the case of the unaudited Financial Statements to normal year-end audit adjustments.

4.15    <u>Proceedings</u>.  Except as set forth on <u>Schedule 4.15</u>, there is no Proceeding pending or, to the Knowledge of Seller, threatened in writing against or affecting Seller or any of the Purchased Assets.  The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to Seller) involving the prior employment of any of Seller's employees, their services provided in connection with the Business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers, in each case which could have a material adverse effect upon the Purchased Intellectual Property or other Purchased Assets.

4.16    <u>Subsidiaries</u>. Seller does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. Seller is not a participant in any joint venture, partnership or similar arrangement.

4.17    <u>No Other Representations and Warranties</u>**.**  Except for the representations and warranties contained in this Article 4 (including the related portions of the Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives or any representation or warranty arising from statute or otherwise in law.

## V.    REPRESENTATIONS AND WARRANTIES OF BUYER.

As of the Closing Date (or as of such specific date as may be specified in the applicable representation and warranty or covenant), Buyer represents and warrants to Seller as follows:

5.1    <u>Existence; Power</u>.  Buyer is duly formed, validly existing, and in good standing as a corporation under the laws of the State of Delaware.

5.2    <u>Authorization; Enforceability</u>.

5.2.1    Buyer's execution, delivery, and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and

thereby, are within Buyer's capacity, power and authority and have been duly authorized by all necessary corporate action.

5.2.2    Buyer has the requisite capacity, power and authority, and have taken all action necessary to execute and deliver this Agreement and each Ancillary Agreement and to consummate the transactions contemplated by this Agreement and each Ancillary Agreement. This Agreement and each Ancillary Agreement has been duly executed and delivered by Buyer. This Agreement and each Ancillary Agreement constitutes a legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its and their respective terms, subject to the Equitable Principles.

5.3    Governmental Authorization; No Conflict.

5.3.1    Except for the entry of the Sale Order, none of (i) the execution, delivery and performance by a Buyer of this Agreement or (ii) the execution, delivery, and performance by a Buyer of each of the Ancillary Agreements to which such Buyer is, as contemplated by this Agreement, to become a party, requires or will require any action by or in respect of, or filing with, any Governmental Authority.

5.3.2    The execution and delivery by Buyer of this Agreement and the other Ancillary Agreements to which Buyer is or will be a party and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) the certificate of incorporation, operating agreement, bylaws or other governing documents of Seller, or (b) any Applicable Law.

5.4    Adequate Funds.  At the Closing, Buyer will have adequate funds available to it in order to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder.

5.5    Finders' Fees.  There is no investment banker, broker, finder, or other intermediary that has been retained by or is authorized to act on behalf of Buyer or any Affiliate of Buyer, who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or any of the Ancillary Agreements.

## VI.    BANKRUPTCY MATTERS.

6.1    Bankruptcy Court Approval.  Seller and Buyer each acknowledge that this Agreement and the sale of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities by Buyer are subject to Bankruptcy Court approval.  Buyer acknowledges that (a) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting the Auction, and (b) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assumed Contract.

6.2     <u>Stalking Horse Status</u>.  Seller confirms that it is critical to the process of arranging an orderly sale of the Purchased Assets to proceed by selecting Buyer as its "stalking horse" (the "***Stalking Horse***") to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable price for the Purchased Assets and that, without Buyer having committed substantial time and effort to such process, Seller's estate would have to employ a less orderly process of sale and thereby incur higher costs and risk attracting lower prices. In recognition of the foregoing Seller acknowledges that Buyer would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring the obligations to pay its outside advisors and legal counsel if Buyer were not paid the the Expense Reimbursement, in the event that Buyer does not purchase the Purchased Assets due to the termination of this Agreement as a result of an Alternative Transaction

6.3     <u>Sale Order</u>. Buyer agrees that it will take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assumed Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Seller agrees that after entry of the Sale Order, it shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

6.4     <u>Bidding Procedures</u>. Buyer agrees and acknowledges that Seller, including through its Representatives, is bound by the Sale Procedures Order, and may continue soliciting inquiries, proposals, or offers from Third Parties for all or any part of the Purchased Assets, and is and may continue discussing and negotiating such inquiries, proposals or offers and providing information to Third Parties in connection therewith, as contemplated by the Sale Motion and the Bidding Procedures.  Buyer acknowledges and agrees that the Sale Procedures Order in the form attached to the Sale Motion as filed on July 14, 2022 is in form and substance satisfactory to Buyer.

6.5     <u>Assumption Motions</u>. To the extent that Seller has not requested such relief in connection with the Sale Motion, Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assumed Contracts and to determine the amount of the Cure Costs.

