## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Redwood Liquidating Co.,[1] | Case No. 22-10621 (BLS) |
| Debtor. | |

## DEBTOR'S COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLAN OF LIQUIDATION

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
David T. Queroli (No. 6318)
J. Zachary Noble (No. 6689)
James F. McCauley (No. 6991)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
defranceschi@rlf.com
merchant@rlf.com
queroli@rlf.com
noble@rlf.com
mccauley@rlf.com

*Counsel to the Debtor
and Debtor in Possession*

Dated: November 28, 2022

---

[1]     The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number, is Redwood Liquidating Co. (*f/k/a* GenapSys, Inc.) (3904).  The Debtor's service address in this Chapter 11 case is 10385 Westmoor Dr. #100, Westminster, Colorado 80021.

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................1

II. DEFINITIONS AND CONSTRUCTION OF TERMS.........................................1

    A. Definitions.................................................................................................1

    B. Interpretation; Application of Definitions and Rules of Construction..................17

III. BACKGROUND ...................................................................................................17

    A. General Background .................................................................................18

        1. The Debtor's Business as of the Petition Date............................18

        2. The Board of Directors, the Special Committee and Debtor's Employees..................18

        3. Preferred Equity Funding...........................................................19

        4. Organizational Structure............................................................19

        5. Prepetition Debt Structure.........................................................19

            a. *Prepetition Loan and Security Agreement* ....................19

            b. *Unsecured Indebtedness* .................................................20

        6. The Debtor's Equity Holders .....................................................20

    B. Circumstances Giving Rise to The Chapter 11 Case ...........................21

        1. Prepetition Liquidity Crunch, the Status Quo Order and Relief Orders....21

        2. The Prepetition Marketing Process............................................24

        3. The Forbearance.........................................................................25

        4. Chapter 11 Financing Discussions.............................................25

    C. The Chapter 11 Case...............................................................................26

        1. First Day Motions and Orders (other than the DIP Motion and DIP Financing Order).................26

        2. Post-Petition Financing and Bidding Procedures .....................28

3.    No Appointment of Committee ....................................................29

4.    The Motion to Dismiss....................................................................29

5.    Employment and Compensation of Debtor's Professionals and
Advisors .....................................................................................29

6.    Post-Petition Sale Process.............................................................29

7.    Claims Process and Bar Date........................................................32

    a.    *Section 341(a) Meeting of Creditors*................................32

    b.    *Schedules and Statements* ...............................................32

    c.    *Bar Dates* ........................................................................32

8.    KEIP/KERP .......................................................................................32

9.    Rejection of Executory Contracts and Unexpired Leases.........33

10.   Corporate Name Change ..............................................................33

**IV.**    SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES ......33

    **A.**    Summary of Treatment of Claims and Equity Interests and Estimated
Recoveries...........................................................................................33

**V.**    TREATMENT OF UNCLASSIFIED CLAIMS................................................39

    **A.**    Administrative Expense Bar Date ...........................................................39

    **B.**    Administrative Expense Claims...............................................................39

    **C.**    Prepetition Secured Parties' Claims.......................................................39

    **D.**    DIP Credit Agreement Claims .................................................................40

    **E.**    Priority Tax Claims...................................................................................40

    1.    Priority Tax Claims..........................................................................40

    2.    Other Provisions Concerning Treatment of Priority Tax Claims .............40

    **F.**    Professional Claims .................................................................................40

    1.    Final Fee Applications and Payment of Professional Claims...................40

    2.    Professional Fee Reserve ...............................................................41

RLF1 28213990v.5

3. Allocation and Estimation of Professional Claims ...................................41

4. Timing for Filing Professional Claims .....................................................41

5. Post-Effective Date Fees and Expenses ....................................................42

G. Payment of Statutory Fees .....................................................................................42

VI. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS; ESTIMATED RECOVERIES .......................................................................................................................42

VII. TREATMENT OF CLAIMS AND EQUITY INTERESTS ...........................................43

A. Treatment of Claims ..............................................................................................43

1. *CLASS 1 – PRIORITY NON-TAX CLAIMS* ...........................................43

a. Classification .................................................................................43

b. Impairment and Voting .................................................................43

c. Treatment .......................................................................................43

2. *CLASS 2 – SECURED CLAIMS* ..............................................................43

a. Classification .................................................................................43

b. Impairment and Voting .................................................................43

c. Treatment .......................................................................................44

3. *CLASS 3 – GENERAL UNSECURED CLAIMS* ......................................44

a. Classification .................................................................................44

b. Impairment and Voting .................................................................44

c. Treatment .......................................................................................44

4. *CLASS 4a – SERIES D PREFERRED EQUITY INTERESTS* ..................44

a. Classification .................................................................................44

b. Impairment and Voting .................................................................44

c. Treatment .......................................................................................44

5. *CLASS 4b – SERIES D 510(b) CLAIMS* ................................................45

a. Classification .................................................................................45

|  |  | b. | Impairment and Voting | 45 |
|  |  | c. | Treatment | 45 |
| 6. | | *CLASS 5a* – SERIES C PREFERRED EQUITY INTERESTS | | 45 |
|  |  | a. | Classification | 45 |
|  |  | b. | Impairment and Voting | 45 |
|  |  | c. | Treatment | 45 |
| 7. | | *CLASS 5b – SERIES C 510(b) CLAIMS* | | 46 |
|  |  | a. | Classification | 46 |
|  |  | b. | Impairment and Voting | 46 |
|  |  | c. | Treatment | 46 |
| 8. | | *CLASS 6a – SERIES B PREFERRED EQUITY INTERESTS* | | 46 |
|  |  | a. | Classification | 46 |
|  |  | b. | Impairment and Voting | 46 |
|  |  | c. | Treatment | 46 |
| 9. | | *CLASS 6b – SERIES B 510(b) CLAIMS* | | 46 |
|  |  | a. | Classification | 46 |
|  |  | b. | Impairment and Voting | 46 |
|  |  | c. | Treatment | 47 |
| 10. | | *CLASS 7a – SERIES A PREFERRED EQUITY INTERESTS* | | 47 |
|  |  | a. | Classification | 47 |
|  |  | b. | Impairment and Voting | 47 |
|  |  | c. | Treatment | 47 |
| 11. | | *CLASS 7b – SERIES A 510(b) CLAIMS* | | 47 |
|  |  | a. | Classification | 47 |
|  |  | b. | Impairment and Voting | 47 |

RLF1 28213990v.5

|  |  | *c.* | Treatment ......................................................................47 |

| | 12. | *CLASS 8a – COMMON EQUITY INTERESTS*...........................48 |
| | | *a.* | Classification..................................................................48 |
| | | *b.* | Impairment and Voting ..................................................48 |
| | | *c.* | Treatment ......................................................................48 |

| | 13. | *CLASS 8b – COMMON EQUITY 510(B) CLAIMS* .................................48 |
| | | *a.* | Classification..................................................................48 |
| | | *b.* | Impairment and Voting ..................................................48 |
| | | *c.* | Treatment ......................................................................48 |

**B.** Reservation of Rights Regarding Claims........................................................48

**C.** Cramdown and No Unfair Discrimination....................................................49

**VIII.** EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................................49

**A.** Rejection of Executory Contracts and Unexpired Leases.....................................49

**B.** Indemnification Claims......................................................................49

**C.** Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Combined Disclosure Statement and Plan......................................................................50

**IX.** IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED DISCLOSURE STATEMENT AND PLAN .....................................................50

**A.** Means for Implementation of the Combined Disclosure Statement and Plan.......50

1. Funding of Liabilities and Distributions.....................................50

2. Corporate Action.....................................................50

3. Direction to Parties .....................................................50

4. Title to Accounts.....................................................51

5. Corporate Documents and Corporate Authority.....................................51

6. Exemption from Certain Taxes.....................................................51

**X.**    PROVISIONS REGARDING THE PLAN ADMINISTRATOR ....................................51

    **A.**    Appointment of the Plan Administrator.................................................................51

    **B.**    Rights and Powers of the Plan Administrator.......................................................52

    **C.**    Post Effective Date Expenses of the Plan Administrator......................................52

    **D.**    Plan Administrator Agreement .............................................................................52

**XI.**    PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED
    DISCLOSURE STATEMENT AND PLAN .......................................................................52

    **A.**    Method of Payment...............................................................................................52

    **B.**    Objections to and Resolution of Claims ...............................................................53

    **C.**    Claims Objection Deadline....................................................................................53

    **D.**    No Distribution Pending Allowance ......................................................................53

    **E.**    Claims Reserve .....................................................................................................53

    **F.**    Indemnification Reserve .......................................................................................54

    **G.**    Timing of Distributions.........................................................................................54

    **H.**    Delivery of Distributions ......................................................................................54

    **I.**    Unclaimed Distributions .......................................................................................55

    **J.**    *De Minimis* Distributions ......................................................................................55

    **K.**    Setoff.....................................................................................................................55

    **L.**    Postpetition Interest ..............................................................................................55

    **M.**    Allocation of Distributions Between Principal and Interest ..................................55

    **N.**    No Creditor to Receive More than Payment in Full .............................................55

    **O.**    Compliance with Tax Requirements......................................................................56

**XII.**    CONFIRMATION AND VOTING PROCEDURES.........................................................56

    **A.**    Confirmation Procedure.........................................................................................56

        1.    Confirmation Hearing .................................................................................56

        2.    Procedure for Objections ............................................................................56

3.    Eligibility to Vote on the Combined Disclosure Statement and Plan ........ 56

4.    Solicitation Notice ...................................................................................... 57

5.    Procedure/Voting Deadlines ....................................................................... 57

6.    Acceptance of the Combined Disclosure Statement and Plan ................... 57

7.    Elimination of Vacant Classes ................................................................... 58

B.    Statutory Requirements for Confirmation ............................................................ 58

1.    Classification of Claims and Equity Interests ........................................... 58

2.    Impaired Claims or Equity Interests .......................................................... 58

3.    Best Interest of Creditors Test ................................................................... 59

4.    Liquidation Analysis .................................................................................. 60

5.    Feasibility ................................................................................................... 60

XIII.    CONDITIONS TO THE EFFECTIVE DATE ................................................................. 60

A.    Conditions Precedent to the Effective Date ........................................................ 60

B.    Establishing the Effective Date............................................................................ 61

C.    Effect of Failure of Conditions ............................................................................ 61

D.    Waiver of Conditions to Confirmation and Effective Date ................................. 61

XIV.    EXCULPATION, RELEASES AND INJUNCTIONS ..................................................... 61

A.    Exculpation. ......................................................................................................... 61

B.    Releases By the Debtor......................................................................................... 62

C.    Third Party Releases.. ........................................................................................... 62

D.    Injunctions Relating to Releases.......................................................................... 63

E.    Injunctions to Protect Estate Assets..................................................................... 64

XV.    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ................. 64

A.    General Bankruptcy Law and Combined Disclosure Statement and Plan
Considerations........................................................................................................ 64

1.    The Combined Disclosure Statement and Plan May Not Be Accepted ..... 64

2.     Debtor May Not Be Able to Secure Confirmation of the Combined Disclosure Statement and Plan or Confirmation May be Delayed ...........64

3.     Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes.........................................................................................65

4.     Failure to Consummate the Combined Disclosure Statement and Plan ....65

5.     Plan Releases May Not Be Approved...........................................65

**B.**     Risks Associated with Forward Looking Statements ............................................66

**C.**     Alternatives to Confirmation and Consummation of the Combined Disclosure Statement and Plan.........................................................................................66

1.     Alternative Plan(s) of Liquidation ..............................................66

2.     Liquidation under Chapter 7 ......................................................66

**XVI.**   CERTAIN FEDERAL INCOME TAX CONSEQUENCES...................................67

**XVII.**  RETENTION OF JURISDICTION ................................................................67

**XVIII.** MISCELLANEOUS PROVISIONS.................................................................69

**A.**     Books and Records ...............................................................................69

**B.**     Revesting of Debtor's Assets................................................................69

**C.**     Termination of Injunctions or Stays .....................................................69

**D.**     Amendment or Modification of the Combined Disclosure Statement and Plan....69

**E.**     Severability ..........................................................................................70

**F.**     Revocation or Withdrawal of the Combined Disclosure Statement and Plan .......70

**G.**     Binding Effect......................................................................................70

**H.**     Notices .................................................................................................70

**I.**     Governing Law .....................................................................................70

**J.**     Withholding and Reporting Requirements ............................................71

**K.**     Headings ..............................................................................................71

**L.**     Exhibits/Schedules ..............................................................................71

RLF1 28213990v.5

**M.**     Filing of Additional Documents ..................................................................71

**N.**     No Admissions..............................................................................................71

**O.**     Successors and Assigns.................................................................................72

**P.**     Reservation of Rights...................................................................................72

**Q.**     Implementation .............................................................................................72

**R.**     Inconsistency................................................................................................72

**S.**     Dissolution of Debtor...................................................................................72

**T.**     Termination of the Plan Administrator .......................................................72

**U.**     Request for Expedited Determination of Taxes...........................................73

RLF1 28213990v.5

THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS CERTAIN STATUTORY PROVISIONS AND DESCRIBES CERTAIN EVENTS IN THE CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN THAT MAY BE ATTACHED AND ARE INCORPORATED BY REFERENCE.  ALTHOUGH THE DEBTOR BELIEVES THAT THIS INFORMATION IS FAIR AND ACCURATE, THIS INFORMATION IS QUALIFIED IN ITS ENTIRETY TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.

THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS MADE ONLY AS OF THE DATE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS ANOTHER TIME IS SPECIFIED.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  THERE CAN BE NO ASSURANCES THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.

NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS.  EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND IN THE RELATED EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES OR ANY OTHER JURISDICTION.

THIS DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1123 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. NO OTHER GOVERNMENTAL OR OTHER REGULATORY AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTOR OR HOLDERS OF

CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**THE DEBTOR SUPPORTS CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AND RECOMMENDS ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN TO VOTE TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

RLF1 28213990v.5

## I.    INTRODUCTION

Redwood Liquidating Co. ("the "Debtor")[2] hereby proposes the Debtor's Combined Disclosure Statement and Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.  The Debtor is the proponent of the Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code.

The Combined Disclosure Statement and Plan constitutes a liquidating chapter 11 plan for the Debtor.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable.  The Debtor will be dissolved under applicable law upon the closing of the Chapter 11 Case.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVIII.D of the Combined Disclosure Statement and Plan, the Debtor expressly reserves the right to alter, amend or modify the Combined Disclosure Statement and Plan, one or more times, before its substantial consummation.

## II.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    **"503(b)(9) Claim"** means any Claim against the Debtor under section 503(b)(9) of the Bankruptcy Code for the value of goods sold to the Debtor in the ordinary course of business and received by the Debtor within twenty (20) days before the Petition Date.

2.    **"Acquired Actions"** means all avoidance and recovery actions or remedies sold to Sequencing Health, pursuant to the Asset Purchase Agreement, that may have been able to be brought on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 550, 551, 552, or 553 of the Bankruptcy Code.

3.    **"Administrative Expense Bar Date"** means the date by which a request for payment of an Administrative Expense Claim (other than a Professional Fee Claim or any Statutory Fees) must be Filed and is thirty (30) days after the Effective Date; *provided that* 503(b)(9) Claims shall be subject to the General Bar Date.

4.    **"Administrative Expense Claim"** means a Claim against the Debtor or its Estate for costs or expenses of administration of the Estate pursuant to sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate

---

[2] All capitalized terms not defined in this introduction shall have the same meanings set forth in Article II of the Combined Disclosure Statement and Plan.

and operating the business of the Debtor; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Professional Claims; (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. sections 1911-1930.

5.      "**Administrative Expense Claim Objection Deadline**" means the date that is no later than ninety (90) days after the later of the Effective Date and any filing of any Administrative Expense Claim or of a motion for approval thereof, unless such objection deadline is extended by order of the Bankruptcy Court upon the motion of the Plan Administrator.

6.      "**Advancement Action**" means that certain action commenced in the Chancery Court on March 29, 2022 and captioned *Esfandyarpour v. GenapSys, Inc.*, C.A. No. 2022-0296-VCZ.

7.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were the Debtor.

8.      "**Allowed**" means any Claim that is not a Disputed Claim or a Disallowed Claim; *provided, however,* that a Disputed Claim shall become an Allowed Claim to the extent (i) no objection to such Claim has been interposed by the Claims Objection Deadline or such other period fixed by the Bankruptcy Court, (ii) an objection to such Claim has been interposed, but withdrawn or overruled by a Final Order and the Debtor has no right to object to such Claim on other grounds, or (iii) the Bankruptcy Court enters a Final Order providing that such Claim is an Allowed Claim.

9.      "**Amended Schedules Bar Date**" means the date that is thirty (30) days after service of a notice to an applicable Creditor of an amendment to, or the addition of, its Claim reflected on the Schedules.

10.     "**Asset Purchase Agreement**" means the *Amended and Restated Asset Purchase Agreement* by and between the Debtor and Sequencing Health, Inc., dated as of August 23, 2022 (as amended from time to time).

11.     "**Assets**" means all of the assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Estate pursuant to section 541 of the Bankruptcy Code, Cash (including proceeds from the Sale), Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.  For the avoidance of doubt, the Assets shall include (i) any refunds or repayments that the Post-Effective Date Debtor receives with respect to any letters of credit, (ii) any remaining Cash from the Debtor's utility deposit account, (iii) all Excluded Assets under the Asset Purchase Agreement, and (iv) the Esfandyarpour Note. For the avoidance of doubt, Assets do not include the Purchased Assets under the Asset Purchase Agreement.

12.     "**Assumed Oxford Indebtedness**" has the meaning ascribed to such term in the Asset Purchase Agreement.

13.    **"Ballot"** means the applicable form or forms of ballot(s) distributed to each holder of an impaired Claim entitled to vote on the Combined Disclosure Statement and Plan on which the holder indicates either acceptance or rejection of the Combined Disclosure Statement and Plan.

14.    **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. sections 101-1532, as amended from time to time.

15.    **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Case, or if such court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

16.    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and any Local Rules of the Bankruptcy Court, as amended from time to time.

17.    **"Bar Date"** or **"Bar Dates"** means the applicable bar date by which a proof of Claim or request for payment of an Administrative Expense Claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and the Confirmation Order.

18.    **"Bar Date Order"** means the *Order Establishing Deadlines and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 288], entered by the Bankruptcy Court on September 29, 2022.

19.    **"Bench Ruling"** means the ruling of the Bankruptcy Court denying the Motion to Dismiss, issued from the bench on August 16, 2022 [Docket No. 181].