6.6     <u>Conflicts</u>. If any conflict arises between the terms of this Agreement or any Ancillary Agreements, on the one hand, and the Sale Order, on the other, the terms of the Sale Order shall control in all respects.

6.7     <u>Bankruptcy Milestones</u>.  The Parties will use commercially reasonable efforts to close the Sale on or before the Outside Date.

6.8     <u>Alternative Transaction and Compliance with Fiduciary Duties</u>.  Notwithstanding any other provision contained in this Agreement, if the Special Committee of the Board of Directors of Seller determines in good faith after consultation with Seller's outside legal counsel and financial advisors that the consummation of an Alternative Transaction would be the highest and otherwise best offer possible for the Purchased Assets or is otherwise in the best interest of

Seller, Seller's estate created under the Bankruptcy Code, its creditors and other stakeholders from a financial point of view as compared to the transactions contemplated hereby, taking into account all relevant factors (including all the terms and conditions of such proposal or offer (including the transaction consideration, conditionality, timing, certainty of financing and/or regulatory approvals and likelihood of consummation) and this Agreement and the transactions contemplated hereby, Seller may terminate this Agreement in accordance with <u>Section 11.1.18</u> in order to enter into an Acquisition Agreement providing for such Alternative Transaction, so long as the Special Committee has determined in good faith after consultation with Seller's outside legal counsel and financial advisors that failure to take such action would reasonably be expected to be inconsistent with (a) the directors' fiduciary duties under applicable Delaware law or (b) the Bankruptcy Code.

## VII.    ADDITIONAL AGREEMENTS.

7.1    <u>Employee Matters</u>.

7.1.1    At least five (5) days prior to the Closing, Buyer may offer to employ, in writing, those Seller Employees that Buyer in its sole discretion determines appropriate, with employment commencing as of the Closing. So that Buyer may have a suitable executive level management team in place at the Closing, no later than five (5) days prior to Closing, Buyer shall (a) identify in a written notice to Seller at least five (5) Seller Employees as "Specified Employees" and (b) offer to employ those Specified Employees on employment terms to be negotiated in good faith on an arms-length basis. For purposes of this Agreement, each Seller Employee who receives such an offer of employment shall be referred to as an "***Offeree***." Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "***Transferred Employee***". For the avoidance of doubt, any Offeree shall not be restricted from discussing potential employment with any other potential purchaser of the Seller's assets, and as of the date hereof, Buyer represents that it has not entered into any employment or independent contractor arrangement with any Seller Employee, but has only negotiated with Seller (and not with any of the Seller Employees) for the terms related to the Seller Employees, including the Specified Employees provided for in this Agreement. At Closing, Seller shall immediately use the Cash Purchase Price to pay the full amount of the Transferred Employee PTO to the Transferred Employees.

7.1.2    Unless the Sale Order that approves the consummation of the transactions contemplated by this Agreement is not timely entered by the Bankruptcy Court after the Sale Hearing, then Seller shall not take any action that would impede, hinder, interfere or otherwise compete with Buyer's effort to hire any Transferred Employees. Seller hereby consents to the hiring of any Transferred Employees and waives, with respect to the employment by Buyer of such Transferred Employees, any claims or rights Seller may have against Buyer, its Affiliates or any such Transferred Employee under any non-competition, confidentiality or employment agreement between Seller and any such Transferred Employee. The Parties acknowledge and agree that Buyer shall have no responsibility for the payment of any severance, payment or other benefits that become due to any current or former Seller Employee (whether or not Seller Employee becomes a Transferred Employee), officer, director, member, partner, or independent contractor as a result of the termination of such individual by Seller and for any periods prior to the Closing Date.

7.1.3    At Buyer's option, Buyer may agree in writing subsequent to the execution of this Agreement, but prior to the entry of the Sale Order, to assume some or all of Seller's Employee Benefit Plans (the "***Assumed Plans***"). In the case of such election, prior to the Closing, Buyer and Seller will take such actions as are reasonably necessary to cause the Assumed Plan Liabilities to transfer to Buyer and to facilitate Buyer's assumption of such Assumed Plan Liabilities, in each case effective as of the Closing.

7.1.4    Buyer shall grant all Transferred Employees full credit after the Closing Date for all service with the Seller for purposes of eligibility, vesting and benefit accrual purposes under any employee benefit or compensation plans, programs, agreements or arrangements maintained by Buyer for the benefit of such Transferred Employees (the "***Buyer Plans***"). With respect to any such Buyer Plan that is a group health or welfare plan in which the Transferred Employees become eligible to participate after the Closing Date, Buyer shall cause to be waived all pre-existing condition exclusions and actively at work requirements and similar limitations, eligibility waiting periods and evidence of insurability requirements under any Buyer Plans during the plan year in which Transferred Employees commence participation in such Buyer Plans.