20.    **"Bid Deadline"** has the meaning ascribed to such term in the Bidding Procedures.

21.    **"Bidding Procedures Motion"** means *Motion of the Debtor for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Authorizing the Debtor to Designate a Stalking Horse Bidder and to Provide Bidding Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 54], filed on July 14, 2022.

22.    **"Bidding Procedures Order"** means the *Order (I) Approving Bidding Procedures for the Sale of Substantially all of the Debtor's Assets, (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 175], entered by the Bankruptcy Court on August 17, 2022.

23.    **"Board"** means the board of directors of the Debtor.

3

24.     "**Books and Records**" has the meaning ascribed to such term in the Asset Purchase Agreement.

25.     "**Business Day**" means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

26.     "**California Action**" has the meaning set forth in Article III.A.6 hereof.

27.     "**Cash**" means legal tender of the United States of America and equivalents thereof.

28.     "**Cash Purchase Price**" has the meaning ascribed to such term in the Asset Purchase Agreement.

29.     "**Causes of Action**" means all Claims, and all other claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims, whether arising under the Bankruptcy Code or other federal or state law, or based in equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, and any and all commercial tort claims against any party.  For the avoidance of doubt, the term Causes of Action does not include the Acquired Actions, which were sold to Sequencing Health under the Asset Purchase Agreement and waived in accordance with its terms.

30.     "**Chancery Court**" means the Chancery Court for the State of Delaware.

31.     "**Chapter 11 Case**" means the chapter 11 case commenced by the Debtor, styled as *In re Redwood Liquidating Co.*, under Case No. 22-10621 (BLS), currently pending in the Bankruptcy Court.

32.     "**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

33.     "**Claims and Noticing Agent**" means Kroll Restructuring Administration LLC or "**Kroll**".

34.     "**Claims Objection Deadline**" means, subject to any extension as set forth in Article XI.C of the Combined Disclosure Statement and Plan, the date that is the first Business Day that is at least one hundred eighty (180) days after the Effective Date; *provided that* for Administrative Expense Claims, such deadline shall be the Administrative Expense Claim Objection Deadline.  For the avoidance of doubt, the Claims Objection Deadline may be extended one or more times by the Bankruptcy Court upon a motion filed by the Plan Administrator.

35.     "**Class**" means any group of substantially similar Claims or Equity Interests classified by the Combined Disclosure Statement and Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

36.     "**Clerk**" means the clerk of the Bankruptcy Court.

37.     "**Combined Disclosure Statement and Plan**" means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, the Plan Supplement, all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof.

38.     "**Common Equity Interests**" means the common equity interests of the Debtor.

39.     "**Common Equity 510(b) Claims**" means any Claim, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of any debt or equity securities of the Debtor issued as Common Equity Interests existing immediately prior to the Effective Date; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) for reimbursement, contribution, or indemnification on account of any such Claim.

40.     "**Conditional Approval and Procedures Order**" has the meaning set forth in Article XII.A.1 herein.

41.     "**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket.

42.     "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

43.     "**Confirmation Notice**" has the meaning set forth in Article XII.A.4 herein.

44.     "**Confirmation Order**" means the Order of the Bankruptcy Court confirming the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code.

45.     "**Creditor**" means any Person that is the Holder of a Claim against the Debtor.

46.     "**Debtor**" means Redwood Liquidating Co. (f/k/a GenapSys, Inc.).

47.     "**DIP Credit Agreement**" means that *Secured Debtor-in-Possession Term Loan and Security Agreement*, dated as of July 28, 2022, by and between the Debtor and Oxford, as the same may have been further amended, restated or otherwise modified from time to time in accordance with the terms thereof.

48.     "**DIP Credit Agreement Claims**" means those Claims (other than any contingent indemnification Claims arising under the DIP Credit Agreement) arising under or related to the DIP Credit Agreement and which were satisfied in full at the closing of the Sale pursuant to terms of the Sale Order and in accordance with the Asset Purchase Agreement.

49.    **"DIP Documents"** means the DIP Credit Agreement, the other "DIP Loan Documents" as described in the DIP Credit Agreement and any other agreements and documents related thereto.

50.    **"DIP Facility"** means the financing facility provided to the Debtor pursuant to the terms of the DIP Credit Agreement and the DIP Financing Order.

51.    **"DIP Financing Order"** means the *Final Order (I) Authorizing the Debtor to (A) Use Cash Collateral and (B) Grant Adequate Protection; (II) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 173], entered by the Bankruptcy Court on August 17, 2022.

52.    **"DIP Lender"** means Oxford in its capacity as DIP Administrative Agent and DIP Lender under the DIP Credit Agreement.

53.    **"DIP Motion"** means the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Use Cash Collateral and (B) Grant Adequate Protection; (II) Authorizing Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens and Superpriority Administrative Expense Claims; (III) Modifying Automatic Stay; (IV) Setting a Final Hearing; and (V) Granting Related Relief* [Docket No. 10], filed on July 12, 2022.

54.    **"Disallowed"** means any Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) is Scheduled as zero or as contingent, disputed or unliquidated and as to which no proof of claim has been Filed or deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed Filed under applicable law or the Combined Disclosure Statement and Plan, (iii) is not Scheduled and as to which no proof of claim has been deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Order or otherwise deemed Filed under applicable law or the Combined Disclosure Statement and Plan, (iv) has been withdrawn by agreement of the Debtor and the Holder thereof or (v) has been withdrawn by the Holder thereof.

55.    **"Disputed"** means any Claim or any portion thereof that (i) has not been Scheduled by the Debtor or has been Scheduled as unknown, contingent, unliquidated, disputed or at zero, whether or not such Claim is the subject of a proof of Claim, (ii) is the subject of a proof of Claim that differs in nature, amount or priority from the Schedules (except to the extent that the Plan Administrator elects, in its discretion, to treat the Claim asserted in such proof of Claim as an Allowed Claim) or (iii) is the subject of an objection interposed by the Claims Objection Deadline or such other time period fixed by the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order; *provided, however*, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or Disallowed Claim.

56.    **"Distribution"** means any distribution to the Holders of Allowed Claims or, if applicable, Allowed Equity Interests.

57.    **"Distribution Date"** means any date on which a Distributions is made to Holders of Allowed Claims or, if applicable, Allowed Equity Interests, under this Combined Disclosure Statement and Plan, or as otherwise agreed.  The first Distributions shall occur on or as soon as

practicable after the Effective Date or as otherwise determined by the Plan Administrator.  To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the Plan Administrator shall determine in accordance with the Plan Administrator Agreement.

58.     "**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

59.     "**D&O Insurance Policies**" means any insurance policy providing insurance and/or similar coverage to a current of former officer, director or employee of the Debtor.

60.     "**Effective Date**" means the date established pursuant to Article XIII.B of the Combined Disclosure Statement and Plan.

61.     "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

62.     "**Equity Interest**" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including the Common Equity Interests, Series A Preferred Equity Interests, Series B Preferred Equity Interests, Series C Preferred Equity Interests, and Series D Preferred Equity Interests.

63.     "**Esfandyarpour Note**" has the meaning set forth in Article III.B.1 hereof.

64.     "**Estate**" means the estate of the Debtor created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

65.     "**Excluded Assets**" has the meaning ascribed to such term in the Asset Purchase Agreement.

66.     "**Excluded Parties**" means each of Hesaam Esfandyarpour, Kosar Parizi, Hamid Rategh and any trust, trustee, family member, or close affiliation of each person, and Foresite.

67.     "**Exculpated Parties**" means the following Entities, each in their respective capacities as such, (a) the Debtor; (b) the Debtor's officers and directors as of the Petition Date, (c) Peter Swider; (d) the members of the Special Committee: Mr. Robert Zollars, Mr. Fredrik Eliasson, and Ms. Loretta Cecil; and (e) the Debtor's Professionals; *provided, however,* that Exculpated Parties shall not include any Excluded Parties.

68.     "**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between the Debtor and any other Person or Entity.

69.     "**Farallon**" means Farallon Capital Management, L.L.C. and certain of its affiliates and/or managed funds.

70.     "**File**", "**Filed**", or "**Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Case.

71.     "**Final Order**" means an Order of the Bankruptcy Court or a court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending.

72.     "**First Day Declaration**" means the *Declaration of Britton Russell in Support of Debtor's Chapter 11 Petition and First Day Motions* [Docket No. 11].

73.     "**First Rejection Motion**" has the meaning set forth in Article III.C.9 hereof.

74.     "**First SQ Relief Order**" means that certain order entered by the Chancery Court on May 23, 2022 in the Section 225 Action.

75.     "**Forbearance Agreement**" means that certain *Forbearance Agreement*, dated June 1, 2022, entered into by and between the Debtor and Oxford.

76.     "**Foresite**" means each of Foresite Capital Fund IV, L.P., Foresite Capital Management IV, LLC and its Related Parties.

77.     "**Fourth Rejection Motion**" has the meaning set forth in Article III.C.9 hereof.

78.     "**General Bar Date**" means November 3, 2022 at 5:00 p.m. (prevailing Eastern Time), pursuant to the *Order Establishing Deadlines and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 288].

79.     "**General Unsecured Claim**" means any Claim against the Debtor that (a) is unpaid as of the Effective Date, and (b) arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not an Administrative Expense Claim, Priority Tax Claim, Secured Claim, or Priority Non-Tax Claim.

80.     "**Governmental Bar Date**" means January 9, 2023 at 5:00 p.m. (prevailing Eastern Time), which is the deadline for Governmental Units to file proofs of claim on account of pre-petition Claims against the Debtor.

81.     "**Governmental Unit**" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

82.     "**Holder**" means the beneficial holder of any Claim or Equity Interest.

83.     **"Impaired"** means, with respect to a Class of Claims or Equity Interests, a Claim or an Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

84.     "**Indemnification Obligations**" mean any obligation of the Debtor for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtor against any claims, costs, liabilities or causes of action as provided in the Debtor's articles of organization, certificates of incorporation (or amended certificate of incorporation), bylaws (or amended bylaws), other organizational documents, contract, or applicable law, owed in connection with one or more events or omissions occurring before the Petition Date.

85.     "**Indemnification Reserve**" has the meaning set forth in Article XI.E hereof.

86.     **"Insurance Policies"** means any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provisions of insurance entered into by or issued to or for the benefit of, at any time, the Debtor or its predecessors.

87.     **"Insurer"** means any company or other entity that issued an Insurance Policy, any third-party administrator of or for any Insurance Policy, and any respective predecessors and/or Affiliates of any of the foregoing.

88.     **"Interim Compensation Order"** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 168], entered by the Bankruptcy Court on August 17, 2022.

89.     **"KEIP"** means the Debtor's key employee incentive program, as more fully discussed in the KEIP/KERP Motion.

90.     **"KEIP/KERP Motion"** means the *Motion of the Debtor for Entry of an Order Approving Debtor's (I) Key Employee Incentive Program and (II) Key Employee Retention Program* [Docket No. 72], filed on July 25, 2022.

91.     "**KEIP/KERP Order**" means the *Order Approving the Debtor's (A) Key Employee Incentive Program, (B) Key Employee Retention Program and (C) Granting Related Relief* [Docket No. 174], entered by the Bankruptcy Court on August 17, 2022.

92.     **"KERP"** means the Debtor's key employee retention program, as more fully discussed in the KEIP/KERP Motion.

93.     "**KERP Employees**" has the meaning ascribed to such term in the KEIP/KERP Motion

94.     "**Lazard**" means Lazard Frères & Co. LLC.

95.     **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law,

9

equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

96.     "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

97.     "**Liquidation Analysis**" means the hypothetical chapter 7 liquidation analysis attached to this Combined Disclosure Statement and Plan as Exhibit A.

98.     "**Love Health**" means Love Health Inc.

99.     "**March 2022 Farallon Term Sheet**" has the meaning set forth in Article III.B.1 herein.

100.     "**May 2022 Farallon Term Sheet**" means Farallon's initial term sheet setting forth a proposal for an in-court restructuring process.

101.     "**Motion to Dismiss**" means the *Motion of Dr. Hesaam Esfandyarpour, Ph.D. and Dr. Kosar Parizi, Ph.D. to (I) Dismiss the Chapter 11 Case or (II) in the Alternative, Appoint a Chapter 11 Trustee* [Docket No. 73].

102.     "**MTD Movants**" means Dr. Hesaam Esfandyarpour, Ph.D. and Dr. Kosar Parizi, Ph.D.

103.     "**NDA**" has the meaning set forth in Article III.B.2 herein.

104.     "**Net Distributable Assets**" means (a) the gross amount available from the liquidation of the Assets, including the proceeds from the Sale minus (b) the amount of (i) Statutory Fees, (ii) Allowed Professional Claims, (iii) Allowed Administrative Expense Claims, (iv) Allowed Priority Tax Claims, and (v) Plan Administrator Expenses.

105.     "**Order**" means an order or judgment of the Bankruptcy Court as entered on the Docket.

106.     "**Oxford**" means Oxford Finance LLC

107.     "**Oxford Loan Modification Agreement**" has the meaning ascribed to such term in the Asset Purchase Agreement.

108.     "**Person**" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

109.     "**Petition Date**" means July 11, 2022.

110.     "**Plan Administrator**" means a Person selected by the Debtor to effectuate the provisions of the Combined Disclosure Statement and Plan after the Effective Date.  The identity, role, and compensation of the Plan Administrator will be disclosed in the Plan Supplement.

10

111.    "**Plan Administrator Agreement**" means the agreement between the Debtor and the Plan Administrator, as the same may be amended from time to time in accordance with its terms, filed as part of the Plan Supplement and approved pursuant to the Confirmation Order.

112.    "**Plan Administrator Expenses**" means the reasonable fees and expenses of the Plan Administrator incurred in the performance of its duties under this Combined Disclosure Statement and Plan, including the reasonable fees and expenses of any professionals retained by the Plan Administrator to assist the Plan Administrator in performing its duties under this Combined Disclosure Statement and Plan, to be paid and reimbursed in accordance with the Plan Administrator Agreement.

113.    "**Plan Documents**" means any of the documents, other than this Combined Disclosure Statement and Plan and including the Plan Administrator Agreement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, all of which shall be in form and substance as provided herein and reasonably acceptable to the Debtor.

114.    "**Plan Supplement**" means the documents, schedules, and any exhibits filed prior to the Confirmation Hearing, as amended, supplemented or modified from time to time, including the form of the Plan Administrator Agreement.

115.    "**Post-Effective Date Debtor**" means the Debtor, from and after the Effective Date.

116.    "**Post-Petition Sale Process**" means the post-petition marketing and sales process conducted in connection with the Bidding Procedures and Bidding Procedures Order.

117.    "**Potentially Relevant Records**" has the meaning set forth in the Sale Order.

118.    "**Preferred Equity Interests**" means, collectively, the Series A Preferred Equity Interests, Series B Preferred Equity Interests, Series C Preferred Equity Interests, and Series D Preferred Equity Interests.

119.    "**Prepetition Lenders**" means the lenders under the Prepetition Loan and Security Agreement.

120.    "**Prepetition Loan and Security Agreement**" means that certain *Loan and Security Agreement*, dated as of December 20, 2019 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among the Debtor and Oxford).

121.    "**Prepetition Marketing Process**" means that certain sales and marketing process commenced by Lazard prior to, and transitioning to the Post-Petition Sale Process on, the Petition Date.

122.    "**Prepetition Secured Parties**" means Oxford and the Prepetition Lenders.

123.    "**Prepetition Secured Parties' Claims**" means the Claims (other than any contingent indemnification Claims arising under the Prepetition Loan and Security Agreement) of the Prepetition Secured Parties arising under the Prepetition Loan and Security Agreement.

124.    "**Priority Non-Tax Claim**" means a Claim that is accorded priority in right of payment under section 507 of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

125.    "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

126.    "**Professional**" means any professional person employed in the Chapter 11 Case pursuant to section 327, 328 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.  The term "Professional" does not include any ordinary course professionals that were retained and compensated pursuant to the *Order Authorizing the Debtor to Employ and Compensate Professionals Utilized in the Ordinary Course of Business Effective as of the Petition Date* [Docket No. 167], entered by the Bankruptcy Court on August 17, 2022.

127.    "**Professional Claims Objection Deadline**" has the meaning set forth in Article V.F.4 hereof.

128.    "**Professional Claims**" means all Claims under sections 330, 331, 503, or 1103 of the Bankruptcy Code for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

129.    "**Professional Fee Escrow Amount**" means the reasonable estimate of the aggregate amount of Allowed Professional Claims relating to the period prior to the Effective Date, which estimates Professionals shall deliver to the Debtor as set forth in Article V.F.3 herein, and which amount shall be paid from the Net Distributable Assets and, if necessary, any other available Cash.

130.    "**Professional Fee Reserve**" means an account funded by the Debtor with Cash as soon as possible after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Escrow Amount, plus any amounts remaining in the Professionals Fees Account established under the Final DIP Order.  For the avoidance of doubt, (i) to the extent that the Professional Fee Reserve is not sufficient to satisfy in full all Allowed Professional Claims, such Allowed Claims shall nevertheless be paid in full in Cash from other available Cash prior to making any Distributions to the Holders of Allowed Claims or, if applicable, Allowed Equity Interests, and (ii) any fees and expenses by Professionals in connection with preparing fee applications shall be paid from the Professional Fee Reserve or, if exhausted, from other available Cash prior to making any Distributions to the Holders of Allowed Claims or, if applicable, Allowed Equity Interests, and (iii) the Professionals Fees Account established under the Final DIP Order may serve as the account utilized for the Professional Fee Reserve.

131.    "**Professional Fees Account**" has the meaning ascribed to such term in the Final DIP Order.

132.    "**Pro Rata**" means, when used with reference to a distribution of property to Holders of Allowed Claims or, if applicable, Allowed Equity Interests, in a particular Class or any other specified group of Claims or Equity Interests pursuant to this Combined Disclosure Statement and Plan, proportionately, so that with respect to a particular Allowed Claim or Allowed Equity Interest in such Class or in such group, the ratio of the amount of property to be distributed on account of such Claim or, if applicable, Equity Interest, to the amount of such Claim or, if applicable, Equity Interest, is the same as the ratio of the amount of property to be distributed on account of all Allowed Claims or, if applicable, Allowed Equity Interests, in such Class or group of Claims or Equity Interests to the amount of all Allowed Claims or Allowed Equity Interests in such Class or group of Claims or Equity Interests. Until all Disputed Claims and Equity Interests in a Class are resolved, Disputed Claims or Equity Interests shall be treated as Allowed Claims and Equity Interests in their face amount for purposes of calculating Pro Rata distribution of property to Holders of Allowed Claims or, if applicable, Allowed Equity Interests, in such Class.