7.1.5    From and after the Closing, Buyer shall be solely responsible for the provision of continuation coverage under COBRA to each "M&A qualified beneficiary" regardless of when such M&A qualified beneficiary's "qualifying event" (as defined in Section 4980B of the Code) has occurred or occurs.

7.1.6    On or prior to the Closing Date, Seller shall be solely responsible for providing all notices required under WARN and for taking all remedial measures, including the payment of all amounts, penalties, liabilities, costs and expenses if such notices are not provided, with respect to any obligations under WARN or any Accrued PTO Liability arising out of or resulting from any termination of employment of any Seller Employees on or before the Closing Date, provided, however, in no event shall Seller be liable for any Accrued PTO Liability owed any Transferred Employee, which for the avoidance of doubt shall be Transferred Employee PTO. If Seller terminates any Seller Employee on or before the Closing Date, and such termination results in any WARN or similar liability to be imposed on Seller (such liability imposed upon Seller, the "***WARN Obligations***"), Buyer, at Closing, shall pay Seller for such WARN Obligations if the Cash Purchase Price is less than $10,000,000, and in such event, only to the extent and in the amount that the amount of the WARN Obligations, together with the Cash Purchase Price, do not exceed $10,000,000 (the *"WARN Obligations Cap*"). If Seller reasonably anticipates that it is likely to incur WARN Obligations, Buyer and Seller shall use commercially reasonable efforts to determine how such action (or such inaction) can be taken (or not taken) in a way such that no WARN Obligations are incurred by Seller. After the Closing Date, Buyer shall be solely responsible for providing all notices required under WARN and for taking all remedial measures, including the payment of all amounts, penalties, liabilities, costs and expenses if such notices are not provided, with respect to any obligations under WARN arising out of or resulting from any termination of employment of any Transferred Employees or Buyer closing any location after the Closing Date. For the avoidance of doubt, Buyer shall not have any obligations under this <u>Section 7.1.6</u> unless the Closing occurs.

7.1.7    Buyer and Seller agree to cooperate in good faith, including by sharing information about terminations of employment in a timely manner, to determine whether any

notification may be required under the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar applicable state and local Law (the "***WARN Act***") as a result of the transaction contemplated by this Agreement.  Buyer shall not be responsible for any such obligation arising or accruing before the Closing.

7.1.8    Nothing in this Agreement is intended to confer upon any past, present or future employee of Seller any rights as a third-party beneficiary or otherwise or any other rights or remedies of any nature or kind whatsoever under or by reason of the transactions contemplated by this Agreement, including, without limitation, any rights of employment, continued employment or any rights under or with respect to any employee benefit, welfare benefit, pension or other fringe benefit plan, fund, program or arrangement.

7.2    Use of Name.  Seller agrees that, upon the Closing, Buyer shall have the sole right to the use of the name "GenapSys" and all other Purchased Marks.  Following the Closing, Seller shall not use the name "GenapSys" or any other Purchased Mark or any variation or simulation thereof or any of Purchased Marks and shall promptly following the Closing change its corporate name to a name that does not include any of Purchased Marks.  In addition, Seller shall, within three (3) Business Days following the Closing, file a motion with the Bankruptcy Court seeking authority to amend the caption in the Bankruptcy Case to reflect the foregoing name change (to the extent such authority is not contained in the Sale Order).

7.3    Collection of Accounts Receivable.  As of the Closing Date, Seller agrees that any monies, checks or negotiable instruments (excluding Cash and Cash Equivalents as of the Closing Date) received or identified by any Party after the Closing Date with respect to Accounts Receivable included in the Purchased Assets which are received by Seller after the Closing shall be held in trust by Seller for such Buyer's benefit and accounts, not commingled with other funds of Seller, and promptly upon receipt by Seller of any such payment, Seller shall pay over to Buyer the amount of such payments without any right of set-off or reimbursement.  As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable relating to products sold by Buyer after the Closing.  Notwithstanding the foregoing, Buyer agrees that, after the Closing, it will hold and will promptly transfer and deliver to Seller, from time to time as and when received or identified by Buyer, any cash, checks with appropriate endorsements, payment of an account, trade, note receivable or other payment or property or assets that Buyer may receive or identify on or after the Closing which properly belongs to Seller as an Excluded Asset.