133.    "**Purchase Price**" has the meaning ascribed to such term in the Asset Purchase Agreement.

134.    "**Purchased Assets**" has the meaning ascribed to such term in the Asset Purchase Agreement.

135.    "**Qualified Bid**" has the meaning ascribed to such term in the Bidding Procedures.

136.    "**Redwood**" means Redwood Liquidating Co. (f/k/a GenapSys, Inc.), a Delaware corporation.

137.    "**Rejection Bar Date**" means the deadline to file a proof of claim for damages relating to the rejection of an Executory Contract (including any unexpired lease), which, pursuant to the Bar Date Order, is the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following service of an order approving rejection of any executory contract or unexpired lease of the Debtor.

138.    "**Related Parties**" means, with respect to any Person or Entity, such Person's or Entity's current and former direct or indirect subsidiaries and affiliates and each of their respective current and former stockholders, members, limited partners, general partners, managed funds, equity holders, directors, managers, officers, employees, agents, consultants, trusts, trustees, designees, attorneys, financial advisors, investment bankers, accountants, and other professionals or representatives; provided, however, that Related Parties shall not include any Excluded Parties.

139.    "**Released Parties**" means the following Entities, each in their capacity as such, (a) the Debtor; (b) the Debtor's officers and directors as of the Petition Date, (c) Peter Swider, (d) Oxford; (e) the members of the Special Committee: Mr. Robert Zollars, Mr. Fredrik Eliasson, and Ms. Loretta Cecil and (f) the Related Parties of the foregoing; provided, however, that Released Parties shall not include any Excluded Parties.

140.    "**Releasing Parties**" means the following Entities, each in their respective capacities as such, (a) Oxford; (b) each Holder of a Claim that (x) votes to accept the Combined Disclosure Statement and Plan or (y) either (I) abstains from voting or (II) votes to reject the

Combined Disclosure Statement and Plan and, in the case of either (I) or (II), does not opt out of the voluntary release contained in Article XIV.C hereof by checking the opt out box on the ballot, and returning it in accordance with the instructions set forth thereon, indicating that they opt not to grant the releases provided in the Combined Disclosure Statement and Plan; (c) each Holder of a Claim that is deemed to accept the Combined Disclosure Statement and Plan or otherwise unimpaired under the Combined Disclosure Statement and Plan and who does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Combined Disclosure Statement and Plan's third-party release provisions; and (d) the Related Parties of the foregoing but only to the extent such Related Party would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (d).  For the avoidance of doubt, nothing contained in this definition shall result in the Released Parties releasing any Claims or Causes of Action against any Excluded Parties.

141.    **"Sale"** means the sale of substantially all of the Debtor's assets pursuant to the Asset Purchase Agreement.

142.    "**Sale Hearing**" means the hearing held by the Bankruptcy Court of September 8, 2022, to consider approval of the Sale to Sequencing Health pursuant to the Asset Purchase Agreement.

143.    **"Sale Motion"** means the *Motion of the Debtor for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Authorizing the Debtor to Designate a Stalking Horse Bidder and to Provide Bidding Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 54], filed on July 14, 2022.

144.    **"Sale Order"** mean the *Order (I) Approving the Asset Purchase Agreement Between Seller and Buyer, (II) Authorizing the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* [Docket No. 243], entered by the Bankruptcy Court on September 12, 2022.

145.    **"Schedules"** means the sealed and redacted forms of the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtor on August 31, 2022, and any and all amendments and modifications thereto [Docket Nos. 217-220].

146.    "**Second Rejection Motion**" has the meaning set forth in Article III.C.9 hereof.

147.    "**Second SQ Relief Order**" means that certain order entered by the Chancery Court on June 10, 2022 in the Section 225 Action.

148.    **"Section 225 Action"** means that certain action commended in the Chancery Court on April 12, 2022 and captioned *Esfandyarpour v. Zollars, Myers, Eliasson, McKenzie, Cecil, & GenapSys, Inc.*, C.A. No. 2022-0324-MTZ.

14

149. "**Secured Claim**" means a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) or as Allowed pursuant to the Combined Disclosure Statement and Plan as a Secured Claim.

150. "**Sequencing Health**" means Sequencing Health, Inc.

151. "**Series A Preferred Equity Interests**" means those preferred equity interests issued as Series A with liquidation preferences over Common Equity Interests.

152. "**Series A 510(b) Claims**" means any Claim, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of any debt or equity securities of the Debtor issued as Series A Preferred Equity Interests existing immediately prior to the Effective Date; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) for reimbursement, contribution, or indemnification on account of any such Claim.

153. "**Series B Preferred Equity Interests**" means those preferred equity interests issued as Series B with liquidation preferences over Series A Preferred Equity Interests and Common Equity Interests.

154. "**Series B 510(b) Claims**" means any Claim, whether or not the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any debt or equity securities of the Debtor issued as Series B Preferred Equity Interests existing immediately prior to the Effective Date; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) for reimbursement, contribution, or indemnification on account of any such Claim.

155. "**Series C Preferred Equity Interests**" means those preferred equity interests issued as Series C with liquidation preferences over Series B Preferred Equity Interests, Series A Preferred Equity Interests and Common Equity Interests.

156. "**Series C 510(b) Claims**" means any Claim, whether or not the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any debt or equity securities of the Debtor issued as Series C Preferred Equity Interests existing immediately prior to the Effective Date; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) for reimbursement, contribution, or indemnification on account of any such Claim.

157.    "**Series D Preferred Equity Interests**" means those preferred equity interests issued as Series D with liquidation preferences over Series C Preferred Equity Interests, Series B Preferred Equity Interests, Series A Preferred Equity Interests and Common Equity Interests.

158.    "**Series D 510(b) Claims**" means any Claim, whether or not the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any debt or equity securities of the Debtor issued as Series A Preferred Equity Interests existing immediately prior to the Effective Date; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) for reimbursement, contribution, or indemnification on account of any such Claim.

159.    "**Solicitation Procedures Motion**" means the *Motion of the Debtor for Entry of an Order (A) Conditionally Approving the Combined Disclosure Statement and Plan for Solicitation Purposes Only, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan, (C) Approving the Form of Ballot and Solicitation Materials, (D) Establishing Voting Record Date, (E) Fixing the Date, Time and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto, and (F) Approving Related Notice Procedures* [Docket No. 336] filed by the Debtor on November 8, 2022.

160.    "**Special Committee**" means the Special Committee of the Board.

161.    "**Stalking Horse Order**" means the *Order (I) Authorizing and Approving Entry into Amended and Restated Stalking Horse Agreement and Related Expense Reimbursement in Connection with the Sale of All or Substantially All of the Debtor's Assets, and (II) Granting Related Relief* [Docket No. 198], entered by the Bankruptcy Court on August 24, 2022.

162.    "**Stalking Horse Bid**" means the bid of the Stalking Horse Bidder.

163.    "**Stalking Horse Bidder**" means Sequencing Health.

164.    "**Stalking Horse Motion**" means the Debtor's *Emergency Motion of the Debtor for Entry of an Order (I) Authorizing and Approving Entry into Stalking Horse Agreement and Related Bid Protections in Connection With the Sale of All or Substantially all of the Debtor's Assets, and (II) Granting Related Relief* [Docket No. 149].

165.    "**Status Quo Order**" means that certain order entered by the Chancery Court on May 18, 2022 in the Section 225 Action.

166.    "**Statutory Fees**" means any fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code to the extent applicable,

167.    "**Successful Bidder**" has the meaning ascribed to such term in the Bidding Procedures.

168.    "**Third Rejection Motion**" has the meaning set forth in Article III.C.9 hereof.

RLF1 28213990v.5

169.    "**Third SQ Relief Order**" means that certain order entered by the Chancery Court on June 17, 2022 in the Section 225 Action.

170.    "**Trial**" means the trial held by the Chancery Court on July 6, 2022 in the Section 225 Action.

171.    "**TSA**" has the meaning set forth in Article III.C.6 hereof

172.    "**United States Trustee**" means the Office of the United States Trustee for the District of Delaware.

173.    "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim or, if applicable, Allowed Equity Interest, on or prior to the Unclaimed Distribution Deadline.

174.    "**Unclaimed Distribution Deadline**" means ninety (90) days from the date the Plan Administrator makes a Distribution of Cash or other property under the Combined Disclosure Statement and Plan to a Holder of an Allowed Claim or, if applicable, Allowed Equity Interest.

**B.**    **Interpretation; Application of Definitions and Rules of Construction**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter.  Unless otherwise specified, all section, article, schedule or exhibit references in the Combined Disclosure Statement and Plan are to the respective section in, Article of, Schedule to, or Exhibit to the Combined Disclosure Statement and Plan.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection or clause contained in the Combined Disclosure Statement and Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Disclosure Statement and Plan.  A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.  The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Disclosure Statement and Plan.

### III.    **BACKGROUND**

On the Petition Date, the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code and, since that date, has operated as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

A.    **General Background**[3]

1.    The Debtor's Business as of the Petition Date

The Debtor, founded in 2010 by Dr. Esfandyarpour,[4] is a privately held Delaware corporation formerly headquartered in Redwood City, California. The Debtor's business involved a novel method for DNA sequencing. Instead of optical-based technologies more traditionally used in the industry, the Debtor's semiconductor-based technology centered around measuring minute changes in electrical signal upon the incorporation of a DNA base, which allows for a simpler, more scalable, and lower cost solution to the challenges of DNA sequencing. Prior to resigning as of February 16, 2021, Dr. Esfandyarpour was the Debtor's chief executive officer. Dr. Esfandyarpour continues to serve on the Board.

Prior to the Sale, the Debtor was developing an electronic-based sequencing solution to enable scalability and reduce the cost of ownership in both centralized and decentralized settings. The Debtor's planned solutions included a benchtop sequencer as well as a sequencing module that could be integrated with automated liquid handlers, each option designed to scale throughput by utilizing a range of semiconductor sensor densities. The Debtor was also developing an end-to-end ecosystem that would enable customers to own and analyze their data to allow for lab customization. The Debtor also maintained an intellectual property portfolio that included dozens of different patents associated with its technology.

2.    The Board of Directors, the Special Committee and Debtor's Employees

As discussed herein, as of the Petition Date, the Debtor's Board was comprised of the following Persons: Messers Hamid Moghadam, Robert Zollars, and Fredrik Eliasson, Ms. Loretta Cecil, Dr. Harish Soundararajan, Dr. Jason Myers and Dr. Hesaam Esfandyarpour.

On July 18, 2022, the Board formed the Special Committee, which is comprised of the following independent directors of the Board: Mr. Zollars, Mr. Eliasson and Ms. Cecil. The Special Committee has been delegated authority to review and evaluate all actions taken and to be taken, arising out of, or related to, the Chapter 11 Case, and to make all decisions and take all actions necessary in furtherance of the foregoing.

Prior to the Petition Date, and as discussed more fully herein, the Debtor engaged in a series of furloughs and layoffs, in an effort to manage its liquidity. As of the Petition Date, the Debtor employed approximately 46 individuals, none of whom were subject to a collective-bargaining agreement. On or before the Closing Date, all of the Debtor's employees were offered

---

[3]    Further information regarding the Debtor's business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Case is set forth in detail in the First Day Declaration, which is incorporated by reference herein. Copies of the First Day Declaration and all other filings in the Chapter 11 Case can be obtained (and viewed) free of charge at the following web address: *https://cases.ra.kroll.com/genapsys*.

[4]    Dr. Esfandyarpour is a Silicon Valley-based electrical engineer. After finishing his Ph.D. and post-doctorate work at Stanford University, Dr. Esfandyarpour and his team developed several novel technologies for DNA sequencing and protein detection at the Stanford Genome Technology Center. These technologies would eventually form the basis for the Debtor's system.

employment by Sequencing Health, the purchaser of substantially all of the Debtor's assets. As of the date hereof, the Debtor has no remaining operational employees. The Debtor has engagements with several independent consultants, including Peter Swider who serves as the Debtor's Chief Wind-down Officer, President, and Secretary.

3.    Preferred Equity Funding

In an effort to finance its operations and bring its technologies to market, over the course of approximately ten years, the Debtor solicited and received financing from various investors in exchange for shares of preferred stock.  The preferred stock is separated into four series: Series A–D.

In March 2013, the Debtor solicited and received approximately $8.5 million from certain investors in exchange for Series A Preferred Equity Interests.  Series A Preferred Equity Interests hold a liquidation preference over Common Equity Interests.

In November 2013, the Debtor solicited and received approximately $36.5 million from certain investors in exchange for Series B Preferred Equity Interests.  Series B Preferred Equity Interests hold a liquidation preference over Series A Preferred Equity Interests and Common Equity Interests.

In February, June, and December 2019, the Debtor solicited and received approximately $85.3 million from certain investors in exchange for Series C Preferred Equity Interests.  Series C Preferred Equity Interests hold a liquidation preference over Series B Preferred Equity Interests, Series A Preferred Equity Interests, and Common Equity Interests.

In February and March 2021, the Debtor solicited and received approximately $70 million from certain investors in exchange for Series D Preferred Equity Interests.  Series D Preferred Equity Interests hold a liquidation preference over Series C Preferred Equity Interests, Series B Preferred Equity Interests, Series A Preferred Equity Interests, and Common Equity Interests.

4.    Organizational Structure

The Debtor does not have any corporate parents, subsidiaries, or corporate affiliates.

5.    Prepetition Debt Structure

a.    *Prepetition Loan and Security Agreement*

On December 20, 2019, the Debtor entered into the Prepetition Loan and Security Agreement with Oxford in its capacity as collateral agent and the lenders party thereto from time to time.  Under the Prepetition Loan and Security Agreement, the Prepetition Secured Parties extended a term loan of $30 million to the Debtor.   The obligations under the Prepetition Loan and Security Agreement were secured by substantially all of the Debtor's assets, except as specifically excluded therein.

　　　　　　b.　　　*Unsecured Indebtedness*

　　　　In the ordinary course of business, the Debtor incurred unsecured indebtedness to various suppliers, trade vendors, landlords, utility providers, and services providers, among others. As of the Petition Date, the Debtor's estimated outstanding trade payables were approximately $4 million.

　　　　6.　　　<u>The Debtor's Equity Holders</u>

　　　　The Debtor is a privately held Delaware corporation.　In order of liquidation preference, Series D is senior with respect to Series C, which is senior with respect to Series B, which is senior with respect to Series A, which is senior with respect to Common Equity Interests. Each series of Preferred Equity Interests accrues dividends at a different annual rate.　The liquidation preferences for Preferred Equity Interests have priority over the Debtor's Common Equity Interests.　As of the Petition Date, the liquidation preferences of the Preferred Equity Interests totaled approximately $200,300,000.

　　　　The table below sets forth the amounts outstanding and the liquidation preference for each series of Preferred Equity Interests as of the Petition Date.

| Series of Preferred Equity Interest | Amount Outstanding | Liquidation Preference |
|---|---|---|
| Series D | $70 million | The greater of: (a) Original Issue Price of $7.8400 per share plus all declared and unpaid dividends, and (b) such amount per share as would have been payable had all shares of preferred stock been converted into common stock immediately prior to the liquidation event. |
| Series C | $85.3 million | Original Issue Price of $18.8852 per share plus all declared and unpaid dividends, where cash dividends accrue at a rate of 4% of the Original Issue Price per annum on each outstanding share of Series C Preferred Equity Interests.[5] |
| Series B | $36.5 million | Original Issue Price of $5.9548 per share plus all declared and unpaid dividends, where cash dividends accrue at a rate of 8% of the Original Issue Price per annum on each outstanding share of Series B Preferred Equity Interests. |

---

[5]　　The liquidation preference for a certain investor holding 443,245 shares of Series C Preferred Equity Interests is $16.920665.

20

| | | |
|---|---|---|
| Series A | $8.5 million | Original Issue Price of $1.00 per share plus all declared and unpaid dividends, where cash dividends accrue at a rate of 8% of the Original Issue Price per annum on each outstanding share of Series A Preferred Equity Interests. |

Prior to the Petition Date, on June 15, 2020, Foresite, one of the Debtor's Series C Preferred Equity Interest investors, commenced in the Superior Court of the State of California in the County of Santa Clara that certain action captioned *Foresite Capital Fund IV, L.P. v. GenapSys, Inc. and Esfandyarpour*, Case No. 20-cv-367305 (the "California Action"), alleging that the Debtor and Dr. Esfandyarpour, among other things, fraudulently induced Foresite to purchase $50 million of the Debtor's Series C Preferred Equity Interests in June 2019 when Dr. Esfandyarpour served as the Debtor's CEO. The Debtor disputes the claims set forth in the California Action, in all respects, and has filed counterclaims against Foresite. Notwithstanding the Debtor's denial of the California Action's merits and its counterclaims, since the California Action's commencement, the California Action has hampered the Debtor's liquidity and has adversely affected its reputation. The California Action remains pending and stayed, as against the Debtor, as of the Petition Date.

**B.    Circumstances Giving Rise to The Chapter 11 Case**

1.    Prepetition Liquidity Crunch, the Status Quo Order and Relief Orders

In late 2019, Dr. Esfandyarpour directed the limited launch of a first-generation DNA benchtop sequencer, selling a few dozen instruments and billing customers less than $1 million. Around that same time, on December 3, 2019, Dr. Esfandyarpour and the Debtor entered into an unsecured promissory note (the "Esfandyarpour Note") whereby Dr. Esfandyarpour borrowed $3,129,999.94 from the Debtor. The Esfandyarpour Note accrues interest at a rate of 2.09% *per* annum and is due and payable on the earlier of December 3, 2028, or such other date as provided for in the Esfandyarpour Note. Dr. Esfandyarpour executed the note in his personal capacity, as the borrower thereunder, and on behalf of the Debtor, as the lender thereunder. No other parties executed the Dr. Esfandyarpour Note. The Debtor reserves all rights with respect to the Esfandyarpour Note.

Beginning in mid-2020, the Board demanded that Dr. Esfandyarpour step down as CEO. In February 2021, Dr. Esfandyarpour's employment with the Debtor ended, and the Board appointed Dr. Jason Myers as CEO. By mid-2021, the Debtor halted sales of the first-generation DNA benchtop sequencer and offered refunds to existing customers. While the underlying semiconductor technology had been externally proven, there were numerous performance issues with the benchtop sequencer due to inherent design flaws. The Debtor quickly realized that it needed to redesign its DNA sequencing solution to better meet customer requirements and that its product development and commercialization efforts would require additional funding.