7.4    Conduct of Business.  Except as otherwise expressly contemplated by this Agreement, as required by Applicable Laws or with the prior written consent of Buyer, from the date hereof until the Closing Date, unless this Agreement is terminated, Seller shall use commercially reasonable efforts to preserve intact the Purchased Assets. Without limiting the generality of the foregoing, Seller will, unless this Agreement has terminated, other than in the ordinary course of business, as required by Applicable Laws or with Buyer's prior written consent (which shall not be unreasonably withheld, delayed or conditioned), refrain from doing any of the following in respect of the Purchased Assets: (i) disposing of, or transferring, any Purchased Asset, (ii) transferring any tangible Purchased Asset to any other location to the extent that such other location is not otherwise part of the Purchased Assets, (iii) granting any license with respect to or otherwise disposing of or transferring any right in any Purchased Intellectual Property, or (iv) except as otherwise provided or required in this Agreement, terminating, amending or

modifying the material terms of any of the Assumed Contracts (other than extensions thereof in the ordinary course of business).

      7.5    <u>Efforts; Cooperation</u>.  Unless this Agreement has terminated, Seller shall promptly inform Buyer in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect or otherwise cause the failure of any of Buyer's conditions to Closing set forth in Article X.  Subject to the other provisions hereof, and unless this Agreement has terminated, each Party shall use commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under Applicable Laws to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other Party and its Representatives with any step required to be taken as a part of its obligations hereunder.

      7.6    <u>Access to Information; Reporting</u>.  Prior to and through the date on which the Closing occurs or this Agreement is terminated, Seller shall cooperate reasonably with Buyer and shall give Buyer and its Representatives (including Buyer's accountants, lenders, consultants, counsel and employees), upon reasonable notice and during normal business hours, reasonable access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause its officers, employees, agents and representatives to furnish to Buyer all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Buyer may reasonably request and at Buyer's expense.  Notwithstanding anything herein to the contrary, Seller shall retain a copy of all Books and Records solely to facilitate Seller's administration of the Bankruptcy Case and wind down of the Business related to the Excluded Assets; <u>provided</u>, <u>however</u>, that Seller shall not disclose any confidential, proprietary or non-public Books and Records to any Third Party without the prior written consent of Buyer or further order of the Bankruptcy Court.  Promptly following the date hereof, Seller shall deliver to Buyer a true, complete and accurate list all material Permits owned or held by or issued to Seller relating to the ownership or operation of the Business or the Purchased Assets.  Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if Seller determines that such disclosure would be reasonably likely to jeopardize any attorney-client or other legal privilege, or contravene any Applicable Law or Contracts entered into prior to the date hereof; provided, however, that the parties shall cooperate in good faith to provide substantially the information the other parties request in such a manner as to not waive any attorney client or other legal privilege or contravene Applicable Law or Contracts.

      7.7    <u>Transition Services</u>.  The Parties shall use their respective commercially reasonable efforts to work together in good faith to negotiate, agree to the terms of, and execute, a transition services agreement (the "***Transition Services Agreement***") in a form reasonably acceptable to each of Buyer and Seller pursuant to which Seller shall provide Buyer and Buyer shall provide Seller, as applicable, with certain services for a 60 day transitional period following the Closing Date (the "***Transition Period***").  The Transition Services Agreement shall provide that the transition services are provided solely at Buyer's costs and expense, by the Transferred Employees, with oversight provided by any one or more executive level Employee of Seller that remains with Seller after the

Closing or any professional advisors engaged by Seller to provide such oversight.  In furtherance of the forgoing, for all transition services, Buyer agrees to pay Seller for all out-of-pocket costs incurred by Seller and attributable to the provision of such services to Buyer plus an agreed amount provided for in the terms and provisions of the Transition Services Agreement.  In addition, for the Transition Period and as a transition service, if any Specified Employee does not accept employment with Buyer or does not enter into a consulting agreement with Buyer, Seller shall use commercially reasonable efforts (but without any costs and expenses to Seller) to assist Buyer with obtaining an employee or consultant to perform the services that Buyer expected such Specified Employee to perform.

  7.8 <u>Oxford Loan Modification</u>.  Buyer shall use commercially reasonable efforts to agree with Oxford Finance prior to August 24, 2022 on the form, terms and provisions of the Oxford Loan Modification Agreement, and to attach as <u>Exhibit B</u> hereto such form of Oxford Loan Modification;

  7.9 <u>Further Assurances</u>.  Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

## VIII.   CLOSING DELIVERABLES.

  8.1 <u>Closing Deliverables of Seller</u>.  Seller hereby agrees to deliver the following documents, or hereby cause the following documents to be delivered, to Buyer:

   8.1.1 the Master Assignment, the IP Assignments and each other Ancillary Agreement to which Seller is a party (including letters-in-lieu of transfer orders) duly executed (and acknowledged, where applicable) by Seller and, where applicable, notarized;

   8.1.2 such other instruments of assignment or conveyance duly executed by the Seller as shall be reasonably requested or reasonably necessary to transfer the Purchased Assets to Buyer in accordance with this Agreement, including, without limitation, the Transition Services Agreement described in Section 7.7;

   8.1.3 evidence of the existence, organization and authority of Seller and of the authority of the persons executing documents on behalf of Seller reasonably satisfactory to Buyer;

   8.1.4 possession of the Purchased Tangible Property, all Books and Records (or copies thereof to the extent contemplated hereby) and all electronic, printed or other tangible copies or other embodiments of all Software, Source Code and other Purchased Intellectual Property in any medium;

   8.1.5 a copy of the Sale Order, certified by the Bankruptcy Court (for recording purposes); and

   8.1.6 such other usual and customary documents, instruments, and certificates as Buyer may reasonably request.