By mid-2021, the Debtor was incurring significant costs in connection with the California Action, which further strained its liquidity position. To address its liquidity needs, the Debtor engaged investment banking firms to assist the Debtor in raising new equity. In late 2021 and early 2022, the Debtor and its investment bankers pursued equity financing, debt financing,

and a special purpose acquisition company transaction.  By early 2022, though, efforts to complete the new equity raise with outside investors were unsuccessful, in part, due to the cloud created by the California Action.

In March 2022, the Debtor formed a Finance and Risk Committee of the Board to oversee and direct financing efforts and focused its efforts on attempting to raise capital from its existing stakeholders.  That same month, the Debtor received a term sheet from Farallon, which contemplated, subject to the terms thereof, Farallon leading a preferred stock financing round of at least $125 million and up to $200 million, based on a $200 million pre-money valuation (the "March 2022 Farallon Term Sheet").  In sum, the Debtor had soft commitments from its existing stakeholders and outside investors for approximately $50 million.  The financing would have diluted investors who did not invest more money, including Dr. Esfandyarpour.  In addition, the Debtor was actively trying to resolve the California Action with respect to Foresite's claims against the Debtor to increase investment opportunities.  Dr. Esfandyarpour did not want his equity interest to be diluted by the financing, and he did not want the Debtor to settle its claims with Foresite, which would leave Dr. Esfandyarpour as the sole defendant in the California Action.  Dr. Esfandyarpour then began a flurry of actions that would lead to the Debtor's financial frailty.

In early 2022, Dr. Esfandyarpour commenced two separate litigations against the Debtor in the Chancery Court.  First, on March 29, 2022, Dr. Esfandyarpour commenced the Advancement Action in the Chancery Court, whereby Dr. Esfandyarpour sought advancement of his legal fees and expenses incurred in connection with the California Action.  Second, on April 12, 2022, Dr. Esfandyarpour commenced the Section 225 Action, whereby Dr. Esfandyarpour sought a determination that the Debtor's Board was improperly constituted and that a new slate of directors were the true members of the Board, as well as entry of an order maintaining the status quo pending a Trial on the Section 225 Action. The earliest Trial date available in the Section 225 Action that Dr. Esfandyarpour would agree to was July 6, 2022—a Trial date much too late while the Debtor's available cash was dwindling.

On May 18, 2022, the Chancery Court entered the Status Quo Order in the Section 225 Action, which limited the Debtor's ability to take any actions outside the ordinary course of business.[6]  The parties in the Section 225 Action filed several motions seeking to modify the Status Quo Order, but none were successful in expediting the requested relief sought or the Trial date.

---

[6]    More specifically, the Status Quo Order prevented the Debtor from taking any actions outside the ordinary course of business, including, but not limited to: (a) taking any action that could result in any changes to the members or size of the Board, (b) amending, modifying, or repealing any of the provisions of the company's bylaws or certificate of incorporation, (c) consenting to any merger, tender offer, restructuring, recapitalization, or reorganization of the company, (d) agreeing to any transaction that would result in a change of control of the company, (e) entering into or agreeing to any transaction, the consummation of which would require the approval of or a vote by the company's stockholders, (f) authorizing or issuing securities of the company, or changing the terms of any of the company's securities (including without limitation any common stock, preferred stock, options, warrants, or purchase rights), or purchasing any of the company's securities; (g) in connection with any potential merger, sale, or other strategic transaction involving the company: (1) entering into any retention, engagement, or similar agreement with any financial advisor or investment banker, (2) agreeing or committing to any exclusivity provision, or (3) agreeing to pay any break-up, termination, or similar fees, or reimbursement or payment of expenses, (h) entering into or agreeing to any transaction to acquire another entity through any form of acquisition structure, including, but not limited to, any equity purchase or asset purchase agreement, or (i) entering into any legal binding commitment with respect to, or agreeing to do, any of the foregoing.

Potential investors and lenders, including those who had previously shown interest in the March 2022 Farallon Term Sheet, were unwilling to move forward with financing while Dr. Esfandyarpour's challenge to the Board composition remained unresolved.

On May 19, 2022, given its diminishing liquidity and the need to consider different restructuring options, the Debtor and the other defendants in the Section 225 Action filed a motion to modify the Status Quo Order to permit the Debtor to retain Lazard to explore all restructuring avenues. On May 23, 2022, the Chancery Court granted the motion and entered the First SQ Relief Order. Subsequently, the Debtor retained Lazard, and Lazard commenced the Prepetition Marketing Process for potential investors, which is discussed in more detail below.

On May 24, 2022, Dr. Esfandyarpour moved to modify the Status Quo Order to try to stop the Finance and Risk Committee from overseeing and directing financing efforts. On June 10, 2020, the Chancery Court denied Dr. Esfandyarpour's motion and entered the Second SQ Relief Order.

The pre-Trial litigation in the Section 225 Action proved to be a major distraction for the Board and management from the Debtor's real issue—finding an investor who would be willing to provide a much-needed capital infusion under the unfortunate circumstances being faced by the Debtor. Although Lazard and the Debtor diligently scoured the market for potential investors, by June 13, 2022, only one potentially viable investor had emerged as of that time. With a mere ten days left of projected liquidity, the Debtor and the other defendants in the Section 225 Action filed another motion to modify the Status Quo Order, this time seeking authority to pursue the potential investment, which, by its terms, necessitated the filing of a chapter 11 case. On June 17, 2022, the Chancery Court denied the motion and entered the Third SQ Relief Order. Shortly thereafter, the Debtor filed a motion to move the trial date up a week. The Chancery Court denied the motion.

As a result, the Debtor had to take actions to limit costs so it could survive until the Chancery Court held the Trial. On June 24, 2022, as a cost-saving measure to manage its waning liquidity, the Debtor furloughed nearly all its employees, and, on July 8, 2022, more than 70 additional employees were laid off or further furloughed.

On July 6, 2022, the Chancery Court conducted the Trial, hearing the arguments of the Debtor, its co-defendants and Dr. Esfandyarpour. On July 8, 2022, the Chancery Court ruled that, among other things, due to certain technicalities under the Debtor's organizational documents, only a portion of the Board was properly constituted and that certain voting agreements were enforceable against Dr. Esfandyarpour, which restricted his ability to appoint or remove Board members.

After the Trial, from July 8, 2022 through July 11, 2022, the Debtor's Board and its stockholders filled certain vacant Board seats consistent with the Chancery Court's ruling in the Section 225 Action. As of July 11, 2022, the Debtor's Board is comprised of the following members: Messers. Moghadam, Soundararajan, Zollars, and Eliasson, Ms. Cecil, Dr. Myers and Dr. Esfandyarpour.

2.      The Prepetition Marketing Process

        As noted above, investors were unwilling to finance the Debtor, primarily in light
of the California Action, the 225 Action, and the disputes with Dr. Esfandyarpour.  Facing
dwindling liquidity, the Debtor engaged Lazard to identify new investors or potential acquirors
through the Prepetition Marketing Process.  To facilitate the Prepetition Marketing Process, the
Debtor and its advisors, including Lazard, prepared, among other things, marketing materials and
an electronic data room to provide potential investors and bidders with information upon which to
make a proposal.  During the Prepetition Marketing Process, of the over 100 potential investors
contacted, 19 interested parties executed confidentiality agreements (each, an "NDA") and were
granted access to the electronic data room, which contained significant diligence and other
confidential information about the Debtor's business, assets, and technologies.  Interested parties
were also offered the opportunity to meet with the Debtor's management.  Lazard informed each
of these parties that the Prepetition Marketing Process was expeditious by necessity in order to
address the Debtor's liquidity.

        The Prepetition Marketing Process yielded two potential anchor investors:  (i) Love
Health and (ii) Farallon.[7]  While the Debtor engaged in negotiations with both parties, these
negotiations temporarily stalled at times.

        One of the potential anchor investors, one or more funds affiliated with Farallon,
had been willing to be a lead investor in the earlier equity raise that was scuttled by the California
Action and Section 225 Action.  Despite waning interest in participating in an equity raise, Farallon
became interested in loaning and/or investing money as part of a chapter 11 bankruptcy filing.
Farallon's proposal also contemplated an additional investment from other investors.
Unfortunately, this proposal, the May 2022 Farallon Term Sheet —which was never signed by the
Debtor or Farallon—came undone.  As the Debtor continued to negotiate with Farallon and other
existing investors, it became clear that the transaction contemplated by the May 2022 Farallon
Term Sheet was not actionable for a number of reasons.  Among other things, Dr. Esfandyarpour
jeopardized the May 2022 Farallon Term Sheet by sending multiple emails and a presentation
addressed to some but not all of the company stockholders (but, notably, not to the Debtor's Board
or to the Debtor's internal or external counsel) that contained a litany of falsehoods and grievances.
At the bottom of the email, Dr. Esfandyarpour forwarded an initial email to the Debtor from Love
Health, exhorting stockholders to demand that the Debtor enter into a transaction with Love
Health.

        While the Prepetition Marketing Process was ongoing, Love Health had
approached senior management and indicated that it was willing to provide a new Series E
preferred equity investment.  Although the liquidity under the proposed investment would have
come too late to rescue the Debtor and the terms of the non-binding offer were unacceptably too
constrictive, management nevertheless engaged in discussions with Love Health.  Love Health
refused to sign the Company's form NDA, but the Debtor ultimately agreed to Love Health's form
of NDA.  In its proposal, Love Health insisted that the Debtor agree to negotiate exclusively with

---

[7]     Funds and/or accounts managed or advised by Farallon own, directly or indirectly, approximately 71% of the
        Series D Preferred Equity Interests.  Additionally, a Series D Director designated by Zone III Healthcare
        Holdings, LLC (a Farallon managed vehicle) is a member of the Debtor's Board.

Love Health and cease preparation of any type of restructuring or bankruptcy filing. Given the dire circumstances facing the Debtor, this was not feasible. Towards the end of June 2022, the Debtor proposed a limited form of exclusivity if Love Health covered payroll and other agreed expenses during the period of exclusivity, but Love Health rejected that proposal. The Debtor made a further proposal to Love Health at the end of June that Love Health also rejected, although Love Health indicated it would make a final proposal, which Love Health did not do until the weekend before the Petition Date, as discussed herein.

Despite the extensive Prepetition Marketing Process, which continued through May and June of 2022, all of the Debtor's prospects for viable sources of investment failed to manifest and/or were deterred by the cloud cast by the California Action and Section 225 Action. Because the Debtor was essentially out of liquidity and there were no interested investors or buyers for the Debtor, by the end of June 2022, the Debtor's prospects for continuing as a going concern company became bleak.

3.    The Forbearance

While the Debtor was litigating the Status Quo Order and conducting the Prepetition Marketing Process, it was also subject to upcoming principal amortization payments under the Prepetition Loan and Security Agreement commencing on June 1, 2022, which were adding significant strain to the Debtor's liquidity. Non-payment would trigger certain default provisions in the Prepetition Loan and Security Agreement. The Debtor requested that Oxford forbear from exercising remedies for 30 days if the Debtor did not make the required payments of principal and interest.

After negotiations, on June 1, 2022, Oxford consented to a 20-day forbearance. Oxford agreed to forbear from debiting the Debtor's bank account for its June 1st principal payment (but required payment of its June interest payment) and from exercising its rights and remedies with respect to certain specified defaults under the Prepetition Loan and Security Agreement until the earliest of (a) June 21, 2022, (b) such other date as may be agreed in writing between the Debtor and the Oxford, and (c) the date of any subsequent default under the Prepetition Loan and Security Agreement or breach of the Forbearance Agreement. The Forbearance Agreement also required that the Debtor provide Oxford with detailed plan and debtor-in-possession term sheets or documents no later than June 10, 2022. Oxford agreed to extend the deadline for those deliverables as the Prepetition Marketing Process continued to develop.

However, given the Debtor's defaults under the Prepetition Loan and Security Agreement, the Debtor no longer had access to certain restricted cash (the "Restricted Cash"). Without access to those funds, the Debtor did not have enough funding to meet its upcoming payroll obligations. As discussed above, shortly after the Chancery Court entered the Third SQ Relief Order, on June 24, and again on July 8, 2022, the Debtor made the difficult decision to furlough and layoff nearly all of its employees.

4.    Chapter 11 Financing Discussions

Shortly after the Chancery Court ruled in the Section 225 Action, Love Health proposed a revised term sheet that removed an interim funding mechanism from the earlier term

sheet, and also contemplated an out-of-court process. The Debtor requested additional information as to whether Love Health was still willing to provide funding to avert an acute liquidity crisis while the parties negotiated the proposal. On the day before the Petition Date, Love Health responded and inquired about the amount of funding needed, and also indicated that it would like a call with Oxford to discuss (among other things) how to avoid a bankruptcy or restructuring.

Concurrently with reviewing Love Health's new proposal, the Debtor received a proposal from Oxford. Oxford agreed to provide the Debtor with access to the Restricted Cash (which totaled $3 million) in connection with an in-court process and the DIP Facility, while Lazard continued to market the Debtor's assets for sale under section 363 of the Bankruptcy Code through the Post-Petition Sale Process. After considering its limited options, including the alternative proposal advanced by Love Health, the Debtor determined that Oxford's funding proposal ultimately proved more feasible and had a greater potential to maximize value for all its stakeholders.

In addition, Lazard and the Debtor engaged with Farallon and Oxford regarding either of these parties potentially acting as a stalking horse purchaser in the Post-Petition Sale Process. As of the Petition Date, though, the Debtor did not reach a deal with either Farallon or Oxford regarding a stalking horse bid. Notwithstanding the fact that the Debtor did not have a stalking horse bid, with Oxford's agreement to provide the DIP Facility, the Debtor commenced its Chapter 11 Case to conduct the Post-Petition Sale Process to sell substantially all of its assets for the benefit of its creditors and stakeholders and continued to engage with Farallon and Oxford from and after the Petition Date.

## C.    **The Chapter 11 Case**

The following is a brief description of certain material events that have occurred during the Chapter 11 Case.

1.    First Day Motions and Orders (other than the DIP Motion and DIP Financing Order)

On the Petition Date, in addition to the voluntary petition for relief filed by the Debtor under chapter 11 of the Bankruptcy Code, the Debtor also filed a number of routine motions and applications seeking certain "first day" relief, including the following:

- *Debtor's Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent Effective as of the Petition Date* [Docket No. 3]. The Debtor sought authorization to retain and employ Kroll as its claims and noticing agent for the Chapter 11 Case. On July 13, 2022, the Bankruptcy Court entered an Order granting the relief requested in the application [Docket No. 47].[8]

---

[8]    Additionally, on August 17, 2022, the Bankruptcy Court entered an Order [Docket No. 166] authorizing the Debtor to retain Kroll, pursuant to section 327(a) of the Bankruptcy Code, to serve as administrative advisor to the Debtor.

- *Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto* [Docket No. 4]. The Debtor sought entry of interim and final Orders (i) authorizing the Debtor to remit and pay certain undisputed taxes and fees in the ordinary course of business, whether incurred before or after the Petition Date, and (ii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on July 13, 2022 [Docket No. 42] and thereafter entered an Order granting the relief requested in the motion on a final basis on August 1, 2022 [Docket No. 87].

- *Debtor's Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief* [Docket No. 5]. The Debtor sought entry of interim and final Orders, (i) approving the Debtor's proposed form of adequate assurance of postpetition payment to the utility companies; (ii) establishing procedures for resolving any objections by the utility companies relating to the proposed adequate assurance; (iii) prohibiting the utility companies from altering, refusing or discontinuing service to, or discriminating against, the Debtor solely on the basis of (a) the commencement of the chapter 11 case, (b) a debt that is owed by the Debtor for services rendered prior to the Petition Date or (c) on account of any perceived inadequacy of the Debtor's proposed adequate assurance; and (iv) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on July 13, 2022 [Docket No. 46] and thereafter entered an Order granting the relief requested in the motion on a final basis on August 1, 2022 [Docket No. 88].

- *Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Maintain Its Cash Management System, Including Bank Accounts and Business Forms, and (B) Honor Certain Prepetition Obligations Related Thereto; (II) Waiving (A) Certain Operating Guidelines, and (B) Section 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief* [Docket No. 6]. The Debtor sought entry of interim and final Orders, (i) authorizing, but not directing, the Debtor to (a) continue to operate the cash management system, (b) honor certain prepetition obligations related thereto, and (c) maintain existing business forms in the ordinary course of business; (ii) waiving certain operating guidelines and deposit requirements; and (iii) granting related relief. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on July 13, 2022 [Docket No. 43] and thereafter

27

entered an Order granting the relief requested in the motion on a final basis on August 1, 2022 [Docket No. 90].

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 7].  The Debtor sought entry of interim and final Orders (i) authorizing, but not directing, the Debtor to (a) pay prepetition wages and salaries, other compensation, and reimbursable expenses, and (b) continue certain employee benefit programs in the ordinary course, (ii) authorizing all banks to honor prepetition checks for payment of prepetition employee obligations, and (iii) granting other related relief.  The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on July 13, 2022 [Docket No. 51] and thereafter entered an Order granting the relief requested in the motion on a final basis on August 1, 2022 [Docket No. 89].

- *Debtor's Motion for Entry of Order (I) Authorizing the Debtor to Redact Certain Personal Identification Information and (II) Granting Related Relief* [Docket No. 8].  On July 13, 2022, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 45].

2.    <u>Post-Petition Financing and Bidding Procedures</u>

On the Petition Date, the Debtor also filed the DIP Motion, asking the Bankruptcy Court to, among other things, authorize the Debtor to obtain the DIP Facility from the DIP Lenders, authorize the Debtor to use "cash collateral," as such term is defined in the section 363 of the Bankruptcy Code, grant the DIP Lenders a senior, priming lien on certain prepetition collateral securing the DIP Facility, and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents.  The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on July 13, 2022 [Docket No. 41] and scheduling a hearing to consider the final relief requested in the DIP Motion for August 4, 2022.

On July 14, 2022, the Debtor filed the Bidding Procedures Motion seeking approval of, among other things, certain key dates and deadlines in connection with the Post-Petition Sale Process and the Debtor's Bidding Procedures.  The hearing to consider the relief requested in the Bidding Procedures Motion was scheduled for August 4, 2022.

On July 28, 2022, the MTD Movants filed objections to the Bidding Procedures Motion and DIP Motion requesting that the hearing on the relief requested therein be adjourned until such time as the Bankruptcy Court ruled on the MTD Movants' Motion to Dismiss, which is discussed further herein.

On August 4, 2022, the Bankruptcy Court held a "second day" hearing to consider, among other things, the relief requested in the DIP Motion, on a final basis, and the Bidding Procedures Motion and the MTD Movants' objections thereto.  At the conclusion of the "second

day" hearing, the Bankruptcy Court adjourned the hearing on the DIP Motion and the Bidding Procedures Motion until after the Bankruptcy Court ruled on the Motion to Dismiss.