8.2    <u>Closing Deliverables of Buyer</u>.  Buyer hereby agrees to deliver the following documents, or hereby cause the following to be delivered, to Seller:

8.2.1    all payments required to be made pursuant to Section 3.2;

8.2.2    a Master Assignment and each other Ancillary Agreement to which Buyer is a party (including letters-in-lieu of transfer orders), duly executed (and acknowledged, where applicable) by Buyer;

8.2.3    an executed certificate of the secretary of Buyer, in a form reasonably satisfactory to Seller, as to (a) the approval of the execution and delivery of this Agreement and the other documents contemplated hereby and the consummation of the transactions contemplated thereby, (b) the certificate of formation of Buyer, and (c) the incumbency and true signatures of the officers of Buyer who executed this Agreement or will execute any other document contemplated hereby on behalf of Buyer; and

8.2.4    such other usual and customary documents, instruments, and certificates as Seller may reasonably request.

8.3    <u>Additional Closing Deliverable of Buyer</u>.

8.3.1    At the Closing, Buyer hereby agrees to deliver to Oxford Finance the Oxford Loan Modification Agreement duly executed by Buyer.

**IX.    CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE.**

Seller's obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by the applicable Seller, at or prior to the Closing, of each of the following conditions:

9.1    <u>Accuracy of Representations</u>. The representations and warranties of Buyer contained in Article V and any Ancillary Agreement shall be true and correct in all material respects (provided, that any such representation or warranty that is subject to any materiality, material adverse effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification) at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

9.2    <u>Buyer's Performance</u>. (i) Buyer shall have performed in all material respects its covenants that it is required to perform pursuant to this Agreement prior to the Closing, and (ii) Seller shall have received a certificate of Buyer certifying the satisfaction of the conditions set forth in <u>Section 9.1</u> and the preceding clause (i) of this <u>Section 9.2</u> signed by a duly authorized officer thereof.

9.3    <u>Buyer's Deliveries</u>.  Each of the deliveries required to be made to Seller pursuant to <u>Section 8.2</u> and to Oxford Finance pursuant to Section 8.3.1 will have been delivered (or Buyer will make such deliveries at the Closing).

9.4    <u>Government Orders</u>.  There shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Authority, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or any Ancillary Agreements.

9.5    <u>No Injunction</u>.  There must not be in effect any Laws or any injunction or other Order that prohibits the sale of the Purchased Assets by Seller to Buyer.

9.6    <u>Entry of Sale Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not be subject to a stay pending appeal. All conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.

9.7    <u>Minimum Liquidity</u>. Buyer shall have demonstrated, to the reasonable satisfaction of Seller, that immediately following Closing (including following the paydown of the Oxford Indebtedness as set forth in the Oxford Loan Modification Agreement) Buyer will have immediate access to not less than thirteen million dollars ($13,000,000).

## X.    CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE.

Buyer's obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Closing, of each of the following conditions:

10.1    <u>Accuracy of Representations</u>. The representations and warranties of Seller contained in Article IV and any Ancillary Agreement shall be true and correct in all material respects (provided, that any such representation or warranty that is subject to any materiality, material adverse effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification) at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

10.2    <u>Seller's Performance</u>. (i) Seller shall have performed in all material respects its covenants that it is required to perform pursuant to this Agreement prior to the Closing, and (ii) Buyer shall have received a certificate of Seller certifying the satisfaction of the conditions set forth in <u>Section 10.1</u> and the preceding clause (i) of this <u>Section 10.2</u> signed by a duly authorized officer thereof.

10.3    <u>Seller's Deliveries.</u>  Each of the deliveries required to be made to Buyer pursuant to <u>Section 8.1</u> will have been delivered (or Seller will make such deliveries at the Closing).

10.4    <u>Oxford Loan Modification Agreement</u>.  Oxford Finance shall have duly executed and delivered its signature page to the Oxford Loan Modification Agreement to the Buyer.

10.5    <u>Government Orders</u>.  There shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Authority, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or any Ancillary Agreements.

10.6    <u>No Injunction</u>. There must not be in effect any Laws or any injunction or other Order that prohibits the sale of the Purchased Assets by Seller to Buyer.