As discussed further herein, after the Bankruptcy Court issued its Bench Ruling on the Motion to Dismiss, on August 17, 2022, the Bankruptcy Court entered the Final DIP Order granting the relief requested in the motion on a final basis [Docket No. 173] and entered the Bidding Procedures Order [Docket No. 175].

3.    No Appointment of Committee

On July 26, 2022, the United States Trustee filed the *Statement that Unsecured Creditors' Committee Has Not Been Appointed* [Docket No. 75] indicating that no official committee of unsecured creditors had been appointed in the Chapter 11 Case.

4.    The Motion to Dismiss

On July 25, 2022, the MTD Movants filed the Motion to Dismiss seeking to, among other things, dismiss the Debtor's Chapter 11 Case for being filed without proper corporate authorization or, in the alternative, appoint a chapter 11 trustee.

On August 8, 2022, the Debtor filed its objection to the Motion to Dismiss [Docket No. 118], arguing, among other things, that the Debtor's Chapter 11 Case was properly authorized by the Board. In addition, Oxford also filed an objection [Docket No. 119] to the Motion to Dismiss.

On August 15, 2022, the Bankruptcy Court held a hearing on the Motion to Dismiss and considered the arguments of counsel for the Debtor, Oxford and the MTD Movants and their respective submissions with the Bankruptcy Court.

On August 16, 2022, the Bankruptcy Court issued the Bench Ruling, among other things, denying the Motion to Dismiss and finding that the Debtor properly constituted its Board after the Trial and properly commenced the Chapter 11 Case. And, on August 18, 2022, the Bankruptcy Court entered an Order denying the Motion to Dismiss for the reasons stated on the record made at the Bench Ruling.

5.    Employment and Compensation of Debtor's Professionals and Advisors

On August 17, 2022, the Bankruptcy Court entered (i) an Order [Docket No. 171] authorizing the Debtor's employment of Richards, Layton & Finger, P.A., as bankruptcy counsel; (ii) an Order [Docket No. 170] authorizing the Debtor's employment of Willkie Farr & Gallagher LLP, as special litigation and corporate counsel; and (iii) an Order [Docket No. 169] authorizing the Debtor's employment of Lazard, as investment banker.

6.    Post-Petition Sale Process

Lazard launched the Prepetition Marketing Process in May 2022, contacting over 100 potential investors on behalf of the Debtor, including strategic investors, financial investors,

venture investors, and existing stakeholders.  The Prepetition Marketing Process was designed to (i) raise capital out-of-court through debt or a new round of preferred equity financing, (ii) solicit bids for the Debtor or its assets, or (iii) raise capital through a chapter 11 process that could include both debtor-in-possession and/or exit financing.  From after the Petition Date, the marketing of the Debtor and its assets continued through the Post-Petition Sale Process.

During the Prepetition Marketing Process, of the over 100 potential investors contacted, 19 interested parties executed confidentiality agreements and were granted access to the electronic data room. In addition, Lazard and the Debtor conducted numerous diligence meetings and responded to numerous diligence requests from potential bidders.

In connection with developing a framework for executing the Post-Petition Sale Process, the Debtor, in consultation with Lazard and its other advisors, designed the Bidding Procedures to promote a competitive and expedient sales process.  The Bidding Procedures were intended to provide the Debtor with flexibility to solicit proposals, negotiate transactions, hold an auction, and consummate a sale for the highest or otherwise best bid.

Following the Petition Date, the Debtor and Lazard's continued negotiations with Farallon resulted in the Debtor receiving a Stalking Horse Bid for substantially all of the Debtor's assets from the Stalking Horse Bidder, Sequencing Health. a purchaser entity affiliated with entities, funds and/or accounts managed or advised, directly or indirectly, by, or under common control with, two investors holding Series D Preferred Equity Interests in the Debtor: Farallon and Soleus Private Equity Fund II, LP.  Pursuant to the Stalking Horse Bid, the Stalking Horse Bidder proposed to purchase the Purchased Assets for the aggregate purchase price of up to $10,000,000 in cash consideration and the assumption of certain prepetition indebtedness to Oxford.   The aggregate Purchase Price, based on the Cash Purchase Price and the Assumed Oxford Indebtedness, was approximately $42 million.

On August 11, 2022, the Special Committee approved the Sale with Sequencing Health and authorized the Debtor's entry into the Asset Purchase Agreement.

On August 12, 2022, the Debtor and Sequencing Health entered into the initial form of Asset Purchase Agreement, and the Debtor filed the Stalking Horse Motion seeking approval of, among other things, the designation of the Stalking Horse Bidder and approval of certain bid protections, including an expense reimbursement and a breakup fee.  On August 21, 2022, the United States Trustee filed an objection to the Stalking Horse Motion.

On August 22, 2022, the Bankruptcy Court held a hearing to consider the Stalking Horse Motion.  At the conclusion of the hearing, the Bankruptcy Court sustained the United States Trustee's Objection in part.  On August 24, 2022, the Bankruptcy Court entered the Stalking Horse Order designating Sequencing Health as the Stalking Horse Bidder under the final form of Asset Purchase Agreement and approving only the expense reimbursement.

On or about August 29, 2022, Love Health reached out to the Debtor regarding the potential extension of the Bid Deadline.  Pursuant to the Bidding Procedures, the Debtor initially established the Bid Deadline as August 30, 2022, at 4:00 p.m. (ET).  After discussions with Love

Health, the Debtor, with the consent of Oxford, entered into a Letter Agreement, dated August 31, 2022, whereby the Debtor agreed to extend the Bid Deadline to September 2, 2022 at 4:00 p.m. based on Love Health's agreement to cover the anticipated additional expenses to be incurred by the Debtor as a consequence of moving the Bid Deadline and related milestones.

On September 2, 2022, Love Health notified the Debtor that it would not be able to meet the extended Bid Deadline and requested a further extension of the Bid Deadline. After consultation with Oxford, the Debtor determined it was not in the best interest of the Debtor's estate to further extend the Bid Deadline or any related milestones, especially given (i) the uncertainty over whether any further extension would assist Love Health being able to meet the requirements for submitting a Qualified Bid and (ii) the ability of Sequencing Health to terminate the Asset Purchase Agreement in the event that a sale had not closed by an outside date of September 16, 2022.

Although the Debtor and Lazard vigorously marketed the Debtor's Assets during both the Prepetition Marketing Process and the Post-Petition Sale Process, the Debtor did not receive any actionable letters of intent, non-binding expressions of interest or draft purchase agreements, other than the Asset Purchase Agreement provided by Sequencing Health. Accordingly, following the expiration of the Bid Deadline, as extended, the Debtor, in consultation with its advisors and Oxford, selected the Stalking Horse Bid as the Successful Bid for the Purchased Assets. On September 3, 2022, the Special Committee authorized the Debtor to seek entry of the Sale Order and consummate the Sale with Sequencing Health pursuant to the Asset Purchase Agreement thereafter.

On September 4, 2022, the Debtor filed the *Notice of (I) Cancellation of Auction and (II) Successful Bid* [Docket No. 229] identifying that (i) the Stalking Horse Bidder submitted the only Qualified Bid for the Debtor's assets, (ii) the Debtor received no other Qualified Bids by the Bid Deadline, and (iii) the Auction was cancelled.

On September 8, 2022, the Bankruptcy Court held the Sale Hearing to consider approval of the Sale to Sequencing Health, as Stalking Horse Bidder, pursuant to the Asset Purchase Agreement. At the Sale Hearing, a representative from Love Health appeared before the Bankruptcy Court, among other things, requesting a further extension of the Bid Deadline. After hearing the request of Love Health and the arguments of the Debtor, Sequencing Health and Oxford, each in opposition to the requested extension, the Bankruptcy Court denied Love Health's request and orally approved the Sale to Sequencing Health pursuant to the Asset Purchase Agreement.

On September 12, 2022, the Bankruptcy Court entered the Sale Order approving the Sale of the Purchased Assets to Sequencing Health pursuant to the Asset Purchase Agreement.

On September 14, 2022, the Sale closed. In connection with the Sale, the Debtor and Sequencing Health entered into that certain *Transitions Services Agreement*, dated September 14, 2022 (the "TSA"), whereby the Debtor agreed to provide certain Services (as defined in the TSA), in exchange for the fees, costs and expenses set forth therein. The term of the TSA expires

on November 14, 2022 and is subject to a one-time extension of thirty (30) days by Sequencing Health.

7.     Claims Process and Bar Date

        a.      *Section 341(a) Meeting of Creditors*

        On August 12, 2022, the United States Trustee presided over the initial section 341(a) meeting of creditors in the Chapter 11 Case.  At the conclusion of the meeting held on August 12, 2022, the United States Trustee adjourned the section 341(a) meeting of creditors until such time as the Debtor filed its Schedules.  On August 31, 2022, the Debtor filed its Schedules.  On September 16, 2022, the United States Trustee reconvened the adjourned section 341(a) meeting of creditors and concluded the meeting.

        b.      *Schedules and Statements*

        On August 31, 2022, the Debtor filed with the Bankruptcy Court sealed and redacted versions of its Schedules.

        c.      *Bar Dates*

        On September 14, 2022, the Debtor filed the *Motion of the Debtor for Entry of an Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 250] seeking entry of an Order establishing certain Bar Dates, including the General Bar Date, the Governmental Bar Date, the Rejection Bar Date, and the Amended Schedules Bar Date.  The Bankruptcy Court entered the Bar Date Order, which granted the relief requested in the motion on September 29, 2022 [Docket No. 288].

        On September 29, 2022, the Debtor filed and caused to be served the *Notice of Deadline for the Filing of Proofs of Claim, Including for Claims Asserted under Section 503(b)(9) of the Bankruptcy Code* [Docket No. 289] establishing the Bar Dates as a matter of record in the Chapter 11 Case.

8.     KEIP/KERP

        On August 17, 2022, the Bankruptcy Court entered the KEIP/KERP Order [Docket No. 174].

        Based on the Purchase Price, the KEIP was not earned and, as a result, the KEIP was not paid.  In connection with the closing of the Sale, the KERP was paid to all eligible KERP Employees in accordance with the terms of the KEIP/KERP Motion, as approved by the KEIP/KERP Order.

9.    <u>Rejection of Executory Contracts and Unexpired Leases</u>

After the Sale closed, in connection with evaluating the path forward for the Debtor, Lazard and the Debtor reviewed the Debtor's remaining executory contracts and determined that a number of those agreements were no longer required because the Debtor no longer maintains an operating business.

Accordingly, on September 14, 2022, the Debtor filed its first omnibus rejection motion [Docket No. 249] (the "<u>First Rejection Motion</u>") seeking to reject certain executory contracts. On September 27, 2022, the Bankruptcy Court entered an Order authorizing the First Rejection Motion [Docket No. 289].

On September 30, 2022, the Debtor filed its second omnibus rejection motion [Docket No. 292] (the "<u>Second Rejection Motion</u>") seeking to reject certain executory contracts. On October 24, 2022, the Bankruptcy Court entered an Order authorizing the Second Rejection Motion [Docket No. 313].

On October 21, 2022, the Debtor filed its third omnibus rejection motion [Docket No. 310] (the "<u>Third Rejection Motion</u>") seeking to reject certain executory contracts.  On November 14, 2022, the Bankruptcy Court entered an Order authorizing the Third Rejection Motion [Docket No. 346].

On October 31, 2022, the Debtor filed its fourth omnibus rejection motion [Docket No. 325] (the "<u>Fourth Rejection Motion</u>") seeking to reject an executory contract and the unexpired real property lease for its former headquarters in Redwood, California.  On November 14, 2022, the Bankruptcy Court entered an Order authorizing the Fourth Rejection Motion [Docket No. 347].

10.    <u>Corporate Name Change</u>

Section 7.2 of the Asset Purchase Agreement required the Debtor to, among other things, cease using its current name, or any variation thereof, within three business days of the closing of the Sale.

Accordingly, on September 15, 2022, the Debtor filed the necessary documentation with the Secretary of State changing its corporate name to "Redwood Liquidating Co."

On September 27, 2022, the Bankruptcy Court entered an Order [Docket No. 283] authorizing the Debtor to change the case caption to reflect, among other things, the Debtor's corporate name change.

## IV.    SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

### A.    Summary of Treatment of Claims and Equity Interests and Estimated Recoveries

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Prepetition Lender Claims, DIP Credit Agreement Claims, and Priority Tax Claims) and an estimate of the recoveries of each

Class.[9]  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article VII of the Combined Disclosure Statement and Plan.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Dollar Amount of Allowed Claims or Equity Interests | Approx. Recovery |
|---|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | The legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a Holder of a Priority Non-Tax Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall receive (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, or (ii) such other treatment that would render such Allowed Priority Non-Tax Claim Unimpaired. | Unimpaired | No (Presumed to accept) | $0.00 | 100% |
| 2 | Secured Claims | The legal, equitable, and contractual rights of the holders of Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Secured Claim agrees to such other, less favorable | Unimpaired | No (Presumed to accept) | $0.00 | 100% |

[9]    These amounts represent estimated Allowed Claims or Allowed Equity Interests, and do not represent amounts actually asserted by Creditors or Holders of Equity Interests in proofs of claim or otherwise.  The Debtor has not completed its analysis of Claims and Equity Interests in the Chapter 11 Case and objections to such Claims and Equity Interests have not been fully litigated.  Therefore, there can be no assurances of the exact amount of the Allowed Claims or Allowed Equity Interests at this time.  Rather, the actual amount of the Allowed Claims or Allowed Equity Interests may be greater or lower than estimated.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Dollar Amount of Allowed Claims or Equity Interests | Approx. Recovery |
|---|---|---|---|---|---|---|
| | | treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, each holder of an Allowed Secured Claim shall receive (i) Cash in an amount equal to such Allowed Secured Claim, (ii) the Debtor's interest in the collateral securing such Holder's Allowed Secured Claim, or (iii) such other treatment that would render such Allowed Secured Claim Unimpaired. | | | | |
| 3 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to such other, less favorable treatment, each Holder of an Allowed General Unsecured Claim shall be paid its Pro Rata share of the Net Distributable Assets, in full and final satisfaction, settlement, and release of, and in exchange for, its Allowed General Unsecured Claims. | Impaired | YES | $6,333,208 | 17% |
| 4a | Series D Preferred Equity Interests | (i)    In the event that Holders of Class 3 General Unsecured Claims are not paid in full, Holders of Series D Preferred Equity Interests shall not receive or retain any distribution under the Plan on account of such Series D Preferred Equity Interests. | Impaired | No (Deemed to reject) | $70,000,000 | 0% |

35

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Dollar Amount of Allowed Claims or Equity Interests | Approx. Recovery |
|---|---|---|---|---|---|---|
| | | (ii)    In the event that Holders of Class 3 General Unsecured Claims are paid in full, each Holder of Series D Preferred Equity Interests shall be paid its Pro Rata share of the remaining Net Distributable Assets after such assets are used to pay in full the Claims of Holders of Class 3 General Unsecured Claims, in accordance with the absolute priority rule and the terms of this Combined Disclosure Statement and Plan.<br><br>Regardless of whether Holders of Class 4 Series D Preferred Equity Interests receive any recovery from available Net Distributable Assets, Series D Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date. | | | | |
| 4b | Series D 510(b) Claims | Holders of Series D 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series D 510(b) Claims. | Impaired | No (Deemed to reject) | N/A | 0% |
| 5a | Series C Preferred Equity Interests | Holders of Series C Preferred Equity Interests shall not receive or retain any distribution under the Plan on account of such Series C Preferred Equity Interests. Series C Preferred Equity | Impaired | No (Deemed to reject) | N/A | 0% |

RLF1 28213990v.5

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Dollar Amount of Allowed Claims or Equity Interests | Approx. Recovery |
|---|---|---|---|---|---|---|
| | | Interests shall be terminated, cancelled, released and extinguished as of the Effective Date. | | | | |
| 5b | Series C 510(b) Claims | Holders of Series C 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series C 510(b) Claims. | Impaired | No (Deemed to reject) | N/A | 0% |
| 6a | Series B Preferred Equity Interests | Holders of Series B Preferred Equity Interests shall not receive or retain any distribution under the Plan on account of such Series B Preferred Equity Interests. Series B Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date. | Impaired | No (Deemed to reject) | N/A | 0% |
| 6b | Series B 510(b) Claims | Holders of Series B 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series B 510(b) Claims. | Impaired | No (Deemed to reject) | N/A | 0% |
| 7a | Series A Preferred Equity Interests | Holders of Series A Preferred Equity Interests shall not receive or retain any distribution under the Plan on account of such Series A Preferred Equity Interests. Series A Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date. | Impaired | No (Deemed to reject) | N/A | 0% |

RLF1 28213990v.5

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Dollar Amount of Allowed Claims or Equity Interests | Approx. Recovery |
|---|---|---|---|---|---|---|
| 7b | Series A 510(b) Claims | Holders of Series A 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series A 510(b) Claims. | Impaired | No (Deemed to reject) | N/A | 0% |
| 8a | Common Equity Interests | Holders of Class 8a Common Equity Interests shall not receive or retain any distribution under the Combined Disclosure Statement and Plan on account of such Common Equity Interests. Common Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date; *provided, however,* that, upon the Effective Date, the Plan Administrator shall be deemed to hold one share of common equity in the Post-Effective Date Debtor solely for the benefit of Holders of Allowed Claims and, if entitled to a recovery in accordance with the terms of this Combined Disclosure Statement and Plan, Allowed Equity Interests; *provided, further*, that the Plan Administrator shall not be entitled to receive any Distribution on account of such Common Equity Interest. | Impaired | No (Deemed to reject) | N/A | 0% |
| 8b | Common Equity | Holders of Common Equity 510(b) Claims shall not receive or retain any distribution under the Plan on account of such | Impaired | No (Deemed to reject) | N/A | 0% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Dollar Amount of Allowed Claims or Equity Interests | Approx. Recovery |
|-------|--------------------------|-----------|------------------------|------------------------------|--------------------------------------------------------------|------------------|
| | 510(b) Claims | Common Equity 510(b) Claims. | | | | |

## V.    TREATMENT OF UNCLASSIFIED CLAIMS

### A.    Administrative Expense Bar Date

Requests for payment of Administrative Expense Claims (other than 503(b)(9) Claims, which are subject to the General Bar Date, Professional Claims and the Claims of Governmental Units arising under section 503(b)(1)(B), (C) or (D) of the Bankruptcy Code) must be filed no later than the Administrative Expense Bar Date.  Unless otherwise Ordered by the Bankruptcy Court, Holders of Administrative Expense Claims (other than the Holders of 503(b)(9) Claims, Professional Claims and the Claims of Governmental Units arising under section 503(b)(1)(B), (C) or (D) of the Bankruptcy Code) that do not file requests for the allowance and payment thereof on or before the Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtor or its Estate.