10.7    <u>Entry of Sale Order</u>.  The Sale Order, in form and substance reasonably satisfactory to Buyer and Seller, shall have been entered by the Bankruptcy Court, shall have become a Final Order, and shall be in full force and effect, and all conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.

10.8    <u>No Material Adverse Effect</u>.  Since the date of this Agreement, there shall have been no Material Adverse Effect.

10.9    <u>Specified Employees</u>. Either (i) at least two Specified Employees shall have accepted an offer of employment from the Buyer, effective as of the Closing or (ii) at least two Specified Employees shall have entered into a consulting agreement with Buyer in form reasonably acceptable to Buyer providing that such Specified Employees shall serve as a consultant to Buyer no less than the duration of the Transition Period performing substantially similar roles and responsibilities as such Specified Employees were respectively performing for Seller prior to the Closing on compensation terms resulting from Buyer's good faith,  commercially reasonable, arms-length negotiations with the applicable Specified Employees but in any event not less than their current compensation as of the date of this Agreement.  If either <u>Section 10.9(i)</u> or <u>Section 10.9(ii)</u> is satisfied, this <u>Section 10.9</u> "*Conditions Precedent to Buyer's Obligations to Close*" shall be satisfied and Buyer shall not have a right to terminate this Agreement under <u>Section 11.1.15</u>.

10.10    <u>Transition Services Agreement</u>. The Transition Services Agreement shall have been documented in a form mutually agreeable to the Parties and shall become effective simultaneously with the Closing under this Agreement.

# XI.    TERMINATION.

11.1    <u>Termination Events</u>. Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

11.1.1    by written mutual consent of Seller and Buyer;

11.1.2    by either Buyer or Seller, if the Closing has not occurred on or prior to 5:00 p.m. (E.T.) on September 16, 2022 (the "***Outside Date***"); <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by Seller or Buyer, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 11.1.2</u>;

11.1.3    by either Buyer or Seller, upon written notice to the other Party, if the other Party is in material breach or default of any provision of this Agreement, which breach is not cured within ten (10) Business Days after written notice thereof is received by the breaching Party, <u>provided</u>, <u>however</u>, that the terminating party is not in material breach or default of this Agreement;

11.1.4    by either Buyer or Seller if (i) the sale is disapproved by the Bankruptcy Court, (ii) any court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any final and non-appealable applicable Law which is in

effect and has the effect of making the Sale illegal or otherwise restraining or prohibiting consummation of the Sale and which is not satisfied, resolved or preempted by the Sale Order, or (iii) to the extent not previously terminated pursuant to another subsection of this <u>Section 11.1</u>, if Seller accepts or agrees to any Alternative Transaction (unless Buyer is a Back-Up Bidder as contemplated by the Sale Procedures Order, then in such case, upon the Closing of the Alternative Transaction);

11.1.5    by either Buyer or Seller, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided, amended or modified (or required to be amended or modified) in form and substance no longer satisfactory to Buyer, by an Order of a court of competent jurisdiction;

11.1.6    by either Buyer or Seller, if the Bankruptcy Case is dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason prior to Closing;

11.1.7    by either Buyer or Seller, upon the conclusion of the Auction, if Buyer is not selected as the Successful Bidder or Back-Up Bidder;

11.1.8    by either Buyer or Seller if the Bankruptcy Court has not approved the consummation of the Sale on or before September 14, 2022, or if the Sale Order has not been entered before such date (or is vacated or stayed as of such date);

11.1.9    by Buyer if the Sale Procedures Order is entered by the Bankruptcy Court after the date of this Agreement and such Order is not in the form attached to the Sale Motion filed on July 14, 2022 or such other form and substance reasonably acceptable to Buyer;

11.1.10   by Buyer immediately upon the Bankruptcy's Court's failure to enter the Stalking Horse Order designating Buyer as the Stalking Horse Bidder, approving the Expense Reimbursement and permitting the release of the Deposit in accordance with the terms of this Agreement;

11.1.11   by Buyer if the Sale Order is not in form and substance reasonably satisfactory to Buyer;

11.1.12   by Buyer (i) if Oxford Finance does not deliver its duly executed signature page to the Oxford Loan Modification Agreement, (ii) if, despite Buyer's commercially reasonable efforts, Buyer and Oxford Finance have not agreed to a form of Oxford Loan Modification Agreement by August 24, 2022, or (iii) in the event that Oxford Finance requires any material modifications (as determined by Buyer in its reasonable discretion) to the Oxford Loan Modification Agreement from the form agreed to by August 24, 2022;

11.1.13   by Buyer if the Cash Purchase Price exceeds ten million dollars ($10,000,000);