### B.    Administrative Expense Claims

Except to the extent that any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the Effective Date or seven (7) Business Days after the entry of a Final Order Allowing such Administrative Expense Claim, or as soon thereafter as is practicable. Such payments to Holders of Allowed Administrative Expense Claims shall be paid by the Plan Administrator. Objections to Administrative Expense Claims must be filed and served on the Plan Administrator and the requesting party by the Administrative Expense Claim Objection Deadline. Nothing in this Combined Disclosure Statement and Plan shall extend or be deemed to extend the deadline of November 3, 2022 previously fixed by the Bar Date Order for filing 503(b)(9) Claims.

### C.    Prepetition Secured Parties' Claims

The Prepetition Secured Parties' Claims have been satisfied in full upon the closing of the Sale through Sequencing Health's assumption of the Debtor's obligations arising under the Prepetition Loan and Security Agreement, via the Oxford Loan Modification Agreement, as set forth in, and subject to the terms of, the Asset Purchase Agreement. The Holder of the Prepetition Secured Parties' Claims shall not receive any Distributions under the Combined Disclosure Statement and Plan.

RLF1 28213990v.5

**D.    DIP Credit Agreement Claims**

The DIP Credit Agreement Claims have been paid in full in Cash and satisfied upon the closing of the Sale.  The Holder of the DIP Credit Agreement Claims shall not receive any Distributions under the Combined Disclosure Statement and Plan.

**E.    Priority Tax Claims**

1.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtor or the Plan Administrator, as applicable, each Holder of an Allowed Priority Tax Claim will receive, at the sole option of the Debtor or the Plan Administrator, as applicable, in full and final satisfaction, settlement, and release of, and in exchange for, its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or such other amount agreed to by the Debtor or the Plan Administrator and such Holder, on the Effective Date or within seven (7) Business Days after such Allowed Priority Tax Claim becomes an Allowed Claim, whichever is later, or as soon thereafter as is practicable or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Plan Administrator as they become due.

2.    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary stated in the Disclosure Statement and Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtor or their respective property.

**F.    Professional Claims**

1.    Final Fee Applications and Payment of Professional Claims

All final requests for payment of Professional Claims may be made any time after Confirmation but shall be filed no later than forty-five (45) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid up to the full Allowed amount.

RLF1 28213990v.5

2.      Professional Fee Reserve

As soon as practicable after Confirmation and not later than the Effective Date, the Debtor shall establish and fund the Professional Fee Reserve. The Professional Fee Reserve shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtor's Estate. The amount of Allowed Professional Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve as set forth herein. Once payments on account of such Allowed Professional Claims have been made in full, any such excess Cash remaining in the Professional Fee Reserve shall be considered Assets of the Post-Effective Date Debtor's Estate for Distribution by the Plan Administrator in accordance with the terms of the Combined Disclosure Statement and Plan. For the avoidance of doubt, (i) to the extent that the Professional Fee Reserve is not sufficient to satisfy in full all Allowed Professional Claims, such Allowed Claims shall nevertheless be paid in full in Cash from other available Cash prior to making any Distributions to the Holders of Allowed Claims or, if applicable, Allowed Equity Interests, and (ii) any fees and expenses by Professionals in connection with preparing fee applications shall be paid from the Professional Fee Reserve or, if exhausted, from other available Cash prior to making any Distributions to the Holders of Allowed Claims or, if applicable, Allowed Equity Interests.

3.      Allocation and Estimation of Professional Claims

Professionals providing services to the Debtor shall reasonably estimate their unpaid Professional Claims against the Debtor relating to the period prior to and through the Effective Date and shall deliver such estimate to the Debtor by two (2) Business Days prior to the Effective Date; *provided*, *however*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional.

4.      Timing for Filing Professional Claims

All requests for compensation or reimbursement of Professionals retained in the Chapter 11 Case for services performed and expenses incurred prior to the Effective Date shall be filed and served on: (i) the Debtor, 10385 Westmoor Dr. #100, Westminster, Colorado 80021 (Attn: Peter Swider); (ii) counsel to the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq. (defranceschi@rlf.com), Michael J. Merchant, Esq. (merchant@rlf.com), and David T. Queroli, Esq. (queroli@rlf.com)); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane Leamy, Esq. (jane.m.leamy@usdoj.gov)); (iv) counsel for the DIP Administrative Agent and Prepetition Agent, (a) Greenberg Traurig LLP, 1000 Louisiana Street, Suite 1700, Houston, Texas 77002 (Attn: Shari L. Heyen, Esq. (heyens@gtlaw.com) and Eric J. Howe, Esq. (howee@gtlaw.com)), and (b) Greenberg Traurig LLP, Terminus 200, 3333 Piedmont Road NE, Suite 2500, Atlanta, Georgia 30305 (Attn: David B. Kurzweil, Esq. (kurzweild@gtlaw.com) and Matthew A. Petrie, Esq. (petriem@gtlaw.com)) and (v) such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Bankruptcy Court, by no later than forty-five (45) days after the Effective Date, unless otherwise agreed by the Debtor or the Plan Administrator, as

41

applicable. Objections to any Professionals Claim must be filed and served on the Plan Administrator and the requesting Professional no later than twenty (20) days after the filing of a request for compensation or reimbursement by a Professional, unless otherwise ordered by the Bankruptcy Court (the "Professional Claims Objection Deadline").

     5.     Post-Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the Plan Administrator Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Bankruptcy Court.

## G.     Payment of Statutory Fees

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Debtor shall remain liable to pay Statutory Fees when due and payable, in accordance with applicable bankruptcy law. The Debtor shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Plan Administrator, on behalf of the Post-Effective Date Debtor, shall file with the Bankruptcy Court all post-confirmation quarterly reports when they become due using UST Form 11-PCR reports. The Debtor shall remain obligated to pay Statutory Fees to the United States Trustee until the earliest of the Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The United States Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

## VI.     CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS; ESTIMATED RECOVERIES

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Equity Interests are classified for the purposes of voting and Distribution pursuant to this Combined Disclosure Statement and Plan, as set forth herein. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such other Class. Except as otherwise specifically provided for herein, the Confirmation Order or any other Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Combined Disclosure Statement and Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Combined Disclosure Statement and Plan by an Impaired Class of Claims; *provided*, *however*, that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the deadline established by the Bankruptcy Court indicating acceptance or rejection of this Combined Disclosure Statement and Plan, such Class will be deemed to have accepted this Combined Disclosure Statement and Plan.  The Debtor may seek Confirmation of this Combined Disclosure Statement and Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.

## VII.    TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    Treatment of Claims

1.    *CLASS 1 – PRIORITY NON-TAX CLAIMS*

*a.*    Classification

Class 1 consists of all Priority Non-Tax Claims.

*b.*    Impairment and Voting

Class 1 is unimpaired by the Combined Disclosure Statement and Plan.  The Holders of Class 1 Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

*c.*    Treatment

The legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a Holder of a Priority Non-Tax Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall receive (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, or (ii) such other treatment that would render such Allowed Priority Non-Tax Claim Unimpaired.

2.    *CLASS 2 – SECURED CLAIMS*

*a.*    Classification

Class 2 consists of Secured Claims.

*b.*    Impairment and Voting

Class 2 is unimpaired by the Combined Disclosure Statement and Plan.  Holders of Allowed Secured Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

RLF1 28213990v.5

c.        Treatment

The legal, equitable, and contractual rights of the holders of Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Secured Claim agrees to such other, less favorable treatment, on, or as soon as reasonably practicable after, the later of the Effective Date, each holder of an Allowed Secured Claim shall receive (i) Cash in an amount equal to such Allowed Secured Claim, (ii) the Debtor's interest in the collateral securing such Holder's Allowed Secured Claim, or (iii) such other treatment that would render such Allowed Secured Claim Unimpaired.

3.        *CLASS 3 – GENERAL UNSECURED CLAIMS*

a.        Classification

Class 3 consists of General Unsecured Claims.

b.        Impairment and Voting

Class 3 is impaired by the Combined Disclosure Statement and Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this Combined Disclosure Statement and Plan.

c.        Treatment

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to such other, less favorable treatment, each holder of an Allowed General Unsecured Claim shall be paid its Pro Rata share of the Net Distributable Assets in full and final satisfaction, settlement, and release of, and in exchange for, its Allowed General Unsecured Claims.

4.        *CLASS 4a – SERIES D PREFERRED EQUITY INTERESTS*

a.        Classification

Class 4a consists of all Series D Preferred Equity Interests.

b.        Impairment and Voting

Class 4a is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 4a Series D Preferred Equity Interests are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.        Treatment

In the event that Class 3 General Unsecured Claims are not paid in full, Holders of Class 4a Series D Preferred Equity Interests shall not receive or retain any distribution under the Combined Disclosure Statement and Plan on account of such Series D Preferred Equity Interests.

Series D Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date.

In the event that Holders of Class 3 General Unsecured Claims are paid in full, Holders of Class 4a Series D Preferred Equity Interests shall be paid their Pro Rata share of the remaining Net Distributable Assets after such assets are used to pay in full the Claims of Holders of Class 3 General Unsecured Claims, in accordance with the absolute priority rule and the terms of this Combined Disclosure Statement and Plan. Series D Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date.

5.     *CLASS 4b – SERIES D 510(b) CLAIMS*

   *a.*     Classification

Class 4b consists of all Series D 510(b) Claims.

   *b.*     Impairment and Voting

Class 4b is Impaired by the Combined Disclosure Statement and Plan. Holders of Class 4b Series D 510(b) Claims are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

   *c.*     Treatment

Holders of Class 4b Series D 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series D 510(b) Claims.

6.     *CLASS 5a –* SERIES C PREFERRED EQUITY INTERESTS

   *a.*     Classification

Class 5a consists of all Series C Preferred Equity Interests.

   *b.*     Impairment and Voting

Class 5a is Impaired by the Combined Disclosure Statement and Plan. Holders of Class 5a Series C Preferred Equity Interests are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

   *c.*     Treatment

Holders of Class 5a Series C Preferred Equity Interests shall not receive or retain any distribution under the Combined Disclosure Statement and Plan on account of such Series C Preferred Equity Interests. Series C Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date.

7.      *CLASS 5b – SERIES C 510(b) CLAIMS*

     *a.*      <u>Classification</u>

Class 5b consists of all Series C 510(b) Claims.

     *b.*      <u>Impairment and Voting</u>

Class 5b is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 5b Series C 510(b) Claims are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

     *c.*      <u>Treatment</u>

Holders of Class 5b Series C 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series C 510(b) Claims.

8.      *CLASS 6a – SERIES B PREFERRED EQUITY INTERESTS*

     *a.*      <u>Classification</u>

Class 6a consists of all Series B Preferred Equity Interests.

     *b.*      <u>Impairment and Voting</u>

Class 6a is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 6a Series B Preferred Equity Interests are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

     *c.*      <u>Treatment</u>

Holders of Class 6a Series B Preferred Equity Interests shall not receive or retain any distribution under the Combined Disclosure Statement and Plan on account of such Series B Preferred Equity Interests.  Series B Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date.

9.      *CLASS 6b – SERIES B 510(b) CLAIMS*

     *a.*      <u>Classification</u>

Class 6b consists of all Series B 510(b) Claims.

     *b.*      <u>Impairment and Voting</u>

Class 6b is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 6b Series B 510(b) Claims are conclusively presumed to have voted to reject the Combined

RLF1 28213990v.5

Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

      *c.*    <u>Treatment</u>

Holders of Class 6b Series B 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series B 510(b) Claims.

10.    *CLASS 7a – SERIES A PREFERRED EQUITY INTERESTS*

      *a.*    <u>Classification</u>

Class 7a consists of all Series A Preferred Equity Interests.

      *b.*    <u>Impairment and Voting</u>

Class 7a is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 7a Series A Preferred Equity Interests are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

      *c.*    <u>Treatment</u>

Holders of Class 7a Series A Preferred Equity Interests shall not receive or retain any distribution under the Combined Disclosure Statement and Plan on account of such Series A Preferred Equity Interests.  Series A Preferred Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date.

11.    *CLASS 7b – SERIES A 510(b) CLAIMS*

      *a.*    <u>Classification</u>

Class 7b consists of all Series A 510(b) Claims.

      *b.*    <u>Impairment and Voting</u>

Class 7b is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 7b Series A 510(b) Claims are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

      *c.*    <u>Treatment</u>

Holders of Class 7b Series A 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Series A 510(b) Claims.

12.    *CLASS 8a – COMMON EQUITY INTERESTS*

  a.    <u>Classification</u>

Class 8a consists of all Common Equity Interests.

  b.    <u>Impairment and Voting</u>

   Class 8a is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 8a Common Equity Interests are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

  c.    <u>Treatment</u>

   Holders of Class 8a Common Equity Interests shall not receive or retain any distribution under the Combined Disclosure Statement and Plan on account of such Common Equity Interests.  Common Equity Interests shall be terminated, cancelled, released and extinguished as of the Effective Date; *provided, however,* that, upon the Effective Date, the Plan Administrator shall be deemed to hold one share of Common Equity Interest in the Post-Effective Date Debtor solely for the benefit of Holders of Allowed Claims  and, if entitled to a recovery in accordance with the terms of this Combined Disclosure Statement and Plan, Allowed Equity Interests; *provided, further*, that the Plan Administrator shall not be entitled to receive any Distribution on account of such Common Equity Interest.

13.    *CLASS 8b – COMMON EQUITY 510(B) CLAIMS*

  a.    <u>Classification</u>

Class 8b consists of all Common Equity 510(b) Claims.

  b.    <u>Impairment and Voting</u>

   Class 8b is Impaired by the Combined Disclosure Statement and Plan.  Holders of Class 8b Common Equity 510(b) Claims are conclusively presumed to have voted to reject the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

  c.    <u>Treatment</u>

   Holders of Class 8b Common Equity 510(b) Claims shall not receive or retain any distribution under the Plan on account of such Common Equity 510(b) Claims.

**B.    <u>Reservation of Rights Regarding Claims</u>**

   Except as otherwise provided in this Combined Disclosure Statement and Plan or in other Orders of the Bankruptcy Court, nothing shall affect the rights or defenses of the Debtor or the Plan Administrator, as applicable, whether legal or equitable, with respect to any Claim,

including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## C.      Cramdown and No Unfair Discrimination

In the event that any impaired Class of Claims or Equity Interests rejects the Combined Disclosure Statement and Plan or is deemed to have rejected the Combined Disclosure Statement and Plan, the Debtor hereby requests, without any delay in the occurrence of the Confirmation Hearing or Effective Date, that the Bankruptcy Court confirm the Combined Disclosure Statement and Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Combined Disclosure Statement and Plan shall constitute a motion for such relief.

Confirming the Combined Disclosure Statement and Plan under such a circumstance is what is known as a "cramdown". Among other things, a "cramdown" is appropriate where the Bankruptcy Court finds that it does not unfairly discriminate against the objecting classes and is fair and equitable with respect to those objecting classes. A plan unfairly discriminates against a class if another class of equal rank in priority will receive greater value under the plan than the nonaccepting class without reasonable justification. A plan is fair and equitable if no claim or interest junior to the objecting class shall receive or retain any claim or interest under the plan.

## VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.      Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts (including any unexpired leases) that are (i) not assumed before the Effective Date or (ii) not subject to a pending motion to assume or reject as of the Effective Date will be deemed rejected. The Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

## B.      Indemnification Claims

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtor for Indemnification Obligations shall be (i) paid only to the extent that there is an applicable D&O Insurance Policy providing insurance coverage therefor, and (ii) to the extent a Proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such claims are not covered by any applicable D&O Insurance Policy providing insurance coverage therefor, including deductibles. Nothing contained herein shall affect the rights of directors, officers or employees under any D&O Insurance Policies or insurance coverage with respect to Indemnification Obligations or limit the rights of the Debtor, the Plan Administrator, or the Debtor's Estate to object to, seek to subordinate or otherwise contest or challenge Claims, including Claims for Indemnification Obligations, or any other rights asserted by any current or former officer, director or employee of the Debtor pursuant to this Article VIII.B or otherwise.

For the avoidance of any doubt, no D&O Insurance Policy shall be cancelled, and the Debtor's directors, officers and employees who have valid claims against the D&O Insurance Policies for Indemnification Obligations, and who have timely filed a Proof of Claim therefor that

is Allowed, may be paid from the applicable D&O Insurance Policies to the extent of the insurance coverage provided by the applicable D&O Insurance Policies.

**C.**    **Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Combined Disclosure Statement and Plan**

If the rejection by the Debtor of an Executory Contract (including any unexpired lease) pursuant to the Combined Disclosure Statement and Plan gives rise to a Claim, a proof of claim must be filed with the Claims and Noticing Agent at Redwood Liquidating Co. (f/k/a GenapSys, Inc.) Claims Processing Center c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232, by no later than thirty (30) days after service of the notice of the Effective Date. Any proofs of Claim not filed and served within such time period will be forever barred from assertion against the Debtor and its Estate. Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and unexpired leases shall be treated as Class 3 (General Unsecured Claims) under the Combined Disclosure Statement and Plan. For the avoidance of doubt, any Claims arising from the rejection of an Executory Contract (including any unexpired lease) pursuant to a separate motion are subject to the General Bar Date or relevant Rejection Damages Bar Date, as applicable.

**IX.**    **IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED DISCLOSURE STATEMENT AND PLAN**

**A.**    **Means for Implementation of the Combined Disclosure Statement and Plan**

In addition to the provisions set forth elsewhere in the Combined Disclosure Statement and Plan, the following shall constitute the means for implementation of the Combined Disclosure Statement and Plan:

1.    _Funding of Liabilities and Distributions_. Allowed Claims, Allowed Equity Interests, and any amounts necessary to wind down the Debtor's Estate shall be paid from the Net Distributable Assets, subject to the limitations and qualifications described herein.

2.    _Corporate Action; Effectuating Documents; Further Transactions_. On the Effective Date, all matters and actions provided for under the Combined Disclosure Statement and Plan that would otherwise require approval of the directors and officers, or members or managers of the Debtor shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, members and managers of the Debtor. The Debtor or the Plan Administrator, as applicable, is authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

3.    _Direction to Parties_. From and after the Effective Date, the Plan Administrator may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver or to join in the execution of delivery of any instruments required to effect a transfer of property contemplated by or necessary to effectuate this Combined Disclosure Statement and Plan, and to perform any other act that is necessary for the consummation of this Combined Disclosure

50

Statement and Plan, pursuant to section 1142(b) of the Bankruptcy Code.