11.1.14   by Buyer if the Bankruptcy Court determines that any Desired Contract listed on <u>Schedule 11.1.14</u> hereto cannot be assigned to Buyer by operation of law and Buyer has not entered into an alternative arrangement with the applicable non-Debtor party for the subject matter of any Desired Contract listed on <u>Schedule 11.1.14</u>;

11.1.15   by Buyer if the condition set forth in <u>Section 10.9</u> is not satisfied;

11.1.16   by Buyer if the Transition Services Agreement has not been agreed to on terms reasonably acceptable to Buyer;

11.1.17   by Seller at any time before the Bid Deadline (established by the Bidding Procedures) to the extent permitted by <u>Section 6.8</u>; and

11.1.18   by Seller if there is an Alternative Transaction and Seller has determined in good faith after consultation with Seller's outside legal counsel and financial advisors that failure to consummate the Alternative Transaction would reasonably be expected to violate the Bankruptcy Code.

11.2   <u>Effect of Termination</u>.

11.2.1   Termination, plus any rights the Parties shall have under this <u>Section 11.2</u> regarding any Expense Reimbursement and the Deposit, shall be the sole and exclusive remedy of the Parties for a breach of this Agreement.  If the Closing does not occur in accordance with this Agreement due exclusively to Buyer's default or breach of this Agreement in accordance with <u>Section 11.1.3</u> or Buyer terminates this Agreement pursuant to <u>Section 11.1.16</u>, then Buyer shall not be entitled to the Expense Reimbursement, and Seller shall be permitted to retain the Deposit, in accordance with the Escrow Agreement.  If the Closing does not occur for any other reason, Buyer shall receive (a) the release of the Deposit to Buyer in accordance with this Agreement, the Escrow Agreement, and Sale Order, and (b) upon consummation of an Alternative Transaction, the Expense Reimbursement.   In the event of an Alternative Transaction, the Expense Reimbursement shall be directly and immediately paid to Buyer at the closing of the Alternative Transaction from the proceeds of the Alternative Transaction. In the event that there is no Alternative Transaction, Buyer shall not be entitled to the Expense Reimbursement.

11.2.2   The Parties acknowledge and agree that either Party's harm caused by the other Party's default or breach of this Agreement would be impossible or very difficult to accurately estimate as of the date of this Agreement, and that the payment or non-payment (where applicable in accordance with <u>Section 11.2.1</u>) of the Expense Reimbursement, as applicable, is a reasonable estimate of the anticipated or actual harm that might arise from such a default or breach.  The payment or non-payment (where applicable in accordance with <u>Section 11.2.1</u>) of the Expense Reimbursement and Deposit is each Party's sole and exclusive remedy for the other Party's default or breach of this Agreement.

11.2.3   The obligations arising under this <u>Section 11.2</u>  shall survive any termination of this Agreement.

## XII.   MISCELLANEOUS.

12.1   <u>Survival</u>. None of the representations or warranties of the Parties set forth in this Agreement, any Ancillary Agreement, or any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.   Other than the requirements of further assurances and actions specifically identified to be taken post-Closing (including without limitation, the satisfaction by Buyer of Assumed Liabilities), all other

covenants of the Parties shall expire upon Closing.  This <u>Section 12.1</u> shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be performed, or prohibit actions, subsequent to the Closing.

12.2    <u>Notices</u>.  Notices. All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (i) when delivered by hand (with written confirmation of receipt), (ii) when sent by email (with read receipt received), (ii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (iv) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties).

If to Seller, then to:

GenapSys, Inc.
Attn:  Dana J. Moss, General Counsel
200 Cardinal Way, 3rd Floor
Redwood City, CA 94063
Email: legal@genapsys.com

With a copy (which will not constitute notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:       Rachel C. Strickland
                 Paul V. Shalhoub
                 Betsy L. Feldman
E-mail address:  rstrickland@willkie.com
                 pshalhoub@willkie.com
                 bfeldman@willkie.com
and

Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Attention:       Daniel J. DeFranceschi
                 Michael J. Merchant
                 Mark A. Kurtz
E-mail address:  defranceschi@rlf.com
                 merchant@rlf.com

kurtz@rlf.com

If to Buyer, then to:

Sequencing Health, Inc.
c/o Farallon Capital Management, L.L.C.
One Maritime Plaza, Suite 2100
San Francisco, CA 94111
Attn: Philip Dreyfuss
E-mail: pdreyfuss@faralloncapital.com

With a copy (which will not constitute notice) to:

Farallon Capital Management, L.L.C.
One Maritime Plaza, Suite 2100
San Francisco, CA 94111
Attn: General Counsel
Email: generalcounsel@faralloncapital.com

Locke Lord LLP
111 South Wacker Drive
Suite 4100
Chicago, IL 60606
Attention:       Brian A. Raynor
E-mail address: braynor@lockelord.com

Locke Lord LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, NY 10281
Attention:       Chelsey Rosenbloom List
E-mail address: chelsey.list@lockelord.com

    12.3    <u>Amendments and Waivers</u>.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Seller and Buyer (or by any successor to such Party), or in the case of a waiver, by the Party against whom the waiver is to be effective (except as expressly provided otherwise in this Agreement). No failure or delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies provided will be cumulative and not exclusive of any rights or remedies provided for in this Agreement by Law.