4. <u>Title to Accounts</u>. Title to all of the Debtor's bank, brokerage and other accounts shall vest in the Post-Effective Date Debtor, effective as of the Effective Date, without any further order of the Bankruptcy Court or further action on the party of any Person or Entity. On and after the Effective Date, all such accounts shall be deemed to be accounts in the name of the Post-Effective Date Debtor without any further action by any Person or Entity or any further order of the Bankruptcy Court.

5. <u>Corporate Documents and Corporate Authority</u>. On the Effective Date, the certificates of incorporation, bylaws, and articles of organization, as applicable, of the Debtor shall be deemed amended to the extent necessary to carry out the provisions of the Combined Disclosure Statement and Plan. The entry of the Confirmation Order shall constitute authorization for the Debtor and the Plan Administrator to take or cause to be taken all actions necessary or appropriate to implement all provisions of, and to consummate, the Combined Disclosure Statement and Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation. Effective as of the Effective Date, all directors, managers, members, and officers of the Debtor shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.

6. <u>Exemption from Certain Taxes</u>. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorized by this Combined Disclosure Statement and Plan; (4) any sale of an Asset by the Plan Administrator in furtherance of the Combined Disclosure Statement and Plan, including but not limited to any sale of personal or real property and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Combined Disclosure Statement and Plan.

## X.    **PROVISIONS REGARDING THE PLAN ADMINISTRATOR**

### A.    **Appointment of the Plan Administrator**

On the Effective Date, the Plan Administrator, who shall be selected by the Debtor, shall be appointed and thereafter serve in accordance with this Combined Disclosure Statement and Plan. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. As part of the Plan Supplement, the Debtor shall identify the Plan Administrator and the material terms of the Plan Administrator's compensation.

RLF1 28213990v.5

## B. **Rights and Powers of the Plan Administrator**

The Plan Administrator shall, in addition to any powers and authority specifically set forth in other provisions of the Combined Disclosure Statement and Plan, be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Combined Disclosure Statement and Plan, (ii) establish, as necessary, disbursement accounts for the deposit and distribution of all amounts distributed under the Combined Disclosure Statement and Plan, (iii) make Distributions in accordance with the Combined Disclosure Statement and Plan, (iv) object to Claims, as appropriate, (v) employ and compensate professionals to represent it with respect to its responsibilities, (vi) assert any of the Debtor's claims, Causes of Action, rights of setoff, or other legal or equitable defenses, and (vii) exercise such other powers as may be vested in the Plan Administrator by order of the Bankruptcy Court, pursuant to the Combined Disclosure Statement and Plan, or as deemed by the Plan Administrator to be necessary and proper to implement the provisions hereof.

The Plan Administrator may take any and all actions which it deems reasonably necessary or appropriate to defend against any Claim, including, without limitation, the right to: (a) exercise any and all judgment and discretion with respect to the manner in which to defend against or settle any Claim, including, without limitation, the retention of professionals, experts and consultants; and (b) enter into a settlement agreement or agreements without Bankruptcy Court approval. Upon the later of the Effective Date and the appointment of the Plan Administrator, the Debtor will have no other officers, directors or managers.

## C. **Post Effective Date Expenses of the Plan Administrator**

The Plan Administrator shall receive reasonable compensation for services rendered pursuant to the Combined Disclosure Statement and Plan without further Bankruptcy Court order. In addition, the amount of reasonable fees, costs, and expenses of the Plan Administrator on or after the Effective Date (including, without limitation, reasonably attorney and professional fees and expenses) may be paid without further Bankruptcy Court order. The Plan Administrator shall be paid from any reserves set aside for such fees, costs, and expenses of the Plan Administrator, as further set forth in the Plan Administrator Agreement. Any amounts remaining in the reserves shall be distributed in accordance with the provisions of the Combined Disclosure Statement and Plan.

## D. **Plan Administrator Agreement**

A form of the Plan Administrator Agreement shall be filed as part of the Plan Supplement.

## XI. **PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN**

## A. **Method of Payment**

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Combined Disclosure Statement and Plan shall be made by check drawn on a

52

domestic bank or by an electronic wire transfer.

## B.      Objections to and Resolution of Claims

The Plan Administrator shall have the right to file objections and/or motions to estimate any and all Claims after the Effective Date.  The Plan Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections, without approval of the Bankruptcy Court.  The Plan Administrator shall further have the authority to resolve and settle any and all Claims without approval of the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Combined Disclosure Statement and Plan (including for purposes of Distributions), and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

## C.      Claims Objection Deadline

Except as otherwise set forth in Articles V.B and V.F above with respect to Administrative Expense Claims and Professionals Claims, the Plan Administrator, and any other party in interest to the extent permitted pursuant to section 502(a) of the Bankruptcy Code, shall file and serve any objection to any Claims or Equity Interests no later than the Claims Objection Deadline; *provided*, *however*, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Plan Administrator.

## D.      No Distribution Pending Allowance

Notwithstanding any other provision of the Combined Disclosure Statement and Plan, no payment or Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim or Equity Interest unless and until all objections to such Claim or Equity Interest are resolved by Final Order or as otherwise permitted by this Combined Disclosure Statement and Plan.

## E.      Claims Reserve

On any date that Distributions are to be made under the terms of the Combined Disclosure Statement and Plan, the Plan Administrator shall (i) reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto and (ii) be authorized, but not required, to establish a reserve, in an amount to be determined solely in the discretion of the Plan Administrator, for contingent and unliquidated Claims, including Indemnification Obligations (the reserve, if any, for Indemnification Obligations, the "Indemnification Reserve").  Such Cash or property, as the case may be, shall be held in trust for the benefit of the Holders of all such Disputed Claims and, if applicable, contingent and unliquidated Claims, including Indemnification Obligations, pending determination of their entitlement thereto.

**F.**     **Indemnification Reserve**

On any date that Distributions are to be made under the terms of the Combined Disclosure Statement and Plan, the Plan Administrator shall be authorized, but not required, to establish the Indemnification Reserve.  The intent of the establishment of the Indemnification Reserve is to permit the Plan Administrator to make Distributions to Holders of Allowed Claims and, if applicable, Equity Interests, as promptly as practicable in accordance with the Combined Disclosure Statement and Plan.  Accordingly, the Plan Administrator shall be fully held harmless and exculpated for the making of such Distributions even if the amount of the Indemnification Reserve is ultimately insufficient to pay in full any or all Allowed Claims on account of Indemnification Obligations and there are no other available Assets to pay in full any or all Allowed Claims on account of Indemnification Obligations.

**G.**     **Timing of Distributions**

Unless otherwise provided herein, on each Distribution Date, each Holder of an Allowed Claim or, if applicable, Allowed Equity Interest, shall receive such Distributions that this Combined Disclosure Statement and Plan provides for Allowed Claims or, if applicable, Allowed Equity Interests, in accordance with Article VII hereof.  In the event that any payment or act under this Combined Disclosure Statement and Plan is required to be made or performed on a date that it not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  The Plan Administrator shall have no obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Confirmation Date.

**H.**     **Delivery of Distributions**

Except as provided herein, Distributions to Holders of Allowed Claims or, if applicable, Allowed Equity Interests, shall be made: (1) at the addresses set forth on the respective proofs of Claim Filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Plan Administrator after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim is filed and the Plan Administrator has not received a written notice of a change of address.

If the Distribution to the Holder of any Allowed Claim or, if applicable, Allowed Equity Interest, is returned to the Plan Administrator as undeliverable, no further distribution shall be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then current address.  Undeliverable Distributions shall remain in the possession of the Plan Administrator until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.

The Plan Administrator shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; *provided*, *however*, nothing contained in the Combined Disclosure Statement and Plan shall require the Plan Administrator to locate any Holder of an Allowed Claim.

**I.**     **Unclaimed Distributions**

Any Cash or other property to be distributed under the Combined Disclosure Statement and Plan shall revert to the Plan Administrator or the Debtor, as applicable, if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline.  If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Entity shall be deemed to be reduced to zero.

**J.**     *De Minimis* **Distributions**

The Plan Administrator shall not distribute Cash to the Holder of an Allowed Claim or, if applicable, Allowed Equity Interest, in an impaired Class if the amount of Cash to be distributed on account of such Claim or, if applicable, Equity Interest, is less than $50.00 in the aggregate.  Any Holder of an Allowed Claim or, if applicable, Allowed Equity Interest, on account of which the amount of Cash to be distributed is less than $50.00 in the aggregate will be forever barred from asserting its Claim or, if applicable, Equity Interest, for such distribution against the Plan Administrator or its property.  Any Cash not distributed pursuant to this Article XI of the Combined Disclosure Statement and Plan will be the property of the Estate.

**K.**     **Setoff**

The Debtor or the Plan Administrator, as the case may be, retain the right, subject to any applicable notice provisions under applicable law, to reduce any Claim by way of setoff in accordance with their Books and Records.

**L.**     **Postpetition Interest**

Interest shall not accrue on any Creditor's prepetition Claims, and no Holder of a prepetition Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date.  No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of secured Claims under section 506(b) of the Bankruptcy Code.

**M.**     **Allocation of Distributions Between Principal and Interest**

For Distributions in respect of Allowed General Unsecured Claims or, if applicable, Allowed Equity Interests, to the extent that any such Allowed Claim or Allowed Equity Interest entitled to a Distribution under the Combined Disclosure Statement and Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim or, if applicable, Equity Interest, first, and then to accrued but unpaid interest.

**N.**     **No Creditor to Receive More than Payment in Full**

Notwithstanding any other provision hereof, no creditor shall receive more than full payment of its applicable Allowed Claim including any interest, costs or fees that may be payable with respect thereto under or pursuant to the Combined Disclosure Statement and Plan.

O.    **Compliance with Tax Requirements**

In connection with the Combined Disclosure Statement and Plan and all Distributions hereunder, to the extent applicable, the Plan Administrator is authorized to take any and all actions that may be necessary or appropriate to comply with all Tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions pursuant to the Combined Disclosure Statement and Plan shall be subject to any such withholding and reporting requirements, as more fully set forth in Article XVIII.J herein.

## XII.    CONFIRMATION AND VOTING PROCEDURES

A.    **Confirmation Procedure**

1.    Confirmation Hearing

On [·], 2022, the Bankruptcy Court entered an Order [Docket No. [·]] (the "Conditional Approval and Procedures Order") conditionally approving the Combined Disclosure Statement for solicitation purposes only and authorizing the Debtor to solicit acceptances of the Combined Disclosure Statement and Plan.  The Confirmation Hearing has been scheduled for **January 5, 2023 at 10:00 a.m. (ET)** at the Bankruptcy Court, Court, 824 North Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801 to consider (i) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

2.    Procedure for Objections

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Disclosure Statement and Plan must be made in writing and filed with the Bankruptcy Court and served on (i)  the Debtor, 10385 Westmoor Dr. #100, Westminster, Colorado 80021 (Attn: Peter Swider); (ii) counsel to the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq. (defranceschi@rlf.com), Michael J. Merchant, Esq. (merchant@rlf.com), and David T. Queroli, Esq. (queroli@rlf.com)); and (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane Leamy, Esq. (jane.m.leamy@usdoj.gov)), in each case, by no later than **December 30, 2022 at 4:00 p.m. (ET).  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

3.    Eligibility to Vote on the Combined Disclosure Statement and Plan

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Class 3 may vote on the Combined Disclosure Statement and Plan.  Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order,

in order to vote on the Combined Disclosure Statement and Plan, you must hold an Allowed Claim in Class 3, or be the Holder of a Claim in such Class that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

    4.    <u>Solicitation Notice</u>

All Holders of Allowed Claims in Class 3 will receive (i) notice of the Confirmation Hearing on the Combined Disclosure Statement and Plan (the "<u>Confirmation Notice</u>") and (ii) a form of ballot.  All other Creditors and parties in interest not entitled to vote on the Combined Disclosure Statement and Plan will only receive a copy of the Confirmation Notice.

    5.    <u>Procedure/Voting Deadlines</u>

In order for your ballot to count, you must either (1) complete an electronic ballot at *https://cases.ra.kroll.com/genapsys/* or (2) complete, date, sign and properly mail, courier or personally deliver a paper ballot to the Claims and Noticing Agent at the following address: Redwood Liquidating Co. (f/k/a GenapSys, Inc.) Ballot Processing Center c/o Kroll Restructuring Administration LLC, 55 East 52nd Street, 17th Floor New York, NY 10055.  BALLOTS SENT BY FACSIMILE TRANSMISSION OR E-MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.

Ballots must be submitted electronically, or the Claims and Noticing Agent must physically receive original ballots by mail or overnight delivery, on or before **December 30, 2022 at 4:00 p.m. (prevailing Eastern Time)**.  Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a ballot is submitted electronically or the Claims and Noticing Agent receives your original paper ballot.

Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Disclosure Statement and Plan.

    6.    <u>Acceptance of the Combined Disclosure Statement and Plan</u>

As a Creditor, your acceptance of the Combined Disclosure Statement and Plan is important. In order for the Combined Disclosure Statement and Plan to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and at least two-thirds in dollar amount of the Claims voting (of each impaired Class of Claims) must vote to accept the Combined Disclosure Statement and Plan.  At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Disclosure Statement and Plan.  The Debtor urges that you vote to accept the Combined Disclosure Statement and Plan.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY SUBMIT YOUR BALLOT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

RLF1 28213990v.5

7.      Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Disclosure Statement and Plan for all purposes, including for purposes of determining acceptance of the Combined Disclosure Statement and Plan by such Class under Section 1129(a)(8) of the Bankruptcy Code.

**B.      Statutory Requirements for Confirmation**

The Bankruptcy Court will confirm the Combined Disclosure Statement and Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Combined Disclosure Statement and Plan (i) must be accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, the Combined Disclosure Statement and Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (ii) must be feasible. The Bankruptcy Court must also find that:

*a.*    the Combined Disclosure Statement and Plan has classified Claims and Equity Interests in a permissible manner;

*b.*    the Combined Disclosure Statement and Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

*c.*    the Combined Disclosure Statement and Plan has been proposed in good faith.

1.      Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Combined Disclosure Statement and Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class. The Combined Disclosure Statement and Plan creates separate Classes to deal respectively with secured Claims, unsecured Claims and Equity Interests. The Debtor believes that the Combined Disclosure Statement and Plan's classifications place substantially similar Claims or Equity Interests in the same Class and thus, meet the requirements of section 1122 of the Bankruptcy Code.

2.      Impaired Claims or Equity Interests

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes impaired by the Combined Disclosure Statement and Plan and receiving a payment or Distribution under the Combined Disclosure Statement and Plan may vote on the Combined Disclosure Statement and Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Disclosure Statement and Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class. The Holders of Claims in Classes not impaired by the Combined Disclosure Statement and Plan are deemed to accept the Combined Disclosure Statement and Plan and do not have the right to vote on the Combined Disclosure Statement and Plan. The Holders of Claims or Equity Interests in

any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Disclosure Statement and Plan are deemed to reject the Combined Disclosure Statement and Plan and do not have the right to vote.  Finally, the Holders of Claims or Equity Interests whose Claims or Equity Interests are not classified under the Combined Disclosure Statement and Plan are not entitled to vote on the Combined Disclosure Statement and Plan.

   3.  <u>Best Interest of Creditors Test</u>

   Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the Combined Disclosure Statement and Plan or (b) receive or retain under the Combined Disclosure Statement and Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

   To calculate the probable distribution to Holders of each Impaired Class of Claims and Equity Interests if the Debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's Assets if the Chapter 11 Case were converted to Chapter 7 cases under the Bankruptcy Code.  Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical Chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the Chapter 11 liquidation contemplated by the Plan.  The Debtor believes, however, that in a Chapter 7 liquidation, there would be additional costs and expenses that would be incurred as a result of the ineffectiveness associated with replacing existing management and professionals in a Chapter 7 case.

   To make these findings, the Bankruptcy Court must (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a Chapter 7 case and the Assets of the Debtor's Estate were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Equity Interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

   Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as compensation of counsel and other professionals retained by the Chapter 7 trustee, all unpaid expenses incurred by the Debtor in its Chapter 11 Case (such as compensation of attorneys, financial advisors and accountants that are allowed in the Chapter 7 case), litigation costs, and claims arising from the operations of the Debtor during the pendency of the Chapter 11 Case.  The "learning curve" that the Chapter 7 trustee and new professionals would be faced with comes with potentially additional costs to the Estate and with a delay compared to the time of Distributions under the Combined Disclosure Statement and Plan.

   The Debtor believes that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

4.      <u>Liquidation Analysis</u>

The Debtor has liquidated substantially all of its Assets through the Sale to Sequencing Health as provided in the Asset Purchase Agreement and approved by the Sale Order. The Debtor believes that liquidation under Chapter 11 is more beneficial to the Holders of Claims than a liquidation under Chapter 7 because the Combined Disclosure Statement and Plan allows the Debtor's Net Distributable Assets to be promptly administered by the Plan Administrator to Impaired Creditors.

As set forth in the Liquidation Analysis, if the Chapter 11 Case were to be converted to a Chapter 7 case, the proceeds from the Sale would remain unchanged, but the Debtor would incur the additional costs of a Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the Chapter 7 trustee.  These costs would reduce potential distribution to Allowed Impaired Claims on a dollar-for-dollar basis.  Conversion also would likely delay the liquidation process and the ultimate distribution, if any, to unsecured creditors.  Accordingly, the Debtor believes that Holders of Allowed Claims or, if applicable, Equity Interests, would receive less than anticipated under the Combined Disclosure Statement and Plan if the Chapter 11 Case were converted to a Chapter 7 case.

5.      <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Combined Disclosure Statement and Plan). Because the Combined Disclosure Statement and Plan proposes a liquidation of all of the Debtor's assets, for purposes of this test, the Debtor has analyzed the ability of the Plan Administrator to meet its obligations under the Combined Disclosure Statement and Plan.  Based on the Debtor's analysis, the Plan Administrator will have sufficient assets to accomplish its tasks under the Combined Disclosure Statement and Plan. Therefore, the Debtor believes that the liquidation pursuant to the Combined Disclosure Statement and Plan will meet the feasibility requirements of the Bankruptcy Code.

## XIII.   <u>CONDITIONS TO THE EFFECTIVE DATE</u>

**A.      <u>Conditions Precedent to the Effective Date</u>**

The Combined Disclosure Statement and Plan shall not become effective unless and until the following conditions shall have been satisfied or waived:

1.      The Confirmation Order shall have become a Final Order and shall be acceptable to the Debtor.

2.      All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Combined Disclosure Statement and Plan are effected or executed and delivered, as applicable.