    12.4    <u>No Presumption Against Drafting Party</u>.  No provision of this Agreement will be interpreted in favor of, or against, any of the Parties by reason of the extent to which any such Party or its counsel participated in the drafting of this Agreement or by reason of the extent to

which any such provision is inconsistent with any prior draft of this Agreement or any provision of this Agreement.

    12.5    <u>Expenses</u>.

        12.5.1    The Seller shall bear the costs of fees and expenses incurred by it incident to this Agreement and the Ancillary Agreements and in preparing to consummate and consummating the transactions contemplated by this Agreement, including reasonable out-of-pocket costs and expenses (including the out-of-pocket fees, disbursements and other charges of legal counsel, consultants and accountants) and fees and expenses of brokers, finders, financial advisors and investment bankers.

        12.5.2    In the event of any litigation brought to enforce or interpret this Agreement, or arising out of its negotiation, performance, or subject matter, the Party who prevails will be entitled to recover its reasonable attorneys' fees, costs and expenses, including those incurred at trial, in any bankruptcy or other proceeding, on appeal, and in enforcing any judgment, as determined by the court.

    12.6    <u>Successors and Assigns</u>.  The provisions of this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party to this Agreement; <u>provided</u>, <u>however</u>, that at any time prior to the Closing, Buyer may, without the prior written consent of Seller, but with no less than two (2) Business Days prior written notice to Seller, assign all or a portion of its rights under this Agreement to an Affiliate, <u>provided</u> that no assignment shall relieve Buyer from any of its obligations hereunder; and provided, further that Seller may, without the prior written consent of Buyer, assign all of its rights under this Agreement to a Seller Permitted Assigns.  Any attempted or purported assignment in violation of this <u>Section 12.6</u> will be deemed void *ab initio*.

    12.7    <u>Entire Agreement</u>.  This Agreement and the Ancillary Agreements (including the Schedules and Exhibits hereto and thereto) constitute the entire agreement among the Parties with respect to the subject matter of this Agreement and such Ancillary Agreements.  This Agreement and the Ancillary Agreements (including the Schedules and Exhibits) supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement and such Ancillary Agreements.

    12.8    <u>Severability</u>.  The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

12.9    No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein expressed or implied will give or be construed to give to any Person, other than the Parties and such permitted assigns, any legal or equitable rights under this Agreement.

12.10    Governing Law. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

12.11    Consent to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Ancillary Agreement shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.  Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or any Ancillary Agreement.

12.12    WAIVER OF JURY.  Each Party hereto expressly waives any right to a trial by jury in any action or proceeding with respect to any action or claim arising out of or any dispute in connection with this Agreement or under any amendment, instrument, document or agreement delivered or which may in the future be delivered in connection with this Agreement or arising from any relationship existing in connection with this Agreement and agrees that any such action or proceeding shall be tried before a court and not before a jury. Each Party has reviewed this waiver and knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  In the event of litigation, a copy of this Agreement may be filed as a written consent to a trial by the court.

12.13    Counterparts.  This Agreement and any amendment hereto may be executed (by hand or electronically) in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.2, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment or other electronic transmission will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.14    Time of the Essence.  Time is of the essence for purposes of this Agreement and the rights and obligations of the Parties hereunder.

*[Signature Page Follows]*

The Parties have executed this Agreement as of the date first above written.

**BUYER:**

**SEQUENCING HEALTH, INC., a Delaware corporation**

By: _____/s/ Philip Dreyfuss_____
    Name:  Philip Dreyfuss
    Title: Authorized Signatory

**SELLER:**

**GENAPSYS, INC., a Delaware corporation**

By: _____

Name: _____

Title: _____

[Signature Page to Amended and Restated Asset Purchase Agreement]

The Parties have executed this Agreement as of the date first above written.

**BUYER:**

**SEQUENCING HEALTH, INC., a Delaware corporation**

By: _____
     Name:  Philip Dreyfuss
     Title: Authorized Signatory

**SELLER:**

**GENAPSYS, INC., a Delaware corporation**

By: _____
     Name: Jason Myers
     Title: Chief Executive Officer

[Signature Page to Amended and Restated Asset Purchase Agreement]