60

3.      The Plan Administrator shall be duly appointed, qualified and acting in that capacity.

4.      The Professional Fee Reserve is funded pursuant to Article V.F.2 of the Combined Disclosure Statement and Plan.

**B.      Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtor.  On or within two (2) Business Days of the Effective Date, the Debtor shall file and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, the Administrative Expense Bar Date, the deadline by which Professionals must file and serve any Professional Claims and the deadline to file a proof of claim relating to damages from the rejection of any Executory Contract (including any unexpired lease) pursuant to the terms of the Combined Disclosure Statement and Plan.

**C.      Effect of Failure of Conditions**

If each condition to the Effective Date has not been satisfied or duly waived within sixty (60) days after the Confirmation Date, then upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; *provided*, *however*, that notwithstanding the filing of such motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtor before any Order granting such relief becomes a Final Order.  If the Confirmation Order is vacated pursuant to this section, the Combined Disclosure Statement and Plan shall be deemed null and void in all respects and nothing contained herein shall (A) constitute a waiver or release of any Claims by or against the Debtor, or (B) prejudice in any manner the rights of the Debtor.

**D.      Waiver of Conditions to Confirmation and Effective Date**

Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtor, without notice or an Order of the Bankruptcy Court.

## XIV.   EXCULPATION, RELEASES AND INJUNCTIONS

**A.      Exculpation**.  **The Exculpated Parties shall not have or incur, and are hereby released from, any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability to one another or to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective Related Parties, for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Chapter 11 Case, including, but not limited to, the Sale and the Asset Purchase Agreement, the negotiation and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Case, the settlement of Claims or renegotiation of Executory Contracts, the pursuit of confirmation of this**

Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be distributed under this Combined Disclosure Statement and Plan, except for their willful misconduct or gross negligence or any obligations that they have under or in connection with this Combined Disclosure Statement and Plan or the transactions contemplated in this Combined Disclosure Statement and Plan; *provided, however,* that for the avoidance of doubt, Exculpated Parties shall not include any Excluded Parties. Nothing herein shall prevent any Exculpated Party from asserting as a defense to any claim of fraud, willful misconduct or gross negligence that they reasonably relied upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan or otherwise. For the avoidance of doubt, the Exculpation shall not result in either the Debtor or Sequencing Health releasing any claims either has or may have pursuant to the Asset Purchase Agreement and/or the TSA.

B.      **Releases By the Debtor**.  Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, its Estate, and the Debtor's successors and assigns, shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission (i) that took place prior to, on or after the Petition Date relating to and/or in connection with the Debtor, and/or (ii), relating to, or arising out of the Chapter 11 Case, including, but not limited to, the Sale and the Asset Purchase Agreement, the negotiation and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Case, including, but not limited to, the settlement of Claims or renegotiation of Executory Contracts, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be distributed under this Combined Disclosure Statement and Plan; *provided*, *however*, that the foregoing provisions shall not operate to waive or release any Causes of Action resulting from any act or omission constituting actual fraud, willful misconduct, or gross negligence of such applicable Released Party as determined by a Final Order; *provided*, *further* that for the avoidance of doubt, the Debtor is not releasing any Claims or Causes of Action against any Excluded Parties.  For the avoidance of doubt, (i) neither the Debtor nor Sequencing Health is releasing any claims either has or may have pursuant to the Asset Purchase Agreement and/or the TSA, and (ii) nothing in this Combined Disclosure Statement and Plan shall result in the release of any claims that either Oxford or Sequencing Health has or may have against the other, including claims under the Oxford Loan Modification Agreement.

C.      **Third Party Releases**.  Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission (i) that took place prior to, on or after the Petition Date

62

relating to and/or in connection with the Debtor, and/or (ii) in connection with, relating to, or arising out of the Chapter 11 Case, including, but not limited to, the Sale and the Asset Purchase Agreement, the negotiation and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Case, the settlement of Claims or renegotiation of Executory Contracts, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan; *provided, however*, that the foregoing provisions shall not operate to waive or release any Causes of Action resulting from any act or omission constituting actual fraud, willful misconduct, or gross negligence of such applicable Released Party as determined by a Final Order; *provided further, however*, that notwithstanding anything to the contrary in the Combined Disclosure Statement and Plan, the provisions of this Article XIV.C. shall not apply with respect to any unimpaired Claim until such unimpaired Claim has been paid in full in the Allowed amount of such Claim determined in accordance with applicable law, or on terms agreed to between the holder of such Claim and the Plan Administrator or the Post-Effective Date Debtor, at which time this Article XIV.C. shall apply in all respects as to the applicable unimpaired Claim; *provided, further however*, that for the avoidance of doubt, nothing contained in this Article XIV.C shall result in the Released Parties releasing any Claims or Causes of Action against any Excluded Parties. For the avoidance of doubt, (i) neither the Debtor nor Sequencing Health is releasing any claims either has or may have pursuant to the Asset Purchase Agreement and/or the TSA, and (ii) nothing in this Combined Disclosure Statement and Plan shall result in the release of any claims that either Oxford or Sequencing Health has or may have against the other, including claims under the Oxford Loan Modification Agreement.

**D.**     <u>**Injunctions Relating to Releases**</u>.  **Effective as of the Effective Date, all Persons that hold, have held or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, that is released pursuant to this Combined Disclosure Statement and Plan, shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, individually, jointly, collectively, derivatively or otherwise, on account of or based on the subject matter of such released claims, Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum, (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order, (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any lien, (iv) setting off (except to the extent such setoff was exercised prior to the Petition Date), seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person released under this Combined Disclosure Statement and Plan, and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan or the Confirmation Order.**

**E.**     **Injunctions to Protect Estate Assets.**  **All Entities who have held, hold or may hold Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against the Debtor (but solely to the extent such action is brought against the Debtor to directly or indirectly recover upon any Assets of the Estate, including, without limitation, any such Assets that vest in the Debtor or Post-Effective Date Debtor, as applicable, upon the Effective Date), the Debtor's Estate, the Debtor's successors, the Post-Effective Date Debtor, the Plan Administrator or any of their property on account of any such Claims or Equity Interests: (i) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or Order; (iii) creating, perfecting, or enforcing any Lien; (iv) asserting a setoff (except to the extent such setoff was exercised prior to the Petition Date), right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan.**

## XV.     CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ITS IMPLEMENTATION.

**A.**     **General Bankruptcy Law and Combined Disclosure Statement and Plan Considerations**

1.     The Combined Disclosure Statement and Plan May Not Be Accepted

The Debtor can make no assurances that the requisite acceptances to the Combined Disclosure Statement and Plan will be received, and the Debtor may need to obtain acceptances to an alternative plan of liquidation for the Debtor, or otherwise, may be forced to liquidate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Holders of Allowed Claims or, if applicable, Allowed Equity Interests, as those proposed in the Combined Disclosure Statement and Plan.

2.     Debtor May Not Be Able to Secure Confirmation of the Combined Disclosure Statement and Plan or Confirmation May be Delayed

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Disclosure Statement and Plan.  Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Combined Disclosure Statement and Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. If the Combined Disclosure Statement and Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims or, if applicable, Allowed Equity Interests, ultimately would receive with respect to their Claims in a subsequent plan of liquidation.

3.      <u>Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes</u>

Projected Distributions are based upon good faith estimates of the total amount of Claims and Equity Interests ultimately Allowed and the Net Distributable Assets available for Distribution. There can be no assurance that the estimated Claim and Equity Interest amounts set forth in the Combined Disclosure Statement and Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors, including, but not limited to, the resolution of objections filed to certain Claims and Equity Interests. Both the actual amount of Allowed Claims or Allowed Equity Interests in a particular Class and the Net Distributable Assets available for Distribution may differ from the Debtor's estimates. If the total amount of Allowed Claims or Allowed Equity Interests in a Class is higher than the Debtor's estimates, or the funds available for Distribution to such Class are lower than the Debtor's estimates, the percentage recovery to Holders of Allowed Claims or, if applicable, Allowed Equity Interests, in such Class will be less than projected.

4.      <u>Failure to Consummate the Combined Disclosure Statement and Plan</u>

The Combined Disclosure Statement and Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Combined Disclosure Statement and Plan, there can be no assurance that any or all of the conditions in the Combined Disclosure Statement and Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Combined Disclosure Statement and Plan will be confirmed by the Bankruptcy Court.  Further, if the Combined Disclosure Statement and Plan is confirmed, there can be no assurance that the Combined Disclosure Statement and Plan go effective.

5.      <u>Plan Releases May Not Be Approved</u>

There can be no assurance that the releases, as provided in Article XIV.C of the Combined Disclosure Statement and Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Combined Disclosure Statement and Plan or the Combined Disclosure Statement and Plan not being confirmed.

**B.**     **Risks Associated with Forward Looking Statements**

The financial information contained in this Combined Disclosure Statement and Plan has not been audited. In preparing this Combined Disclosure Statement and Plan, the Debtor relied on financial data derived from its Books and Records that was available at the time of such preparation. Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Combined Disclosure Statement and Plan, and while the Debtor believes that such financial information fairly reflects the financial condition of the Debtor, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**C.**     **Alternatives to Confirmation and Consummation of the Combined Disclosure Statement and Plan**

The Debtor believes that the Combined Disclosure Statement and Plan affords the Holders of Claims the potential for a better realization on the Debtor's assets than a Chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Combined Disclosure Statement and Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11, or (b) liquidation of the Debtor under chapter 7 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

1.     Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Combined Disclosure Statement and Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan or plans of liquidation. With respect to an alternative liquidation plan, the Debtor has explored various other alternatives in connection with the development and formulation of the Combined Disclosure Statement and Plan. The Debtor believes that the Combined Disclosure Statement and Plan enables creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

2.     Liquidation under Chapter 7

If the Combined Disclosure Statement and Plan is not confirmed, the Debtor's Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code. In a case under Chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtor. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtor.  The Debtor believes that in a liquidation under Chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, would cause a substantial diminution in the value of the estate.  The assets available for distribution to Holders of Claims or, if applicable, Equity Interests, would be reduced by such additional expenses.

# XVI.  **CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

The confirmation and execution of the Combined Disclosure Statement and Plan may have tax consequences to Holders of Claims and Equity Interests. The Debtor does not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Combined Disclosure Statement and Plan. All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Combined Disclosure Statement and Plan. The Combined Disclosure Statement and Plan is not intended, and should not be construed, as legal or tax advice to any Creditor, Holder of Equity Interests or other party interest.

# XVII.  **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Combined Disclosure Statement and Plan are carried out.  The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of the Chapter 11 Case and the Combined Disclosure Statement and Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.      To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

2.      To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

3.      To issue such Orders in aid of execution and consummation of the Combined Disclosure Statement and Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

4.      To consider any amendments to or modifications of the Combined Disclosure Statement and Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

5.      To hear and determine all requests for compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code;

6.      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Combined Disclosure Statement and Plan, including, without limitation, any motion of the Plan Administrator (or any successor thereto) with respect to the disposition of the Potentially Relevant Records;

7.      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without

limitation, any request by the Debtor or the Plan Administrator for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

8.      To hear any other matter not inconsistent with the Bankruptcy Code;

9.      To enter a final decree closing the Chapter 11 Case;

10.      To ensure that Distributions to Holders of Allowed Claims or, if applicable, Allowed Equity Interests, are accomplished pursuant to the provisions of the Combined Disclosure Statement and Plan;

11.      To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

12.      To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Disclosure Statement and Plan, except as otherwise provided herein;

13.      To determine any other matters that may arise in connection with or related to the Combined Disclosure Statement and Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Combined Disclosure Statement and Plan or the Disclosure Statement;

14.      To hear any disputes and determine any other matters that may arise in connection with or related to the Sale Order and the Asset Purchase Agreement, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Sale Order and the Asset Purchase Agreement;

15.      To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

16.      To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

17.      To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the General Bar Date, the Governmental Bar Date, the Rejection Bar Date, the Amended Schedules Bar Date, the Administrative Expense Bar Date, and/or the conditional or final hearing on the approval of the Combined Disclosure Statement and Plan for the purpose of determining whether a Claim, or Equity Interest is released, satisfied and/or enjoined hereunder or for any other purpose; and

18.     To resolve any other matter or for any purpose specified in the Combined Disclosure Statement and Plan, the Confirmation Order, or any other document entered into in connection with any of the foregoing.

## XVIII.   MISCELLANEOUS PROVISIONS

### A.     Books and Records

As set forth in the Asset Purchase Agreement and the Sale Order, the Debtor shall retain a copy of all Books and Records to facilitate the Debtor's administration of its Chapter 11 Case and wind down its business related to the Excluded Assets and to comply with its document preservation obligations in the California Action.

On the Effective Date, the Debtor's Books and Records (including, without limitation, the Potentially Relevant Records (as defined in the Sale Order)) that remain with the Estate as of the Effective Date shall be transferred to the Plan Administrator, and the Plan Administrator shall be bound by the terms of the Asset Purchase Agreement and the Sale Order with respect to the maintenance and disposal of the Books and Records (including, without limitation, the Potentially Relevant Records (as defined in the Sale Order)). Without limiting the generality of the foregoing, the Plan Administrator, pursuant to paragraph 46 of the Sale Order, shall not destroy any Potentially Relevant Records absent further order of the Bankruptcy Court.

### B.     Revesting of Debtor's Assets

Except as otherwise provided herein, any assets that are property of the Debtor's Estate on the Effective Date including, without limitation, any Causes of Action, shall revest in the Post-Effective Date Debtor on the Effective Date.  Thereafter, subject to the terms of the Combined Disclosure Statement and Plan, the Post-Effective Date Debtor (through the Plan Administrator) may operate pursuant to the terms of the Plan Administrator Agreement and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or Bankruptcy Court approval. Except as specifically provided in the Combined Disclosure Statement and Plan or the Confirmation Order, as of the Effective Date, all property of the Debtor shall be free and clear of any liens, Claims, encumbrances and interests of any kind.

### C.     Termination of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect.

### D.     Amendment or Modification of the Combined Disclosure Statement and Plan

Alterations, amendments or modifications of the Combined Disclosure Statement and Plan may be proposed in writing by the Debtor, at any time before the Confirmation Date; *provided that* the Combined Disclosure Statement and Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  Additionally, after the Confirmation Date, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Combined

69

Disclosure Statement and Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Combined Disclosure Statement and Plan in such manner as may be necessary to carry out the purpose and intent of the Combined Disclosure Statement and Plan consistent with the terms set forth herein.

**E.      Severability**

In the event the Bankruptcy Court determines, before the Confirmation Date, that any provision in the Combined Disclosure Statement and Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the Holder or Holders of such Claims or Equity Interest as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Combined Disclosure Statement and Plan.

**F.      Revocation or Withdrawal of the Combined Disclosure Statement and Plan**

The Debtor reserves the right to revoke or withdraw the Combined Disclosure Statement and Plan before the Confirmation Date. If the Debtor revokes or withdraws the Combined Disclosure Statement and Plan before the Confirmation Date, then the Combined Disclosure Statement and Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or Plan Administrator, if any, or to prejudice in any manner the rights of either of the Debtor or Plan Administrator, if any, in any further proceedings involving the Debtor.

**G.      Binding Effect**

The Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtor, the Holders of Claims, and the Holders of Equity Interests, and their respective successors and assigns.

**H.      Notices**

All notices, requests and demands to or upon the Plan Administrator or the Debtor, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as shall be set forth in the notice of the Effective Date.

**I.      Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Combined Disclosure Statement and Plan provides otherwise, the rights and obligations arising under the Combined Disclosure Statement and Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**J.**      **Withholding and Reporting Requirements**

In connection with the consummation of the Combined Disclosure Statement and Plan, the Debtor and Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  Notwithstanding the above, each Holder of an Allowed Claim or, if applicable, Allowed Equity Interest, that is to receive a Distribution under the Combined Disclosure Statement and Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.  The Debtor and the Plan Administrator have the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to any disbursing party for payment of any such tax obligations.  The Debtor or Plan Administrator may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim or, if applicable, Allowed Equity Interest, complete and return a Form W-8, W-9 or a similar tax form, as applicable to each such Holder.  If the Debtor or Plan Administrator make such a request and the Holder fails to comply before the date that is 90 days after the request is made, such Holder shall be deemed to have forfeited rights to all Distributions and the amount of such forfeited Distributions shall irrevocably revert to the Debtor and any Claim or, if applicable, Equity Interest, in respect of such Distribution shall be disallowed and forever barred from assertion against the Debtor or its property.

**K.**      **Headings**

Headings are used in the Combined Disclosure Statement and Plan for convenience and reference only, and shall not constitute a part of the Combined Disclosure Statement and Plan for any other purpose.

**L.**      **Exhibits/Schedules**

All exhibits and schedules to the Combined Disclosure Statement and Plan, including the Plan Supplement, are incorporated into and are a part of the Combined Disclosure Statement and Plan as if set forth in full herein.

**M.**      **Filing of Additional Documents**

On or before substantial consummation of the Combined Disclosure Statement and Plan, the Debtor shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

**N.**      **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Disclosure Statement and Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

RLF1 28213990v.5

**O.**    **Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in the Combined Disclosure Statement and Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

**P.**    **Reservation of Rights**

Except as expressly set forth herein, the Combined Disclosure Statement and Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims or Equity Interest before the Effective Date.

**Q.**    **Implementation**

The Debtor shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in this Combined Disclosure Statement and Plan.

**R.**    **Inconsistency**

In the event of any inconsistency among the Combined Disclosure Statement and Plan and any other instrument or document created or executed pursuant to the Combined Disclosure Statement and Plan, the provisions of the Combined Disclosure Statement and Plan shall govern.

**S.**    **Dissolution of Debtor**

Upon the closing of the Chapter 11 Case, the Debtor shall be deemed dissolved under applicable law without the need for filing any documents.

**T.**    **Termination of the Plan Administrator**

After the Chapter 11 Case is closed and the Plan Administrator has completed all of the tasks necessary in order to fully and completely wind down, dissolve and/or terminate the Debtor and to otherwise comply with its obligations under the terms of the Combined Disclosure Statement and Plan, the Plan Administrator shall have fully completed its duties under the Combined Disclosure Statement and Plan and thereby shall be fully released and discharged of its duties and obligations to carry out the terms of the Combined Disclosure Statement and Plan.

RLF1 28213990v.5

**U.**     **Request for Expedited Determination of Taxes**

The Debtor and the Plan Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

Dated:  November 28, 2022        Redwood Liquidating Co.
   Wilmington, Delaware

         By:  */s/ Peter Swider*
           Peter Swider
           Chief Wind-down Officer,
           President and Secretary

RLF1 28213990v.5